IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IRISH MAE B. DE LOS SANTOS, REYNALDO C. INFIESTO, RICKEL S. INTING, JELSON C. SUMABAL, AND ADELISA C. SURIGAO,

*Applicants*,

For an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in a Foreign Proceeding

Misc. Case No. ____________________

**MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* APPLICATION FOR AN ORDER GRANTING LEAVE TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

Reena Gambhir
Mary Sameera Van Houten Harper
Kira Hesskiel
**HAUSFELD LLP**
1200 17th Street, Suite 600
Washington, DC 20036
Tel.: (202) 540-7200
Fax: (202) 540-7201
rgambhir@hausfeld.com
mvanhouten@hausfeld.com
khesskiel@hausfeld.com

Alison Borochoff-Porte
Lindsay A. Bailey
Rachel Conrad
**EARTHRIGHTS INTERNATIONAL**
1400 K Street NW, Suite 750
Washington, DC 20005
Tel: (202) 466-5188 x116
alison.borochoff-porte@earthrights.org
lindsay.bailey@earthrights.org
rachel.conrad@earthrights.org

## TABLE OF CONTENTS

INTRODUCTION ........ 1

BACKGROUND ........ 4

A. The parties: applicants and the American Petroleum Institute ........ 4

B. The foreign proceeding in the United Kingdom ........ 5

C. Applicants seek highly relevant information from respondent ........ 16

JURISDICTION AND VENUE ........ 23

LEGAL FRAMEWORK ........ 24

ARGUMENT ........ 25

I. This application satisfies section 1782's three statutory requirements ........ 26

A. Respondent is "found" in the District of Columbia ........ 26

B. The discovery sought is "for use" in a foreign proceeding ........ 26

C. Applicants are "interested" persons ........ 28

II. The discretionary *Intel* factors favor granting discovery ........ 29

A. Respondent is not a "participant" in the United Kingdom proceeding ........ 29

B. Courts in the United Kingdom are receptive to section 1782 discovery ........ 29

C. There is no attempt to circumvent foreign proof-gathering restrictions ........ 31

D. The requested discovery is highly relevant and appropriately tailored ........ 32

CONCLUSION ........ 35

## TABLE OF AUTHORITIES

### Cases

*Amgen Inc. v. Hill*,
No. 2:14-mc-00908, 2015 U.S. Dist. LEXIS 38832 (D. Utah Feb. 24, 2015) .... 23

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012) .... 31

*In re Bapa Holdings*,
No. 25-mc-00026, 2025 LX 590430 (D.D.C. Nov. 24, 2025) .... 24

**In re Barnwell Enterprises Ltd.*,
265 F. Supp. 3d 1 (D.D.C. 2017) .... 31, 34

*In re Batbold*,
No. 21-mc-218, 2021 U.S. Dist. LEXIS 195475 (S.D.N.Y. Oct. 6, 2021) .... 28, 34

**In re C5 Cap. Ltd.*,
No. 1:24-mc-10, 2024 U.S. Dist. LEXIS 71278 (D.D.C. Apr. 18, 2024) .... passim

*In re Caratube Int'l Oil Co.*,
730 F. Supp. 2d 101 (D.D.C. 2010) .... 30

*In re Chodiev*,
No. 1:18-mc-13, 2021 U.S. Dist. LEXIS 253092 (D.D.C. May 17, 2021) .... 25

*In re de Leon*,
No. 19-mc-0197, 2020 U.S. Dist. LEXIS 37270 (D.D.C. Mar. 4, 2020) .... 24, 29, 32

*In re DiGiulian*,
314 F. Supp. 3d 1 (D.D.C. 2018) .... 30, 32

*In re DiGiulian*,
No. 1:19-mc-132, 2020 U.S. Dist. LEXIS 161078 (D.D.C. Sept. 2, 2020) .... 30

*In re Kuwait Ports Auth.*,
No. 22-mc-64, 2025 U.S. Dist. LEXIS 102478 (D.D.C. May 28, 2025) .... 27

*In re Marinakis*,
No. 1:24-mc-485, 2025 U.S. Dist. LEXIS 3164 (S.D.N.Y. Feb. 21, 2025) .... 30

*In re Nat'l Bank Tr.*,
No. 3:20-mc-85, 2021 U.S. Dist. LEXIS 6858 (D. Conn. Jan. 13, 2021) .... 29–30

**In re Pishevar*,
No. 21-mc-105, 2023 U.S. Dist. LEXIS 27894 (D.D.C. Feb. 17, 2023) .... 24, 25, 26, 30

*In re Qatar Nat'l Bank*,
No. 24-35, 2025 U.S. Dist. LEXIS 23819 (D.D.C. Feb. 10, 2025) ........ 25–26

*In Re Thai-Lao Lignite (Thail.) Co.*,
821 F. Supp. 2d 289 (D.D.C. 2011) ........ 33

*In re Tuohy*,
No. 24-mc-605, 2025 U.S. Dist. LEXIS 74456 (S.D.N.Y. Apr. 18, 2025) ........ 30

**In re Veiga*,
746 F. Supp. 2d 8 (D.D.C. 2010) ........ passim

**Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) ........ passim

*Mees v. Buiter*,
793 F.3d 291 (2d Cir. 2015) ........ 29, 31, 34

*Menashe v. Covington & Burling LLP*,
552 F. Supp. 3d 35 (D.D.C. 2021) ........ 33

*Norex Petroleum Ltd. v. Chubb Ins. Co. of Can.*,
No. 04-mc-281, 2005 WL 8178298 (D.D.C. Mar. 9, 2005) ........ 24

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R.*,
322 F.R.D. 1 (D.D.C. 2017) ........ 34

**Pishevar v. Fusion GPS*,
No. 21-mc-105, 2025 U.S. Dist. LEXIS 53056 (D.D.C. Mar. 21, 2025) ........ 32

*Qatar Nat'l Bank v. Perles Law Firm, P.C.*,
No. 25-7029, 2025 U.S. App. LEXIS 27117 (D.C. Cir. Oct. 17, 2025) ........ 24, 25, 26, 29

*U.S. Dep't of the Treasury v. Pension Benefit Guaranty Corp.*,
301 F.R.D. 20 (D.D.C. 2014) ........ 34

**Statutes**

*28 U.S.C. § 1782(a) ........ 3, 23

Civil Code § 19, Rep. Act 386, as amended (Phil.) ........ 14

Civil Code § 20, Rep. Act 386, as amended (Phil.) ........ 14

Civil Code § 21, Rep. Act 386, as amended (Phil.) ........ 14

Civil Code § 2176, Rep. Act 386, as amended (Phil.) ........ 13

Fed. R. Civ. P. 26(b)(1) ........ 32, 34

**Websites**

*About*, Am. Petroleum Inst. .... 4

*Contact*, Am. Petroleum Inst. .... 26

*Industry Mission*, Am. Petroleum Inst. .... 5

*Members*, Am. Petroleum Inst. .... 5

**Court Filings**

Compl., *Minnesota v. Am. Petroleum Inst.*, No. 62-CV-20-3837 (Minn. Dist. Ct. June 24, 2020) .... 18

*Conservation Law Found., Inc. v. Equilon Enters. LLC*, No. 1:17-cv-00396 (D.R.I.),
Pl.'s Ltr. of Request for Deposition and Document Production in the United Kingdom, Dkt. No. 243 (July 14, 2025) .... 34
Ex. 1, Dkt. No. 324-1 (Mar. 6, 2026) .... 34

**Other Authorities**

6 Moore's Federal Practice—Civil § 26.08 (2026) .... 34

Benjamin Andrew Franta, *Big Carbon's Strategic Response to Global Warming, 1950-2020* (Aug. 2022) .... 18

Benjamin Franta, *Early Oil Industry Disinformation on Global Warming*, 30 Env't Pol. 663 (2021) .... 18

Chris McGreal, *How a Powerful US Lobby Group Helps Big Oil to Block Climate Action*, The Guardian (July 19, 2021) .... 18

Shell plc, *Annual Report and Accounts 2025* (2026) .... 5

Shell plc, *Climate and Energy Transition Lobbying Report 2025* (2026) .... 19

U.N. Off. for the Coordination of Humanitarian Affs., *Super Typhoon Rai–One Month On: In Numbers*, (Jan. 11, 2022) .... 6

## INTRODUCTION

Applicants Irish Mae B. De Los Santos, Reynaldo C. Infiesto, Rickel S. Inting, Jelson C. Sumabal, and Adelisa C. Surigao seek an *ex parte* order to take discovery for use in a foreign legal proceeding currently underway in the United Kingdom. Applicants are residents of the Philippines who—alongside over one hundred plaintiffs—have filed an action in England against Shell for injuries suffered due to the impacts of a typhoon that struck the Philippines approximately five years ago. Applicants respectfully submit this application for an order pursuant to 28 U.S.C. § 1782 to take third-party discovery from the American Petroleum Institute.

Typhoon Rai killed hundreds of individuals and damaged or destroyed over one million homes when it struck the Philippines, causing the Philippines government to declare a state of calamity in six separate regions. Applicants are five of many individuals who suffered heart-rending harms from the storm. Alongside dozens of other plaintiffs, they have filed a civil case in the United Kingdom against Shell plc and The Shell Trading and Transport Company Limited (together, "defendants," and collectively, and along with the associated Group companies, "Shell")—a multinational energy and petrochemical company. The English case argues that the defendants materially contributed to the typhoon's damage through its role in exacerbating, and obfuscating the risks of, anthropogenic climate change. Applicants seek discovery from the American Petroleum Institute, an oil and gas industry trade association that they allege served as Shell's agent in conducting and disseminating climate change research and engaging in misinformation about the same. The American Petroleum Institute holds unique knowledge highly relevant to plaintiffs' claims in the English case.

The English case alleges that despite decades of knowledge of the harm its products would cause, defendants materially contributed to the human-caused climate change that augmented the likelihood and severity of the typhoon. Applicants and the other plaintiffs further allege that defendants—individually and through a network of other companies and organizations, including

respondent—misleadingly engaged in communications with the goal of undermining the scientific consensus on the causes and likely effects of climate change. Plaintiffs allege this was done with the objective of avoiding or delaying a reduction in the sale of Shell's products, in order to maximize profits.

The English case was filed in the High Court of Justice of England and Wales in December of 2025 and raises claims under Philippine law. The case is not the first time this type of liability has been examined under Philippine law. Three years prior, following an intensive seven-year investigation, a constitutionally-empowered national body—the Commission of Human Rights of the Philippines—published a report concluding in part that large fossil fuel producers such as Shell could be held civilly liable under Philippine law for violations resulting from climate change.

This application is brought to obtain relevant evidence located in this district. It is the plaintiffs' position in the English proceeding that respondent American Petroleum Institute acted as defendants' agent, and that respondent, alone or through others, obtained significant knowledge regarding climate change and carried out related misleading communications strategies. The plaintiffs allege that a material portion of Shell's obfuscatory actions took place through Shell's engagement with entities in the United States, including respondent American Petroleum Institute.

It is thus highly likely that respondent has information relevant to plaintiffs' claims. But despite a large portion of the causal fact pattern underlying plaintiffs' English case against Shell having occurred through respondent, a U.S. entity, the English court is unlikely to be able to compel respondent to produce discovery. Applicants thus initiate the present petition to obtain relevant information in respondent's possession, custody, or control that would aid their foreign litigation.

As detailed below and through declarations from applicants' English counsel and a Philippine law expert, the requested discovery is proportional and relevant to evidencing elements of the plaintiffs' claims, such as Shell's violation of a reasonable standard of care for negligence claims, acts

that caused harm for negligence and nuisance claims, and acts that were in bad faith or violated public policy for claims under Articles 19 to 21 of the Philippine Civil Code. For these reasons, applicants respectfully request an *ex parte* order from the Court pursuant to section 1782, permitting them to serve upon respondent American Petroleum Institute discovery requests in the form of requests for production and a Rule 30(b)(6) deposition.[1]

Congress passed section 1782 to give interested parties access to evidence in the United States for use in their foreign proceedings. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247–49 (2004). Section 1782 broadly permits such discovery, and this application satisfies section 1782's three statutory requirements. *First,* the discovery target—the American Petroleum Institute—"resides" in this district, where its headquarters are located. *Second,* the requested discovery is "for use" in a foreign proceeding. *Third,* applicants—as plaintiffs in the foreign proceeding—qualify as "interested person[s]" entitled to seek assistance from this Court under section 1782. *See* 28 U.S.C. § 1782(a).

Similarly, the four discretionary factors set forth by the Supreme Court in *Intel* weigh in favor of granting this application. *First,* the discovery target is not a named or contemplated "participant" in the English proceeding and is not subject to jurisdiction there. *Second,* the foreign jurisdiction is receptive to section 1782 assistance. U.S. "courts routinely grant § 1782(a) applications for use in English proceedings." *In re C5 Cap. Ltd.*, No. 1:24-mc-10, 2024 U.S. Dist. LEXIS 71278, at *6–7 (D.D.C. Apr. 18, 2024) (citations omitted). *Third,* this application is filed in good faith to obtain probative evidence held in the United States and does not seek to circumvent any foreign proof-gathering restrictions. *Fourth,* the discovery sought is tailored to the claims and key relevant facts in the English proceeding and is thus neither overly broad nor overly burdensome.

---

[1] Applicants request an order to take discovery in the form of the attached requests for production and deposition subpoena. *See* Declaration of Alison Borochoff-Porte, dated Sept. 28, 2026 ("Borochoff-Porte Decl."), Exs. A (deposition subpoena), B (requests for production).

Applicants seek discovery that falls squarely within the purview of the statute and respectfully request that the Court grant this application.

## BACKGROUND

### A. The parties: applicants and the American Petroleum Institute

Applicants are five of over one hundred claimants, i.e., plaintiffs, in an ongoing civil action in the United Kingdom against Shell plc and The Shell Trading and Transport Company Limited (collectively, "defendants"), which are the relevant companies of the entities that comprise what is known as the Shell Group (collectively, "Shell")—a multinational energy and petrochemical enterprise. *See generally* Declaration of Gregory Lascelles, dated Sept. 25, 2026 ("Lascelles Decl."); *id.*, Exs. B, D. The plaintiffs in the United Kingdom action are residents, and the personal representative of a deceased resident, of the Philippines who suffered harms from Typhoon Rai. *Id.* ¶ 5; *id.*, Ex. D ¶ 9.

Applicants seek to obtain relevant evidence for their English proceeding pursuant to section 1782 and appear in this action through their attorney-in-fact, Gregory James Lascelles—a partner at Hausfeld & Co. LLP—via form of authority agreements. *Id.* ¶ 4; *id.*, Ex. A. Applicants make subsistence livings and belong to fishing or farming communities. *Id.* ¶ 12; *id.*, Ex. D ¶ 11. All plaintiffs in the English proceeding suffered "immense loss and damage" from Typhoon Rai, ranging from personal injury to property destruction to loss of income. *Id.* ¶ 13; *id.*, Ex. D.

Respondent American Petroleum Institute ("API") is a District of Columbia-based trade association and lobbyist that represents the oil and gas industry. *See, e.g.*, Borochoff-Porte Decl. ¶ 5; *id.*, Ex. C.[2] API is comprised of over 600 members, including, currently, a U.S.-based wholly-owned

[2] *See also About*, Am. Petroleum Inst., https://www.api.org/about (last visited Aug. 28, 2026).

subsidiary of Shell.[3] Respondent coordinates among members of the industry and has a mission "to influence public policy."[4]

### B. The foreign proceeding in the United Kingdom

#### 1. Proceeding before the High Court of Justice of England and Wales

On December 9, 2025, applicants, alongside over one hundred plaintiffs, filed a lawsuit in the High Court of Justice of England and Wales in London. Lascelles Decl. ¶ 8; *id.*, Ex. C. All plaintiffs are residents of the Philippines, and their claims are brought under Philippine law. *Id.* ¶¶ 6, 21; *id.*, Ex. D ¶ 8. The defendants are Shell plc and The Shell Trading and Transport Company Limited. *Id.* ¶ 2; *id.*, Ex. D ¶¶ 12–13.

The filing of the claim form—which commenced the lawsuit in the United Kingdom—followed the earlier issuance of a "Letter Before Action," a formal pre-suit legal notice sent to a party to inform them of an intended legal proceeding. *See id.* ¶¶ 6–7; *id.*, Ex. B. The plaintiffs sent the defendants their Letter Before Action on October 22, 2025, detailing the intended allegations and claims. *Id.* ¶ 6; *id.*, Ex. B. On July 31, 2026, they served the defendants with their "Particulars of Claim"—the equivalent of a complaint—which further detailed their claims and legal grounds. *See id.* ¶ 9; *id.*, Ex. D.[5]

The defendants will file a "Defence" and the plaintiffs will have an opportunity to file a "Reply." *Id.* ¶ 10. These Defence is currently due on December 7, 2026, and the Reply thereafter. "[I]t is anticipated that due to the complex nature of the Proceedings standard timelines may not apply."

---

[3] *See Members*, Am. Petroleum Inst., https://www.api.org/membership/members (last visited Sept. 24, 2026); *see also* Shell plc, *Annual Report and Accounts 2025* 449 (2026), https://www.sec.gov/Archives/edgar/data/1306965/000162828026017027/shellannualreportandacco.htm (listing Shell USA, Inc. as 100 percent owned by Shell plc).

[4] *Industry Mission*, Am. Petroleum Inst., https://www.api.org/about/industry-mission (last visited Sept. 24, 2026).

[5] The Letter Before Action and Particulars of Claim are collectively referred to herein as the "pleadings."

*Id.* As plaintiffs, the applicants will have "numerous opportunities" "to submit any evidence obtained" through this section 1782 application during the course of the English proceeding. *Id.* ¶ 75.

### 2. Allegations and claims in the foreign proceeding

#### a) Typhoon Rai

The plaintiffs, including applicants, allege claims under Philippine law for injuries suffered due to the impacts of Typhoon Rai—also known as Typhoon Odette. *See generally* Lascelles Decl., Exs. B, D. The plaintiffs live in areas of the Philippines that were among those "worst affected" by Typhoon Rai. *Id.*, Ex. D ¶ 9. Rai struck the Philippines in December of 2021. *Id.*, Ex. D ¶ 1. The storm's winds reached 175 miles per hour, and storm surges reached 13 feet. *Id.*, Ex. D ¶¶ 31–33. The typhoon killed hundreds, injured thousands, damaged or destroyed over one million homes, and displaced millions. *See, e.g.*, *id.*, Ex. D ¶ 36; *id.*, Ex. B ¶¶ 40–41 (citations omitted). The United Nations Office for the Coordination of Humanitarian Affairs reported that Typhoon Rai "swept through 11 of the country's 17 regions, leaving a swathe of destruction. It damaged houses and roads, tore down power lines, destroyed trees and crops, and smashed fishing boats to pieces. The Government declared a state of calamity in six regions."[6]

The plaintiffs have suffered personal injury and property damage; one brings claims on behalf of a family member killed during the typhoon. Lascelles Decl. ¶ 13; *id.*, Ex. D ¶¶ 3, 36, 233. Applicants and their co-plaintiffs experienced harms, including loss of a spouse, loss of a sister, loss of homes, injured children, contamination of land, and loss of main sources of income such as livestock and fishing equipment. *Id.*, Ex. D ¶¶ 3, 36, 233; *id.*, Ex. B at 3–5.

According to the pleadings, the Philippines is comprised of over 7,000 islands and ranks as one of the world's "most climate-change vulnerable countries." *Id.*, Ex. D ¶¶ 28, 30. Further, as alleged,

---

[6] U.N. Off. for the Coordination of Humanitarian Affs., *Super Typhoon Rai–One Month On: In Numbers* (Jan. 11, 2022), https://unocha.exposure.co/nbsp-nbsp-super-typhoon-rainbsp-nbspnbsp; *see also* Lascelles Decl., Ex. B ¶ 39 (citing same).

anthropogenic climate change—or human-caused climate change—"increases the frequency of typhoon landfall in the Philippines and the severity of those typhoons." *Id.*, Ex. D ¶ 29(2); *see also id.*, Ex. B ¶¶ 36–37 (citations omitted). And the "rapid intensification" seen in Typhoon Rai—"from a Category 1 to a Category 5 storm in just 24 hours"—is "characteristic" of typhoons influenced by anthropogenic climate change. *Id.*, Ex. D ¶ 31. Citing a scientific report, the plaintiffs allege that anthropogenic climate change "more than doubled the risk of a combined rainfall and windspeed event of the severity of Typhoon Rai." *Id.*, Ex. B ¶ 44 (citation omitted); *see also id.*, Ex. D ¶¶ 34–35.

**b) Defendants' knowledge and conduct**

In the English proceeding, the plaintiffs allege that defendants "materially contributed to [anthropogenic climate change] and thus materially contributed to both the likelihood and severity of Typhoon Rai." *Id.*, Ex. B ¶ 5; *see also id.*, Ex. D ¶¶ 37–41, 126(2), 186(6). Plaintiffs specifically allege that defendants contributed "more than 2.5% of historical global industrial greenhouse gas ('GHG') emissions." *Id.*, Ex. B ¶ 5. Plaintiffs state that defendants harbored knowledge of the significant harms of their fossil fuel products for decades, yet "adopted and pursued group-wide strategies and policies which promoted the expansion of production and sale of fossil fuels, tripling group-wide [greenhouse gas] emissions from 1965 to 2021[,]" and "funded, promoted and/or engaged in public communications strategies and political lobbying efforts with the objective of undermining the emerging scientific consensus on the causes and likely effects of [anthropogenic climate change] and delaying or avoiding the need to reduce the volume of fossil fuels they produced and/or sold." *Id.*, Ex. B ¶¶ 6–7. Plaintiffs' pleadings rely on documents that have come to light through litigation, investigative reporting, congressional investigations, and academic studies. *See generally id.*, Ex. B; *id.*, Ex. D.

Plaintiffs allege that at least one of the defendants had actual knowledge or ought to have known of the material contribution of their activities to anthropogenic climate change for decades.

*See, e.g.*, *id.* ¶¶ 21–22; *id.*, Ex. B ¶¶ 13–30; *id.*, Ex. D ¶¶ 127–29. The pleadings evidence knowledge as early as the 1960s, *id.*, Ex. D ¶¶ 127–28; *id.*, Ex. B ¶¶ 53–61, citing the Chief Geologist of the Shell Oil Company in 1962:

> *[t]here is evidence that the greatly increasing use of fossil fuels, whose material contents after combustion are principally H2O and CO2, is seriously contaminating the earth's atmosphere with CO2. Analyses indicate that the CO2 content of the atmosphere since 1900 has increased 10 per cent. Since CO2 absorbs long-wavelength radiation, it is possible that this is already producing a secular climatic change in the direction of higher average temperatures. This could have profound effects both on the weather and on the ecological balances.*

*Id.*, Ex. B ¶ 54 (citation omitted) (brackets and italicization in Letter Before Action). The pleadings further cite other examples of defendants' early knowledge, including a 1965 report from U.S. President Lyndon Johnson's Science Advisory Committee, which stated that atmospheric carbon dioxide was increasing, pointing to fossil fuels as the source. *Id.*, Ex. D ¶¶ 127–28. The pleadings detail examples of early knowledge throughout the following decades, including through internal and industry-sponsored scientific research, and including details of when the other defendant would have held knowledge or reasonably ought to have known. *Id.*, Ex. D ¶¶ 129–33, Ex. B at 20–21; *see also* Declaration of Roberto Eugenio Templo Cadiz, dated Sept. 23, 2026 ("Cadiz Decl."), ¶¶ 27, 33.

The plaintiffs allege that, notwithstanding this knowledge, defendants, and Shell, intentionally increased their "production and sale of fossil fuels." Lascelles Decl., Ex. B ¶ 7; *see also id.*, Ex. D ¶¶ 122–23. The plaintiffs further state that, as the scientific evidence linking combustion to anthropogenic climate change became increasingly clear, defendants engaged in a decades-long campaign to mislead the public. The pleadings, citing internal documents, allege that defendants "funded, promoted, and/or engaged in" numerous deceptive acts of public communications or political lobbying in an effort to "undermin[e] the emerging scientific consensus" around anthropogenic climate change to protect their products. *See id.*, Ex. B ¶ 7; *id.*, Ex. D ¶¶ 134–38. Plaintiffs allege that one of the defendants "suppressed information and promoted misinformation as to the link between" emissions and anthropogenic climate change and its likely consequences,

including through public statements and research funding. *Id.*, Ex. D ¶¶ 134–36.

Given this, plaintiffs allege, it can be reasonably inferred that the defendants knew these actions "would, or were likely to, slow the global energy transition away from a reliance on fossil fuels." *Id.*, Ex. D ¶ 138(5). The pleadings allege that the strategy thus served a commercial objective: delaying public understanding and acceptance of science and discouraging regulatory, consumer, and public responses that threatened demand for their products. *See, e.g.*, *id.*, Ex. B ¶ 115. Plaintiffs allege that, as a result of defendants' conduct, they have suffered, among other injuries, psychological harm, illness, displacement, death, property damage, loss of cultural rights, and loss of earnings. *See id.*, Ex. D ¶ 233; *id.*, Ex. B ¶ 136.

**c) American Petroleum Institute**

Respondent American Petroleum Institute features heavily in the foreign pleadings. The plaintiffs allege that defendants have used respondent as a conduit for knowledge, and as a tool for influencing public perception and promoting misinformation. Lascelles Decl. ¶¶ 39, 45.

The plaintiffs allege that through one or more corporate entities, Shell has maintained a close relationship with and been an American Petroleum Institute member for decades. *See, e.g.*, *id.*, Ex. D ¶ 137(2); *id.*, Ex. B ¶¶ 57–58. The pleadings detail this longstanding relationship between the defendants and respondent, noting, for example, that not only has a Shell entity "been a member . . . from at least the 1950s," it has maintained high-level positions through seats on respondent's board of directors and Executive Committee. *Id.*, Ex. D ¶ 137(2). A Shell entity has provided substantial funding to and remains a member of respondent today. *See id.* ¶¶ 36–37 (citations omitted) (highlighting a report noting that payments to respondent in the year of Typhoon Rai amounted to over $10 million); *id.*, Ex. D ¶¶ 137(2), 139(4)(b); *id.*, Ex. B ¶ 84.

The plaintiffs further allege that, given Shell's membership in and funding of respondent American Petroleum Institute, respondent's knowledge regarding the impacts of fossil fuels and

misinformation actions can be imputed to the defendants. Lascelles Decl. ¶ 44. Specifically, given Shell's close involvement with respondent, respondent would have consulted Shell, and respondent "would have reported regularly to executives or employees of" one of the defendants. *Id.*, Ex. D ¶ 139(4)(c). Thus, "[t]he nature of the activities being undertaken pursuant to that membership and funding would therefore have been known to, and authori[z]ed and/or endorsed by" one of the defendants. *Id.*

One of plaintiffs' central allegations is that Shell used respondent "to spread information to the general public and policy makers that undermined the scientific consensus around climate change." *Id.* ¶ 35; *see also id.*, Ex. D ¶ 139(4)(b) ("The purpose of [Shell's] membership [in] and funding [of API] was to advance the Shell Group's commercial and economic interests by seeking to influence public opinion and public policy in a way which aligned with and furthered (rather than diverging from and impeding) the pursuit of those interests."). The pleadings emphasize that respondent has long played an institutional coordinating and public persona role for the fossil fuel industry, noting that "[i]ndustry insiders have described the API as the '*public face'* of fossil fuel companies, used to lobby lawmakers and influence policy in the interests of the fossil fuel industry, while keeping their brands un-associated with such efforts." *Id.*, Ex. B ¶ 84 (emphasis in original) (citations omitted). While the plaintiffs allege that defendants themselves conducted many obfuscatory acts, they also allege that a significant portion of defendants' allegedly wrongful activity was conducted through or along with the American Petroleum Institute, and that defendants are liable for "funding and/or promotion of misinformation concerning [anthropogenic climate change] by the . . . API, of which the Shell Group was a member." *Id.*, Ex. D ¶ 194(6)(d). The pleadings include the following examples:

- Shell representatives participated in several relevant API subcommittees, for example, a CO2 and climate-related task force established in 1979 "whose purpose was to influence public opinion and lobby policymakers in support of the fossil fuel industry." *Id.*, Ex. D ¶ 137(2)(a);

*id.*, Ex. B ¶¶ 62, 64–65 (citations omitted).

- While Shell was an API member, respondent API published a book in 1981 that "sought to cast doubt on the risks associated with increasing levels of CO2 in the atmosphere" and misrepresented the work of a "well-known scientist." *Id.*, Ex. D ¶ 137(2)(a).
- Defendants supported API in publishing a 1996 report that "promot[ed] fringe science," "made false statements," and "sought to deny the anthropogenic sources of climate change." *Id.*, Ex. B ¶ 90; *see also id.*, Ex. D ¶ 137(2)(b).
- Defendants further supported API's involvement in the Global Climate Science Communications Team, which sought "to convince the public of the uncertainty of climate science." *Id.*, Ex. B ¶ 92 (citation omitted).
- While Shell was an API member, API created and promoted a disinformation strategy in the late 1990s that stated, "'[u]nless "climate change" becomes a non-issue, meaning the Kyoto proposal [to establish a treaty with legally binding emissions reduction targets] is defeated and there are no further initiatives to thwart the threat of climate change, there may be no moment when we can declare victory for our efforts.'" *See id.*, Ex. D ¶ 137(2)(d); *id.*, Ex. B ¶ 92 (citation omitted).
- Shell and API were both members of the Global Climate Coalition ("GCC"). *Id.* ¶ 45, Ex. D ¶ 137(1). The Global Climate Coalition "engaged in strategic activities to create doubt and uncertainty around climate science," such as "aggressively campaigning to cast doubt," spending millions on an advertisement campaign "the object of which was to confuse the public's understanding of climate science and undermine its trust in climate scientists" and testifying before the United States Congress that climate change science was inconclusive. *Id.*, Ex. B ¶¶ 86–87 (citations omitted) (listing numerous other examples of GCC efforts); *see also id.*, Ex. D ¶ 137(1).

Respondent American Petroleum Institute is also mentioned numerous times in the pleadings regarding defendants' knowledge. *See generally id.*, Ex. B ¶ 57. The plaintiffs maintain that respondent possessed early knowledge of anthropogenic climate change, *id.*, and that respondent likely would have shared its knowledge with Shell, given Shell's membership and high-level positions in the organization. *Id.* ¶¶ 18, 35. The allegations regarding defendants' and respondent's early knowledge date back decades. For instance, the plaintiffs allege that at the time of the 1965 keynote address by API's then-President, "[t]he Shell Oil Company was a member of API, was represented on the Executive Board of the API, and had senior executives present at the annual meeting." *Id.*, Ex. B ¶ 57. At the address, the President highlighted a report from U.S. President Lyndon Johnson's Science Advisory Committee on environmental pollution, which noted increases in atmospheric carbon dioxide and a fair level of certainty that fossil fuels were the cause. *See id.*, Ex. B ¶¶ 55, 57 (citations omitted). As stated by API's President at the keynote address:

> *One of the most important predictions of the report is that carbon dioxide is being added to the earth's atmosphere by the burning of coal, oil, and natural gas at such a rate that by the year 2000 the heat balance will be so modified as possibly to cause marked changes in climate beyond local or even national efforts… The substance of the report is that there is still time to save the world's peoples from the catastrophic consequence of pollution, but time is running out.*

*Id.*, Ex. B ¶ 57 (citation omitted) (italicization in Letter Before Action).

The pleadings cite numerous other examples evidencing respondent's early knowledge, including: a 1968 report that respondent commissioned from the Stanford Research Institute regarding air pollution and carbon dioxide; a supplemental report respondent commissioned that predicted what CO2 concentrations would reach in the year 2000; a 1980 presentation by a Stanford University engineer to a respondent-established climate task force (of which Shell was a member), warning of the major economic impacts of temperature rise and the need for immediate action to be taken; and a 1982 Columbia University-prepared report for respondent recognizing CO2 concentration increases and warning over the consequences of temperature rise that all models

forecasted to human survival and world food supply. *Id.*, Ex. B ¶¶ 58, 61–62, 64, 66 (citations omitted).

**d) Philippine law claims**

The plaintiffs' allegations implicate numerous provisions of Philippine law—specifically, the Philippines Civil Code, the Philippines Constitution, and Philippine statutes. *See generally* Lascelle Decl., Ex. D ¶¶ 146–52. The relevant Civil Code articles include Articles 19–21, 23, 694–96, 703, and 2176, which contain tort provisions that protect against public and private nuisance, quasi-delict (negligence), and causing damage to others in a manner that is contrary to law, morals, good customs, and public policy. *See id.*, Ex. D ¶¶ 160–232; Ex. B ¶¶ 105–23. To support their claims, plaintiffs allege that: defendants materially contributed to anthropogenic climate change and Typhoon Rai; (2) defendants knew of the effects of their products; and (3) defendants knew of or were involved in the suppression of information about the risks of their products or the dissemination of misinformation about such risks. *See id.*, Ex. D ¶¶ 151(5), 174, 185, 186, 190, 194–95, 205–07, 209, 211–13, 219–21, 224, 227–28.

The nuisance claims arise under Articles 694, 696, and 703 of the Civil Code, and establish, for example, liability for "any act, omission, establishment, business, condition of property or anything else which, amongst other things, injures or endangers the health of safety of others and/or hinders or impairs the use of property." *See id.*, Ex. D ¶ 161.

The quasi-delict—similar to negligence—claims arise under Article 2176 of the Civil Code, which provides that "[w]hoever by act or omission causes damage to another, there being fault or negligence, is obliged to pay for the damage done." Civil Code § 2176, Rep. Act 386, as amended (Phil.). This article involves analysis of negligence and an appropriate standard of conduct. Lascelles Decl., Ex. D ¶¶ 184–85; *see also* Cadiz Decl. ¶ 45. The plaintiffs state that the assessment involves looking to, *inter alia*, "[d]efendants' actual and constructive knowledge" of the risks associated with their business activities and their "knowledge of and/or involvement in the suppression of

information about such risks and/or the dissemination of misinformation about such risks." Lascelles Decl., Ex. D ¶ 185(10)-(11). They also cite the "reasonable and prudent person" standard, alleging the defendants "would have known" of numerous causal factors, including that anthropogenic greenhouse gas emissions would contribute to anthropogenic climate change which would increase the severity "or likelihood of weather events such as typhoons." *See, e.g.*, *id.*, Ex. D ¶ 186(1)-(2). Plaintiffs allege that a "reasonable and prudent person" would have taken a different course of action, including "refrain[ing] from making, publishing, disseminating or supporting statements which materially understated, obscured, misrepresented or denied such risks." *Id.*, Ex. D ¶ 187(3).

Finally, are the claims arising under Philippines Civil Code Articles 19, 20, and 21, which "provide a cause of action for causing damage to others in a manner that is negligent or contrary to law, morals, good customs, and public policy." Lascelles Decl. ¶ 29; *see also id.*, ¶¶ 27–32; *id.*, Ex. D ¶¶ 200–32; Cadiz Decl. ¶¶ 41–43. According to the Supreme Court of the Philippines, "Articles 19, 20, and 21 have been historically planted to ensure that no wanton discounting of the rights of others may escape with impunity . . . ." Lascelles Decl. ¶ 30 (quoting Philippines Supreme Court decision *Navarro-Banaria v. Banaria*, G.R. No. 217806, 878 Phil. Rep. 137 (July 28, 2020) (Phil.) (Caguioa, J., concurring)).

- Article 19 provides: "Every person must, in the exercise of his rights and in the performance of his duties, act with justice, give everyone his due, and observe honesty and good faith." Civil Code § 19, Rep. Act 386, as amended (Phil.).
- Article 20 provides: "Every person who, contrary to law, wilfully or negligently causes damage to another, shall indemnify the latter for the same." *Id.* § 20.
- Article 21 provides: "Any person who wilfully causes loss or injury to another in a manner that is contrary to morals, good customs or public policy shall compensate the latter for the damage." *Id.* § 21.

The plaintiffs allege that Shell's conduct violates the standard of morals, honesty, and good

faith required under Articles 19 and 21 of the Philippines Civil Code. *See generally* Lascelles Decl., Ex. D ¶¶ 200–32. These Articles look, *inter alia*, to standards of conduct and whether they have been breached through acting with "conscious indifference to the harm." *See, e.g.*, *id.*, Ex. D ¶ 201. In conducting its business, the plaintiffs state that Shell "acted with conscious indifference to the interests of persons" likely to be affected by its actions, and that its "conduct was abusive and/or negligent from the point at which it knew or ought reasonably to have known" of the state of scientific knowledge mentioned in the pleadings. *See, e.g.*, *id.*, Ex. D ¶¶ 211, 213; *see also* Cadiz Decl. ¶¶ 33, 44.

The plaintiffs also allege that defendants' conduct violated Article 20 of the Philippines Civil Code, because their conduct was contrary to the law, including under Article 2, section 16 of the Philippines Constitution which regards a "right of the people to a balanced and healthful ecology." Lascelles Decl., Ex. D ¶¶ 202–16.

#### e) The Commission on Human Rights of the Philippines

The Philippines Civil Code causes of action that will be pursued in the English proceeding are informed and supported by a report from the Commission on Human Rights of the Philippines ("Commission"), a national body in the Philippines that is constitutionally empowered to investigate human rights matters. *See* Lascelles Decl. ¶ 25; *see also id.*, Ex. E (Commission report); Cadiz Decl. ¶ 8. In 2015, the Commission received a petition asking it to investigate "the responsibility of the world's largest investor-owned fossil fuel and cement producers for human rights violations resulting from the impacts of climate change." Lascelles Decl., Ex. E at 12; *see also* Cadiz Decl. ¶¶ 19–21. The Commission conducted an independent national inquiry into the petition's allegations. Lascelles Decl., Ex. E at 12; *see also* Cadiz Decl. ¶ 21. Over seven years, the Commission investigated the impacts of anthropogenic climate change on human rights and the role of some of the world's largest producers of industrial greenhouse gases, including private enterprise oil and gas producers such as Shell. *See generally* Lascelles Decl., Ex. E at 12; *see also* Cadiz Decl. ¶¶ 21, 23. The multi-year investigation was

extensive, involving the review of "*amici* briefs, research studies, and position papers from science and legal experts, professional organizations, the academe, advocates, and duty-bearers," as wells as "interviews, round-table discussions, expert consultations, and community dialogues." Lascelles Decl., Ex. E at 5; *see also* Cadiz Decl. ¶¶ 23, 25–27. The Commission further held public hearings in Manila, New York, and London, involving sixty-five witnesses who testified under oath and hundreds of scientific and legal documents. Lascelles Decl., Ex. E at 6; *see also* Cadiz Decl. ¶ 24.

The resulting report, titled the 2022 National Inquiry on Climate Change Report ("National Inquiry Report"), determined "that the [major producers] have known since 1965 that their products, when used as intended, result in various harms to the climate system," and that "[t]he fossil fuel industry, including the [major producers], engaged in measures to convince the public that the use of their products would not lead to significant harms." Lascelles Decl., Ex. E at 94. The Commission concluded that "an argument may be made" that major producers such as Shell could be held civilly liable under Philippine law, because "the acts of obfuscation, deception, and misinformation as described above contravene the standard of honesty and good faith expected of a person in the exercise of his rights." *Id.* at 109 (citing Civil Code §§ 19–21, Rep. Act 386, as amended (Phil.)).

### C. Applicants seek highly relevant information from respondent

Applicants seek leave to take discovery of documents and information in respondent's possession, custody, or control pertinent to the ongoing litigation in the United Kingdom. The application for discovery through the section 1782 procedure is a critical step in advancing the English litigation, because respondent is believed to hold particularly relevant information and complete records, and the court in the United Kingdom will not have jurisdiction to order discovery from respondent. *See* Lascelles Decl. ¶¶ 64–65. As outlined above, the plaintiffs plead violations of a variety of provisions of Philippine law, including raising claims akin to torts of public and private nuisance and negligence, and claims regarding acts in bad faith or contrary to public policy. To make out these

claims, plaintiffs will need to demonstrate Shell's knowledge of the impact of its actions, and its knowing decision to participate in acts of misinformation or allow other actors to engage in misinformation on its behalf. The requests for production and deposition subpoena are tailored to seeking evidence relevant to these topics. *See* Borochoff-Porte Decl., Exs. A, B.

In support of this petition, applicants submit two substantive attorney declarations that speak to the relevancy of the information sought. The first declaration is from Gregory James Lascelles, applicants' attorney-in-fact for this petition and counsel to the plaintiffs in the English proceeding. Lascelles Decl. ¶ 2. Mr. Lascelles is a solicitor licensed in England and Wales, and a partner at Hausfeld & Co. LLP. *Id.* ¶ 3. He has over twenty years of experience, including a prior partnership position with Covington & Burling LLP, and across practice areas such as international commercial litigation, arbitration, and regulatory investigations. *Id.* Mr. Lascelles' current practice focuses on "fraud, negligence, contracts and statutory breach issues." *Id.*

The second declaration is from Roberto Eugenio Templo Cadiz, a prominent Filipino attorney, who is a former Commissioner of the Commission on Human Rights of the Philippines and the Chairperson of the Commission's National Inquiry on Climate Change. Cadiz Decl. ¶¶ 7–17. Former Commissioner Cadiz has practiced law for over thirty-five years, spanning fields such as constitutional, civil and criminal, corporate, and human rights law. *Id.* ¶ 7. He has been invited to speak at various United Nations programs and universities such as the London School of Economics and Yale University. *Id.* ¶ 17. As the Chairperson of the National Inquiry, he directed the Inquiry, "supervised its evidentiary proceedings," and "substantially drafted" the National Inquiry Report mentioned above. *Id.* ¶ 11. During the National Inquiry, former Commissioner Cadiz examined testimony, scientific literature, law, and corporate documents concerning many issues relevant to the foreign proceeding, and for the purposes of this petition, "the role of industry associations, including the American Petroleum Institute." *Id.* ¶ 12.

### 1. Discovery from respondent holds particular probative value

Discovery from respondent is of particularly high value to the English proceeding. As detailed above, plaintiffs allege a decades-long relationship between Shell and respondent American Petroleum Institute, Shell's use of respondent to acquire "relevant knowledge about climate change," Lascelles Decl. ¶ 39, and how respondent played a central role coordinating the fossil fuel industry's response to climate change, including by acting as defendants' agent and public persona in misinformation campaigns "that undermined the scientific consensus." *Id.* ¶ 35. Other than defendants themselves, respondent is one of the main institutions mentioned in the plaintiffs' pleadings. *See, e.g.*, *id.*, Ex. B ¶¶ 57–62, 64–66, 83–85, 90, 92, 95; *id.*, Ex. D ¶ 137(2).

The English case's allegations regarding the American Petroleum Institute's role build on significant public reporting on the subject. As stated in the Commission on Human Rights of the Philippines' report, "[t]hrough the API, the industry perpetrated massive climate denial campaigns." *Id.*, Ex. E at 94. Academics,[7] reporters,[8] and several U.S. lawsuits[9] have also detailed or alleged the role of respondent in disseminating misinformation. By its own admission, Shell's 2025 Climate and

---

[7] *See, e.g.*, Benjamin Franta, *Early Oil Industry Disinformation on Global Warming*, 30 Env't Pol. 663, 664–66 (2021), https://doi.org/10.1080/09644016.2020.1863703; *see also* Benjamin Andrew Franta, *Big Carbon's Strategic Response to Global Warming, 1950-2020* 41–42, 54, 111–13, 125–28, 138–72 (Aug. 2022) (Ph.D. dissertation, Stanford University), https://stacks.stanford.edu/file/hq437ph9153/Franta%20-%20Big%20Carbon%20strategic%20response%20to%20global%20warming%201950-2020%20-%202022-08-25-augmented.pdf (describing the petroleum industry's early knowledge and suggesting that API members would have received disseminated information, for example: "In 1972, members of the API received a status report on all environmental research projects funded by the trade association, including the 1968 report from SRI, which warned of the climatic effects of fossil fuels." (citation omitted)).

[8] *See, e.g.*, Chris McGreal, *How a Powerful US Lobby Group Helps Big Oil to Block Climate Action*, The Guardian (July 19, 2021), https://www.theguardian.com/environment/2021/jul/19/big-oil-climate-crisis-lobby-group-api ("Critics accuse Shell and other major oil firms of using API as cover for the industry. While companies run publicity campaigns claiming to take the climate emergency seriously, the trade group works behind the scenes in Congress to stall or weaken environmental legislation.").

[9] *See e.g.*, Compl., *Minnesota v. Am. Petroleum Inst.*, No. 62-CV-20-3837, ¶¶ 83, 89, 90, 100, 126 (Minn. Dist. Ct. June 24, 2020).

Energy Transition Lobbying Report explicitly states that they engaged with the U.S. government (i.e., lobbied) "*through*" industry associations, including respondent in relation to relevant issues.[10] *See also* Lascelles Decl. ¶ 43 (stating and citing same).

Ultimately, third-party discovery from respondent is crucial to applicants' claims. Respondent's status as the largest trade association representing companies like defendants and its strategic coordinating effort regarding both research into anthropogenic climate change and information campaigns—paired with respondent and defendants' close relationship—suggests that much of the evidence of both anthropogenic climate change knowledge and efforts and communications about the same originated from or passed through respondent to, or on behalf of, defendants.

**2. The discovery sought is directly relevant to the claims in the foreign proceeding**

Applicants request categories of documents, communications, and testimony that are directly relevant to the specific aspects of the claims that are the subject of applicants' English proceeding. As set forth above, applicants' claims are based on the alleged contravention of Philippine law, primarily violations of the Philippines Civil Code for causes of action that touch on issues of nuisance, negligence, good faith, honesty, and moral conduct.

Applicants' English counsel details categories of documents sought and their relevancy to the Philippine causes of action, noting they are a "proportionate but critical set of materials that are highly relevant to the Proceedings." *See* Lascelles Decl. ¶ 47. Former Commissioner Cadiz concluded that the requests are "capable of providing highly relevant and probative evidence":

[10] Shell plc, *Climate and Energy Transition Lobbying Report 2025* 18, 29 (2026), https://www.shell.com/sustainability/advocacy-and-political-activity/_jcr_content/root/main/section/simple/promo_copy_copy_copy/links/item1.stream/1778744696798/8c962986fada3ab3a172d8bf235c828154a2eea1/climate-and-energy-transition-lobbying-report-2025pdf.

> I have reviewed the categories of documents sought from API in connection with the said proceedings. Based upon my understanding of the issues raised therein, my knowledge and experience in the application of Philippine law, and my experience as Chairperson of the National Inquiry on Climate Change ("NICC"), it is my opinion that the requested API materials are capable of providing highly relevant and probative evidence concerning issues material to the claims asserted against Shell.
>
> In particular, such materials may bear upon Shell's knowledge of climate-related risks, the timing and dissemination of that knowledge, its communications and activities undertaken through or in coordination with API, the nature and purpose of any such coordinated activities, and the extent to which those matters may be relevant under Philippine law to questions of foreseeability, good faith, negligence, fault, causation, and corporate responsibility. My opinion does not assume that the allegations concerning Shell are established; rather, it is directed to the evidentiary capacity of the requested materials to assist the foreign court in determining those disputed issues.

Cadiz Decl. ¶¶ 62–64.

The categories of documents sought include requests tailored to understand Shell's knowledge of anthropogenic climate change and related topics; Shell's knowledge of and participation in acts of misinformation; the scope of Shell and respondent's relationship; and evidence related to specific documents and events the plaintiffs already consider probative such as the 1965 annual remarks of respondent's then-President. *See* Lascelles Decl. ¶¶ 41–42, 49.

*First,* applicants seek information with respect to the issue of defendants' knowledge. Proving and detailing the full extent of the defendants' knowledge of their material contribution to and the potential for extreme harm of anthropogenic climate change is essential to the plaintiffs' nuisance, negligence, and Article 19–21 claims. Details regarding defendants' knowledge comprise a large percentage of plaintiffs' forty-three-page Letter Before Action and ninety-seven-page Particulars. *See generally id.*, Exs. B, D. Obtaining greater specificity as to the extent and timing of Shell's knowledge regarding climate change and related topics is, for example, crucial to proving that the defendants' choice to increase production and sales and engage in disinformation deviated from the standard of care a reasonable company would be expected to abide by. *Id.* ¶ 50(b); *see also* Cadiz Decl. ¶ 66 ("Documents concerning climate-risk assessments, internal governance processes, board-level

deliberations, or corporate decision-making may also assist the court in evaluating whether reasonable measures were taken to identify, assess, and address known climate-related risks. Such evidence may bear upon questions of negligence, reasonable care, and compliance with evolving standards of corporate governance and business responsibility.").

"Evidence of Shell's knowledge may also provide proof that its acts undertaken with this knowledge should be seen as wilful or consciously indifferent acts of bad faith" "or contrary to morals and relevant standards" under Philippines Civil Code Articles 19 to 21. Lascelles Decl. ¶ 50(c). To establish Shell's knowledge, applicants seek documents containing information about anthropogenic climate change and related topics that were shared between defendants, respondent, and industry associations and coalitions such as the Global Climate Coalition. This is highly relevant information because it is plaintiffs' counsel's understanding that substantial climate change research on behalf of industry members such as Shell was done by respondent, on behalf of respondent, through respondent's committees, and through industry associations, coalitions, and campaigns. *Id.* ¶¶ 51–53.

*Second,* applicants request information regarding defendants' involvement in and responsibility for suppression of information or misinformation activities. This evidence is valuable to assessing behavior that is contrary to the standard required of defendants under the Philippines Civil Code, including the standard of care a reasonable business would undertake and willful actions of dishonesty or bad faith by engaging in, promoting, encouraging, advising, cooperating with, or *ex post* approving of campaigns to disseminate misleading information, and knowledge of the potential harm of such campaigns. *Id.* ¶ 55. These types of materials could further "assist the foreign court in evaluating issues of causation[,]" Cadiz Decl. ¶ 67, particularly for negligence and nuisance claims, Lascelles Decl. ¶ 55(a). The "[d]ocumentary evidence demonstrating the timing and nature of corporate knowledge, decisions, communications, or coordinated activities may assist the court in determining whether such conduct materially contributed to delayed public understanding, regulatory responses, or other

circumstances alleged to have increased the risk or severity of climate-related harms." Cadiz Decl. ¶ 67.

To evidence misleading communications, advocacy, and advertising, and defendants' knowledge thereof, applicants request documents and testimony regarding activities conducted by respondent's committees as well as various industry associations, coalitions, and campaigns that applicants believe are highly relevant. Lascelles Decl. ¶¶ 56, 58. Applicants also request information regarding international initiatives and groups such as the United Nations Framework Convention on Climate Change that include "interactions with and any attempts to shape these initiatives." *Id.* ¶ 57. Finally, applicants request information regarding consumer viewpoints and misleading communications and marketing activities, "evidence which will help demonstrate facts surrounding shaping public opinion and dissemination of misleading information." *Id.* ¶ 59.

*Third,* applicants request evidence related to Shell and respondent's relationship. This discovery would assist English courts in understanding and making determinations regarding "(i) the nature of the relationship between Shell and the API; (ii) the degree of control and/or influence that Shell exert(ed) over the API; and (iii) the reporting lines and communication mechanisms that operate(d) between Shell and the API," and ultimately in determining whether respondent's activities can be attributed to Shell under English or Philippine law. Lascelles Decl. ¶¶ 60–61. Moreover, "[m]aterials reflecting communications among API and its member companies may further assist the court in determining whether decisions were made independently or through coordinated industry action." Cadiz Decl. ¶ 65. Plaintiffs specifically allege that defendants are liable for "funding and/or promotion of misinformation" by respondent. Lascelles Decl., Ex. D ¶ 194(6)(d). Accordingly, applicants request documents related to the degree of the defendants' involvement with respondent.

*Finally,* applicants seek evidence regarding specific documents and events the plaintiffs already consider probative, such as the 1965 annual remarks of respondent's then-President. *See id.* ¶ 41;

Borochoff-Porte Decl., Ex. B, Request No. 23(a). Plaintiffs' pleadings already refer to many of these documents and events, but applicants do not have authenticated copies of these documents. *Compare, e.g.*, Lascelles Decl., Ex. B ¶ 62, *with* Borochoff-Porte Decl., Ex. B, Request No. 21 (discussing AQ-9 Task Force); Lascelles Decl., Ex. D ¶ 137.2, *with* Borochoff-Porte Decl., Ex. A, Schedule B, ¶ 11 (discussing 1996 API Policy Book); Lascelles Decl., Ex. B ¶ 66 n.62, *with* Borochoff-Porte Decl., Ex. A, Schedule B, ¶ 5 (discussing 1982 API Climate Models).

* * *

The information sought will be central to the foreign proceeding. For the reasons set forth herein, including its prominent coordinating role, it is likely that respondent possesses relevant information. Accordingly, applicants request, among other things, documents related to the degree of defendants' involvement with respondent, knowledge shared between defendants and respondent in relevant areas of climate, participation in industry associations that played a role in disinformation, and information regarding advertising and consumer viewpoints. Applicants also seek a Rule 30(b)(6) deposition to depose a corporate representative(s) regarding, *inter alia*, early knowledge, reporting lines and shared information between defendants and respondent, and participation in, endorsement of, or knowledge of acts of public communications.[11]

**JURISDICTION AND VENUE**

This Court has jurisdiction pursuant to 28 U.S.C. § 1782(a). Respondent maintains its corporate headquarters in this District. *See* Borochoff-Porte Decl., Ex. C; 28 U.S.C. § 1782(a)

[11] The requests for production and deposition notice applicants request to serve on respondent are represented in the attached notice of Rule 30(b)(6) deposition, Borochoff-Porte Decl., Ex. A, and requests for production, *id.*, Ex. B. Applicants also respectfully request that the Court order respondent to cooperate in verifying the authenticity of the documents to facilitate their submission as evidence in the United Kingdom proceeding. *See*, *e.g.*, *Amgen Inc. v. Hill*, No. 2:14-mc-00908, 2015 U.S. Dist. LEXIS 38832, *1–2 (D. Utah Feb. 24, 2015) (ordering documents produced under section 1782 to be "accompanied by a signed certification verifying the authenticity of the documents").

(establishing that a discovery order may issue from "[t]he district court of the district in which a person resides or is found").

**LEGAL FRAMEWORK**

28 U.S.C. § 1782 broadly permits federal district courts to order that discovery be taken for use in foreign proceedings. Courts are empowered to consider applications *ex parte*.[12] The statute "is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel*, 542 U.S. at 247. Its breadth is purposeful. With every revision of the statute, Congress has chosen to expand its reach, making it ever easier for U.S. courts to provide discovery assistance abroad. *See id.* at 247–49.

In weighing whether to grant a section 1782 application, courts analyze three statutory requirements and four discretionary factors. The statute authorizes district courts to grant an application for discovery when three statutory requirements are met: "(1) the person from whom discovery is sought 'resides or is found' within the district; (2) the discovery is 'for use in a proceeding in a foreign or international tribunal'; and (3) the application is made by an 'interested person.'" *Qatar Nat'l Bank v. Perles Law Firm, P.C.*, No. 25-7029, 2025 U.S. App. LEXIS 27117, at *7 (D.C. Cir. Oct. 17, 2025) (per curiam) (quoting 28 U.S.C. § 1782 (a)).

---

[12] It is typical to consider requests for section 1782 assistance *ex parte*. *See, e.g.*, *In re Pishevar*, 2023 U.S. Dist. LEXIS at *1. *Ex parte* review is generally "justified by the fact that the parties [from whom discovery is sought] will be given adequate notice of any discovery taken pursuant to the request and will then have the opportunity to move to quash the discovery or to participate in it." *In re de Leon*, 2020 U.S. Dist. LEXIS 37270, at *3 (alteration in original) (citation omitted); *see also In re Bapa Holdings*, No. 25-mc-00026, 2025 LX 590430, at *1 (D.D.C. Nov. 24, 2025) (granting application *ex parte* where applicant highlighted "that any issues related to the subpoena could be raised in a motion to quash"); *Norex Petroleum Ltd. v. Chubb Ins. Co. of Can.*, No. 04-mc-281, 2005 WL 8178298, at *2 (D.D.C. Mar. 9, 2005) (rejecting objection to *ex parte* approach); *Gushlak v. Gushlak*, F. App'x 215, 217 (2d Cir. 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*. The respondent's due process rights are not violated because he can later challenge any discovery request by moving to quash pursuant to Federal Rule of Civil Procedure 45(c)(3).").

If the three statutory requirements are met, a "court must next determine whether to exercise its discretion under Section 1782(a)"—a decision that is "guided by the statute's twin aims of providing efficient means of assistance to participants in international litigation and . . . encouraging foreign countries by example to provide similar means of assistance to our courts." *In re Qatar Nat'l Bank*, No. 24-35, 2025 U.S. Dist. LEXIS 23819, at *10–11 (D.D.C. Feb. 10, 2025) (citation modified), *aff'd sub. nom. Qatar Nat'l Bank*, 2025 U.S. App. LEXIS 27117. Once the three prerequisites are satisfied, "district courts have 'considerable discretion to grant a § 1782 application.'" *In re Chodiev*, No. 1:18-mc-13, 2021 U.S. Dist. LEXIS 253092, at *26 (D.D.C. May 17, 2021) (quoting *Lazaridis v. Int'l Ctr. for Missing & Exploited Child. (In re Order Pursuant to 28 U.S.C. § 1782)*, 473 F. App'x 2, 3–4 (D.C. Cir. 2012)) (citation modified).

The four "*Intel* factors" are often used to guide a court's discretionary analysis: (1) "whether the person from whom discovery is sought is a participant in the foreign proceeding;" (2) "whether the relevant foreign tribunal is receptive to Section 1782 discovery;" (3) "whether the [. . .] [application] conceals an attempt to circumvent foreign proof-gathering restrictions or other policies"; and (4) "whether the requested discovery is unduly intrusive or burdensome." *Qatar Nat'l Bank*, 2025 U.S. App. LEXIS 27117, at *9–11 (citation omitted). Because these factors are discretionary, a court may decide to grant an application without weighing them, and a failure to meet any one of them does not preclude discovery. *Intel*, 542 U.S. at 264; *accord In re Qatar Nat'l Bank*, 2025 U.S. Dist. LEXIS 23819, at *6 ("consideration of these factors is not mandatory"); *In re Pishevar*, No. 21-mc-105, 2023 U.S. Dist. LEXIS 27894, at *7 (D.D.C. Feb. 17, 2023)("[w]eighing these factors is not required").

## ARGUMENT

Applicants satisfy all three statutory requirements. Likewise, the discretionary factors all weigh in applicants' favor. The discovery applicants seek is precisely the type of assistance to foreign courts that Congress contemplated when it enacted section 1782. The Court should grant the application.

## I. This application satisfies section 1782's three statutory requirements

As noted above, a district court has the authority to grant discovery under section 1782 if three statutory requirements are met. *In re Veiga*, 746 F. Supp. 2d 8, 17 (D.D.C. 2010) (citing 28 U.S.C. § 1782); *see also Qatar Nat'l Bank*, 2025 U.S. App. LEXIS 27117, at *6–7. All are met here.

### A. Respondent is "found" in the District of Columbia

First, the discovery target is found within the District of Columbia. Respondent is a section 501(c)(6) nonprofit corporation and trade association headquartered at 200 Massachusetts Ave. NW, Suite 1100, Washington, D.C. 20001. *See* Borochoff-Porte Decl., Ex. C.[13] Respondent thus resides and is found in this district. *See In re Pishevar*, 2023 U.S. Dist. LEXIS 27894, at *2 ("A corporation is 'found within' the district where it is headquartered or incorporated." (citation omitted)).

### B. The discovery sought is "for use" in a foreign proceeding

Second, the information applicants seek is relevant to central issues in the claims in the United Kingdom and sought for use in that foreign tribunal. This satisfies the "for use" prong, which merely requires a "de minimis" showing that the information sought may be used in the foreign proceeding. *See In re Qatar Nat'l Bank*, 2025 U.S. Dist. LEXIS 23819, at *9 (citation omitted).

The applicants need not show that the evidence would be discoverable or admissible in the English proceeding. *Id.* (quoting *In re Veiga*, 746 F. Supp. 2d at 17–18). Instead, applicants must simply make a *prima facie* showing that the requested discovery is relevant to claims and defenses abroad. *In re Veiga*, 746 F. Supp. 2d at 18 (granting request where applicant's "*prima facie* showing and its conclusion that the discovery sought in fact relates to claims and defenses"). Evidencing this low burden, section 1782 discovery applications are often granted before foreign actions are even filed, when claims are simply reasonably contemplated. *See, e.g.*, *In re C5 Cap. Ltd.*, 2024 U.S. Dist. LEXIS 71278, at *4, 9

---

[13] *See also Contact*, Am. Petroleum Inst., https://www.api.org/contact (last visited Aug. 28, 2026).

(finding "for use" prong met where "[a]pplicants are reasonably contemplating a U.K. proceeding" and "have outlined the claims they intend to pursue" and granting application).

Applicants' foreign proceeding is more than reasonably contemplated. It already exists, as do its claims. "Here, there is an ongoing lawsuit . . . so the statutory requirement is unmistakably met." *In re Kuwait Ports Auth.*, No. 22-mc-64, 2025 U.S. Dist. LEXIS 102478, at *6 (D.D.C. May 28, 2025).

Moreover, applicants' attorney declarations emphasize that the targeted discovery sought is "highly relevant" to central issues and intended for use in the English proceeding. Lascelles Decl. ¶ 47; Cadiz Decl. ¶ 62. The claims brought by applicants and other plaintiffs will require showings that defendants knew their actions were contributing to anthropogenic climate change, and that anthropogenic climate change was in turn likely to cause or augment the types of harms plaintiffs experienced. Applicants accordingly seek discovery tailored towards respondent's knowledge of the impact of anthropogenic climate change, the impact of climate change on society, and how it discussed and shared that information with defendants. *See* Lascelles Decl. ¶¶ 51–53; *see also, e.g.*, Borochoff-Porte Decl., Ex. B, Request Nos. 7–8, 12–13.

Plaintiffs must also prove, under Philippine law, that defendants' actions failed to meet a reasonable standard of conduct, and that defendants did not act in a way that was honest and in good faith. *See, e.g.*, Lascelles Decl. ¶¶ 29, 31 (citation omitted), 55(c). Evidence regarding whether, how, and to what extent defendants participated in or supported disinformation activities speaks directly to these matters. Accordingly, applicants request documents that would evidence positions taken by the fossil fuel industry, including Shell, with respect to international climate change groups, documents that would illuminate the full extent of Shell and respondent's involvement with groups known to disseminate misleading information such as the Global Climate Coalition, documents that would speak to respondent's role in any misinformation, and documents that would track advertising and marketing campaigns that were aimed at the public. Lascelles Decl. ¶¶ 54–55, 57; *see also* Cadiz Decl. ¶ 67

("Documentary evidence demonstrating the timing and nature of corporate knowledge, decisions, communications, or coordinated activities may assist the court in determining whether such conduct materially contributed to delayed public understanding, regulatory responses, or other circumstances alleged to have increased the risk or severity of climate-related harms."); Borochoff-Porte Decl., Ex. B, Request Nos. 10–11, 24–26. This information will support a court's assessment of any breach of duty of care, and whether defendants acted willfully or with conscious indifference in a manner that was dishonest, in bad faith, and contrary to morals, good customs, or public policy pursuant to claims under Articles 19 to 21. Lascelles Decl. ¶ 55.

There will be ample opportunity to submit the evidence in the foreign proceeding, for example, in a reply brief or as exhibits to witness evidence. *See* Lascelles Decl. ¶ 75; *In re Batbold*, No. 21-mc-218, 2021 U.S. Dist. LEXIS 195475, at *6 (S.D.N.Y. Oct. 6, 2021) (quoting the Second Circuit that, "as long as" an applicant shows that they can "inject the requested information into a foreign proceeding[,]" "it is not fatal to the application that he or she lacks a claim for relief before the foreign tribunal," and that "[r]ather, the term 'for use' . . . has only its ordinary meaning—that the requested discovery is something that will be employed with some advantage or serve some use in the proceeding" (citation omitted)). Therefore, the application satisfies the "for use" requirement.

**C. Applicants are "interested" persons**

Finally, this application is made by interested persons. Parties to the underlying proceeding "may be the most common" type of interested party, *Intel*, 542 U.S. at 256, and fall squarely within the terms of the statute. Thus, applicants—plaintiffs in the United Kingdom proceeding by and through their attorney-in-fact—are "interested person[s]" within the meaning of section 1782, *see In re C5 Cap. Ltd.*, 2024 U.S. Dist. LEXIS 71278, at *3 ("because Applicants intend to launch a U.K. lawsuit . . . , they qualify as 'interested person[s]'" (citation omitted)).

## II. The discretionary *Intel* factors favor granting discovery

All four discretionary *Intel* factors weigh in favor of granting section 1782 discovery.

### A. Respondent is not a "participant" in the United Kingdom proceeding

The first factor is whether "the person from whom discovery is sought is a participant in the foreign proceeding." *Intel*, 542 U.S. at 264. The need for discovery is more apparent where the person from whom discovery is sought is a "nonparticipant[] in the foreign proceeding" and "may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Id.*; *see also Qatar Nat'l Bank*, 2025 U.S. App. LEXIS 27117, at *9.

This factor presents a "straightforward inquiry," *In re C5 Cap. Ltd.*, 2024 U.S. Dist. LEXIS 71278, at *7, and courts have routinely rejected an exhaustion requirement that would require applicants to first seek discovery in the foreign jurisdiction, *see id.*; *Mees v. Buiter*, 793 F.3d 291, 303 (2d Cir. 2015) (citation omitted). Respondent API is not a contemplated defendant or otherwise a party to the proceeding in the United Kingdom, "and thus the discovery cannot be compelled through that court." *In re de Leon*, No. 19-mc-0197, 2020 U.S. Dist. LEXIS 37270, at *6 (D.D.C. Mar. 4, 2020); Lascelles Decl. ¶¶ 57–59. Applicants' U.K. counsel confirms that the foreign court is "unlikely to have jurisdiction" over respondent, and that "there is no realistic prospect" that applicants could, as a matter of United Kingdom law, seek a court order there to obtain the information requested. *See* Lascelles Decl. ¶¶ 64, 66. Accordingly, this factor favors granting discovery. *In re Nat'l Bank Tr.*, No. 3:20-mc-85, 2021 U.S. Dist. LEXIS 6858, at *8 (D. Conn. Jan. 13, 2021) (finding the first factor weighed in favor where "none of the entities from whom [applicant] seeks discovery is a participant in the U.K. Action" and was "thus not directly obtainable in the U.K. Action so requires assistance of this Court under § 1782"). Because respondent is a non-party, this factor weighs in favor of granting discovery.

### B. Courts in the United Kingdom are receptive to section 1782 discovery

The second factor "considers whether the nature of the foreign tribunal, the character of the

proceedings, and the receptivity of the court to U.S. judicial assistance weigh in favor of granting" the request. *In re DiGiulian*, No. 1:19-mc-132, 2020 U.S. Dist. LEXIS 161078, at *10 (D.D.C. Sept. 2, 2020) (citing *Intel*, 542 U.S. at 264). There is a strong presumption that the foreign court will be receptive to evidence obtained in the United States, *In Re Pishevar*, 2023 U.S. Dist. LEXIS 27894, at *8–9, and courts "should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782," *In re Caratube Int'l Oil Co.*, 730 F. Supp. 2d 101, 106 (D.D.C. 2010) (citation omitted); *see also In re DiGiulian*, 314 F. Supp. 3d 1, 8 (D.D.C. 2018). Respondent bears the burden of showing that the foreign court would reject this evidence. *In re Veiga*, 746 F. Supp. 2d at 23–24.

Courts in the United Kingdom are receptive to 1782 discovery, and this district is one of many that has granted section 1782 discovery assistance to English courts. *See, e.g.*, *In re C5 Cap. Ltd.*, 2024 U.S. Dist. LEXIS 71278, at *6 (stating that applicants had "provided affirmative proof" that the English court would be receptive where English counsel's declaration stated so and cited English precedent); *In re Pishevar*, 2023 U.S. Dist. LEXIS 27894, at *8–9 (citing to English counsel's declaration stating a belief that the English court would be receptive); *In re Tuohy*, No. 24-mc-605, 2025 U.S. Dist. LEXIS 74456, at *8 (S.D.N.Y. Apr. 18, 2025) ("there is ample evidence that courts in the United Kingdom are receptive to this Court's assistance with discovery under Section 1782" (citation modified)); *In re Marinakis*, No. 1:24-mc-485, 2025 U.S. Dist. LEXIS 3164, at *12–13 (S.D.N.Y. Feb. 21, 2025) (collecting S.D.N.Y. cases supporting the proposition that "there is no apparent reason to believe that the court presiding over the English Action would be unreceptive to this discovery"); *In re Nat'l Bank Tr.*, 2021 U.S. Dist. LEXIS 6858, at *8–9.

English courts have confirmed their own approval of the use of section 1782 discovery, and applicants' United Kingdom-based counsel believes that the relevant foreign court will be receptive to the evidence applicants seek. *See* Lascelles Decl. ¶¶ 73–74. Specifically, applicants' English counsel

states that the Courts of England and Wales "have previously shown their willingness to accept evidence obtained through Section 1782 applications in comparable litigation." *Id.* ¶ 73 (citing relevant cases).

Here, there is no "unequivocal indication," *In re Veiga*, 746 F. Supp. 2d at 24, that a United Kingdom court would reject evidence obtained through section 1782, and there will be numerous opportunities for applicants to submit any evidence obtained in the foreign proceeding. Lascelles Decl. ¶ 75. Because there is no authoritative proof that the Courts of England and Wales would not be receptive to the discovery, and indeed, there are numerous examples of those courts expressing openness, this factor weighs in favor of granting discovery.

### C. There is no attempt to circumvent foreign proof-gathering restrictions

The third factor is whether the "request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. Foreign proof-gathering restrictions are not the same as discovery or admissibility restrictions.[14] As noted above, "section 1782 does not require that the material sought be discoverable or even admissible in the foreign proceedings." *In re Barnwell Enters.*, 265 F. Supp. 3d 1, 12 (D.D.C. 2017); *see also Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts."); *In re Veiga*, 746 F. Supp. 2d at 17–18; *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012).

This application is a good faith effort to obtain relevant evidence for use in a foreign court proceeding and is not an attempt to circumvent foreign proof-gathering restrictions or other policies

[14] "'[P]roof-gathering restrictions' are best understood as rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information." *Mees*, 793 F.3d at 303 n.20 (quoting *Intel*, 542 U.S. at 265) (alteration added by *Mees*).

of the United Kingdom or the United States. Applicants do not seek discovery that would violate English law or public policy, such as evidence protected by attorney-client privilege. *See* Lascelles Decl. ¶ 74. Further, "[t]he laws of England and Wales . . . do not prohibit the acquisition or use of the information sought," nor have the courts there "placed any restrictions on the section 1782 discovery sought." *Id.* ¶ 72. "[T]hat the foreign court will receive and consider the evidence indicates that the request would not circumvent proof-gathering restrictions in that jurisdiction." *In re De Leon*, 2020 U.S. Dist. LEXIS 37270, at *7.

Here, as noted above, English courts will be able to receive and consider the evidence. Lascelles Decl. ¶¶ 71–72. And the English court has not placed any restrictions on the section 1782 discovery sought. Accordingly, this factor favors granting discovery. *See In re C5 Cap. Ltd.*, 2024 U.S. Dist. LEXIS 71278, at *6–7 ("[O]n the third factor, there is no evidence that discovery under § 1782(a) would circumvent a 'proof-gathering restriction' imposed by English law. For these reasons, courts routinely grant § 1782(a) applications for use in English proceedings." (citations omitted)); *Pishevar v. Fusion GPS*, No. 21-mc-105, 2025 U.S. Dist. LEXIS 53056, at *29–30 (D.D.C. Mar. 21, 2025).

### D. The requested discovery is highly relevant and appropriately tailored

The final *Intel* factor looks to whether the requests are "unduly intrusive or burdensome." 542 U.S. at 265. Like all federal discovery, the proper scope of discovery under section 1782 is governed by the Federal Rules of Civil Procedure. *See In re Veiga*, 746 F. Supp. 2d at 19. Accordingly, applicants can seek discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Courts have interpreted this inquiry to encompass the relevance of the requested discovery to the foreign proceeding." *In re De Leon*, 2020 U.S. Dist. LEXIS 37270, at *7 (citations omitted); *In re DiGiulian*, 314 F. Supp. 3d at 9. "When relevance is in doubt, the district court should be permissive." *In re Veiga*, 746 F. Supp. 2d at 19.

As detailed more thoroughly above, applicants' requests are tailored to obtain highly relevant

and necessary information central to the proceeding in the United Kingdom, including regarding defendants' knowledge and the alleged obfuscatory actions of defendants and their agents. *See, e.g.*, *supra*, Background, Section C; Lascelles Decl. ¶¶ 42–61; Cadiz Decl. ¶¶ 62–71. In addition to relevancy, when assessing intrusiveness and burden of discovery requests, courts have considered other factors such as whether the requests seek privileged documents, *see, e.g.*, *Menashe v. Covington & Burling LLP*, 552 F. Supp. 3d 35, 44 (D.D.C. 2021), or documents stored abroad, *see, e.g.*, *In Re Thai-Lao Lignite (Thail.) Co.*, 821 F. Supp. 2d 289, 297–98 (D.D.C. 2011). Here, the requests do not seek privileged materials, such as attorney-client communications. Nor do they seek documents located outside of the United States.

Applicants' need for the discovery is immense and necessary to the foreign proceeding. Respondent is outside of the jurisdiction of English courts, thus apart from this petition, applicants could not otherwise access the requested discovery. Lascelles Decl. ¶ 74. As detailed above, it is plaintiffs' position that respondent effectively served as an agent of the defendants. Underscoring this, respondent, while not a defendant, is a primary actor in plaintiffs' pleadings. Plaintiffs also allege that respondent would have received and disseminated much of the relevant information. *Id.* ¶¶ 60–61. Applicants' foreign counsel believes that "API is likely to have unique documents, and a thorough repository of historical documents, including those that regard Shell's knowledge of climate change and evidence of API's activities." *Id.* ¶ 70. Furthermore, the evidence sought could corroborate and provide important context to other evidence presented during the English proceeding, for instance by demonstrating what the defendants knew or should have known when it made public statements. *See, e.g.*, Cadiz Decl. ¶ 68. Whether each item sought is discoverable or admissible in English courts is immaterial. *In re Barnwell Enters.*, 265 F. Supp. 3d at 1, 11 ("section 1782 does not require that the material sought in the United States be discoverable—or even admissible—in the foreign tribunals").

In addition, when weighing whether any burden is undue in the context of section 1782, "courts should look to the statute's twin aims: i.e., to provide fair and efficient assistance to participants in international litigation and to encourage other countries to provide similar assistance." *In re Veiga*, 746 F. Supp. 2d at 17 (citation omitted). Other countries are already providing similar assistance. For example, the United Kingdom recently permitted discovery in Scotland for a U.S.-based case alleging that Shell failed to prepare its petroleum storage facilities for climate change risks.[15] Granting discovery here will encourage further reciprocity.

Courts have also considered a party's sophistication and resources with which to respond to discovery requests. *See, e.g.*, *Oxbow Carbon & Minerals LLC v. Union Pac. R.R.*, 322 F.R.D. 1, 6 (D.D.C. 2017) (listing factors such as party resources for discovery analysis); *see also* Fed. R. Civ. P. 26(b)(1) (listing "a party's resources" as a factor to consider). Respondent is a sophisticated and well-resourced national trade association with a budget of hundreds of millions of dollars that is equipped to respond to the requests.

Finally, if respondent were to succeed in challenging the breadth of any of the requests, it is "far preferable" to limit the discovery requests accordingly rather than "simply denying relief outright." *See, e.g.*, *Mees*, 793 F.3d at 302; *see also, e.g.*, *U.S. Dep't of the Treasury v. Pension Benefit Guaranty Corp.*, 301 F.R.D. 20, 25 (D.D.C. 2014) ("A] court should be loath to quash a subpoena if other protection of less absolute character is possible."); *In re Batbold*, 2021 U.S. Dist. LEXIS 195475 at *10 ("Even if this request were not properly tailored, the Court has the authority to closely tailor any future discovery order."); 6 Moore's Federal Practice—Civil § 26.08 (2026) ("[T]o the extent that a district

---

[15] *See* Pl.'s Ltr. of Request for Deposition and Document Production in the United Kingdom, *Conservation Law Found., Inc. v. Equilon Enters. LLC*, No. 1:17-cv-00396 (D.R.I. July 14, 2025), Dkt. No. 243; *see generally* Ex. 1, *Conservation Law Found., Inc. v. Equilon Enters. LLC*, No. 1:17-cv-00396 (D.R.I. Mar. 6, 2026), Dkt. No. 324-1 (confirming the process).

court finds a discovery request overbroad, it should ordinarily consider, before denying the application, whether that defect can be cured through a limited grant of discovery." (citation omitted)).

Because the discovery sought from respondent is relevantly tailored to claims and thus neither unduly intrusive nor burdensome, it falls well within the scope of discovery that the Federal Rules allow. This factor favors granting discovery. Any burden is not undue and is outweighed by the needs and import of a case alleging a decades-long history of knowledge and deception that are relevant to an assessment of damages over the homes of millions of people. Applicants merely seek discovery from an actor otherwise unavailable before the English proceeding due to its location in the United States. This is the precise circumstance for which section 1782 was intended.

## CONCLUSION

For the foregoing reasons, applicants respectfully request that the Court grant the *ex parte* application in its entirety.

Dated: September 28, 2026

Respectfully submitted,

*/s/ Alison Borochoff-Porte*
Alison Borochoff-Porte (D.C. Bar No. 219393)
Lindsay A. Bailey (D.C. Bar No. 17234447)
Rachel Conrad (D.C. Bar No. 90042405)*
**EARTHRIGHTS INTERNATIONAL**
1400 K Street NW, Suite 750
Washington, DC 20005
Tel.: (202) 466-5188 x116
alison.borochoff-porte@earthrights.org
lindsay.bailey@earthrights.org
rachel.conrad@earthrights.org

Reena Gambhir (D.C. Bar No. 989470)*
Mary Sameera Van Houten Harper (D.C. Bar No. 1045137)
Kira Hesskiel (D.C. Bar No. 90016170)*
**HAUSFELD LLP**
1200 17th Street, Suite 600
Washington, DC 20036
Tel.: (202) 540-7200
Fax: (202) 540-7201
rgambhir@hausfeld.com

mvanhouten@hausfeld.com
khesskiel@hausfeld.com

**Pro hac vice* motions forthcoming