IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IRISH MAE B. DE LOS SANTOS, REYNALDO C. INFIESTO, RICKEL S. INTING, JELSON C. SUMABAL, AND ADELISA C. SURIGAO,<br><br>*Applicants,*<br><br>For an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in a Foreign Proceeding | Misc. Case No. ____________________ |

**DECLARATION OF ALISON BOROCHOFF-PORTE**

I, Alison Borochoff-Porte, hereby declare under penalty of perjury under 28 U.S.C § 1746 that that the following is true and correct:

1. I am over the age of eighteen and have personal knowledge of the facts contained herein. If so called to testify, I could competently testify to said facts.

2. I am an attorney licensed to practice law in the State of New York and the District of Columbia. I am a Senior Attorney with EarthRights International, and counsel to Irish Mae B. De Los Santos, Reynaldo C. Infiesto, Rickel S. Inting, Jelson C. Sumabal, and Adelisa C. Surigao ("Petitioners") through their attorney-in-fact, Gregory James Lascelles, in this matter.

3. Attached as Exhibit A is Petitioners' proposed Rule 30(b)(6) deposition subpoena.

4. Attached as Exhibit B is Petitioners' proposed requests for document production.

5. Attached as Exhibit C is what I understand to be a true and correct copy of the American Petroleum Institute's Form 990 from tax year 2024, retrieved from https://projects.propublica.org/nonprofits/organizations/130433430/202523219349306147/full.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 28, 2026, in Brooklyn, New York.

*/s/ Alison Borochoff-Porte*
Alison Borochoff-Porte

# Exhibit A

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | | |
|---|---|---|
| In re application of: Irish Mae B. De Los Santos, Reynaldo C. Infiesto, Rickel S. Inting, Jelson C. Sumabal, and Adelisa C. Surigao<br>*Plaintiff*<br>v.<br><br>*Defendant* | )<br>)<br>)<br>)<br>)<br>) | Civil Action No. |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: AMERICAN PETROLEUM INSTITUTE

*(Name of person to whom this subpoena is directed)*

☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| | |
|---|---|
| Place: EarthRights International, 1400 K Street, NW, Washington, D.C., 20005 | Date and Time: |

The deposition will be recorded by this method: Audio, audiovisual, and/or stenographic means

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: ______________

*CLERK OF COURT*

OR

*Signature of Clerk or Deputy Clerk* | *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* ______________ ______________, who issues or requests this subpoena, are:

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No.

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ______________ .

❒ I served the subpoena by delivering a copy to the named individual as follows: ______________
______________________________________________________________
______________________________________ on *(date)* ______________ ; or

❒ I returned the subpoena unexecuted because: ______________________________
______________________________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of
$ ______________ .

My fees are $ ______________ for travel and $ ______________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

Print | Save As... | Add Attachment | Reset

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IRISH MAE B. DE LOS SANTOS, REYNALDO C. INFIESTO, RICKEL S. INTING, JELSON C. SUMABAL, and ADELISA C. SURIGAO,<br><br>*Applicants*,<br><br>For an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in a Foreign Proceeding | Misc. Case No. ___________________ |

**NOTICE OF RULE 30(b)(6) DEPOSITION UNDER 28 U.S.C. § 1782**

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 1782, Rules 26 and 30(b)(6) of the Federal Rules of Civil Procedure, and Local Rules 26.2 and 30.1, applicants Irish Mae B. De Los Santos, Reynaldo C. Infiesto, Rickel S. Inting, Jelson C. Sumabal, and Adelisa C. Surigao, by and through their undersigned counsel, will take the deposition upon oral examination of the American Petroleum Institute's designated representative or representatives at 9:00 a.m. on a date or dates to be agreed upon by the parties, at the offices of EarthRights International, 1400 K Street, NW, Washington, D.C., 20005. The deposition will continue from day to day until completed, with Saturdays, Sundays, and legal holidays excepted, under the time limitations provided by Rule 30(d) or the Court.

Pursuant to Rule 30(b)(6), applicants request that respondent designate and produce one or more officers, directors, managing agents, or other persons designated by respondent to testify on its behalf, as to information known or reasonably available to respondent, within the scope of the topics identified in Schedule A. The deposition shall be before an officer authorized by law to administer oaths and will be recorded by audio, and/or, audiovisual, and/or stenographic means. Counsel of record are invited to attend and cross-examine. Respondent shall provide, no fewer than ten business

days prior to the deposition, the names of the person(s) who is (are) designated to testify, the specific subject matters for which each person is designated, the documents that the deponent(s) needs to reference to testify fully regarding the topics for which they have been designated, and any documents that the deponent(s) reviewed during preparation for the deposition. This notice is continuing, and applicants reserve the right to supplement, amend, or clarify topics, consistent with any rules or Court orders.

Dated: September 28, 2026

*/s/ Alison Borochoff-Porte*
Alison Borochoff-Porte (D.C. Bar No. 219393)
Lindsay A. Bailey (D.C. Bar No. 17234447)
Rachel Conrad (D.C. Bar No. 90042405)*
**EARTHRIGHTS INTERNATIONAL**
1400 K Street NW, Suite 750
Washington, DC 20005
Tel.: (202) 466-5188 x116
alison.borochoff-porte@earthrights.org
lindsay.bailey@earthrights.org
rachel.conrad@earthrights.org

Reena Gambhir (D.C. Bar No. 989470)*
Mary Sameera Van Houten Harper (D.C. Bar No. 1045137)
Kira Hesskiel (D.C. Bar No. 90016170)*
**HAUSFELD LLP**
1200 17th Street, Suite 600
Washington, DC 20036
Tel.: (202) 540-7200
Fax: (202) 540-7201
rgambhir@hausfeld.com
mvanhouten@hausfeld.com
khesskiel@hausfeld.com

**Pro hac vice* motions forthcoming

## SCHEDULE A

## DEFINITIONS

Please note that all words herein have their meaning in the ordinary English usage. If there is any difficulty in understanding the scope or meaning of any word, please feel free to contact Applicants' attorneys for an explanation.

Unless a contrary meaning appears in the text, the following definitions apply and shall be construed broadly to bring responses within the scope of the request that might otherwise be excluded when using a narrower construction. Definitions shall apply to words regardless of capitalization.

1. **Advertising or Advertisement** shall mean any oral, auditory, written, digital, graphic, or pictorial representation or message that is used in (a) promoting or selling a product, service, company, or brand; (b) promoting and associating a particular lifestyle, culture, or mindset with a product, service, company, or brand; or (c) seeking to inform or persuade members of a particular target market or audience regarding goods, services, organizations, or ideas. Advertisement includes any such representation or message published in a newspaper, magazine, journal, or other periodical; set forth in a notice, handbill, circular, flyer, pamphlet, catalogue, electronic mail, or letter; placed on a sign, billboard, poster, or other display; published on the Internet, television, radio, or social media; or contained in any tag or label attached to or accompanying any product offered for sale. Advertisement includes any of the foregoing categories of messages or representations that are sent, directed to, or disseminated to persons who are potential consumers of the advertised brand, company, product, or service. The term "Advertising" refers to the act of creating, disseminating, distributing, placing, purchasing, transmitting, and/or using an Advertisement.

2. **American Petroleum Institute, API, you, and your** shall include the American Petroleum Institute and any predecessor entity, as well as all its agents (whether as employees, independent contractors, or otherwise), employees, trustees, board members, foreign branches,

divisions, groups, segments, departments, operating units, partners, managers, directors, representatives, contractors, subcontractors, principals, officers, officials, attorneys, associates, consultants, brokers, advisors, accountants, alter egos, parents, subsidiaries, and affiliates, or other persons or entities acting or purporting to act on your behalf.

3. **API Committees** shall refer to the following API-related committees or sub-committees:

a) The Climate Task Force (also referred to as the "CO2 and Climate Task Force" or "AQ-9 Task Force" or "Climate and Energy Task Force");

b) The Global Science Team (also referred to as the "Global Climate Science Team" or "GCST" or "Global Climate Science Communications Team" or "GCSCT");

c) The Climate Team (also referred to as the "Climate Steering Committee" or the "API Global Climate Change Steering Group");

d) The Committee for Air & Water Conservation;

e) The Global Climate Coordinating Council;

f) The Committee on Public Affairs;

g) The Environmental Affairs Division; and

h) Any other committee, sub-committee, or group engaging in work concerning Climate Change, Climate Adaptation, Climate Advocacy Activities, Climate Science, Climate Responses, or Greenhouse Gases.

4. **And** includes the word **or** and vice versa.

5. **Any** includes the word **all** and vice versa.

6. **Assessment** shall include evaluations, studies, reports.

7. **Climate Adaptation** shall mean taking action to prepare for, adjust to, and manage the current and future impacts of Climate Change.

8. **Climate Advocacy Activities** shall refer to any activity, conduct, communication, or expenditure undertaken, directly or indirectly, that is materially related to, intended to influence, or reasonably likely to affect public opinion, market behavior, bodies working on climate change, or stakeholder perceptions, concerning Climate Change or Climate Science, as defined herein, or concerning the likelihood that Climate Change has been and is occurring, or the likelihood that fossil fuel production and use are contributing to Climate Change. The term includes Public Relations and communications, media planning, media relations, social media, Marketing and Advertising, influencer marketing, strategic messaging, promotion, and research or analysis purposes.

9. **Climate Change** shall refer to any change, variation, disruption, or alteration in the Earth's climate system, whether natural or anthropogenic, including changes in atmospheric composition, temperature, precipitation patterns, ocean conditions, cryosphere conditions, or weather variability over any period of time, the accumulation, concentration, emission, or radiative forcing effects of greenhouse gases, and any actual or projected physical impacts of Climate Change, including sea-level rise, ocean warming or acidification, glacial or ice sheet melt, permafrost thaw, drought, desertification, water scarcity, flooding, wildfires, extreme weather events, major storms, or ecosystem disruption. The term shall be construed broadly and encompasses any synonymous, analogous, related, predecessor, or successor terms, phrases, or concepts, including the carbon dioxide problem, weather modification, heat balance of the atmosphere, solar variation, global warming, climatic change, climatic variation, climate instability or disruption, the climate crisis, the greenhouse effect, enhanced greenhouse, carbon emissions, $CO_2$ buildup or accumulation, atmospheric $CO_2$, or radiative forcing. Climate Change shall encompass the definition found in the Intergovernmental Panel on Climate Change Glossary, *available at* https://apps.ipcc.ch/glossary/.

10. **Climate Science** shall refer to any scientific, technical, or analytical data, study, discipline, field of inquiry, modeling, or body of knowledge relating to the Earth's climate system,

including the causes, mechanisms, characteristics, effects, measurement, modeling, projection, or interpretation of Climate Change. The term shall be construed broadly and includes any synonymous, analogous, related, predecessor, or successor terms, phrases, or concepts, whether used in scientific, technical, regulatory, or business contexts.

11. **Climate Responses** shall refer to matters relating to Climate Adaptation, biofuels, net zero, hydrogen-based fuels, operational emissions reduction technologies, and carbon capture and sequestration or storage.

12. **Communication(s)** shall refer to any oral, written, in person, or any other form of relay, transmission, or transference of information or Documents by any means whatsoever including but not limited to by way of mail, computer, telephone, cellular or mobile phone, voice mail, electronic mail, digital file attachments, shared network or cloud-based storage drives, radio, video, sound recordings, television, telefax, telex, social media, or any other medium. Communications shall include Documents.

13. **Concerning** shall mean referring to, describing, offering evidence of, constituting, and relating to.

14. **Document(s)** is a broadly inclusive term, and shall refer to any and all written or other graphic matter, however produced, generated, or reproduced, of every kind and description, and to anything upon which sounds, pictures, or electronic images are recorded, transferred, imprinted or depicted by photography, video, typewriting, handwriting, sound recording, or otherwise. Documents also refer to any electronically stored data/information stored on magnetic media such as floppy diskettes, thumb drives, computer disk, hard computer disk, or other computer storage system. Such terms refer to originals, copies where originals are unavailable, copies of originals which differ in any manner from the originals, and all drafts prepared in connection with such matter, including but not limited to the following: contracts, agreements, memoranda of understanding, charts, graphs,

inventories, accounts, lists, transcripts, abstracts, tape recordings, video recordings, sound reproductions, summaries, files, pleadings, depositions, answers to requests for admissions, answers to interrogatories, file jackets, file covers, records, books, papers, journals, correspondence, notes, electronic mail messages, agreements, statements, opinions, photographs, motion pictures, objects, microfilm, telegrams, telegraphs, telexes, telefaxes, texts, facsimiles, cables, copies, letters, memoranda, materials, notes, notations, scratch paper, minutes of meetings, minutes of interviews, minutes of in-person or telephonic conversations or communications, interoffice communications, shareholder reports, press releases, reports, studies, statistical records, evaluations, tabulations, audits, reviews, assessments, statistics, stenographic notebooks, calendars, appointment books, diaries, agendas, time sheets, logs, computer disks, computer programs, databases, computer printouts, data processing cards, data processing tapes, or papers similar to any of the foregoing however denominated by the responding party, regardless of whether it was prepared in whole or in part by Respondent.

15. **Greenhouse Gases ("GHGs")** shall encompass the definition in the Intergovernmental Panel on Climate Change Glossary, *available at* https://apps.ipcc.ch/glossary/. This term shall be construed broadly to include greenhouse gas emissions, atmospheric CO2, methane, and other greenhouse gases, both natural and anthropogenic Greenhouse Gases and contributions, and the greenhouse effect.

16. **Including** shall mean including but not limited to.

17. **Industry Associations, Coalitions, and Campaigns** means the International Petroleum Industry Environmental Conservation Association ("IPIECA" or "Ipieca"), including the IPIECA Working Group on Global Climate Change; the Global Climate Coalition ("GCC"), including the Science and Technology Assessment Committee; the Global Climate Information Project; the Cooler Heads Coalition; the American Fuel and Petrochemical Manufacturers; the American Gas Association; the National Association of Manufacturers; the U.S. Chamber of Commerce; and the

Western States Petroleum Association. This definition includes the present and former iterations of the associations, coalitions, and campaigns listed, their present and former parents and subsidiaries, and their agents, representatives, trustees, officers, directors, employees, members, attorneys, and internal groups, subgroups, committees, and divisions.

18. **Marketing** shall mean any activity undertaken to promote, advertise, offer, sell, distribute, or otherwise generate interest in a product or service, including communications with actual or prospective customers through any medium.

19. **Public Relations** shall refer to communication that seeks to make use of publicity and other forms of promotion and information to influence the feelings, opinions, or beliefs about a company, its products or services, or about the value of the product or service or the activities of the organization to buyers, prospects, or other stakeholders. It similarly refers to the management of communication between a client or entity and audiences consisting of large groups of persons outside the company. Public Relations includes performing strategic planning relating to a client or entity's communications; issue management on behalf of clients or entities; identifying the communications environment; performing communication duties for organizations; managing communication programs, including (i) developing third-party communication organizations, (ii) devising measurement and reporting standards, (iii) creating certifications and recognitions (e.g., awards); writing, editing, and designing promotional communications and publications, including press releases; conducting research to facilitate communications; providing media training for clients, entities, and representatives; preparing clients or entities for government testimony; offering legislative representation; and counseling managers, individuals, groups of individuals, and other organizations relating to any of the above.

20. **Possession, custody, or control** shall include Documents in the possession, custody, or control of Respondent, including Documents in the possession or custody of subsidiaries that are in Respondent's control, whether such Documents are found within or outside this district.

21. **Related to and relating to** shall mean in relation to, consisting of, referring to, reflecting, concerning, discussing, describing, evidencing, commenting on, supporting, contradicting or having any logical or factual connection with the matter identified, in whole or in part.

22. **Relied upon** shall mean informing, consulted, or otherwise serving to justify or support any particular position, communication, statement, or conclusion.

23. **Shell** shall refer to present and former iterations of, the present and former parents and subsidiaries of, the Shell Group of companies, including Shell plc, the Shell Transport and Trading Company Limited, Shell USA, Inc, and Shell Oil Company, as well as all its agents (whether as employees, independent contractors, or otherwise), employees, trustees, board members, foreign branches, divisions, groups, segments, departments, operating units, partners, managers, directors, representatives, contractors, subcontractors, principals, officers, officials, associates, consultants, brokers, advisors, accountants, and all persons and entities acting or purporting to act on its behalf.

24. All use of terms in the singular include the plural and vice versa.

## RELEVANT TIME FRAME

Unless otherwise specified, the relevant time period for this Notice is 1965 to 2021.

## MATTERS ON WHICH EXAMINATION IS REQUESTED

1. Your document retention policies from 1965 to the date of production.

2. Your internal corporate structure, including but not limited to Your governance and management; Your divisions, committees, and task forces; and what role Your members play in those functions.

3. Shell's affiliation with and involvement with You, including:

a) Shell's role in Your corporate structure, governance, management, divisions, committees, and task forces;

b) Shell's membership with You;

c) Any formal or informal position or roles held at or in relation to You by Shell's employees or representatives, including any time a Shell employee, representative, agent, or affiliate served as a member of any of Your management, boards, committees, divisions, task groups, or subgroups, or as a consultant in any capacity; and

d) Any Shell employee, representative, agent, or affiliate's membership, liaison, position, title, ambassadorship, or attendance at Your or API-affiliated groups, occasions, or meetings.

4. Shell's financial contributions to You and API-sponsored work, initiatives, coalitions, campaigns, research, Advertisements, and studies, including:

a) Policies and practices regarding how Shell's financial contributions to You and API-sponsored work, initiatives, coalitions, campaigns, research, Advertisements, and studies were permitted to be used; and

a) Where, when, and how much of Shell's financial contributions were used to fund You and API-sponsored work, initiatives, coalitions, campaigns, research, Advertisements, and studies related to Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses.

5. How information regarding Climate Science, Climate Adaptation, Climate Responses, Greenhouse Gases, and Climate Change is shared between You and Your members, including through formal and informal channels and mediums.

6. Your knowledge, including knowledge regarding Climate Science, Climate Responses, and Greenhouse Gases, Climate Change, and their impacts, including potential and actual impacts on

extreme weather events, tropical storms, and typhoons and potential and actual localized climate change-related impacts, including risks to communities, infrastructure, property, public health, or economic interests in the Philippines, or the Asia-Pacific region, including:

a) The types of mediums and sources through which such knowledge is obtained, such as through publicly available information, procured studies and analyses, internal or external parties;

b) The dates when such knowledge was obtained; and

c) How this knowledge was shared with and communicated to Your members such as Shell.

7. Your policies, approaches, and work done for, with, or regarding international bodies and efforts relating to Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses, including:

a) The United Nations Framework Convention on Climate Change;

b) The International Panel on Climate Change;

c) The United Nations Conference on Environment and Development;

d) The Kyoto Protocol;

e) The Paris Agreement;

f) What involvement Your members had in those policies, approaches, and work done, including collaboration, review, input, and approval; and

g) What You communicated to and between Your members regarding information related to international bodies and efforts regarding Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses.

8. Your knowledge regarding the API Committees relating to Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses, including but not limited to:

a) The organizational structures of the API Committees, including the relevant internal departments and workstreams, the purpose and objectives of each sub-committee, and how they interacted with other groups within API;

b) The genesis and need for the existence of each Committee;

c) Shell's relationships to, involvement in, or information received or disseminated from or regarding any Committee;

d) Committee discussions, strategy, and work concerning Climate Change, Greenhouse Gases, Climate Responses, Climate Advocacy Activities, and Climate Science (including any related reports and memoranda produced);

e) Committee discussions, strategy, and work concerning actual and potential private and public litigation relating to Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses;

f) Committee discussions, strategy, and work concerning Public Relations, Advertising, and Marketing as it relates to Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses; and

g) Scientific, Marketing, public opinion, or Public Relations reports and/or strategy papers presented to or commissioned by each API Committee.

9. Your relationship to, role in, and knowledge regarding the Industry Associations, Coalitions, and Campaigns and concerning Climate Change, Greenhouse Gases, Climate Advocacy Activities, and Climate Science, including but not limited to:

a) The organizational structures of the Industry Associations, Coalitions, and Campaigns;

b) Entities and individuals who were members of or affiliated with the Industry Associations, Coalitions, and Campaigns, including Shell;

c) Strategies and plans of the Industry Associations, Coalitions, and Campaigns;

d) Your formal or information role in the Industry Associations, Coalitions, and Campaigns, and years of participation;

e) Scientific papers or analyses received from or provided to the Industry Associations, Coalitions, and Campaigns;

f) Industry association campaigns, commercials, Public Relations, target audiences, and Advertisements;

g) Message testing and focus groups;

h) What information was shared with or from Your members regarding the Industry Associations, Coalitions, and Campaigns and any information sent to or from the Industry Associations, Coalitions, and Campaigns;

i) Documents, communications, or other work product that was developed, sponsored, funded, reviewed, approved, distributed, or otherwise supported by API;

j) Shell's participation the Industry Associations, Coalitions, and Campaigns;

k) Establishment, purpose, objective, and work of the GCC, and Shell's departure from the GCC;

l) Establishment, purpose, objective, and work of the IPIECA Working Group on Global Climate Change (also known as the Ad Hoc Group on the Greenhouse Effect); and

m) Establishment, purpose, objective, and work of the GCC's Science and Technology Assessment Committee.

10. Your assessment(s) of public understanding, consumer viewpoints, or consumer behavior concerning Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses, including testing, focus groups, consumer surveys, and polling, including:

a) Who conducted the assessments and in what years;

b) The purpose of the assessments; and

c) How the assessments were used.

11. API led, funded, commissioned, or contributed to Marketing, Public Relations, media campaigns, influence campaigns, polling and assessment, Advertising, content, and messaging related Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses.

12. The Energy and Man symposium held in New York City in 1959, including attendees.

13. Your Communications with, from, or about or relationship to the California Institute of Technology, John Laurmann, Edward Teller, and Marion King Hubbert, concerning Climate Change, Greenhouse Gases, Climate Advocacy Activities, and Climate Science, including any analyses prepared for You.

14. Your funding of, Communications and interactions with, and reception of study or research results from, the Air Pollution Foundation, between 1953 and 1961, including any communication or collaboration with Shell regarding the same.

15. The February 9, 1980, AQ-9 Task Force meeting at which there was a presentation from John Laurmann of Stanford University.

16. For the documents listed in Schedule B, documents produced in response to discovery requests in this action, and any other Documents and Communications and statements financed fully or in part by, published, drafted, edited, or commissioned by You concerning Climate Change, Greenhouse Gases, Climate Advocacy Activities, and Climate Science:

a) Your acquisition, circulation, summarization, discussion, analysis, or any other activities regarding the Document, Communication, or statement, including who it may have been disseminated to;

b) Your knowledge of the role Shell played in the conception, scientific development, strategic direction, drafting, editing, review, approval, publication, and dissemination, of the Document, Communication, or statement;

c) Your evaluation, review, discussion, analysis, critique, endorsement, or disagreement concerning the scientific findings, conclusions, assumptions, or recommendations contained in the Document, Communication, or statement;

d) Communications, discussions, meetings, or other interaction between You and Shell concerning the preparation, content, conclusions, recommendations, publication, revision, distribution, or treatment of the Document, Communication, or statement; and

e) Your knowledge of Shell's role in the publication, dissemination, promotion, and messaging for or around the Document, Communication, or statement.

**SCHEDULE B**

1. The Document by Frank N. Ikard titled *Meeting the Challenges of 1966*.

2. The 1966 report prepared by Professor James Lovelock Group titled *Combustion of Fossil Fuel: Large Scale Atmospheric Effects*.

3. The paper titled *Environmental Pollution resulting from the Production and Use of Fuels: Petroleum and Petroleum Products* which was submitted to the Organisation for Economic Co-operation and Development's Special Committee for Oil ahead of their 1968 meeting.

4. The 1968 report from the E. Robinson and R.C. Robbins / Stanford Research Institute titled *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants* and the 1969 supplemental report from the E. Robinson and R.C. Robbins / Stanford Research Institute titled *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants: Supplement*.

5. The 1982 Document prepared by Alan Oppenheim and William L. Donn of Columbia University's Lamont-Doherty Geological Observatory titled *Climate Models and CO2 Warming: A Selective Review and Summary*.

6. The 1988 Shell report titled *The Greenhouse Effect*.

7. The 1989 Shell Document titled "*Scenarios 1989-2010 – Challenge and Response*" and an amended version that was published in 1991.

8. The 1992 Shell Document titled *The Potential Augmented Greenhouse Effect, & Depletion of the Ozone Layer*.

9. The 1994 Shell Document titled *The Enhanced Greenhouse Effect*.

10. The 1995 Shell Document titled, *Is Climate Change Occurring Already?*

11. The 1996 API Document titled, Reinventing Energy, Making the Right Choices.

12. The 1997 Washington Post article by William O'Keefe titled, *A Climate Policy*.

13. The 1998 Shell report titled *The Greenhouse Effect*.

14. The 1998 Document titled *The Global Climate Science Communications Action Plan*.

15. The briefing Document prepared by the IPIECA Working Group on Global Climate Change for IPIECA membership in February 1990, titled *Potential Enhanced Greenhouse Effect*, including the July 1989 document titled *The American Petroleum Institute (API) Position on Global Climate Change*.

16. The 1994 GCC document titled, *Issues and Options: Potential Global Climate Change*.

17. The 1995 GCC document titled, *Climate Change: Your Passport to the Facts*.

18. The 1996 GCC document titled, *Primer on Climate Change Science – Final Draft*.

19. The 1996 GCC document titled, *Global Climate Coalition, An Overview*.

# Exhibit B

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In re Application of: Irish Mae B. De Los Santos, Reynaldo C. Infiesto, Rickel S. Inting, Jelson C. Sumabal, and Adelisa C. Surigao )
*Plaintiff* )
v. ) Civil Action No.
)
)
*Defendant* )

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To: AMERICAN PETROLEUM INSTITUTE
American Petroleum Institute

*(Name of person to whom this subpoena is directed)*

4 *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached.

| Place: EarthRights International, 1400 K Street, NW, Washington, D.C., 20005 | Date and Time: See attached. |
|---|---|

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: ____________

*CLERK OF COURT*

OR

____________________ *Signature of Clerk or Deputy Clerk*

____________________ *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* ____________ , who issues or requests this subpoena, are:

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No.

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ______________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ______________________
______________________________________________ on *(date)* ______________ ; or

❒ I returned the subpoena unexecuted because: ______________________
______________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______________ .

My fees are $ ______________ for travel and $ ______________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

Print | Save As... | Add Attachment | Reset

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IRISH MAE B. DE LOS SANTOS, REYNALDO C. INFIESTO, RICKEL S. INTING, JELSON C. SUMABAL, and ADELISA C. SURIGAO,<br><br>*Applicants,*<br><br>For an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in a Foreign Proceeding | Misc. Case No. ____________________ |

**REQUESTS FOR PRODUCTION OF DOCUMENTS**

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 1782, applicants request that respondent, the American Petroleum Institute, respond to these Requests for Production of documents and things identified below, and produce and permit applicants to inspect and copy all responsive documents within 30 days. Respondent is advised of its obligations under Rule 26(e) of the Federal Rules of Civil Procedure to supplement its response.

All documents shall be produced at the office of EarthRights International, 1400 K St. NW, Suite 750, Washington, DC 20005 and shall be produced as they were maintained in the ordinary course of business.

**DEFINITIONS**

Please note that all words herein have their meaning in the ordinary English usage. If there is any difficulty in understanding the scope or meaning of any word, please feel free to contact applicants' attorneys for an explanation.

Unless a contrary meaning appears in the text, the following definitions apply and shall be construed broadly to bring responses within the scope of the request that might otherwise be excluded when using a narrower construction. Definitions shall apply to words regardless of capitalization.

1. **Advertising or Advertisement** shall mean any oral, auditory, written, digital, graphic, or pictorial representation or message that is used in (a) promoting or selling a product, service, company, or brand; (b) promoting and associating a particular lifestyle, culture, or mindset with a product, service, company, or brand; or (c) seeking to inform or persuade members of a particular target market or audience regarding goods, services, organizations, or ideas. Advertisement includes any such representation or message published in a newspaper, magazine, journal, or other periodical; set forth in a notice, handbill, circular, flyer, pamphlet, catalogue, electronic mail, or letter; placed on a sign, billboard, poster, or other display; published on the Internet, television, radio, or social media; or contained in any tag or label attached to or accompanying any product offered for sale. Advertisement includes any of the foregoing categories of messages or representations that are sent, directed to, or disseminated to persons who are potential consumers of the advertised brand, company, product, or service. The term "Advertising" refers to the act of creating, disseminating, distributing, placing, purchasing, transmitting, and/or using an Advertisement.

2. **American Petroleum Institute, API, you, and your** shall include the American Petroleum Institute and any predecessor entity, as well as all its agents (whether as employees, independent contractors, or otherwise), employees, trustees, board members, foreign branches, divisions, groups, segments, departments, operating units, partners, managers, directors, representatives, contractors, subcontractors, principals, officers, officials, attorneys, associates, consultants, brokers, advisors, accountants, alter egos, parents, subsidiaries, and affiliates, or other persons or entities acting or purporting to act on your behalf.

3. **API Committees** shall refer to the following API-related committees or sub-committees:

a) The Climate Task Force (also referred to as the "CO2 and Climate Task Force" or "AQ-9 Task Force" or "Climate and Energy Task Force");

b) The Global Science Team (also referred to as the "Global Climate Science Team" or "GCST" or "Global Climate Science Communications Team" or "GCSCT");

c) The Climate Team (also referred to as the "Climate Steering Committee" or the "API Global Climate Change Steering Group");

d) The Committee for Air & Water Conservation;

e) The Global Climate Coordinating Council;

f) The Committee on Public Affairs;

g) The Environmental Affairs Division; and

h) Any other committee, sub-committee, or group engaging in work concerning Climate Change, Climate Adaptation, Climate Advocacy Activities, Climate Science, Climate Responses, or Greenhouse Gases.

4. **And** includes the word **or** and vice versa.

5. **Any** includes the word **all** and vice versa.

6. **Assessment** shall include evaluations, studies, reports.

7. **Climate Adaptation** shall mean taking action to prepare for, adjust to, and manage the current and future impacts of Climate Change.

8. **Climate Advocacy Activities** shall refer to any activity, conduct, communication, or expenditure undertaken, directly or indirectly, that is materially related to, intended to influence, or reasonably likely to affect public opinion, market behavior, bodies working on climate change, or stakeholder perceptions, concerning Climate Change or Climate Science, as defined herein, or concerning the likelihood that Climate Change has been and is occurring, or the likelihood that fossil fuel production and use are contributing to Climate Change. The term includes Public Relations and communications, media planning, media relations, social media, Marketing and Advertising, influencer marketing, strategic messaging, promotion, and research or analysis purposes.

9. **Climate Change** shall refer to any change, variation, disruption, or alteration in the Earth's climate system, whether natural or anthropogenic, including changes in atmospheric composition, temperature, precipitation patterns, ocean conditions, cryosphere conditions, or weather variability over any period of time, the accumulation, concentration, emission, or radiative forcing effects of greenhouse gases, and any actual or projected physical impacts of Climate Change, including sea-level rise, ocean warming or acidification, glacial or ice sheet melt, permafrost thaw, drought, desertification, water scarcity, flooding, wildfires, extreme weather events, major storms, or ecosystem disruption. The term shall be construed broadly and encompasses any synonymous, analogous, related, predecessor, or successor terms, phrases, or concepts, including the carbon dioxide problem, weather modification, heat balance of the atmosphere, solar variation, global warming, climatic change, climatic variation, climate instability or disruption, the climate crisis, the greenhouse effect, enhanced greenhouse, carbon emissions, CO2 buildup or accumulation, atmospheric CO2, or radiative forcing. Climate Change shall encompass the definition found in the Intergovernmental Panel on Climate Change Glossary, *available at* https://apps.ipcc.ch/glossary/.

10. **Climate Science** shall refer to any scientific, technical, or analytical data, study, discipline, field of inquiry, modeling, or body of knowledge relating to the Earth's climate system, including the causes, mechanisms, characteristics, effects, measurement, modeling, projection, or interpretation of Climate Change. The term shall be construed broadly and includes any synonymous, analogous, related, predecessor, or successor terms, phrases, or concepts, whether used in scientific, technical, regulatory, or business contexts.

11. **Climate Responses** shall refer to matters relating to Climate Adaptation, biofuels, net zero, hydrogen-based fuels, operational emissions reduction technologies, and carbon capture and sequestration or storage.

12. **Communication(s)** shall refer to any oral, written, in person, or any other form of relay, transmission, or transference of information or Documents by any means whatsoever including but not limited to by way of mail, computer, telephone, cellular or mobile phone, voice mail, electronic mail, digital file attachments, shared network or cloud-based storage drives, radio, video, sound recordings, television, telefax, telex, social media, or any other medium. Communications shall include Documents.

13. **Concerning** shall mean referring to, describing, offering evidence of, constituting, and relating to.

14. **Document(s)** is a broadly inclusive term, and shall refer to any and all written or other graphic matter, however produced, generated, or reproduced, of every kind and description, and to anything upon which sounds, pictures, or electronic images are recorded, transferred, imprinted or depicted by photography, video, typewriting, handwriting, sound recording, or otherwise. Documents also refer to any electronically stored data/information stored on magnetic media such as floppy diskettes, thumb drives, computer disk, hard computer disk, or other computer storage system. Such terms refer to originals, copies where originals are unavailable, copies of originals which differ in any manner from the originals, and all drafts prepared in connection with such matter, including but not limited to the following: contracts, agreements, memoranda of understanding, charts, graphs, inventories, accounts, lists, transcripts, abstracts, tape recordings, video recordings, sound reproductions, summaries, files, pleadings, depositions, answers to requests for admissions, answers to interrogatories, file jackets, file covers, records, books, papers, journals, correspondence, notes, electronic mail messages, agreements, statements, opinions, photographs, motion pictures, objects, microfilm, telegrams, telegraphs, telexes, telefaxes, texts, facsimiles, cables, copies, letters, memoranda, materials, notes, notations, scratch paper, minutes of meetings, minutes of interviews, minutes of in-person or telephonic conversations or communications, interoffice communications, shareholder

reports, press releases, reports, studies, statistical records, evaluations, tabulations, audits, reviews, assessments, statistics, stenographic notebooks, calendars, appointment books, diaries, agendas, time sheets, logs, computer disks, computer programs, databases, computer printouts, data processing cards, data processing tapes, or papers similar to any of the foregoing however denominated by the responding party, regardless of whether it was prepared in whole or in part by Respondent.

15. **Electronically Stored Information ("ESI")** shall mean, as referenced in the United States Federal Rules of Civil Procedure, information that is stored electronically, regardless of the media or whether it is in the original format in which it was created, as opposed to stored in hard copy (i.e., on paper). ESI is also considered to be Documents, as defined herein.

16. **Greenhouse Gases ("GHGs")** shall encompass the definition in the Intergovernmental Panel on Climate Change Glossary, *available at* https://apps.ipcc.ch/glossary/. This term shall be construed broadly to include greenhouse gas emissions, atmospheric CO2, methane, and other greenhouse gases, both natural and anthropogenic Greenhouse Gases and contributions, and the greenhouse effect.

17. **Including** shall mean including but not limited to.

18. **Industry Associations, Coalitions, and Campaigns** means the International Petroleum Industry Environmental Conservation Association ("IPIECA" or "Ipieca"), including the IPIECA Working Group on Global Climate Change; the Global Climate Coalition ("GCC"), including the Science and Technology Assessment Committee; the Global Climate Information Project; the Cooler Heads Coalition; the American Fuel and Petrochemical Manufacturers; the American Gas Association; the National Association of Manufacturers; the U.S. Chamber of Commerce; and the Western States Petroleum Association. This definition includes the present and former iterations of the associations, coalitions, and campaigns listed, their present and former parents and subsidiaries,

and their agents, representatives, trustees, officers, directors, employees, members, attorneys, and internal groups, subgroups, committees, and divisions.

19. **Marketing** shall mean any activity undertaken to promote, advertise, offer, sell, distribute, or otherwise generate interest in a product or service, including communications with actual or prospective customers through any medium.

20. **Public Relations** shall refer to communication that seeks to make use of publicity and other forms of promotion and information to influence the feelings, opinions, or beliefs about a company, its products or services, or about the value of the product or service or the activities of the organization to buyers, prospects, or other stakeholders. It similarly refers to the management of communication between a client or entity and audiences consisting of large groups of persons outside the company. Public Relations includes performing strategic planning relating to a client or entity's communications; issue management on behalf of clients or entities; identifying the communications environment; performing communication duties for organizations; managing communication programs, including (i) developing third-party communication organizations, (ii) devising measurement and reporting standards, (iii) creating certifications and recognitions (e.g., awards); writing, editing, and designing promotional communications and publications, including press releases; conducting research to facilitate communications; providing media training for clients, entities, and representatives; preparing clients or entities for government testimony; offering legislative representation; and counseling managers, individuals, groups of individuals, and other organizations relating to any of the above.

21. **Possession, custody, or control** shall include in the possession, custody, or control of Respondent, including Documents in the possession or custody of subsidiaries that are in Respondent's control, whether such Documents are found within or outside this district.

22. **Related to and relating to** shall mean in relation to, consisting of, referring to, reflecting, concerning, discussing, describing, evidencing, commenting on, supporting, contradicting or having any logical or factual connection with the matter identified, in whole or in part.

23. **Relied upon** shall mean informing, consulted, or otherwise serving to justify or support any particular position, communication, statement, or conclusion.

24. **Shell** shall refer to present and former iterations of, the present and former parents and subsidiaries of, the Shell Group of companies, including Shell plc, the Shell Transport and Trading Company Limited, Shell USA, Inc, and Shell Oil Company, as well as all its agents (whether as employees, independent contractors, or otherwise), employees, trustees, board members, foreign branches, divisions, groups, segments, departments, operating units, partners, managers, directors, representatives, contractors, subcontractors, principals, officers, officials, associates, consultants, brokers, advisors, accountants, and all persons and entities acting or purporting to act on its behalf.

25. All use of terms in the singular include the plural and vice versa.

## INSTRUCTIONS

1. Every request for a Document or Documents to be produced calls for the production of all responsive Documents in your possession, custody, or control, or in the possession, custody, or control of your present and former agents (whether as employees, independent contractors, or otherwise), employees, trustees, board members, foreign branches, divisions, groups, segments, departments, operating units, partners, managers, directors, representatives, contractors, subcontractors, principals, officers, officials, attorneys, associates, consultants, brokers, advisors, accountants, alter egos, parents, subsidiaries, and affiliates, or other persons or entities acting or purporting to act on your behalf, without regard to the physical location of such Documents. Without limiting the term "control," a Document is deemed to be within one's control if that person or entity

has any ownership, possession, or custody of the Document, or the right to obtain the Document or a copy thereof.

2. Every request for a Document or Documents to be produced requires production of the Document, in its entirety, without abbreviation or alteration, without redaction of any portions of the Document.

3. If any Document is withheld, in whole or in part (including, for example, attachments or cover letters), for any reason, including a claim of privilege, whether work-product or attorney-client or other, produce it to the extent possible, and identify each such Document withheld and set forth separately with respect to each such Document: the name and job title or capacity of the author(s)/originator(s), sender(s), addressee(s) and recipient(s) of the Document; the custodian(s) of the Document; the number of pages and the Bates numbers of the Document; the date the Document was prepared and, if different, the date(s) on which it was sent to or shared with persons other than the author(s); if no date appears on the document, an estimated date and a notation that it is estimated; the title, file name, and description of the Document; the subject matter addressed in the Document; type of Document (e.g., email or letter); the purpose(s) for which it was prepared or communicated; the specific basis for the claim that it is privileged; and all such other information as is sufficient to enable an assessment of the applicability of the privilege or protection claimed.

4. If a request seeks Communications from any person who used or uses alias names or email addresses, any Communications to or from such aliases must be included in your response.

5. If a request seeks a specific Document or an itemized category that is not in your possession, custody, or control, identify the Document by its author, recipient, and subject matter, provide all Documents you have that contain all or part of the information contained in the requested Document or category, and state whether the Document is lost, has been discarded or destroyed, or has been transferred to others.

6. You should construe every request for the production of copies of an original Document to include, to the extent applicable, preliminary drafts of Documents that differ in any respect from the original or final draft or from each other.

7. If you do not clearly understand, or if you have any questions about, the definitions, instructions, or any request for Documents, contact Applicant's counsel promptly for clarification.

8. All requested Documents shall be produced as they are kept in the regular course of business or shall be organized and labeled to correspond to the categories in this request. More particularly, all Documents must be produced in their entirety, including all attachments and enclosures, and in their original folder, binder, or other cover or container. A request for a Document shall be deemed to include a request for any and all transmittal sheets, cover letters, exhibits, enclosures or attachments to the document, in addition to the document itself. The Document shall be produced together with its Document families so the relationship is not obfuscated. Whenever a Document or group of Documents is removed from a file folder, binder, file drawer, file box, notebook, or other cover or container, a copy of the label of such cover or other container must be attached to the Document.

9. Form of production:

a) Paper Documents. All Documents maintained or stored by you in paper format shall be produced as digitally scanned images. You must unitize all scanned images with accurate Document breaks and package breaks.

b) Digital, electronic, or other Documents. All Documents produced shall conform to the provisions of an electronically stored information protocol ("ESI Protocol") to be agreed upon by the parties.

c) In general, however, all Documents stored by you digitally, electronically, or any other medium shall be produced in the Document's native format. In conjunction with

the production of any such Documents, all metadata or other bibliographic or historical data relating to such Documents shall also be produced. In addition, if information stored in such Documents cannot be accessed with systems or software available to the general public, such legacy or proprietary systems or software shall be produced with the Documents. If usernames, passwords, other credentials, or decryption systems are necessary to access information stored in digital, electronic, or other media, you must provide such usernames, passwords, credentials, or decryption devices when the Documents are produced.

d) Documents produced shall be Bates-stamped or otherwise sequentially marked in the lower right-hand corner. The Bates stamps must have consistent padding across the entire production and be sequential within a given Document. The numbering convention shall be consistent throughout rolling productions. There shall be no spaces between the prefix and the numeric value. There shall be no special characters used other than underscores and dashes. If suffixes are used, they shall be in dot notation (e.g., BATES000000001.001), unless the parties otherwise agree. Bates numbers shall be branded in the lower right-hand corner of all TIFF or PDF images and shall not obscure any part of the underlying image to the extent possible.

10. For each Document that is responsive to a request but redacted, in whole or in part, for any reason, including the assertion of privilege, a work product claim, or other objection, you must produce the non-privileged portion and indicate the portion of the Document so withheld by redacting in a manner that clearly indicates which characters, lines, and other portions of the Document are allegedly privileged, for example by stamping the words "MATERIAL REDACTED" on the Document at an appropriate location on the Document that does not obscure the remaining text.

11. To the extent a Document subject to an assertion of privilege, a work product claim, or other objection contains any responsive information not subject to such assertion or objection, the non-privileged portion must be produced. Claimed irrelevance is not a lawful basis for redacting or failing to produce part of a Document the balance of which contains responsive material.

12. All Documents or other items requested concerning a certain subject matter shall also include Documents or other items tending to support, contradict, rebut, or relate to statements made and conclusions drawn concerning such subject matter. To the extent that there are no Documents responsive to a particular request, you shall state so in writing.

13. If a request calls for Documents that utilize a specific word, the request shall also include any variant spellings and common misspellings of that word.

14. Your response to each request shall state (a) whether all responsive Documents, Communications, or things in your possession, custody, or control have been or will be produced; and (b) whether, after a diligent search, no responsive Documents or things are in your possession, custody, or control.

15. These instructions shall apply equally to Communications.

16. These requests are continuing, and your response to these requests must be properly supplemented when appropriate or necessary and pursuant to ongoing duties.

**DOCUMENT REQUESTS**

1. All Documents and Communications sufficient to identify and describe your document retention policies from 1965 to the date of production.

2. All Documents and Communications sufficient to identify and describe your internal corporate structure from 1965 to 2021.

3. All Documents and Communications sufficient to show Shell's affiliation with and involvement with you from 1965 to 2021, including any formal or informal positions or roles held at

or in relation to API by Shell's employees or representatives, including any membership, liaisons, positions, titles, ambassadors, or attendees at API or API-affiliated groups, occasions, or meetings. This includes Documents and Communications sufficient to demonstrate any time a Shell employee, representative, agent, or affiliate served as a member of any of API's boards, committees, or subgroups, or as a consultant in any capacity; and any time a Shell employee, representative, agent, or affiliate attended an API-hosted or affiliated meeting.

4. All Documents and Communications sufficient to show Shell's financial contributions to API and API-sponsored work, initiatives, coalitions, campaigns, research, Advertisements, and studies from 1965 to 2021.

5. All Documents and Communications sufficient to show policies and practices regarding how Shell's financial contributions to API and API-sponsored work, initiatives, coalitions, campaigns, research, Advertisements, and studies could be used, including Documents and Communications sufficient to show parameters, limits, and prohibitions on how Shell's financial contributions could be used from 1965 to 2021.

6. All Documents and Communications sufficient to show where, when, and how much of Shell's financial contributions were used to fund API and API-sponsored work, initiatives, coalitions, campaigns, research, Advertisements, and studies related to Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses from 1965 to 2021.

7. All Documents and Communications related to, from, or with Shell that concern Climate Change, Greenhouse Gases, Climate Advocacy Activities, and Climate Science from 1965 to 2021.

8. All Documents and Communications such as analyses, memoranda, and reports, that Shell assisted with or contributed to in whole or in part—including through research, commentary,

review, or funding—and that are related to Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses from 1965 to 2021.

9. All Documents and Communications related to both Shell and the listing of CO2 or methane as a pollutant under the Clean Air Act.

10. All Documents and Communications related to Shell's review, input, approval, and position on API's policies and approaches with respect to the United Nations Framework Convention on Climate Change and the International Panel on Climate Change, including but not limited to the United Nations Conference on Environment and Development, the Kyoto Protocol, and the Paris Agreement.

11. All Documents and Communications related to both Shell and the Kyoto Protocol.

12. All Documents and Communications concerning Climate Change and its impacts, Greenhouse Gases, or Climate Science and related to typhoons, the Philippines, or the Asia-Pacific region.

13. All Documents and Communications sufficient to identify and describe individuals, teams, divisions, and groups—employed by or affiliated with you—that conducted work related to Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses from 1965 to 2021. This includes Documents and Communications sufficient to identify, *inter alia*, relevant departments, academics, academic institutions, committees, groups, subgroups, subcommittees, collaborations, individual titles, consultants, Public Relations and Advertising firms, marketing groups, and experts.

14. All Documents and Communications sufficient to identify, describe, and explain the organizational structures of the API Committees, including any organograms and an explanation of the relevant internal departments and workstreams, the purpose and objectives of each sub-committee, and how they interacted with other groups within API from 1965 to 2021.

15. All Documents and Communications of the API Committees relating to Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Responses, and Climate Science and from 1965 to 2021, including but not limited to:

a) discussions of the genesis or need for the existence of each Committee;

b) Documents and Communications sufficient to evidence Shell's relationships to, involvement in, or information received from any Committee;

c) all reports and memoranda produced;

d) all board meeting minutes (and all papers submitted to any boards for such meetings);

e) discussions of actual and potential private and public litigation and regulation relating to Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses;

f) discussions concerning Public Relations, Advertising, and Marketing as it relates to Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses;

g) all strategy papers, such as annual plans, reports, and long-term planning Documents along with budget Documents;

h) all scientific reports presented to or commissioned by each API Committee;

i) all Marketing, public opinion, or Public Relations reports presented to or commissioned by each API Committee; and

j) all reports made by each API Committee to their upward reporting lines.

16. All Documents and Communications relating to the Industry Associations, Coalitions, and Campaigns and concerning Climate Change, Greenhouse Gases, Climate Advocacy Activities, and Climate Science from 1965 to 2021, including but not limited to:

a) all Documents and Communications containing details of entities and individuals who were members of or affiliated with the Industry Associations, Coalitions, and Campaigns;

b) all meeting minutes and sign-in sheets;

c) all related strategy papers and updates, such as annual plans, reports, and long-term planning documents, received from and provided to the Industry Associations, Coalitions, and Campaigns;

d) all scientific reports, papers, or analyses received from or provided to the Industry Associations, Coalitions, and Campaigns;

e) all Documents and Communications related to any campaigns, commercials, Public Relations, target audiences, and Advertisements;

f) all Documents and Communications related to message testing and focus groups;

g) all Documents and Communications related to the establishment of the GCC;

h) all Documents and Communications related to the establishment and work of the IPIECA Working Group on Global Climate Change;

i) all Documents and Communications related to the briefing document prepared by the IPIECA Working Group on Global Climate Change for IPIECA membership in February 1990, titled *Potential Enhanced Greenhouse Effect*, including the July 1989 document titled *The American Petroleum Institute (API) Position on Global Climate Change*, including the Document itself;

j) all Documents and Communications related to the 1994 GCC document titled, *Issues and Options: Potential Global Climate Change*, including the Document itself;

k) all Documents and Communications related to the 1995 GCC document titled, *Climate Change: Your Passport to the Facts*, including the Document itself;

l) all Documents and Communications related to the 1996 GCC document titled, *Primer on Climate Change Science – Final Draft*, including the Document itself;

m) all Documents and Communications related to the 1996 GCC document titled, *Global Climate Coalition, An Overview*, *available at* https://www.documentcloud.org/documents/5453339-1996-GCC-Overview-and-Reports/, including the document itself, including the Document itself;

n) all Documents and Communications related to the International Panel on Climate Change's assessment reports;

o) all Documents and Communications containing details of the organizational structures of the Industry Associations, Coalitions, and Campaigns, including the IPIECA Working Group on Global Climate Change (also known as the Ad Hoc Group on the Greenhouse Effect) and the GCC's Science and Technology Assessment Committee, including any organograms and an explanation of the relevant internal departments and workstreams; any Documents describing the purpose and objectives of each committee; and any Documents identifying the individuals who staffed each committee or department and discussing how they interacted with other groups within their respective organizations;

p) all Documents and Communications sufficient to demonstrate Shell's participation in the Industry Associations, Coalitions, and Campaigns, including participation in the creation of or funding of any of them; and

q) all Documents and Communications related to Shell's departure from the GCC.

17. All Documents and Communications related to communications with the California Institute of Technology and its employees or affiliates, including Harrison Brown, concerning Climate Change, Greenhouse Gases, Climate Advocacy Activities, and Climate Science.

18. All Documents and Communications related to the Energy and Man symposium held in New York City in 1959, including attendees.

19. All Documents and Communications related to Communications with, from, or about Edward Teller.

20. All Documents and Communications related to Communications with, from, or about Marion King Hubbert, concerning Climate Change, Greenhouse Gases, Climate Advocacy Activities, and Climate Science, including any analyses prepared for API.

21. All Documents and Communications related to the February 9, 1980 AQ-9 Task Force meeting at which there was a presentation from John Laurmann of Stanford University, including the March 18, 1980 letter from Jimmie J. Nelson.

22. All Documents and Communications related to Communications with, from, or about John Laurmann.

23. All Documents and Communications related to the following Documents, including the Documents themselves:

a) the Document titled *Meeting the Challenges of 1966* by Frank N. Ikard, *available at* https://www.documentcloud.org/documents/5348130-1965-API-Proceedings/;

b) the paper titled *Environmental Pollution resulting from the Production and Use of Fuels: Petroleum and Petroleum Products* which was submitted to the Organisation for Economic Co-operation and Development's ("OECD") Special Committee for Oil ahead of their September 24, 1968 meeting;

c) the 1968 report from the E. Robinson and R.C. Robbins / Stanford Research Institute titled *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants*;

d) the 1969 supplemental report from the E. Robinson and R.C. Robbins / Stanford Research Institute titled *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants: Supplement*;

e) the 1982 Document titled *Climate Models and CO2 Warming: A Selective Review and Summary*, prepared by Alan Oppenheim and William L. Donn of Columbia University's Lamont-Doherty Geological Observatory;

f) the 1988 Shell report titled *The Greenhouse Effect*, *available at* https://s3.documentcloud.org/documents/4411090/Document3.pdf;

g) the 1992 Shell Document titled, *The Potential Augmented Greenhouse Effect, & Depletion of the Ozone Layer*, *available at* https://www.documentcloud.org/documents/24359060-1992-internal-shell-group-planning-report-potential-augmented-greenhouse-effect-and-depletion-of-the-ozone-layer/;

h) the 1994 Shell Document titled, *The Enhanced Greenhouse Effect*, *available at* https://embed.documentcloud.org/documents/4411099-Document11/#document/p15/a411511;

i) the 1995 Shell Document titled, *Is Climate Change Occurring Already?*, *available at* https://www.climatefiles.com/shell/1995-shell-internal-report-is-climate-change-occurring-already/;

j) the 1996 API Document titled, *Reinventing Energy, Making the Right Choices*, *available at* https://www.documentcloud.org/documents/4224133-Reinventing-Energy/;

k) the 1997 Washington Post article, *A Climate Policy*, by William O'Keefe; and

l) the 1998 Document titled, *The Global Climate Science Communications Action Plan*, *available at* https://s3.documentcloud.org/documents/2840903/1998-API-Global-Climate-Science-Communications.pdf.

24. All Documents and Communications sufficient to identify all individuals, firms, companies, independent contractors, and groups involved in Marketing, Public Relations, media campaigns, influence campaigns, polling and assessment, Advertising, content, and messaging related to Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses that API engaged, hired, contracted with formally or informally, including, for example:

a) The E. Bruce Harrison Company and any of its employees, representatives, or affiliates;

b) Edelman or Daniel J. Edelman and Associates and any of their employees, representatives, or affiliates; and

c) Blue Advertising and any of their employees, representatives, or affiliates.

25. All Documents and Communications and statements financed fully or in part by, published, drafted, edited, or commissioned by you concerning Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses that were made public or intended to be made public.

26. All Documents and Communications concerning public understanding, consumer viewpoints, or consumer behavior concerning Climate Change, Greenhouse Gases, Climate Advocacy, Climate Science, and Climate Responses, including testing, consumer surveys, and polling.

Dated: September 28, 2026

*/s/ Alison Borochoff-Porte*

Alison Borochoff-Porte (D.C. Bar No. 219393)
Lindsay A. Bailey (D.C. Bar No. 17234447)
Rachel Conrad (D.C. Bar No. 90042405)*
**EARTHRIGHTS INTERNATIONAL**
1400 K Street NW, Suite 750
Washington, DC 20005
Tel.: (202) 466-5188 x116
alison.borochoff-porte@earthrights.org
lindsay.bailey@earthrights.org
rachel.conrad@earthrights.org

Reena Gambhir (D.C. Bar No. 989470)*
Mary Sameera Van Houten Harper (D.C. Bar No. 1045137)
Kira Hesskiel (D.C. Bar No. 90016170)*
**HAUSFELD LLP**
1200 17th Street, Suite 600
Washington, DC 20036
Tel.: (202) 540-7200
Fax: (202) 540-7201
rgambhir@hausfeld.com
mvanhouten@hausfeld.com
khesskiel@hausfeld.com

**Pro hac vice* motions forthcoming

# Exhibit C

efile Public Visual Render | ObjectId: 202523219349306147 - Submission: 2025-11-17 | TIN: 13-0433430

Form **990**

Department of the Treasury
Internal Revenue Service

# Return of Organization Exempt From Income Tax

**Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)**

Do not enter social security numbers on this form as it may be made public.

**Go to *www.irs.gov/Form990* for instructions and the latest information.**

OMB No. 1545-0047

**2024**

**Open to Public Inspection**

**A For the 2024 calendar year, or tax year beginning 01-01-2024 , and ending 12-31-2024**

**B** Check if applicable:
- ☐ Address change
- ☐ Name change
- ☐ Initial return
- ☐ Final return/terminated
- ☐ Amended return
- ☐ Application pending

C Name of organization
AMERICAN PETROLEUM INSTITUTE

Doing business as

Number and street (or P.O. box if mail is not delivered to street address) | Room/suite
200 MASSACHUSETTS AVE NW 1100

City or town, state or province, country, and ZIP or foreign postal code
WASHINGTON, DC 20001

**D Employer identification number**
13-0433430

E Telephone number
(202) 682-8000

G Gross receipts $ 268,010,806

F Name and address of principal officer:
MICHAEL J SOMMERS
200 MASSACHUSETTS AVE NW 1100
WASHINGTON, DC 20001

H(a) Is this a group return for subordinates? ☐ Yes ☑ No

H(b) Are all subordinates included? ☐ Yes ☐ No
If "No," attach a list. See instructions.

H(c) Group exemption number

**I** Tax-exempt status: ☐ 501(c)(3) ☑ 501(c) ( 6 ) (insert no.) ☐ 4947(a)(1) or ☐ 527

**J Website:** WWW.API.ORG

**K** Form of organization: ☑ Corporation ☐ Trust ☐ Association ☐ Other

L Year of formation: 1919

M State of legal domicile: DC

## Part I Summary

**Activities & Governance**

1 Briefly describe the organization's mission or most significant activities:
SEE FORM 990, PART III, LINE 1 FOR COMPLETE MISSION STATEMENT

2 Check this box ☐

| | | | |
|---|---|---|---|
| 3 | Number of voting members of the governing body (Part VI, line 1a) | 3 | 42 |
| 4 | Number of independent voting members of the governing body (Part VI, line 1b) | 4 | 41 |
| 5 | Total number of individuals employed in calendar year 2024 (Part V, line 2a) | 5 | 372 |
| 6 | Total number of volunteers (estimate if necessary) | 6 | 20,000 |
| 7a | Total unrelated business revenue from Part VIII, column (C), line 12 | 7a | 0 |
| b | Net unrelated business taxable income from Form 990-T, Part I, line 11 | 7b | 0 |

| | | | Prior Year | Current Year |
|---|---|---|---|---|
| Revenue | 8 | Contributions and grants (Part VIII, line 1h) | 0 | 0 |
| | 9 | Program service revenue (Part VIII, line 2g) | 235,117,523 | 217,973,539 |
| | 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d ) | 1,446,290 | 2,493,564 |
| | 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 30,991,674 | 31,860,393 |
| | 12 | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 267,555,487 | 252,327,496 |
| Expenses | 13 | Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) | 229,626 | 305,380 |
| | 14 | Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| | 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 78,635,308 | 82,080,228 |
| | 16a | Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| | b | Total fundraising expenses (Part IX, column (D), line 25) 0 | | |
| | 17 | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 179,451,547 | 173,035,461 |
| | 18 | Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) | 258,316,481 | 255,421,069 |
| | 19 | Revenue less expenses. Subtract line 18 from line 12 | 9,239,006 | -3,093,573 |

| | | | Beginning of Current Year | End of Year |
|---|---|---|---|---|
| Net Assets or Fund Balances | 20 | Total assets (Part X, line 16) | 122,917,046 | 109,879,063 |
| | 21 | Total liabilities (Part X, line 26) | 133,697,455 | 108,642,792 |
| | 22 | Net assets or fund balances. Subtract line 21 from line 20 | -10,780,409 | 1,236,271 |

## Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| | | |
|---|---|---|
| **Sign Here** | Signature of officer | 2025-11-14<br>Date |
| | AMY KRIZ VICE PRESIDENT & CFO<br>Type or print name and title | |

| | | | | | |
|---|---|---|---|---|---|
| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date<br>2025-11-12 | Check ☐ if self-employed | PTIN<br>P01345960 |
| | Firm's name CLIFTONLARSONALLEN LLP | | | Firm's EIN 41-0746749 | |
| | Firm's address 950 NORTH GLEBE ROAD SUITE 1200<br>ARLINGTON, VA 22203 | | | Phone no. (571) 227-9500 | |

May the IRS discuss this return with the preparer shown above? See Instructions. . . . . . . . . . ☐ Yes ☑ No

**For Paperwork Reduction Act Notice, see the separate instructions.** Cat. No. 11282Y Form **990** (2024)





Part III **Statement of Program Service Accomplishments**

Check if Schedule O contains a response or note to any line in this Part III . . . . . . . . . . . . . . ☑

**1** Briefly describe the organization's mission:

THE MISSION OF AMERICAN PETROLEUM INSTITUTE (API) IS TO PROMOTE SAFETY ACROSS THE INDUSTRY GLOBALLY AND TO INFLUENCE PUBLIC POLICY IN SUPPORT OF A STRONG, VIABLE U.S. OIL AND NATURAL GAS INDUSTRY.

**2** Did the organization undertake any significant program services during the year which were not listed on the prior Form 990 or 990-EZ? . . . . . . . . . . . . . . . . . . . . ☐ Yes ☑ No

If "Yes," describe these new services on Schedule O.

**3** Did the organization cease conducting, or make significant changes in how it conducts, any program services? . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☑ No

If "Yes," describe these changes on Schedule O.

**4** Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses. Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and revenue, if any, for each program service reported.

**4a** (Code: ) (Expenses $ including grants of $ ) (Revenue $ )

ADVOCACY - API SPEAKS FOR THE OIL AND NATURAL GAS INDUSTRY TO THE PUBLIC, CONGRESS, THE EXECUTIVE BRANCH, STATE GOVERNMENTS AND THE MEDIA. API NEGOTIATES WITH REGULATORY AGENCIES, REPRESENTS THE INDUSTRY IN LEGAL PROCEEDINGS, PARTICIPATES IN COALITIONS AND WORKS IN PARTNERSHIP WITH OTHER ASSOCIATIONS TO ACHIEVE OUR MEMBERS' PUBLIC POLICY GOALS.

**4b** (Code: ) (Expenses $ including grants of $ ) (Revenue $ )

RESEARCH & STATISTICS - API CONDUCTS OR SPONSORS ANALYSIS AND RESEARCH IN SUPPORT OF FREE MARKETS, INFORMS COST-EFFECTIVE REGULATION, AND PROMOTES ECONOMIC GROWTH. WE COLLECT, MAINTAIN AND PUBLISH STATISTICS AND DATA ON ALL ASPECTS OF U.S. INDUSTRY OPERATIONS, INCLUDING SUPPLY AND DEMAND FOR VARIOUS PRODUCTS, IMPORTS AND EXPORTS, DRILLING ACTIVITIES AND COSTS, AND WELL COMPLETIONS. THIS DATA PROVIDES TIMELY INDICATORS OF INDUSTRY TRENDS. API'S WEEKLY STATISTICAL BULLETIN IS THE MOST RECOGNIZED PUBLICATION, WIDELY REPORTED BY THE MEDIA.

**4c** (Code: ) (Expenses $ including grants of $ ) (Revenue $ )

STANDARDS - SINCE 1924, API HAS LED THE DEVELOPMENT OF MORE THAN 800 PETROLEUM, NATURAL GAS AND PETROCHEMICAL EQUIPMENT AND OPERATING STANDARDS. THESE REFLECT THE INDUSTRY'S COLLECTIVE EXPERTISE AND ACCEPTED GOOD PRACTICES. ADDRESSING EVERYTHING FROM DRILL BITS TO ENVIRONMENTAL PROTECTION, THEY ADVANCE SAFETY, EFFICIENCY AND ENVIRONMENTAL RESPONSIBILITY. API STANDARDS ARE RECOGNIZED WORLDWIDE FOR THEIR TECHNICAL RIGOR AND GLOBAL IMPACT, WITH MANY INCORPORATED INTO FEDERAL AND STATE REGULATIONS. DEVELOPED THROUGH A CONSENSUS-DRIVEN PROCESS ACCREDITED BY THE AMERICAN NATIONAL STANDARDS INSTITUTE (ANSI), THEY ARE THE MOST WIDELY CITED STANDARDS BY THE INTERNATIONAL REGULATORY COMMUNITY.

(Code: ) (Expenses $ including grants of $ ) (Revenue $ )

CERTIFICATION - EACH DAY, THE OIL AND NATURAL GAS INDUSTRY DEPENDS ON EQUIPMENT TO PRODUCE, REFINE AND DISTRIBUTE ITS PRODUCTS. THE EQUIPMENT USES ADVANCED TECHNOLOGY, ALLOWING THE INDUSTRY TO OPERATE IN AN ENVIRONMENTALLY SAFE AND EFFICIENT MANNER. API'S STANDARDS SUPPORT THAT EFFORT, PROVIDING TECHNICAL GUIDANCE THAT ALIGNS WITH INDUSTRY GOOD PRACTICES, BUT API'S ROLE EXTENDS BEYOND PUBLISHING TECHNICAL DOCUMENTS. THROUGH ITS CERTIFICATION PROGRAMS, API PROVIDES A STRUCTURED, VERIFIABLE WAY FOR COMPANIES TO DEMONSTRATE CONFORMANCE TO THOSE STANDARDSAND TO BUILD CREDIBILITY IN A HIGH-STAKES, HIGHLY SCRUTINIZED INDUSTRY.

(Code: ) (Expenses $ including grants of $ ) (Revenue $ )

EVENTS AND TRAINING - API ORGANIZES SEMINARS, WORKSHOPS, CONFERENCES AND SYMPOSIA ON PUBLIC POLICY ISSUES. THROUGH API-U, WE PROVIDE TRAINING MATERIALS TO HELP PEOPLE IN THE OIL AND NATURAL GAS BUSINESS MEET REGULATORY REQUIREMENTS AND INDUSTRY STANDARDS.

(Code: ) (Expenses $ including grants of $ ) (Revenue $ )

SAFETY - THE CENTER FOR OFFSHORE SAFETY IS AN INDUSTRY SPONSORED PROGRAM THAT WAS ESTABLISHED TO PROVIDE TOOLS, PEER LEARNING OPPORTUNITIES, GOOD PRACTICES AND SUPPORT FOR COMPANIES OPERATING ON THE U.S. OUTER CONTINENTAL SHELF. API'S SYSTEM PROGRAMS SAFETY ASSESSMENTS, INCLUDING THE PROCESS SAFETY SITE ASSESSMENT PROGRAM (PSSAP) AND THE PIPELINE SAFETY MANAGEMENT SYSTEM (SMS) ASSESSMENT PROGRAM, PROVIDE FOR INDEPENDENT ASSESSMENT BY CREDIBLE, THIRD-PARTY SAFETY EXPERTS OF A REFINERY'S (PSSAP) OR AN OPERATOR'S (PIPELINE SMS) SAFETY MANAGEMENT SYSTEMS BASED UPON API'S STANDARDS AND RECOMMENDED PRACTICES.

| | | |
|---|---|---|
| 4d | Other program services (Describe in Schedule O.) (Expenses $ including grants of $ ) (Revenue $ ) | |
| 4e | **Total program service expenses** | |

Form **990** (2024)

Page 3

Form 990 (2024) Page **3**

## Part IV Checklist of Required Schedules

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If "Yes," complete Schedule A* | 1 | | No |
| 2 | Is the organization required to complete *Schedule B, Schedule of Contributors*? See instructions. | 2 | | No |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? *If "Yes," complete Schedule C, Part I* | 3 | Yes | |
| 4 | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? *If "Yes," complete Schedule C, Part II* | 4 | | |
| 5 | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Rev. Proc. 98-19? *If "Yes," complete Schedule C, Part III* | 5 | Yes | |
| 6 | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If "Yes," complete Schedule D*, Part I | 6 | | No |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? *If "Yes," complete Schedule D, Part II* | 7 | | No |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If "Yes," complete Schedule D,* Part III | 8 | | No |
| 9 | Did the organization report an amount in Part X, line 21 for escrow or custodial account liability; serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? *If "Yes," complete Schedule D, Part IV* | 9 | | No |
| 10 | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi endowments? *If "Yes," complete Schedule D, Part V* | 10 | | No |
| 11 | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X, as applicable. | | | |
| a | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? *If "Yes," complete Schedule D,* Part VI. | 11a | Yes | |
| b | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VII* | 11b | | No |
| c | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VIII* | 11c | | No |
| d | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part IX* | 11d | Yes | |
| e | Did the organization report an amount for other liabilities in Part X, line 25? *If "Yes," complete Schedule D, Part X* | 11e | Yes | |
| f | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If "Yes," complete Schedule D, Part X* | 11f | | No |
| 12a | Did the organization obtain separate, independent audited financial statements for the tax year? *If "Yes," complete Schedule D, Parts XI and XII* | 12a | | No |
| b | Was the organization included in consolidated, independent audited financial statements for the tax year? *If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional* | 12b | Yes | |
| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* | 13 | | No |
| 14a | Did the organization maintain an office, employees, or agents outside of the United States? | 14a | Yes | |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If "Yes," complete Schedule F, Parts I and IV* | 14b | Yes | |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? *If "Yes," complete Schedule F, Parts II and IV* | 15 | | No |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? *If "Yes," complete Schedule F, Parts III and IV* | 16 | Yes | |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If "Yes," complete Schedule G, Part I.* See instructions. | 17 | | No |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* | 18 | | No |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* | 19 | | No |
| 20a | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* | 20a | | No |

| | | | | |
|---|---|---|---|---|
| | | 20a | | No |
| b | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | 20b | | |
| 21 | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* | 21 | Yes | |

Form **990** (2024)

Page 4

Form 990 (2024) Page **4**

**Part IV Checklist of Required Schedules** *(continued)*

| | | | Yes | No |
|---|---|---|---|---|
| 22 | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* | 22 | | No |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5, about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* | 23 | Yes | |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25a* | 24a | | No |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? | 24b | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? | 24c | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? | 24d | | |
| 25a | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L,* Part I | 25a | | |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L,* Part I | 25b | | |
| 26 | Did the organization report any amount on Part X, line 5 or 22 for receivables from or payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part II* | 26 | | No |
| 27 | Did the organization provide a grant or other assistance to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or employee thereof, a grant selection committee member, or to a 35% controlled entity (including an employee thereof) or family member of any of these persons? *If "Yes," complete Schedule L,*Part III | 27 | | No |
| 28 | Was the organization a party to a business transaction with one of the following parties (see the Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): | | | |
| a | A current or former officer, director, trustee, key employee, creator or founder, or substantial contributor? *If "Yes," complete Schedule L, Part IV* | 28a | | No |
| b | A family member of any individual described in line 28a? *If "Yes," complete Schedule L, Part IV* | 28b | | No |
| c | A 35% controlled entity of one or more individuals and/or organizations described in line 28a or 28b? *If "Yes," complete Schedule L, Part IV* | 28c | | No |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* | 29 | | No |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* | 30 | | No |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* | 31 | | No |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* | 32 | | No |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* | 33 | Yes | |
| 34 | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* | 34 | Yes | |
| 35a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | 35a | Yes | |
| b | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* | 35b | Yes | |
| 36 | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* | 36 | | |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* | 37 | | No |
| 38 | Did the organization complete Schedule O and provide explanations on Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O. | 38 | Yes | |

**Part V Statements Regarding Other IRS Filings and Tax Compliance**

Check if Schedule O contains a response or note to any line in this Part V ☐

| | | | | Yes | No |
|---|---|---|---|---|---|
| **1a** | Enter the number reported in box 3 of Form 1096. Enter -0- if not applicable | 1a | 418 | | |
| **b** | Enter the number of Forms W-2G included on line 1a. Enter -0- if not applicable | 1b | 0 | | |
| **c** | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? | | 1c | | |

Form **990** (2024)

Page 5

Form 990 (2024) Page **5**

Part V **Statements Regarding Other IRS Filings and Tax Compliance** *(continued)*

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| **2a** | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return | 2a | 372 | | | |
| **b** | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? | | | 2b | Yes | |
| **3a** | Did the organization have unrelated business gross income of $1,000 or more during the year? | | | 3a | | No |
| **b** | If "Yes," has it filed a Form 990-T for this year?*If "No" to line 3b, provide an explanation in Schedule O* | | | 3b | | |
| **4a** | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | | | 4a | Yes | |
| **b** | If "Yes," enter the name of the foreign country:BR , CH<br>See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). | | | | | |
| **5a** | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? | | | 5a | | No |
| **b** | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | | | 5b | | No |
| **c** | If "Yes," to line 5a or 5b, did the organization file Form 8886-T? | | | 5c | | |
| **6a** | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? | | | 6a | | No |
| **b** | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? | | | 6b | | |
| **7** | **Organizations that may receive deductible contributions under section 170(c).** | | | | | |
| **a** | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? | | | 7a | | |
| **b** | If "Yes," did the organization notify the donor of the value of the goods or services provided? | | | 7b | | |
| **c** | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? | | | 7c | | |
| **d** | If "Yes," indicate the number of Forms 8282 filed during the year | 7d | | | | |
| **e** | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | | | 7e | | |
| **f** | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? | | | 7f | | |
| **g** | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? | | | 7g | | |
| **h** | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? | | | 7h | | |
| **8** | **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? | | | 8 | | |
| **9** | **Sponsoring organizations maintaining donor advised funds.** | | | | | |
| **a** | Did the sponsoring organization make any taxable distributions under section 4966? | | | 9a | | |
| **b** | Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? | | | 9b | | |
| **10** | **Section 501(c)(7) organizations.** Enter: | | | | | |
| **a** | Initiation fees and capital contributions included on Part VIII, line 12 | 10a | | | | |
| **b** | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | 10b | | | | |
| **11** | **Section 501(c)(12) organizations.** Enter: | | | | | |
| **a** | Gross income from members or shareholders | 11a | | | | |
| **b** | Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.) | 11b | | | | |
| **12a** | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | | | 12a | | |
| **b** | If "Yes," enter the amount of tax-exempt interest received or accrued during the year. | 12b | | | | |
| **13** | **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | | | |
| **a** | Is the organization licensed to issue qualified health plans in more than one state?<br>**Note.** See the instructions for additional information the organization must report on Schedule O. | | | 13a | | |

| | | | | Yes | No |
|---|---|---|---|---|---|
| b | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans | 13b | | | |
| c | Enter the amount of reserves on hand | 13c | | | |
| 14a | Did the organization receive any payments for indoor tanning services during the tax year? | | 14a | | No |
| b | If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation in Schedule O* | | 14b | | |
| 15 | Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? If "Yes," see the instructions and file Form 4720, Schedule N. | | 15 | Yes | |
| 16 | Is the organization an educational institution subject to the section 4968 excise tax on net investment income? If "Yes," complete Form 4720, Schedule O. | | 16 | | No |
| 17 | **Section 501(c)(21) organizations.** Did the trust, or any disqualified or other person engage in any activities that would result in the imposition of an excise tax under section 4951, 4952, or 4953? If "Yes," complete Form 6069. | | 17 | | |

Form **990** (2024)

Page 6

Form 990 (2024) Page **6**

Part VI **Governance, Management, and Disclosure.** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.*
Check if Schedule O contains a response or note to any line in this Part VI ☑

**Section A. Governing Body and Management**

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| 1a | Enter the number of voting members of the governing body at the end of the tax year | 1a | 42 | | | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | | | | | |
| b | Enter the number of voting members included in line 1a, above, who are independent | 1b | 41 | | | |
| 2 | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? | | | 2 | | No |
| 3 | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? | | | 3 | | No |
| 4 | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? | | | 4 | | No |
| 5 | Did the organization become aware during the year of a significant diversion of the organization's assets? | | | 5 | | No |
| 6 | Did the organization have members or stockholders? | | | 6 | Yes | |
| 7a | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? | | | 7a | Yes | |
| b | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? | | | 7b | | No |
| 8 | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | | | |
| a | The governing body? | | | 8a | Yes | |
| b | Each committee with authority to act on behalf of the governing body? | | | 8b | Yes | |
| 9 | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* | | | 9 | | No |

**Section B. Policies** *(This Section B requests information about policies not required by the Internal Revenue Code.)*

| | | | Yes | No |
|---|---|---|---|---|
| 10a | Did the organization have local chapters, branches, or affiliates? | 10a | Yes | |
| b | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | 10b | Yes | |
| 11a | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? | 11a | | No |
| b | Describe on Schedule O the process, if any, used by the organization to review this Form 990. | | | |
| 12a | Did the organization have a written conflict of interest policy? *If "No," go to line 13* | 12a | Yes | |
| b | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? | 12b | Yes | |
| c | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe on Schedule O how this was done* | 12c | Yes | |
| 13 | Did the organization have a written whistleblower policy? | 13 | Yes | |
| 14 | Did the organization have a written document retention and destruction policy? | 14 | Yes | |
| 15 | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| a | The organization's CEO, Executive Director, or top management official | 15a | Yes | |
| b | Other officers or key employees of the organization | 15b | Yes | |
| | If "Yes" to line 15a or 15b, describe the process on Schedule O. See instructions. | | | |

| | | | |
|---|---|---|---|
| **16a** Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? | **16a** | | No |
| **b** If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? | **16b** | | |

**Section C. Disclosure**

**17** List the states with which a copy of this Form 990 is required to be filed CA

**18** Section 6104 requires an organization to make its Form 1023 (1024 or 1024-A, if applicable), 990, and 990-T (section 501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.

☐ Own website ☐ Another's website ☑ Upon request ☐ Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

**20** State the name, address, and telephone number of the person who possesses the organization's books and records:
AMY KRIZ 200 MASSACHUSETTS AVENUE NW 1100 WASHINGTON, DC 20001 (202) 682-8000

Form **990** (2024)

Page 7

Form 990 (2024) Page **7**

Part VII **Compensation of Officers, Directors,Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**

Check if Schedule O contains a response or note to any line in this Part VII ☐

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

- List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.
- List all of the organization's **current** key employees, if any. See the instructions for definition of "key employee."
- List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (box 5 of Form W-2, box 6 of Form 1099-MISC, and/or box 1 of Form 1099-NEC) of more than $100,000 from the organization and any related organizations.
- List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.
- List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See the instructions for the order in which to list the persons above.

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee): Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | (D) Reportable compensation from the organization (W-2/1099-MISC/1099-NEC) | (E) Reportable compensation from related organizations (W-2/1099-MISC/1099-NEC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) MICHAEL J SOMMERS<br>PRESIDENT AND CEO | 40.00 | X | | X | | | | 5,131,620 | 0 | 1,021,758 |
| (2) JOHN B HESS<br>CHAIRMAN OF THE BOARD | 0.50 | X | | X | | | | 0 | 0 | 0 |
| (3) GRETCHEN H WATKINS<br>BOARD MEMBER & CHAIR FIN CMTE | 0.50 | X | | X | | | | 0 | 0 | 0 |
| (4) ORLANDO ALVAREZ<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (5) ALAN S ARMSTRONG<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (6) WILLIE CHIANG<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| | 0.50 | | | | | | | | | |

| (A) Name and title | (B) Average hours per week | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | (D) | (E) | (F) |
|---|---|---|---|---|---|---|---|---|---|---|
| (7) JOHN J CHRISTMANN<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (8) GREGORY L EBEL<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (9) SANDY ESSLEMONT<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (10) W RANDALL FOWLER<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (11) ANN G FOX<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (12) JACK A FUSCO<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (13) CHRIS GOLDEN<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (14) MIKE J HENNIGAN<br>BOARD MEMBER - LEFT NOV 2024 | 0.50 | X | | | | | | 0 | 0 | 0 |
| (15) STEPHEN L HIGHTOWER<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (16) VICKI HOLLUB<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (17) W HERBERT HUNT<br>BOARD MEMBER - LEFT APR 2024 | 0.50 | X | | | | | | 0 | 0 | 0 |

Form **990** (2024)

Page 8

Form 990 (2024) Page **8**

Part VII **Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees** *(continued)*

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee): Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | (D) Reportable compensation from the organization (W-2/1099-MISC/1099-NEC) | (E) Reportable compensation from related organizations (W-2/1099-MISC/1099-NEC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| (18) ROGER HUTSON<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (19) ROGER JENKINS<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (20) THOMAS E JORDEN<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (21) TRACY W KROHN<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (22) RYAN M LANCE<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (23) MATTHEW LANIGAN<br>BOARD MEMBER - LEFT JAN 2024 | 0.50 | X | | | | | | 0 | 0 | 0 |
| (24) RODERICK D LARSON<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (25) MARK E LASHIER | 0.50 | X | | | | | | 0 | 0 | 0 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| BOARD MEMBER | | | | | | | | | | |
| (26) OLIVIER LE PEUCH<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (27) MELANIE LITTLE<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (28) MARYANN MANNEN<br>BOARD MEMBER - START NOV 2024 | 0.50 | X | | | | | | 0 | 0 | 0 |
| (29) JEFFREY W MARTIN<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (30) BRENDAN MCCRACKEN<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (31) JEFF MILLER<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (32) RICHARD E MUNCRIEF<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (33) JOSEBA MURILLAS<br>BOARD MEMBER - START NOV 2024 | 0.50 | X | | | | | | 0 | 0 | 0 |
| (34) PIERCE H NORTON<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (35) MEG E O'NEILL<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (36) DOUGLAS J PFERDEHIRT<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (37) FRANCOIS POIRIER<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (38) CHRISTINE RESLER<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (39) FERDINANDO RIGARDO<br>BOARD MEMBER - LEFT SEP 2024 | 0.50 | X | | | | | | 0 | 0 | 0 |
| (40) JEFFREY RINKER<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (41) LORENZO SIMONELLI<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (42) TRAVIS D STICE<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (43) LEE TILLMAN<br>BOARD MEMBER - LEFT NOV 2024 | 0.50 | X | | | | | | 0 | 0 | 0 |
| (44) MICHAEL URE<br>BOARD MEMBER - LEFT OCT 2024 | 0.50 | X | | | | | | 0 | 0 | 0 |
| (45) RICHARD VOORBERG<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (46) BILL WAY<br>BOARD MEMBER - LEFT SEP 2024 | 0.50 | X | | | | | | 0 | 0 | 0 |
| (47) MICHAEL K WIRTH<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (48) DARREN W WOODS<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (49) KAREN B WRIGHT<br>BOARD MEMBER | 0.50 | X | | | | | | 0 | 0 | 0 |
| (50) SHANNON DIBARI<br>SENIOR VICE PRESIDENT AND COO | 40.00 | | | X | | | | 838,039 | 0 | 242,133 |
| (51) RYAN P MEYERS<br>SR. VP, GENERAL COUNSEL, CORP SECY | 40.00 | | | X | | | | 724,949 | 0 | 102,757 |
| (52) AMANDA E EVERSOLE<br>EXECUTIVE VP & CHIEF ADVOCACY OFFR | 40.00 | | | | X | | | 1,431,855 | 0 | 249,106 |
| (53) ANCHAL S LIDDAR<br>SENIOR VP, GLOBAL INDUSTRY SERVICES | 40.00 | | | | X | | | 767,797 | 0 | 162,011 |
| (54) DUSTIN MEYER<br>SR VP, POLICY, ECONOMICS & REG AFFRS | 40.00 | | | | X | | | 594,679 | 0 | 92,509 |

| Name and title | Average hours per week | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | Reportable compensation from the organization | Reportable compensation from related organizations | Estimated amount of other compensation |
|---|---|---|---|---|---|---|---|---|---|---|
| SR VP, POLICY, ECONOMICS & REG AFFRS | | | | | | | | | | |
| (55) AMY KRIZ<br>VP AND CHIEF FINANCIAL OFFICER | 40.00 | | | | X | | | 322,809 | 0 | 29,875 |
| (56) MEGAN B BLOOMGREN<br>SR VP COMMUNICATIONS (UNTIL 6/2024) | 40.00 | | | | X | | | 274,615 | 0 | 45,768 |
| (57) KEVIN SLAGLE<br>SENIOR VP, COMMUNICATIONS | 40.00 | | | | X | | | 172,292 | 0 | 13,428 |
| (58) ROLF W HANSON<br>VP, STATE GOVERNMENT RELATIONS | 40.00 | | | | | X | | 651,276 | 0 | 349,697 |
| (59) JOHN P WAGNER<br>VP, DEPUTY GENERAL COUNSEL | 40.00 | | | | | X | | 735,899 | 0 | 184,446 |
| (60) ROBIN RORICK<br>VP, MIDSTREAM POLICY | 40.00 | | | | | X | | 441,023 | 0 | 192,190 |
| (61) STEPHEN COMSTOCK<br>VP & SR. COUNSELOR (UNTIL 10/2024) | 40.00 | | | | | X | | 469,816 | 0 | 17,948 |
| (62) KRISTIN WESTMORELAND<br>VP AND CHIEF OF STAFF | 40.00 | | | | | X | | 444,976 | 0 | 37,856 |

| | | | |
|---|---|---|---|
| **1b Sub-Total** . . . . . . . . . . . . . . | | | |
| **c Total from continuation sheets to Part VII, Section A** . . | | | |
| **d Total (add lines 1b and 1c)** . . . . . . . . . | 13,001,645 | 0 | 2,741,482 |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization 249

| | | | Yes | No |
|---|---|---|---|---|
| **3** | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . | 3 | | No |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | Yes | |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization?*If "Yes," complete Schedule J for such person* . . . . . . . . | 5 | | No |

## Section B. Independent Contractors

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A)<br>Name and business address | (B)<br>Description of services | (C)<br>Compensation |
|---|---|---|
| MAIN STREET MEDIA GROUP<br><br>PO BOX 25093<br>ALEXANDRIA, VA 22313 | ADVERTISING | 23,984,151 |
| META PLATFORMS INC<br><br>1601 WILLOW ROAD<br>MENLO PARK, CA 94025 | ADVERTISING | 3,899,514 |
| BROADAXIS INC<br><br>1400 PRESTON ROAD SUITE 400<br>PLANO, TX 75093 | IT CONSULTING | 3,834,186 |
| INTERTEK TECHNICAL SERVICES INC UK<br><br>4 CANDYMILL LANE<br>HAMILTON, SOUTH LANARKSHIRE<br>UK | AUDITING | 3,086,057 |
| BUREAU OF QUALITY SURVEILLANCE INC<br><br>25329 BUDDE ROAD SUITE 301<br>THE WOODLANDS, TX 77380 | AUDITING | 3,077,559 |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization 251

Form **990** (2024)

Page 9

Form 990 (2024) Page **9**

Part VIII **Statement of Revenue**

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . . . . ☐

| | (A)<br>Total revenue | (B)<br>Related or exempt function revenue | (C)<br>Unrelated business revenue | (D)<br>Revenue excluded from tax under sections 512 - 514 |
|---|---|---|---|---|

Contributions, Gifts, Grants and Other Similar Amounts

| | | |
|---|---|---|
| ...derated campaigns | 1a | |
| ...embership dues | 1b | |
| ...undraising events | 1c | |
| ...elated organizations | 1d | |
| ...overnment grants (contributions) | 1e | |
| f All other contributions, gifts, grants, and similar amounts not included above | 1f | |
| g Noncash contributions included in lines 1a - 1f:$ | 1g | |
| h **Total.** Add lines 1a-1f | | |

Program Service Revenue

| | Business Code | | | | |
|---|---|---|---|---|---|
| 2a CERTIFICATION PROGRAM | 900099 | 122,233,181 | 122,233,181 | | |
| b MEMBERSHIP DUES | 900099 | 84,803,134 | 84,803,134 | | |
| c MEETING REVENUE | 900099 | 10,599,024 | 10,599,024 | | |
| d SUBSCRIPTIONS | 900099 | 338,200 | 338,200 | | |
| e | | | | | |
| f All other program service revenue. | | | | | |
| g **Total.** Add lines 2a–2f. | 217,973,539 | | | | |

Other Revenue

| | | | | | | |
|---|---|---|---|---|---|---|
| 3 Investment income (including dividends, interest, and other similar amounts) | | | 2,876,917 | | | 2,876,917 |
| 4 Income from investment of tax-exempt bond proceeds | | | | | | |
| 5 Royalties | | | 31,430,639 | 31,430,639 | | |
| | (i) Real | (ii) Personal | | | | |
| 6a Gross rents 6a | | | | | | |
| b Less: rental expenses 6b | | | | | | |
| c Rental income or (loss) 6c | | | | | | |
| d Net rental income or (loss) | | | | | | |
| | (i) Securities | (ii) Other | | | | |
| 7a Gross amount from sales of assets other than inventory 7a | 15,299,957 | | | | | |
| b Less: cost or other basis and sales expenses 7b | 15,683,095 | 215 | | | | |
| c Gain or (loss) 7c | -383,138 | -215 | | | | |
| d Net gain or (loss) | | | -383,353 | | | -383,353 |
| 8a Gross income from fundraising events (not including $ of contributions reported on line 1c). See Part IV, line 18 8a | | | | | | |
| b Less: direct expenses 8b | | | | | | |
| c Net income or (loss) from fundraising events | | | | | | |
| 9a Gross income from gaming activities. See Part IV, line 19 9a | | | | | | |

| | | | (A) | (B) | (C) | (D) |
|---|---|---|---|---|---|---|
| b Less: direct expenses | 9b | | | | | |
| c Net income or (loss) from gaming activities | | | | | | |
| 10a Gross sales of inventory, less returns and allowances | 10a | | | | | |
| b Less: cost of goods sold | 10b | | | | | |
| c Net income or (loss) from sales of inventory | | | | | | |
| | | Business Code | | | | |
| 11a 211B REVENUE | | 900099 | 323,024 | | | 323,024 |
| b LATE FEES | | 900099 | 67,000 | | | 67,000 |
| c PAYROLL MANAGEMENT REIMBURSEMENTS (OtherRevenueMiscAmt) | | 900099 | 39,730 | | | 39,730 |
| d All other revenue | | | | | | |
| e **Total.** Add lines 11a–11d | | | 429,754 | | | |
| 12 **Total revenue.** See instructions | | | 252,327,496 | 249,404,178 | 0 | 2,923,318 |

Form **990** (2024)

Page 10

Form 990 (2024) Page **10**

Part IX **Statement of Functional Expenses**

Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).

Check if Schedule O contains a response or note to any line in this Part IX ☑

| **Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII.** | **(A)** Total expenses | **(B)** Program service expenses | **(C)** Management and general expenses | **(D)** Fundraising expenses |
|---|---|---|---|---|
| 1 Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 | 249,500 | | | |
| 2 Grants and other assistance to domestic individuals. See Part IV, line 22 | | | | |
| 3 Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, lines 15 and 16. | 55,880 | | | |
| 4 Benefits paid to or for members | | | | |
| 5 Compensation of current officers, directors, trustees, and key employees | 12,218,000 | | | |
| 6 Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) | | | | |
| 7 Other salaries and wages | 53,149,996 | | | |
| 8 Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) | 5,982,085 | | | |
| 9 Other employee benefits | 6,980,367 | | | |
| 10 Payroll taxes | 3,749,780 | | | |
| 11 Fees for services (non-employees): | | | | |
| a Management | | | | |
| b Legal | 11,306,722 | | | |
| c Accounting | 235,867 | | | |
| d Lobbying | 2,972,922 | | | |
| e Professional fundraising services. See Part IV, line 17 | | | | |
| f Investment management fees | 84,433 | | | |
| g Other (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O) | 41,248,644 | | | |
| 12 Advertising and promotion | 43,461,534 | | | |
| 13 Office expenses | 3,712,154 | | | |
| 14 Information technology | 12,768,219 | | | |
| 15 Royalties | 888,978 | | | |
| 16 Occupancy | 6,037,516 | | | |

| | (A) | (B) | (C) | (D) |
|---|---|---|---|---|
| **17** Travel | 9,105,819 | | | |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials | | | | |
| **19** Conferences, conventions, and meetings | 12,738,209 | | | |
| **20** Interest | | | | |
| **21** Payments to affiliates | | | | |
| **22** Depreciation, depletion, and amortization | 3,183,681 | | | |
| **23** Insurance | 1,318,711 | | | |
| **24** Other expenses. Itemize expenses not covered above (List miscellaneous expenses in line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) | | | | |
| **a** STUDIES/RESEARCH | 11,980,230 | | | |
| **b** THIRD-PARTY OUTREACH | 10,263,368 | | | |
| **c** INCOME AND EXCISE TAXES | 1,680,358 | | | |
| **d** | | | | |
| **e** All other expenses | 48,096 | | | |
| **25** **Total functional expenses.** Add lines 1 through 24e | 255,421,069 | | | |
| **26** **Joint costs.** Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation.Check here ☐ if following SOP 98-2 (ASC 958-720). | | | | |

Form **990** (2024)

Page 11

Form 990 (2024) Page **11**

Part X **Balance Sheet**

Check if Schedule O contains a response or note to any line in this Part IX ☐

| | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|
| Assets | **1** | Cash–non-interest-bearing | 30,878,999 | **1** | 5,867,246 |
| | **2** | Savings and temporary cash investments | 386,342 | **2** | 13,216,578 |
| | **3** | Pledges and grants receivable, net | | **3** | |
| | **4** | Accounts receivable, net | 15,162,107 | **4** | 17,353,455 |
| | **5** | Loans and other receivables from any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons | | **5** | |
| | **6** | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), and persons described in section 4958(c)(3)(B) | | **6** | |
| | **7** | Notes and loans receivable, net | | **7** | |
| | **8** | Inventories for sale or use | | **8** | |
| | **9** | Prepaid expenses and deferred charges | 4,468,582 | **9** | 3,682,308 |
| | **10a** | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D — **10a** 55,396,520 | | | |
| | **b** | Less: accumulated depreciation — **10b** 41,769,627 | 13,077,220 | **10c** | 13,626,893 |
| | **11** | Investments—publicly traded securities | 33,680,881 | **11** | 33,993,794 |
| | **12** | Investments—other securities. See Part IV, line 11 | | **12** | |
| | **13** | Investments—program-related. See Part IV, line 11 | | **13** | |
| | **14** | Intangible assets | | **14** | |
| | **15** | Other assets. See Part IV, line 11 | 25,262,915 | **15** | 22,138,789 |
| | **16** | **Total assets.** Add lines 1 through 15 (must equal line 33) | 122,917,046 | **16** | 109,879,063 |
| Liabilities | **17** | Accounts payable and accrued expenses | 18,568,010 | **17** | 19,164,624 |
| | **18** | Grants payable | | **18** | |
| | **19** | Deferred revenue | 19,612,287 | **19** | 15,928,271 |
| | **20** | Tax-exempt bond liabilities | | **20** | |
| | **21** | Escrow or custodial account liability. Complete Part IV of Schedule D | | **21** | |
| | **22** | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons | | **22** | |
| | **23** | Secured mortgages and notes payable to unrelated third parties | | **23** | |
| | **24** | Unsecured notes and loans payable to unrelated third parties | | **24** | |

| | | | | | |
|---|---|---|---|---|---|
| 24 | Unsecured notes and loans payable to unrelated third parties | | 24 | | |
| 25 | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17 - 24). Complete Part X of Schedule D | 95,517,158 | 25 | 73,549,897 |
| 26 | **Total liabilities.** Add lines 17 through 25 | 133,697,455 | 26 | 108,642,792 |
| Net Assets or Fund Balances | **Organizations that follow FASB ASC 958, check here** ☑ **and complete lines 27, 28, 32, and 33.** | | | |
| 27 | Net assets without donor restrictions | -10,780,409 | 27 | 1,236,271 |
| 28 | Net assets with donor restrictions | | 28 | |
| | **Organizations that do not follow FASB ASC 958, check here ▶** ☐ **and complete lines 29 through 33.** | | | |
| 29 | Capital stock or trust principal, or current funds | | 29 | |
| 30 | Paid-in or capital surplus, or land, building or equipment fund | | 30 | |
| 31 | Retained earnings, endowment, accumulated income, or other funds | | 31 | |
| 32 | Total net assets or fund balances | -10,780,409 | 32 | 1,236,271 |
| 33 | Total liabilities and net assets/fund balances | 122,917,046 | 33 | 109,879,063 |

Form **990** (2024)





## Part XI **Reconcilliation of Net Assets**

Check if Schedule O contains a response or note to any line in this Part XI ☑

| | | | |
|---|---|---|---|
| 1 | Total revenue (must equal Part VIII, column (A), line 12) | 1 | 252,327,496 |
| 2 | Total expenses (must equal Part IX, column (A), line 25) | 2 | 255,421,069 |
| 3 | Revenue less expenses. Subtract line 2 from line 1 | 3 | -3,093,573 |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 32, column (A)) | 4 | -10,780,409 |
| 5 | Net unrealized gains (losses) on investments | 5 | 699,157 |
| 6 | Donated services and use of facilities | 6 | |
| 7 | Investment expenses | 7 | |
| 8 | Prior period adjustments | 8 | |
| 9 | Other changes in net assets or fund balances (explain in Schedule O) | 9 | 14,411,096 |
| 10 | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 32, column (B)) | 10 | 1,236,271 |

## Part XII **Financial Statements and Reporting**

Check if Schedule O contains a response or note to any line in this Part XII ☐

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990: ☐ Cash ☑ Accrual ☐ Other ______ If the organization changed its method of accounting from a prior year or checked "Other," explain on Schedule O. | | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? | 2a | | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both: ☐ Separate basis ☐ Consolidated basis ☐ Both consolidated and separate basis | | | |
| b | Were the organization's financial statements audited by an independent accountant? | 2b | Yes | |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both: ☐ Separate basis ☑ Consolidated basis ☐ Both consolidated and separate basis | | | |
| c | If "Yes," to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | 2c | Yes | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O. | | | |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Uniform Guidance, 2 C.F.R. Part 200, Subpart F? | 3a | | No |
| b | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits. | 3b | | |

Form **990** (2024)

## Additional Data

Return to Form

**Software ID:**

**Software Version:**

**Form 990, Special Condition Description:**

| Special Condition Description |
|---|

efile Public Visual Render | ObjectId: 202523219349306147 - Submission: 2025-11-17 | TIN: 13-0433430

**SCHEDULE C**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Political Campaign and Lobbying Activities

**For Organizations Exempt From Income Tax Under section 501(c) and section 527**

▶Complete if the organization is described below. ▶Attach to Form 990 or Form 990-EZ.
▶Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

**2024**

Open to Public Inspection

**If the organization answered "Yes" on Form 990, Part IV, Line 3, or Form 990-EZ, Part V, line 46 (Political Campaign Activities), then**
- Section 501(c)(3) organizations: Complete Parts I-A and B. Do not complete Part I-C.
- Section 501(c) (other than section 501(c)(3)) organizations: Complete Parts I-A and C below. Do not complete Part I-B.
- Section 527 organizations: Complete Part I-A only.

**If the organization answered "Yes" on Form 990, Part IV, Line 4, or Form 990-EZ, Part VI, line 47 (Lobbying Activities), then**
- Section 501(c)(3) organizations that have filed Form 5768 (election under section 501(h)): Complete Part II-A. Do not complete Part II-B.
- Section 501(c)(3) organizations that have NOT filed Form 5768 (election under section 501(h)): Complete Part II-B. Do not complete Part II-A.

**If the organization answered "Yes" on Form 990, Part IV, Line 5 (Proxy Tax) (see separate instructions) or Form 990-EZ, Part V, line 35c (Proxy Tax) (see separate instructions), then**
- Section 501(c)(4), (5), or (6) organizations: Complete Part III.

| Name of the organization | Employer identification number |
|---|---|
| AMERICAN PETROLEUM INSTITUTE | 13-0433430 |

## Part I-A Complete if the organization is exempt under section 501(c) or is a section 527 organization.

1 Provide a description of the organization's direct and indirect political campaign activities in Part IV. See instructions for definition of "political campaign activities."

2 Political campaign activity expenditures. See instructions ▶ $ 4,505,000

3 Volunteer hours for political campaign activities. See instructions 0

## Part I-B Complete if the organization is exempt under section 501(c)(3).

1 Enter the amount of any excise tax incurred by the organization under section 4955 ▶ $

2 Enter the amount of any excise tax incurred by organization managers under section 4955 ▶ $

3 If the organization incurred a section 4955 tax, did it file Form 4720 for this year? ☐ Yes ☐ No

4a Was a correction made? ☐ Yes ☐ No

b If "Yes," describe in Part IV.

## Part I-C Complete if the organization is exempt under section 501(c), except section 501(c)(3).

1 Enter the amount directly expended by the filing organization for section 527 exempt function activities ▶ $ 0

2 Enter the amount of the filing organization's funds contributed to other organizations for section 527 exempt function activities ▶ $ 4,505,000

3 Total exempt function expenditures. Add lines 1 and 2. Enter here and on Form 1120-POL, line 17b ▶ $ 4,505,000

4 Did the filing organization file **Form 1120-POL** for this year? ☑ Yes ☐ No

5 Enter the names, addresses and employer identification number (EIN) of all section 527 political organizations to which the filing organization made payments. For each organization listed, enter the amount paid from the filing organization's funds. Also enter the amount of political contributions received that were promptly and directly delivered to a separate political organization, such as a separate segregated fund or a political action committee (PAC). If additional space is needed, provide information in Part IV.

| (a) Name | (b) Address | (c) EIN | (d) Amount paid from filing organization's funds. If none, enter -0-. | (e) Amount of political contributions received and promptly and directly delivered to a separate political organization. If none, enter -0-. |
|---|---|---|---|---|
| (1) CONGRESSIONAL LEADERSHIP FUND | 1747 PENNSYLVANIA AVE NW 5TH FLO<br>WASHINGTON, DC 20006 | 45-3578123 | 2,000,000 | |
| (2) SENATE LEADERSHIP FUND | 45 N HILL DRIVE SUITE 100<br>WARRENTON, VA 20186 | 47-2994920 | 2,000,000 | |
| (3) REPUBLICAN GOVERNORS ASSOCIATION | 1747 PENNSYLVANIA AVE NW STE 25<br>WASHINGTON, DC 20006 | 11-3655877 | 135,000 | |
| (4) REPUBLICAN ATTORNEYS GENERAL ASSN | 1747 PENNSYLVANIA AVE SUITE 800<br>WASHINGTON, DC 20006 | 46-4501717 | 125,000 | |
| (5) REPUBLICAN STATE LEADERSHIP CMTE | 1201 F STREET NW SUITE 675<br>WASHINGTON, DC 20004 | 05-0532524 | 125,000 | |
| (6) DEMOCRATIC LEGIS CAMPAIGN CMTE | 1225 EYE ST NW SUITE 1250<br>WASHINGTON, DC 20005 | 52-1870839 | 70,000 | |
| (7) AMERICAN PETROLEUM INSTITUTE POLITICAL ACTION COMMITTEE | 200 MASSACHUSETTS AVE NW STE 1100<br>WASHINGTON, DC 20001 | 26-2596972 | | 57,650 |
| (8) DEMOCRATIC GOVERNORS ASSOCIATION | 1401 K ST NW STE 200<br>WASHINGTON, DC 20005 | 52-1304889 | 50,000 | |

Page 2

Schedule C (Form 990) 2024 Page **2**

**Part II-A** **Complete if the organization is exempt under section 501(c)(3) and filed Form 5768 (election under section 501(h)).**

**A** Check ▶ ☐ if the filing organization belongs to an affiliated group (and list in Part IV each affiliated group member's name, address, EIN, expenses, and share of excess lobbying expenditures).

**B** Check ▶ ☐ if the filing organization checked box A and "limited control" provisions apply.

| **Limits on Lobbying Expenditures** (The term "expenditures" means amounts paid or incurred.) | **(a)** Filing organization's totals | **(b)** Affiliated group totals |
|---|---|---|
| **1a** Total lobbying expenditures to influence public opinion (grass roots lobbying) | | |
| **b** Total lobbying expenditures to influence a legislative body (direct lobbying) | | |
| **c** Total lobbying expenditures (add lines 1a and 1b) | | |
| **d** Other exempt purpose expenditures | | |
| **e** Total exempt purpose expenditures (add lines 1c and 1d) | | |
| **f** Lobbying nontaxable amount. Enter the amount from the following table in both columns. | | |

| If the amount on line 1e, column (a) or (b) is: | The lobbying nontaxable amount is: |
|---|---|
| Not over $500,000 | 20% of the amount on line 1e. |
| Over $500,000 but not over $1,000,000 | $100,000 plus 15% of the excess over $500,000. |
| Over $1,000,000 but not over $1,500,000 | $175,000 plus 10% of the excess over $1,000,000. |
| Over $1,500,000 but not over $17,000,000 | $225,000 plus 5% of the excess over $1,500,000. |
| Over $17,000,000 | $1,000,000. |

| | (a) | (b) |
|---|---|---|
| **g** Grassroots nontaxable amount (enter 25% of line 1f) | | |
| **h** Subtract line 1g from line 1a. If zero or less, enter -0-. | | |
| **i** Subtract line 1f from line 1c. If zero or less, enter -0-. | | |

**j** If there is an amount other than zero on either line 1h or line 1i, did the organization file Form 4720 reporting section 4911 tax for this year? ☐ **Yes** ☐ **No**

**4-Year Averaging Period Under Section 501(h)**
**(Some organizations that made a section 501(h) election do not have to complete all of the five columns below. See the separate instructions for lines 2a through 2f.)**

**Lobbying Expenditures During 4-Year Averaging Period**

| Calendar year (or fiscal year beginning in) | **(a)** 2021 | **(b)** 2022 | **(c)** 2023 | **(d)** 2024 | **(e)** Total |
|---|---|---|---|---|---|
| **2a** Lobbying nontaxable amount | | | | | |
| **b** Lobbying ceiling amount (150% of line 2a, column(e)) | | | | | |
| **c** Total lobbying expenditures | | | | | |
| **d** Grassroots nontaxable amount | | | | | |
| **e** Grassroots ceiling amount (150% of line 2d, column (e)) | | | | | |
| **f** Grassroots lobbying expenditures | | | | | |

**Schedule C (Form 990) 2024**

Page 3

Schedule C (Form 990) 2024 Page **3**

**Part II-B** **Complete if the organization is exempt under section 501(c)(3) and has NOT filed Form 5768 (election under section 501(h)).**

| *For each "Yes" response on lines 1a through 1i below, provide in Part IV a detailed description of the lobbying activity.* | (a) Yes | (a) No | (b) Amount |
|---|---|---|---|
| **1** During the year, did the filing organization attempt to influence foreign, national, state or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of: | | | |

| | | | | |
|---|---|---|---|---|
| a | Volunteers? | | | |
| b | Paid staff or management (include compensation in expenses reported on lines 1c through 1i)? | | | |
| c | Media advertisements? | | | |
| d | Mailings to members, legislators, or the public? | | | |
| e | Publications, or published or broadcast statements? | | | |
| f | Grants to other organizations for lobbying purposes? | | | |
| g | Direct contact with legislators, their staffs, government officials, or a legislative body? | | | |
| h | Rallies, demonstrations, seminars, conventions, speeches, lectures, or any similar means? | | | |
| i | Other activities? | | | |
| j | Total. Add lines 1c through 1i | | | |
| 2a | Did the activities in line 1 cause the organization to be not described in section 501(c)(3)? | | | |
| b | If "Yes," enter the amount of any tax incurred under section 4912 | | | |
| c | If "Yes," enter the amount of any tax incurred by organization managers under section 4912 | | | |
| d | If the filing organization incurred a section 4912 tax, did it file Form 4720 for this year? | | | |

**Part III-A** **Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6).**

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Were substantially all (90% or more) dues received nondeductible by members? | 1 | | No |
| 2 | Did the organization make only in-house lobbying expenditures of $2,000 or less? | 2 | | No |
| 3 | Did the organization agree to carry over lobbying and political expenditures from the prior year? | 3 | Yes | |

**Part III-B** **Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6) and if either (a) BOTH Part III-A, lines 1 and 2, are answered "No" OR (b) Part III-A, line 3, is answered "Yes."**

| | | | |
|---|---|---|---|
| 1 | Dues, assessments and similar amounts from members | 1 | 84,803,134 |
| 2 | Section 162(e) nondeductible lobbying and political expenditures **(do not include amounts of political expenses for which the section 527(f) tax was paid).** | | |
| a | Current year | 2a | 16,225,516 |
| b | Carryover from last year | 2b | -117,944,397 |
| c | Total | 2c | -101,718,881 |
| 3 | Aggregate amount reported in section 6033(e)(1)(A) notices of nondeductible section 162(e) dues . | 3 | 8,480,313 |
| 4 | If notices were sent and the amount on line 2c exceeds the amount on line 3, what portion of the excess does the organization agree to carryover to the reasonable estimate of nondeductible lobbying and political expenditure next year? | 4 | -110,199,194 |
| 5 | Taxable amount of lobbying and political expenditures. See Instructions | 5 | |

**Part IV** **Supplemental Information**

Provide the descriptions required for Part I-A, line 1; Part I-B, line 4; Part I-C, line 5; Part II-A (affiliated group list); Part II-A, lines 1 and 2 (see instructions), and Part II-B, line 1. Also, complete this part for any additional information.

| Return Reference | Explanation |
|---|---|
| PART I-A, LINE 1: | API CONDUCTS POLITICAL ACTIVITIES THROUGH A SEPARATE SEGREGATED FUND, AMERICAN PETROLEUM INSTITUTE POLITICAL ACTION COMMITTEE. IN 2024, API MADE PAYMENTS TOTALING $4,505,000 TO SECTION 527 POLITICAL ORGANIZATIONS. |

**Schedule C (Form 990) 2024**

## Additional Data

Return to Form

**Software ID:**

**Software Version:**

efile Public Visual Render | ObjectId: 202523219349306147 - Submission: 2025-11-17 | TIN: 13-0433430

**SCHEDULE D** (Form 990)

Department of the Treasury Internal Revenue Service

# Supplemental Financial Statements

▶ Complete if the organization answered "Yes," on Form 990, Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.
▶ Attach to Form 990.
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

Open to Public Inspection

**Name of the organization**
AMERICAN PETROLEUM INSTITUTE

**Employer identification number**
13-0433430

## Part I Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.
Complete if the organization answered "Yes" on Form 990, Part IV, line 6.

| | | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year | | |
| 2 | Aggregate value of contributions to (during year) | | |
| 3 | Aggregate value of grants from (during year) | | |
| 4 | Aggregate value at end of year | | |

5 Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are the organization's property, subject to the organization's exclusive legal control? ☐ Yes ☐ No

6 Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring impermissible private benefit? ☐ Yes ☐ No

## Part II Conservation Easements.
Complete if the organization answered "Yes" on Form 990, Part IV, line 7.

1 Purpose(s) of conservation easements held by the organization (check all that apply).

☐ Preservation of land for public use (e.g., recreation or education)
☐ Preservation of an historically important land area
☐ Protection of natural habitat
☐ Preservation of a certified historic structure
☐ Preservation of open space

2 Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day of the tax year.

| | | | Held at the End of the Year |
|---|---|---|---|
| a | Total number of conservation easements | 2a | |
| b | Total acreage restricted by conservation easements | 2b | |
| c | Number of conservation easements on a certified historic structure included in (a) | 2c | |
| d | Number of conservation easements included in (c) acquired after July 25, 2006, and not on a historic structure listed in the National Register | 2d | |

3 Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax year ▶

4 Number of states where property subject to conservation easement is located ▶

5 Does the organization have a written policy regarding the periodic monitoring, inspection, handling of violations, and enforcement of the conservation easements it holds? ☐ Yes ☐ No

6 Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the year ▶

7 Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year ▶ $

8 Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i) and section 170(h)(4)(B)(ii)? ☐ Yes ☐ No

9 In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for conservation easements.

## Part III Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.
Complete if the organization answered "Yes" on Form 990, Part IV, line 8.

1a If the organization elected, as permitted under FASB ASC 958, not to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIII, the text of the footnote to its financial statements that describes these items.

b If the organization elected, as permitted under FASB ASC 958, to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to these items:

(i) Revenue included on Form 990, Part VIII, line 1 ▶ $

(ii) Assets included in Form 990, Part X ▶ $

2 If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the following amounts required to be reported under FASB ASC 958 relating to these items:

a Revenue included on Form 990, Part VIII, line 1 ▶ $

b Assets included in Form 990, Part X ▶ $

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.** Cat. No. 52283D **Schedule D (Form 990) (Rev. 1-2025)**

Schedule D (Form 990) (Rev. 1-2025) Page **2**

**Part III Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets** *(continued)*

3 Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply):

a ☐ Public exhibition
b ☐ Scholarly research
c ☐ Preservation for future generations
d ☐ Loan or exchange programs
e ☐ Other

4 Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII.

5 During the year, did the organization solicit or receive donations of art, historical treasures or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection?. . . ☐ Yes ☐ No

**Part IV Escrow and Custodial Arrangements.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

1a Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X? ☐ Yes ☐ No

b If "Yes," explain the arrangement in Part XIII and complete the following table:

| | | Amount |
|---|---|---|
| c Beginning balance | 1c | |
| d Additions during the year | 1d | |
| e Distributions during the year | 1e | |
| f Ending balance | 1f | |

2a Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability? . . . ☐ Yes ☐ No

b If "Yes," explain the arrangement in Part XIII. Check here if the explanation has been provided in Part XIII . . . . ☐

**Part V Endowment Funds.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 10.

| | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|
| 1a Beginning of year balance | | | | | |
| b Contributions | | | | | |
| c Net investment earnings, gains, and losses | | | | | |
| d Grants or scholarships | | | | | |
| e Other expenditures for facilities and programs | | | | | |
| f Administrative expenses | | | | | |
| g End of year balance | | | | | |

2 Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as:
a Board designated or quasi-endowment ▶
b Permanent endowment ▶
c Term endowment ▶
The percentages on lines 2a, 2b, and 2c should equal 100%.

3a Are there endowment funds not in the possession of the organization that are held and administered for the organization by:

| | | Yes | No |
|---|---|---|---|
| (i) Unrelated organizations | 3a(i) | | |
| (ii) Related organizations | 3a(ii) | | |
| b If "Yes" on 3a(ii), are the related organizations listed as required on Schedule R? | 3b | | |

4 Describe in Part XIII the intended uses of the organization's endowment funds.

**Part VI Land, Buildings, and Equipment.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 11a. See Form 990, Part X, line 10.

| Description of property | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Accumulated depreciation | (d) Book value |
|---|---|---|---|---|
| 1a Land | | | | |
| b Buildings | | | | |
| c Leasehold improvements | | 11,363,917 | 4,666,979 | 6,696,938 |
| d Equipment | | 1,968,036 | 1,095,912 | 872,124 |
| e Other | | 42,064,567 | 36,006,736 | 6,057,831 |
| **Total.** Add lines 1a through 1e. *(Column (d) must equal Form 990, Part X, column (B), line 10(c).)* ▶ | | | | 13,626,893 |

**Schedule D (Form 990) (Rev. 1-2025)**

**Part VII Investments - Other Securities.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 11b.See Form 990, Part X, line 12.

| **(a)** Description of security or category (including name of security) | **(b)** Book value | **(c)** Method of valuation: Cost or end-of-year market value |
|---|---|---|
| **(1)** Financial derivatives | | |
| **(2)** Closely-held equity interests | | |
| **(3)**Other | | |
| (A) | | |
| (B) | | |
| (C) | | |
| (D) | | |
| (E) | | |
| (F) | | |
| (G) | | |
| (H) | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col. (B) line 12.)* ▶ | | |

**Part VIII Investments - Program Related.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| **(a)** Description of investment | **(b)** Book value | **(c)** Method of valuation: Cost or end-of-year market value |
|---|---|---|
| **(1)** | | |
| **(2)** | | |
| **(3)** | | |
| **(4)** | | |
| **(5)** | | |
| **(6)** | | |
| **(7)** | | |
| **(8)** | | |
| **(9)** | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 13.)* ▶ | | |

**Part IX Other Assets.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11d. See Form 990, Part X, line 15.

| **(a)** Description | **(b)** Book value |
|---|---|
| **(1)**RIGHT-OF-USE ASSET | 22,138,789 |
| **(1)** | |
| **(2)** | |
| **(3)** | |
| **(4)** | |
| **(5)** | |
| **(6)** | |
| **(7)** | |
| **(8)** | |
| **(9)** | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 15.)* ▶ | 22,138,789 |

**Part X Other Liabilities.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11e or 11f.See Form 990, Part X, line 25.

| **1.** **(a)** Description of liability | **(b)** Book value |
|---|---|

| | |
|---|---|
| **(1)** Federal income taxes | |
| POST-RETIREMENT BENEFITS, OTHER THAN PENSION | 28,456,499 |
| LEASE LIABILITY, NET | 40,099,540 |
| ACCRUED PENSION LIABILITY | 1,210,223 |
| SUPPLEMENTAL BENEFIT PLANS | 3,783,635 |
| | |
| | |
| | |
| | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 25.)* ▶ | 73,549,897 |

**2.** Liability for uncertain tax positions. In Part XIII, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48 (ASC 740). Check here if the text of the footnote has been provided in Part XIII ☐

**Schedule D (Form 990) (Rev. 1-2025)**

Page 4

Schedule D (Form 990) (Rev. 1-2025) Page **4**

**Part XI Reconciliation of Revenue per Audited Financial Statements With Revenue per Return.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a.

| | | | | | |
|---|---|---|---|---|---|
| 1 | Total revenue, gains, and other support per audited financial statements | | | 1 | 253,127,479 |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | | | |
| a | Net unrealized gains (losses) on investments | 2a | 699,157 | | |
| b | Donated services and use of facilities | 2b | | | |
| c | Recoveries of prior year grants | 2c | | | |
| d | Other (Describe in Part XIII.) | 2d | 185,044 | | |
| e | Add lines **2a** through **2d** | | | 2e | 884,201 |
| 3 | Subtract line **2e** from line **1** | | | 3 | 252,243,278 |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line **1**: | | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | 84,433 | | |
| b | Other (Describe in Part XIII.) | 4b | -215 | | |
| c | Add lines **4a** and **4b** | | | 4c | 84,218 |
| 5 | Total revenue. Add lines **3** and **4c.** (This must equal Form 990, Part I, line 12.) | | | 5 | 252,327,496 |

**Part XII Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a.

| | | | | | |
|---|---|---|---|---|---|
| 1 | Total expenses and losses per audited financial statements | | | 1 | 241,157,292 |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | | | |
| a | Donated services and use of facilities | 2a | | | |
| b | Prior year adjustments | 2b | | | |
| c | Other losses | 2c | | | |
| d | Other (Describe in Part XIII.) | 2d | -14,179,344 | | |
| e | Add lines **2a** through **2d** | | | 2e | -14,179,344 |
| 3 | Subtract line **2e** from line **1** | | | 3 | 255,336,636 |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line **1:** | | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | 84,433 | | |
| b | Other (Describe in Part XIII.) | 4b | | | |
| c | Add lines **4a** and **4b** | | | 4c | 84,433 |
| 5 | Total expenses. Add lines **3** and **4c.** (This must equal Form 990, Part I, line 18.) | | | 5 | 255,421,069 |

**Part XIII Supplemental Information**

Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information.

| Return Reference | Explanation |
|---|---|
| PART XI, LINE 2D - OTHER ADJUSTMENTS: | API POLITICAL ACTION COMMITTEE CONSOLIDATED IN AUDITED FINANCIAL STATEMENTS 185,044. |
| PART XI, LINE 4B - OTHER ADJUSTMENTS: | LOSS ON FIXED ASSET DISPOSAL -215. |
| PART XII, LINE 2D - OTHER ADJUSTMENTS: | OTHER PENSION AND POST-RETIREMENT BENEFIT CHANGES -12,640,088. NET PERIODIC COST (BENEFIT) -1,771,008. API POLITICAL ACTION COMMITTEE CONSOLIDATED IN AUDITED FINANCIAL STATEMENTS 231,537. LOSS ON FIXED ASSET DISPOSAL 215. |

**Schedule D (Form 990) (Rev. 1-2025)**

## Additional Data

Return to Form

**Software ID:**
**Software Version:**

efile Public Visual Render | ObjectId: 202523219349306147 - Submission: 2025-11-17 | TIN: 13-0433430

**SCHEDULE F (Form 990)** (Rev. January 2025)

Department of the Treasury Internal Revenue Service

# Statement of Activities Outside the United States

▶ Complete if the organization answered "Yes" to Form 990, Part IV, line 14b, 15, or 16.
▶ Attach to Form 990.
▶ Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

Open to Public Inspection

Name of the organization
AMERICAN PETROLEUM INSTITUTE

**Employer identification number**
13-0433430

Part I **General Information on Activities Outside the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 14b.

1 **For grantmakers.** Does the organization maintain records to substantiate the amount of its grants and other assistance, the grantees' eligibility for the grants or assistance, and the selection criteria used to award the grants or assistance? . . . . ☑ Yes ☐ No

2 **For grantmakers.** Describe in Part V the organization's procedures for monitoring the use of its grants and other assistance outside the United States.

3 Activites per Region. (The following Part I, line 3 table can be duplicated if additional space is needed.)

| (a) Region | (b) Number of offices in the region | (c) Number of employees, agents, and independent contractors in the region | (d) Activities conducted in region (by type) (such as, fundraising, program services, investments, grants to recipients located in the region) | (e) If activity listed in (d) is a program service, describe specific type of service(s) in the region | (f) Total expenditures for and investments in the region |
|---|---|---|---|---|---|
| CENTRAL AMERICA AND THE CARIBBEAN | 0 | 0 | PROGRAM SERVICES | CERTIFICATION PROGRAMS | 58,277 |
| RUSSIA AND NEIGHBORING STATES | 0 | 0 | PROGRAM SERVICES | CERTIFICATION PROGRAMS | 229,048 |
| SUB-SAHARAN AFRICA | 0 | 0 | PROGRAM SERVICES | CERTIFICATION PROGRAMS | 281,863 |
| NORTH AMERICA | 0 | 0 | PROGRAM SERVICES | CERTIFICATION PROGRAMS | 927,210 |
| SOUTH AMERICA | 1 | 2 | PROGRAM SERVICES | CERTIFICATION PROGRAMS | 1,355,340 |
| SOUTH ASIA | 0 | 0 | PROGRAM SERVICES | CERTIFICATION PROGRAMS | 1,368,178 |
| EUROPE (INCLUDING ICELAND & GREENLAND) | 0 | 0 | PROGRAM SERVICES | CERTIFICATION PROGRAMS | 2,735,122 |
| MIDDLE EAST AND NORTH AFRICA | 1 | 2 | PROGRAM SERVICES | CERTIFICATION PROGRAMS | 2,755,838 |
| EAST ASIA AND THE PACIFIC | 1 | 3 | PROGRAM SERVICES | CERTIFICATION PROGRAMS | 9,526,402 |
| 3a Sub-total . . . . | 2 | 4 | | | 9,710,876 |
| b Total from continuation sheets to Part I . . . | 1 | 3 | | | 9,526,402 |
| c Totals (add lines 3a and 3b) | 3 | 7 | | | 19,237,278 |



Page 2



Part II **Grants and Other Assistance to Organizations or Entities Outside the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 15, for any recipient who received more than $5,000. Part II can be duplicated if additional space is needed.

| 1 (a) Name of organization | (b) IRS code section and EIN (if applicable) | (c) Region | (d) Purpose of grant | (e) Amount of cash grant | (f) Manner of cash disbursement | (g) Amount of noncash assistance | (h) Description of noncash assistance | (i) Method of valuation (book, FMV, appraisal, other) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

2 Enter total number of recipient organizations listed above that are recognized as charities by the foreign country, recognized as tax-exempt by the IRS, or for which the grantee or counsel has provided a section 501(c)(3) equivalency letter . . . . . . . . ▶

3 Enter total number of other organizations or entities . . . . . . . . . . . . . . . . . . . . . . ▶

Schedule F (Form 990) (Rev. 1-2025)

Page 3

Schedule F (Form 990) (Rev. 1-2025) Page **3**

**Part III** **Grants and Other Assistance to Individuals Outside the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 16. Part III can be duplicated if additional space is needed.

| **(a)** Type of grant or assistance | **(b)** Region | **(c)** Number of recipients | **(d)** Amount of cash grant | **(e)** Manner of cash disbursement | **(f)** Amount of noncash assistance | **(g)** Description of noncash assistance | **(h)** Method of valuation (book, FMV, appraisal, other) |
|---|---|---|---|---|---|---|---|
| INTERNATIONAL OIL SPILL CONFERENCE SCHOLARSHIPS | CENTRAL AMERICA AND THE CARIBBEAN | 2 | | | 4,705 | AIRFARE AND LODGING | FMV |
| INTERNATIONAL OIL SPILL CONFERENCE SCHOLARSHIPS | SUB-SAHARAN AFRICA | 5 | | | 16,171 | AIRFARE AND LODGING | FMV |
| INTERNATIONAL OIL SPILL CONFERENCE SCHOLARSHIPS | NORTH AMERICA | 2 | | | 3,422 | AIRFARE AND LODGING | FMV |
| INTERNATIONAL OIL SPILL CONFERENCE SCHOLARSHIPS | SOUTH AMERICA | 4 | | | 11,313 | AIRFARE AND LODGING | FMV |
| INTERNATIONAL OIL SPILL CONFERENCE SCHOLARSHIPS | SOUTH ASIA | 3 | | | 10,153 | AIRFARE AND LODGING | FMV |
| INTERNATIONAL OIL SPILL CONFERENCE SCHOLARSHIPS | EUROPE (INCLUDING ICELAND & GREENLAND) | 2 | | | 5,529 | AIRFARE AND LODGING | FMV |
| INTERNATIONAL OIL SPILL CONFERENCE SCHOLARSHIPS | EAST ASIA AND THE PACIFIC | 2 | | | 4,587 | AIRFARE AND LODGING | FMV |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Schedule F (Form 990) (Rev. 1-2025)

Page 4

Schedule F (Form 990) (Rev. 1-2025) Page **4**

**Part IV** **Foreign Forms**

1 Was the organization a U.S. transferor of property to a foreign corporation during the tax year? *If "Yes," the organization may be required to file Form 926, Return by a U.S. Transferor of Property to a Foreign Corporation (see Instructions for Form 926)* . . . . . ☐ Yes ☑ No

2 Did the organization have an interest in a foreign trust during the tax year? *If "Yes," the organization may be required to separately file Form 3520, Annual Return to Report Transactions with Foreign Trusts and Receipt of Certain Foreign Gifts, and/or Form 3520-A, Annual Information Return of Foreign Trust With a U.S. Owner (see Instructions for Forms 3520 and 3520-A; don't file with Form 990)* . . . . . ☐ Yes ☑ No

3 Did the organization have an ownership interest in a foreign corporation during the tax year? *If "Yes," the organization may be required to file Form 5471, Information Return of U.S. Persons with Respect to Certain Foreign Corporations. (see Instructions for Form 5471)* . . . . . ☐ Yes ☑ No

4 Was the organization a direct or indirect shareholder of a passive foreign investment company or a qualified electing fund during the tax year? *If "Yes," the organization may be required to file Form 8621, Information Return by a Shareholder of a Passive Foreign Investment Company or Qualified Electing Fund. (see Instructions for Form 8621)* . ☐ Yes ☑ No

5 Did the organization have an ownership interest in a foreign partnership during the tax year? *If "Yes," the organization may be required to file Form 8865, Return of U.S. Persons with Respect to Certain Foreign Partnerships (see Instructions for Form 8865)* . . . . . ☐ Yes ☑ No

6 Did the organization have any operations in or related to any boycotting countries during the tax year? *If "Yes," the organization may be required to separately file Form 5713, International Boycott Report (see Instructions for Form 5713; don't file with Form 990).* . . . . . ☑ Yes ☐ No

Schedule F (Form 990) (Rev. 1-2025)

Page 5

Schedule F (Form 990) (Rev. 1-2025) Page **5**

**Part V** **Supplemental Information**

Provide the information required by Part I, line 2 (monitoring of funds); Part I, line 3, column (f) (accounting method; amounts of investments vs. expenditures per region); Part II, line 1 (accounting

amounts of investments vs. expenditures per region), Part II, line 1 (accounting method); Part III (accounting method); and Part III, column (c) (estimated number of recipients), as applicable. Also complete this part to provide any additional information. See instructions.

| ReturnReference | Explanation |
|---|---|
| PART I, LINE 2: | ALL GRANTS ARE ASSIGNED AN API STAFF MEMBER AS THE CONTRACT OFFICER. THE CONTRACT OFFICER'S RESPONSIBILITIES INCLUDE MONITORING THE ACTIVITIES OF GRANTEES, AS WELL AS THE RECEIPT AND REVIEW OF PERIODIC PROGRESS REPORTS. |

**Schedule F (Form 990) (Rev. 1-2025)**

## Additional Data

**Software ID:**
**Software Version:**

efile Public Visual Render | ObjectId: 202523219349306147 - Submission: 2025-11-17 | TIN: 13-0433430

Note: To capture the full content of this document, please select landscape mode (11" x 8.5") when printing.

**Schedule I (Form 990)**

(Rev. January 2025)

Department of the Treasury Internal Revenue Service

# Grants and Other Assistance to Organizations, Governments and Individuals in the United States

**Complete if the organization answered "Yes," on Form 990, Part IV, line 21 or 22.**
**▶ Attach to Form 990.**
**▶ Go to www.irs.gov/Form990 for instructions and the latest information.**

OMB No. 1545-0047

Open to Public Inspection

Name of the organization
AMERICAN PETROLEUM INSTITUTE

Employer identification number
13-0433430

## Part I General Information on Grants and Assistance

1 Does the organization maintain records to substantiate the amount of the grants or assistance, the grantees' eligibility for the grants or assistance, and the selection criteria used to award the grants or assistance? ☑ Yes ☐ No

2 Describe in Part IV the organization's procedures for monitoring the use of grant funds in the United States.

## Part II Grants and Other Assistance to Domestic Organizations and Domestic Governments.

Complete if the organization answered "Yes" on Form 990, Part IV, line 21, for any recipient that received more than $5,000. Part II can be duplicated if additional space is needed.

| (a) Name and address of organization or government | (b) EIN | (c) IRC section (if applicable) | (d) Amount of cash grant | (e) Amount of non-cash assistance | (f) Method of valuation (book, FMV, appraisal, other) | (g) Description of noncash assistance | (h) Purpose of grant or assistance |
|---|---|---|---|---|---|---|---|
| (1) AMERICAN ENTERPRISE INSTITUTE 1150 SEVENTEETH STREET NW WASHINGTON, DC 20036 | 53-0218495 | 501(C)(3) | 120,000 | 0 | | | GENERAL SUPPORT |
| (2) CONGRESSIONAL SPORTSMEN'S FOUNDATION 110 NORTH CAROLINA AVE SE WASHINGTON, DC 20003 | 52-1686163 | 501(C)(3) | 25,000 | 0 | | | GENERAL SUPPORT |
| (3) FORD'S THEATRE 514 TENTH ST NW WASHINGTON, DC 20004 | 52-6073157 | 501(C)(3) | 12,500 | 0 | | | GENERAL SUPPORT |
| (4) THE NATIONAL SOCIETY OF BLACK ENGINERS 205 DAINGERFIELD ROAD ALEXANDRIA, VA 22314 | 35-1410757 | 501(C)(3) | 15,000 | 0 | | | GENERAL SUPPORT |
| (5) THE THIRD WAY FOUNDATION 1156 15TH STREET NW SUITE 400 WASHINGTON, DC 20005 | 52-1629221 | 501(C)(3) | 50,000 | 0 | | | GENERAL SUPPORT |
| (6) WASHINGTON SCHOOL FOR GIRLS 1901 MISSISSIPPI AVENUE NW WASHINGTON, DC 20020 | 52-2031849 | 501(C)(3) | 15,000 | 0 | | | GENERAL SUPPORT |
| (7) WESTERN CAUCUS FOUNDATION 400 N CAPITOL STREET NW 382-B WASHINGTON, DC 20001 | 46-3948410 | 501(C)(3) | 12,000 | 0 | | | GENERAL SUPPORT |

2 Enter total number of section 501(c)(3) and government organizations listed in the line 1 table . . . ▶ 7

3 Enter total number of other organizations listed in the line 1 table . . . ▶ 0

For Paperwork Reduction Act Notice, see the Instructions for Form 990. Cat. No. 50055P **Schedule I (Form 990) Rev. 1-2025**

Page 2

Schedule I (Form 990) Rev. 1-2025 Page **2**

## Part III Grants and Other Assistance to Domestic Individuals.

Complete if the organization answered "Yes" on Form 990, Part IV, line 22. Part III can be duplicated if additional space is needed.

| (a) Type of grant or assistance | (b) Number of recipients | (c) Amount of cash grant | (d) Amount of noncash assistance | (e) Method of valuation (book, FMV, appraisal, other) | (f) Description of noncash assistance |
|---|---|---|---|---|---|
| (1) | | | | | |
| (2) | | | | | |
| (3) | | | | | |
| (4) | | | | | |
| (5) | | | | | |
| (6) | | | | | |
| (7) | | | | | |

## Part IV Supplemental Information.

Provide the information required in Part I, line 2; Part III, column (b); and any other additional information.

| Return Reference | Explanation |
|---|---|
| PART I, LINE 2: | IN ORDER TO ENSURE ALL GRANT FUNDS ARE USED FOR THEIR INTENDED PURPOSE, ALL GRANTS ARE ASSIGNED AN API STAFF MEMBER AS THE CONTRACT OFFICER. THE CONTRACT OFFICER'S RESPONSIBILITIES INCLUDE MONITORING THE ACTIVITIES OF GRANTEES, AS WELL AS THE RECEIPT AND REVIEW OF PERIODIC PROGRESS REPORTS. DURING 2024, API PROVIDED SCHOLARSHIPS IN THE FORM OF AIRFARE AND LODGING TO CERTAIN FOREIGN INDIVIDUALS ATTENDING THE INTERNATIONAL OIL SPILL CONFERENCE. THESE SCHOLARSHIPS ARE REPORTED ON SCHEDULE F, PARTS I AND III. |

**Schedule I (Form 990) Rev. 1-2025**

## Additional Data

Return to Form

**Software ID:**
**Software Version:**

| efile Public Visual Render | ObjectId: 202523219349306147 - Submission: 2025-11-17 | TIN: 13-0433430 |
|---|---|---|

**Schedule J** (Form 990) (Rev. January 2025) Department of the Treasury Internal Revenue Service

# Compensation Information

For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees
▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 23.
▶ Attach to Form 990.
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

Open to Public Inspection

Name of the organization
AMERICAN PETROLEUM INSTITUTE

Employer identification number
13-0433430

## Part I Questions Regarding Compensation

| | | | Yes | No |
|---|---|---|---|---|
| **1a** | Check the appropriate box(es) if the organization provided any of the following to or for a person listed on Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items.<br>☑ First-class or charter travel ☐ Housing allowance or residence for personal use<br>☑ Travel for companions ☐ Payments for business use of personal residence<br>☑ Tax idemnification and gross-up payments ☑ Health or social club dues or initiation fees<br>☐ Discretionary spending account ☑ Personal services (e.g., maid, chauffeur, chef) | | | |
| **b** | If any of the boxes on Line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain . . . . . | 1b | Yes | |
| **2** | Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, officers, including the CEO/Executive Director, regarding the items checked on Line 1a? . . . . | 2 | Yes | |
| **3** | Indicate which, if any, of the following the filing organization used to establish the compensation of the organization's CEO/Executive Director. Check all that apply. Do not check any boxes for methods used by a related organization to establish compensation of the CEO/Executive Director, but explain in Part III.<br>☐ Compensation committee ☐ Written employment contract<br>☑ Independent compensation consultant ☑ Compensation survey or study<br>☑ Form 990 of other organizations ☑ Approval by the board or compensation committee | | | |
| **4** | During the year, did any person listed on Form 990, Part VII, Section A, line 1a, with respect to the filing organization or a related organization: | | | |
| **a** | Receive a severance payment or change-of-control payment? . . . . . . . . . . . . . . . . . | 4a | | No |
| **b** | Participate in, or receive payment from, a supplemental nonqualified retirement plan? . . . . . . . . . . . | 4b | Yes | |
| **c** | Participate in, or receive payment from, an equity-based compensation arrangement? . . . . . . . . . . . .<br>If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III. | 4c | | No |
| | **Only 501(c)(3), 501(c)(4), and 501(c)(29) organizations must complete lines 5-9.** | | | |
| **5** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of: | | | |
| **a** | The organization? . . . . . . . . . . . . . . . . . . . . . . . . | 5a | | |
| **b** | Any related organization? . . . . . . . . . . . . . . . . . . . . . . . . . .<br>If "Yes," on line 5a or 5b, describe in Part III. | 5b | | |
| **6** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of: | | | |
| **a** | The organization? . . . . . . . . . . . . . . . . . . . . . . . . | 6a | | |
| **b** | Any related organization? . . . . . . . . . . . . . . . . . . . . . . . . . .<br>If "Yes," on line 6a or 6b, describe in Part III. | 6b | | |
| **7** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization provide any nonfixed payments not described in lines 5 and 6? If "Yes," describe in Part III . . . . . . . . . . . . . . . . | 7 | | |
| **8** | Were any amounts reported on Form 990, Part VII, paid or accured pursuant to a contract that was subject to the initial contract exception described in Regulations section 53.4958-4(a)(3)? If "Yes," describe in Part III . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | | |
| **9** | If "Yes" on line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53.4958-6(c)? . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.** Cat. No. 50053T **Schedule J (Form 990) (Rev. 1-2025)**

Page 2

Schedule J (Form 990) (Rev. 1-2025) Page **2**

## Part II Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees. Use duplicate copies if additional space is needed.

For each individual whose compensation must be reported on Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii). Do not list any individuals that are not listed on Form 990, Part VII.
**Note.** The sum of columns (B)(i)-(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D) and (E) amounts for that individual.

| (A) Name and Title | | (B) Breakdown of W-2, 1099-MISC compensation, and/or 1099-NEC (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)-(D) | (F) Compensation in column (B) reported as deferred on prior Form 990 |
|---|---|---|---|---|---|---|---|---|
| 1 MICHAEL J SOMMERS<br>PRESIDENT AND CEO | (i) | 2,945,350 | 1,911,000 | 275,270 | 985,166 | 36,592 | 6,153,378 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 AMANDA E EVERSOLE<br>EXECUTIVE VP & CHIEF ADVOCACY OFFR | (i) | 984,457 | 385,000 | 62,398 | 208,690 | 40,416 | 1,680,961 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 SHANNON DIBARI<br>SENIOR VICE PRESIDENT AND COO | (i) | 546,942 | 205,000 | 86,097 | 240,357 | 1,776 | 1,080,172 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 ROLF W HANSON<br>VP, STATE GOVERNMENT RELATIONS | (i) | 450,420 | 190,000 | 10,856 | 313,093 | 36,604 | 1,000,973 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5 ANCHAL S LIDDAR<br>SENIOR VP, GLOBAL INDUSTRY SERVICES | (i) | 531,313 | 215,000 | 21,484 | 125,407 | 36,604 | 929,808 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 6 JOHN P WAGNER<br>VP, DEPUTY GENERAL COUNSEL | (i) | 423,120 | 70,000 | 242,779 | 147,950 | 36,496 | 920,345 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 RYAN P MEYERS<br>SR. VP, GENERAL COUNSEL, CORP SECY | (i) | 549,954 | 155,000 | 19,995 | 100,933 | 1,824 | 827,706 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 DUSTIN MEYER<br>SR VP, POLICY, ECONOMICS & REG AFFRS | (i) | 469,623 | 110,000 | 15,056 | 78,269 | 14,240 | 687,188 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9 ROBIN RORICK<br>VP, MIDSTREAM POLICY | (i) | 385,220 | 49,500 | 6,303 | 155,766 | 36,424 | 633,213 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10 STEPHEN COMSTOCK<br>VP & SR. COUNSELOR (UNTIL 10/2024) | (i) | 300,647 | 0 | 169,169 | 16,500 | 1,448 | 487,764 | 130,584 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11 KRISTIN WESTMORELAND<br>VP AND CHIEF OF STAFF | (i) | 373,410 | 67,000 | 4,566 | 35,012 | 2,844 | 482,832 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 12 AMY KRIZ<br>VP AND CHIEF FINANCIAL OFFICER | (i) | 282,942 | 35,700 | 4,167 | 28,500 | 1,375 | 352,684 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 13 MEGAN B BLOOMGREN<br>SR VP COMMUNICATIONS (UNTIL 6/2024) | (i) | 239,602 | 0 | 35,013 | 28,266 | 17,502 | 320,383 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 14 KEVIN SLAGLE<br>SENIOR VP, COMMUNICATIONS | (i) | 121,345 | 50,000 | 947 | 6,224 | 7,204 | 185,720 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | |
| | | | | | | | | |

Schedule J (Form 990) (Rev. 1-2025)

Page 3

Schedule J (Form 990) (Rev. 1-2025) Page **3**

**Part III Supplemental Information**

Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II. Also complete this part for any additional information.

| Return Reference | Explanation |
|---|---|
| PART I, LINE 1A | FIRST-CLASS OR CHARTER TRAVEL - FIRST OR BUSINESS CLASS AIR TRAVEL MUST BE APPROVED IN ADVANCE BY AN EXECUTIVE STAFF MEMBER, AND THE EMPLOYEE MUST PROVIDE THE JUSTIFICATION ON THE EXPENSE REPORT. NO FLIGHTS WERE CHARTERED DURING 2024. TRAVEL FOR COMPANIONS - INSTANCES IN WHICH A SPOUSE ACCOMPANIES AN EMPLOYEE TRAVELING ON BUSINESS AT API EXPENSE ARE LIMITED AND APPROVED IN ADVANCE. IN SUCH AUTHORIZED CASES, UNLESS THE STRICT LEGAL DEFINITION OF BUSINESS PURPOSE IS MET, THE REIMBURSEMENT IS TREATED AS TAXABLE INCOME TO THE EMPLOYEE. TAX INDEMNIFICATION AND GROSS UP PAYMENTS - FOR EMPLOYEES WHO QUALIFY TO PARTICIPATE IN THE NONQUALIFIED RETIREMENT INCOME PLAN, API PAYS TAXES DUE ON THE ACCRUED BENEFITS AS THEY ARE AWARDED TO THE PARTICIPANTS. THESE TAX PAYMENTS ARE TREATED AS AN ADVANCE AND NETTED FROM THE ACCRUED BENEFITS TO THE PARTICIPANTS UPON DISTRIBUTION. HEALTH OR SOCIAL CLUB DUES OR INITIATION FEES - REIMBURSEMENT OF CLUB DUES TO AN EMPLOYEE IN ANY CLUB ORGANIZED FOR PLEASURE, RECREATION, OR OTHER SOCIAL PURPOSE (I.E. COUNTRY CLUBS, LUNCHEON CLUBS, AND AIRLINE AND HOTEL CLUBS) IS LIMITED AND REQUIRES EXECUTIVE STAFF APPROVAL. EMPLOYEES WHO HAVE BEEN REIMBURSED FOR CLUB DUES MUST ANNUALLY ACCOUNT FOR THEIR BUSINESS USE, AND NON-BUSINESS USE IS TREATED AS TAXABLE INCOME TO THE EMPLOYEE. PERSONAL SERVICES - API PROVIDES A PERSONAL DRIVER TO THE PRESIDENT & CEO PRIMARILY FOR BUSINESS PURPOSES. ANY PERSONAL USAGE IS TREATED AS TAXABLE INCOME TO THE PRESIDENT & CEO. |
| PART I, LINE 4B | IN 2024, THE FOLLOWING PARTICIPANTS IN THE AMERICAN PETROLEUM INSTITUTE 457(F) SUPPLEMENTAL BENEFIT PLANS RECEIVED VESTED CONTRIBUTIONS THAT WERE INCLUDED IN THE PARTICIPANT'S 2024 W-2, AS WELL AS NON-VESTED CONTRIBUTIONS. THE TOTAL VESTED AND NON-VESTED CONTRIBUTIONS IN 2024 WERE AS FOLLOWS: MICHAEL J. SOMMERS $1,196,183 RYAN P. MEYERS $88,333 SHANNON DIBARI $256,591 AMANDA E. EVERSOLE $224,971 ANCHAL S. LIDDAR $112,766 DUSTIN MEYER $58,719 JOHN P. WAGNER $232,810 ROLF W. HANSON $44,374 ROBIN RORICK $25,483 KRISTIN WESTMORELAND $2,700 THE FOLLOWING PARTICIPANT IN THE AMERICAN PETROLEUM INSTITUTE 457(F) SUPPLEMENTAL BENEFIT PLANS RECEIVED A DISTRIBUTION IN 2024 AS FOLLOWS, THIS DISTRIBUTION WAS INCLUDED IN THE PARTICIPANT'S 2024 W-2: STEPHEN COMSTOCK $139,393 |

Schedule J (Form 990) (Rev. 1-2025)

## Additional Data

Return to Form

**Software ID:**

**Software Version:**

| efile Public Visual Render | ObjectId: 202523219349306147 - Submission: 2025-11-17 | TIN: 13-0433430 |
|---|---|---|

**SCHEDULE O**
**(Form 990)**
(Rev. January 2025)
Department of the Treasury
Internal Revenue Service

# Supplemental Information to Form 990 or 990-EZ

**Complete to provide information for responses to specific questions on Form 990 or 990-EZ or to provide any additional information.**
**Attach to Form 990 or 990-EZ.**
**Go to www.irs.gov/Form990 for instructions and the latest information.**

OMB No. 1545-0047

Open to Public Inspection

Name of the organization
AMERICAN PETROLEUM INSTITUTE

**Employer identification number**
13-0433430

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION A, LINE 1A | THERE SHALL BE AN EXECUTIVE COMMITTEE COMPOSED OF UP TO FIFTEEN (15) BUT NO LESS THAN TWELVE (12) MEMBERS OF THE BOARD, INCLUDING THE API CHAIRMAN OF THE BOARD AND THE CHAIR OF THE FINANCE COMMITTEE, WHO SHALL BE ELECTED ANNUALLY. THE PRESIDENT SERVES AS AN EX OFFICIO VOTING MEMBER. THE CHAIRMAN OF THE BOARD SHALL SERVE AS THE CHAIRMAN OF THE EXECUTIVE COMMITTEE. ANY VACANCY SHALL BE FILLED BY THE EXECUTIVE COMMITTEE UNTIL THE NEXT MEETING OF THE BOARD. REPRESENTATIVES OF THE TOP SIX (6) DUES PAYERS SHALL ALWAYS BE MEMBERS OF THE EXECUTIVE COMMITTEE, WITH THE REMAINING SEVEN (7) MEMBERS CHOSEN FROM THE REMAINING DUES PAYERS. ONE (1) MEMBER OF THE EXECUTIVE COMMITTEE SHALL REPRESENT THE API GENERAL MEMBERSHIP COMMITTEE. UNLESS RENOMINATED BY THE BOARD OF DIRECTORS TO REMAIN ON THE EXECUTIVE COMMITTEE, THE SEVEN (7) AT-LARGE MEMBERS AND THE GENERAL MEMBERSHIP COMMITTEE MEMBER MAY BE LIMITED TO TWO (2) CONSECUTIVE TERMS OF ONE (1) YEAR EACH. THE EXECUTIVE COMMITTEE HAS THE AUTHORITY TO EXERCISE ALL THE POWERS OF THE BOARD OF DIRECTORS IN THE ABSENCE OF ACTION BY THE BOARD, EXCEPT TO AMEND THE BYLAWS OR AS OTHERWISE LIMITED BY LAW. ITS RESPONSIBILITIES INCLUDE LONG-RANGE PLANNING, STRATEGIC ISSUES, PROGRAM AND BUDGET DEVELOPMENT, OVERSIGHT AND ADMINISTRATION. |
| FORM 990, PART VI, SECTION A, LINE 6 | API IS A TRADE ASSOCIATION WITH MEMBERSHIP DRAWN FROM THE OIL AND NATURAL GAS INDUSTRY. MEMBERSHIP IS AT A COMPANY (PARTNERSHIP, COMPANY, OR CORPORATION) LEVEL. |
| FORM 990, PART VI, SECTION A, LINE 7A | THE BOARD MEMBERS ARE ELECTED BY THE BOARD OF DIRECTORS AT THE ANNUAL MEETING, FROM WITHIN THE MEMBERSHIP. |
| FORM 990, PART VI, SECTION B, LINE 11B | API'S FORM 990 WAS PREPARED BY API'S EXTERNAL ACCOUNTING FIRM WITH INFORMATION PROVIDED BY API STAFF. PRIOR TO FILING, THE FORM 990 WAS INCLUDED WITH THE MATERIALS FOR THE FINANCE COMMITTEE'S MEETING IN SEPTEMBER 2025 AND REVIEWED DURING THE MEETING. A COPY OF THE FORM 990 WAS PROVIDED TO THE EXECUTIVE COMMITTEE PRIOR TO FILING. |
| FORM 990, PART VI, SECTION B, LINE 12C | API'S STANDARDS OF CONDUCT GUIDELINES REQUIRE, AMONG OTHER THINGS, EMPLOYEES TO AVOID ANY ACT THAT WOULD RESULT IN A CONFLICT (OR POTENTIAL FOR CONFLICT). ON AN ANNUAL BASIS, ALL EMPLOYEES ARE ASKED TO CONFIRM THEIR COMPLIANCE WITH THE STANDARDS OF CONDUCT GUIDELINES. ANY EMPLOYEE WHO IS AWARE OF A VIOLATION OF THIS POLICY MUST TAKE APPROPRIATE ACTION SO THAT THE VIOLATION IS PROMPTLY ADDRESSED. THIS MAY INCLUDE REPORTING A VIOLATION TO AN EXECUTIVE STAFF MEMBER, HUMAN RESOURCES, OR TO AN EXTERNALLY-OPERATED ETHICS HOTLINE. ALL REPORTS ARE ASSIGNED TO AN APPROPRIATE EXECUTIVE STAFF MEMBER, THE OFFICE OF THE GENERAL COUNSEL AND HUMAN RESOURCES (IF APPLICABLE), FOR INVESTIGATION AND RESOLUTION. API LEADERSHIP PROVIDES INCIDENT REPORTS TO THE FINANCE COMMITTEE AS APPROPRIATE. THE BOARD OF DIRECTORS ADOPTED A CONFLICT OF INTEREST POLICY IN 2008 THAT REQUIRES FULL DISCLOSURE OF ALL ACTUAL AND POTENTIAL CONFLICTS. THE DISINTERESTED MEMBERS OF THE API EXECUTIVE COMMITTEE SHALL DECIDE WHETHER A CONFLICT EXISTS AND WHAT SUBSEQUENT ACTION IS APPROPRIATE (IF ANY). A COPY OF THE POLICY IS PROVIDED ANNUALLY TO ALL BOARD MEMBERS WHO ARE REQUESTED TO COMPLETE AND SIGN AN ACKNOWLEDGEMENT AND DISCLOSURE FORM. |
| FORM 990, PART VI, SECTION B, LINE 15 | COMPENSATION FOR API'S PRESIDENT & CEO AND KEY EMPLOYEES IS REVIEWED AND APPROVED BY THE EXECUTIVE COMMITTEE, BASED ON PERFORMANCE REVIEWS, ANNUAL DATA OF INDUSTRY COMPARABLES PREPARED BY INDEPENDENT CONSULTANTS, AND OTHER RELEVANT INFORMATION. THE PRESIDENT & CEO'S COMPENSATION IS BASED ON A WRITTEN CONTRACT APPROVED BY THE EXECUTIVE COMMITTEE. A REVIEW WAS LAST CONDUCTED IN 2024 FOR THE PRESIDENT & CEO AND KEY EMPLOYEES. |
| FORM 990, PART VI, SECTION C, LINE 19 | THE GOVERNING DOCUMENTS, CONFLICT OF INTEREST POLICY, AND FINANCIAL STATEMENTS ARE NOT MADE AVAILABLE FOR PUBLIC INSPECTION. |
| FORM 990, PART IX, LINE 11G | EMPLOYMENT AGENCY FEES 1,110,024. OTHER CONSULTING FEES 8,012,535. ADVOCACY CONSULTANT FEES 8,830,809. GIS AUDITOR SERVICES 23,295,276. |
| FORM 990, PART XI, LINE 9: | OTHER PENSION AND POST-RETIREMENT BENEFIT CHANGES 12,640,088. NET PERIODIC BENEFIT (COST) 1,771,008. |

## Additional Data

Return to Form

**Software ID:**
**Software Version:**

efile Public Visual Render | ObjectId: 202523219349306147 - Submission: 2025-11-17 | TIN: 13-0433430

**SCHEDULE R (Form 990)**
(Rev. January 2025)
Department of the Treasury
Internal Revenue Service

# Related Organizations and Unrelated Partnerships

**Complete if the organization answered "Yes" on Form 990, Part IV, line 33, 34, 35b, 36, or 37.**
**Attach to Form 990.**
**Go to www.irs.gov/Form990 for instructions and the latest information.**

OMB No. 1545-0047
Open to Public Inspection

Name of the organization
AMERICAN PETROLEUM INSTITUTE

**Employer identification number**
13-0433430

**Part I Identification of Disregarded Entities.** Complete if the organization answered "Yes" on Form 990, Part IV, line 33.

| (a) Name, address, and EIN (if applicable) of disregarded entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Total income | (e) End-of-year assets | (f) Direct controlling entity |
|---|---|---|---|---|---|
| (1) AMERICAN PETROLEUM INSTITUTE HOLDING LLC<br>200 MASSACHUSETTS AVE NW STE 1100<br>WASHINGTON, DC 20001<br>13-0433430 | HOLDS A MINORITY INTEREST IN API-BRASIL CONSULTORIA LDTA. | DE | 0 | 0 | AMERICAN PETROLEUM INSTITUTE |
| (2) API-BRASIL CONSULTORIA LTDA<br>STREET LAURO MULLER 116 - 32 AND 3<br>RIO DE JANEIRO 22290-160<br>BR 98-1154471 | BUSINESS DEVELOPMENT | BR | 0 | 200,615 | AMERICAN PETROLEUM INSTITUTE |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part II Identification of Related Tax-Exempt Organizations.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related tax-exempt organizations during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Exempt Code section | (e) Public charity status (if section 501(c)(3)) | (f) Direct controlling entity | (g) Section 512(b)(13) controlled entity? Yes | No |
|---|---|---|---|---|---|---|---|
| (1)AMERICAN PETROLEUM INSTITUTE POLITICAL ACTION COMMITTEE<br>200 MASSACHUSETTS AVE STE 1100<br>WASHINGTON, DC 20001<br>27-2596972 | POLITICAL ACTION COMMITTEE/SEPARATE SEGREGATED FUND | DC | 527 | | AMERICAN PETROLEUM INSTITUTE | Yes | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.** Cat. No. 50135Y **Schedule R (Form 990) (Rev. 1-2025)**

Page 2

Schedule R (Form 990) (Rev. 1-2025) Page **2**

**Part III Identification of Related Organizations Taxable as a Partnership.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related organizations treated as a partnership during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Predominant income(related, unrelated, excluded from tax under sections 512-514) | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproprtionate allocations? Yes | No | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? Yes | No | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

**Part IV Identification of Related Organizations Taxable as a Corporation or Trust.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related organizations treated as a corporation or trust during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile | (d) Direct controlling entity | (e) Type of entity (C corp, S | (f) Share of total income | (g) Share of end-of-year | (h) Percentage ownership | (i) Section 512(b)(13) controlled entity? |
|---|---|---|---|---|---|---|---|---|

| | | (state or foreign country) | | corp, or trust) | | assets | | Yes | No |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Schedule R (Form 990) (Rev. 1-2025)

Page 3

Schedule R (Form 990) (Rev. 1-2025) Page **3**

**Part V Transactions With Related Organizations.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, 35b, or 36.

| | | Yes | No |
|---|---|---|---|
| **Note.** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule. | | | |
| 1 During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? | | | |
| **a** Receipt of **(i)** interest, **(ii)**annuities, **(iii)** royalties, or **(iv)** rent from a controlled entity | 1a | | No |
| **b** Gift, grant, or capital contribution to related organization(s) | 1b | | No |
| **c** Gift, grant, or capital contribution from related organization(s) | 1c | | No |
| **d** Loans or loan guarantees to or for related organization(s) | 1d | | No |
| **e** Loans or loan guarantees by related organization(s) | 1e | | No |
| **f** Dividends from related organization(s) | 1f | | No |
| **g** Sale of assets to related organization(s) | 1g | | No |
| **h** Purchase of assets from related organization(s) | 1h | | No |
| **i** Exchange of assets with related organization(s) | 1i | | No |
| **j** Lease of facilities, equipment, or other assets to related organization(s) | 1j | | No |
| **k** Lease of facilities, equipment, or other assets from related organization(s) | 1k | | No |
| **l** Performance of services or membership or fundraising solicitations for related organization(s) | 1l | Yes | |
| **m** Performance of services or membership or fundraising solicitations by related organization(s) | 1m | | No |
| **n** Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) | 1n | Yes | |
| **o** Sharing of paid employees with related organization(s) | 1o | Yes | |
| **p** Reimbursement paid to related organization(s) for expenses | 1p | | No |
| **q** Reimbursement paid by related organization(s) for expenses | 1q | | No |
| **r** Other transfer of cash or property to related organization(s) | 1r | Yes | |
| **s** Other transfer of cash or property from related organization(s) | 1s | | No |

**2** If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| (a) Name of related organization | (b) Transaction type (a-s) | (c) Amount involved | (d) Method of determining amount involved |
|---|---|---|---|
| (1)AMERICAN PETROLEUM INSTITUTE POLITICAL ACTION COMMITTEE | N | 72,100 | FAIR MARKET VALUE |
| (2)AMERICAN PETROLEUM INSTITUTE POLITICAL ACTION COMMITTEE | O | 212,395 | FAIR MARKET VALUE |
| (3)AMERICAN PETROLEUM INSTITUTE POLITICAL ACTION COMMITTEE | R | 57,650 | CASH |
| | | | |
| | | | |
| | | | |

Schedule R (Form 990) (Rev. 1-2025)

Page 4

Schedule R (Form 990) (Rev. 1-2025) Page **4**

**Part VI Unrelated Organizations Taxable as a Partnership.** Complete if the organization answered "Yes" on Form 990, Part IV, line 37.

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue) that was not a related organization. See instructions regarding exclusion for certain investment partnerships.

| (a) Name, address, and EIN of entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Predominant income (related, unrelated, excluded from tax under sections 512-514) | (e) Are all partners section 501(c)(3) organizations? | | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproprtionate allocations? | | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? | | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Yes | No | | | Yes | No | | Yes | No | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Schedule R (Form 990) (Rev. 1-2025)

Page 5

Schedule R (Form 990) (Rev. 1-2025) Page **5**

**Part VII Supplemental Information**

Provide additional information for responses to questions on Schedule R. See instructions.

| Return Reference | Explanation |
|---|---|

Schedule R (Form 990) (Rev. 1-2025)

## Additional Data

Return to Form

**Software ID:**
**Software Version:**