IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IRISH MAE B. DE LOS SANTOS, REYNALDO C. INFIESTO, RICKEL S. INTING, JELSON C. SUMABAL, AND ADELISA C. SURIGAO<br><br>*Applicants*,<br><br>For an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in a Foreign Proceeding | Misc. Case No. ____________________ |

**DECLARATION OF GREGORY JAMES LASCELLES**

I, Gregory James Lascelles, hereby declare under penalty of perjury under 28 U.S.C § 1746 that that the following is true and correct:

1. I am over the age of eighteen and have personal knowledge of the facts contained herein. If so called to testify, I could competently testify to said facts.

2. I am a solicitor licensed to practice law in England and Wales. I am a Partner with the law firm Hausfeld & Co. LLP of 12 Gough Square, London, EC4A 3DW ("Hausfeld"), counsel to Irish Mae B. De Los Santos, Reynaldo C. Infiesto, Rickel S. Inting, Jelson C. Sumabal, and Adelisa C. Surigao ("Applicants" or "Petitioners") who are, among others, the Claimants in proceedings against Shell plc and The Shell Transport and Trading Company Limited (together, "Shell" or the "Defendants") filed in the High Court of England & Wales (KB-2025-004538) (the "Proceedings").

3. Prior to Hausfeld, I spent over eight years (from 2016-2024) as a Partner in the London Office of Covington & Burling LLP, as well as five years (from 2011-2016) as a Partner in the London Office of King & Wood Mallesons SJ Berwin. I hold an LLB in English and French law from King's College London, a Maîtrise in French Law from Université Paris 1 Panthéon-Sorbonne and a M.A.,

Economics from Bocconi University. I was admitted as a Solicitor in England and Wales on 15 September 2003. I have extensive experience in a range of matters covering international commercial litigation, arbitration and regulatory investigations. My practice focuses on solving disputes relating to fraud, negligence, contracts and statutory breach issues.

4. I make this declaration in support of the Petitioners' Application for an Order of Judicial Assistance pursuant to 28 U.S.C. § 1782 (the "Application").

5. The five Petitioners have duly authorised me to bring this Application on their behalf through Forms of Authority. True and correct copies of the Forms of Authority are annexed as Exhibit A.

**Procedural History**

6. The Proceedings are brought by Filipino Claimants seeking remedy from Shell due to the loss and damage they suffered during Typhoon Rai, which was a storm that caused enormous damage across the Philippines in 2021.

7. On October 22, 2025, Hausfeld issued a "Letter Before Action" (or "LBA") on behalf of 67 individuals to Shell. The LBA is a formal pre-suit legal notice sent to a party to inform them of intended legal proceedings. It details the intended allegations and claims. A true and correct copy of the Letter Before Action is annexed as Exhibit B.

8. On December 9, 2025, Hausfeld filed the Claim Form, which formally commenced the lawsuit, in the High Court of Justice of England and Wales in London. Ultimately, following an Amended Claim Form that was filed on December 16, 2025, the Proceedings have been filed on behalf of 103 living persons and the estate of one individual who died during Typhoon Rai (the "Claimants"). A true and correct copy of the Re-Amended Claim Form is annexed as Exhibit C.

9. The Claimants served the Defendants with the Particulars of Claim, which further detailed the grounds on which the Claimants are bringing their claims, on July 31, 2026 ("the

Particulars" and, together with the LBA, "the Pleadings"). A true and correct copy of the Particulars is annexed as Exhibit D.

10. Following this, the Defendants will serve a "Defence," and the Claimants will have an opportunity to serve a responsive "Reply". Currently, the Defence is due by 11 December 2026 and the Reply thereafter. It is anticipated that due to the complex nature of the Proceedings standard timelines may not apply (so it is difficult to predict now what the length of the proceedings will be).

11. The Claimants are individuals living in the Philippines in or around: Cebu City (and the surrounding areas); Ubay, Bohol; and the small islands off the port of Tubigon, Bohol (including Batasan Island, Ubay Island, Bilangbilangan Island and Inanuran Island).

12. The Petitioners in this Application (like most of the Claimants) belong to fishing and/or farming communities who fish and/or farm for subsistence living and sell any additional produce. Several of the Claimants also have part-time employment, but none of the Claimants, as far as I am aware, have material financial assets to their name. The vast majority of the Claimants own their homes and/or property through customary land ownership rights, having often inherited such from their family rather than purchasing land on an open market.

13. All the Claimants suffered immense loss and damage as a result of Typhoon Rai, including but not limited to personal injury (including death), bereavement, destruction of home and/or property and loss of income. The Claimants' homes were all destroyed or significantly damaged by Typhoon Rai, as was much of their local environment.

**Shell's Liability to the Claimants**

14. The Defendants have their registered offices and places of incorporation in the United Kingdom. Shell plc's UK company number is 04366849, and its registered address is Shell Centre, London, SE1 7NA. It is the parent company of the worldwide Shell group of companies ("the Shell

Group"). The Shell Transport and Trading Company Limited's UK company number is 000544845, and its registered address is also Shell Centre, London, SE1 7NA.

15. Below, I summarise several key aspects of the Claimants' allegations, which are more fully set forth in the Pleadings.

16. The Claimants allege that Defendants materially contributed to anthropogenic climate change "and thus materially contributed to both the likelihood and severity of Typhoon Rai". *See* LBA ¶ 5; Particulars ¶¶ 122-26, ¶¶ 34-35, 37-41.

17. The Claimants state that Defendants had knowledge of the significant harms of their fossil fuel products for decades, yet "adopted and pursued group-wide strategies and policies which promoted the expansion of production and sale of fossil fuels, tripling group-wide [greenhouse gas] emissions from 1965 to 2021", and "funded, promoted and/or engaged in public communications strategies and political lobbying efforts with the objective of undermining the emerging scientific consensus on the causes and likely effects of [anthropogenic climate change] and delaying or avoiding the need to reduce the volume of fossil fuels they produced and/or sold." LBA ¶¶ 6-7.

18. The Claimants allege that the Defendants have had actual knowledge of the material contribution of their activities to ACC since the 1960s. *See* LBA ¶¶ 13-30; Particulars ¶¶ 112, 127-33. For example:

a. The LBA cites the Chief Geologist of the Shell Oil Company in 1962:

> *[t]here is evidence that the greatly increasing use of fossil fuels, whose material contents after combustion are principally H2O and CO2, is seriously contaminating the earth's atmosphere with CO2. Analyses indicate that the CO2 content of the atmosphere since 1900 has increased 10 per cent. Since CO2 absorbs long-wavelength radiation, it is possible that this is already producing a secular climatic change in the direction of higher average temperatures. This could have profound effects both on the weather and on the ecological balances.*

LBA ¶ 54 (citation omitted) (bracket and italicisation in Letter Before Action).

b. The Pleadings provide further examples of the Defendants' early knowledge of the risks of ACC and their operations throughout the 1960s until 2021, see LBA ¶¶ 6, 115; Particulars ¶¶ 124, 134-35, including an internal Shell report marked 'Confidential,' which was published internally in 1988 and stated, *inter alia*, that *"[t]here is reasonable scientific agreement that increased levels of greenhouse gases would cause a global warming [and that] [s]uch relatively fast and dramatic changes [as would be caused] would impact on the human environment, future living standards and food supplies and could have major social, economic and political consequences*", and which calculated Shell's share of global $CO_2$ emissions to be 4%. LBA ¶¶ 6, 70-72, 115 (citation omitted) (bracket and italicisation in Letter Before Action); Particulars ¶ 132(2).

19. The Claimants allege that, as well as failing to take appropriate steps to reduce their own production of fossil fuels (and instead actively increasing the same), Particulars ¶¶ 122-26, the Defendants engaged in suppression of information and numerous obfuscatory acts of public communications or political lobbying in an effort to undermine the scientific consensus around climate change to protect their products. *Id.* ¶¶ 134-37. It is the Claimants' case that Shell did so in order to further their own financial interests at the expense of the environment and the climate vulnerable communities (including the Claimants) who they could reasonably foresee would be adversely affected by the continued and/or increased production of fossil fuels.

**<u>Applicable Law and Jurisdiction</u>**

20. The Claimants are bringing the Proceedings in the Courts of England and Wales ("E&W Courts") as this is where the Defendants are domiciled. The Defendants have confirmed that they will not be seeking to challenge the jurisdiction of the E&W Courts to hear the Proceedings.

21. It is my belief as counsel for the Claimants that the law applicable to the claims will be determined by the provisions of Regulation (EC) No 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations (the "Rome II

Regulation"), which guides the determination of the applicable substantive law in cases such as the Proceedings brought before the E&W Courts. As such, it is my position that the substantive law governing the determination of these claims is the law of the Philippines as this is the country in which the relevant damage occurred, pursuant to Article 4(1) of the Rome II Regulation, which states:

> Unless otherwise provided for in this Regulation, the law applicable to a non-contractual obligation arising out of a tort/delict shall be the law of the country in which the damage occurs irrespective of the country in which the event giving rise to the damage occurred and irrespective of the country or countries in which the indirect consequences of that event occur.[1]

22. It is further my belief as counsel for the Claimants that as the relevant damage is the result of defendants' continuing acts and omissions, déçepage (whereby different laws may apply to different issues in the same proceedings) does not apply. If déçepage does apply, which the Claimants deny, the applicable law would still be the law of the Philippines under section 11(2)(a) and (b) of the Private International Law (Miscellaneous Provisions) Act 1995, and under the common law.

23. The Defendants have currently withheld their position as to the applicable law for the Proceedings.

**<u>Claims</u>**

24. The Claimants' claims arise out of alleged violations of Philippine law, including but not limited to the Philippines Civil Code, and alleged violations of the Claimants' Constitutional rights. LBA ¶¶ 105-127; Particulars ¶¶ 146-238. The Claimants claim that the acts and/or omissions of the Defendants entitle the Claimants to relief under Philippine law.

25. These causes of action are informed by the May 2022 report of the Commission on Human Rights of the Philippines (the "HR Commission") entitled the "National Inquiry of Climate Change Report" (the "HR Report"). A true and correct copy of the HR Report is annexed as Exhibit

[1] Regulation (EC) No 864/2007 of the European Parliament and of the Council

E. The HR Commission is a Philippines institution empowered by the Philippines Constitution to promote and protect the human rights of all individuals. Ex. E at 1. In May 2022, it published the HR Report after more than seven years of research, hearings, and investigations. *Id.* at 12-24. The HR Report was submitted by Commissioner Roberto Eugenio T. Cadiz and adopted by the Commission as a whole through Resolution CHR (V) No. POL2002-017, dated 4 May 2022.

26. The HR Report established, *inter alia*, that climate change had significantly increased the frequency and severity of cyclones in the country, *id.* at 28, and that the so-called Carbon Majors, including Shell plc, bore significant responsibility for this. *Id.* at 88-90.

27. The HR Report further concluded that, in light of the documented history of climate misinformation and lobbying:

> [T]he Commission agrees that the Carbon Majors [including Shell], directly by themselves or indirectly through others [including the API], singly and/or through concerted action, engaged in willful obfuscation of climate science, which has prejudiced the right of the public to make informed decisions about their products, concealing that their products posed significant harms to the environment and the climate system. All these have served to obfuscate scientific findings and delay meaningful environmental and climate action. An argument may be made under Philippine law that the acts of obfuscation, deception, and misinformation as described above contravene the standard of honesty and good faith expected of a person in the exercise of his rights. Articles 19 and 21 of the Civil Code of the Philippines.

*Id.* at 98.

28. I believe that a subset of Claimants' claims may be more familiar in nature to a United States court and judiciary, such as those arising under Articles 694, 696, and 703, which are public and private nuisance claims, and those arising under Article 2176, which are quasi-delict claims, which can be likened to nuisance. For this reason, I focus herein on claims I believe may be less familiar, namely those arising under Articles 19, 20 and 21.

29. Articles 19-21 of the Philippines Civil Code provide a cause of action for causing damage to others in a manner that is negligent or contrary to law, morals, good customs and public policy. Below is the text of each Article.

a. Article 19: "Every person must, in the exercise of his rights and in the performance of his duties, act with justice, give everyone his due, and observe honesty and good faith".

b. Article 20: "Every person who, contrary to law, wilfully or negligently causes damage to another, shall indemnify the latter for the same".

c. Article 21: "Any person who wilfully causes loss or injury to another in a manner that is contrary to morals, good customs or public policy shall compensate the latter for the damage".

30. It is notable—as I understand from Filipino lawyers—that these provisions (Articles 19-21) were drafted broadly by the Civil Code Commission to provide a remedy for a wide range of wrongs, regardless of whether the acts or omissions are in contravention of other specific legal provisions. As Philippines Supreme Court Associate Justice Caguioa articulated in *Navaror-Banarria v Banaria*:

> Articles 19, 20, and 21 have been historically planted to ensure that no wanton discounting of the rights of others may escape with impunity for the sole reason that no black letter law specifically prohibits the same. For if the case were otherwise, we would be constantly confronted with the irony wherein, as the Report of the Code Commission itself described, people would be free to cause damage to others, and violate the most elementary principles of morality, so long as no positive law is broken.[2]

31. Article 19 does not establish a standalone tort but instead describes a standard of conduct in the exercise of rights which, if not met, may give rise to an actionable claim when alleged together with Article 20 or Article 21. In *Globe Mackay Radio and Cable Corp. v CA*, the Philippines Supreme Court described Article 19 as follows:

> This article, known to contain what is commonly referred to as the principle of abuse of rights, sets certain standards which must be observed not only in the exercise of

[2] *G.R. No. 217806 July 28, 2020*, https://lawphil.net/judjuris/juri2020/jul2020/gr217806caguioa.html.

> one's rights but also in the performance of one's duties. **These standards are the following: to act with justice; to give everyone his due; and to observe honesty and good faith. The law, therefore, recognizes a primordial limitation on all rights; that in their exercise, the norms of human conduct set forth in Article 19 must be observed. A right, though by itself legal because recognized or granted by law as such, may nevertheless become the source of some illegality.** When a right is exercised in a manner which does not conform with the norms enshrined in Article 19 and results in damage to another, a legal wrong is thereby committed for which the wrongdoer must be held responsible. But while Article 19 lays down a rule of conduct for the government of human relations and for the maintenance of social order, it does not provide a remedy for its violation. Generally, an action for damages under either Article 20 or Article 21 would be proper.[3]

32. In the Proceedings, the Claimants claim that Shell have violated their obligations under Articles 19-21 of the Philippines Civil Code through having:

> a. wilfully adopted, set and/or pursued group-wide strategies and policies to expand the production and sale of fossil fuels which drove a more than threefold increase in group-wide GHG emissions between 1965 and 2021 and a more than 70% increase in group-wide GHG emissions between 1990 and 2021;
>
> b. deliberately and/or negligently failed throughout the period from the mid-1960s to 2021 – to adopt, set and/or pursue group-wide strategies and policies to effectively reduce group-wide GHG emissions; and
>
> c. instead, in the pursuit of their own financial self-interest, funded, promoted and/or engaged in public communications and political lobbying campaigns designed to undermine the scientific consensus on the causes and likely effects of ACC and prevent or delay national and international measures to encourage or require a reduction in the production or consumption of fossil fuels.

LBA ¶ 115(b); *see also* Particulars ¶¶ 200-30.

33. Article 20 provides for relief when a party wilfully or negligently causes damage in a manner that is contrary to law, where the law otherwise does not provide for damages. Particulars ¶ 202.

34. Claimants allege that Shell's conduct violates environmental and constitutional law in the Philippines. In particular, Article II, section 16 of the Philippines Constitution with respect to "rights of the people to a balanced and healthful ecology". Particulars ¶¶ 146-47. Claimants claim that

[3] *G.R. No. 81262 August 25, 1989*, https://lawphil.net/judjuris/juri1989/aug1989/gr812621989.html. [Emphasis in the original].

"[t]he Defendants' contribution of around 2.55% of cumulative industrial GHG emissions from 1850-2021 and around 2.3% of cumulative industrial GHG emissions from 1965-2021 has caused a warming in atmospheric and ocean surface temperatures around the Philippines that is of such magnitude as to prejudice the[ir] life, health, and property" and cause "an ongoing violation of the right of the people to a balanced and healthful ecology". LBA ¶ 127(a)-(b); Particulars ¶ 202(2).

**The American Petroleum Institute (the "API")**

35. Central to the Claimants' pleaded case in the Proceedings are allegations that Shell, through their involvement in and/or influence over industry bodies (perhaps most notably and prominently the API), sought to spread information to the general public and policy makers that undermined the scientific consensus around climate change, despite having clear knowledge of the harm climate change would cause and their contributions to it (including by virtue of their membership of the API).

36. The Pleadings allege a long-standing relationship of Shell and the API. To my understanding and belief, an entity of the Shell Group is (and, at all times relevant to the Proceedings, has been) a member of the API. Shell has further held prominent positions on the board of directors of the API, and a seat on its Executive Committee (which to my understanding is currently 10 members but has been smaller in previous years). As just two examples: in 2017, Mr. Bruce Culpepper, the President and Country Chair of the Shell Oil Company, was listed on the API board of directors; and in Shell's 2023 Climate and Energy Transition Lobbying Report, the company lists itself as being on the Board and Executive Committee of the API.[4]

---

[4] Shell PLC, *Climate and Energy Transition Lobbying Report 2023* 29 (2023), https://www.shell.com/sustainability/reporting-centre/reporting-centre-archive/jcrcontent/root/main/section2106585602/tabs/tab/text1351547253/links/item0.stream/1742907002141/265be738035f3b57f002891e4da4832105bb2a7f/shell-climate-and-energy-transition-lobbying-report-2023.pdf. *See also* Particulars ¶ 137(2); Letter from Jack N. Gerard, API President and Chief Executive Officer, to Ryan Zinke, Secretary of the U.S. Department of the Interior (27

37. There are numerous public facts that support this belief and underscore the proximity. For example, Shell's 2025 Climate and Energy Transition Lobbying Report states that in 2025, Shell's "payments" to the API were between USD$5,000,000 and USD$7,500,000.[5] Although Shell USA, Inc. is the Shell Group entity that is currently a member of the API (to my understanding the API only allows US registered entities to be part of its membership),[6] the aforementioned report is published by Shell plc that details the Shell Group's engagement with, and funding of, the API. It is reported that in 2021, the year the Claimants suffered loss and damage due to Typhoon Rai, Shell donated over USD$10,000,000 to the API.[7]

38. It is the Claimants' position that Shell USA, Inc. acts as a member of the API for the benefit of the entire Shell Group's operations. Further information about the reporting lines between the API and Shell have been sought through this Application.

39. It is further the Claimants' position that through this role, Shell have used, and continue to use, the API as a means of gaining relevant knowledge about climate change (and the impact of their operations on it) and influencing public perception and policy decisions.

40. It is my understanding that there would have been significant lines of communication between Shell and the API, given the prominent API roles Shell employees have had, and that

---

Feb. 2017),
https://www.doi.gov/sites/default/files/uploads/all_records_combined_for_foia_library.pdf.

[5] Shell PLC, *Climate and Energy Transition Lobbying Report 2025* 42 (2025), https://www.shell.com/sustainability/advocacy-and-political-activity/jcrcontent/root/main/section/simple/promocopycopycopy/links/item1.stream/1778744696798/8c962986fada3ab3a172d8bf235c828154a2eea1/climate-and-energy-transition-lobbying-report-2025.pdf.

[6] *See* API, *Members*, https://www.api.org/membership/members (listing Shell USA, Inc. as member).

[7] Chris McGreal, *How a powerful US lobby group helps big oil to block climate action*, The Guardian (19 July 2021), https://www.theguardian.com/environment/2021/jul/19/big-oil-climate-crisis-lobby-group-api.

information would have disseminated through regular lines of communication such as through the API's reports and proceedings.

41. The Pleadings contain a non-exhaustive selection of examples of the API's actions that are believed to underscore Shell's knowledge of the impact of its actions. For example, the Pleadings allege that in 1965, the President of the API gave a keynote address at their annual conference, where senior Shell Group representatives were present, that addressed recent advances in climate science (and the corresponding report that had recently been published by the US Government):

> *One of the most important predictions of the report is that carbon dioxide is being added to the earth's atmosphere by the burning of coal, oil, and natural gas at such a rate that by the year 2000 the heat balance will be so modified as possibly to cause marked changes in climate beyond local or even national efforts… The substance of the report is that there is still time to save the world's peoples from the catastrophic consequence of pollution, but time is running out.*

LBA ¶ 57 (citation omitted) (italicisation in Letter Before Action).

42. The Pleadings allege that obfuscatory acts of public communications or political lobbying in an effort to undermine the scientific consensus around climate change to protect their products were both done by Shell itself, and through the trade associations and industry bodies that Shell was part of—including the API. Particulars ¶ 137(2). The Pleadings evidence the way in which Shell relies on the API for some of its key public-facing lobbying activities. *Id.* One public news report cited a major fossil fuel lobbyist as "describing API as the industry's 'whipping boy' to direct public and political criticism away from individual companies".[8]

43. The API states on its website that the first element of "What We Do" is: "**Policy Advocacy**: API is the leading voice of the natural gas and oil industry—engaging with Congress, the Executive Branch, state and local governments, regulatory agencies, courts, the media, and the

[8] Chris McGreal, *How a powerful US lobby group helps big oil block climate action*.

public".[9] Shell's 2025 Climate and Energy Transition Lobbying Report suggests that "*through*" the API they engaged and/or advocated with the US Government in relation to critical industry issues,[10] including: decommissioning,[11] low-carbon fuels,[12] carbon capture and storage[13] and Liquefied Natural Gas.[14]

44. Claimants allege that "[t]he purpose of [the Shell Group's] membership and funding" of the API "was to advance the Shell Group's commercial and economic interests by seeking to influence public opinion and public policy in a way which aligned with and furthered (rather than diverging from and impeding) the pursuit of those interests." Particulars ¶ 139(4)(b). Claimants allege that the API would have consulted the Shell Group about the activities it "proposed to undertake in pursuit of the Shell Group's commercial and economic interests, including . . . regarding statements which . . . API proposed to make/publish as part of those activities," and "reported regularly to executives" at Shell regarding the API's activities. Particulars ¶ 139(4)(c)(i)-(ii). As such, the Claimants' case is that for the purposes of the lobbying and dis-information activities (as described above in this Declaration) and this Application, the API's activities would "have been known to and authorised and/or endorsed by" Shell. Particulars ¶ 139(4)(c)(iii). Accordingly, Claimants argue that the API should be treated as an agent of Shell, and the API's activities can be attributed to Shell. Claimants believe it likely that Shell will seek to argue that activities of (or knowledge held by) the API can in no way be attributed to them.

45. The Pleadings also evince how Shell used trade associations or other groups to undertake lobbying and disinformation activities on their behalf. Particulars ¶ 139(4)(b). It has been

---

[9] API, *About*, https://www.api.org/about (last accessed on 30 June 2026).
[10] Shell PLC, *Climate and Energy Transition Lobbying Report 2025* 18 (emphasis added).
[11] *Id.* at 19.
[12] *Id.* at 22.
[13] *Id.* at 29.
[14] *Id.* at 32.

written that these associations and "coalitions have acted to enhance the collective political capacity of individual corporations by fulfilling two key functions. The first is to constitute and promote the industry's social identity as a legitimate actor in the political system and thereby manage reputational risks to avoid regulation. . . . The second function is to pool economic and political resources from across the industry sectors to advocate for the coalition's collective interests". [15] This is highly relevant to the Claimants' case, as for example, the API and Shell were both jointly members of the Global Climate Coalition (the "GCC") for many years,[16] a coalition which the Pleadings allege engaged in extensive climate misinformation activities on behalf of its members. Particulars ¶ 137(1). It has also been written that the GCC was "the first and largest U.S. domestic coalition organized to oppose climate action".[17] Claimants allege that the GCC, like the API, would have consulted and/or informed Shell prior to undertaking misinformation activities, and accordingly that GCC's activities would have been authorised or endorsed by Shell. Particulars ¶ 139(4)(c).

**Relevance of the Discovery Sought**

46. While the American Petroleum Institute is not a party to the Proceedings, evidence in the API's possession regarding Shell's activities and knowledge and the API's activities with the approval and/or direction of Shell is likely to greatly assist the E&W Courts in making their determinations of the claims being brought under Philippine law.

47. The discovery sought represents a proportionate but critical set of materials that are highly relevant to the Proceedings. Given these issues are of a central importance to the Claimants'

[15] Robert J. Brulle, *Advocating inaction: a historical analysis of the Global Climate Coalition*, Environmental Politics (2022), https://cssn.org/wp-content/uploads/2022/04/GCC-Paper.pdf.
[16] *See* Global Climate Coalition Membership (1989), https://www.climatefiles.com/denial-groups/global-climate-coalition-collection/1989-membership/; *see also* Ex. E at 97; Center for International Environmental Law, *A Crack in the Shell* 11 (2018), https://www.ciel.org/wp-content/uploads/2018/04/A-Crack-in-the-Shell-April-2018.pdf.
[17] Robert J. Brulle, *Advocating inaction: a historical analysis of the Global Climate Coalition* (Environmental Politics 2022), https://cssn.org/wp-content/uploads/2022/04/GCC-Paper.pdf.

claims before the E&W Courts, the discovery sought is critical to the fair and just management of the Proceedings.

48. The discovery requests and deposition topics were developed subsequent to significant research in order to identify tailored categories of requests that we strongly believe would lead to relevant evidence. Herein, I provide examples of the categories, how they relate to the Philippine law claims, and why they were included.

Knowledge of climate change, greenhouse gases and climate science

49. One category of requests revolves around knowledge. Several requests and deposition topics seek information regarding knowledge of climate change, greenhouse gases and climate science. Such information would be directly relevant to prove that emissions materially contributed to anthropogenic climate change and Typhoon Rai, that defendants possessed such knowledge, and when defendants possessed such knowledge. Responsive documents would be highly probative in determining the full extent of Shell's knowledge, through materials shared with or by the API, of science and whether their products posed harms to the environment and the climate system.

50. This evidence would be relevant to the following elements of Claimants' Philippine law claims.

a. A nuisance act. The Claimants allege that Shell's acts were a nuisance in part because Shell knew that their activities, which caused "very substantial emissions of $CO_2$, methane, and nitrous oxides", "would substantially contribute to the occurrence and/or magnitude of [anthropogenic climate change], and the risk of harm to people and property caused by [anthropogenic climate change]." Particulars ¶¶ 37-38, 174(2).

b. Standard of care for quasi-delict (negligence). Shell's actual or constructive knowledge of the impact of their actions—and at what point Shell had that knowledge—is critical to proving that Shell's decision to increase fossil fuel emissions and spread

misinformation regarding fossil fuel impacts failed to meet the standard of care that would be expected of a reasonable company, which is a critical element of quasi-delict (negligence). Particulars ¶¶ 185(10)-(11), 186, 195.

c. Wrongful acts under Articles 19 to 21. Evidence of Shell's knowledge may also provide proof that its acts undertaken with this knowledge should be seen as wilful or consciously indifferent acts of bad faith and/or contrary to morals and the relevant standards under Philippine law, which are elements of claims under Articles 19 to 21 of the Philippines Civil Code. *See* Particulars ¶¶ 206, 207, 211-13.

51. For example, Petitioners request the API's correspondence "related to, from, or with Shell" that "concern Climate Change" and "Climate Science". Petitioners also seek information about the API's climate-related internal or supported research, including information about which API committees conducted these activities and what work they conducted. This is highly relevant information because it is Claimants' counsel's understanding and presumption that substantial climate change research on behalf of industry members such as Shell was done by the API, on behalf of the API or through the API's committees.[18] The "API Committees" listed in the definitions of the requests were identified through diligent research. For instance, Claimants allege that the API's CO2 and Climate Task Force held a meeting in 1980 where John Laurmann, from Stanford University, gave a "stark warning" on the risks of uncontrolled fossil fuel emissions. LBA ¶ 64 (citation omitted).

52. Petitioners also request information that passed through various industry associations, coalitions, and campaigns. This includes groups such as the Global Climate Coalition, where it is

---

[18] *See* Benjamin Franta, *Big carbon's strategic response to global warming, 1950-2020* 35-36, 41-42, 54, 111-13, 125-28, 138-72 (PhD Dissertation, Stanford University 2022), https://stacks.stanford.edu/file/druid:hq437ph9153/Franta%20-%20Big%20Carbon%20strategic%20response%20to%20global%20warming%201950-2020%20-%202022-08-25-augmented.pdf (describing the API's early knowledge and suggestions that the API members would have received disseminated information).

documented that both Shell and the API participated in these groups. *Supra* ¶ 45. This request also seeks probative information, as it is Claimant's counsel's presumption that substantial climate change research on behalf of Shell and other industry members was conducted through industry associations.

53. These requests are highly geared towards probative evidence that would identify to what extent there was information sharing between Shell, the API, the API's committees, and industry associations, what information was shared, and when.

Involvement in and responsibility for suppression of information or misinformation activities

54. Several requests and deposition topics seek information regarding knowledge of and/or involvement in the suppression of information about the risks of greenhouse gas emissions and/or the dissemination of misinformation about such risks. These requests are highly geared towards probative evidence that would identify the API and Shell's involvement in or endorsement of acts to influence the public and bodies working on climate change, the degree to which misinformation took place, as well as the rationale, motivation, and strategy behind Shell's and the API's acts.

55. This evidence would be relevant to the following elements of Claimants' Philippine law claims.

a. Causation for negligence and nuisance. The Claimants allege that misinformation activities "delay[ed], impede[d] and/or weaken[ed] measures to mitigate [anthropogenic climate change] and its effects, thereby contributing to the continuation and exacerbation of the harm suffered by the Claimants." Particulars ¶ 190(7).

b. Breach of a duty of care in negligence. The Claimants allege that "Defendants' . . . involvement in the suppression of information about such risks and/or the dissemination of misinformation about such risks," including "funding of research designed to cast doubt upon the relationship between [anthropogenic greenhouse gas] emissions and [anthropogenic

climate change] and the risks posed by [anthropogenic climate change]; and funding and/or promotion of misinformation concerning [anthropogenic climate change] by the GCC and the API, of which the Shell Group was a member" failed to meet the standard of care a reasonable business would undertake, because the harm from those acts was reasonably foreseeable. Particulars ¶¶ 185.11, 190, 194.

c. Wrongful acts under Articles 19 to 21. Such evidence can be used to prove that Shell (themselves and/or through the API) acted in a manner that was dishonest, in bad faith, and "contrary to morals, good customs or public policy," both because the Claimants allege that misinformation was the wrongful act, Particulars ¶¶ 205, 209, 211, and because the Claimants allege that Shell's "knowledge of and/or involvement in the suppression of information about such risks and/or the dissemination of misinformation about" the risks of greenhouse gas emissions, and knowledge that "the continued circulation of that misinformation, if left uncorrected or unrepudiated, was liable to influence public, governmental and commercial understanding and decision-making concerning [anthropogenic greenhouse gas] emissions and [anthropogenic climate change], thereby foreseeably delaying, impeding and/or weakening measures to mitigate [anthropogenic climate change] and its effects," meant that Defendants acted with conscious indifference or wilfully. Particulars ¶¶ 206, 211, 228 (citing Particulars ¶¶ 186, 190(7)).

56. Petitioners seek documents and testimony from the API regarding information about the API's Climate Advocacy Activities and Climate Responses, including information about which API Committees conducted these activities and what work they conducted. This is highly relevant information because it is Claimants' counsel's understanding and presumption that much of the climate change advocacy and response work on behalf of industry members such as Shell was done

through the API and its committees.[19] For example, the Claimants allege that the API drew up an API Kyoto Strategy document (as defined and cited in the Particulars) and that it was "explicitly designed to undermine the consensus on the science of climate change and the need for urgent action to curb reliance on fossil fuels". Particulars ¶ 137(2)(d).

57. Petitioners also seek information regarding specific policy and international climate change initiatives and groups, such as the Kyoto Protocol, the United Nations Framework Convention on Climate Change, and the Intergovernmental Panel on Climate Change. These requests would generate relevant evidence regarding the fossil fuel industry's, including Shell's, interactions with and any attempts to shape these initiatives through misinformation or withholding disinformation. It is my understanding that these United Nations programs were/are critical multilateral initiatives that had the potential to implement global understanding/agreements regarding emissions reductions that could have implicated the financial interests of Shell and other fossil fuel companies. There are reports that the industry has tried to influence these multilateral initiatives for decades.[20]

58. Also relevant to this category, Petitioners seek information about the work of various industry associations, coalitions, and campaigns. This includes groups such as the Global Climate Coalition and the International Petroleum Industry Environmental Conservation Association ("IPIECA"). It has been reported that both groups engaged in promoting misleading information with

---

[19] *E.g.*, LBA ¶¶ 85, 90; Particulars ¶ 137(2); *see also* Benjamin Franta, *Big carbon's strategic response to global warming, 1950-2020* 125-280 (describing the API's use of "public disinformation to downplay the threat" of climate change "and promote greater fossil fuel use"); Chris McGreal, *How a powerful US lobby group helps big oil block climate action*.

[20] *See, e.g.*, Benjamin Franta, *Big carbon's strategic response to global warming, 1950-2020* 153-54 ("the industry continue to organize internationally to block any meaningful action"); Chris McGreal, *How a powerful US lobby group helps big oil block climate action*; Amy Westervelt & Royce Kurmelovs, *The Great COP Co-opting: New Documents Show Big Oil Has Been There All Along*, Drilled (Nov. 20, 2024), https://drilled.media/news/IPIECA1.

respect to climate change.[21] For example, Claimants allege that IPIECA published a "strategy memo" "received by hundreds of oil companies" that aimed to avoid public policies that control fossil fuel use. LBA ¶ 93(b) (citation omitted).[22] And as also alleged, the GCC published several misleading or false documents, and even gave false testimony to the US House of Representatives. Particulars ¶ 137(1).

59. Several requests are further tailored towards information regarding marketing, public statements, and consumer behaviour and viewpoints. Applicants request, for example, documents regarding "Marketing, Public Relations, media campaigns, influence campaigns, polling and assessment, Advertising, content, and messaging" activities, focused on "Climate Advocacy Activities" and documents "concerning public understanding, consumer viewpoints, or consumer behavior" "concerning Climate Change", evidence which will help demonstrate facts surrounding shaping public opinion and dissemination of misleading information.

<u>The relationship between the API and Shell</u>

60. Another category of documents and deposition topics is tailored towards identifying the scope of the relationship between Shell and the API. These include, among other things, requests regarding specific roles held at the API by Shell employees and Shell's financial contributions to the API. More specifically, Petitioners ask for documents to show "Shell's affiliation with and involvement with" the API, "Shell's financial contributions to API", "how Shell's financial contributions . . . could be used", and when Shell's financial contributions were actually "used to fund API and API-sponsored

---

[21] *See* LBA ¶¶ 83, 87, 93 (describing the GCC and IPIECA's deceptive acts); Particulars ¶ 137(1) (describing the GCC's deceptive acts); Benjamin Franta, *Big Carbon Strategic Response to Global Warming, 1950-2020* 137-42; Amy Westervelt & Royce Kurmelovs, *Revealed: Oil Majors Used a Little-Known UN-Affiliated Organization to Seed the Economic Argument Against Climate Action* (Nov. 21, 2024), drilled.media/news/Ipieca2; Robert J. Brulle, *Advocating inaction: a historical analysis of the Global Climate Coalition* (Environmental Politics, 2022), https://cssn.org/wp-content/uploads/2022/04/GCC-Paper.pdf.

[22] *See also* Benjamin Franta, *Big Carbon Strategic Response to Global Warming, 1950-2020* 139-40.

work, initiatives, coalitions, campaigns, research, Advertisements, and studies related to Climate Change, Greenhouse Gases, Climate Advocacy Activities, Climate Science, and Climate Responses".

61. These requests and topics are tailored to obtaining discovery that will document and establish control over and knowledge of the API's actions and will evince that the API's actions and knowledge should be attributed to Shell. It is my belief that such discovery will assist the E&W Courts to understand and make determinations regarding, *inter alia*: (i) the nature of the relationship between Shell and the API; (ii) the degree of control and/or influence that Shell exert(ed) over the API; and (iii) the reporting lines and communication mechanisms that operate(d) between Shell and the API. As discussed above, attributing such knowledge and actions to Shell would be directly relevant to the potential liability of Defendants for nuisance, quasi-delict (negligence), and under Articles 19 to 21 of the Philippines Civil Code, as it will help establish the Defendants' knowledge of the risks and/or dangers of their activities, and their responsibility for the API's acts of misinformation and/or obfuscation of knowledge.

Specific events, individuals, and documents

62. Finally, Petitioners seek evidence of specific events, individuals, and documents that we already know to be in existence, and which are directly relevant to Claimants' causes of action. This category identifies information and facts that speak directly to Shell's and the API's knowledge of anthropogenic climate change and to Shell's and the API's involvement in and knowledge of misinformation. The requests include documents that have already been identified as directly relevant through our research and seek further information surrounding those documents.

63. For example, the document titled *Meeting the Challenges of 1966* by Frank N. Ikard contains the annual remarks of the API's then-President, Frank Ikard, which mentions the report of US President Johnson's Science Advisory Committee, and specifically notes that "[o]ne of the most important predictions of the report is that carbon dioxide is being added to the earth's atmosphere by

the burning of coal, oil, and natural gas".[23] It is my understanding that this document would have been sent to API members, and that Shell representatives would have been present at the annual remarks. *See* LBA ¶ 57. This directly speaks to probative information around early knowledge.

**<u>Availability of Evidence in the E&W Courts</u>**

64. This Application for discovery through the section 1782 procedure is a critical step in advancing the English litigation, particularly because the E&W Courts are unlikely to have jurisdiction to order discovery from respondent.

65. The respondent is not domiciled in the United Kingdom,[24] and none of the applicable jurisdictional gateways potentially available to the E&W Courts appear relevant to such an application for discovery from the respondent.

66. In my view, there is no realistic prospect that the E&W Courts would make an order that discovery be sought from the respondent (as a non-party) in these Proceedings.

67. I believe the API likely has available highly relevant information pertaining to Claimants' claims against Shell.

68. First, it is my belief that there is a reasonable inference that can be drawn, given the reports about industry companies affecting some of their work through organisations like the API, that the API would, in certain circumstances, have even greater documentation related to the topics sought than Shell itself, as the API would have held and coordinated messaging across the industry. Petitioners allege that Shell is liable for some of the API's misinformation activities, and the API itself would have the best records of its own activities, which Shell would not necessarily possess.

[23] *See* Frank N. Ikard, *Meeting the Challenges of 1966* 13, https://www.documentcloud.org/documents/5348130-1965-API-Proceedings/.
[24] *See Contact*, API, https://www.api.org/contact (last visited 17 December 2025).

69. Second, Petitioners argue that Shell is liable for some of the misinformation activities conducted by associations such as the GCC, of which the API is also a member. The API may also have unique records of the activities of groups like the GCC or IPIECA, due to its coordinating role and differences in recordkeeping.

70. Third, I believe the API is likely to have unique documents, and a thorough repository of historical documents, including those that regard Shell's knowledge of climate change. As a "major research institute" that is "tailored to serve its members" by providing "scientific, economic, and legal analysis",[25] the API is likely to have a thorough repository of the scientific research that was available to industry actors, including Shell. Given the specialised and critical role that the API represents in the oil and gas industry, it is my belief that the API likely possesses highly relevant information critical to Claimants' claims that are not discoverable through any other means.

**<u>Receptivity of the E&W Courts</u>**

71. I am not aware of any reason why the E&W Courts would not be receptive to the judicial assistance requested in this Application and believe they will be receptive.

72. The laws of England and Wales (which are the procedural rules which will govern the Proceedings) do not prohibit the acquisition or use of the information sought, and the E&W Courts have not placed any restrictions on the section 1782 discovery sought.

73. The E&W Courts have previously shown their willingness to accept evidence obtained through Section 1782 applications in comparable litigation. For example:

a. In the UK House of Lords case of *South Carolina Co v Assurantie N V.*, the Court rejected the notion that information obtained from a 1782 application was inherently

[25] *See Members*, API, https://www.api.org/membership/members.

objectionable and abusive because it interfered with the court's control of its own procedure. The House of Lords held that it did not consider that a party to English proceedings,

> by seeking to exercise a right potentially available to them under the Federal law of the United States [i.e., seeking discovery through a 1782 application], have in any way departed from, or interfered with, the procedure of the English court. . . . All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe they need in order to prepare and present their case.[26]

b. Similarly, in *Nokia Corporation v Interdigital Technology Corp.*, the High Court ruled:

> [I]t cannot be said a priori or that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings . . . . the English court should not seek to circumscribe the discretion possessed by the [US] district court by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in proceedings as they stand. It is legitimate for the requesting party to use the request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary after appropriate amendment.[27]

c. Further, in *Dreymoor Fertilisers Overseas PTE Ltd v Eurochem Trading GmbH*, the High Court allowed the use of evidence obtained through a 1782 application as it was not deemed "unconscionable" to do so.[28]

d. Finally, in a more recent 2023 case of *Soriano v Forensic News LLC and ors*, the Court of Appeal held that materials obtained through a 1782 application in a U.S. court could be used in English civil proceedings as the application was not "*oppressive or vexatious or which interferes with the due process of the court*" which is the relevant test.[29]

---

[26] *South Carolina Co v Assurantie N V.* [1987] A.C. 24 (HL) at 42.
[27] *Nokia Corporation v Interdigital Technology Corp.* [2004] EWHC 2920 at 8.
[28] *Dreymoor Fertilisers Overseas PTE Ltd v Eurochem Trading GmbH* ([2018] EWHC 2267 (Comm)) (referencing *South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien" NV* (1987) 1 AC 24 (HL)).
[29] As per *South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien" NV* (1987) 1 AC 24 (HL).

74. This Application does not seek to circumvent foreign proof-gathering restrictions or other practices of the E&W courts, and I believe that there is no basis under the laws of England & Wales to assert otherwise, especially as no discovery is sought of privileged materials. Instead, this Application seeks evidence from a non-party located outside the jurisdiction of the E&W courts that would otherwise be unavailable to the Petitioners. The E&W Courts do not prohibit this type of evidence from being sought outside the jurisdiction.

75. There will be numerous opportunities for the Claimants to submit any evidence obtained through the Application in the Proceedings, including as part of the Claimants' pleaded case (in the Reply, which will follow the Defendants' Defence) or through being exhibited to witness evidence during the litigation at an appropriate time.

76. For the reasons set out in the parts above, it is my belief that the discovery sought through this Application is relevant to the Proceedings, is likely to assist the E&W courts in determining issues arising in those Proceedings (including those involving issues of Philippine law),and cannot realistically be obtained through procedures available in England and Wales.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 25 September 2026, in London, United Kingdom.



Gregory James Lascelles

# Exhibit A

**PRIVATE AND CONFIDENTIAL**

Hausfeld & Co LLP ("Hausfeld"): 12 Gough Square, London EC41 3DW

Email: glascelles@hausfeld.com

Claim: Sucano & Ors v Shell plc & Anor (Claim Number: KB-2025-004538)

**FORM OF AUTHORITY**

**Name:** ADELISA C. SURIGAO

**Date of Birth:** DECEMBER 22, 1995

I am a Claimant in the above-reference claim in the High Courts of England & Wales (the "**Claim**") and I authorise Hausfeld to:

1. Prepare, issue, file, serve and pursue an Application for an Order of Judicial Assistance pursuant to 28 U.S.C. § 1782 against the American Petroleum Institute on my behalf in the United States Courts (the "**Application**") in relation to the Claim. I understand that this Application may lead to discovery being provided that will be of relevance to the Claim.

2. Take all steps necessary to advance the Application as Hausfeld deem appropriate, including through working with additional experts and/or legal counsel.

3. I agree that a copy of this form will be valid as the original.

I have understood this Form of Authority and if I cannot read or understand the English language, it was explained to me in my language, and I have asked any questions I wanted to ask about it.

Signature: [signature] Dated: JULY 13, 2026

**PRIVATE AND CONFIDENTIAL**

Hausfeld & Co LLP ("Hausfeld"): 12 Gough Square, London EC41 3DW

Email: glascelles@hausfeld.com

Claim: Sucano & Ors v Shell plc & Anor (Claim Number: KB-2025-004538)

**FORM OF AUTHORITY**

**Name:** IRISH MAE B. DE LOS SANTOS

**Date of Birth:** DEC. 07, 1986

I am a Claimant in the above-reference claim in the High Courts of England & Wales (the "**Claim**") and I authorise Hausfeld to:

1. Prepare, issue, file, serve and pursue an Application for an Order of Judicial Assistance pursuant to 28 U.S.C. § 1782 against the American Petroleum Institute on my behalf in the United States Courts (the "**Application**") in relation to the Claim. I understand that this Application may lead to discovery being provided that will be of relevance to the Claim.

2. Take all steps necessary to advance the Application as Hausfeld deem appropriate, including through working with additional experts and/or legal counsel.

3. I agree that a copy of this form will be valid as the original.

I have understood this Form of Authority and if I cannot read or understand the English language, it was explained to me in my language, and I have asked any questions I wanted to ask about it.

Signature.................................... Dated: JULY 13, 2026

**PRIVATE AND CONFIDENTIAL**

Hausfeld & Co LLP ("Hausfeld"): 12 Gough Square, London EC41 3DW

Email: glascelles@hausfeld.com

Claim: Sucano & Ors v Shell plc & Anor (Claim Number: KB-2025-004538)

**FORM OF AUTHORITY**

**Name:** Jelson C. Sumabal

**Date of Birth:** Nov. 17, 1980

I am a Claimant in the above-reference claim in the High Courts of England & Wales (the "**Claim**") and I authorise Hausfeld to:

1. Prepare, issue, file, serve and pursue an Application for an Order of Judicial Assistance pursuant to 28 U.S.C. § 1782 against the American Petroleum Institute on my behalf in the United States Courts (the "**Application**") in relation to the Claim. I understand that this Application may lead to discovery being provided that will be of relevance to the Claim.

2. Take all steps necessary to advance the Application as Hausfeld deem appropriate, including through working with additional experts and/or legal counsel.

3. I agree that a copy of this form will be valid as the original.

I have understood this Form of Authority and if I cannot read or understand the English language, it was explained to me in my language, and I have asked any questions I wanted to ask about it.

Signature.......[signature]....................... Dated: July 13, 2026

PRIVATE AND CONFIDENTIAL

Hausfeld & Co LLP ("Hausfeld"): 12 Gough Square, London EC41 3DW

Email: glascelles@hausfeld.com

Claim: Sucano & Ors v Shell plc & Anor (Claim Number: KB-2025-004538)

**FORM OF AUTHORITY**

**Name:** Reynaldo C. Inficcto

**Date of Birth:** Oct. 6, 1942

I am a Claimant in the above-reference claim in the High Courts of England & Wales (the "**Claim**") and I authorise Hausfeld to:

1. Prepare, issue, file, serve and pursue an Application for an Order of Judicial Assistance pursuant to 28 U.S.C. § 1782 against the American Petroleum Institute on my behalf in the United States Courts (the "**Application**") in relation to the Claim. I understand that this Application may lead to discovery being provided that will be of relevance to the Claim.
2. Take all steps necessary to advance the Application as Hausfeld deem appropriate, including through working with additional experts and/or legal counsel.
3. I agree that a copy of this form will be valid as the original.

I have understood this Form of Authority and if I cannot read or understand the English language, it was explained to me in my language, and I have asked any questions I wanted to ask about it.

Signature.............................. Dated: July 13, 2026

**PRIVATE AND CONFIDENTIAL**

Hausfeld & Co LLP ("Hausfeld"): 12 Gough Square, London EC41 3DW

Email: glascelles@hausfeld.com

Claim: Sucano & Ors v Shell plc & Anor (Claim Number: KB-2025-004538)

**FORM OF AUTHORITY**

**Name:** Rickcd S. 2nting

**Date of Birth:** Oct. 19, 1979

I am a Claimant in the above-reference claim in the High Courts of England & Wales (the "**Claim**") and I authorise Hausfeld to:

1. Prepare, issue, file, serve and pursue an Application for an Order of Judicial Assistance pursuant to 28 U.S.C. § 1782 against the American Petroleum Institute on my behalf in the United States Courts (the "**Application**") in relation to the Claim. I understand that this Application may lead to discovery being provided that will be of relevance to the Claim.

2. Take all steps necessary to advance the Application as Hausfeld deem appropriate, including through working with additional experts and/or legal counsel.

3. I agree that a copy of this form will be valid as the original.

I have understood this Form of Authority and if I cannot read or understand the English language, it was explained to me in my language, and I have asked any questions I wanted to ask about it.

Signature.......................................... Dated: July 13, 2026

# Exhibit B

HAUSFELD

22 October 2025

12 Gough Square
London EC4A 3DW

**Greg Lascelles**
**Partner**

**E** glascelles@hausfeld.com
**T** +44 20 7743 8209

Our ref: GL/510249.0001

FAO: Philippa Bounds, Chief Legal Officer
Shell plc
Shell Centre
London, SE1 7NA

The Shell Transport and Trading Company Limited
Shell Centre
London, SE1 7NA

**By Courier and Email**
generalpublicenquiries-uk@shell.com

Dear Shell plc and The Shell Transport and Trading Company Limited

**LETTER BEFORE ACTION – Claim on behalf of victims of Typhoon Odette**

## A. INTRODUCTION

1. This is a Letter Before Action ("**LBA**") written in accordance with the Practice Direction on Pre-Action Conduct and Protocols (the "**Pre-Action Protocol**").

2. This LBA serves as notice of intended legal proceedings against Shell plc and The Shell Transport and Trading Company Limited (together the "**Defendants**") in the High Court of Justice of England and Wales. In accordance with §6 of the Pre-Action Protocol, we set out concise details of our clients' claims, to enable you to conduct investigations into the subject of the intended proceedings.

3. Our clients suffered personal injury, property damage and other loss from the impacts of Typhoon Odette (known internationally as Typhoon Rai) which devastated the Philippines in December 2021. In addition, a number of our clients intend to bring claims on behalf of family members who were killed by Typhoon Odette.

4. Initial reports from leading international scientists from the Centre for Environmental Policy, the Grantham Institute and the University of Sheffield have concluded that anthropogenic climate change ("**ACC**") more than doubled the risk of a combined rainfall and windspeed event of the severity of Typhoon Odette and that, applying a probabilistic approach, more than half of the damage caused by Typhoon Odette was attributable to ACC.

5. Through their contribution of more than 2.5% of historical global industrial greenhouse gas ("**GHG**") emissions, the Defendants have materially contributed to ACC and thus materially contributed to both the likelihood and severity of Typhoon Odette.

6. The Defendants have known, from 1965 at the latest, that the production and combustion of fossil fuels was increasing the concentration of GHGs in the atmosphere and was the primary cause of ACC. The Defendants also knew, from 1965 at the latest, that to avoid a level of ACC



Hausfeld & Co. LLP is a limited liability partnership registered in the State of New York. It is authorised and regulated by the Solicitors Authority in England & Wales with number 513826 with its principal business address at 12 Gough Square, London EC4A 3DW.

that would have significantly harmful impacts on the environment and on people, including people in developing countries like the Philippines who are particularly vulnerable to the adverse effects of ACC, it was necessary to stabilise and then reduce global production and combustion of fossil fuels.

7. Despite this knowledge, the Defendants adopted and pursued group-wide strategies and policies which promoted the expansion of production and sale of fossil fuels, tripling group-wide GHG emissions from 1965 to 2021. Simultaneously, in their own financial self-interest and without regard to the likely adverse effects on the environment and people like our clients, the Defendants funded, promoted and/or engaged in public communications strategies and political lobbying efforts with the objective of undermining the emerging scientific consensus on the causes and likely effects of ACC and delaying or avoiding the need to reduce the volume of fossil fuels they produced and/or sold.

8. Our clients allege that, under Philippines law, the Defendants' conduct gives rise to liability for the loss and damage they suffered as a result of Typhoon Odette and entitles them to relief to prevent further damage arising as a result of the Defendants' continuing acts and omissions.

9. Our clients' claims are set out in the following sections:

- Our Clients (**Section B**);
- The Defendants (**Section C**);
- Factual Background (**Section D**);
- Jurisdiction and Applicable Law (**Section E**);
- Factual basis of the Defendants' liability (**Section F**);
- Causes of Action (**Section G**);
- Causation (**Section H**);
- Limitation (**Section I**);
- Loss and Damage (**Section J**);
- Remedy Sought (**Section K**);
- Alternative Dispute Resolution (**Section L**); and
- Timetable and Next Steps (**Section M**).

10. This letter seeks to set out our clients' claims in detail in order to facilitate the Defendants' full understanding of, and response to, those claims. However, our clients reserve their right to augment or amend their case in due course, including following disclosure of relevant documents held by the Defendants which our clients have not yet had sight of.

## B. OUR CLIENTS

11. We currently represent 67 clients based in areas of the Philippines that were among those most adversely affected by Typhoon Odette, namely: (i) Ubay, Bohol; (ii) Batasan, Bilangbilangan, Inanuran and Ubay Islands, Tubigon, Bohol; (iii) Toledo City, Cebu; (iv) Mandaue City, Cebu; (v) Pinamungajan, Cebu; and (vi) Cebu City, Cebu. As a result of Typhoon Odette, these clients have suffered losses including: bereavements; serious property damage; personal injury; psychological impacts; loss of earnings; violations of constitutional rights and / or loss of cultural rights. We anticipate the number of clients will increase significantly in the coming months and may extend to additional geographical locations within the Philippines. However, we envisage that any additional clients will be seeking remedies for the same types of damage as those listed in this LBA, and suffered by our existing clients.

12. Our clients all live (or lived) in communities that are highly vulnerable to the adverse effects of ACC. For example, 22 of our current clients live (or lived) on the Batasan, Bilangbilangan, Inanuran and Ubay Islands, which are particularly vulnerable to ACC-induced storm surges, high winds, and heavy rain, as occurred during Typhoon Odette.



*Image 1 – Bilangbilangan Island*

13. In due course we will provide full schedules of the loss and damage suffered by each of our clients. Here, we simply provide an indication of the types of loss and damage suffered by our clients.

14. First, some of our clients lost family members in Typhoon Odette. For example:

a. One client[1] lost her husband after he was struck by a tree while attempting to save a truck from the flood in Toledo.

[1] None of our clients' names have been included in this letter due to security concerns of some arising out of the history of severe oppression of environmental defenders and campaigners in the Philippines. Further instructions will be taken in this regard prior to issuing any claim.

b. Another client lost her sister, who was fatally injured by falling debris amid the storm surge in Cebu City.

The psychological impacts on those who lost loved ones, and on the communities in which they lived, are significant and enduring.

15. Second, some of our clients lost their homes due to Typhoon Odette. For example:

a. One client's home on Batasan Island was destroyed by Typhoon Odette as pictured below. She was forced to live away from Batasan Island with her family until she was able to rebuild her home six months later.



*Image 2 – This photograph, taken immediately after Typhoon Odette, shows the rubble left behind following the collapse of this client's home*

b. Another client's home in Mandaue City was completely destroyed due to Typhoon Odette. He and his family were displaced by the disaster and took temporary shelter in accommodation provided by his employer.

c. Another client's home on Mandaue City was almost completely destroyed by Typhoon Odette. She has not been able to find new accommodation and has not had the financial means to afford to rebuild, so her family of five are forced to live and sleep in the one remaining habitable room.



*Image 3 – This photograph, taken in November 2023, shows what used to be this client's family kitchen.*

16. Third, some of our clients suffered personal injury due to Typhoon Odette. For example:

    a. One client's two-year-old child was injured by broken glass in Toledo City.

    b. Another client's foot was pierced by nails in Batasan.

17. Fourth, some of our clients suffered loss of earnings in the aftermath of Typhoon Odette. For example:

    a. One client, also from Toledo City, lost her livestock which was her main source of income.

    b. Another client, from Bilangbilangan Island, was unable to fish for several months following the storm during which all his boats and fishing equipment were destroyed, cutting off his primary source of income.

    c. Another client lost rental income from his second property in Toledo City, since he had no tenants after it was partially destroyed.

18. Finally, some of our clients suffered violations of constitutional rights and/or loss of cultural rights. For example, one client faces the possibility of having to permanently relocate from Batasan Island, which she finds particularly difficult because of her family's long running cultural ties to the island: her great-great-grandfather was the first person to discover the island and move there. Typhoon Odette significantly added to the challenges that this client faces in remaining on the island.

19. Moreover, as particularised below, all our clients suffered violations of their constitutional rights, including their right to a balanced and healthful ecology.

20. These indicative examples highlight the type of harm caused to our wider client cohort by Typhoon Odette. We may also be instructed by representatives bringing claims for loss and

damage suffered by particular communities, with it being well established that such representative actions are permissible under Philippines law.[2]

## C. THE DEFENDANTS

21. The Defendants are the current and former parent companies of one of the largest and most profitable oil and gas groups in the world. The Defendants have their registered offices and place of incorporation in the United Kingdom. Shell plc's UK company number is 04366849 and its registered address is Shell Centre, London, SE1 7NA. It is the parent company of the worldwide Shell group of companies ("**the Shell Group**"). The Shell Transport and Trading Company Limited's UK company number 000544845 and its registered address is also Shell Centre, London, SE1 7NA.

22. The Defendants have a complicated corporate history of mergers with, and acquisitions of, other companies involved in similar business practices, as well as changes to their corporate names and structures. In particular, our clients' understanding is that from 1907 until 2005, the Royal Dutch Shell Group had two parent companies, Royal Dutch Petroleum ("**RDP**") and the Shell Transport and Trading Company Limited ("**TSTTCL**"). On 20 July 2005, those two parent companies unified in a single new parent company named Royal Dutch Shell plc ("**RDS plc**"). RDP ceased to exist but TSTTCL remains listed on Companies House and is therefore included as a named defendant in this claim. In January 2022, RDS plc was renamed Shell plc.

23. For the purposes of this claim, it is alleged that Shell plc is legally responsible for the acts and omissions of its corporate predecessors, including but not limited to TSTTLC and RDP, and that material knowledge obtained by one entity in the Shell Group that has the potential to impact on Group-wide policies and operations would at all material times have been known to the parent of the Group (now Shell plc and previously TSTTCL and RDP). This is supported by the Supreme Court's decision in *Okpabi v Royal Dutch Shell Plc* [2021] UKSC 3, which confirmed that the Shell Group is organised along vertically-integrated "*Business and Functional lines rather than simply according to corporate status*"[3], so that critical decisions for each operational division are likely to ultimately be made within Shell plc. Similarly, in 2012 the Court of Justice of the European Union ("**CJEU**") (in *Shell Petroleum NV v European Commission* [2012] 5.C.M.L.R 22) found that the European Commission was right to impute the conduct of Shell Petroleum NV (a subsidiary of RDS plc) to its parent company, as Shell Petroleum NV had not proved that the Shell Group was not a single economic enterprise.

24. Further, the CJEU cited a report lodged by the Shell Group with the US Securities and Exchange Commission which stated that "*[a]ll operating activities have been conducted through the subsidiaries of Royal Dutch [RDP] and Shell Transport [TSTTCL] which have operated as a single economic enterprise"* [4] as demonstrating that it is not appropriate to divide the Shell Group according to the separate legal entities that exist within it.

25. The operations of the Shell Group produce, amongst others, the following GHGs:

---

[2] Republic of the Philippines Supreme Court, Manila '*Rules of Procedure for Environmental Cases*' (, 29 April 2010), Rule 2, Section 4; *Sanggacala, et. al v. National Power Corporation* G.R. No. 209538, 7 July 2021.

[3] *Okpabi v Royal Dutch Shell Plc* [2021] UKSC 3 at para. 156.

[4] *Shell Petroleum NV v European Commission* [2012] 5.C.M.L.R 22 at para. 67.

a. Carbon Dioxide ($CO_2$);

b. Methane ($CH_4$);

c. Nitrogen oxides ($N_2O$);

d. Hydrofluorocarbons (HFCs);

e. Sulphur hexafluoride ($SF_6$).

26. These GHGs can be classified, in accordance with the GHG Protocol, as:[5]

a. "**Scope 1 Emissions**": direct greenhouse gas emissions from owned or controlled sources, including operational and fugitive emissions involved in the exploration for, and production of, oil and gas.

b. "**Scope 2 Emissions**": indirect greenhouse gas emissions from the generation of purchased energy.

c. "**Scope 3 Emissions**": all indirect greenhouse gas emissions (not included in Scope 2 Emissions) that occur in the value chain of the Shell Group, including both upstream and downstream emissions and including, significantly for the purposes of this claim, those emissions resulting from the combustion of the fossil fuels produced, marketed, and/or sold by the Shell Group, such emissions being the inevitable consequence of Shell's production and sales activity: see *R (on the application of Finch on behalf of the Weald Action Group) v Surrey County Council and others* [2024] UKSC 20.

27. In 2023, the GHG emissions reported by the Shell Group included:

a. 50Mt of carbon dioxide equivalent ("**$CO_2$e**") Scope 1 Emissions;

b. 7Mt tonnes $CO_2$e of Scope 2 Emissions; and

c. 1,147Mt tonnes $CO_2$e of Scope 3 emissions.[6]

28. The Climate Accountability Institute has estimated that the Shell Group's cumulative Scope 1, Scope 2 and Scope 3 GHG emissions:

a. for the period between 1850 – 2018 was **38,704Mt $CO_2$e** or **2.55%** of the total global industrial GHG emissions in that period; and

b. for the period 1965 – 2018 was **32,498Mt $CO_2$e** or **2.3%** of the total global industrial GHG emissions in that period.[7]

[5] Greenhouse Gas Protocol, '*FAQs - What are scope 3 emissions?*' (12 December 2022) <https://ghgprotocol.org/sites/default/files/2022-12/FAQ.pdf>.

[6] Shell plc, '*Annual Report and Accounts 2023*' (25 March 2024) 105 ('*Scope 3 and net carbon intensity*') <https://www.shell.com/investors/results-and-reporting/annual-report-archive.html>.

[7] Climate Accountability Institute, '*Press Release: Update of Carbon Majors 1965-2018*' (9 December 2020) <https://climateaccountability.org/wp-content/uploads/2020/12/CAI-PressRelease-Dec20.pdf>.

29. The Defendants (each at their respective time) are or were the parent company / companies of the Shell Group and have at all material times had control over the group-wide strategies and policies that substantially determine the Scope 1, 2 and 3 GHG emissions of the Shell Group. Despite having "*long recognised that greenhouse gas (GHG) emissions from the use of hydrocarbon-based energy are contributing to the warming of the climate system*",[8] the Defendants did not, in any year prior to 2021, oversee a significant year-on-year reduction in the GHG emissions of the Shell Group. On the contrary, they oversaw:

a. a more than three-fold increase in group-wide GHG emissions between 1965 and 2021; and

b. a more than 70% increase in group-wide emissions between 1990 and 2021.

30. As part of its 2021 Powering Progress strategy, Shell plc evidenced its control over group-wide Scope 1, 2 and 3 emissions by committing to "*becoming a net-zero emissions energy business by 2050*"[9] and setting (unambitious and since-weakened) interim targets for 2025 and 2030.

31. The operations of the Shell Group that have caused around 2.55% of total global industrial GHG emissions have generated significant profits for the Defendants. Between 1990 and 2020, the parent companies of the Shell Group (Shell plc and prior to 2005, TSTTCL and RDP) made US$524 billion in profits.[10] In 2022 alone, Shell plc reported group profits of US$39.9 billion.[11]

## D. FACTUAL BACKGROUND

### *D1. Science of ACC*

32. ACC is caused by anthropogenic emissions of GHGs including carbon dioxide, methane, nitrous oxides, hydrofluorocarbons, perfluorocarbons, sulphur hexafluoride, and nitrogen trifluoride,[12] all of which have a positive radiative forcing effect on the Earth's atmosphere. Emissions from industrial processes and from land use change contribute to ACC, but emissions from the production (primarily carbon dioxide and methane) and combustion (primarily carbon dioxide and nitrous oxide) of fossil fuels are by far the biggest contributor. $CO_2$ has accounted for approximately 80% of the increase in radiative forcing effect on the

---

[8] Royal Dutch Shell plc, '*Annual Report and Accounts 2020*' (7 January 2021) 94 ('*Climate Change and Energy Transition*') <https://www.shell.com/investors/results-and-reporting/annual-report-archive.html#tab-2020>.

[9] Shell, '*Shell Energy Transition Strategy 2024: 5. Have any targets changed in your update?*' (n.d.) 56 <www.shell.com/sustainability/climate/shell-energy-transition-strategy.html>.

[10] Matthew Taylor and Jillian Ambrose, '*Revealed: big oil's profits since 1990 total nearly $2tn*', The Guardian, (London, 12 February 2020) <www.theguardian.com/business/2020/feb/12/revealed-big-oil-profits-since-1990-total-nearly-2tn-bp-shell-chevron-exxon>.

[11] M. Race, '*Shell reports lower profits as energy prices cool*', BBC, (London, 1 February 2024) <www.bbc.co.uk/news/business-68164030>.

[12] Nitrogen oxides (NOx), carbon monoxide (CO), non-methane volatile organic compounds (NMVOC) and sulphur dioxide (SO2) are indirect Greenhouse gases. See, for example: UK National Atmospheric Emissions Inventory, '*Greenhouse Gases*' (4 October 2023) <https://naei.energysecurity.gov.uk/greenhouse-gases>.

earth's atmosphere[13] of which fossil fuels account for approximately 90%.[14] Accordingly, the cumulative emissions caused by the production and combustion of fossil fuels since the industrial revolution is estimated to have contributed to around 72% of the increase in radiative forcing effect on the Earth's atmosphere.

33. The most obvious measurable effect of ACC is a warming of global surface temperature. The latest five-year average temperature is 1.3°C warmer than the pre-industrial average.[15] Other measurable effects include rising sea surface temperatures, sea-level rise, and an increased frequency and severity of certain extreme weather events, including heatwaves, droughts, and tropical cyclones.[16]

34. There is strong consensus that limiting ACC to less than 1.5°C compared to the pre-industrial average is necessary to prevent severe and irreversible changes to our climate and ecosystems. Indeed, the International Court of Justice recently recognised that 1.5°C is the "scientifically based consensus target" under the Paris Agreement (the core international instrument embodying states' collective consensus and commitment to address climate change, adopted at the 2015 Conference of the Parties, COP21, under the UNFCCC).[17] Similarly, there is consensus that "*limiting global warming to 1.5°C with no or limited overshoot requires deep, rapid and sustained reductions in global greenhouse gas emissions of 43 per cent by 2030 and 60 per cent by 2035 relative to the 2019 level and reaching net zero carbon dioxide emissions by 2050*."[18]

35. However, it is also well-recognised that "*[w]arming of 1.5°C is not considered 'safe' for most nations, communities, ecosystems and sectors and poses significant risks to natural and human*

---

[13] National Oceanic and Atmospheric Administration (NOAA), '*Annual Greenhouse Gas Index (AGGI)*' (Updated Summer 2024) <https://gml.noaa.gov/aggi/aggi.html>.

[14] United Nations, '*Causes and Effects of Climate Change'* <https://www.un.org/en/climatechange/science/causes-effects-climate-change>.

[15] Copernicus Climate Change Service (CS3) & World Meteorological Organization (WMO), '*European State of the Climate 2024*' (2025) <https://climate.copernicus.eu/sites/default/files/custom-uploads/ESOTC-2024/press-resources/ESOTC-2024-report.pdf>.

[16] Intergovernmental Panel on Climate Change (IPCC), '*Climate Change 2021: The Physical Science Basis – Summary for Policymakers'* (IPCC 2021) <https://www.ipcc.ch/report/sixth-assessment-report-working-group-i/> accessed 7 October 2025.

[17] International Court of Justice, *Advisory Opinion on the Obligations of States in respect of Climate Change* (23 July 2025), para 224: "*the Court considers the 1.5°C threshold to be the parties' agreed primary temperature goal for limiting the global average temperature increase under the Paris Agreement. The Court adds that this interpretation is consistent with Article 4, paragraph 1, of the Paris Agreement, which requires that mitigation measures be based on the 'best available science*'".

See also para 245: "*In light of the above, the Court considers that the discretion of parties in the preparation of their NDCs is limited. As such, in the exercise of their discretion, parties are obliged to exercise due diligence and ensure that their NDCs fulfil their obligations under the Paris Agreement and thus, when taken together, are capable of achieving the temperature goal of limiting global warming to 1.5°C above pre-industrial levels, as well as the overall objective of the 'stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system'*".

[18] "*Outcome of the first global* stocktake", Decision 1/CMA.5, 13 December 2023, UN doc. FCCC/PA/CMA/2023/16/Add.1, p. 5, para. 27.

*systems*."[19] Climate-vulnerable countries such as the Philippines are exposed to severe harms at much lower levels of warming than 1.5°C.

### *D2. The impacts of ACC on the Philippines*

36. In 2017, the Philippines was ranked as the fourth most climate vulnerable country in the world by the Global Risk Index.[20] In 2019 a separate report by the Institute for Economics and Peace found that the Philippines was the country with the highest risk of climate hazards.[21]

37. One of the key impacts of ACC in the Philippines is the increased frequency and severity of tropical cyclones ("**TCs**"). This is due, among other factors, to the higher sea surface and subsurface temperatures resulting from ACC, which remove the natural buffer on typhoon strength that cooler water in and below the ocean's surface previously provided. Sea-level rise resulting from ACC has and will continue to worsen the effects of these strong typhoons, in particular by exacerbating the adverse effects of storm surges.[22] The Intergovernmental Panel on Climate Change ("**IPCC**") noted that the impacts of Typhoon Haiyan / Yolanda (a typhoon of comparable scale to Typhoon Odette that hit the Philippines in 2013) "*were worsened by thermodynamic effects on [sea surface temperatures], [sea level rise] and storm surges due to climate change*".[23]

### *D3. Typhoon Odette*

38. Typhoon Odette made landfall in the Philippines on 16 December 2021. It was the 15th storm to hit the country that year, and by far the strongest.[24] With winds reaching 280 km/h or 77 m/s,

---

[19] IPCC, 2018, Global Warming of 1.5°C: *an IPCC special report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty*, Chap. 5, p. 447.

[20] Sönke Kreft, David Eckstein and Inga Melchior, '*Global Climate Risk Index 2017: Who Suffers Most From Extreme Weather Events? Whether-Related Loss Events in 2015 and 1996 to 2015*' Germanwatch e.V. (November 2016) <www.germanwatch.org/en/12978>.

[21] Institute for Economics & Peace, '*Global Peace Index 2019: Measuring Peace in a Complex World*' (June 2019) <https://www.economicsandpeace.org/wp-content/uploads/2023/09/GPI-2019-web.pdf>.

[22] United Nations Office for Disaster Risk Reduction (UNDRR), '*Impacts of super typhoons and climate change*' (12 January 2022) <https://www.preventionweb.net/news/impacts-super-typhoons-and-climate-change>.

[23] IPCC, '*Chapter 6: Extremes, Abrupt Changes and Managing Risks*' <https://www.ipcc.ch/srocc/chapter/chapter-6/>.

[24] Center for Disaster Philanthropy, '*Super Typhoon Odette (Rai)*' (2022) <https://disasterphilanthropy.org/disasters/super-typhoon-odette-rai/>.

Typhoon Odette was an off-the-scale event.[25] In Cebu and Bohol, storm surges reached 2.54m and 4.06m respectively.[26]

39. The United Nations Office for the Coordination of Humanitarian Affairs (OCHA) reported that Typhoon Odette "*swept through 11 of the country's 17 regions, leaving a swathe of destruction. It damaged houses and roads, tore down power lines, destroyed trees and crops, and smashed fishing boats to pieces. The Government declared a state of calamity in six regions*."[27]

40. According to the National Disaster Risk Reduction and Management Council (NDRRMC) and the Department of Social Welfare and Development (DSWD), the typhoon killed at least 409 people, injuring thousands and cumulatively displacing nearly 3.2 million people.[28] Typhoon Odette damaged or destroyed around 1.7 million homes, exceeding by some margin the adverse impacts of Typhoon Haiyan, which had damaged or destroyed around 1.1 million homes eight years before.[29]

41. The typhoon had a catastrophic effect on the country as it "*left hundreds dead and hundreds of thousands of families homeless… [with] massive damage to infrastructure, agricultural land, fishing communities and livelihoods across a vast geographic area of the country*."[30] For months afterwards, hundreds of thousands of people remained displaced or living in damaged shelters with little access to basic services.

42. Typhoon Odette progressed from a Category 1 to a Category 5 storm in just 24 hours. This speed of intensification is a characteristic of typhoons influenced by climate change,[31] and it caught many community members unprepared.[32]

43. Recent advancements in climate attribution science have enabled scientists to confidently attribute to ACC a specific level of damage caused by particular climate events, such as

---

[25] The Beaufort scale, which rates storms on a force from 1 to 12 based on wind speed, describes a force 12 as a hurricane "*very rarely experienced and accompanied by wide-spread damage*", and considers any winds beyond 118 km/h to reach force 12. On another scale, the Saffir–Simpson scale, grades storms (once they reach a certain threshold) into 5 categories, with 'category 5' storms being the strongest with maximum sustained wind-speeds of over 70 metres per second (m/s).

[26] Esteban, M., Valdez, J., Tan, N., Rica, A. ., Vasquez, G. ., Jamero, L., Valenzuela, P., Sumalinog, B., Ruiz, R., Geera, W., Chadwick, C., Spatarau, C., & Shibayama, T. '*Field Survey of 2021 Typhoon Rai – Odette- in the Philippines*' (2023) 1 *Journal of Coastal and Riverine Flood Risk* <https://doi.org/10.48438/jcrfr.2023.0001>.

[27] OCHA '*Super Typhoon Rai – One Month On: In Numbers*' (11 January 2022) <https://unocha.exposure.co/nbsp-nbsp-super-typhoon-rainbsp-nbspnbsp>.

[28] OCHA, *'Philippines: Super Typhoon Rai (Odette) Humanitarian Needs and Priorities Revision'* (December 2021 – June 2022) (2022) <https://www.unocha.org/publications/report/philippines/philippines-super-typhoon-rai-odette-humanitarian-needs-and-priorities-revision>.

[29] Ibid.

[30] Ibid.

[31] Working Group I report (The Physical Science Basis, published 2021): IPCC, 2021: *Climate Change 2021: The Physical Science Basis* (Table 11.1 - Synthesis table on observed changes in extremes and contribution by human influence). K Balagru, "*A Global Increase in Nearshore Tropical Cyclone Intensification*" (2 May 2024) <https://www.nature.com/articles/s41467-023-43532-4>.

[32] Center for Disaster Philanthropy, '*Super Typhoon Odette (Rai)*' (2022) <https://disasterphilanthropy.org/disasters/super-typhoon-odette-rai/>.

typhoons. For example, recent peer-reviewed studies into the causes and effects of Typhoon Hagibis[33] in Japan and Hurricane Harvey[34] in the US have found that ACC materially (and calculably) increased their impacts.

44. Initial reports from leading international scientists from the Centre for Environmental Policy, the Grantham Institute and the University of Sheffield have concluded that ACC more than doubled the risk of a combined rainfall and windspeed event of the severity of Typhoon Odette and that, applying a probabilistic approach, more than half of the damage caused by Typhoon Odette is attributable to ACC.[35]

## E. JURISICTION AND APPLICABLE LAW

### *E1. Jurisdiction*

45. As the Defendants are domiciled within the jurisdiction of England and Wales, our clients are able to serve the Defendants within the jurisdiction as of right and the English courts have jurisdiction to hear our clients' claims against them.

46. England is the only appropriate forum for this claim. Although the damage for which a remedy is sought occurred in the Philippines, the claims do not primarily or substantially relate to the acts or omissions of the Defendants in the Philippines. To the contrary, they relate to the acts and omissions of (now) English-domiciled Defendants which resulted in the release of GHG emissions in the UK and across the globe.

47. Moreover, in 2017, in the context of the then-ongoing inquiry of the Philippines Commission on Human Rights into the effects of climate change in the Philippines, Shell plc denied that the Philippines had jurisdiction over an entity that was incorporated and operating outside of Philippines territory.[36] The Defendants' position was that the appropriate place to regulate the conduct of multinationals was the "home" state, in this case England.

48. Given the above, we anticipate that there will be no dispute that England is the appropriate jurisdiction for this claim.

### *E2. Applicable Law*

49. The law applicable to our clients' claims will be determined by the provisions of the Rome II Regulation. As such, the law governing the determination of these claims is the law of the Philippines pursuant to Article 4(1) of the Rome II Regulation, as this is the country in which the

---

[33] Li, S., Otto, F. '*The role of human-induced climate change in heavy rainfall events such as the one associated with Typhoon Hagibis*' (2022) 172 Climatic Change, 7 <https://doi.org/10.1007/s10584-022-03344-9>.

[34] Frame, David et al '*The economic costs of Hurricane Harvey attributable to climate change'* (2020) Climatic Change 160(271) <https://doi.org/10.1007/s10584-020-02692-8>.

[35] Clarke, B., Li, S., Toumi, R., and Sparks, N.: The influence of anthropogenic climate change on Super Typhoon Odette (Typhoon Rai) and its impacts in the Philippines, EGUsphere [preprint], <https://doi.org/10.5194/egusphere-2025-665, 2025>.

[36] '*Rejoinder, In Re: National Inquiry on the Impact of Climate Change on the Filipino People*' (submitted to the Commission on Human Rights of the Philippines, 2017) <https://chr-observatories.uwazi.io/en/entity/3kn3sx9pdti?raw=true>.

relevant damage occurred. As the relevant damage is the result of the Defendants' continuing acts and omissions, déçepage does not apply.

50. If déçepage does apply, which our clients deny, the applicable law would still be the law of the Philippines under section 11(2)(a) and (b) of the Private International Law (Miscellaneous Provisions) Act 1995, and under the common law.

51. The law governing the procedure of the claim is the law of England and Wales.

## F. FACTUAL BASIS OF THE DEFENDANTS' LIABILITY

### *F1. The Defendants exercised control over the emissions of the Shell Group*

52. At all material times prior to 20 July 2005, TSTTCL and RDP had control over the group-wide strategies and policies that substantially determined the Scope 1, 2 and 3 GHG emissions of the Shell Group. At all material times since 20 July 2005, Shell plc (named RDS until 2021) had control over the group-wide strategies and policies that substantially determined the Scope 1, 2 and 3 GHG emissions of the Shell Group

### *F2. The Defendants had actual knowledge of their material contribution to, and potentially catastrophic effects of, ACC*

53. Since 1965, at the latest, TSTTCL and RDP knew that GHG emissions resulting from the production and combustion of fossil fuels are the primary cause of ACC and that a stabilisation and then reduction in the global production and combustion of fossil fuels was needed to avoid climatic changes that are seriously detrimental to the environment, ecology, and to people around the world.

54. In 1962, the Chief Geologist of the Shell Oil Company (the then-US subsidiary of TSTTCL and RDP) Marion King-Hubbert acknowledged that there were possible human and environmental risks of global warming,[37] stating that: *"[t]here is evidence that the greatly increasing use of the fossil fuels, whose material contents after combustion are principally H2O and CO2, is seriously contaminating the earth's atmosphere with CO2. Analyses indicate that the CO2 content of the atmosphere since 1900 has increased 10 per cent. Since CO2 absorbs long-wavelength radiation, it is possible that this is already producing a secular climatic change in the direction of higher average temperatures. This could have profound effects both on the weather and on the ecological balances*".[38]

55. In 1965, US President Lyndon Johnson's Science Advisory Committee published an extensive report on environmental pollution[39], including a section on carbon dioxide and global warming led by geologist and oceanographer Roger Revelle. Revelle and his colleagues reported that atmospheric carbon dioxide was increasing "*clearly and conclusively*". The report recorded that the scientific community was "*fairly certain*" that fossil fuels were the only source of carbon

[37] '*Shell already knew about climate change in the early 1970s (and still promoted the use of coal)*' Follow the Money (1 April 2013) <https://www.ftm.eu/articles/shell-climate-coal>; Center for International Environmental Law, '*A Crack in the Shell: New Documents Expose a Hidden Climate History'* (April 2018) <https://www.ciel.org/wp-content/uploads/2018/04/A-Crack-in-the-Shell-April-2018.pdf>.

[38] Ibid.

[39] President's Science Advisory Committee: Environmental Pollution Panel, '*Restoring the Quality of Our Environment'*, (The White House, Washington, D.C. 1965). For the discussion of carbon dioxide and global warming, see Roger Revelle et al., Appendix Y4: Atmospheric Carbon Dioxide.

dioxide that could account for such an increase, and that the oceans and land based biospheres (which could absorb carbon dioxide) were absorbing only about half of what was emitted by fossil fuel use, meaning atmospheric concentrations would keep increasing so long as fossil fuels remained a major energy source.

56. Revelle et al. estimated that *"[b]y the year 2000 the increase in atmospheric* $CO_2$ *[compared to pre-industrial levels] will be close to 25%."*[40] As the academic Dr Benjamin Franta has recently highlighted, this prediction was highly accurate: by 2000, atmospheric carbon dioxide concentrations were around 370 parts per million ("**ppm**"), 24% higher than preindustrial concentrations of around 280 ppm.[41]

57. Three days after Revelle's report was published, the President of the American Petroleum Institute ("**API**") gave a keynote address at the API's 1965 annual conference in which he addressed the report. The President of the API noted: "*One of the most important predictions of the report is that carbon dioxide is being added to the earth's atmosphere by the burning of coal, oil, and natural gas at such a rate that by the year 2000 the heat balance will be so modified as possibly to cause marked changes in climate beyond local or even national efforts… The substance of the report is that there is still time to save the world's peoples from the catastrophic consequence of pollution, but time is running out*."[42] The Shell Oil Company was a member of the API, was represented on the Executive Board of the API, and had senior executives present at the annual meeting.

58. That said, the petroleum industry's interest in carbon accumulation goes back to, at least, 1958. A review in that year of the API Smoke and Fumes Committee's Air Pollution Research Program by Charles Jones (who was the committee secretary and a Shell executive), mentions a project focused on analysing gaseous carbon data to determine the amount of carbon of fossil origin compared to the total amount.[43] According to an API presentation at the 1958 National Conference on Air Pollution, the API's stance at this time was that "*the petroleum industry supplies the fuel used by the automobile, and thus has a sincere interest in the solution to the problem of pollution from automobile exhaust*".[44] Indeed, the API stated that the objective of the Smoke and Fumes committee was to "*determine the causes and methods of control of objectional atmospheric pollution resulting from the production, manufacture, transportation, sale, and use of petroleum and its products*".[45]

---

[40] Ibid, p 126.

[41] Benjamin Franta, *'Big Carbon: Strategic Response to Global Warming, 1950-2020'* (PhD dissertation, Stanford University 2022), p 32, citing Elmer Robinson and RC Robbins, '*Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants'* Final Report (Stanford Research Institute, Menlo Park CA, February 1968), p 109 <https://chr2bucket.storage.googleapis.com/wp-content/uploads/2019/11/08170454/Exhibit-3H-Sources-Abundance-and-Fate-of-Gaseous-Atmospheric-Pollutants.pdf>.

[42] Ibid, p 34; Ikard, F.N., 1965, Proc. American Petroleum Institute, (1965) p 12-15.

[43] Charles A. Hones, '*A Review of the Air Pollution Research Program of the Smoke and Fumes Committee of the American Petroleum Institute'* (1958) Journal of the Air Pollution Control Association <https://www.tandfonline.com/doi/pdf/10.1080/00966665.1958.10467854>.

[44] C.A. Jones, '*Sources of Air Pollution – Transportation (Petroleum)'* (19 November 1958) <https://www.worthingtoncaron.com/documents/1958_SOURCES-OF-AIR-POLLUTION-TRANSPORTATION.pdf>, p 2.

[45] Ibid, p 3.

59. In 1968, the API commissioned the consulting firm Stanford Research Institute ("**SRI**") to produce a report into a range of air pollution issues including carbon dioxide which was titled "Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants".[46] This report "*reiterated Revelle's report from three years before: a 25% increase in atmospheric carbon dioxide could occur by the year 2000, causing global warming of 1.1--4 degrees Celsius, melting of the Antarctic ice cap, and rapid sea level rise, and fossil fuels were the clearest source of the pollution*".[47] The report concluded that "*[s]ignificant temperature changes are almost certain to occur by the year 2000 and these could bring about climatic changes. [...] there seems to be no doubt that the potential damage to our environment could be severe*."[48]

60. The SRI was also clear about the likely cause of the increased levels of $CO_2$stating that: "*Although, as we mentioned before, there are other possible sources for the additional* $CO_2$ *now being observed in the atmosphere, none seems to fit the presently observed situation as well as the fossil fuel emanation theory does*".[49] The SRI concluded that there was in fact little significant uncertainty as studies of $CO_2$ were "*detailed and seem to explain adequately the present state of* $CO_2$ *in the atmosphere".*[50] The API did not publish the SRI report, but as a member of the API with representation on the Executive Board, The Shell Oil Company must have received it and/or must have been made aware of its contents at the time. Certainly, in 1972, The Shell Oil Company received a status report on all environmental research projects funded by API, including the 1968 report from SRI, highlighting the climatic risks associated with the combustion of fossil fuels.[51]

61. A supplement to the 1968 report prepared for API in 1969 projected that based on current fuel usage, atmospheric $CO_2$ concentrations would reach 370 ppm by 2000.[52] As above (see paragraph 56), this prediction was again highly accurate.[53] The supplemental report also drew a connection between the rising concentration and the use of fossil fuels, finding that "*balance between environmental sources and sinks has been disturbed by the emission to the atmosphere of additional $CO_2$ from the increased combustion of carbonaceous fuels*". The authors found it "*unlikely that the observed rise in atmospheric $CO_2$ has been due to changes in the biosphere*".

---

[46] CIEL, Smoke and Fumes: The Legal and Evidentiary Basis for Holding Big Oil Accountable for the Climate Crisis (CIEL November 2017) citing Elmer Robinson and RC Robbins, '*Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants'* Final Report (Stanford Research Institute, Menlo Park CA, February 1968).

[47] Benjamin Franta, *'Big Carbon: Strategic Response to Global Warming, 1950-2020'* (PhD dissertation, Stanford University 2022), p 36.

[48] Ibid; Elmer Robinson and RC Robbins, '*Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants'* Final Report (Stanford Research Institute, Menlo Park CA, February 1968), p 109.

[49] Ibid, p 109.

[50] Ibid, p 112.

[51] Benjamin Franta, *'Big Carbon: Strategic Response to Global Warming, 1950-2020'* (PhD dissertation, Stanford University 2022), p 54; American Petroleum Institute, '*Environmental Research, A Status Report*' (January 1972) Committee for Air and Water Conservation http://files.eric.ed.gov/fulltext/ED066339.pdf.

[52] Elmer Robinson & R.C. Robbins, *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants Supplement*, Stanford Research Institute (June 1969) p 3.

[53] NASA Goddard Institute for Space Studies (GISS), '*Global Mean $CO_2$ Mixing Ratios (ppm): Observations'* <https://data.giss.nasa.gov/modelforce/ghgases/Fig1A.ext.txt>.

62. In 1979, the API established a task force initially named the $CO_2$ and Climate Task Force and subsequently renamed the Climate and Energy Task Force. That same year, the API sent its members a background memo related to the $CO_2$ and Climate Task Force which stated that $CO_2$ concentrations were steadily rising in the atmosphere and predicting when the first clear effects of climate change might be felt.[54]

63. In the same year, the first World Climate Conference was convened by the World Meteorological Organization to bring together leading scientists from a range of disciplines to discuss the emerging problem of ACC. The resulting Declaration concluded "*with some confidence that the burning of fossil fuels, deforestation and changes of land use have increased the amount of carbon dioxide in the atmosphere by about 15 per cent during the last century and is at present increasing by about 0.4 per cent per year. It is likely that an increase will continue in the future*."[55] As an outcome of the Conference, the World Climate Programme was established through which the World Meteorological Organisation, the United Nations Environment Programme and the International Council of Scientific Unions would pursue further studies on climate and climate change.

64. In 1980, the API's Climate Task Force was presented with a stark warning from John Laurmann of Stanford University that if fossil fuel emissions were not controlled, the likely impacts would be a 2.5°C temperature rise by 2038, with major economic consequences.[56] At this meeting the "*scientific consensus on the potential for large future climatic response to increased $CO_2$ levels*"[57] was discussed along with the "*strong empirical evidence that rise [in $CO_2$ ppm levels was] caused by anthropogenic release of $CO_2$, mainly from fossil fuel burning*".[58] Laurmann's advice was that immediate action was needed because he warned that predicted warming of 2.5°C would bring "*world economic growth to a halt*"[59] and that the *"time scale for significant impact [was very roughly] 50 years*" (i.e., 2030). Regarding the implications for what policies should be pursued, he concluded with the following: "*[t]ime for action? Market penetration time theory says there is <u>no</u> leeway*."[60]

65. Also in 1980, the Task Force considered alternative energy sources as a means of mitigating $CO_2$ emissions from fossil fuel products. It called for research and development in relation to the "*Investigat[ing] the Market Penetration Requirements of Introducing a New Energy Source*

---

[54] American Petroleum Institute, '*AQ-9 Task Force Meeting Minutes'* (March 18, 1980), <https://insideclimatenews.org/documents/aq-9-task-force-meeting-1980/> (AQ-9 refers to the "CO2 and Climate" Task Force).

[55] World Meteorological Organization, Declaration of the First World Climate Conference, (Geneva 1979) p 4<https://library.wmo.int/records/item/54699-world-climate-conference-declaration-and-supp>.

[56] J. A. Laurmann, '*The CO2 Problem: Addressing Research Agenda Development'*, American Petroleum Institute CO2 and Climate Task Force (AQ-9), (29 February 1980) < https://insideclimatenews.org/documents/aq-9-task-force-meeting-1980/>.

[57] Ibid, p 9.

[58] Ibid, p 10.

[59] Ibid, p 16.

[60] Ibid, p 15.

*into World Wide Use*", which was to include the technical implications of energy source changeover, research timing and requirements.[61]

66. In 1982, scientists at the Lamont-Doherty Geological Observatory at Columbia University prepared another report for the API. The report recognised that atmospheric $CO_2$ concentration had risen significantly compared to the beginning of the industrial revolution (from about 290 ppm to about 340 ppm in 1981). The report acknowledged that all models forecasted a temperature increase caused by anthropogenic $CO_2$ within a global mean range of 4°C and that "*such a warming can have serious consequences for man's comfort and survival since patterns of aridity and rainfall can change, the height of the sea level can increase considerably and the world food supply can be affected*".[62]

67. In 1985, the World Climate Programme published its first report the "*Report of the International Conference on the Assessment of the Role of Carbon Dioxide and of other Greenhouse Gases in Climate Variations and Associated Impacts*".[63] The foreword noted that the conclusions of the international scientists who attended the conference were "*very striking indeed and are of great importance to mankind*". The Conference Statement recorded the "*consensus scientific understanding*" that if then-present trends continued, then a doubling in $CO_2$ equivalent atmospheric GHGs could be expected as early as the 2030s and that "*could have profound effects on global ecosystems, agriculture, water resources and sea ice*." It noted that "*while some warming of climate now appears inevitable due to past actions, the rate and degree of future warming could be profoundly affected by governmental policies on energy conservation, use of fossil fuels, and the emission of some greenhouse gases*".

68. In the same year, 1985, TG Wilkinson of the Long Term Business Planning Unit in the Ecology Section of Shell UK (the UK subsidiary of TSTTCL and RDP) published an industry journal article in which it stated:

> *"Burning of fossil fuels which have taken millions of years to form has effectively upset the balance leading to an increase in* $CO_2$ *in the atmosphere.* […] *The Greenhouse effect could lead to some melting of the ice-cap and a significant change in the climatic pattern throughout the world. Whilst this will cause major adverse changes to some areas, others will benefit.* […] *The dilemma therefore remains as to whether to encourage the continued use of fossil fuels with the potential enormous effects on the world's climate."*[64]

69. In 1987 the Shell International Petroleum Company (a subsidiary of TSTTCL and RDP that provided centralised services to companies across the Shell Group), prepared a publication

---

[61] American Petroleum Institute, '*AQ-9 Task Force Meeting Minutes'* (March 18, 1980), <https://insideclimatenews.org/documents/aq-9-task-force-meeting-1980/>, p 3.

[62] American Petroleum Institute, *Climate Models and CO2 Warming: A Selective Review and Summary, (*Lamont-Doherty Geological Observatory, Columbia University, March 1982) <https://assets.documentcloud.org/documents/2805626/1982-API-Climate-Models-and-CO2-Warming-a.pdf>, p 5.

[63] World Climate Programme, '*Report of the International Conference on the Assessment of the Role of Carbon Dioxide and of Other Greenhouse Gases in Climate Variations and Associated Impacts*' (1985) <https://library.wmo.int/viewer/28228/download?file=wmo_661_en.pdf&type=pdf&navigator=1>.

[64] T. G. Wilkinson, Ecology Section Long Term Business Planning Unit – Shell UK, '*Why and How to Control Energy Pollution – can harmonisation work*?' Conservation & Recycling vol. 8, p 19, 20.

entitled "*Air Pollution: An Oil Industry Perspective*" for consumption by all companies with the Shell Group. It stated that:

> "*There is concern that further increases in carbon dioxide levels could cause climatic changes, notably a rise in overall temperature, having major environmental, social, and economic consequences*."[65]

70. In 1988, the Greenhouse Effect Working Group of the Shell International Petroleum Company produced a confidential report for the Shell Environmental Conservation Committee entitled "*The Greenhouse Effect*"[66] which set out its understanding of the adverse impacts of climate change and the company's contributions to it. This report detailed the links between fossil fuels, $CO_2$, and global warming, including that it was "*generally accepted that the increasing concentration of* CO2 *in the atmosphere is primarily determined by the combustion of fossil fuels*".[67] The report predicted that a doubling of pre-industrial atmospheric $CO_2$ concentrations would occur between 2040 and 2080, and that the resulting temperature changes would cause dramatic changes in precipitation and storm patterns.[68] This report stated:

> *"[t]here is reasonable scientific agreement that increased levels of greenhouse gases would cause a global warming [and that] [s]uch relatively fast and dramatic changes [as would be caused] would impact on the human environment, future living standards and food supplies and could have major social, economic and political consequences*."[69]

71. Further, the report calculated the Shell Group's total contribution to global carbon emissions at 4%: "*Fossil fuels which are marketed and used by the Group account for the production of 4% of the CO2 emitted worldwide from combustion. Of these emissions, 80% comes from Group oil, 12% from Group gas and 8% from Group coal"*[70].

72. The report also noted that by the time climate impacts became detectable "*it could be too late to take effective countermeasures to reduce the effects or even to stabilise the situation",* and as such a *"forward looking approach by the energy industry is clearly desirable*".[71] The report regarded the rise in temperature as inevitable without significant action[72] and described the anticipated climatic changes as potentially "*the greatest in recorded history*".[73] It foresaw that "*poorer countries would run the greatest risk as their ability to adapt would be the smallest*"[74],

---

[65] Shell Briefing Service, '*Air Pollution: an oil industry perspective*' Number 1 (1987) <shell-briefing-service-air-pollution-an-oil-industry-perspective-nr1-1987.pdf (documentcloud.org)>, p 5.

[66] R. P. W. M. Jacobs, The Greenhouse Effect Working Group, (Shell Internationale Petroleum Maatschappij B.V., The Hague 1988) <https://s3.documentcloud.org/documents/4411090/Document3.pdf>.

[67] Ibid, p 17.

[68] Ibid, p 17.

[69] Ibid, p 1.

[70] Ibid, p 29.

[71] Ibid, p 1.

[72] Ibid, p 19.

[73] Ibid, p 25.

[74] Ibid, p 26.

foreshadowing the stark situation currently suffered by climate vulnerable countries in the Global South such as the Philippines.

73. In 1988, NASA scientist James Hansen told the US Congress that NASA was 99% certain that the observed global warming trend was caused by human activity.[75] He noted that the temperature changes expected were sufficiently large to have major impacts on mankind and his environment.

74. In 1989, a Shell Group entity believed to be the Shell International Petroleum Company conducted a confidential group scenario planning exercise that acknowledged that the evidence that human activity could affect the climate was *"strong and accumulating fast"*. It observed that the global temperature could rise because of increasing concentrations of global GHGs in the atmosphere, and that $CO_2$ levels have been increasing predominantly because of the combustion of fossil fuels.[76]

75. In 1989, the Malé Declaration on Global Warming and Sea Level Rise, agreed at the conclusion of the Small-States Conference on Sea-Level Rise, highlighted the vulnerability of low-lying, small, coastal and island states to sea-level rise and the increase in frequency and intensity of natural disasters related to climate change.[77]

76. In 1990, the IPCC released its First Assessment Report:

a. Working Group 1 concluded with certainty that emissions resulting from human activities were substantially increasing atmospheric concentrations of GHGs, enhancing the greenhouse effect, and resulting in additional warming of the Earth's surface.[78] It calculated with confidence that to stabilise the concentration of long-lived GHGs (including $CO_2$) at their current atmospheric levels, <u>an immediate reduction in GHG emissions by 60%</u> was required.

b. Working Group 2 concluded that a 'business as usual' scenario was likely to see a 2°C increase in global mean temperature by 2025 as compared to the pre-industrial average, and a 4°C increase in global mean temperature by 2100 as compared to the pre-industrial average.[79] That scenario would lead to unequal effects, with the most vulnerable being those in developing countries especially exposed to natural hazards, including coastal flooding and severe wind storms or tropical cyclones. It noted that: *"Should severe weather, such as tropical cyclones, occur more frequently or become more intense as a result of*

[75] Dr James Hansen, Testimony before the United States Senate Committee on Energy and Natural Resources, United States Senate, One Hundredth Congress, First Session (23 June 1988) <https://www.sealevel.info/1988_Hansen_Senate_Testimony.html>.

[76] The Shell Group Planning, '*Scenarios 1989 – 2010 – challenge and response*' (October 1989) p 33 <https://www.climatefiles.com/shell/1989-shell-confidential-group-planning-scenarios-1989-2010-challenge-and-response/>.

[77] Malé Declaration on Global Warming and Sea Level Rise (Small States Conference on Sea Level Rise, Malé, Maldives, 14-18 November 1989) <https://www.islandvulnerability.org/slr1989/declaration.pdf>.

[78] IPCC, Climate Change: The IPCC 1990 and 1992 Assessments, (IPCC 1990), p 63 https://www.ipcc.ch/site/assets/uploads/2018/05/ipcc_90_92_assessments_far_full_report.pdf.

[79] Ibid, p 87-89.

*climate changes, human settlement and industry may be seriously affected, with large loss of human life."*[80]

77. In 1991, Shell International Petroleum Company produced a film, "Climate of Concern", which warned of an increasing frequency of abnormal weather and sea level rise of around one metre in the next century. The film observed that while "*no two [climate change projection] scenarios fully agree,… [they] have each prompted the same serious warning. A warning endorsed by a uniquely broad consensus of scientists in their report to the UN at the end of 1990*". The impacts of anthropogenic sea level rise on tropical islands were specifically identified by Shell: "*barely afloat even now,… [f]irst made uninhabitable and then obliterated beneath the waves. Wetland habitats destroyed by intruding salt. Coastal lowlands suffering pollution of precious groundwater*". The film warned of "*greenhouse refugees*", people who were forced to abandon their homeland that had been inundated by the sea or displaced because of catastrophic changes to the environment. The film concluded with a stern warning:[81]

> "*Global warming is not yet certain, but many think that the wait for final proof would be irresponsible. Action now is seen as the only safe insurance*".

78. In 1992, 154 states agreed to the United Nations Framework Convention on Climate Change and the UN Rio Declaration on Environment and Development[82].

79. In 1995, Shell International Petroleum Company circulated a management brief to companies within the Shell Group which stated that the "*possibility of climate change brought about by global warming via man-made increases in gases such as carbon dioxide* ($CO_2$) *and methane – the enhanced greenhouse effect – is probably the most prominent global environmental issue of today and could have major business implications for the fossil fuel industry*".[83]

80. In a document from 1998, Shell Publicity Services (understood to be part of Shell International Petroleum Company) circulated a publication to all companies within the Shell Group predicting that public concern relating to severe weather events would trigger lawsuits against the government and fossil fuel companies. The scenario predicted class action lawsuits based on what the Shell Group knew following a series of severe storms striking the US in 2010:

> "*Following the storms, a coalition of environmental NGOs brings a class-action suit against the US government and fossil-fuel companies on the grounds of neglecting what scientists (including their own) have been saying for years: that something must be done. A social reaction to the use of fossil fuels grows, and individuals become "vigilante environmentalists" in the same way, a generation earlier, they had become*

---

[80] Ibid, p 114.

[81] Jelmer Mommers, '*Shell Made a Film About Climate Change in 1991 (then Neglected To Heed Its Own Warning)',* De Correspondent (Feb. 27, 2017), <https://thecorrespondent.com/6285/shell-made-a-:film-about-clin1ate-change-in-I 99 l-then-neglected-to-heed-its-own-warning/692663565-875331 f6.>

[82] United National General Assembly, Report of the United Nations Conference On Environment and Development, (Rio de Janeiro, 3-14 June 1992) <https://www.un.org/en/development/desa/population/migration/generalassembly/docs/globalcompact/A_CONF.151_26_Vol.I_Declaration.pdf>.

[83] Shell Management Brief, '*Climate Change'* (February 1995) <https://www.documentcloud.org/documents/4411100-Document12/>.

*fiercely anti-tobacco. Direct-action campaigns against companies escalate. Young consumers, especially, demand action.*" [84]

81. The scenario goes on to predict that the power, auto, and oil industries see billions wiped off their market value overnight.[85] As such, over 25 years ago Shell anticipated facing exactly the type of claim that our clients are here advancing.

82. In the circumstances, it is to be inferred that the matters which were known to the Shell companies referred to above were also at the material times known to TSTTCL and RDP and (following 20 July 2005) were also known to Shell plc.

***F3. Despite the knowledge of the Defendants, they funded or participated in and/or directed or encouraged their subsidiaries to fund or participate in public communications and political lobbying activities to undermine the emerging scientific consensus on the causes and likely effects of climate change with the objective of avoiding or delaying the need to reduce the volume of fossil fuel it produced and/or sold.***

83. Despite their knowledge that the production and combustion of fossil fuels was the main cause of ACC, and despite their knowledge that a stabilisation and then reduction of fossil fuel production and consumption was needed to avoid the potentially catastrophic effects of ACC, the Defendants funded or participated in and/or directed their subsidiaries to fund or participate in public communications and political lobbying activities to undermine the emerging scientific consensus on the causes and likely effects of ACC and to prevent or delay the introduction of national and international measures to encourage or require a reduction in the production or consumption of fossil fuels. They, and on their direction or encouragement their subsidiaries, did so in their own right, through the API, the Global Climate Coalition ("**GCC**"), the International Petroleum Industry Environmental Conservation Association ("**IPIECA**") and the American Fuel & Petrochemical Manufacturers ("**AFPM**") (among other organisations).

84. The API is the largest oil and gas trade association in the US, and arguably the most influential globally. At the direction, encouragement and/or with the knowledge of its parent companies, the Shell Oil Company has been a major funder of the API, donating over $10m in 2021 alone.[86] Industry insiders have described the API as the "*public face*" of fossil fuel companies, used to lobby lawmakers and influence policy in the interests of the fossil fuel industry, while keeping their brands un-associated with such efforts[87]. As US Senator Sheldon Whitehouse has put it: "*The major oil companies and API move very much together*".[88]

---

[84] Shell Internal TINA Group Scenarios 1998-2020 Report, <https://www.documentcloud.org/documents/4430277-27-1-Compiled/>, p 122.

[85] Ibid.

[86] Chris McGreal, '*How a powerful US lobby group helps big oil to block climate action*' The Guardian (10 August 2022) <https://www.theguardian.com/environment/2021/jul/19/big-oil-climate-crisis-lobby-group-api>.

[87] Lawrence Carter, '*Inside Exxon's playbook: How the oil giant works through front groups to head-off regulations on toxic chemicals and plastics*' Unearthed (July 2021) <https://unearthed.greenpeace.org/2021/07/01/exxon-undercover-pfas-plastic-chemicals/>.

[88] Chris McGreal, '*How a powerful US lobby group helps big oil to block climate action*' The Guardian (10 August 2022) <https://www.theguardian.com/environment/2021/jul/19/big-oil-climate-crisis-lobby-group-api>.

85. As early as 1979, a taskforce (including representatives from the Shell Oil Company)[89] was established by the API to influence public perception and lobby in favour of the fossil fuel industry.[90] Notwithstanding Laurmann's advice to the API that immediate action was needed to avoid dramatically adverse impacts on the climate, in 1980 the API published a policy book entitled "Two Energy Futures: A National Choice for the '80s"[91] which sought to cast doubt on the risks associated with increasing levels of $CO_2$ in the atmosphere. The book misrepresented the work of Dr Carl Sagan to suggest that some scientists were "*sanguine*" about the presence of $CO_2$ in the atmosphere. In fact, Sagan's view was clear that *"the possibility of a runaway greenhouse effect suggests that we have to be careful: even a one- or two-degree rise in the global temperature can have catastrophic consequences".*[92] The book promoted the rapid expansion of fossil fuel production, in particular coal (calling for an alarming worldwide tripling of coal production by the year 2000[93]), in the final two decades of the twentieth century, arguing, falsely, that such an expansion would be consistent with the conclusions of the World Climate Conference.

86. In 1989, at the direction, encouragement and/or with the agreement of its parent companies, Shell Oil Company became a founding member of the GCC. With TSTTCL and RDP's support, GCC engaged in strategic activities to create doubt and uncertainty around climate science. The GCC acknowledged in internal documents that "*the scientific basis for the Greenhouse Effect and the potential impact of human emissions of greenhouse gases such as* $CO_2$ *on climate is well established and cannot be denied*"'.[94] In public, however, it advocated for a delay in taking any steps to transition away from fossil fuels.

87. With TSTTCL and RDP's support, the GCC aggressively campaigned to cast doubt on the reality of climate change and its anthropogenic nature, to challenge the consensus on climate science and to dissuade national and international attempts to agree measures to transition away from fossil fuels. For example:

a. In 1989, the GCC testified before the US Congress at hearings on climate change, arguing that the science of climate change was inconclusive and did not merit any action.

b. The GCC spent USD 13 million between 1989 and 1998 on one advertisement campaign, the object of which was to confuse the public's understanding of climate science and

---

[89] Neela Banerjee, '*Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s,Too*' Inside Climate News (22 December 2015) <https://insideclimatenews.org/news/22122015/exxon-mobil-oil-industry-peers-knew-about-climate-change-dangers-1970s-american-petroleum-institute-api-shell-chevron-texaco/>.

[90] Benjamin Franta, *'Big Carbon: Strategic Response to Global Warming, 1950-2020'* (PhD dissertation, Stanford University 2022), p 111.

[91] American Petroleum Institute, '*Two energy futures: a national choice for the 80s',* (Library of the University of Wyoming, Laramie, August 1980).

[92] Benjamin Franta, *'Big Carbon: Strategic Response to Global Warming, 1950-2020'* (PhD dissertation, Stanford University 2022), p 126.>

[93] Ibid, p 127 citing C. L. Wilson, 1980, Coal: Bridge to the Future, Report of the World Coal Study (WOCOL) (Ballinger Publishing Company).

[94] Global Climate Coalition (GCC), '*Primer on Climate Change Science*', Climate Files (1995) <https://s3.documentcloud.org/documents/4895861/Predicting-Future-Climate-Change-a-Primer.pdf>.

undermine its trust in climate scientists.[95] As part of this campaign, the GCC distributed a video to journalists which claimed carbon dioxide emissions would increase crop production and feed the hungry.[96]

c. In September 1990, the GCC opposed legislation in the US mandating reductions in carbon emissions, emphasising scientific uncertainty and the adverse economic impacts allegedly consequent upon such reductions.[97]

d. In a report published in 1994, the GCC stated that "*observations have not yet confirmed evidence of global warming that can be attributed to human activities*" and that the claim that serious impacts of climate change have occurred or will do so "*has not been proven*".[98]

e. In 1995, the GCC stated that it would take scientists 10-20 years "*to have more certainty on the effects of greenhouse gases on the environment and that there is very little danger in waiting until that information is available*"[99]. That same year, the GCC published a booklet, "*Climate Change: Your Passport to the Facts*", which stated that "*While many warnings have reached the popular press about the consequences of a potential man-made warming of the Earth's atmosphere during the next 100 years, there remains no scientific evidence that such a dangerous warming will occur*".[100]

f. In 1996, the GCC campaigned aggressively against the IPCC, accusing it – without any reasonable justification – of lacking scientific integrity.[101]

88. In 1992, the Group Planning division of a Shell Group entity believed to be the Shell International Petroleum Company released a publication for wide external distribution that purported to describe the "*Basic Scientific Facts*" of the "*Potential Augmented Greenhouse Effect*".[102] Through that document, TSTTCL and RDP knowingly downplayed scientific consensus and referred to the "*relatively few established scientific fundamentals*" regarding the causes of climate change.[103] TSTTCL and RDP also incorrectly suggested that a "*particular*

---

[95] Wendy E. Franz, Kennedy Sch. of Gov't, Harvard Univ., '*Science, Skeptics and Non-State Actors in the Greenhouse*', ENRP Discussion Paper E-98-18, 1, 13 (September 1998) <https://perma.cc/E4GR-8DK4>.

[96] The Center for Media and Democracy, '*Global Climate Coalition*', Source Watch, <https://perma.cc/7K47-G6CP>.

[97] Robert J. Brulle, '*Advocating inaction: a historical analysis of the Global Climate Coalition*' (Environmental Politics, 2022) https://cssn.org/wp-content/uploads/2022/04/GCC-Paper.pdf, p 9.

[98] GCC, '*Issues and Options: Potential Global Climate Change',* Climate Files (1994) <https://www.climatefiles.com/denial-groups/global-climate-coalition-collection/1994-potential-global-climate-change-issues/>, Preface and p 43.

[99] Benjamin Franta, *'Big Carbon: Strategic Response to Global Warming, 1950-2020'* (PhD dissertation, Stanford University 2022), p 157; Arthur Gottschalk, '*Inside talk - Arthur Gottschalk on global warming wisest action may be to wait and see*,' Journal of Commerce (7 August 1995).

[100] GCC, '*Climate Change: Your Passport to the Fact's*, Climate Files (1995), <https://perma.cc/W3FL-UPDH>.

[101] Benjamin Franta, *'Big Carbon: Strategic Response to Global Warming, 1950-2020'* (PhD dissertation, Stanford University 2022), p 161.

[102] Jan Kuyper, '*Potential Augmented Greenhouse Effect, & Depletion of the Ozone Layer*', Shell Grp. 3 (September 1992) <https://perma.cc/SM9A-FDAD>.

[103] Ibid, p 1.

*cause*" of climate change was difficult to identify, despite their knowledge of the material role played by fossil fuels in accelerating climate change.

89. In 1994, the Shell International Petroleum Company published a report entitled "*The Enhanced Greenhouse Effect: a Review of the Scientific Aspects*" which emphasised scientific uncertainty around climate change and warned of the *"economic effects of ill-advised policy measures"* and argued that action to reduce GHGs risked diverting resources *"from more pressing needs and further distort[ing] markets"*.[104]

90. In 1996, with TSTTCL and RDP's support, the API published a report entitled "*Reinventing Energy: Making the Right Choices*".[105] The report is one of the clearest examples available publicly of the Defendants' knowing participation in a campaign of disinformation with respect to the reality of climate change and its anthropogenic sources. It sought to undermine the emerging scientific consensus on climate change, highlighting uncertainties, promoting fringe science, and pointing to the alleged benefits of a warming climate, to encourage ongoing fossil fuel production and combustion. The report:

a. made false statements, such as *"when facts – not commonly held misconceptions – are used, there is no persuasive* basis *for forcing Americans to dramatically change their lifestyles to use less oil"*;

b. sought to deny the anthropogenic sources of climate change, saying that no "*scientific evidence exists that human activities are significantly affecting sea levels, rainfall, surface temperatures or the intensity and frequency of storms*"; and

c. argued that proposed action to reduce fossil fuel use was *"radical", "costly", "and would have relatively little effect on long-term atmospheric concentrations of greenhouse gases",* falsely maintaining that "*facts don't support the contention that oil use must be curtailed*" and that *"our current reliance on oil makes economic, environmental and common sense"*.

91. In 1998, the Shell Oil Company (at the direction of TSTTCL and RDP) left the GCC, purportedly on account of a disagreement arising out of GCC's campaign against legally binding targets in the Kyoto Protocol. Shell's public explanation[106] was that the *"Shell view"* is that "*prudent precautionary measures*" to mitigate ACC were needed.[107] It seems clear that the Shell Oil Company's participation in, and withdrawal from, the GCC was directed by its parent companies. Despite that, rather than advancing any such precautionary measures, the Shell Group – at the

---

[104] P. Langcake, '*The Enhanced Greenhouse Effect: A review of the Scientific Aspects',* (December 1994), <https://legacy-assets.eenews.net/open_files/assets/2018/04/05/document_cw_04.pdf>.

[105] Sally Brain Gentille et al., '*Reinventing Energy: Making the Right Choices',* American Petroleum Institute*,* (1996), <https://www.climatefiles.com/trade-group/american-petroleum-institute/1996-reinventing-energy/>.

[106] As articulated in its report '*Climate Change: What does Shell Think and Do About It?*" and in a separate report: The Shell Report 1998, '*Profits and Principles – does there have to be a choice*?' (1998) <https://www.documentcloud.org/documents/24359055-shell-sustainability-report-1998-post-gcc-membership-version/>.

[107] The Shell Report 1998, '*Profits and Principles – does there have to be a choice*?' (1998) <https://www.documentcloud.org/documents/24359055-shell-sustainability-report-1998-post-gcc-membership-version/>.

direction of TSTTCL and RDP – continued to cast doubt on the role of fossil fuels and to call for the expansion of oil and gas production for the next 20-30 years.[108]

92. At the direction or encouragement of TSTTLC and RDP, Shell Oil Company also continued to support the API's Global Climate Science Communications Team, which worked to convince the public of the uncertainty of climate science, in the face of overwhelming evidence to the contrary.[109] After the signing of the Kyoto Protocol, and with the Shell Group's support, the API drew up a disinformation campaign strategy explicitly designed to undermine the consensus on the science of climate change and the need for urgent action to curb reliance on fossil fuels. The strategy stated: "*Unless "climate change" becomes a non-issue, meaning the Kyoto proposal is defeated and there are no further initiatives to thwart the threat of climate change, there may be no moment when we can declare victory for our efforts*".[110]

93. The Shell Group was also heavily involved in the IPIECA, a trade association which regards itself as the global oil and gas industry association for environmental and social issues. Despite its name, IPIECA too was involved in devising and advancing industry-wide climate disinformation, again with the support of TSTTCL and RDP and the Shell Group. For example:

a. In 1987 the IPIECA held a symposium to review the state of climate science and potential policies and set up an "Ad Hoc Group on the Greenhouse Effect", soon renamed the "Working Group on Global Climate Change".[111] This group included a Shell representative and was explicitly focused on, amongst other things, maintaining the fossil fuel industry's dominance through public communications strategies in response to concerns about climate change.[112] Those strategies included funding scientific research that emphasised uncertainty, cherry-picking and promoting research that made ACC appear less alarming, and promoting communications that sought to undermine the consensus on climate change.

b. In 1990, IPIECA published a strategy memo that was received by hundreds of oil companies around the world, including TSTTCL and RDP, which explained that, to delay a global shift away from burning fossil fuels, the industry should emphasise uncertainties in climate science and the need for further research.[113] In alignment with the 1990 IPIECA memo, in the late 1990s the Shell Group, under the direction of TSTTCL and RDP, began to shift its policy from openly denying ACC towards climate change scepticism.

---

[108] For instance, the 'Profits and principles' report claimed: *"All the world's estimated resources of conventional oil and gas could be consumed without raising atmospheric carbon concentrations above the limits suggested by even the most pessimistic observers. The real problem is with the very much larger resources of carbon intensive coal"* and the 'Climate Change' report explicitly called for the expansion of oil and gas production.

[109] The American Petroleum Institute, '*Roadmap for Climate Deception*' (1998) <https://www.ucs.org/sites/default/files/attach/2015/07/The-Climate-Deception-Dossiers.pdf>.

[110] The American Petroleum Institute, '*Global Climate Science Communications* : Action Plan' (3 April 1998) <https://s3.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf>, p 3.

[111] Benjamin Franta, *'Big Carbon: Strategic Response to Global Warming, 1950-2020'* (PhD dissertation, Stanford University 2022), p 138; Interview with Brian P. Flannery, 1 February 2021.

[112] Ibid, p 139 – 141.

[113] Ibid, p 140.

94. TSTTCL and RDP also funded climate denialism independently of trade groups. For instance, RDP was Carl Johan Friedrich Böttcher's largest donor.[114] Böttcher was one of the first active climate change deniers and later stated that he had "*allowed [himself] to be persuaded by a number of contacts – generally from Shell circles – to take on a CO2/greenhouse effect project*"[115]. He wrote, amongst others, the 1994 industry paper: "*Climate Change and the $CO_2$ Myth*"[116], which stated that "*further increase of the CO2 concentration in the atmosphere has little effect on the greenhouse effect*".

95. RDP's financing of Böttcher is just one early example of its financing of climate disinformation campaigns. A 2016 study by InfluenceMap suggests that entities within the Shell Group spent $22m annually on such campaigns, with the API spending $65m annually on the same.[117]

96. The Defendants' active role in lobbying efforts also extends to influence on climate-related policy setting. For example, via its lobbying the Shell Group sought to undermine European renewable energy targets ahead of a key agreement on emissions cuts reached in 2014. According to documents released in 2015, the Shell Group began lobbying the European Commission president as early as 2011 arguing that a market-led strategy of gas expansion would save Europe €500bn in its transition to low carbon energy system, compared to an approach centred on renewables.[118] Additionally, leading up to the UNFCCC Conference of the Parties in Paris in 2015, while the Shell Group was nominally asking policy makers for a price on carbon, it was lobbying against strands of policy and regulations designed to create such a meaningful price.[119]

97. At the direction or encouragement of RDS / Shell plc, the Shell Group has also falsely presented itself as committed to a transition to renewable energy and a net-zero future.[120] The reality is reflected in its operations and investments: between 2010 and 2018, 98.7% of the Shell Group's

---

[114] Alexander Beunder and co-authors, '*How Shell Backed Dutch "Coordinator" of Climate Science Denial for Decades*' De Smog (14 May 2020) <https://www.desmog.com/2020/05/14/bottcher-shell-funding-european-climate-science-denial/>.

[115] Bas Van Beek, Alexander Beunder, Jilles Mast and Merel De Buck, '*For nine years, multinationals like Shell and Bayer funded a prominent climate denier*', Follow the Money <https://www.ftm.nl/dutch-multinationals-funded-climate-sceptic>.

[116] C J. F. Boettcher, '*Climate Change and the $CO_2$ myth*', Ingenieur (1994) 106 (10) (The Hague, Netherlands) <https://www.osti.gov/etdeweb/biblio/6985394#:~:text=Publication%20Date:%20Jun%2007%2C%201994,Language:%20Dutch>.

[117] InfluenceMap, '*How much big oil spends on obstructive climate lobbying*' (April 2016) <https://influencemap.org/login?show_reg_modal=True&return_to=/evoke/3/file_access%3Fuuid%3Da942732a4ad311ed90a50629e04faa41#>.

[118] Arthur Neslen, '*Shell lobbied to undermine EU renewables targets, documents reveal*', *The Guardian*, (London, 27 April 2015) <https://www.theguardian.com/environment/2015/apr/27/shell-lobbied-to-undermine-eu-renewables-targets-documents-reveal>.

[119] InfluenceMap '*Big Oil and the Obstruction of Climate Regulations*' (October 2015) <https://influencemap.org/report/Big-Oil-the-Price-of-Carbon-and-Obstruction-of-Climate-Regulations>.

[120] ClientEarth, '*Greenwashing Files: Shell*', '*Despite Shell's climate pledges, the Climate Action 100+ Net Zero Company Benchmark finds that the company only meets some of the Benchmark's targets criteria – Shell does not have both an ambition to reach 'net-zero' and net zero-aligned short, medium and long-term GHG reduction targets, which cover all its relevant emissions*' <https://www.clientearth.org/projects/the-greenwashing-files/shell/>.

investments were in oil and gas.[121] In the face of overwhelming evidence that the expansion of oil and gas production is incompatible with a safe climate,[122] RDS and then Shell plc has continued to expand its oil and gas commitments and abandoned its previously stated commitment to significant reductions in net carbon intensity by 2035.[123] The current CEO of Shell plc, Wael Sawan, now claims it would be "*dangerous and irresponsible*" to reduce oil production.[124] This language is particularly striking given the enormous harm such production is causing to climate vulnerable countries such as the Philippines.[125]

98. This false commitment to a net-zero future is also reflected in Shell International Ltd's membership of the International Gas Union (the "**IGU**"), which is an industry association representing the fossil gas sector and in which its senior executives have held leadership positions.[126] One of the IGU's objectives was to "*[i]ncrease social acceptance of natural gas as distinct from other fossil fuels and of gas in all its forms as a key part of a transition to a clean and inclusive energy future*".[127] InfluenceMap's analysis of IGU strategy documents show that it developed a "*global playbook of regionally specific communication strategies to promote fossil gas based on 'environmental-consciousness' of the market*".[128] In Europe, this included a focus on "*greening of gas*", which presented fossil gas as part of a broader category of 'gases', including "*low-carbon*" and "*decarbonised*" gases. These messaging strategies were designed to "*promote positive sentiment*" and "*increase social acceptance*" for fossil gas, in defence against the "*potentially existential*" threat posed by discussions around climate change, despite that promotion being misaligned with the science of the IPCC.[129] On that basis, the Shell Group's and the IGU's promotion of fossil gas as a transitional gas was misleading.

99. Shell plc's misleading promotion of its commitment to sustainability is continuing and is demonstrated by many advertisements from recent years. For example:

a. Shell's numerous advertisements on *The New York Times* website as part of its 2016 "Make the Future" campaign misleadingly portrayed it as heavily engaged in developing and

---

[121] Ibid.

[122] IEA, '*Net Zero by 2050: A roadmap for the Global Energy Sector*' (IEA 2021)< https://www.iea.org/reports/net-zero-by-2050>; IPCC, 'Climate Change 2023: Synthesis Report', 'Summary for Policy Makers' (IPCC 2023) <https://www.ipcc.ch/report/sixth-assessment-report-cycle/>.

[123] *Shell Weakens 2030 Emissions-Cut Target in Move Away From Clean Power*', Bloomberg UK (March 2024) <https://www.bloomberg.com/news/articles/2024-03-14/shell-moderates-2030-emissions-cut-target-in-strategy-update>.

[124] *Oil giant Shell warns cutting production "dangerous"*', BBC (6 July 2023) <https://www.bbc.co.uk/news/business-66108553>.

[125] Sönke Kreft, David Eckstein and Inga Melchior, '*Global Climate Risk Index 2017: Who Suffers Most From Extreme Weather Events? Whether-Related Loss Events in 2015 and 1996 to 2015'* (Germanwatch e.V. 2017) <www.germanwatch.org/en/12978>.

[126] InfluenceMap "*The International Gas Union's Climate Strategy: What the IGU reveals about the industry's global playbook to lock in fossil gas*" (December 2022) <https://influencemap.org/landing/-a794566767a94a5d71052b63a05e825f-20189>, p 6.

[127] Ibid, p 12.

[128] Ibid, p 3.

[129] Ibid, p 37.

selling clean energy sources.[130] Shell promoted its investment in new energy sources including liquified natural gas and biofuel, which it referred to as "*cleaner sources*". For instance, Shell's "In for the Long Haul" *New York Times* advertisement publicised its investment in hydrogen fuel cells and biofuels, misleadingly promoting them as meaningful attempts to mitigate the effects of ACC.

b. A Shell advertisement in *The Washington Post* on or around November 2018 titled "The Making of Sustainable Mobility" referred to liquified natural gas as a "*critical component of a sustainable energy mix*" and a "*lower-carbon fuel*" that could "*help decrease*" $CO_2$ emissions.[131] It also emphasised Shell's role in "*setting the course*" for a "*lower-carbon mobility future*".

c. Another Shell advertisement in *The Washington Post* on or around November 2018 titled "The Mobility Quandary" similarly emphasised Shell's role in working to forestall climate change through investments in alternative energy: "*Shell is a bigger player than you might expect in this budding movement to realize a cleaner and more efficient transportation future*".[132] The advertisement also misleadingly represented Shell's investments in hydrogen fuel cell technology and hydrogen generally as "*sustainable in the long-term*" and "*one of the cleaner sources*" that power electric vehicles.

d. Shell's public communications firm, Edelman, explained in or around 2018: "*As part of their efforts to make consumers, particularly millennials, aware of their commitment to cleaner energy, Shell launched the #makethefuture campaign. The company tasked Edelman with the job of giving millennials a reason to connect emotionally with Shell's commitment to a sustainable future. We needed them to forget their prejudices about 'big oil' and think differently about Shell*".[133]

e. In a 2017 speech, RDS's CEO promoted fossil fuels by arguing that the industry could play a "*crucial role*" in lifting people out of poverty.[134] In a Shell website promotion that same year, the company touted that they were "*helping to meet the world's growing demand while limiting $CO_2$ emissions, by delivering more cleaner-burning natural gas*".[135]

100. These advertisements and campaigns were misleading because Shell's spending on low-carbon and energy diversification at the time was substantially lower than the advertisements stated or implied. Between 2010 and 2018, Shell spent a trivial 1.33% of its total capital

---

[130] *See* Graham Readfearn, '*Hey Millennials, Don't Fall for Shell's Pop Star PR*', The Guardian (25 April 2018), <https://www.theguardian.com/environment/planet-oz/2018/apr/25/hey-millennials-dont-fall-for-shells-pop-star-pr>.

[131] Content from Shell, '*The Making of Sustainable Mobility*', Washington Post (November 2018), <https://www.washingtonpost.com/brand-studio/shell/the-making-of-sustainable-mobility>.

[132] Content from Shell, *The Mobility Quandary*, Washington Post (November 2018), <https://www.washingtonpost.com/brandstudio/shell/the-mobility-quandary>.

[133] Edelman, '*Shell: South Pole Energy Challenge*', <https://perma.cc/FUM8-PE7K>.

[134] Shell Speech by Ben van Beurden, CEO of Shell, *Deliver Today, Prepare for Tomorrow* (Mar. 9, 2017), <https://perma.cc/NBQ4-LJT4> .

[135] Shell United States, '*Transforming Natural Gas*', <https://perma.cc/T9WV-SXRA>.

spending on low-carbon energy sources.[136] This low level of investment in low-carbon energy is entirely inconsistent with its messaging that it was committed to green, clean or sustainable energy.[137] This was archetypal greenwashing.

101. To date, Shell plc has continued to grow its investments in fossil fuel expansion, further reducing its commitments to low-carbon energy sources. In 2022, it spent almost six times more money on oil and gas development than on renewable investments.[138] In 2023, it withdrew its 2021 pledge to cut oil production each year for the rest of the decade, instead maintaining the current level of oil production until 2030 and pledging to invest USD 40 billion in oil and gas production between 2023 and 2035.[139]

102. Throughout this time, the Shell Group's statements remained mismatched with its actual investments. For instance, Shell plc stated that approximately 12% of its 2021 capital spending went to its "Renewables and Energy Solutions" department, while indicating in its own financial reporting that only around 1.5% of its capital was dedicated to developing renewable energy sources, with the majority of the remaining allocated spending going to projects related to natural gas.[140] Despite record profits in 2022, Shell plc failed to allocate further spending on the "Renewables and Energy Solutions" department and announced a focus on new spending towards fossil fuel production.[141] That reality is also reflected in a fine-print disclaimer in its 2016 net-zero pathways report, which reads "*We have no immediate plans to move to a net-zero emissions portfolio over our investment horizon of 10-20 years*".[142]

103. Similarly, in 2023, the UK's Advertising Standards Authority's banned one of Shell's marketing campaigns for implying "*that a significant proportion of its business was in low carbon energy products*" and that *"further information about the proportion of Shell's overall business model that comprised lower-carbon energy products was material information that should have been included*".[143] The advertisement in question was consistent with the misleading claims made by Shell over the 2010s: that Shell was catalysing the energy transition and that it was providing

---

[136] Mei Lei, Gregory Trencher and Jusen Asuka, '*The clean energy claims of BP, Chevron, ExxonMobil and Shell: A mismatch between discourse, actions and investments'* (16 February 2022) PLoS ONE 17(2): e0263596. <https://doi.org/10.1371/journal.pone.0263596>.

[137] Fletcher et al., '*Beyond the Cycle'*, CDP (November 2018) p 38, Figure 69 ("*Disclosed low-carbon investment as a proportion of total CAPEX (2010-Q3 2018)*") <https://perma.cc/3SY2-PNSX>.

[138] Ron Bousso, '*Exclusive: Shell Pivots Back to Oil to Win Over Investors'*, Reuters (9 June 2023), <https://perma.cc/3MYK-T6TV>.

[139] Lottie Limb, '*Shell Joins BP and Total In U-Turning on Climate Pledges 'to Reward Shareholders''*, euronews (15 June 2023), <https://perma.cc/9QR8-JQLB>.

[140] Oliver Milman, '*Shell's Actual Spending on Renewables is Fraction of What It Claims, Group Alleges'*, The Guardian (1 February 2023), <https://perma.cc/3QRS-FZYL>.

[141] Will Mathis*, 'Shell Hits the Brakes on Growing Renewables Unit After Record 2022 Profit'*, Bloomberg (2 February 2023), <https://perma.cc/VEX5-KCJD>.

[142] David Hone – Chief Climate Change Advisor for Shell, 'A global timeline to net-zero emissions' (27 September 2016), <https://blogs.shell.com/2016/09/27/timeline/>.

[143] Ed Davey, '*Shell's Clean Energy Advertising Campaign is Misleading, UK Watchdog Says'*, Wood Mackenzie (June 7, 2023, 11:50 AM EST), <https://perma.cc/9G3D-9P8K>; *see also* Advertising Standards Authority, '*ASA Ruling on Shell UK Ltd t/a Shell'* (7 June 2023), <https://perma.cc/7QVU-MGYD>.

renewable energy, when in fact Shell spent only a trivial proportion of its total capital on low-carbon energy sources. Once again, this was an archetypal example of greenwashing.

104. Shell plc's business model and operations remain misaligned with global net zero commitments, as well as with its legal obligations,[144] because Shell plc does not plan to sufficiently divest its interests in fossil fuels and to transition rapidly towards renewable energy, as required by the International Energy Agency's Net Zero Emissions by 2050 Scenario,[145] instead pledging to continue investing in oil and gas. Despite decades of scientific consensus on fossil fuels' contribution to the dangerous effects of ACC, TSTTCL, RDP and Shell plc failed, and Shell plc continues to fail, to make any meaningful commitment and take any meaningful action to mitigate these effects. Rather, the parent companies of the Shell Group took a leading role in lobbying and campaigning for the obstruction of climate progressive policies, in order to profit significantly from the continued expansion of fossil fuels, while seeking to maintain its social licence to profit from oil and gas production.

## G. CAUSES OF ACTION

105. Our clients intend to bring their claims against the Defendants under:

a. the Philippines Civil Code (the "**Civil Code**"):

i. Articles 19, 20 and 21;
ii. Articles 2176 and 2177; and
iii. (in the alternative) Article 23.

b. Article 2, section 16 and Article 3, section 1 of the 1987 Constitution of the Republic of the Philippines (the "**Constitution**").

106. These causes of action are informed by the May 2022 report of the Commission on Human Rights of the Philippines (the "**HR Commission**")entitled the "National Inquiry of Climate Change Report" (the "**HR Report**").[146] The HR Commission is a Philippines institution empowered by the Philippines Constitution to examine human rights issues. In May 2022, it published the HR Report after more than 7 years of climate and science research, hearings, and investigations. The HR Report established, among other things, that the climate crisis had significantly increased the frequency and severity of cyclones in the country and that the so-called Carbon Majors, including Shell plc, bore significant responsibility for this. The HR Report detailed some of the potential grounds upon which victims of weather events caused and/or contributed to climate change could bring civil legal actions against Carbon Majors under Philippines law to establish liability and secure a remedy.

107. Our clients reserve the right to pursue additional or different causes of action as may be appropriate.

---

[144] For instance, Shell was ordered to reduce its emissions in alignment with global net zero targets by the Dutch Court of Appeal: Milieudefensie v Shell Plc, case number 200.302.332/01, Judgment of 12 November 2024.

[145] International Energy Agency '*Fossil Fuels*' <https://www.iea.org/energy-system/fossil-fuels>.

[146] Commission on Human Rights of the Philippines, '*National Inquiry on Climate Change Report*' (2022), <https://chr2bucket.storage.googleapis.com/wp-content/uploads/2022/12/08152514/CHRP_National-Inquiry-on-Climate-Change-Report.pdf>.

### *G1. The Civil Code*

*Extraterritorial application*

108. The Philippines Civil Code generally applies to regulate the conduct of actors within the territory of the Philippines. However, consistent with the customary international law "effects doctrine"[147] it can also apply to conduct taking place outside the Philippines where that conduct has foreseeable and substantial effects in the Philippines. In this regard, our clients observe that Article II, section 2 of the Constitution incorporates the generally accepted principles of international law (including the law relating to prescriptive jurisdiction) as part of the law of the Philippines.

*Articles 19, 20 and 21*

109. Articles 19 – 21 of the Civil Code provide:

> *"Article 19: Every person must, in the exercise of his rights and in the performance of his duties, act with justice, give everyone his due, and observe honesty and good faith.*
>
> *Article 20: Every person who, contrary to law, wilfully or negligently causes damage to another, shall indemnify the latter for the same.*
>
> *Article 21: Any person who wilfully causes loss or injury to another in a manner that is contrary to morals, good customs or public policy shall compensate the latter for the damage."*

110. These provisions were drafted broadly by the Civil Code Commission to provide a remedy for a wide range of wrongs, regardless of whether the acts or omissions are in contravention of other specific legal provisions. As Associate Justice Caguioa articulated in *Navaror-Banarria v Banaria*[148]:

> "*Articles 19, 20, and 21 have been historically planted to ensure that no wanton discounting of the rights of others may escape with impunity for the sole reason that no black letter law specifically prohibits the same. For if the case were otherwise, we would be constantly confronted with the irony wherein, as the Report of the Code Commission itself described, people would be free to cause damage to others, and violate the most elementary principles of morality, so long as no positive law is broken*".

111. Article 19 does not establish a standalone tort but instead describes a standard of conduct in the exercise of rights which, if not met, may give rise to an actionable claim when alleged together with Article 20 or Article 21. In *Globe Mackay Radio and Cable Corp. v. CA*,[149] the Philippines Supreme Court described Article 19 as follows:

> *"This article, known to contain what is commonly referred to as the principle of abuse of rights, sets certain standards which must be observed not only in the exercise of one's rights but also in the performance of one's duties.* ***These standards are the***

---

[147] See *Restatement (Third) of the Foreign Relations Law of the United States* (Am Law Inst 1987) (Third Restatement) §402(1), comment d; and *Restatement (Fourth) of the Foreign Relations Law of the United States* (Am Law Inst 2018) (Fourth Restatement) §409, Reporters' Note 5.

[148] *G.R. No. 217806 July 28, 2020* <https://lawphil.net/judjuris/juri2020/jul2020/gr_217806_caguioa.html>.

[149] *G.R. No. 81262 August 25, 1989* <https://lawphil.net/judjuris/juri1989/aug1989/gr_81262_1989.html>.

> ***following: to act with justice; to give everyone his due; and to observe honesty and good faith. The law, therefore, recognizes a primordial limitation on all rights; that in their exercise, the norms of human conduct set forth in Article 19 must be observed. A right, though by itself legal because recognized or granted by law as such, may nevertheless become the source of some illegality.*** *When a right is exercised in a manner which does not conform with the norms enshrined in Article 19 and results in damage to another, a legal wrong is thereby committed for which the wrongdoer must be held responsible. But while Article 19 lays down a rule of conduct for the government of human relations and for the maintenance of social order, it does not provide a remedy for its violation. Generally, an action for damages under either Article 20 or Article 21 would be proper." [Emphasis in the original]*

112. A lack of "honesty" has been defined in the case law as including *"lack of integrity; lack of honesty probity and integrity in principle; lack of fairness and straightforwardness."*[150] "Good faith" has been defined by member of the Code Commission[151] and ex-Senate president Arturo Tolentino as an "*honest intention to abstain from taking any unconscientious advantage of another, even through the forms or technicalities of the law, together with an absence of all information or belief of facts which would render the transaction unconscientious*".[152] The Supreme Court of the Philippines said in *Globe Mackay Radio* that *"[t]here is no hard and fast rule which can be applied to determine whether or not the principle of abuse of rights may be invoked. The question of whether or not the principle of abuse of rights has been violated, resulting in damages under Articles 20 and 21 or other applicable provision of law, depends on the circumstances of each case."*[153]

113. Article 20 establishes liability for wilful or negligent acts or omissions that are contrary to law and cause damage. Relevantly:

   a. Where conduct is in violation of the Article 19 standard, it will necessarily be "*contrary to law*".[154]

   b. Conduct is considered "*wilful*" if it is committed with knowledge of its injurious effect, even if it is committed not for the purpose of producing the injury[155]. The act need not be directed against the person injured, rather it suffices that a person suffers damage as a

---

[150] *Gillamac-Ortiz v. Almeida, Jr., A.M. No. P-07-2401, November 28, 2007, citing In Re: Ting, A.M. No. 2001-7 SC & No. 2001-8-SC, July 22, 2005; Olivan v. Rubio, A.M. No. P-12-3063, 26 November 2013, citing Philippine Amusement and Gaming Corp*. v. Marquez, G.R. Nos. 191877 & 192287, 18 June 2013.

[151] Ex-Senate president Arturo Tolentino, who drafted the Civil Code.

[152] Tolentino, A. M, '*Commentaries and Jurisprudence on the Civil Code of the Philippines'*, Vol. I (2004th ed, Central Law Book Publishing Co., Inc., 1997) 62; and see *Dart Philippines, Inc. v. Spouses Calogcog, G.R. No. 149241, August 24, 2009* <https://lawphil.net/judjuris/juri2009/aug2009/gr_149241_2009.html>.

[153] *Globe Mackay Cable and Radio Corp. vs CA,* G.R. No. 81262, August 25 1989 <https://lawphil.net/judjuris/juri1989/aug1989/gr_81262_1989.html>.

[154] Tolentino, A. M, '*Commentaries and Jurisprudence on the Civil Code of the Philippines'*, Vol. I (2004th ed, Central Law Book Publishing Co., Inc., 1997), p 68.

[155] Ibid, p 62, 71.

consequence of a wrongful act of another in order that indemnity could be demanded from the wrongdoer.[156]

c. Negligence is *"an omission to do an act which a reasonable person would do, guided by those considerations which ordinarily regulate the conduct of human affairs, or the…failure to observe that degree of care, precaution and vigilance that the circumstance justly demand".*[157] Each allegation of negligence is evaluated in accordance with the specific circumstances of each case.

114. Article 21 establishes liability for injuries that are caused by wilful conduct that is not necessarily proscribed by law, but which nevertheless contravenes moral standards, good customs, or public policy.[158]

a. The definition of "wilful" is the same as that in Article 20.

b. In determining whether conduct contravenes moral standards, good customs or public policy, the court may have regard to published standards, including the principles of fairness and transparency[159], the principle of social justice[160], Constitutional rights including the right to a balanced and healthful ecology[161] and established corporate responsibility standards.[162]

115. Our clients intend to claim damages under Article 19 in relation to Article 20 of the Civil Code and under Article 19 in relation to Article 21 of the Civil Code, on the grounds that, on a continuing basis from the mid-1960s to December 2021, the Defendants abused their right to operate a business involved in the production and sale of oil and gas because:

a. In the knowledge that:

i. the production and combustion of fossil fuels was the primary cause of ACC; and

ii. a stabilisation, then reduction, of global production and combustion of fossil fuels was needed to avoid the likely harmful effects of ACC, including to people in developing countries like the Philippines who were particularly vulnerable to the adverse effects of ACC;

---

[156] *Petrophil v. Court of Appeals*, G.R. No. 122796, December 10, 2001.

[157] *Philippine National Construction Corp., v. Court of Appeals,* G.R. No. 159260, 22 August 2005.

[158] *St. Martin Polyclinic v. PVW Construction Corporation,* G.R. No. 217426. December 04, 2017.

[159] SEC (Philippines), Memorandum Circular No. 19, Series of 2016, Code of Corporate Governance for Publicly-Listed Companies (22 November 2016) <https://www.ecgi.global/sites/default/files/codes/documents/philippines_cgcode_2016.pdf>.

[160] 1987 Constitution of the Republic of Philippines, Article XIII, Sec. 1: '*The Congress shall give highest priority to the enactment of measures that protect and enhance the right of all the people to human dignity, reduce social, economic, and political inequalities, and remove cultural inequities by equitably diffusing wealth and political power for the common good*.'

[161] 1987 Constitution of the Republic of Philippines, Article II, Sec. 16: '*The State shall protect and advance the right of the people to a balanced and healthful ecology in accord with the rhythm and harmony of nature*.'

[162] Including, e.g., the UN Guiding Principles on Business and Human Rights, the OECD Guidelines for Multinational Corporations, the UN Global Compact. See HR Report page 89ff.

b. The Defendants:

i. wilfully adopted, set and/or pursued group-wide strategies and policies to expand the production and sale of fossil fuels which drove a more than threefold increase in group-wide GHG emissions between 1965 and 2021 and a more than 70% increase in group-wide GHG emissions between 1990 and 2021;

ii. deliberately and/or negligently failed – throughout the period from the mid-1960s to 2021 – to adopt, set and/or pursue group-wide strategies and policies to effectively reduce group-wide GHG emissions; and

iii. instead, in the pursuit of their own financial self-interest, funded, promoted and/or engaged in public communications and political lobbying campaigns designed to undermine the scientific consensus on the causes and likely effects of ACC and prevent or delay national and international measures to encourage or require a reduction in the production or consumption of fossil fuels.

c. That conduct demonstrated a lack of good faith and straightforwardness, and a lack of honesty, probity and integrity in principle. It was inconsistent with morals and with public policy as reflected in the Constitutional right of the people to a balanced and healthful ecology, and contravened applicable standards of corporate responsibility.[163] By their conduct, the Defendants acted contrary to established principles of social justice, enshrined in the 1987 Constitution and Philippines law, and constituting limits to the exercise of one's property rights. It is no defence to these allegations that the Defendants conducted their operations in a manner that was in accordance with the relevant legal licensing and business frameworks.[164]

d. As a result of the Defendants' conduct, the Defendants have caused loss and damage to our clients occurring within the territory of the Philippines (see below regarding causation).

*Article 2176: Quasi-delict*

116. In addition to the claims set out above, our clients also intend to advance claims under Article 2176 of the Civil Code, which provides:

> "*Whoever by act or omission causes damage to another, there being fault or negligence, is obliged to pay for the damage done. Such fault or negligence, if there is no pre-existing contractual relation between the parties, is called a quasi-delict and is governed by the provisions of this Chapter.*"

117. The definition of negligence is found in Article 1173 of the Civil Code, namely:

---

[163] Including the UN Guiding Principles on Business and Human Rights, the OECD Guidelines for Multinational Enterprises and established obligations of fairness and transparency which public corporations owe to their stakeholders, including not just shareholders and directors, but also regulators and the communities in which they operate, as for instance set out in the SEC Memorandum Circular No. 19, Series of 2016, Code of Corporate Governance for Publicly-Listed Companies.

[164] *Phil. Refining Co., Inc. v. Garcia* 18 SCRA 107 (1966).

"*The fault or negligence of the obligor consists in the omission of that diligence which is required by the nature of the obligation and corresponds with the circumstances of the persons, of the time and of the place.*

*If the law or contract does not state the diligence which is to be observed in the performance, that which is expected of a good father of a family shall be required*."

118. In *Davao Del Norte Electric Cooperative v. Heirs of Victorino Lucas,*[165] the Philippines Supreme Court defined negligence as "*the failure to observe for the protection of the interests of another person that degree of care, precaution, and vigilance which the circumstances justly demand, whereby such other person suffers injury*."

119. In *Sanggacala v National Power Corporation*[166], the Philippines Supreme Court affirmed that a claim in quasi-delict could apply to environmental harms affecting specific individuals.

120. Our clients intend to claim damages under Article 2176 of the Civil Code on the grounds that, on a continuing basis from the mid-1960s to December 2021, the Defendants, through their wrongful and negligent acts and omissions, caused damage to the Claimant. In particular:

a. In the knowledge that:

i. the production and combustion of fossil fuels was the primary cause of ACC; and

ii. a stabilisation, then reduction, of global production and combustion of fossil fuels was needed to avoid the likely harmful effects of ACC, including to people in developing countries like the Philippines who were particularly vulnerable to the adverse effects of ACC;

b. The Defendants:

i. wilfully adopted, set and/or pursued group-wide strategies and policies to expand the production and sale of fossil fuels which drove a more than threefold increase in group-wide GHG emissions between 1965 and 2021 and a more than 70% increase in group-wide GHG emissions between 1990 and 2021;

ii. deliberately and/or negligently failed to adopt, set and/or pursue group-wide strategies and policies to effectively reduce group-wide GHG emissions at any stage between 1965 and 2021; and

c. That conduct has caused loss and damage to our clients occurring within the territory of the Philippines (see below regarding causation).

<u>*Article 23: unjust enrichment*</u>

121. In the alternative, our clients allege that the Defendants are liable to compensate them for the damage they have suffered given that the Defendants have profited enormously from their contribution to ACC, at the expense of our clients.

---

[165] *Davao Del Norte Electric Cooperative vs. Heirs of Victorino Luca*, G.R. No. 254395, June 14, 2023, page 8.

[166] *Sanggacala v National Power Corporation* G.R. No. 209538, 7 July 2021.

122. Article 23 of the Civil Code provides a remedy based in equity for unjust enrichment. It must be read as an extension of the concept of unjust enrichment provided by Article 22. The two Articles provide as follows:

> *"Article 22. Every person who through an act of performance by another, or any other means, acquires or comes into possession of something at the expense of the latter without just or legal ground, shall return the same to him.*
>
> *Article 23. Even when an act or event causing damage to another's property was not due to the fault or negligence of the defendant, the latter shall be liable for indemnity if through the act or event he was benefited."*

123. In the event that the Court finds that our clients have no other right to a remedy, our clients intend to claim damages under Article 23 on the grounds that:

a. Through the production and sale of fossil fuels, Shell plc and before it TSTTCL and RDP generated very significant profits, including profits of US$520 billion between 1990 – 2020.

b. Through their production and sale of fossil fuels, Shell has caused damage to our clients' property in the Philippines (see below regarding causation);

c. It would be unjust as a matter of equity for Shell to retain the financial benefits of the conduct that caused damage to our clients' property, even if that conduct was not due to Shell's fault or negligence.

### *G2. The Constitution*

124. Article 2, section 16 of the Philippines Constitution requires the State (including the judiciary) to protect the right of the people to a balanced and healthful ecology. This right is *"self-executing"* and enforceable against both public and private actors[167] and in relation to conduct both within and outside the territory of the Philippines, to the extent that the conduct impairs the enjoyment of the right by the people within the Philippines. In *Oposa v. Factoran* G.R. No. 101083 (30 July 1993), the Supreme Court said:

> *"While the right to a balanced and healthful ecology is to be found under the Declaration of Principles and State Policies and not under the Bill of Rights, it does not follow that it is less important than any of the civil and political rights enumerated in the latter. Such a right belongs to a different category of rights altogether for it concerns nothing less than self-preservation and self-perpetuation — aptly and fittingly stressed by the petitioners — the advancement of which may even be said to predate all governments and constitutions. As a matter of fact, these basic rights need not even be written in the Constitution for they are assumed to exist from the inception of humankind. If they are now explicitly mentioned in the fundamental charter, it is because of the well-founded fear of its framers that unless the rights to a balanced and healthful ecology and to health are mandated as state policies by the Constitution itself, thereby highlighting their continuing importance and imposing upon the state a solemn obligation to preserve the first and protect and advance the second, the day would not be too far when all else would be lost not only for the present generation, but also for those to come — generations which stand to inherit nothing but parched earth incapable of sustaining life."*

---

[167] *Oposa v Factoran*, G.R. No. 101083, 30 July 1993, page 18.

125. As the Supreme Court affirmed in that case, the right to a balanced and healthful ecology pre-dates the Constitution and is capable of reaching back in time to cover acts or omissions which commenced prior to the 1987 Constitution but which cause a violation of the right post 1987. The Supreme Court has confirmed that the right carries the correlative duty to refrain from impairing the environment.[168]

126. Claims in respect of violations can be brought as a civil action for damages and/or under the Writ of Kalikasan ("**WOK**"). The WOK, which is a remedy provided for by Rule 7 of the Rules of Procedure in Environmental Cases ("**RPEC**"), enables the Court to award non-pecuniary remedies for persons whose constitutional right to a balanced and healthful ecology is violated by an unlawful act or omission. In *Paje vs. Casiño*, G.R. No. 159290 (23 Oct 2006), the Philippines Supreme Court said of the WOK that:

> *"The writ is categorized as a special civil action and was, thus, conceptualized as an extraordinary remedy, which aims to provide judicial relief from threatened or actual violation/s of the constitutional right to a balanced and healthful ecology of a magnitude or degree of damage that transcends political and territorial boundaries. It is intended 'to provide a stronger defense for environmental rights through judicial efforts where institutional arrangements of enforcement, implementation and legislation have fallen short' and seeks 'to address the potentially exponential nature of large-scale ecological threats.'"*

127. In this case, our clients are entitled to seek non-pecuniary remedies for the Defendants' continuing violation of their right to a balanced and healthful ecology. They will claim that:

a. The Defendants' contribution of around 2.55% of cumulative industrial GHG emissions from 1850 – 2021 and around 2.3% of cumulative industrial GHG emissions from 1965 – 2021 has caused a warming in atmospheric and ocean surface temperatures around the Philippines that is of such magnitude as to prejudice the life, health, and property of inhabitants of two or more cities or provinces;

b. The effect is an ongoing violation of the right of the people to a balanced and healthful ecology.

## H. CAUSATION

128. Philippines law applies the principle of "proximate cause" to establish legal causation. The Philippines Supreme Court has eschewed a strict application of a "but for" test to establish proximate cause in favour of a more flexible approach. In *Dy Teban Trading Inc v Jose Ching & others*[169], the Court said:

> *"There is no exact mathematical formula to determine proximate cause. It is based upon mixed considerations of logic, common sense, policy and precedent. Plaintiff must, however, establish a sufficient link between the act or omission and the damage or injury. That link must not be remote or far-fetched; otherwise, no liability will attach. The damage or injury must be a natural and probable result of the act or omission."*

---

[168] See *Zabal vs. Pres. Duterte*, G.R. No. 238467, 12 February 2019; *Henares v. LTRFB and DOTC*, G.R. No. 158290, 23 October 2006, infra

[169] G.R. No. 161803, 4 February 2008.

129. Recent case law from other jurisdictions in respect of claims relating to climate change-related harm supports a flexible approach to causation:

a. In ***Smith v Fonterra***,[170] the New Zealand Supreme Court at [164] doubted the suitability of the "but for" test for causation in a case alleging public nuisance by large emitters. In its judgment on appeal from an application for strike out, the Court noted that it was *"certainly arguable that in the case of public nuisance, a defendant must take responsibility for its contribution to a common interference with public rights; its responsibility should not be contingent on the absence of co-contribution or be in effect discharged by the equivalent acts of others."* The Court continued at [166]:

> *"How the law of torts should respond to cumulative causation in a public nuisance case involving newer technologies and newer harms (GHGs, rather than sewage and other water pollution) is a matter that should not be answered pre-emptively, without evidence and policy analysis exceeding that available on a strike out application. Accordingly, suppliers of fuels producing GHGs—here the fifth, sixth and seventh respondents, who supply retail and commercial customers with fuel products; operate a shipping terminal, storage tanks and a pipeline that carries fuel; and who mine coal principally for export, respectively— should not in our view be eliminated as parties until these difficult but fact- and policy-driven questions have been resolved by full trial and (potential) appeal."*

b. In ***Verein Klimaseniorinnen Schweiz and others v Switzerland***[171], the European Court of Human Rights also rejected a "but for" test of causation in considering the compliance of Contracting Parties with their obligations under the ECHR with regard to climate change. The Court said (at paragraph 439):

> *"In the context of climate change, the particularity of the issue of causation becomes more accentuated. The adverse effects on and risks for specific individuals or groups of individuals living in a given place arise from aggregate GHG emissions globally, and the emissions originating from a given jurisdiction make up only part of the causes of the harm. Accordingly, the causal link between the acts or omissions on the part of State authorities in one country, and the harm, or risk of harm, arising there, is necessarily more tenuous and indirect compared to that in the context of local sources of harmful pollution. Furthermore, from the perspective of human rights, the essence of the relevant State duties in the context of climate change relates to the reduction of the risks of harm for individuals. Conversely, failures in the performance of those duties entail an aggravation of the risks involved, although the individual exposures to such risks will vary in terms of type, severity and imminence, depending on a range of circumstances. Accordingly, in this context, issues of individual victim status or the specific content of State obligations cannot be determined on the basis of a strict conditio sine qua non requirement."*

c. In ***Lliuya v RWE***[172], the Higher Regional Court of Hamm rejected the defendant's contention that its contribution to the endangerment of the plaintiff's property was

[170] [2024] NZSC 5.

[171] Application no. 53600/20, judgment of 9 April 2024.

[172] I-5 U 15/17.

insignificant and held that its 0.38% contribution to cumulative industrial GHG emissions was capable of amounting to causation of climate change-related harm. It stated:

> *"In the case of multi-causal liability scenarios, a comparative consideration must always be made. It is not the mere amount of the causal contribution as such – e.g. 5 % or 10 % - that is the yardstick for materiality, but the amount in relation to other causal contributions (see Schirmer, Nachhaltiges Privatrecht, 2023, § 6 Klimahaftung, p. 197; Kieninger, ZHR 2023, 348 ff., 368 f.). By comparing different causal contributions, it is therefore necessary to filter out which causal contribution has significantly increased the risk, i.e. which is more important than others and which is not (see BGH, judgment of 19.11.1971 – V ZR 100/69, para. 37; OLG Hamm, judgment of 07.12.2001 – 9 U 127/00, para. 15). Based on these principles, it cannot be assumed in the case in dispute that the risk of damage occurring is only insignificantly increased. According to the plaintiff's submission, the vast majority of global warming, namely 95%, is attributable to anthropogenic influences; the defendant is said to be involved in this with a share of 39 approx… 0.38% of all industrial CO2 emissions…*
>
> *According to all of the above, the materiality of the defendant's contribution to causation must be affirmed if the calculation period – relevant in the context of adequacy – begins with the year 1965 in accordance with the "Heede Study" referred to by the plaintiff."*

130. As a matter of international law, the International Court of Justice affirmed in its recent Advisory Opinion on the *Obligations of States in Respect of Climate Change* that the diffuse nature of climate change does not mean it is impossible to establish causation and has rejected the proposition that the fact that damage from climate change is the result of concurrent causes exempts a state from the obligation to make reparation[173]. Instead, the Court has expressed the view that the standard of *"a sufficiently direct and certain causal nexus"* between an alleged wrongful action or omission and the alleged damage *"is flexible enough to address the challenges arising in respect of the phenomenon of climate change"*[174].

131. There is a strong basis to consider that Philippines law demands a similar flexible approach to causation in a case involving climate change-related harm, not least because Rule 20 of the RPEC provides as follows:

> "*When there is <u>a lack of full scientific certainty in establishing a causal link between human activity and environmental effect, the court shall apply the precautionary principle</u> in resolving the case before it.*
>
> *The constitutional right of the people to a balanced and healthful ecology <u>shall be given the benefit of the doubt</u>.*
>
> *… In applying the precautionary principle, the following factors, among others, may be considered: (1) <u>threats to human life or health</u>; (2) inequity to present or future generations; or (3) <u>prejudice to the environment</u> without legal consideration of the environmental rights of those affected*." [emphasis added]

---

[173] International Court of Justice, *Obligations of States in Respect of Climate Change (Advisory Opinion)*, 23 July 2025 at [435].

[174] Ibid at [436].

132. Rule 20 of the RPEC is applicable both prospectively in relation to scientific uncertainty about potential future damage, and retrospectively in relation to scientific uncertainty about the cause of past damage. In essence, the rule requires any doubt in establishing a causal link between Shell's conduct and Typhoon Odette to be resolved by giving the benefit of the doubt to the constitutional right of the people to a balanced and healthful ecology (see *International Service v. Greenpeace Southeast Asia*[175]; *PTK2 H2O Corporation v. HON. Court of Appeal*[176]; *Concerned Residents of Manila Bay v. MMDA*).[177] In *PTK2 H2O Corporation v. HON. Court of Appeal* the Court held that the precautionary principle is applied "*in cases of uncertainty and effectively shifts the burden of evidence of harm*" away from the Claimants[178]. As a rule raising a presumption in law and/or relating to burden of proof, Article 22 of Rome II requires the English High Court to apply this rule.

133. In this case, our clients will claim that Shell's material contribution to the loss and damage caused by Typhoon Odette is a "sufficient link" to constitute a proximate cause in Philippines law because:

a. ACC involves, amongst other things, a warming of the atmosphere and a warming of the ocean. Every fraction of a degree of warming of the atmosphere and warming of the ocean surface around the Philippines makes typhoons in the Philippines more likely and more severe.

b. As a matter of fact, ACC made Typhoon Odette more than twice as likely and significantly more severe as compared to the pre-industrial norm.

c. ACC is caused by cumulative anthropogenic emissions of GHGs. Through its control over the group-wide strategies and policies that substantially determined the Scope 1, 2 and 3 GHG emissions of the Shell Group, Shell contributed around 2.55% of cumulative industrial GHG emissions from 1850 - 2021 and around 2.3% of cumulative industrial GHG emissions from 1965 - 2021. Through its participation in public communications and political lobbying efforts to undermine the emerging scientific consensus on the causes and likely effects of ACC, Shell obstructed efforts to reduce cumulative industrial GHG emissions.

d. Through its conduct in (c) above, Shell materially contributed to both the risk, and severity, of Typhoon Odette, constituting a proximate cause of the loss and damage suffered by our clients as a result of Typhoon Odette.

e. Through its conduct in (c) above, together with its current failure to have in place a transition plan compatible with a safe climate, Shell materially contributes to the ongoing risk posed by ACC to the life, health, and property of inhabitants of the Philippines, constituting a proximate cause of the ongoing violation of our clients' right to a balanced and healthful ecology.

---

[175] G.R. No. 209271, 8 Dec 2015 <https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/61545>.

[176] G.R. No. 218416, 16 November 2021 <https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/68026>.

[177] G. R. Nos. 171947-98, 18 December 2008 <https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/35384>.

[178] G.R. No. 218416 16 November 2021, para. 56 <https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/68026>.

## I. LIMITATION

134. The applicable limitation period under Philippines law runs from the occurrence of damage (i.e. the date of Typhoon Odette) and is either 4 years (for actions based on negligence or tort)[179] or 5 years (where there is no stated limitation period for a given cause of action)[180].

135. As such, given that Typhoon Odette first made landfall on 16 December 2021, the applicable limitation period (dependent on the precise cause of action) will end on 15 December 2025/26.

## J. LOSS AND DAMAGE

136. As a result of the Defendants' conduct, our clients have suffered (and continue to suffer) significant loss and damage. This can be summarised in the following categories:

a. **Personal injury**. Some of our clients suffered personal injuries associated with the impact of Typhoon Odette. Examples of the injuries suffered are set out in Section B above.

b. **Past, ongoing and future psychological harm,**[181]. Several of our clients describe the ongoing psychological effects of Typhoon Odette. Many describe being scared all the time and especially when there is any wind or rain. Most, if not all, of our clients have suffered, are suffering and will continue to suffer the psychological effects of this destructive event.

c. **Bereavement and death**. Some of our clients had immediate family members whose lives were lost from the impact of Typhoon Odette.

d. **Loss of and/or significant damage to property**. At present, most of our clients have suffered significant property damage arising from Typhoon Odette's impact.

e. **Loss of cultural rights and/or constitutional rights**. As further set out in Section B above, Typhoon Odette has caused our clients to experience a broad loss of cultural rights and/or interference with their constitutional rights.

f. **Loss of earnings and / or damage to property (such as fishing boats and equipment)**. Many of our clients' livelihoods were lost as a result of the typhoon, either due to, for example, damage to property or as a result of the passing of the family member who was the sole earner for the family.

137. All of our clients have also suffered from the violation of their right to a balanced and healthful ecology.

138. In *Sanggacala v. NPC*, the Supreme Court explained that environmental harm may include "*immediate and future physical injury to people, emotional distress from fear of future injury, social and economic disruption, remediation costs, property damage, ecological damage, and*

[179] Article 1146 of the Civil Code of the Philippines.

[180] Article 1149 of the Civil Code of the Philippines.

[181] *Cathay Pacific Airways v. Spouses Vasquez* G.R. No. 150843, 14 March 2003, recognizes that psychological injury alone may be considered an injury sufficient to sustain a cause of action <https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/48547>.

*regulatory harms*."[182] Accordingly, our clients are entitled to compensation for the losses they have suffered under the various categories set out further above.

139. We are still investigating our clients' losses. However, we estimate that they are likely to be significant.

## K. REMEDY SOUGHT

140. Our clients are entitled to claim compensatory and non-compensatory damages and remedial measures such as contributions to adaptation (including protection and relocation) and emissions reductions.

141. In relation to their claims for loss and damage under the Civil Code, our clients seek damages to put them back into the same position they would have been in if the Defendants had not caused Typhoon Odette. In this regard, our clients will seek to hold each of the Defendants:

a. solidarily liable as a joint tortfeasor under Article 2194 of the Civil Code. In *PP v Velasco*[183] it was held that:

> "*Joint tortfeasors are those who command, instigate, promote, encourage, advise, countenance, cooperate in, aid or abet the commission of a tort, or who approve of it after it is done, if done for their benefit. They are also referred to as those who act together in committing wrong or whose acts, if independent of each other, unite in causing a single injury. Under Article 2194 of the Civil Code, joint tortfeasors are solidarily liable for the resulting damage*."

b. alternatively, liable in proportion to its contribution to ACC.

142. In relation to their claim under Articles 19 – 21 of the Civil Code, our clients will also seek moral damages, including exemplary damages[184].

143. In relation to their claims for a remedy under the WOK, our clients are entitled to seek declaratory relief, an order for remediation and rehabilitation of the damage caused by Typhoon Odette, and a permanent environmental protection order requiring the Defendants to stop the ongoing activity that is causing the violation of the right to a balanced and healthful ecology.

144. Our clients reserve the right to claim further relief, including but not limited to further non-monetary and declaratory relief.

## L. ALTERNATIVE DISPUTE RESOLUTION

145. As noted in this LBA, our clients continue to live not only with the consequences of Typhoon Odette, but also in the reasonable fear of similar climate events occurring – such events being more likely and (generally) more severe due to the actions of the Defendants. Whilst we have

---

[182] G.R. No. 209538 July 7, 2021, page 13, citing Albert C. Lin, 'T*he Unifying Role of Harm in Environmental Law*', Wisconsin Law Review 897, 928, available at <https://escholarship.org/uc/item/6w95v8dx>.

[183] *People v. Velasco*, G.R. No. 195668, June 25, 2014 <https://lawphil.net/judjuris/juri2014/jun2014/gr_195668_2014.html>.

[184] *General Bank & Trust Co. v. CA*, G.R. No. 152551 citing *Bert Osmena & Associates v. Court of Appeals*, 120 SCRA 395 and *Nadura v. Benguet Consolidated, Inc.* (5 SCRA 879.)

authority to issue proceedings on their behalf, our clients welcome prompt resolution of their claims and are open to considering all forms of alternative dispute resolution.

## M. TIMETABLE AND NEXT STEPS

146. We anticipate that we will issue proceedings by 15 December 2025 to protect our clients' position on limitation under Philippines law (see section I, above).

147. In terms of case management going forward, we propose that the parties agree an extension of time for service of the claim form and particulars of claim until 31 July 2026. This will allow the parties to comply with their obligations under the Pre-Action Protocol, including the Defendants' obligation to provide a letter of response within 3 months of the date of this letter (i.e. by 22 January 2026) in accordance with paragraph 6(b) of the Pre-Action Protocol.

148. Subject to the terms of a suitable consent order, please confirm whether the Defendants are willing in principle to agree to an extension of time for service of the claim form and particulars of claim (without prejudice to their position on jurisdiction and/or applicable law, if necessary). We confirm that our clients will not argue that agreeing to any such terms at this stage constitutes submission to the jurisdiction.

149. Please acknowledge safe receipt of this letter. In the meantime, please confirm that the Defendants will take proper and appropriate steps to ensure no relevant documents, including electronic documents, that are in the Defendants' control, are altered, lost, destroyed or disposed of pursuant to paragraph 7 of CPR Practice Direction 31B.

150. We look forward to hearing from you regarding our case management proposal at paragraphs 147 to 148 above as soon as possible, and by no later than 5 November 2025. Please provide your letter of response by 22 January 2026 in accordance with paragraph 6(b) of the Pre-Action Protocol.

Yours faithfully

Hausfeld & Co LLP

**Hausfeld & Co LLP**

# Exhibit C

Amended Claim Form under CPR 17.1(1) dated 16 December 2025

AMENDED

# Claim Form

| In the | HIGH COURT OF JUSTICE KINGS BENCH DIVISION |
|---|---|
| **Fee Account no.** | PBA0088382 |
| **Help with Fees - Ref no.** (if applicable) | H W F KB-2025-004538 |

09 December 2025

For court use only

| | |
|---|---|
| Claim no. | |
| Issue date | |

**You may be able to issue your claim online which may save time and money. Go to www.moneyclaims.service.gov.uk/make-claim to find out more.**

SEAL

HIGH COURT OF JUSTICE ★ ★ QUEEN'S BENCH DIVISION

16 Dec 2025

KB-2025-004538

Claimant(s) name(s) and address(es) including postcode

1. Ms. Annie Sucano Casquejo of Purok 1, Batasan Island, Tubigon, Bohol, Philippines, 6329 and

2. Those other persons identified in Schedule 1(a) and Schedule 1(b) appended to this Claim Form.

Defendant(s) name and address(es) including postcode

1. Shell plc of Shell Centre, London, SE1 7NA; and

2. The Shell Transport and Trading Company Limited of Shell Centre, London, SE1 7NA.

Brief details of claim

Please see Schedule 2 appended to this Claim Form.

Value

The Claimants expect to recover more than £100,000.

Defendant's name and address for service including postcode

As above

| | £ |
|---|---|
| Amount claimed | Unspecified |
| Court fee | 10,646 |
| Legal representative's costs | To be assessed |
| **Total amount** | Unspecified |



© Crown Copyright 2024

| Claim no. | |
|---|---|

You must indicate your preferred County Court Hearing Centre for hearings here (see notes for guidance)

High Court of Justice, King's Bench Division, Royal Courts of Justice

Do you believe you, or a witness who will give evidence on your behalf, are vulnerable in any way which the court needs to consider?

☐ Yes. Please explain in what way you or the witness are vulnerable and what steps, support or adjustments you wish the court and the judge to consider.

☑ No

Does, or will, your claim include any issues under the Human Rights Act 1998?

☐ Yes

☑ No

| Claim no. | |
|---|---|

Particulars of Claim

☐ attached

☑ to follow

## Statement of truth

**Note:** you are reminded that a copy of this claim form must be served on all other parties.

**I understand that proceedings for contempt of court may be brought against a person who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.**

☐ **I believe** that the facts stated in this claim form and any attached sheets are true.

☑ **The claimant** believes that the facts stated in this amended claim form and any attached sheets are true. **I am authorised** by the claimant to sign this statement.

**Signature**

☐ Claimant

☐ Litigation friend (where claimant is a child or protected party)

☑ Claimant's legal representative (as defined by CPR 2.3(1))

**Date**

| Day | Month | Year |
|---|---|---|
| ~~9~~ 16 | 12 | 2025 |

Full name

Gregory James Lascelles

Name of claimant's legal representative's firm

Hausfeld & Co LLP

If signing on behalf of firm or company give position or office held

Partner

Claimant's or claimant's legal representative's address to which documents should be sent.

Building and street

12 Gough Square

Second line of address

Town or city

London

County (optional)

Postcode

| E | C | 4 | A | 3 | D | W |
|---|---|---|---|---|---|---|

If applicable

Phone number

020 7665 5000

DX number

Your Ref.

GL/510249.0001

Email

glascelles@hausfeld.com
odette@hausfeld.com

Find out how HM Courts and Tribunals Service uses personal information you give them when you fill in a form:
https://www.gov.uk/government/organisations/hm-courts-and-tribunals-service/about/personal-information-charter

# Exhibit D

**Claim No. KB-2025-004538**

**IN THE HIGH COURT OF JUSTICE**

**KING'S BENCH DIVISION**

**BETWEEN:**

**ANNIE SUCANO CASQUEJO AND OTHERS**

**Claimants**

**v**

**SHELL PLC**

**First Defendant**

**THE SHELL TRANSPORT AND TRADING COMPANY LIMITED**

**Second Defendant**

---

# PARTICULARS OF CLAIM

---

## A SUMMARY OF CLAIM

1. On 12 December 2021, a tropical low pressure system developed into a topical cyclone near the Federated States of Micronesia ("**Typhoon Rai**"). As it moved in a westerly direction across the Philippine Sea, Typhoon Rai intensified rapidly into a Category 5 tropical cyclone, with maximum wind speeds of up to 280 km/h. In addition to extreme windspeeds, it brought extreme rainfall and a storm surge that inundated parts of the country. Typhoon Rai made landfall in the Philippines on 16 December 2021 and traversed the country in a westerly direction over the course of two days. It brought a storm surge that inundated parts of the country. The rainfall caused by Typhoon Rai in the Philippines exceeded 400mm in some regions, including maximum 24hr rainfall of more than 250mm.

2. Typhoon Rai caused widespread devastation, including over 400 deaths, more than 1,100 serious injuries, destruction of over 1.4 million homes, mass displacement, extensive infrastructure damage and interruption of essential services.

3. The Claimants are individuals (or a personal representative of a deceased individual) who suffered death, loss of family members, personal injury, destruction of homes, property and personal effects, displacement, loss of livelihoods and other loss and damage as a result of Typhoon Rai.

4. The Shell group of companies ("**the Shell Group**") is one of the world's largest fossil fuel producers. At all material times, it carried on the extraction, production, refining, transport, marketing and sale of fossil fuels, which generated substantial greenhouse gas ("**GHG**") emissions. The activities of the Shell Group have resulted in the emission of substantially more than 40 billion tonnes of carbon dioxide equivalent ("**$CO_2e$**") into the atmosphere and the generation of many billions of dollars in profits for the Defendants.

5. The First Defendant has been the sole parent of the Shell Group since 20 July 2005. Prior to 20 July 2005, the Second Defendant was a dual parent of the Shell Group together with Royal Dutch Petroleum Company N.V. By reason of the direction and control exercised by each Defendant over the Shell Group during its respective period of parentage, the GHG emissions arising from the Shell Group's activities during those periods are attributable to the relevant Defendant.

6. The Defendants knew that the GHG emissions arising from the Shell Group's activities would contribute to anthropogenic climate change ("**ACC**") and create a foreseeable risk of catastrophic climate-related harm. Notwithstanding that knowledge, they continued, expanded, promoted and encouraged the Shell Group's fossil fuel extraction, production and sale activities and resulting GHG emissions; failed to take reasonable steps to prevent, reduce or mitigate the resulting GHG emissions and their harmful ACC consequences; and failed adequately to inform, warn or protect persons foreseeably exposed to those harmful consequences, including the Claimants. The Second Defendant further participated in a prolonged campaign of misinformation, disinformation and suppression of information concerning the risks and consequences of ACC, thereby delaying and impeding effective responses to those risks. After assuming control of the Shell Group in 2005, the First Defendant failed adequately to discontinue or correct the Second Defendant's conduct.

7. The GHG emissions attributable to the Defendants form a substantial part of the anthropogenic GHG emissions that cause ACC. ACC caused Typhoon Rai to occur as a Category 5 tropical cyclone with the extreme and exceptional windspeed, rainfall and storm surge characteristics described above. Absent ACC, Typhoon Rai, as defined, would not have occurred. ACC was therefore a proximate cause of Typhoon Rai and the Claimants' resulting loss and damage.

8. By reason of the foregoing matters, the Claimants contend that the Defendants are liable in public nuisance under Articles 694, 695, 696 and 703 of the Philippines Civil Code ("**the Civil Code**"); in private nuisance under Articles 694, 696 and 703 of the Civil Code; in quasi-delict under Article 2176 of the Civil Code; and for abuse of rights under Articles 19 and 20 and/or Articles 19 and 21 of the Civil Code. The Defendants are liable as direct tortfeasors and, further or alternatively, as joint tortfeasors by reason of their approval, direction, promotion, encouragement, advice, cooperation in and/or benefit from the Shell Group's activities and the resulting GHG emissions.

## B <u>THE PARTIES</u>

### B1 The Claimants

9. The Claimants are individuals who resided (or the personal representative of the estate of a deceased individual who resided) in one of the following areas of the Philippines, which were among the worst affected by Typhoon Rai: (i) Ubay, Bohol; (ii) Batasan, Bilangbilangan, Inanuran and Ubay Islands, Tubigon, Bohol; (iii) Toledo City, Cebu; (iv) Mandaue City, Cebu; (v) Pinamungajan, Cebu; and (vi) Cebu City, Cebu.

10. The Claimants owned (and continue to own) land and property through customary ownership, often having inherited or been gifted land by family members or other members of the community without formal documentation being provided. In addition to claiming remedies for damage to such land and property, the Claimants also claim remedies in these proceedings for damage to their local land and environment that they do not have individual proprietary rights in but which they enjoyed and benefited from by virtue of their life in their community.

11. The Claimants are primarily fisherfolk and/or farmers who fish and farm for their own subsistence, and that of their family, and sell what additional produce they may be able

to. While some of the Claimants also have additional jobs, farming and/or fishing constitute a significant part of each of the Claimants' livelihoods and community life.

### B2 The Defendants

12. The First Defendant is one of the largest oil and gas companies in the world. Since 20 July 2005, it has been the sole parent company of the worldwide Shell Group. Until January 2022, the First Defendant was named Royal Dutch Shell plc. Since January 2022 it has been named Shell Plc.

13. The Second Defendant was joint parent company of the Shell Group from 1907 until 20 July 2005.

14. The First and Second Defendants both have their registered address at Shell Centre, London, SE1 7NA.

15. At all material times, the Shell Group has comprised numerous companies and related undertakings, operating across multiple countries globally. Between 1990 and 2020, the Shell Group made approximately US$524 billion in profits. In 2022 alone, the First Defendant reported annual profits of £32.2 billion.

## C <u>ANTHROPOGENIC CLIMATE CHANGE AND TYPHOON RAI</u>

### C1 The Greenhouse Effect and Anthropogenic Climate Change

16. Various gases in the atmosphere have greenhouse properties. These include naturally occurring GHGs such as carbon dioxide ("**$CO_2$**"), methane and nitrous oxide, as well as industrial fluorinated GHGs such as hydrofluorocarbons, perfluorocarbons, sulphur hexafluoride and nitrogen trifluoride. GHGs exert a positive radiative forcing effect: they reduce the amount of outgoing longwave infrared radiation escaping from the Earth into space, thereby creating an energy imbalance that warms the Earth. This warming mechanism is commonly referred to as the "greenhouse effect".

17. GHGs emitted as a result of human activities are known as anthropogenic GHGs ("**AGHGs**"). While the sources of AGHGs include land use, land use change and forestry, agriculture, industry and waste, more than 75% of all global AGHG emissions are associated with the extraction, production and combustion of fossil fuels, including oil, natural gas and coal.

18. The extraction and production of fossil fuels cause AGHG emissions through four primary mechanisms:

(1) Venting: the intentional release of un-combusted methane and $CO_2$ into the atmosphere for safety or operational reasons.

(2) Flaring: the intentional combustion of excess or unwanted hydrocarbon gases, resulting in release of $CO_2$, and small quantities of methane, into the atmosphere.

(3) Fugitive emissions: the unintentional release of methane and other hydrocarbons from fossil fuel infrastructure into the atmosphere, including through uncapped wells, and leaks at all stages of extraction, processing, storage and transportation.

(4) Own fuel use: the combustion of fossil fuels by the producer to provide the energy required for extraction, processing, refining, and other operations, resulting in the release of $CO_2$, and small quantities of methane and nitrous oxide into the atmosphere.

19. The end-use combustion of fossil fuel products causes AGHG emissions through the release of $CO_2$, and small quantities of methane and nitrous oxide, into the atmosphere.

20. $CO_2$ is a long-lived GHG: while some emitted $CO_2$ is taken up by ocean and land carbon sinks, a significant proportion remains in the atmosphere for centuries to millennia. $CO_2$ thus accumulates in the atmosphere and its positive radiative forcing effect strengthens with accumulation.

21. Methane is a short-lived GHG: within a period of 12 to 20 years, it oxidises in the atmosphere to $CO_2$ and water vapour. However, during its lifetime, methane is a potent GHG which:

(1) measured by global warming potential over a 20-year time horizon, has a warming effect approximately 80 times greater than the warming effect of an equivalent volume of $CO_2$; and

(2) measured by global warming potential over a 100-year time horizon, has a warming effect approximately 28 times greater than the warming effect of an equivalent volume of $CO_2$. In these Particulars of Claim, the global warming potential of methane is expressed as $CO_2e$ calculated by reference to the 100-year time horizon.

22. The cumulative contribution of AGHGs to the atmosphere has intensified the greenhouse effect, causing average global surface temperatures to rise around 1.1°C above 1850-1900 levels by 2011-2020. This warming of the Earth's surface and atmosphere is the primary driver of ACC.

23. ACC has, among other things, the following consequences:

(1) A rise in global mean sea levels, caused by thermal expansion of the oceans and the melting of glaciers and ice sheets.

(2) An increase in the frequency, intensity and likelihood of extreme weather events, including heatwaves, droughts, wildfires, tropical cyclones, heavy precipitation events and compound flooding.

(3) Ocean warming, deoxygenation and acidification, with adverse effects on marine ecosystems, fisheries and coral reefs.

(4) The degradation, disruption and loss of terrestrial, freshwater, coastal and marine ecosystems, including loss of biodiversity and species range shifts.

(5) Alterations to weather patterns, precipitation regimes and seasonal cycles, including changes to monsoons, snowpack, river flows and groundwater recharge.

(6) Increased risks to human life, health, livelihoods, food security, water security, housing, infrastructure and economic activity.

(7) Increased risks of displacement, migration, conflict, poverty and inequality, particularly for vulnerable states, communities and groups.

(8) The occurrence of irreversible or long-lasting harms, including loss of glaciers, ice sheets, permafrost and ecosystems, and increased risk of crossing climatic tipping points beyond which a return to the climatic *status quo ante* is not possible (a climatic tipping point is a critical threshold beyond which a system reorganises, often abruptly and/or irreversibly).

24. ACC also increases the chance of compound extreme events, meaning combinations of multiple climate drivers and/or hazards that contribute to societal or environmental risk. These include concurrent heatwaves and droughts; fire weather in some regions of

all inhabited continents; and compound flooding, including combinations of storm surge, extreme rainfall and/or river flow in some locations.

25. ACC affects tropical cyclones by, among other things:

(1) Increasing the likelihood that tropical cyclones will reach high intensity, including Category 3-5 intensity, and hence increasing the proportion of tropical cyclones that reach Category 3-5 intensity.

(2) Increasing the speed at which some tropical cyclones intensify, including the likelihood of rapid intensification before landfall.

(3) Increasing the volume of rainfall associated with tropical cyclones, because a warmer atmosphere holds more water vapour.

(4) Increasing the risk of storm surge and coastal flooding associated with tropical cyclones, including by reason of higher mean sea levels and lower pressure systems.

(5) Affecting tropical cyclone tracks (i.e. the path followed by a cyclone), forward speed (i.e. the speed at which the cyclone follows that path) and areas of occurrence (i.e. the areas of land and sea affected by the cyclone), thereby altering the location and duration of exposure to tropical cyclone hazards.

26. The impacts of ACC increase as average global surface temperature increases: every increment of global warming intensifies multiple and concurrent climatic hazards. Those hazards disproportionately affect those persons whose geography, socio-economic conditions, infrastructure, livelihoods, or adaptive capacity make them more exposed to such hazards.

27. Since the mid-1970s, there has been a broad scientific consensus that the only way to avoid dangerous anthropogenic interference with the climate system, and consequent losses and damage to those most vulnerable to the adverse effects of ACC, is to make dramatic reductions to anthropogenic emissions of GHGs. Notwithstanding this science, global AGHG emissions have continued to rise, reaching record levels in recent years. That continued rise is attributable primarily to a continued growth in emissions from the extraction, production and combustion of fossil fuels.

**C2 Vulnerability of the Philippines to Anthropogenic Climate Change**

28. The Philippines is comprised of over 7,600 islands, many of which are low-lying. It is a developing country with substantial socioeconomic inequality.

29. The Philippines is particularly vulnerable to the adverse effects of climate change for the following reasons, among others:

(1) The Philippines lies in a region of the Western North Pacific that experiences regular tropical cyclones, which are known in the region as "typhoons".

(2) ACC increases the frequency of typhoon landfall in the Philippines and the severity of those typhoons. Higher sea surface and subsurface temperatures resulting from ACC remove the natural buffer on typhoon development and strength that cooler water in and below the ocean's surface previously provided.

(3) ACC impacts the path and seasonal occurrence of typhoons in the Philippines. Historically, the peak typhoon season for the Philippines ran from July to October, with the fewest experienced between February and March. In recent years, the southern Philippines has seen a significant increase in the rate of typhoon landfalls between November and February.

(4) ACC causes sea levels to rise, with the effect (among others) of exacerbating the impacts of storm surges associated with typhoons.

(5) On account of its development status and geographic characteristics, the Philippines has very limited material capacity to deliver climate-change adaptation measures, including (for example) the provision of coastal defences to protect those living along the many thousands of kilometres of low-lying coastline from storm surges, and structural improvements to homes and buildings sufficient to withstand increasingly frequent and severe typhoons.

30. As a result, the Philippines is one of the most climate-change vulnerable countries in the world. In support of this averment the Claimants will rely on the following matters, among others:

(1) Each year between 2011 and 2018, the Philippines was ranked as the country with the third highest risk of natural disaster in the world by the annual World Risk Report published by the United Nations.

(2) In 2017, the Philippines was ranked as the fifth most climate vulnerable country in the world by the Global Climate Risk Index (an index of climate risk produced by the NGO Germanwatch).

(3) In 2019, a report by the Institute for Economics and Peace found that the Philippines was the country with the highest risk of climate hazards.

(4) In 2022, a report by the Commission on Human Rights of the Philippines stated that long-term data over a 20-year period places the Philippines as the fifth most climate change-affected country in the Global Climate Risk Index.

**C3 Typhoon Rai**

31. Typhoon Rai was a tropical cyclone that made landfall in the Philippines on 16 December 2021. It was the 15th storm to hit the country that year, and by far the strongest to make landfall in 2021. It progressed from a Category 1 to a Category 5 storm in just 24 hours. The rapid intensification of Typhoon Rai was characteristic of ACC-influenced cyclones. Typhoon Rai had wind speeds as high as 280 km/h or 77 metres per second (m/s). These wind speeds significantly exceeded the thresholds for the maximum force storms under the two internationally recognised scales for measuring storms:

(1) The Beaufort scale rates winds between Force 0 or 1 (the lowest force) and Force 12 (the highest force). The threshold for Force 12 is 118 km/h. The wind speeds measured during Typhoon Rai were two and a half times greater than the threshold for a Force 12 storm.

(2) The Saffir–Simpson scale grades storms (once they reach a certain threshold) into five categories, with 'Category 5' storms being the strongest with maximum sustained wind-speeds of over 70 m/s. The wind speeds measured during Typhoon Rai were more than 10% above the threshold for a Category 5 storm.

32. Typhoon Rai brought extreme rainfall in the Philippines. In some regions, total cumulative rainfall between 14 December and 18 December 2021 exceeded 400mm, with one-day maximum rainfall of more than 250mm.

33. The extreme low-pressure system associated with Typhoon Rai caused a storm surge of significant magnitude. For example, in Cebu and Bohol, storm surges reached 2.54 metres and 4.06 metres respectively.

34. ACC more than doubled the likelihood of a compound weather event of at least the same windspeed and at least the same rainfall as Typhoon Rai. That reflects ACC's separate influence on each of the two meteorological hazards (rainfall and wind) that combined to cause Typhoon Rai's impacts.

35. If and to the extent that, in the absence of ACC, a typhoon might still have made landfall in the Philippines on or around 16 December 2021, ACC significantly increased both the rainfall and windspeed intensity of Typhoon Rai such that it became a Category 5 typhoon, the most intense category of all, with associated extreme rainfall.

36. Typhoon Rai killed over 400 people, seriously injured at least 1,100 people, damaged or destroyed over 1.4 million homes, displaced residents from their homes, damaged infrastructure, interrupted essential services, and caused other losses affecting a considerable number of persons throughout the Philippines. In respect of the Claimants, Typhoon Rai caused, *inter alia*: death, personal injury, damage to property and personal effects, loss of livelihood, income, earnings and earning capacity. Further particulars are provided in Section J below.

## D THE SHELL GROUP'S ACTIVITIES AND GREENHOUSE GAS EMISSIONS

37. At all material times since 1907, save as otherwise set out at sub-paragraphs (3) and (6) below, the core business activities of the Shell Group, which the Second Defendant controlled until 20 July 2005, and which the First Defendant controlled from that date, comprised:

(1) the exploration for, and extraction and production of, crude oil and natural gas;

(2) the refining and processing of crude oil into fuel products;

(3) since 1964, the processing, treatment and liquification of natural gas;

(4) the transportation, storage and distribution of crude oil and natural gas and their products;

(5) the marketing and sale of oil and gas products (including both oil and gas produced by the Shell Group and oil and gas products produced by other persons outside the Shell Group); and

(6) between around 1974 and 2000, the mining, extraction, processing, transportation, distribution, marketing and sale of coal and coal products

(together, "**the Activities**").

38. The Activities caused very substantial emissions of $CO_2$, methane, and nitrous oxides to be released into the Earth's atmosphere (collectively "**Shell Emissions**"). The Shell Emissions included:

(1) emissions associated with venting and flaring, fugitive emissions, emissions from own-fuel use at installations owned or controlled by the Shell Group, and emissions from the generation of purchased electricity consumed in the production of oil and gas products ("**Production Emissions**");

(2) emissions caused by the combustion of the fossil fuel products produced by the Shell Group, which was the inevitable and intended purpose of producing those fossil fuel products ("**Produced Combustion Emissions**"); and

(3) emissions caused by the combustion of the fossil fuel products marketed and sold by (but not produced by) the Shell Group, which was the inevitable and intended purpose of marketing and selling those fossil fuel products ("**Sold Combustion Emissions**").

39. The total Production Emissions and Produced Combustion Emissions associated with the Activities of the Shell Group between 1907 and 2021 constituted:

(1) more than 2.1% of global AGHGs caused by the production and consumption of fossil fuels and cement; and

(2) approximately 1.5% of total cumulative global AGHGs.

40. Between 1965 and 2021, the total Production Emissions and Produced Combustion Emissions constituted:

(1) more than 2.2% of global AGHGs caused by the production and consumption of fossil fuels and cement in that period; and

(2) approximately 1.5% of total global AGHGs for that period.

41. The Claimants do not currently have access to reliable historic information on the Sold Combustion Emissions. In 2021, however, the Shell Group's Sold Combustion

Emissions, measured as $CO_2e$, exceeded Produced Combustion Emissions by a factor of 1.65. Prior to disclosure, it can reasonably be inferred that the Shell Emissions (i.e. the total emissions attributable to the Activities of the Shell Group, including all Production Emissions, Produced Combustion Emissions, and Sold Combustion Emissions) significantly exceed 2% of total global cumulative AGHGs and significantly exceeded 2% of total global AGHGs for the period 1965-2021.

## E THE DEFENDANTS' RESPONSIBILITY FOR THE SHELL GROUP'S ACTIVITIES AND GREENHOUSE GAS EMISSIONS

### E1 Corporate History

(a) The Dual-Parent Structure

42. In 1907, Royal Dutch Petroleum Company N.V. ("**Royal Dutch**") and the Second Defendant combined their interests in the oil industry and formed the Shell Group.

43. From 1907 until 2005 ("**the Dual-Parent Period**"), the Shell Group operated under a dual-parent structure. Royal Dutch held a 60% interest, and the Second Defendant held a 40% interest, in Shell Petroleum NV ("**SPNV**"). SPNV in turn held controlling interests in the Shell Group's operating subsidiaries.

44. At all material times during the Dual-Parent Period, Royal Dutch and the Second Defendant exercised decisive control and influence over SPNV and the entities within the Shell Group and directed and controlled the activities of the Shell Group as part of a vertically integrated single economic enterprise.

(b) The Unification Transaction

45. In 2005, the Shell Group underwent a structural reorganisation pursuant to which the dual-parent structure was replaced by a single parent company, Royal Dutch Shell plc ("**the Unification Transaction**"), which was renamed Shell plc in January 2022. Following the Unification Transaction, the enterprise formerly governed by the Second Defendant and Royal Dutch through the dual-parent structure came to be governed under the unified governance, strategic direction and oversight of a single parent company, namely the First Defendant.

46. The single economic enterprise that comprised the Shell Group otherwise remained unchanged. Following the Unification Transaction until the present day ("**the Single-**

**Parent Period**"), the First Defendant directed, controlled and benefited from the activities that had previously been directed and controlled through the dual-parent structure.

## E2 Governance and Management of the Shell Group

(a) The Second Defendant's Governance Structure

47. During the Dual-Parent Period, the Second Defendant exercised direction and control over the Activities through a governance structure comprising a Board of Directors ("**the STTC Board**") and the Committee of Managing Directors ("**CMD**").

*(i) STTC Board*

48. At all material times, the Second Defendant was governed by the STTC Board.

49. The STTC Board's responsibilities included:

(1) the overall management of the Second Defendant;

(2) approval of the Annual Report and Accounts and dividends;

(3) approval of material contracts;

(4) approval of appointments to the Board and changes to the dual-parent relationship; and

(5) the direction and control of the Activities of the Shell Group.

*(ii) Committee of Managing Directors*

50. The CMD was established by the boards of the Second Defendant, Royal Dutch and SPNV to assist those boards in controlling and operating the Shell Group effectively. Each member of the CMD was a member of the board of the Second Defendant or Royal Dutch.

51. The CMD was at the centre of the decision-making process in the Shell Group and controlled and directed the conduct of the subsidiaries of the Shell Group. In particular, the CMD:

(1) was responsible for coordinating the operational activity and the governance of all Shell Group companies;

(2) advised and directed SPNV on its investments and on the exercise of its shareholder rights in the companies it controlled; and

(3) comprised individuals who were simultaneously members of the Boards of one of the two ultimate parent companies, including the Second Defendant, and members of the board of SPNV, thereby constituting a direct and structural link between the two parent companies and the Shell Group's operating subsidiaries.

52. Through the CMD, the Second Defendant, jointly with Royal Dutch, exercised decisive control and influence over the conduct of SPNV and every Shell Group operating subsidiary. The situation within the Shell Group during the Dual-Parent Period was therefore analogous to that in which a single parent company controls fully its subsidiary.

*(iii) Joint Supervisory Committees*

53. In addition to the CMD, the Second Defendant and Royal Dutch established two joint supervisory committees through which the Second Defendant participated in the oversight of the Shell Group:

(1) The Group Audit Committee ("**GAC**"), which consisted of three members of the supervisory board of Royal Dutch and three members of the board of the Second Defendant, was responsible for examining the principal financial developments in the Shell Group, its internal control procedures and its external audits.

(2) The Remuneration and Succession Review Committee, which likewise consisted of three members of the supervisory board of Royal Dutch and three members of the board of the Second Defendant, was responsible for making recommendations on remuneration and appointments with respect to Shell Group Managing Directors.

*(iv) High level of control and direction exercised by the Second Defendant over the Shell Group*

54. Throughout the Dual-Parent Period, the Second Defendant exercised a high degree of direction and control over the operations and activities of all Shell Group subsidiaries. In support of this averment (and pending disclosure of internal documents within the control of the Second Defendant which are not currently available to the Claimants) the Claimants will rely *inter alia* on the facts and matters pleaded at paragraphs 47 to 53 above and the following:

(1) A Form 20-F Annual Report dated 13 March 2006 published by the First Defendant pursuant to Section 13 or 15(d) of the United States Securities Exchange Act of 1934 stated, in the course of describing the corporate structure applicable during the Dual-Parent Period: "*All operating activities have been conducted through the subsidiaries of Royal Dutch and Shell Transport which have operated as a single economic enterprise*."

(2) An expert report by Professor Jordan Siegel, which was submitted in 2008 in legal proceedings in the United States against the Second Defendant, Royal Dutch and the Shell Group's Nigerian subsidiary, The Shell Petroleum Development Company of Nigeria Limited ("**SPDC**"), and contained a detailed analysis of the relationship between the Second Defendant, Royal Dutch and SPDC. It is reasonably to be inferred from Professor Siegel's report that throughout the Dual-Parent Period: (i) the Second Defendant exercised an equivalent very high level direction and control over all other operating subsidiaries within the Shell Group to that described by Professor Siegel in relation to SPDC; and (ii) all Shell Group operating subsidiaries acted in the interests of the Second Defendant rather than in their own interests, and were agents of the Second Defendant and the CMD. In this regard, the Claimants rely (*inter alia*) on the following passages of Professor Siegel's report, which was based on his review of thousands of pages of internal Shell Group documents:

(a) "*[I]n contrast to many oil companies around the world*", the Shell Group is "*highly vertically integrated*". In particular, "*Royal Dutch/Shell is clearly in control of SPDC*" because it is "*shown through internal documents to hold and exercise decisive influence on the strategic and organizational choices that the subsidiary makes*".

(b) "*In terms of the Royal Dutch/Shell Group's governance, the group's service and operating companies are overseen by a so-called Committee of Managing Directors (CMD), a committee which controls resource allocation and guides overall strategy and significant business policies and public affairs policies for the entities below*".

(c) "*Until the 2005 combination of the two parent companies into one, the central offices at the top of the group served the CMD (and the two*

*parent companies that they ultimately represented), and the central offices at the top of the group coordinated the assignment and movement of management and personnel within the group of companies...*"

(d) "*It is clear from internal documents that the Committee CMD* [sic.] *decides on what level of resource the subsidiary is to receive, what should be the subsidiary's business plan, and what should be the subsidiary's response to significant proposals from business partners*".

(e) "*The Royal Dutch/Shell Group of Companies tightly controls its Nigerian subsidiary, SPDC. This control comes in the form of monitoring and approving business plans, allocating important investment resources, choosing the management, and overseeing how the subsidiary responds to major public affairs issues.*"

(f) SPDC "*clearly acts in the interests of the parent company and does not act on its own*". This "*differentiates Royal Dutch/Shell from numerous multinationals around the world where the local manager effectively runs an autonomous business*".

(g) Through a combination of "*its organizational structure, resource allocation process, and other managerial oversight, the Royal Dutch/Shell Group of Companies exercises a very high degree of control over the important subsidiary SPDC*" and applies "*an unusually stringent regime of control*".

(h) "*SPDC is unambiguously an agent of the principals at the Committee of Managing directors and parent companies that sit at the top of the Royal Dutch/Shell Group of Companies*".

(3) The decision of the European Commission in Re Dutch Bitumen Cartel [2007] 5 CMLR 9, which found (*inter alia*) that:

(a) "*The centre of the decision making process in the Shell group is the Committee of Managing Directors.*"

(b) "*This Committee of Managing Directors was at the centre of the decision making process in the Shell Group and ultimately steered the conduct of*

*the subsidiaries of the group. The Committee of Managing Directors advised Shell Petroleum NV on its investments and on the exercise of shareholder rights for the companies the latter controls. Among those companies was Shell Nederland BV, which in turn controlled Shell Nederland Verkoopmaatschappij BV. The fact that Shell Petroleum NV did not generate any turnover itself shows precisely that it was not an autonomous economic actor in its own right, but rather performed supervisory functions within the Shell group which makes it an essential link within the chain of command stretching from the two top parent companies to the operational sales company Shell Nederland Verkoopmaatschappij BV.*"

(c) By virtue of that high level of control, the Second Defendant and SPNV were jointly and severally liable with one of the Shell Group's subsidiaries for an infringement of EU competition law committed by that subsidiary.

(4) The judgment of the European Court of Justice in *Shell Petroleum NV v European Commission* [2012] 5 CMLR 22, which found (*inter alia*) that:

(a) The CMD "*played a decisive role within the group*" and "*was responsible for coordinating the operational activity and the governance of all the group companies*".

(b) The governance structure of the Shell Group was "*analogous to that in which a single parent company controls fully its subsidiary*".

(b) The First Defendant's Governance Structure

55. During the Single-Parent Period, the First Defendant exercised direction and control over the Activities through a governance structure comprising a Board of Directors ("**the Board**") and the First Defendant's Executive Committee ("**the Executive Committee**").

*(i) The Board*

56. At all material times, the First Defendant was governed by the Board.

57. The Board's responsibilities included:

(1) the approval of overall strategy and oversight of management across the Shell Group;

(2) oversight of risk management and internal control across the Shell Group;

(3) approval of significant contracts entered by companies within the Shell Group;

(4) changes to the corporate and capital structure, and other corporate governance matters; and

(5) the direction and control of the Activities of the Shell Group.

58. The Board was assisted by four principal committees: the Audit Committee; the Nomination and Succession Committee; the Remuneration Committee; and, until December 2019, the Corporate and Social Responsibility Committee ("**CSRC**"), which was thereafter replaced by the Safety, Environmental and Sustainability Committee ("**SESCo**").

*(ii) The First Defendant's Chief Executive Officer and Executive Committee*

59. At all material times, the First Defendant's Chief Executive Officer ("**CEO**") had overall responsibility for the implementation, by the Executive Committee, of the strategy approved by the Board, and the operational management of the company and the business enterprise connected with it. The CEO therefore had overall responsibility for the operational management of the Shell Group and the implementation throughout the Shell Group of the strategy determined by the Board.

60. The Executive Committee was the First Defendant's senior management body. It was chaired by the CEO and was the principal body through which the CEO discharged responsibility for the overall control and management of the Shell Group. The composition of the Executive Committee (insofar as this can be established by the Claimants on the basis of documents which are in the public domain) is set out in Schedule 1 to these Particulars of Claim.

61. The CMD was the immediate predecessor to the Executive Committee. The role of the Executive Committee was fundamentally the same as that of the predecessor CMD.

**E3 Risk Management and Control**

62. At all material times during the Single-Parent Period, the First Defendant exercised direction and control over the management of material risks affecting the Shell Group through mandatory Group-wide governance and risk management systems and comprehensive Group-wide assurance arrangements.

63. Pending disclosure, it is reasonably to be inferred that the governance, risk management and control frameworks pleaded below (or their predecessors or equivalents) applied across the Shell Group during the Dual-Parent Period, and that the Second Defendant, as one of the two ultimate parent companies then at the apex of the Shell Group, directed and controlled the management of material risks affecting the Shell Group through those or equivalent frameworks during that period. In support of that averment, the Claimants will rely *inter alia* on:

(1) The facts and matters pleaded at paragraphs 47 to 54 above.

(2) The judgment of the Supreme Court in *Okpabi v Royal Dutch Shell Plc* [2021] UKSC 3, which records at paragraph 67 that Professor Jordan Siegel had provided a witness statement for those proceedings in which he summarised materials that post-dated the expert report referred to in paragraph 54(2) above, and in which he stated that "*there has been no material change in the senior management of the Shell Group's ability to tightly control*" its Nigerian subsidiary and that the role of the Executive Committee during the Single-Parent Period is "*fundamentally the same*" as the role of the CMD during the Dual-Parent Period.

(a) The Shell Control Framework

64. From no later than 2006, the First Defendant promulgated and maintained a single overall control framework for itself and its subsidiaries (the "**Control Framework**"). The purpose of the Control Framework was to establish and enshrine a clear governance structure which would enable the First Defendant to manage and control the activities of the Shell Group and thereby manage and control the risk of the Shell Group failing to achieve the business objectives set by the First Defendant.

65. Through its controlling interest in each relevant subsidiary, the First Defendant required those subsidiaries to comply with and implement the Control Framework. The Control

Framework established multiple systems and reporting lines which were designed to enable the First Defendant to control, supervise and enforce Shell Group subsidiaries' compliance with mandatory standards, requirements and practices promulgated by the First Defendant.

66. The Control Framework encompassed "*foundation elements*", "*management processes*" and a "*structural*" component. In particular:

(1) The "*foundation elements*" were the principles and rules that underpinned and established boundaries for the Activities.

(2) The "*management processes*" defined the First Defendant's critical processes, and included strategy, planning and appraisal processes designed to improve performance, and processes for managing risks throughout the Shell Group through the application of effective controls and assurance.

(3) The "*structural*" component defined the organisational structures and key governance principles that were applied to facilitate the achievement by the Shell Group of the First Defendant's overall business objectives.

(4) The "*foundation elements*" of the Control Framework comprised, amongst other things:

(a) The "*Statement on Risk Management*", which was a key enabler of many of the management processes within the Control Framework.

(b) "*Group Standards*", which were adopted for matters presenting significant Group-level risks or which were subject to external stakeholder expectations or external disclosure obligations. The Group Standards established mandatory rules governing compliance with legal and regulatory requirements and operation in accordance with the Shell Group Business Principles (addressed at paragraphs 68 to 70 below). The Group Standards applied to the Activities and were mandatory for all Shell Group companies.

(c) "*Operating Standards*", which established the mandatory rules required in addition to the Group Standards to manage significant risks arising in specific business activities. They were approved by the relevant

"*Business Head*" and were mandatory for all Shell Group personnel engaged in the relevant business activity.

(d) "*Manuals*", which provided detailed mandatory instructions for implementing Group Standards, Operating Standards and other foundation elements.

(e) "*Technical Practices*", which established mandatory requirements for the design, engineering, construction and operation of assets and wells. They were approved by the relevant Technical Function Head or Global Discipline Head. The requirements relating to "*Process Safety*" were mandatory for all Shell Group projects, well activities and asset operations.

67. Under the Control Framework:

(1) The First Defendant organised the Shell Group's activities principally along "*Business*" and "*Function*" lines and maintained an integrated and consistent process for delegating authority from the Board to organisations, individuals and committees within the Shell Group.

(2) Organisational approval (i.e. approval at the level of Group-wide "*Businesses*" or "*Functions*"), as a general rule, preceded formal corporate approval by the relevant entity carrying out a particular action. Whilst individual legal entities took formal binding decisions through corporate authorities, it was the task of the Group-wide "*Businesses*" and "*Functions*" to provide prior advice and approval in relation to those decisions and actions.

(b) <u>Shell General Business Principles</u>

68. The Shell General Business Principles ("**SGBP**") were first promulgated by the Second Defendant and Royal Dutch in or around 1976 (as varied by them from time to time) and have been maintained by the First Defendant since 2005. The SGBP set out the Shell Group's responsibilities to shareholders, customers, employees, business partners and society and prescribed standards for the way Shell Group conducted its business. At all material times, all Shell Group companies and Shell Group-operated ventures have been required to comply with the SGBP.

69. In relation to health, safety, security and the environment ("**HSSE**"), the SGBP provided that Shell Group companies were required to have "*a systematic approach to health, safety, security and environmental management in order to achieve continuous performance improvement*" and that, to that end, Shell Group companies were to "*manage these matters as critical business activities, set standards and targets for improvement, and measure, appraise and report performance externally*". The SGBP further provided that Shell Group companies would "*continually look for ways to reduce the environmental impact of our operations, products and services*".

70. In relation to the impact of the Shell Group's operations and actions on local communities, the SGBP provided that all Shell Group companies were to "*manage the social impacts of our business activities carefully and work with others to enhance the benefits to local communities, and to mitigate any negative impacts from our activities.*"

(c) The HSSE & SP Policy, Control Framework and Assurance

71. The First Defendant promulgated and published the Shell Commitment and Policy on HSSE and Social Performance ("**the HSSE & SP Policy**"). Pursuant to the HSSE & SP Policy, the First Defendant publicly committed to, amongst other things:

(1) pursue "*the goal of no harm to people*";

(2) respect "*nature by protecting the environment, reducing waste, making a positive contribution to biodiversity, and reducing Greenhouse Gases*";

(3) operate "*assets safely, efficiently and responsibly*";

(4) manage HSSE & SP matters as any other critical business activity; and

(5) publicly report on its HSSE & SP performance.

72. The HSSE & SP Policy further provided that, in respect of HSSE & SP matters, every Shell Group company was required to:

(1) have "*a systematic approach designed to ensure compliance with the law and achieve continuous performance improvement*";

(2) set targets for improvement, and measure, appraise and report performance;

(3) require contractors to manage HSSE & SP in line with the policy;

(4) require joint ventures under its operational control to apply the policy, and use its influence to promote it in its other ventures;

(5) engage effectively with neighbours and impacted communities; and

(6) include HSSE & SP performance in the appraisal of staff and reward accordingly.

73. The First Defendant also promulgated a HSSE and Social Performance Control Framework ("**the HSSE & SP Control Framework**") which translated the commitments and obligations of the HSSE & SP Policy into prescriptive mandatory standards, requirements and accountabilities applicable to every Shell entity and Shell-operated venture at each level of the Shell Group. Those standards set out the procedures and processes that all Shell Group employees and contractor staff were required to follow. The procedures and processes covered, amongst other things, health, environment, personal safety, process safety, security, social performance, projects and product stewardship.

74. The mandatory AGHG and energy management standards pleaded below were set in and formed part of the Shell Group's environmental performance standards under the HSSE & SP Control Framework.

75. Compliance with the HSSE & SP Control Framework was assured by the First Defendant's Process Safety and HSSE & SP Assurance team, which provided assurance to the Board as to the effectiveness of the HSSE & SP Control Framework through a Board-approved annual audit programme covering the full Shell Group portfolio.

(d) The Code of Conduct

76. The First Defendant promulgated and published Shell's Code of Conduct ("**the Code of Conduct**") which established requirements and guidance to assist the First Defendant's management team in designing and developing controls to manage risks consistently across the Shell Group. The Code of Conduct further set out how Shell Group employees and contract staff were required to behave in line with the SGBP. It applied to all employees and contingent workers in Shell Group companies and Shell-operated joint ventures and required every individual to protect the environment, follow the First Defendant's environmental policies and report any violations or concerns related to the First Defendant's HSSE & SP commitments and policies.

## E4 Group-Wide Monitoring, Assurance and Oversight

77. The First Defendant established and maintained comprehensive Group-wide assurance arrangements through which it obtained information concerning, and monitored, the effectiveness of risk management and internal control across the Shell Group.

78. Those arrangements comprised, amongst other things, the Audit Committee, Shell Internal Audit, HSSE assurance processes, ethics and compliance functions, reserves assurance and reporting functions and the assurance processes pleaded below. The purpose of these arrangements was to establish and enshrine a governance structure which would enable the First Defendant to manage and control the activities of the Shell Group and thereby manage and control risk of the Shell Group failing to achieve the business objectives set by the First Defendant.

79. Without prejudice to the generality of the foregoing and pending disclosure, the Claimants rely on the following matters:

(1) The Board, assisted by the Audit Committee, was responsible for the oversight of risk management and internal control, for maintaining a sound system of risk management and internal control, and for keeping the effectiveness of that system under regular review.

(2) Significant HSSE, ethics and compliance and business control incidents were reported through those assurance arrangements to senior Shell Group management, the Executive Committee, the Audit Committee and the Board.

(3) The First Defendant maintained further Group-wide assurance through annual "*Business Assurance Letters*", which each "*Business*" and "*Function*" Head was required to submit to the Chief Executive Officer, the Executive Committee and the Board, formally confirming the extent of their operations' compliance with all elements of the Control Framework.

(4) The Executive Committee and the Audit Committee conducted an annual review of the effectiveness of the First Defendant's system of risk management and internal control. That review was informed by the outputs of those Group-wide assurance arrangements, including the "*Group Assurance Letter*" process, under which each Executive Director conducted a structured internal assessment of compliance with legal and ethical requirements and the Control Framework.

80. Pending disclosure, it is reasonably to be inferred that equivalent Group-wide monitoring, assurance and reporting arrangements applied during the Dual-Parent Period. In this regard the Claimants will rely *inter alia* on the following matters:

(1) The facts and matters pleaded at paragraphs 42 to 44, 47 to 54 and 63 above.

(2) The fact that Second Defendant and Royal Dutch established the GAC, which was responsible for examining the principal financial developments in the Shell Group, its internal control procedures and its external audits, as pleaded at paragraph 53 above.

**E5 Commercial Strategy and Investment and Expansion of the Activities**

(a) Commercial Strategy

81. Throughout the Single-Parent Period, the Activities were undertaken pursuant to a Group-wide strategy which was set by the First Defendant and substantially directed to maintaining and expanding oil and gas production in order to generate the maximum possible commercial return for the First Defendant. That strategy included:

(1) sustained high levels of capital investment in oil and gas exploration and production;

(2) continued exploration for new hydrocarbon resources;

(3) the acquisition of new oil and gas exploration sites and the development of new oil and gas projects;

(4) the expansion of integrated gas and liquefied natural gas capacity; and

(5) corporate acquisitions directed to enlarging the Shell Group's oil and gas reserves and production capacity.

82. Pending disclosure, it is reasonably to be inferred that the Second Defendant set a materially identical Group-wide strategy during the Dual-Parent Period which was directed to the same ends as those identified at paragraph 81 above (which, between 1974 and 2000, also included coal exploration and production and the acquisition and development of new coal sites and projects).

(b) Investment in the Activities

83. During the Single-Parent Period, the First Defendant substantially invested in expanding the Shell Group's oil and gas exploration and production capacity, including by:

(1) investing US$10.8 billion in capital investment in oil and gas exploration and production in the first year of the Single-Parent Period, increasing such investment by 25% as compared to the last year of the Dual-Parent Period;

(2) investing in excess of US$10 billion in capital investment in oil and gas exploration and production in every subsequent year between 2006 and 2021;

(3) expanding fossil fuel production capacity through acquisitions, including the acquisition of Duvernay Oil Corporation (in 2008); East Resources (in 2010); Arrow Energy (in 2010); part of Repsol (in 2013); and BG Group plc in 2016. The acquisition of BG Group plc alone increased the Shell Group's proved oil and gas reserves by approximately 25% and its production by approximately 20%.

84. The First Defendant invested substantially more capital in upstream oil and gas development than low-carbon energy solutions. For example, between 2010 and 2018, the First Defendant spent only 1.33% of its total capital spending on low-carbon energy sources.

85. Pending disclosure, it is reasonably to be inferred that the Second Defendant substantially invested in expanding the Shell Group's oil and gas exploration and production capacity during the Dual-Parent Period and that such investment was substantially greater than investments made by the Second Defendant in low-carbon energy solutions, if any.

(c) New Oil and Gas projects

86. During the Single-Parent Period, the First Defendant developed several new oil and gas Projects, including but not limited to:

(1) in late 2005 and early-2006, the deep water Bonga field and Erha field projects in Nigeria;

(2) in 2007, the BC-10 Project in Brazil;

(3) in 2008, the Stybarrow Project in Australia, Champion West Phase 3B/C in Brunei, the Duvernay Project in Canada, the Changbei Project in China, the

Ormen Lange Project in Norway, the West Salym Project in Russia and the Deimos Project in the United States of America;

(4) in 2010, the Perdido Project in the Gulf of Mexico and Gbaran-Ubie Project in Nigeria;

(5) in 2011, the Qatargas 4 LNG Project and GTL Project in Qatar and the expansion of the Athabasca Oil Sands Project in Canada;

(6) in 2012, the Gumusut-Kakap Project in Malaysia;

(7) in 2013, the acquisition of part of Repsol S.A.'s LNG portfolio, including positions in Peru and Trinidad and Tobago;

(8) in 2014, the Bonga North West development off the coast of Nigeria and the Cardamom and Olympus Projects in the Gulf of Mexico;

(9) in 2015, the Bonga Phase 3 and Erha North Phase 2 Projects in Nigeria and the Corrib gas field in Ireland;

(10) in 2016, the Stones development in the Gulf of Mexico and the Malikai TLP in Malaysia;

(11) in 2017, the Lula South deep-water development in Brazil, Phase 2 of the Gbaran-Ubie development in the Niger-Delta and the Schiehallion redevelopment in the UK;

(12) in 2018, the Kaikias Phase 1 subsea development in the Gulf of Mexico, the second phase of the Clair field in the UK and phase 2 of the Coulomb project in the Gulf of Mexico;

(13) in 2019, the Appomattox project in the Gulf of Mexico and the Prelude floating LNG facility in Australia; and

(14) in 2021, the Arran Project in the UK and new production at the existing Clair Ridge site.

## E6 Climate Governance and Emissions Strategy

87. At all material times during the Single-Parent Period, and as pleaded at Section G below, the First Defendant:

(1) knew that AGHG emissions from the extraction, production and combustion of fossil fuels were contributing to climate change and an increase in global temperatures;

(2) recognised that climate change and risks resulting from AGHG emissions were a significant risk factor for the Shell Group; and

(3) accordingly considered and managed risks relating to climate change and AGHG emissions as matters of strategic significance at the apex of the Shell Group's corporate governance structure.

88. Without prejudice to the generality of the foregoing, Annual Reports published by the First Defendant during the Single-Parent Period stated that:

(1) The First Defendant "*has long recognised that greenhouse gas (GHG) emissions from the use of fossil fuels are contributing to the warming of the climate system*".

(2) "*Climate change and risks resulting from GHG emissions have been identified as a significant risk factor for Shell*".

89. Further, at all material times between 1965 and 2005, and as pleaded at Section G below, the Second Defendant knew that AGHG emissions from the use of fossil fuels were contributing to climate change and an increase in global temperatures.

90. Pending disclosure, it is reasonably to be inferred that the Second Defendant, as one of the two ultimate parent companies at the apex of the Shell Group's corporate governance structure during the Dual-Parent Period, was in the same position as the First Defendant in the respects pleaded at paragraphs 87(2) and (3) above, namely that it recognised that climate change and risks resulting from AGHG emissions were a significant risk factor for the Shell Group, and accordingly considered and managed risks relating to climate change and AGHG emissions as matters of strategic significance. This inference is supported by the fact that the Shell Group operated as a vertically integrated single economic enterprise throughout the Dual-Parent Period, such that knowledge and management of climate risk at Group level during that period is properly attributable to both parent companies jointly.

91. The Defendants accordingly regarded and treated climate change and the risks arising from AGHG emissions as significant risks to the Shell Group's business and operations

and accordingly assumed responsibility for the management of climate risk and emissions strategy across the Shell Group. In particular:

(1) The First Defendant exercised that responsibility during the Single-Parent Period through the governance bodies and mechanisms, management functions, and remuneration arrangements pleaded in paragraphs 55 to 79(4) above and paragraphs 92 to 104 below.

(2) Pending disclosure, it is reasonably to be inferred that the Second Defendant exercised equivalent responsibility for the management of climate risk and emissions strategy during the Dual-Parent Period through the STTC Board, the CMD and the governance structures pleaded in paragraphs 47 to 54 above.

(a) <u>The Board</u>

92. At all material times during the Single-Parent Period, the First Defendant exercised control over the identification and management of risks resulting from AGHG emissions and climate change through the Board and Executive Committee. Without prejudice to the generality of the foregoing (and pending receipt of the Defendants' disclosure in these proceedings), the Claimants rely on the following matters:

(1) The First Defendant's 2017 Annual Report states that: "*Climate change and risks resulting from GHG emissions…are managed in accordance with other significant risks through the Board and Executive Committee*."

(2) The First Defendant's 2021 Annual Report states that: "*Climate change and risks resulting from greenhouse gas emissions are significant risk factors for Shell. They are monitored, like other significant risks, by the Executive Committee and the Board. Shell has a climate change risk management structure which is supported by standards, policies and controls*."

(3) From at least 2014, the Board held informal discussions with leading independent experts on matters such as climate change and energy transition scenarios.

(4) From at least 2017, the Board held strategy sessions on energy transition and climate change, and considered risks of the current and future shape of the Shell Group's portfolio.

(5) From 2020, those considerations included the Shell Group's announcement of its target to become a net-zero emissions energy business by 2050.

(6) In 2021, the Board convened 12 times and regularly oversaw the Shell Group's net-zero initiatives. Throughout that year, the Board considered climate-related matters in the course of reviewing the Shell Group's energy transition strategy, assessing risk management policies and endorsing business plans including major capital expenditures, acquisitions and divestments.

(b) <u>Board Committees</u>

93. During the Single-Parent Period, the CSRC and, from December 2019, SESCo, reviewed and advised the Board on the Shell Group's strategy, policies and performance in relation to safety, the environment, climate change, AGHG emissions, sustainability and the Shell Group's "*Net Carbon Footprint*" (i.e. the net quantity of AGHGs emitted into the atmosphere as a result of the Activities). The CSRC further assessed the Shell Group's sustainability performance, audit results and the sustainable development metrics that apply to the Executive Committee.

94. Climate change and AGHG emissions were consistently on the agenda at meetings of the CSRC and, from December 2019, SESCo. Without prejudice to the generality of the foregoing and pending disclosure, the Claimants rely on the following matters reported in the First Defendant's Annual Reports:

(1) In 2015, the key topics discussed by the CSRC included climate change and the energy transition.

(2) In 2016, the key topics discussed by the CSRC included climate change and AGHG targets.

(3) In 2017, the CSRC discussed, amongst other topics, the energy transition, AGHG emission targets, the Shell Group's Net Carbon Footprint ambition and methane-related developments.

(4) In 2018, the CSRC regularly discussed the Shell Group's approach to climate change, including the energy transition, AGHG emission targets, methane policy, the Shell Group's Net Carbon Footprint and nature-based solutions.

(5) From December 2019, SESCo's duties included reviewing the Shell Group's progress towards meeting its climate targets and the energy transition, and advising the Remuneration Committee on metrics relating to sustainable development and energy transition.

(6) In 2020, SESCo supported and contributed to the First Defendant's announcement that it aimed for the Shell Group to become a net-zero emissions energy business by 2050. The SESCo had in-depth discussions with management about the use of nature-based solutions, the development of carbon capture utilisation and storage, and carbon abatement programmes at operated facilities.

(7) In 2021, SESCo met 13 times and discussed climate-related matters at nine of those meetings. After each meeting the SESCo Chair directly provided updates to the Board.

95. The Audit Committee also oversaw the effectiveness of the Shell Group's risk management and internal control framework to ensure, amongst other things, that the First Defendant's financial statements reflect the risks associated with energy transition strategy and climate change.

96. The Remuneration Committee set remuneration policy and targets designed to challenge and support management to reduce carbon emissions.

(c) Chief Executive Officer

97. During the Single-Parent Period:

(1) The CEO was the most senior individual within the Shell Group with accountability for climate change risk.

(2) The CEO had delegated authority from the Board to manage the Shell Group's actions in relation to the First Defendant's strategy, which included strategy in relation to climate change.

98. Pending disclosure, it is it reasonably to be inferred that, during the Dual-Parent Period, the Second Defendant's chief executive officer held equivalent senior accountability and delegated authority from the Second Defendant in relation to climate change strategy and risk.

(d) Executive Committee

99. The CEO was assisted by a number of senior management positions on climate-related matters to implement the First Defendant's energy transition strategy and ensure that such matters were appropriately monitored. At all material times each member of the Executive Committee had defined accountability for an aspect of climate risk management:

(1) The Projects and Technology Director was responsible for establishing and maintaining Group-wide emissions, climate and reporting standards.

(2) The Director of Strategy, Sustainability and Corporate Relations supported the CEO in developing the First Defendant's energy transition strategy and augmenting the First Defendant's Carbon Management Framework (addressed further at paragraph 111 below), which included the setting of carbon budgets for the First Defendant's businesses and the implementation of carbon-related activities.

(3) The Downstream Director was responsible for managing and mitigating the climate risks of the First Defendant's existing downstream businesses.

(4) The Integrated Gas, Renewables and Energy Solutions Director was responsible for finding and developing low-carbon solutions and opportunities as well as managing and mitigating carbon emissions.

(5) The Upstream Director was responsible for identifying low-carbon and emission reduction opportunities in the First Defendant's upstream oil and gas businesses through managing and mitigating carbon emissions.

(6) The Chief Financial Officer was responsible for monitoring the effective application of the Control Framework, which provided the basis for managing climate-related risks, carbon emissions and climate-related disclosures.

100. Pending disclosure, it is reasonably to be inferred that, during the Dual-Parent Period the CMD, as the functional equivalent and predecessor of the Executive Committee, discharged equivalent responsibilities for the management of climate risk and emissions strategy across the Shell Group. In support of this averment the Claimants will rely, *inter alia*, on the matters set out in paragraphs 42 to 54 and 63 above.

(e) Group-Level Climate Risk Management

101. From at least 2017, the Executive Vice President for Safety and Environment (who reported to the Projects and Technology Director) was accountable, amongst other things, for oversight of AGHG issues affecting the Shell Group. The department overseen by the Executive Vice President for Safety and Environment included both a dedicated Group $CO_2$ team (later renamed the Group Carbon team) and the HSSE & SP Assurance and Reporting team.

102. The Group $CO_2$ team/Group Carbon team was responsible for:

(1) monitoring and examining the strategic implications of climate change for the Shell Group and the impact of developments in governmental policy and regulation;

(2) preparing proposed policy positions based on internal analysis and external input;

(3) ensuring consistency in the application of the First Defendant's core principles and policy tasks in interactions with policymakers;

(4) overseeing the Shell Group's AGHG management programme; and

(5) supporting the different lines of business to embed AGHG management strategies and manage AGHG-related risks.

103. The HSSE & SP Assurance and Reporting team was responsible for auditing the performance of the Shell Group's businesses against the HSSE & SP Control Framework requirements, including in relation to climate risk management.

(f) Executive Remuneration

104. During the Single-Parent Period, the First Defendant designed remuneration scorecards for (so far as applicable) employees of the Shell Group and/or the First Defendant's senior executives which directly linked their remuneration to performance against climate change and sustainability targets set by the First Defendant. Without prejudice to the generality of the foregoing and pending disclosure, the Claimants rely on the following matters:

(1) The executive scorecard was the mechanism by which the First Defendant determined bonus levels for all employees across the Shell Group, including members of the Executive Committee. From at least 2012, sustainable

development accounted for 20% of the Shell Group's executive scorecard. In 2017, the executive scorecard expressly included AGHG emissions metrics for business areas including refining, chemical plants and flaring in upstream assets.

(2) From 2019, an energy transition condition was included in the Long-Term Incentive Plan awards for executive directors and approximately 150 senior executives. From 2020, that condition was extended to Performance Share Plan awards.

(3) In 2021, progress in energy transition key performance indicators was embedded across all principal remuneration instruments, namely, the executive scorecard (15% weighting), applying to virtually all Shell Group employees; the Performance Share Plan awards (10% weighting), applying to approximately 16,500 Shell Group employees; and the Long-Term Incentive Plan awards (20% weighting), applying to senior Shell Group executives.

**E7 AGHG Management, Carbon Management, and AGHG-related Decision-making**

105. The First Defendant exercised direction and control over the Activities (and the AGHG consequences thereof) during the Single-Parent Period through the mandatory standards, frameworks and management systems pleaded in paragraphs 106 to 111 below. Pending disclosure, it is reasonably to be inferred that the Second Defendant, as joint ultimate parent at the apex of the Shell Group during the Dual-Parent Period, exercised equivalent direction and control over the Activities (and the AGHG consequences of the Activities) through equivalent mechanisms.

106. During the Single-Parent Period:

(1) The emissions, climate and reporting standards that governed the management of AGHG emissions across the Shell Group were set at parent company level by the First Defendant's senior executive management and were applied mandatorily to every Shell Group company.

(2) Through those standards, and through the mandatory systems and frameworks pleaded below, the First Defendant exercised direction and control over the AGHG consequences of the Activities at every level of the Shell Group and assumed responsibility for the management of AGHG emissions and the climate-related risks arising from the Activities.

(3) At operational level, each "Business" and "Function" within the Shell Group was required to regularly review its risk profile, risk responses and assurance activities to ensure climate-related risks were managed in accordance with the requirements and expectations set by the First Defendant. The outputs of those reviews were reported to the Executive Committee and the Board. The Executive Committee and the Board actively considered the significance of climate change and AGHG emissions risks relative to other risks on the Shell Group risk profile, reviewed whether the First Defendant's risk responses were effective in addressing those risks, and where necessary, directed supplementary in-depth reviews with the relevant management teams.

(a) Project Screening

107. During the Single-Parent Period, the First Defendant also exercised direction and control over the AGHG emissions of the Activities by requiring every planned investment across the Shell Group to be assessed against project screening and/or carbon cost requirements before approval. Those requirements quantified the AGHG consequences of proposed investments and informed project appraisal and approval. Without prejudice to the generality of the foregoing and pending disclosure, the Claimants rely on the following matters:

(1) From the moment it became the parent company of the Shell Group in 2005, the First Defendant required every planned investment to be assessed against a $CO_2$ project screening value ("**PSV**"), which measured the relevant project's exposure to future carbon regulation. From 2008, a uniform PSV of $40 per tonne of $CO_2$ equivalent was applied to every planned investment across the Shell Group. From 2018, the First Defendant replaced the uniform PSV with country-specific estimates of future carbon costs derived from countries' Nationally Determined Contributions under the Paris Agreement.

(2) The mandatory application of the PSV, and, thereafter, of country-specific carbon cost estimates prescribed by the First Defendant, ensured that the projected financial consequences to the Shell Group of the future regulation of AGHG were quantified and taken into account as part of the Shell Group's investment appraisal process in respect of every planned investment.

(b) AGHG and Energy Management Plans

108. The First Defendant maintained mandatory AGHG and energy management plans for every Shell Group-operated facility expected to generate more than 50,000 tonnes of AGHG emissions per year and for every proposed major project expected to generate more than 500,000 tonnes per year. Those plans were required to include the sources of AGHG emissions, a ten-year forecast of expected emissions and options for improving energy efficiency or reducing emissions.

109. In 2021, the First Defendant updated its Greenhouse Gas and Energy Management standard, which formed part of both the HSSE & SP Control Framework and the First Defendant's "*Asset Management System*". The First Defendant's AGHG and energy management process was integrated into the annual business planning cycles to provide senior executives of the First Defendant and/or Shell Group entities with the information required to make decisions on AGHG reduction opportunities and portfolio choices.

110. The First Defendant also created a dedicated Group-level position, namely, the "*Global Process Owner for GHG and energy management*", which was responsible for working across the Shell Group to ensure that AGHG and energy management requirements were adopted and embedded in business operations, planning and performance management processes across the Group. By that role, the First Defendant maintained a specific Group-wide mechanism for ensuring that mandatory AGHG and energy management requirements were implemented across the Shell Group.

(c) The Carbon Management Framework

111. From 2021, the First Defendant implemented a comprehensive Carbon Management Framework ("**CMF**") designed to embed carbon emissions as a consideration in decision-making at every level of the Shell Group's businesses and operations, in the same way that financial considerations pervaded the First Defendant's management framework. The CMF reflected and reinforced the First Defendant's centralised control over the carbon consequences of the Activities at every level of the Shell Group. Without prejudice to the generality of the foregoing and pending disclosure, the Claimants rely on the following matters:

(1) The CMF set mandatory carbon budgets for every Shell Group business. Net carbon intensity targets were translated into "Scope 1", "Scope 2" and "Scope 3" carbon budgets for each business, which operated as mandatory boundaries

within which each business was required to optimise its operating plan. The expressions "Scope 1", "Scope 2" and "Scope 3" are defined in the Greenhouse Gas Protocol Corporate Accounting and Reporting Standard, which is published by the Greenhouse Gas Protocol Initiative. The expressions bear the following meanings:

(a) "Scope 1" emissions are direct GHG emissions from sources that are owned or controlled by an entity, for example, emissions from combustion in owned or controlled boilers, furnaces, vehicles, etc.; and emissions from chemical production in owned or controlled process equipment.

(b) "Scope 2" emissions are GHG emissions from the generation of purchased electricity consumed by an entity.

(c) "Scope 3" emissions are the GHG emissions that are a consequence of the activities of an entity, but occur from sources not owned or controlled by that entity. They include the extraction and production of purchased materials, transportation of purchased fuels; and use of sold products and services.

(2) Accordingly, in the context of the Shell Emissions:

(a) The Production Emissions are "Scope 1" and "Scope 2" emissions.

(b) The Produced Combustion Emissions and Sold Combustion Emissions are "Scope 3" emissions.

(3) The Shell Group's operating plan, outlook and budgets were forecasted for a ten-year period and updated every year, reflecting its "Scope 1", "Scope 2" and net carbon intensity (including "Scope 3" targets throughout). According to the First Defendant's 2021 Annual Report, the CMF facilitates assessment of "*the trade-offs between emitting carbon and generating value*" for the First Defendant.

(4) Two Group-level committees institutionalised carbon management in investment and reporting decisions across the Shell Group:

(a) The Capital Investment Committee, comprising the First Defendant's CEO, Chief Financial Officer and the individual business directors, was

responsible for ensuring that climate risks and opportunities were embedded in every investment decision across the Shell Group.

(b) The Carbon Reporting Committee was responsible at Group level for ensuring that AGHG emissions measures complied with all regulatory and legal requirements and for embedding Group-wide measurement and reporting of AGHG emissions metrics.

(5) Every Shell Group business unit was required to identify viable opportunities to reduce its Scope 1, Scope 2 and Scope 3 AGHG emissions as part of the annual planning process. Carbon emissions objectives were further embedded in the portfolio management forums through which the Shell Group's most senior business managers made decisions about which assets to grow and which to divest. Certain business units were required to identify specific AGHG abatement opportunities and incorporate them into their annual business plans.

(d) Defendants' acquisition of knowledge of the AGHG consequences of the Activities and ability to direct and control those consequences

112. By reason of the systems and mechanisms pleaded in paragraphs 105 to 111 above, during the Single-Parent Period the First Defendant obtained comprehensive knowledge of the AGHG consequences of the Activities throughout the Shell Group and possessed and exercised the means to direct and control those consequences, including by directing and controlling:

(1) the type and quantity of fossil fuels that were extracted, processed, acquired and/or sold by companies within the Shell Group;

(2) the manner in which fossil fuels were extracted and processed, including any measures taken (or not taken) to reduce the Production Emissions generated through that extraction and processing;

(3) the extent of investments made by companies within the Shell Group in alternative energy solutions, including renewable electricity generation, biofuels, hydrogen and carbon capture/storage;

(4) how the Shell Group managed the trade-off between (i) the harms caused by the emission of AGHGs into the atmosphere; and (ii) making profit through the

extraction, production and sale of fossil fuels which inevitably result in the emission of such AGHGs into the atmosphere;

(5) the information which was (and was not) made public by companies within the Shell Group regarding the ACC risks created by the Activities; and

(6) the steps that were taken (or not taken) by companies within the Shell Group to mitigate the harmful impacts of ACC on individuals and communities who were most vulnerable to those impacts.

113. Further, by reason of the matters pleaded in this section, during the Dual-Parent Period the Second Defendant obtained comprehensive knowledge of the AGHG consequences of the Activities throughout the Shell Group and possessed and exercised the means to direct and control those consequences, including by directing and controlling the matters referred to in paragraph 112 above.

**E8 Direction and Control of the Activities**

(a) <u>The Single-Parent Period</u>

114. By reason of the matters pleaded in paragraphs 55 to 113 above, during the Single-Parent Period the First Defendant directed, controlled and supervised the Activities through the Shell Group companies and Shell Group-operated ventures by which the Activities were carried out (the "**Single-Parent Period Activities**"), and assumed responsibility for their management through the governance, management and control arrangements pleaded in paragraphs 55 to 113 above.

115. During the Single-Parent Period, the Shell Group was so highly integrated and centrally managed by the First Defendant that:

(1) the First Defendant tightly controlled all of the Shell Group's subsidiaries, and their engagement in the Single-Parent Period Activities, through the governance, management and control arrangements pleaded above;

(2) all Shell Group subsidiaries engaged in the Single-Parent Period Activities pursuant to, and in accordance with, requirements, directions and expectations set and communicated by the First Defendant, which the Shell Group subsidiaries were required to, and did in fact, comply with;

(3) the scope and extent of the Single-Parent Period Activities (and hence the scope and extent of the resulting AGHG emissions) was determined centrally by the First Defendant, rather than by any Shell Group subsidiaries acting autonomously; and

(4) the existence, scope and extent of any steps taken (or not taken) by the Shell Group to mitigate the impact of the Single-Parent Period Activities on ACC (and the resulting risks of harm to individuals and communities) was determined centrally by the First Defendant, rather than by any Shell Group subsidiaries acting autonomously.

116. By virtue of its direction, control, supervision and management of the Single-Parent Period Activities, the First Defendant exercised decisive direction, influence and control over the Production Emissions, Produced Combustion Emissions and Sold Combustion Emissions generated throughout the Single-Parent Period ("**Single-Parent Period Emissions**").

(b) The Dual-Parent Period

117. By reason of the matters pleaded in paragraphs 47 to 113 above, during the Dual-Parent Period, the Second Defendant directed, controlled and supervised the Activities through the Shell Group companies and Shell Group-operated ventures by which the Activities were carried out (the "**Dual-Parent Period Activities**"), and assumed responsibility for their management. The Second Defendant did this through the governance, management and control arrangements pleaded in paragraphs 47 to 113 above. Paragraph 115 above is repeated *mutatis mutandis*.

118. By virtue of its direction, control, supervision and management of the Dual-Parent Period Activities, the Second Defendant exercised decisive direction and control over the Production Emissions, Produced Combustion Emissions and Sold Combustion Emissions generated throughout the Dual-Parent Period ("**Dual-Parent Period Emissions**").

**E9 Approval, Promotion, Encouragement and Cooperation in the Activities**

119. Further, during the Single-Parent Period the First Defendant approved of, promoted, encouraged, advised, cooperated in and benefitted from the Single-Parent Period Activities and during the Dual-Parent Period, the Second Defendant approved of,

promoted, encouraged, advised, cooperated in and benefitted from the Dual-Parent Period Activities.

120. Without prejudice to the generality of the foregoing, the Claimants rely on the facts and matters pleaded at paragraphs 42 to 118 above and in particular, the following:

(1) The Defendants approved the Activities by formally authorising and sanctioning the Shell Group's business plans, capital expenditure budgets, investment decisions and production targets which provided for the continuation and expansion of fossil fuel extraction, production and sale by Shell Group subsidiaries.

(2) The Defendants promoted the Activities by publicly advocating and marketing the Shell Group's oil, gas and/or coal products to customers, governments and investors worldwide, by holding the Shell Group out to the market as a leading oil and gas business, and by actively seeking new markets and customers for the Shell Group's fossil fuel products.

(3) The Defendants encouraged the continuation and expansion of the Activities *inter alia* by:

(a) setting production growth targets for Shell Group subsidiaries, the attainment of which required the continuation and expansion of the Activities;

(b) controlling the allocation of the financial, human and technical resources necessary to achieve such targets; and

(c) rewarding executives and employees of the Shell Group (including through performance-linked remuneration) for achieving or exceeding production and revenue targets related to the Activities.

(4) The Defendants advised Shell Group subsidiaries in relation to the conduct of the Activities by issuing group-wide operational standards, policies, guidelines, technical guidance and strategic direction governing the manner in which the Activities were carried out. The Defendants maintained centralised functions (including in respect of strategy, finance, health and safety, and sustainability)

which advised and directed Shell Group subsidiaries in their conduct of the Activities.

(5) The Defendants cooperated in the Activities *inter alia* by providing Shell Group subsidiaries with access to centralised services, shared infrastructure, group financing, intellectual property, technology and operational expertise necessary for the conduct and expansion of the Activities, and by coordinating the Shell Group's worldwide operations through integrated planning and management systems.

121. Pending disclosure, insofar as any of the matters pleaded above in relation to the Second Defendant are not established directly by the facts pleaded at paragraphs 42 to 118 above, the Claimants will invite the Court to infer those matters from the governance arrangements, functions and control exercised by the Second Defendant pleaded above.

## F CONTRIBUTION TO ANTHROPOGENIC CLIMATE CHANGE

122. Notwithstanding the Defendants' knowledge of the need to reduce anthropogenic emissions of GHGs (as addressed further in Section G below), including by reducing the extraction, production and combustion of fossil fuels, at all material times the Defendants maintained and implemented a business strategy which was centred on the extraction, production, marketing and sale of fossil fuels.

123. In particular, pursuant to strategy and directions set by the Defendants, the Shell Group at all material times:

(1) continued to explore for, develop, produce, market and sell oil and gas (and, between 1974 and on or around 2000, coal);

(2) invested substantial capital in new and existing oil and gas production capacity (and between 1974 and on or around 2000, coal production capacity), thereby maintaining or increasing the volume of oil and gas (and, at the relevant times, coal) which the Shell Group was able to extract, produce and sell; and

(3) acquired additional oil and gas reserves and production through corporate acquisitions; and continued to plan for growth in its upstream, integrated gas and liquefied natural gas businesses, thereby further increasing the volume of fossil fuels which the Shell Group was able to extract, acquire, produce and sell.

124. As a result, the Defendants:

(1) maintained or increased fossil fuel production at levels, expressed as million barrels of oil equivalent, above 1965 levels for every year between 1965 and 2020, and above 1990 levels for every year between 1991 and 2020; and

(2) maintained or increased the volume of Production Emissions and Produced Combustion Emissions above 1965 levels for every year between 1965 and 2020, and above 1990 levels for every year between 1991 and 2014, with minimal reductions below 1990 levels from 2014 to 2020.

125. Prior to disclosure, there is limited information on how the Defendants' Sold Combustion Emissions changed over time. However, it is inferred from the matters above that Sold Combustion Emissions were maintained above 1965 levels in every year from 1966 to 2020, and were maintained at or around, or increased above, 1990 levels in every year from 1991 to 2020.

126. Accordingly:

(1) The Defendants significantly increased the relative and absolute impact of Shell Emissions on ACC over time.

(2) As a result of the matters set out above, the Activities have materially contributed to both the existence and magnitude of ACC.

## G KNOWLEDGE OF THE RISKS OF ANTHROPOGENIC CLIMATE CHANGE RESULTING FROM GREENHOUSE GAS EMISSIONS

### G1 Knowledge based on widely reported publicly available information

127. The Second Defendant, and the subsidiaries within the Shell Group over which the Second Defendant exercised direction and control, knew or ought reasonably to have known of the risk that AGHG emissions from the extraction, production and combustion of fossil fuels would contribute to ACC by November 1965 at the latest, when the report of the Environmental Pollution Panel of President Lyndon B. Johnson's Science Advisory Committee, "*Restoring the Quality of Our Environment*", was published ("**the 1965 Presidential Panel Report**").

128. Amongst other things, the 1965 Presidential Panel Report stated that fossil fuel combustion was "*measurably increasing*" atmospheric $CO_2$ levels, and increased atmospheric $CO_2$ levels "*may have a significant effect on climate*", because "*much like the glass in a greenhouse*" it could "*raise the temperature of the lower air*". Possible effects were identified as including the melting of the Antarctic ice cap, rising sea level, and warming of sea water. Under the heading "*Conclusions and Findings*" the 1965 Presidential Panel Report stated that:

> *"Through his worldwide industrial civilization, Man is unwittingly conducting a vast geophysical experiment. Within a few generations he is burning the fossil fuels that slowly accumulated in the earth over the past 500 million years. The $CO_2$ produced by this combustion is being injected into the atmosphere; about half of it remains there. The estimated recoverable reserves of fossil fuels are sufficient to produce nearly a 200% increase in the carbon dioxide content of the atmosphere. By the year 2000 the increase in atmospheric $CO_2$ will be close to 25%. This may be sufficient to produce measurable and perhaps marked changes in climate, and will almost certainly cause significant changes in the temperature and other properties of the stratosphere."*

129. After November 1965, further information as to the severity and nature of the risk of ACC (and its probable consequences for humans) became publicly available, of which the Second Defendant and the subsidiaries within the Shell Group over which the Second Defendant exercised direction and control, were aware or ought reasonably to have been aware. The information includes, *inter alia*, the following:

(1) In 1979, the first World Climate Conference was convened by the World Meteorological Organization to bring together leading scientists from a range of disciplines to discuss the emerging problem of ACC. The resulting Declaration concluded "*with some confidence that the burning of fossil fuels, deforestation and changes of land use have increased the amount of carbon dioxide in the atmosphere by about 15 per cent during the last century and is at present increasing by about 0.4 per cent per year. It is likely that an increase will continue in the future*."

(2) In 1986, the World Climate Programme published its first report, the "*Report of the International Conference on the Assessment of the Role of Carbon Dioxide*

*and of other Greenhouse Gases in Climate Variations and Associated Impacts*". The foreword noted that the conclusions of the international scientists who attended the conference were "*very striking indeed and are of great importance to mankind*". The report recorded the "*consensus scientific understanding*" that if then-present trends continued, then a doubling in $CO_2$ equivalent atmospheric GHGs could be expected as early as the 2030s and that could lead to increases of the global mean equilibrium surface temperature of between 1.5 and 4.5°C which "*could have profound effects on global ecosystems, agriculture, water resources and sea ice*." The report stated that "*while some warming of climate now appears inevitable due to past actions, the rate and degree of future warming could be profoundly affected by governmental policies on energy conservation, use of fossil fuels, and the emission of some greenhouse gases*". The report noted that the volume of GHGs other than $CO_2$, including methane, were increasing in the atmosphere and were playing an increasingly important role in changing the climate.

(3) In 1988, NASA scientist James Hansen told the US Congress that NASA was 99% certain that the observed global warming trend was caused by human activity. He noted that the temperature changes expected were sufficiently large to have major impacts on mankind and the environment.

(4) In 1989, the Malé Declaration on Global Warming and Sea Level Rise, agreed at the conclusion of the Small-States Conference on Sea-Level Rise, highlighted the vulnerability of low-lying, small, coastal and island states to sea-level rise and the increase in frequency and intensity of natural disasters related to climate change.

(5) In 1990, the Intergovernmental Panel on Climate Change ("**IPCC**") First Assessment Report stated: "*We are certain of the following: emissions resulting from human activities are substantially increasing the atmospheric concentrations of the greenhouse gases. These increases will result on average in an additional warming of the Earth's surface*." The Report also noted the positive radiative forcing effect of methane and recorded that 20% of the global total methane source was of fossil origin, largely from the coal, oil and natural

gas industries. It identified available technological options to reduce up to 80% of all methane emissions from the oil and gas sector by 2005.

(6) In 1996, the IPCC Guidelines for National Greenhouse Gas Inventories specifically identified fugitive emissions (particularly of methane) as a significant contributor to ACC. It said: "*In addition to the emission of greenhouse gases from fuel combustion, other emissions into the atmosphere occur in an unplanned or a deliberate manner. These are fugitive emissions. Fugitive emissions are intentional or unintentional releases of gases from anthropogenic activities. In particular, they may arise from the production, processing, transmission, storage and use of fuels, and include emissions from combustion only where it does not support a productive activity (e.g., flaring of natural gases at oil and gas production facilities). The most significant greenhouse gas emissions in this category are methane emissions from coal mining and from oil and gas systems.*"

(7) In 2001, the IPCC Third Assessment Report found that, "*There is new and stronger evidence that most of the warming observed over the last 50 years is attributable to human activities*" and that "*detection and attribution studies consistently find evidence for an anthropogenic signal in the climate record of the last 35 to 50 years*."

(8) In 2004, the multilateral Methane to Markets Partnership was launched by a number of countries in recognition of the urgent need to reduce methane emissions from, *inter alia*, oil and gas systems. The launch materials identified methane as the second-most prevalent AGHG and noted its high heat-trapping potency relative to $CO_2$. The countries that joined the Methane to Markets Partnership included the United Kingdom and the United States of America.

130. By virtue of the prominence and public accessibility of the matters set out at paragraphs 127 to 129 above and the relevance of those matters to the Activities, the First Defendant must have known (and, in any event, ought reasonably to have known) of those matters from the time that the First Defendant became the sole parent company of the Shell Group in 2005.

131. Further, the First Defendant was aware (and, in any event, or ought reasonably to have been aware), of further information regarding the nature and severity of the risk that AGHG emissions from the extraction, production and combustion of fossil fuels would

contribute to ACC, which was made public after the First Defendant became the sole parent company of the Shell Group in 2005. This includes, *inter alia*, the following:

(1) In 2007, the IPCC Fourth Assessment Report (AR4) concluded that "*Warming of the climate system is unequivocal*" and that "*most of the observed increase in global average temperatures since the mid-20th century is very likely due to the observed increase in anthropogenic greenhouse gas concentrations*."

(2) In 2012, the IPCC released a report titled "*Managing the Risks of Extreme Events and Disasters to Advance Climate Change Adaptation*" which concluded that it is "*likely that anthropogenic influences have led to warming of extreme daily minimum and maximum temperatures at the global scale*" and that there "*is medium confidence that anthropogenic influences have contributed to intensification of extreme precipitation at the global scale*".

(3) In 2014, the IPCC Fifth Synthesis Report confirmed that "*human influence on the climate system is clear and growing, with impacts observed across all continents and oceans*" and that "*it is extremely likely that more than half of the observed increase in global average surface temperature from 1951 to 2010 was caused by the anthropogenic increase in GHG concentrations and other anthropogenic forcings together*".

(4) In 2018, the IPCC Special Report on Global Warming of 1.5°C found that human activities had already caused approximately 1.0°C of warming above pre-industrial levels and that $CO_2$ emissions must decline by about 45% from 2010 levels by 2030 to hold warming to 1.5°C.

**G2 Knowledge based on Shell Group studies and internal Shell Group documents**

132. In addition, the First and Second Defendants knew or ought reasonably to have known of the information contained in internal Shell Group documents which analysed the scientific evidence regarding the relationship between AGHG and ACC and/or the risks to which ACC gave rise. Those documents include:

(1) A 1966 internal report titled "*Combustion of Fossil Fuel: Large Scale Atmospheric Effects*" which the Shell Group commissioned Professor James Lovelock to produce (the "**1966 Shell Climate Change Report**"). The report

expressed concern about "*the almost certain fact that the climate is worsening and the probability that the combustion of fuel is responsible*".

(2) A report titled "*The Greenhouse Effect*", which was produced by the Greenhouse effect working group in the Health, Safety and Environment Division of Shell Internationale Petroleum Maatschappij B.V. for the Shell Environmental Conservation Committee (the **"1988 Shell Greenhouse Effect Report**"). The 1988 Shell Greenhouse Effect Report was circulated on a confidential basis within the Shell Group in 1988 but not made publicly available until 2018, when it was published by a Dutch news organisation. The report stated, among other things, that:

(a) The main cause of increasing $CO_2$ concentrations in the atmosphere was considered to be fossil fuel burning. Fossil fuels "*marketed and used by*" the Shell Group accounted for the production of 4% of the $CO_2$ emitted worldwide from combustion of fossil fuels.

(b) Chlorofluorocarbons, ozone, methane and nitrous oxide were at least as important in changing the radiation energy balance as $CO_2$ and a principal source of atmospheric methane was its release during mineral, oil and gas exploration and gas transmission.

(c) A doubling of pre-industrial $CO_2$ was projected by 2040 - 2080, which could increase global mean temperature by 1.3 - 3.3°C, with associated risks including sea level rise, changes in precipitation and food insecurity.

(d) By the time climate impacts became detectable "*it could be too late to take effective countermeasures to reduce the effects or even to stabilise the situation*", and accordingly a "*forward looking approach by the energy industry is clearly desirable*".

(e) The anticipated climatic changes "*may be the greatest in recorded history*".

(3) A Shell Group Planning Document "*Scenarios 1989-2010 – Challenge and Response*" (the "**1989 Shell Confidential Scenarios Document**"), circulated on

a confidential basis within the Shell Group in 1989. The document stated amongst other things that:

(a) "*[C]limate change – the greenhouse effect, global warming – is of special significance because: It is the most global of environmental problems. It is directly tied to man's economic activities by the use of energy. Hence, it could be the most important issue for the energy industry. The idea that mankind and his activities could affect the climate is relatively new. But evidence that they do is strong and accumulating fast.*"

(b) "*[W]e know that over the ages there has been a clear relationship between global mean temperature and $CO_2$ concentration in the earth's atmosphere. We know, too, that $CO_2$ concentration has been increasing and continues to increase about 0.4 per cent per year.*"

(c) One of two identified dominant contributors to increasing $CO_2$ concentrations in the atmosphere was "*the combustion of fossil fuels*".

(d) "*The consequences of high global temperature – should that result – are vastly different weather patterns, particularly in the temperate zones and flooding of coastal plains*".

(e) A "*shift*" to "*non-fossil fuels*" was identified as a counter-measure to global warming.

133. The 1989 Shell Confidential Scenarios Document outlined the two possible paths available to society, which it labelled as "*Sustainable World*" or "*Global Mercantilism*". It stated that while global mean temperatures were likely to rise in either scenario, they "*could rise considerably more in Global Mercantilism*", with the most dramatic changes occurring at temperate latitudes where "*there would be more violent weather – more storms, more droughts, more deluges*".

**G3 The Shell Group's suppression of information, and dissemination of misinformation**

134. From at least 1966, companies within the Shell Group, acting under the control and direction of the Second Defendant, supressed information and promoted misinformation as to the link between AGHG emissions and ACC, and the likely consequences of ACC.

In support of that averment (and pending disclosure by the Defendants) the Claimants rely on the facts and matters set out at paragraphs 135 to 139 below.

135. The Second Defendant participated in suppressing the findings about the link between AGHG and ACC, and the likely consequences of ACC, which were contained in confidential internal Shell Group documents. Pending receipt of the Defendants' disclosure in these proceedings, the Claimants will rely on the following matters in support of this averment:

(1) In 1967 Victor Rothschild, the Director of Research at the Shell Group, told Professor Lovelock not to share the findings of his research (i.e. the research which formed the basis for the 1966 Shell Climate Change Report) with any "*non-Shell people*".

(2) The 1988 Shell Greenhouse Effect Report was never published by the Shell Group and was not published until 2018, after it had been provided to a journalist.

(3) The 1989 Shell Confidential Scenarios Document was never published by the Shell Group and did not become publicly available until it was deposited in the in the Oxford University Business School Archive in 2016. A document which summarised some of its contents (the "**Public Scenarios Document**") was published in 1991, but the Public Scenarios Document claimed there were "*significant disagreements over the seriousness and urgency of the problems (especially global warming)*" and excluded or downplayed many of the warnings contained in the 1989 Shell Confidential Scenarios Document. In particular, it did not contain any of the statements pleaded at paragraphs 132(3)-133 above.

(4) Notwithstanding the contents of the internal Shell Group documents referred to at paragraph 132 above, the Second Defendant and its executives made public statements which cast doubt over the certainty of the scientific evidence regarding the relationship between AGHG and ACC and the nature and extent of the impact of AGHG on ACC. For example:

(a) In 1993, the Shell Group's Annual Report (which was published by the Second Defendant and Royal Dutch) acknowledged that the possibility of climate change was "*probably the greatest environmental dilemma facing all of us*" but still emphasised that "[s]*cientific uncertainty still*

*surrounds the world's understanding of climate behaviour, the effect of carbon dioxide absorption by oceans and forests, and the climate changes of the past*".

(b) In its 1996 Annual Report (which was published by the Second Defendant and Royal Dutch), the Shell Group accepted that there "*is now sufficient scientific evidence to support taking prudent precautionary action*" but asserted that there "*are still many uncertainties about the impact of increasing atmospheric concentrations of man-made carbon dioxide on global climate*".

(c) In 1997, John Jennings, the Chairman and Managing Director of the Second Defendant, stated publicly at the Business and the Environment Programme in Cambridge, England, that: "*Man-made carbon dioxide is only a small fraction of the flux in natural systems. I believe that we are still not in a position to know whether any effect will be good, bad, or indifferent, whether it will be lasting, or whether the earth's natural processes will restore stability*."

136. The Shell Group also funded and published research which sought to cast doubt over the relationship between AGHG and ACC and the existence and severity of the risks of ACC. For example (and pending receipt of the Defendants' disclosure):

(1) In August 1972, three research scientists from the Shell Research Laboratory in Amsterdam, which was owned and operated by the Shell Group, published a paper titled "*World Dynamics: Social Feedback May Give Hope for the Future*" (the "**1972 Shell Research Paper**"), which cast doubt on the conclusions of a report published earlier that year by the Club of Rome titled "*The Limits to Growth*" (the "**Limits to Growth Paper**"), which had warned that: "*By the year 2000, the CO2 concentration will reach 380 ppm, an increase of nearly 30 per cent compared to 1860 levels. The source of this exponential rise in atmospheric CO2 levels is the increasing burning of fossil fuels by humans. [...] It is not known how much CO2 or thermal pollution can be released without causing irreversible changes in the earth's climate. [...] This ignorance about the limits of the earth's ability to absorb pollutants should be reason enough for caution in the release of polluting substances*." The authors of the 1972 Shell Research Paper stated that

it was "*too early for policy conclusions*" arising from climate research, and criticised the predictions in the Limits to Growth Paper, stating that: "*The wide uncertainty of these models makes pessimistic predictions by no means certain, and more hopeful predictions appear equally valid*".

(2) Shell Nederland BV was the largest donor to Professor Carl Johan Friedrich Böttcher's work on $CO_2$, emissions and the greenhouse effect in the early 1990s. Professor Böttcher was a Professor of Physical Chemistry and a climate change denier who stated, in written personal notes made in or around August 1995 held in the Friedrich Böttcher archives in Haarlem, the Netherlands, that he had "*allowed [himself] to be persuaded by a number of contacts – generally from Shell circles – to take on a CO2/greenhouse effect project*" and described Shell as the "*godfather*" of his "*CO2-project*". Following a meeting with Royal Dutch's then Managing Director and Board Member, Huub Van Engelshoven, in 1989, Professor Böttcher published a paper in 1994 titled "*Climate Change and the $CO_2$ Myth*", which stated that "*further increase of the CO2 concentration in the atmosphere has little effect on the greenhouse effect*". In a 1995 interview with *2Vandaag*, a public television news programme, Professor Böttcher claimed that "*plants are craving for more $CO_2$ in the atmosphere.* [...] *The current increase, from 0.028 to 0.035 percent, is merely the first step in the right direction for the plant world. Let's emphasize the positive, instead of harping on about $CO_2$.*" In 1996, Professor Böttcher appeared before a Dutch parliamentary committee investigating climate change to argue that the UN's official advisor, the IPCC was incorrect and that, in reality, $CO_2$ had positive impacts on plants, and the greenhouse effect was an unproven hypothesis.

137. The First Defendant, the Second Defendant and other entities within the Shell Group were also members of industry bodies that promoted misinformation regarding ACC. In particular:

(1) The Shell Group was a member of the Global Climate Coalition (the "**GCC**") from 1989 to 1998. In that period, the GCC engaged in (*inter alia*) the following misinformation activities:

(a) In 1992, the GCC distributed a video to journalists which claimed $CO_2$ emissions would increase crop production and feed the hungry.

(b) In March 1992, Michael E. Baroody gave evidence on behalf of the GCC to the Energy and Power Subcommittee of the US House of Representatives in the form of written and oral testimony. The written testimony stated, amongst other things, that "*some scientists forecast that the impact of future climate change may be neutral or beneficial*." Mr Baroody's oral testimony included multiple statements which cast doubt over the scientific support for the link between AGHG emissions and ACC, and the severity of the risks associated with ACC. For example, Mr Baroody stated that "*there is still substantial uncertainty about the importance of human-induced global warming*"; that "*[s]ome scientists forecast that the impact of future climate change may be neutral or beneficial. Recent data indicates that warming may be manifested through increased nighttime minimum temperatures with no change in daytime maximum temperatures*"; and "*[w]hile some warming may occur, the Coalition believes that the current state of knowledge does not justify predictions of substantial warming and accompanying adverse environmental impacts in the next century*."

(c) In 1994, the GCC published a report entitled "*Issues and Options: Potential Global Climate Change*" which stated that "*observations have not yet confirmed evidence of global warming that can be attributed to human activities*" and that the claim that serious impacts of climate change have occurred or will do so "*has not been proven*".

(d) In May 1994, the GCC published a "*Climate Watch Bulletin*" which highlighted "*new scientific evidence*", which suggested that fossil fuels may help maintain "*an essential atmospheric balance*" and "*that cutbacks in fossil fuel use may actually enhance the greenhouse effect.*"

(e) In 1995, the GCC stated that it would take scientists 10 to 20 years "*to have more certainty on the effects of greenhouse gases on the environment and that there is very little danger in waiting until that information is available*". The same year, the GCC published a booklet titled "*Climate Change: Your Passport to the Facts*", which stated that:

"*While many warnings have reached the popular press about the consequences of a potential man made warming of the Earth's atmosphere during the next 100 years, there remains no scientific evidence that such a dangerous warming will occur*".

(2) The Shell Group has been a member of the American Petroleum Institute (the "**API**") from at least the 1950s until the present. The Shell Group is (and, at all relevant times, has been) on the Board of Directors of the API, and has a permanent seat on its Executive Committee. In that period, the API engaged in (*inter alia*) the following misinformation activities:

(a) In 1979, the API established a taskforce (which included representatives from the Shell Group) whose purpose was to influence public opinion and lobby policymakers in support of the fossil fuel industry. In 1981, the API published a policy book titled "*Two Energy Futures: A National Choice for the 80s*" (the "**1981 API Policy Book**") which sought to cast doubt on the risks associated with increasing levels of $CO_2$ in the atmosphere. The 1981 API Policy Book misrepresented the work of the well-known scientist Dr Carl Sagan to suggest that some scientists were "*sanguine*" about the presence of $CO_2$ in the atmosphere. Contrary to that mischaracterisation, Dr Sagan's view (which was published in a book he authored in 1980 titled *Cosmos*) was that: "*the possibility of a runaway greenhouse effect suggests that we have to be careful: even a one- or two-degree rise in the global temperature can have catastrophic consequences*". The 1981 API Policy Book also advocated for the rapid expansion of fossil fuel production and argued falsely that the expansion which it advocated for would be consistent with the conclusions of the World Climate Conference.

(b) In 1996, the API published a policy book titled "*Reinventing Energy: Making the Right Choices*" ("the **1996 API Policy Book**"). Amongst other things, it stated that "*were atmospheric concentrations of carbon dioxide to double*, *we might expect a warming of .5 to 1.5 degrees Celsius…present[ing] few if any problems. [These] modest changes could have both negative and positive impacts…offset by natural*

*adaptation*." The 1996 API Policy Book stated there was a need for "*additional scrutiny*" and that "*no conclusive–or even strongly suggestive–scientific evidence exists that human activities are significantly affecting sea levels, rainfall, surface temperatures or the intensity and frequency of storms*."

(c) In 1997, Executive Vice-President of the API William O'Keefe (who was also Chairman of the GCC) spoke at the 15th World Petroleum Congress in China and stated that the idea that "*the world must act quickly to reduce emissions to avoid potentially damaging temperature increases sometime in the next century*" was a "*shaky premise*" and a "*rush to judgment [that goes] well beyond the state of knowledge*".

(d) In 1998 (at a time when the Shell Group was publicly stating its support for the Kyoto Protocol) the API drew up a disinformation campaign strategy (the "**API Kyoto Strategy**") which was explicitly designed to undermine the consensus on the science of climate change and the need for urgent action to curb reliance on fossil fuels. The API Kyoto Strategy stated: "*Unless 'climate change' becomes a non-issue, meaning the Kyoto proposal is defeated and there are no further initiatives to thwart the threat of climate change, there may be no moment when we can declare victory for our efforts*". The API Kyoto Strategy, *inter alia,* also proposed to: (i) *"Develop and implement a national media relations program to inform the media about uncertainties in climate science"*; (ii) *"Identify, recruit and train a team of five independent scientists to participate in media outreach"* on behalf of the API; (iii) strive for a situation where those "*promoting Kyoto treaty on the basis of extant science appear to be out of touch with reality"*; and (iv) ensure that the "*media*", "*industry leaders*", and "*average citizens*" *"understands" (recognizes) [as in original] [the] uncertainties in climate change".*

138. In the circumstances, it is reasonably to be inferred that:

(1) The Second Defendant knew (and in any event ought reasonably to have known) of the existence and contents of the documents and statements identified at

paragraphs 135 to 137 above at (or, at the very least, shortly after) the date when each of those documents and statements was produced/made.

(2) The First Defendant knew (and in any event ought reasonably to have known) of the existence and contents of the documents and statements identified at paragraphs 135 to 137 above at (or, at the very least, shortly after) the date when the First Defendant became the parent company of the Shell Group in 2005.

(3) The Second Defendant authorised, encouraged and/or endorsed the suppression of the matters described at paragraph 135(1)-(2) above and the publication of the documents and the making of the statements identified at paragraphs 135(3) to 137 above.

(4) The First and Second Defendants deliberately made no attempt to correct the inaccurate and misleading information contained in the statements identified at paragraphs 135(3)-(4) to 137 above.

(5) The First and Second Defendants knew (and in any event ought reasonably to have known) that the activities listed at sub-paragraphs (1) to (4) above would, or were likely to, slow the global energy transition away from a reliance on fossil fuels.

139. In support of the averment at paragraph 138 above the Claimants will rely *inter alia* on the following facts and matters:

(1) The existence and contents of statements contained in documents published by the Second Defendant (such as the Shell Group's annual reports) and statements made by the Second Defendant's directors are self-evidently within the knowledge of, and made on behalf and with the authority of, the Second Defendant.

(2) The Second Defendant exercised a high degree of control over the Shell Group during the Dual-Parent Period, as pleaded in Section E above. That high level of control meant that during the Dual-Parent Period it was inherently likely that the Second Defendant would have been aware of:

(a) The existence, contents and accuracy of statements made by senior Shell Group executives regarding the relationship between AGHG emissions and ACC and/or the consequences of AGHG emissions on ACC.

(b) The existence, contents and accuracy of statements about the relationship between AGHG emissions and ACC and/or the consequences of AGHG emissions on ACC, which were made and/or published by researchers who were employed and/or funded by the Shell Group.

(c) Any instruction issued by a senior Shell Group executive that important scientific findings and conclusions of research which had been commissioned and/or funded by the Shell Group into the relationship between AGHG emissions and ACC and/or the consequences of AGHG emissions on ACC should not be made public or disclosed to anyone outside the Shell Group.

(d) Any decision or instruction by a company, executive or employee within the Shell Group that the existence and contents of significant Shell Group documents which analysed the extent of the Shell Group's contribution to AGHG emissions, the impact of such emissions on ACC and/or the steps that would need to be taken in order to mitigate ACC, should not be made public.

(3) By virtue of the matters described in paragraph 139(2) above, it was inherently likely that:

(a) Statements, decisions and instructions of the types described in paragraph 139(2) above would not have taken place without the Second Defendant's authority and approval.

(b) Had any of those matters taken place without the Second Defendant's authority and approval, then the Second Defendant would have procured the retraction or correction of the relevant unapproved statement, decision or instruction. The absence of any such retraction or correction therefore demonstrates and confirms the Second Defendant's authorisation and approval of those matters.

(4) In relation to the activities of the GCC and API referred to in paragraph 137 above:

(a) As pleaded at Section E above, throughout the Dual-Parent Period the Shell Group functioned as a vertically integrated single economic enterprise over which the Second Defendant exercised a high level of direction, control and supervision.

(b) The Shell Group was a member of, and provided funding to, the GCC and API at the time of the activities referred to in paragraph 137 above. The purpose of that membership and funding was to advance the Shell Group's commercial and economic interests by seeking to influence public opinion and public policy in a way which aligned with and furthered (rather than diverging from and impeding) the pursuit of those interests. The Shell Group's funding and membership of the GCC and API was reported at parent company level (as demonstrated by the inclusion of references to the funding and/or membership of both organisations in the Shell Group's annual reports and/or sustainability reports and/or Climate and Energy Transition Lobbying Reports).

(c) In the light of the matters described in subparagraphs (a) and (b) above, it is therefore inherently likely that:

(i) The Second Defendant would have been consulted (either directly or via executives or employees of the Shell Group who reported to executives or employees of the Second Defendant) about the activities which the GCC and API proposed to undertake in pursuit of the Shell Group's commercial and economic interests, including by being consulted regarding statements which the GCC and API proposed to make/publish as part of those activities.

(ii) The GCC and API would have reported regularly to executives or employees of the Second Defendant (or, alternatively, would have reported regularly to executives or employees of other Shell Group companies, who in turn reported to executives or

employees of the Second Defendant) regarding the activities which the GCC and API were undertaking, including statements which the GCC and API had made/published as part of those activities.

(iii) The nature of the activities being undertaken pursuant to that membership and funding would therefore have been known to, and authorised and/or endorsed by, the Second Defendant.

(d) Further and in any event, the statements which were made by the GCC and API were made in prominent public fora and/or were published in the public domain in publications which were likely to attract a substantial worldwide readership. The prominence and/or extent of the publication of the statements, and the fact that the statements were made by bodies that the Shell Group was a major member and funder of, made it inherently likely that the statements would come to the attention of both:

(i) employees and/or executives of the Second Defendant and executives or employees of other Shell Group companies who reported to executives or employees of the Second Defendant; and

(ii) employees and/or executives of the First Defendant (after it became the parent company of the Shell Group in 2005) and executives or employees of other Shell Group companies who reported to executives or employees of the First Defendant.

(5) At all material times during the Single-Parent Period (in respect of the First Defendant) and the Dual-Parent Period (in respect of the Second Defendant) the Defendants had the capacity to publicly correct any inaccurate or misleading statement made by or on behalf of the Shell Group of which they were, at the relevant time, sole parent or dual parent, respectively. Accordingly, it is reasonably to be inferred that where the Defendants were aware of the existence and content of any such inaccurate or misleading statement and failed to take any steps to correct it, the failure to do so was deliberate.

## H APPLICABLE LAW

### H1 The Defendants' non-contractual obligations

140. The Claimants' claims against the Defendants for loss resulting from Typhoon Rai are properly to be characterised as claims in tort/delict for the purposes of the Rome II Regulation ("**Rome II**") as applicable under The Law Applicable to Contractual Obligations and Non-Contractual Obligations (Amendment etc.) (UK Exit) Regulations 2019 (SI 2019/834).

141. Pursuant to Article 4(1) of Rome II, any non-contractual obligation arising out of the torts/delicts alleged by the Claimants in respect of Typhoon Rai is governed by Philippines law as the law of the country in which the damage occurred.

### H2 The Defendants' contractual obligations

142. The attribution to the Defendants of the conduct and knowledge of the individuals upon whose conduct and knowledge the Claimants rely depends upon the existence and scope of the relevant relationships of agency. The law governing those relationships falls to be determined in accordance with the conflicts rules applicable to contractual obligations.

143. Accordingly, the law governing the relevant relationships of agency is determined pursuant to, as applicable:

(1) Articles 3(1), 4(2) and/or 4(5) of the Convention on the law applicable to contractual obligations ("**Rome Convention**"); or

(2) Articles 3(1), 4(1)(b), 4(2), 4(3) and/or 8(1) of Regulation (EC) No. 593/2008 on the law applicable to contractual obligations ("**Rome I Regulation**"); or

(3) where neither instrument applies, the common law rules identifying the proper law of the relationship of principal and agent.

144. Pending disclosure of the relevant employment, agency and contractor agreements, the Claimants rely upon any express choice of law pursuant to Article 3(1) of the Rome Convention and/or Articles 3(1) and/or 8(1) of the Rome I Regulation. In the absence of an express choice of law, the Claimants aver that the relevant relationships of agency were governed by English law:

(1) where the relevant individual was habitually resident in England and Wales, pursuant to Article 4(2) of the Rome Convention and/or Article 4(1)(b) or 4(2) of the Rome I Regulation; or

(2) where the relevant individual was not habitually resident in England and Wales, because the relationships of agency were manifestly more closely connected with England and Wales within the meaning of Article 4(5) of the Rome Convention and/or Article 4(3) of the Rome I Regulation, having regard in particular to the fact that the Defendants were incorporated in, and carried on their business from, England and Wales.

145. Where neither the Rome Convention nor the Rome I Regulation applies, the Claimants rely upon the common law rule that the proper law of the agency relationship is the law of the country where the relationship was created or, alternatively, where the Defendants principally carried on business, where the agents were intended to act on behalf of the Defendants, or with which the relationship of agency was most closely connected. On any of those bases, the applicable law is English law.

### H3 Philippines Law

(a) <u>The Constitution</u>

146. The Constitution of the Republic of the Philippines 1987 (the "**Constitution**") contains amongst others the following material articles:

(1) Article II, Section 2, provides:

> "*The Philippines* […] *adopts the generally accepted principles of international law as part of the law of the land*".

(2) Article II, Section 16, provides:

> "*The State shall protect and advance the right of the people to a balanced and healthful ecology in accord with the rhythm and harmony of nature.*"

147. The right to a balanced and healthful ecology is a specific fundamental right which carries with it a correlative duty to refrain from impairing the environment.

(b) Climate Change Act of 2009

148. Republic Act No. 9729 (2009) or the Climate Change Act of 2009 (the "**Climate Change Act**") contains amongst others the following material articles:

(1) Section 2 provides:

> "[…] *It is the policy of the State to afford full protection and the advancement of the right of the people to a healthful ecology in accord with the rhythm and harmony of nature.* […] *Towards this end, the State adopts the principle of protecting the climate system for the benefit of humankind, on the basis of climate justice or common but differentiated responsibilities and the Precautionary Principle to guide decision-making in climate risk management.* […] *It shall be the policy of the State to enjoin the participation of national and local governments, businesses, nongovernment organizations, local communities and the public to prevent and reduce the adverse impacts of climate change and, at the same time, maximize the benefits of climate change.* […]"

(2) Section 3 provides:

> "*For purposes of this Act, the following shall have the corresponding meanings:*
>
> […]
>
> *(c) "Anthropogenic causes" refer to causes resulting from human activities or produced by human beings.*
>
> *(d) "Climate Change" refers to a change in climate that can be identified by changes in the mean and/or variability of its properties and that persists for an extended period typically decades or longer, whether due to natural variability or as a result of human activity.*
>
> […]
>
> *(f) "Climate Risk" refers to the product of climate and related hazards working over the vulnerability of human and natural ecosystems.*

*(g) "Disaster" refers to a serious disruption of the functioning of a community or a society involving widespread human, material, economic or environmental losses and impacts which exceed the ability of the affected community or society to cope using its own resources.*

*(h) "Disaster risk reduction" refers to the concept and practice of reducing disaster risks through systematic efforts to analyze and manage the causal factors of disasters, including through reduced exposure to hazards, lessened vulnerability of people and property, wise management of land and the environment, and improved preparedness for adverse events.*

[…]

*(l) "Greenhouse gases (GHG)" refers to constituents of the atmosphere that contribute to the greenhouse effect including, but not limited to, carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons and sulfur hexafluoride.*

[…]

*(n) "Mitigation" in the context of climate change, refers to human intervention to address anthropogenic emissions by sources and removals by sinks of all GHG, including ozone-depleting substances and their substitutes.*

*(o) "Mitigation potential" shall refer to the scale of GHG reductions that could be made, relative to emission baselines, for a given level of carbon price (expressed in cost per unit of carbon dioxide equivalent emissions avoided or reduced)*".

(c) Clean Air Act of 1999

149. Republic Act No. 8749 or the Philippine Clean Air Act of 1999 (the "**Clean Air Act**") contains amongst others the following material articles:

(1) Section 2 provides:

"*The State shall promote and protect the global environment to attain sustainable development while recognizing the primary responsibility of local government units to deal with environmental problems.*

[…]

*The State also recognizes the principle that "polluters must pay".*

*Finally, the State recognizes that a clean and healthy environment is for the good of all and should, therefore, be the concern of all.*"

(2) Section 3 provides:

"*It shall be the policy of the State to:*

[…]

*(e) Formulate and enforce a system of accountability for short and long-term adverse environmental impact of a project, program or activity. This shall include the setting up of a funding or guarantee mechanism for clean-up and environmental rehabilitation and compensation for personal damages*"

(3) Section 4 provides:

"*Pursuant to the above-declared principles, the following rights of citizens are hereby sought to be recognized and the State shall seek to guarantee their enjoyment:*

*(a) The right to breathe clean air;*

[…]

*(e) The right to be informed of the nature and extent of the potential hazard of any activity, undertaking or project and to be served timely notice of any significant rise in the level of pollution and the accidental or deliberate release into the atmosphere of harmful or hazardous substances;*

[…]

*(g) The right to bring action in court or quasi-judicial bodies to enjoin all activities in violation of environmental laws and regulations, to compel the rehabilitation and cleanup of affected area, and to seek the imposition of penal sanctions against violators of environmental laws; and*

*(h) The right to bring action in court for compensation of personal damages resulting from the adverse environmental and public health impact of a project or activity*"

(4) Section 5 provides:

"*(a) "Air pollutant" means any matter found in the atmosphere other than oxygen, nitrogen, water vapor, carbon dioxide, and the inert gases in their natural or normal concentrations, that is detrimental to health or the environment, which includes but not limited to smoke, dust, soot, cinders, fly ash, solid particles of any kind, gases, fumes, chemical mists, steam and radio-active substances.*

[…]

*(h) "Emission" means any air contaminant, pollutant, gas stream or unwanted sound from a known source which is passed into the atmosphere;*

*(i) "Greenhouse gases" mean those gases that can potentially or can reasonably be expected to induce global warming, which include carbon dioxide, methane, oxides of nitrogen, chlorofluorocarbons, and the like*".

(5) Section 41 provides:

"*For purposes of enforcing the provisions of this Act or its implementing rules and regulations, any citizen may file an appropriate civil, criminal or administrative action in the proper courts against:*

*(a) Any person who violates or fails to comply with the provisions of this Act or its implementing rules and regulations* […]"

(d) <u>Disaster Risk Reduction and Management Act 2010</u>

150. Republic Act No. 10121 or the Philippine Disaster Risk Reduction and Management Act of 2010 (the "**Disaster Risk Reduction and Management Act**") contains amongst others the following material articles:

(1) Section 2 provides:

"*It shall be the policy of the State to:*

[…]

*(d) Adopt a disaster risk reduction and management approach that is holistic, comprehensive, integrated, and proactive in lessening the socioeconomic and environmental impacts of disasters including climate change, and promote the involvement and participation of all sectors and all stakeholders concerned, at all levels, especially the local community*".

(2) Section 3 provides:

"*For purposes of this Act, the following shall refer to:*

*(n) "Disaster Risk Reduction" - the concept and practice of reducing disaster risks through systematic efforts to analyze and manage the causal factors of disasters, including through reduced exposures to hazards, lessened vulnerability of people and property, wise management of land and the environment, and improved preparedness for adverse events*".

(e) <u>The Civil Code</u>

151. Republic Act No. 386 or the Civil Code contains amongst others the following material articles:

(1) Article 9 provides:

"*No judge or court shall decline to render judgment by reason of the silence, obscurity or insufficiency of the laws.*"

(2) Article 10 provides:

"*In case of doubt in the interpretation or application of laws, it is presumed that the lawmaking body intended right and justice to prevail.*"

(3) Article 19 provides:

"*Every person must, in the exercise of his rights and in the performance of his duties, act with justice, give everyone his due, and observe honesty and good faith.*"

(4) Article 20 provides:

"*Every person who, contrary to law, wilfully or negligently causes damage to another, shall indemnify the latter for the same.*"

(5) Article 21 provides:

"*Any person who wilfully causes loss or injury to another in a manner that is contrary to morals, good customs or public policy shall compensate the latter for the damage.*"

(6) Article 694 provides:

"*A nuisance is any act, omission, establishment, business, condition of property, or anything else which:*

*(1) Injures or endangers the health or safety of others; or*

*(2) Annoys or offends the senses; or*

*(3) Shocks, defies or disregards decency or morality; or*

*(4) Obstructs or interferes with the free passage of any public highway or street, or any body of water; or*

*(5) Hinders or impairs the use of property.*"

(7) Article 695 provides:

"*Nuisance is either public or private. A public nuisance affects a community or neighborhood or any considerable number of persons, although the extent of the annoyance, danger or damage upon individuals may be unequal. A private nuisance is one that is not included in the foregoing definition.*"

(8) Article 696 provides:

"*Every successive owner or possessor of property who fails or refuses to abate a nuisance in that property started by a former owner or possessor is liable therefor in the same manner as the one who created it.*"

(9) Article 697 provides:

"*The abatement of a nuisance does not preclude the right of any person injured to recover damages for its past existence.*"

(10) Article 698 provides:

"*Lapse of time cannot legalize any nuisance, whether public or private.*"

(11) Article 699 provides:

"*The remedies against a public nuisance are:*

[…]

*(2) A civil action* […]".

(12) Article 703 provides:

"*A private person may file an action on account of a public nuisance, if it is specially injurious to himself.*"

(13) Article 705 provides:

"*The remedies against a private nuisance are:*

[…]

*(1) A civil action* […]".

(14) Article 2176 provides:

"*Whoever by act or omission causes damage to another, there being fault or negligence, is obliged to pay for the damage done. Such fault or negligence, if there is no pre-existing contractual relation between the parties, is called a quasi-delict and is governed by the provisions of this Chapter.*"

(15) Article 2194 provides:

"*The responsibility of two or more persons who are liable for quasi-delict is solidary.*"

(16) Article 2197 provides:

"*Damages may be:*

*(1) Actual or compensatory;*

*(2) Moral;*

[…]

*(4) Temperate or moderate;*

[…]

*(6) Exemplary or corrective.*"

(17) Article 2198 provides:

"*The principles of the general law on damages are hereby adopted insofar as they are not inconsistent with this Code.*"

(18) Article 2199 provides:

"*Except as provided by law or by stipulation, one is entitled to an adequate compensation only for such pecuniary loss suffered by him as he has duly proved. Such compensation is referred to as actual or compensatory damages.*"

(19) Article 2200 provides:

"*Indemnification for damages shall comprehend not only the value of the loss suffered, but also that of the profits which the obligee failed to obtain.*"

(20) Article 2202 provides:

"*In crimes and quasi-delicts, the defendant shall be liable for all damages which are the natural and probable consequences of the act or omission complained of. It is not necessary that such damages have been foreseen or could have reasonably been foreseen by the defendant.*"

(21) Article 2211 provides:

"*In crimes and quasi-delicts, interest as a part of the damages may, in a proper case, be adjudicated in the discretion of the court.*"

(22) Article 2217 provides:

"*Moral damages include physical suffering, mental anguish, fright, serious anxiety, besmirched reputation, wounded feelings, moral shock, social humiliation, and similar injury. Though incapable of pecuniary computation, moral damages may be recovered if they are the proximate result of the defendant's wrongful act or omission.*"

(23) Article 2218 provides:

"*In the adjudication of moral damages, the sentimental value of property, real or personal, may be considered.*"

(24) Article 2219 provides:

"*Moral damages may be recovered in the following and analogous cases:*

[…]

*(2) Quasi-delicts causing physical injuries;*

[…]

*(10) Acts and actions referred to in articles 21* […]".

(25) Article 2221 provides:

"*Nominal damages are adjudicated in order that a right of the plaintiff, which has been violated or invaded by the defendant, may be vindicated or recognized, and not for the purpose of indemnifying the plaintiff for any loss suffered by him.*"

(26) Article 2222 provides:

"*The court may award nominal damages in every obligation arising from any source enumerated in article 1157, or in every case where any property right has been invaded.*"

(27) Article 2229 provides:

"*Exemplary or corrective damages are imposed, by way of example or correction for the public good, in addition to the moral, temperate, liquidated or compensatory damages.*"

(28) Article 2231 provides:

"*In quasi-delicts, exemplary damages may be granted if the defendant acted with gross negligence.*"

(29) Article 2233 provides:

"*Exemplary damages cannot be recovered as a matter of right; the court will decide whether or not they should be adjudicated.*"

(30) Article 2234 provides:

> "*While the amount of the exemplary damages need not be proved, the plaintiff must show that he is entitled to moral, temperate or compensatory damages before the court may consider the question of whether or not exemplary damages should be awarded. In case liquidated damages have been agreed upon, although no proof of loss is necessary in order that such liquidated damages may be recovered, nevertheless, before the court may consider the question of granting exemplary in addition to the liquidated damages, the plaintiff must show that he would be entitled to moral, temperate or compensatory damages were it not for the stipulation for liquidated damages.*"

152. The Claimants will further rely on the following principles of Philippines law:

(1) The "Precautionary Principle" according to which the right to a balanced and healthful ecology shall be given the benefit of the doubt where there is a lack of full scientific certainty in establishing a causal link between human activity and environmental damage.

(2) The "Polluter Pays Principle" according to which, those who are responsible for pollution should bear the full costs of the harm caused thereby.

## I LIABILITY OF THE DEFENDANTS

153. By reason of the facts, provisions and/or principles of Philippines law pleaded above, the Defendants are liable to the Claimants pursuant to the causes of action pleaded below.

### I1 Agency and Attribution

154. Insofar as any conduct is relied upon against the Defendants to establish any of the Claimants' pleaded causes of action, the Claimants will aver that the Defendants are liable for the conduct of their agents and fixed with their knowledge.

155. Pending disclosure, the Claimants' best particulars are that any individual employed by any entity within the Shell Group was at all material times acting on behalf of and/or at the direction of both the relevant employing entity and the Second Defendant (during the

Dual-Parent Period) and the relevant employing entity and the First Defendant (during the Single-Parent Period).

156. In support of the foregoing and pending disclosure, the Claimants rely on the matters pleaded at paragraphs 47 to 121 above and aver that the organisation of the Shell Group was so highly integrated and centrally managed that all individuals employed by any entity within the Shell Group:

(1) carried out their roles as if they were part of a single commercial undertaking directed and controlled by the Second Defendant (during the Dual-Parent Period) or the First Defendant (during the Single-Parent Period);

(2) were at all times treated as representatives of the Second Defendant (during the Dual-Parent Period) or the First Defendant (during the Single-Parent Period) regardless of formal employing entity, location or jurisdiction; and

(3) were at all times bound to act in accordance with the Group-wide standards, policies, frameworks and strategies of the Second Defendant (during the Dual-Parent Period) or the First Defendant (during the Single-Parent Period).

157. In the premises:

(1) During the Dual-Parent Period, the acts, omissions and knowledge of all such individuals in carrying out or otherwise participating in the Activities are attributable to the Second Defendant.

(2) During the Single-Parent Period, the acts, omissions and knowledge of all such individuals in carrying out or otherwise participating in the Activities are attributable to the First Defendant.

**I2 Applicable causal test**

158. For the purposes of the causal allegations pleaded herein, the applicable causal test under the law of the Philippines is one of proximate causation. Without prejudice to the generality of the foregoing, the Claimants rely on the following matters:

(1) A cause is a proximate cause where, in a natural and continuous sequence, unbroken by any efficient intervening cause, it produces, alone or in combination with other causes, the injury complained of and without which the injury would not have occurred.

(2) An intervening cause is a distinct, successive, independent and efficient cause which breaks the chain of causation.

(3) A cause does not cease to be a proximate cause merely because other causes also contributed to the result, including where another cause made a greater contribution thereto.

(4) Where multiple causes combine to produce a single injury, each may constitute a proximate cause thereof notwithstanding that it is impossible to determine the precise extent to which each contributed to the injury. In such circumstances, the injury may be attributed to all or any of such proximate causes.

159. The proximate causation test is to be interpreted and applied having regard to the matters outlined at paragraph 185(6) below. Further, applying the Precautionary Principle pleaded at paragraph 152(1) above, any uncertainty in satisfying that test is to be resolved in favour of the Claimants.

**I3 Liability in Public Nuisance**

160. The Defendants are liable to the Claimants for public nuisance under Articles 694, 695, 696 and 703 of the Civil Code. In this regard, the Claimants will rely on the matters pleaded in paragraphs 161 to 179 below.

(a) <u>Nuisance</u>

161. For the purposes of Articles 694(1) and 694(5) of the Civil Code, respectively, a nuisance is any act, omission, establishment, business, condition of property or anything else which, amongst other things, injures or endangers the health or safety of others and/or hinders or impairs the use of property.

162. The Activities injured and endangered the health and safety of others and/or hindered and impaired the use of property. The Claimants rely on the matters set out at paragraph 36 above and paragraphs 233 to 235 below.

163. Without prejudice to the generality of the foregoing, the Claimants further rely on the following matters:

(1) Paragraph 37 above is repeated.

(2) The Activities resulted in very large quantities of AGHGs being released into the atmosphere. The Shell Emissions were substantial both in and of themselves and as a proportion of cumulative AGHG emissions. Paragraphs 38 to 41 above are repeated.

(3) ACC is caused by cumulative AGHG emissions. The Activities substantially contributed to and formed part of such cumulative AGHG emissions. Paragraphs 16 to 27 and 38 to 41 above are repeated.

(4) Applying the causal test outlined at paragraph 158 above, ACC was a proximate cause of Typhoon Rai occurring as a Category 5 tropical cyclone with the windspeed, rainfall and storm surge characteristics described at paragraphs 31 to 33 above. Absent ACC, Typhoon Rai, as defined, would not have occurred.

(5) Typhoon Rai caused death, personal injury, illness and displacement. Further, Typhoon Rai caused the destruction of homes and infrastructure, flooding and inundation of land, loss of productive use of property, and interruption of economic and social activity.

(6) Applying the causal test outlined at paragraph 158 above, the Activities formed part of the causal chain which resulted in Typhoon Rai and the consequences pleaded at sub-paragraph (5) above in a natural and continuous sequence unbroken by any efficient intervening cause. In the premises, the Activities were a proximate cause of such consequences and injured the health and safety of the Claimants and/or hindered and impaired their use of property.

164. In all the premises, the Activities constitute a nuisance within the meaning of Articles 694(1) and 694(5) of the Civil Code ("**the Nuisance**").

(b) The Claimants' standing to bring a claim in public nuisance

165. For the purposes of Article 695 of the Civil Code, a public nuisance is one which affects a community or neighbourhood or any considerable number of persons, although the extent of the annoyance, danger or damage upon individuals may be unequal.

166. The effects of the Nuisance were suffered by a considerable number of persons. In particular, Typhoon Rai killed over 400 people, seriously injured at least 1,100 people, damaged or destroyed over 1.4 million homes, displaced residents from their homes, damaged infrastructure, interrupted essential services, and caused other losses affecting

a considerable number of persons throughout the Philippines. Paragraph 36 above is repeated.

167. A private person may bring a claim on account of a public nuisance under Article 695 of the Civil Code if they have suffered damage in a different kind and degree from that suffered by the public generally ("**special damage**").

168. The Claimants have suffered special damage in the form of, amongst other things, death, injury, bereavement, destruction of homes, displacement, loss of income and/or a loss of livelihood. The Claimants rely on the matters pleaded at paragraph 36 above and paragraphs 233 to 235 below. Particulars of damage suffered by each individual Claimant (to the extent such information is presently available to the Claimants) are set out in schedules of information appended at Schedule 2 to these Particulars of Claim and will be updated in due course.

169. The Claimants therefore have standing to bring claims in public nuisance in respect of the loss and damage which they have suffered.

(c) Bases of Liability

170. By reason of the matters pleaded at paragraphs 42 to 121 and 154 to 157 above, the Single-Parent Period Activities (and the resulting Single-Parent Period Emissions) are attributable to the First Defendant and the Dual-Parent Period Activities (and the resulting Dual-Parent Period Emissions) are attributable to the Second Defendant. Accordingly, for the reasons set out below, the First Defendant and the Second Defendant are each liable as direct tortfeasors as a result of the Activities which gave rise to the Nuisance.

171. Alternatively, if and insofar as the Activities (and resulting Shell Emissions) constituting the Nuisance are not properly attributable to either Defendant, for the reasons set out below, that Defendant is nevertheless liable as a joint tortfeasor in respect of the Nuisance by reason of having approved, promoted, encouraged, advised, cooperated in and/or otherwise participated in the commission or continuation of the Activities, or of having approved of them after they were performed for its benefit.

(d) Liability of the First Defendant

172. The First Defendant created, maintained, continued, adopted, permitted and/or assumed responsibility for the Single-Parent Period Activities and the climate-related

consequences of the Single-Parent Period Emissions. Without prejudice to the generality of the foregoing, the Claimants repeat paragraphs 42 to 121 and 154 to 157 above and further rely on the following matters in particular:

(1) Throughout the Single-Parent Period the First Defendant exercised extensive direction, control and influence over all aspects of the Shell Group's worldwide operations, including over the following matters:

(a) whether (and, if so, how and where) the Shell Group established and operated facilities for the extraction, processing, transportation, refinement and sale of oil and natural gas;

(b) the volume of oil and natural gas that was extracted, processed, transported, refined, marketed and/or sold by the Shell Group throughout the world;

(c) the allocation of financial, technical and human resources necessary in order to construct, maintain and operate the infrastructure needed in order to carry out that extraction, processing, transportation, acquisition and sale of oil and natural gas by the Shell Group; and

(d) the steps which were taken (or not taken) by the Shell Group to assess, identify and mitigate the effects of the Single-Parent Period Emissions on ACC and the resulting risks of harm to people and property.

(2) Throughout the Single-Parent Period, the First Defendant determined the scope and scale of the Single-Parent Period Activities, and therefore determined the volume of the Single-Parent Period Emissions. Paragraphs 81 to 86 and 111 to 112 above are repeated.

173. Further or alternatively, the First Defendant approved of, promoted, encouraged, advised and/or cooperated in the Single-Parent Period Activities (and hence the Single-Parent Period Emissions) and/or approved of them after they were carried out for the First Defendant's benefit. In support of the foregoing, the Claimants rely on the matters pleaded at paragraph 172 above.

174. Further or alternatively, in addition to the First Defendant's responsibility for the Single-Parent Period Activities and the Single-Parent Period Emissions, the First Defendant also

continued, adopted and assumed responsibility jointly with the Second Defendant for the ongoing consequences of the Dual-Parent Period Activities and the Dual-Parent Period Emissions. Without prejudice to the generality of the foregoing, the Claimants rely on the following maters:

(1) The First Defendant was aware that the Dual-Parent Period Activities had resulted in the Dual-Parent Period Emissions.

(2) The First Defendant was aware that the Dual-Parent Period Emissions would substantially contribute to the occurrence and/or magnitude of ACC, and the risk of harm to people and property caused by ACC, during the Single-Parent Period.

(3) As the corporate successor to the Second Defendant and the sole parent company of the Shell Group during the Single-Parent Period, the First Defendant was aware throughout the Single-Parent Period that the First Defendant owned, controlled and benefitted from all of the companies within the Shell Group whose activities had resulted in the Dual-Parent Period Emissions.

(4) By virtue of that ownership and control, the First Defendant had the ability to conduct the Single-Parent Period Activities in a way that mitigated the climate-related consequences of the Dual-Parent Period Emissions.

(5) However, the First Defendant elected to continue the Single-Parent Period Activities in a manner that substantially maintained and/or increased the annual level of emissions caused by the Shell Group's operations and thereby compounded, rather than alleviated and/or sufficiently mitigated, the climate-related consequences of the Dual-Parent Period Emissions.

175. In all the premises, the First Defendant is strictly and solidarily liable to the Claimants for the Nuisance.

(e) <u>Liability of the Second Defendant</u>

176. The Second Defendant created, maintained, continued, adopted, permitted and/or assumed responsibility for the Dual-Parent Period Activities and the climate-related consequences of the Dual-Parent Period Emissions. Without prejudice to the generality of the foregoing, the Claimants repeat paragraphs 42 to 121 and 154 to 157 above and further rely on the following matters in particular:

(1) Throughout the Dual-Parent Period, the Second Defendant exercised extensive direction, control and influence over all aspects of the Shell Group's worldwide operations, including over the following matters:

(a) whether (and, if so, how and where) the Shell Group established and operated facilities for the extraction, processing, transportation, refinement and sale of oil, natural gas and (between 1974 and 2000) coal;

(b) the volume of oil, natural gas and (between 1974 and 2000) coal that was extracted, processed, transported, refined and/or sold by the Shell Group throughout the world;

(c) the allocation of financial, technical and human resources necessary in order to construct, maintain and operate the infrastructure needed in order carry out that extraction, processing, transportation, acquisition and sale of oil, natural gas and (between 1974 and 2000) coal by the Shell Group; and

(d) the steps which were taken (or not taken) by the Shell Group to assess, identify and mitigate the effects of the Dual-Parent Period Emissions on ACC and the resulting risks of harm to people and property.

(2) Throughout the Dual-Parent Period, the Second Defendant determined the scope and scale of the Dual-Parent Period Activities, and therefore determined the volume of Dual-Parent Period Emissions. Paragraphs 82, 85, 105 and 113 above are repeated.

177. Further or alternatively, by reason of the matters pleaded at paragraph 176 above, the Second Defendant approved of, promoted, encouraged, advised and/or cooperated in the Dual-Parent Period Activities and/or approved of them after they were carried out for the Second Defendant's benefit.

178. In all the premises, the Second Defendant is strictly and solidarily liable to the Claimants for the Nuisance.

(f) <u>Liability for the Claimants' loss and damage</u>

179. Applying the causal test pleaded at paragraph 158 above, the Single-Parent Period Activities (and the resulting Single-Parent Period Emissions) and the Dual-Parent Period

Activities (and the resulting Dual-Parent Period Emissions) are each a proximate cause of the loss and damage suffered by the Claimants. In the premises, the First Defendant the Second Defendant are solidarily liable for the whole of the loss and damage suffered by the Claimants notwithstanding that other persons also contributed thereto or that it is impossible to determine the precise extent to which each contributed thereto. The Claimants' case on loss and damage is pleaded further at Section J below.

180. In all the premises, the Defendants are strictly and solidarily liable in public nuisance for the loss and damage suffered by the Claimants.

### I4 Liability in Private Nuisance

181. Further or alternatively, the Defendants are liable to the Claimants in private nuisance under Articles 694, 696 and 703 of the Civil Code. In this regard, the Claimants will rely on the following matters:

(1) Paragraphs 154 to 159 and 161 to 164 above are repeated.

(2) The Defendants are strictly and solidarily liable to the Claimants as direct tortfeasors and/or joint tortfeasors for private nuisance. Paragraphs 170 to 178 above are repeated.

(3) The Claimants owned, occupied, possessed, used and/or enjoyed property that was hindered and/or impaired by the Nuisance. In the premises, the Nuisance hindered and/or impaired the Claimants' use and enjoyment of their property and caused damage thereto. The nature and/or extent of such hindrance and/or impairment is set out in schedules of information appended at Schedule 2 to these Particulars of Claim, which will be updated in due course.

(4) Paragraph 179 above is repeated.

182. In all the premises, the Defendants are strictly and solidarily liable in private nuisance for the loss and damage suffered by the Claimants.

### I5 Liability in Quasi-Delict

183. The Defendants are liable to the Claimants in quasi-delict under Article 2176 of the Civil Code. In this regard, the Claimants will rely on the matters pleaded in paragraphs 184 to 199 below.

(a) Negligence

184. For the purposes of Article 2176 of the Civil Code:

(1) Any person who by act or omission causes damage to another through fault or negligence is liable in quasi-delict for the damage thereby caused.

(2) Negligence is the omission to do something which a reasonable person, guided by those considerations which ordinarily regulate the conduct of human affairs, would do, or the doing of something which a prudent and reasonable person would not do.

(3) Negligence further includes conduct which creates an undue risk of harm to another and the failure to observe the degree of care, precaution and vigilance which the circumstances justly demand.

(4) Fault or negligence is to be assessed by reference to the standard of conduct of a reasonable and prudent person in the defendant's position having regard to all the circumstances of the case.

(b) Standard of conduct

185. The circumstances relevant to the assessment of negligence in the present case include, amongst other things, the following:

(1) The standards of conduct embodied in Article 19 of the Civil Code requiring persons, in the exercise of their rights and performance of their duties, to act with justice, give everyone their due, and observe honesty and good faith.

(2) The importance of protecting and advancing the right of the people to a balanced and healthful ecology in accord with the rhythm and harmony of nature, as expressly recognised by Article II, Section 16 of the Constitution and section 2 of the Climate Change Act.

(3) The policy of the Philippines to enjoin businesses to prevent and refute the adverse impacts of climate change, as expressly recognised in section 2 of the Climate Change Act.

(4) The importance of adopting an approach to disaster risk reduction and management that is holistic, comprehensive, integrated and proactive in lessening the socioeconomic and environmental impacts of climate change, as expressly

recognised in sections 2 and 5 of the Disaster Risk Reduction and Management Act 2010.

(5) The legal right to clean air and to be informed of the nature and extent of the potential hazard of any activity, undertaking or project, as expressly recognised in section 4 of the Clean Air Act, and the principle that a clean and healthy environment is for the good of all and should therefore be the concern of all, as expressly recognised in section 2 of the Clean Air Act.

(6) The International Court of Justice's recognition, in its Advisory Opinion of 23 July 2025 on *Obligations of States in respect of Climate Change*, that:

(a) anthropogenic greenhouse gas emissions have caused significant harm to the climate system;

(b) climate change results from cumulative greenhouse gas emissions;

(c) notwithstanding the cumulative nature of greenhouse gas emissions, it is scientifically possible to determine the contribution of particular sources to those emissions and, through attribution methodologies, to assess the significance of that contribution;

(d) the existence of multiple contributing causes does not, of itself, prevent the establishment of a sufficiently direct and certain causal nexus between a particular party's conduct and the damage suffered;

(e) the existence of such a causal nexus must be assessed on an *in concreto* basis having regard to the facts of the particular case; and

(f) whether a particular climatic event is attributable to anthropogenic climate change is capable of scientific determination.

(7) The particular vulnerability of the Philippines to climate change. Paragraphs 28 to 30 above are repeated.

(8) The Defendants' creation of and/or contribution to the risks associated with the Activities. Paragraphs 37 to 41 and 122 to 126 above are repeated.

(9) The Defendants' control over the Activities giving rise to such risks and their assumption of responsibility in relation to such risks. Paragraphs 42 to 121 and 172 and 176 above are repeated.

(10) The Defendants' actual or constructive knowledge of such risks. Paragraphs 112 and 113 and 127 to 133 above are repeated.

(11) The Defendants' knowledge of and/or involvement in the suppression of information about such risks and/or the dissemination of misinformation about such risks. Paragraphs 134 to 139 above are repeated.

(12) The fact that the Defendants have generated many billions of pounds of profits through the Activities and therefore have very substantial financial, scientific and technical resources at their disposal.

186. A reasonable and prudent person in the position of the Defendants would have known of the circumstances pleaded at paragraph 185 above as well as the following further matters:

(1) AGHG cause and contribute to ACC. Paragraphs 16 to 27 are repeated.

(2) ACC substantially increases the frequency, severity and/or likelihood of extreme weather events such as typhoons. Paragraphs 23 to 26 above are repeated.

(3) Such extreme weather events are capable of causing death, personal injury, illness, displacement, property damage and economic loss.

(4) There is a strong causal relationship between the frequency, severity and likelihood of extreme weather events and the extent and magnitude of the deaths and personal injuries, physical damage and economic losses caused by such events. Paragraphs 23 to 26 above are repeated.

(5) The Philippines and its residents (especially those residing in the areas where the Claimants resided) are particularly vulnerable to such harms. Paragraphs 28 to 30 above are repeated.

(6) The Shell Emissions materially contributed (and would continue in future to materially contribute) to ACC and to its magnitude, and, in particular, significantly increased (and would continue in future to significantly increase)

both the likelihood of a typhoon such as Typhoon Rai occurring in the Philippines and the strength, intensity and destructive force of any such storm.

(7) Accordingly, the Shell Emissions created and/or significantly increased (and would continue in future to create and/or significantly increase) the risk that persons in the position of the Claimants would suffer death, personal injury and/or property destruction (and resulting economic losses) as a result of such an extreme weather event.

187. Having regard to what the Defendants knew and ought to have known, a reasonable and prudent person in the position of the Defendants would have taken at least the following steps:

(1) effectively investigated, monitored and assessed the risks associated with the Shell Emissions and ACC and taken effective steps in the light of the information and knowledge thereby obtained to:

(a) substantially reduce and/or mitigate such risks; and

(b) inform, warn and protect persons foreseeably at risk of harm arising from such emissions and climate change, including the Claimants;

(2) taken prompt and effective steps to remedy and mitigate harm caused to vulnerable persons such as the Claimants by extreme weather events such as Typhoon Rai which were caused and/or made more severe by ACC;

(3) refrained from making, publishing, disseminating or supporting statements which materially understated, obscured, misrepresented or denied such risks;

(4) refrained from unreasonably increasing such risks by continuing, expanding, promoting or encouraging the Activities notwithstanding knowledge of such risks; and

(5) taken timely steps to mitigate the effects of the Activities, including by:

(a) substantially reducing Production Emissions through the adoption of reasonably available techniques to limit venting and flaring and fugitive emissions; and

(b) substantially reducing Produced Combustion Emissions and Sold Combustion Emissions by substantially reducing the volume of fossil fuels extracted, produced, acquired and sold by the Shell Group.

(c) Bases of Liability

188. By reason of the matters pleaded at paragraphs 42 to 121 and 154 to 157 above, the relevant acts, omissions and/or activities of the Shell Group during the Dual-Parent Period and the Single-Parent Period are attributable to the Second Defendant and the First Defendant, respectively. Accordingly, for the reasons set out below, the First Defendant and the Second Defendant are each liable as direct tortfeasors for quasi-delict under Article 2176 of the Civil Code.

189. Alternatively, if and insofar as any relevant act, omission or activity of the Shell Group is not properly attributable to either Defendant, for the reasons set out below, that Defendant is nevertheless liable for quasi-delict under Article 2176 of the Civil Code as a joint tortfeasor by reason of having approved, promoted, encouraged, advised, cooperated in and/or otherwise participated in the commission or continuation of that act, omission or activity, or of having approved of it after it was done for its benefit.

(d) Liability of the First Defendant

190. The First Defendant's conduct fell below the standard of care pleaded at paragraph 187 above. Without prejudice to the generality of the foregoing and pending disclosure, the Claimants repeat paragraphs 42 to 121 and 154 to 157 above and further rely on the following matters in particular:

(1) Paragraph 172 above is repeated.

(2) The First Defendant failed adequately to investigate, monitor and assess the risks of harm associated with the Shell Emissions and ACC as well as the steps that were necessary to effectively mitigate those risks and to protect persons foreseeably at risk of harm as a result of those risks.

(3) The First Defendant increased the risks of ACC by:

(a) continuing, expanding, promoting and/or encouraging the Activities during the Single-Parent Period and failing, in a timely manner, to take steps to reduce the Produced Combustion Emissions and Sold

Combustion Emissions by substantially reducing the volume of oil and gas extracted, processed, acquired and sold by the Shell Group during the Single-Parent Period; and

(b) failing, in a timely manner, substantially to reduce the Production Emissions by adopting reasonably available techniques to limit venting, flaring and fugitive emissions during the process of extracting and producing oil and gas products during the Single-Parent Period. Paragraphs 81, 83 to 84, 86, 112 and 122 to 126 above are repeated.

(4) The First Defendant failed to reduce, in a timely manner, the Shell Emissions to a level that mitigated the risks of harm identified at paragraphs 186(6) and 186(7) above. Paragraphs 81, 83 to 84, 86, 112 and 122 to 126 above are repeated.

(5) The First Defendant failed to take any effective measures to inform, warn or otherwise protect the Claimants, or persons in their position, against the foreseeable risks of serious harm posed by extreme weather events caused and/or made more severe by ACC such as Typhoon Rai and/or failed to take any effective measures to remedy and mitigate such harm.

(6) The First Defendant failed to take any effective measures to inform, warn or otherwise protect the Claimants, or persons in their position, against the foreseeable risks of serious harm posed by ACC.

(7) Having assumed sole control of the Shell Group in 2005, the First Defendant knew or ought reasonably to have known the following matters:

(a) During the Dual-Parent Period, the Shell Group, under the direction and control of the Second Defendant and Royal Dutch, suppressed information and/or disseminated misinformation about the link between AGHG emissions and ACC and the likely consequences of ACC.

(b) The continued circulation of that misinformation, if left uncorrected or unrepudiated, was liable to influence public, governmental and commercial understanding and decision-making concerning AGHG emissions and ACC, thereby foreseeably delaying, impeding and/or weakening measures to mitigate ACC and its effects.

(c) It was reasonably foreseeable that such influence would delay, impede and/or weaken measures to mitigate ACC and its effects, thereby contributing to the continuation and exacerbation of the harm suffered by the Claimants.

(8) Notwithstanding those matters, the First Defendant failed, within a reasonable time after the Unification Transaction, to take reasonable steps to correct, withdraw, qualify and/or publicly repudiate the misinformation, notwithstanding that it had the ability to do so.

191. By reason of the matters pleaded at paragraphs 185 and 186 above, it was reasonably foreseeable to a reasonable and prudent person in the position of the First Defendant that the conduct pleaded at paragraph 190 above, if undertaken or omitted to be undertaken, created a foreseeable risk of harm. Accordingly, in undertaking or omitting to undertake that conduct, the First Defendant failed to exercise reasonable care.

192. Applying the causal test pleaded at paragraph 158 above, the First Defendant's negligence contributed to and formed part of the causal process which resulted in Typhoon Rai and the consequences pleaded at paragraph 163(5) above in a natural and continuous sequence unbroken by any efficient intervening cause. In the premises, such negligent conduct was a proximate cause of Typhoon Rai.

193. Further or alternatively, the First Defendant approved of, promoted, encouraged, advised and/or cooperated in the negligent acts and omissions pleaded at paragraph 190 above and/or approved of those acts and omissions after they had been carried out for the First Defendant's benefit. In the premises, insofar as such acts and omissions are not directly attributable to the First Defendant, the First Defendant is nevertheless liable for them as joint tortfeasor.

(e) <u>Liability of the Second Defendant</u>

194. The Second Defendant's conduct fell below the standard of care pleaded at paragraph 187 above. Without prejudice to the generality of the foregoing and pending disclosure, the Claimants repeat paragraphs 42 to 121 and 154 to 157 above and further rely on the following matters in particular:

(1) Paragraph 176 above is repeated.

(2) The Second Defendant failed adequately to investigate, monitor and assess the risks of harm associated with the Shell Emissions and ACC as well as the steps that were necessary to effectively mitigate those risks and to protect persons foreseeably at risk of harm as a result of those risks.

(3) The Second Defendant increased the risks of ACC by:

(a) continuing, expanding, promoting and/or encouraging the Activities during the Dual-Parent Period and failing, in a timely manner, to take steps to reduce the Produced Combustion Emissions and Sold Combustion Emissions by substantially reducing the volume of fossil fuels extracted, processed, acquired and sold by the Shell Group during the Dual-Parent Period; and

(b) failing, in a timely manner, substantially to reduce the Production Emissions by adopting reasonably available techniques to limit venting, flaring and fugitive emissions during the process of extracting and producing oil and gas products during the Dual-Parent Period. Paragraphs 82 to 85, 113 and 122 to 126 above are repeated.

(4) The Second Defendant failed to reduce, in a timely manner, the Shell Emissions to a level that mitigated the risks of harm identified at paragraphs 186(6) and 186(7) above. Paragraphs 82 to 85, 113 and 122 to 126 above are repeated.

(5) The Second Defendant failed to take any effective measures to inform, warn or otherwise protect the Claimants, or persons in their position, against the foreseeable risks of serious harm posed by extreme weather events caused and/or made more severe by ACC such as Typhoon Rai and/or failed to take any effective measures to remedy and mitigate such harm.

(6) Paragraphs 134 to 139 above are repeated. In particular, the Claimants rely on the Second Defendant's participation in:

(a) dissemination of misleading statements concerning the relationship between AGHG emissions and ACC and the resulting risks of harm;

(b) suppression of information concerning the relationship between AGHG emissions and ACC and the likely consequences of ACC;

(c) funding of research designed to cast doubt upon the relationship between AGHG emissions and ACC and the risks posed by ACC; and

(d) funding and/or promotion of misinformation concerning ACC by the GCC and API, of which the Shell Group was a member.

(7) The Second Defendant knew (and in any event ought reasonably to have appreciated) that:

(a) the dissemination of the misinformation pleaded above was liable to influence public, governmental and commercial understanding and decision-making concerning AGHG emissions and ACC; and

(b) such influence was liable to delay, impede and/or weaken measures to mitigate ACC and its effects.

(8) Notwithstanding those matters, the Second Defendant engaged in the conduct pleaded above.

195. For the avoidance of doubt, the Claimants' case is not that the Second Defendant's acts and omissions with respect to the Dual-Parent Period Activities and the Dual-Parent Period Emissions were negligent irrespective of the state of scientific knowledge regarding the link between AGHGs and ACC at the relevant time. Rather, the Claimants' case is that the Second Defendant's conduct fell below the applicable standard of care from the point at which it knew or ought reasonably to have known the matters set out at paragraphs 185 to 186 above, including that AGHGs were causally linked to climate change and that continued extraction, sale and combustion of fossil fuels at or around business-as-usual levels gave rise to foreseeable risks of harm.

196. Paragraphs 191 to 192 and 194 above are repeated *mutatis mutandis*.

197. Further or alternatively, the Second Defendant approved of, promoted, encouraged, advised and/or cooperated in the negligent acts and omissions pleaded at paragraph 194 above and/or approved of those acts and omissions after they had been carried out for the Second Defendant's benefit. In the premises, insofar as such acts and omissions are not directly attributable to the Second Defendant, the Second Defendant is nevertheless liable for them as joint tortfeasor.

(f) Liability for the Claimants' loss and damage

198. Applying the causal test pleaded at paragraph 158 above, the First and Second Defendant's negligent conduct was each a proximate cause of the loss and damage suffered by the Claimants. In the premises, the Defendants are solidarily liable for the whole of the loss and damage suffered by the Claimants notwithstanding that other persons also contributed thereto or that it is impossible to determine the precise extent to which each contributed thereto. The Claimants' case on loss and damage is pleaded further at Section J below.

199. In all the premises, the Defendants are solidarily liable in quasi-delict for the loss and damage suffered by the Claimants.

**H6 Liability under Articles 19 and 20 of the Civil Code**

200. The Defendants are liable to the Claimants under Articles 19 and 20 of the Civil Code. In this regard, the Claimants will rely on the matters pleaded in paragraphs 201 to 215 below.

(a) Article 19 of the Civil Code

201. Pursuant to Article 19 of the Civil Code, every person must, in the exercise of his rights and in the performance of his duties, act with justice, give everyone his due, and observe honesty and good faith. Article 19 prescribes the standards of conduct governing the exercise of rights and the performance of duties. The exercise of a right in a manner contrary to justice, honesty or good faith constitutes an abuse of rights. Whether those standards have been breached is to be assessed in light of all the circumstances of the case, including what the matters known to the Defendant. A right is exercised abusively where the holder of the right acts contrary to the standards of conduct embodied in Article 19 with conscious indifference to the harm that its conduct would foreseeably cause to others.

(b) Article 20 of the Civil Code

202. Pursuant to Article 20 of the Civil Code, every person who, contrary to law, wilfully or negligently causes damage to another, is required to indemnify the latter for the same. Amongst other things, conduct is contrary to law for the purposes of Article 20 of the Civil Code where:

(1) the conduct is contrary to the standards of conduct enshrined in Article 19 of the Civil Code; or

(2) the conduct violates the right to a balanced and healthful ecology in accord with the rhythm and harmony of nature, as recognised by Article II, Section 16 of the Constitution.

(c) <u>Bases of Liability</u>

203. By reason of the matters pleaded at paragraphs 42 to 121 and 154 to 157 above, the acts, omissions and/or activities of the Shell Group during the Dual-Parent Period and the Single-Parent Period are attributable to the Second Defendant and the First Defendant, respectively. Accordingly, for the reasons set out below, the First Defendant and the Second Defendant are each liable as direct tortfeasors under Articles 19 and 20 of the Civil Code.

204. Alternatively, if and insofar as any act, omission or activity of the Shell Group is not properly attributable to either Defendant, for the reasons set out below, that Defendant is nevertheless liable under Articles 19 and 20 of the Civil Code as a joint tortfeasor by reason of having approved, promoted, encouraged, advised, cooperated in and/or otherwise participated in the commission or continuation of that act, omission or activity, or of having approved of it after it was done for its benefit.

(d) <u>Liability of the First Defendant</u>

205. The Single-Parent Period Activities were undertaken by the First Defendant in the exercise of its rights to conduct business through the Shell Group.

206. While exercising such rights, the First Defendant engaged in the conduct pleaded at paragraph 190 above. The First Defendant did so knowing or appreciating the circumstances and matters pleaded at paragraphs 174(1) to 174(3), 185, 186 and 190(7) above. The First Defendant thereby acted with conscious indifference to the interests of persons liable to be adversely affected by the Single-Parent Period Activities, including those of the Claimants. In the premises, the First Defendant exercised its rights to carry on the Single-Parent Period Activities in a manner which was:

(1) contrary to the standards of conduct required by Article 19 of the Civil Code; and

(2) in violation of the Claimants' rights to a balanced and healthy ecology in accord with the rhythm and harmony of nature.

207. The First Defendant's conduct was wilful and/or negligent for the purposes of Article 20 of the Civil Code. In this regard, the Claimants rely on the First Defendant's knowledge and/or appreciation of the consequences of the Single-Parent Period Activities and their conscious indifference to the interests of persons liable to be adversely affected thereby, including the Claimants. Paragraph 206 above is repeated.

208. Applying the causal test pleaded at paragraph 158 above, the First Defendant's abusive exercise of rights contributed to and formed part of the causal process which resulted in Typhoon Rai and the consequences pleaded at paragraph 163(5) above in a natural and continuous sequence unbroken by any efficient intervening cause. In the premises, such abuse of rights was a proximate cause of Typhoon Rai.

209. Further or alternatively, the First Defendant approved of, promoted, encouraged, advised and/or cooperated in the abusive conduct pleaded at paragraph 206 above, or approved of such conduct after it had been performed for its benefit. In the premises, insofar as such conduct is not directly attributable to the First Defendant, the First Defendant is nevertheless liable for such conduct as joint tortfeasor.

(e) Liability of the Second Defendant

210. The Dual-Parent Period Activities were undertaken by the Second Defendant in the exercise of its rights to conduct business through the Shell Group.

211. While exercising such rights, the Second Defendant engaged in the conduct pleaded at paragraph 194 above. The Second Defendant did so knowing or appreciating the circumstances and matters pleaded at paragraphs 185, 186, and 194(7) above. The Second Defendant thereby acted with conscious indifference to the interests of persons liable to be adversely affected by the Dual-Parent Period Activities, including those of the Claimants. In the premises, the Second Defendant exercised its rights to carry on the Dual-Parent Period Activities in a manner which was:

(1) contrary to the standards of conduct required by Article 19 of the Civil Code; and

(2) in violation of the Claimants' rights to a balanced and healthy ecology in accord with the rhythm and harmony of nature.

212. The Second Defendant's conduct was wilful and/or negligent for the purposes of Article 20 of the Civil Code. In this regard, the Claimants rely on the Second Defendant's knowledge and/or appreciation of the consequences of the Dual-Parent Period Activities and their conscious indifference to the interests of persons liable to be adversely affected thereby, including the Claimants. Paragraph 211 above is repeated.

213. For the avoidance of doubt, the Claimants' case is not that the Second Defendant's conduct was abusive and/or negligent irrespective of the state of scientific knowledge regarding the link between AGHGs and ACC at the relevant time. Rather, the Claimants' case is that the Second Defendant's conduct was abusive and/or negligent from the point at which it knew or ought reasonably to have known the matters set out at paragraphs 185 to 186 above, including that AGHGs were causally linked to climate change and that continued extraction, sale and combustion of fossil fuels at or around business-as-usual levels gave rise to foreseeable risks of harm.

214. Paragraphs 208 to 209 and 211 above are repeated *mutatis mutandis*.

(f) Liability for the Claimants' loss and damage

215. Applying the causal test pleaded at paragraph 158 above, the First and Second Defendant's abusive conduct was each a proximate cause of the loss and damage suffered by the Claimants. In the premises, the Defendants are solidarily liable for the whole of the loss and damage suffered by the Claimants notwithstanding that other persons also contributed thereto or that it is impossible to determine the precise extent to which each contributed thereto. The Claimants' case on loss and damage is pleaded further at Section J below.

216. In all the premises, the Defendants are solidarily liable under Articles 19 and 20 of the Civil Code for the loss and damage suffered by the Claimants.

**I6 Liability under Articles 19 and 21 of the Civil Code**

217. The Defendants are liable to the Claimants under Articles 19 and 21 of the Civil Code. In this regard the Claimants will rely on the matters set out in paragraphs 218 to 231 below.

(a) Article 19 of the Civil Code

218. Paragraph 201 above is repeated.

(b) Article 21 of the Civil Code

219. Pursuant to Article 21 of the Civil Code, any person who wilfully causes loss or injury to another in a manner that is contrary to morals, good customs or public policy shall compensate the latter for the damage thereby caused.

220. In determining whether conduct is contrary to morals, good customs or public policy for the purpose of Article 21, regard is to be had all the circumstances of the case, including, amongst other things, to:

(1) the standards of justice, honesty and good faith embodied in Article 19 of the Civil Code;

(2) the importance of protecting and advancing the right of the people to a balanced and healthful ecology in accord with the rhythm and harmony of nature, as expressly recognised by Article II, Section 16 of the Constitution and section 2 of the Climate Change Act;

(3) the policy of the Philippines to enjoin businesses to prevent and refute the adverse impacts of climate change, as expressly recognised in section 2 of the Climate Change Act; and

(4) the importance of adopting an approach to disaster risk reduction and management that is holistic, comprehensive, integrated and proactive in lessening the socioeconomic and environmental impacts of climate change, as expressly recognised in sections 2 and 5 of the Disaster Risk Reduction and Management Act 2010.

221. The exercise of rights in a manner which is inconsistent with the standards pleaded at paragraph 220 above is capable of constituting conduct contrary to morals, good customs or public policy for the purpose of Article 21.

(c) Bases of Liability

222. By reason of the matters pleaded at paragraphs 42 to 121 and 154 to 157 above, the relevant acts, omissions and/or activities of the Shell Group during the Dual-Parent Period and the Single-Parent Period are attributable to the Second Defendant and the First Defendant, respectively. Accordingly, for the reasons set out below, the First

Defendant and the Second Defendant are each liable as direct tortfeasors under Articles 19 and 21 of the Civil Code.

223. Alternatively, if and insofar as any relevant act, omission or activity of the Shell Group is not properly attributable to either Defendant, for the reasons set out below, that Defendant is nevertheless liable under Articles 19 and 21 of the Civil Code as a joint tortfeasor by reason of having approved, promoted, encouraged, advised, cooperated in and/or otherwise participated in the commission or continuation of that act, omission or activity, or of having approved of it after it was done for its benefit.

(d) Liability of the First Defendant

224. By reason of the matters pleaded at paragraph 206 above, the First Defendant's exercise of the rights pleaded at paragraph 205 above was contrary to morals, good customs and public policy for the purposes of Article 21 of the Civil Code. In the premises, the First Defendant's conduct constituted an abusive exercise of rights.

225. By reason of the matters pleaded at paragraphs 206 to 207 above, the First Defendant wilfully caused the loss and damage suffered by the Claimants for the purpose of Article 21 of the Civil Code. In this regard, the Claimants rely upon the First Defendant's knowledge or appreciation that the Single-Parent Period Activities were liable to cause to injury, loss and damage to persons in the position of the Claimants and its conscious indifference to whether such injury, loss and damage would thereby be caused.

226. Paragraphs 208 to 209 and 224 above are repeated.

(e) Liability of the Second Defendant

227. By reason of the matters pleaded at paragraph 211 above, the Second Defendant's exercise of the rights pleaded at paragraph 210 above was contrary to morals, good customs and public policy for the purposes of Article 21 of the Civil Code. In the premises, the Second Defendant's conduct constituted an abusive exercise of rights.

228. By reason of the matters pleaded at paragraphs 211 to 212 above, the Second Defendant wilfully caused the loss and damage suffered by the Claimants for the purpose of Article 21 of the Civil Code. In this regard, the Claimants rely upon the Second Defendant's knowledge or appreciation that the Dual-Parent Period Activities were liable to cause to injury, loss and damage to persons in the position of the Claimants and its conscious indifference to whether such injury, loss and damage would thereby be caused.

229. For the avoidance of doubt, the Claimants' case is not that the Second Defendant's conduct was abusive irrespective of the state of scientific knowledge regarding the link between AGHGs and ACC at the relevant time. Rather, the Claimants' case is that the Second Defendant's conduct was abusive from the point at which it knew or ought reasonably to have known the matters set out at paragraphs 185 to 186 above, including that AGHGs were causally linked to climate change and that continued emissions of AGHGs gave rise to foreseeable risks of harm.

230. Paragraphs 208 to 209 and 227 above are repeated *mutatis mutandis*.

(f) Liability for the Claimants' loss and damage

231. Paragraph 215 above is repeated.

232. In all the premises, the Defendants are solidarily liable under Articles 19 and 21 of the Civil Code for the loss and damage suffered by the Claimants.

## J LOSS AND DAMAGE

233. By reason of the matters pleaded above, the Claimants have suffered injury, loss and damage. Individual particulars of injury, loss and damage in respect of each Claimant are set out, to the best of their ability at present, in schedules of information appended at Schedule 2 to these Particulars of Claim. Without prejudice to the generality of the foregoing, the Claimants have suffered the following forms of injury, loss and damage:

(1) Moral damage in the form of:

(a) physical suffering, mental anguish, fright, serious anxiety, wounded feelings, moral shock, social humiliation and similar injury;

(b) grief, bereavement and emotional suffering arising from the death, injury, illness and/or endangerment of family members and loved ones;

(c) loss of enjoyment and/or amenity of land, including community land;

(d) displacement from homes and communities; and

(e) disruption and inconvenience occasioned by loss of access to basic amenities, such as electricity and clean water.

(2) Material damage and/or pecuniary losses in the form of:

(a) destruction and/or damage to homes, buildings, land and other property;

(b) flooding and contamination of land;

(c) loss of personal possessions;

(d) loss of livelihood, income, earnings and earning capacity;

(e) loss of productive use of land and other economic resources;

(f) expenses incurred as a result of displacement;

(g) costs incurred in reinstating and/or repairing and/or restoring homes, buildings, infrastructure, possessions and other property; and/or

(h) economic loss.

(3) Such further injury, loss and damage as identified in the schedules of information appended at Schedule 2 to these Particulars of Claim.

234. For the purposes of paragraph 233(1) above and by reason of the nature and consequences of Typhoon Rai pleaded herein, including death, personal injury, illness, endangerment of family members and loved ones, displacement from homes and communities, and destruction of homes, property and livelihoods, moral damage may be inferred and/or presumed as a matter of Philippines law.

235. Applying the causal test pleaded at paragraph 158 above, the injuries, losses and damage pleaded above were caused by and/or resulted from the nuisance, negligence and abuses of rights pleaded herein.

## K REMEDIES

236. By reason of the injuries, losses and damage pleaded above, the Claimants seek the following remedies:

(1) Actual or compensatory damages in respect of the material damage and/or pecuniary losses suffered by the Claimants pleaded at paragraph 233(2) above and in the schedules of information appended at Schedule 2 to these Particulars of Claim pursuant to Article 2199 of the Civil Code.

(2) Moral damages in respect of the moral damage suffered by the Claimants pleaded at paragraph 233(1) above and in the schedules of information appended at

Schedule 2 to these Particulars of Claim pursuant to Article 2217 of the Civil Code.

(3) Following disclosure, the Claimants reserve the right to seek such other categories of damages and relief as may be available under Philippines law, including exemplary damages and/or temperate damages.

237. The Claimants claim damages in Philippines pesos ("**PHP**") because their pecuniary losses were suffered in PHP.

238. Further, the Claimants are entitled to and do claim interest under Philippines law on all damages to which they are entitled. Alternatively, the Claimants are entitled to interest on such damages at such rate or rates as the court thinks fit pursuant to Section 35A of the Senior Courts Act 1981.

**EDWARD CRAVEN KC**

**TOBY FISHER**

**KATE BOAKES**

**MARGHERITA CORNAGLIA**

**GRACE FERRIER**

**<u>Statement of Truth</u>**

The Claimants believe that the facts stated in these Particulars of Claim are true. The Claimants understand that proceedings for contempt of court may be brought against anyone who makes, or causes to make, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:

Name: Gregory James Lascelles

Position: Partner

Dated: 31 July 2026

# Exhibit E

# National Inquiry on Climate Change Report

A report by the *Commission en Banc V* of the Commission on Human Rights



2022

THIS IS A REPORT BY THE
**COMMISSION ON HUMAN RIGHTS OF THE PHILIPPINES (CHRP)**

A copy of this report is available at https://chr.gov.ph/

First Printing, December 2022 by the CHRP

All rights reserved.

**Commission on Human Rights of the Philippines**
SAAC Building, UP Complex, Commonwealth Avenue
Diliman, Quezon City, Metro Manila, Philippines 1101
chad.pasco.chr@gmail.com; chr.escrcenter@gmail.com

# NATIONAL INQUIRY ON CLIMATE CHANGE REPORT

REPUBLIC OF THE PHILIPPINES
COMMISSION ON HUMAN RIGHTS

# Contents


**Preface** 1

**I. Mandate of the Commission** 9

**II. Matter Before the Commission** 9

**III. CHRP Jurisdiction and Admissibility of the Petition** 10

**IV. History of the Climate Inquiry and Conduct of the Public Hearings** 12

*A. Multi-disciplinary Consultative Process* 13

*B. Public Hearings* 19

**V. Findings** 24

*A. Climate Change is Real* 24

1. Atmospheric Warming 26
2. Oceanic Indicators 26
3. Cryosphere Loss 27
4. Extreme Weather and Climate Events 28

*B. Anthropogenic Dimension of Climate Change* 29

*C. Climate Change: A Grave and Urgent Human Rights Concern* 30

1. Adverse Impacts of Climate Change on Human Rights 30
2. Adverse Impacts of Climate Change in the Philippines 32

**VI. Duty of States to Protect Human Rights** 63

*A. General Duty* 63

*B. Special Duty of States to Protect Human Rights in the Context of Climate Change* 70

*C. Refusal of Governments to Engage in Meaningful Action to Mitigate Climate Change may be Categorized as a Human Rights Violation* 78

**VII. Responsibility of Business Enterprises to Respect Human Rights** 79

*A. General Responsibility* 79

1. The Corporate Responsibility to Respect Human Rights Under the United Nations Guiding Principles on Business and Human Rights (UNGP-BHR) 80
2. The United Nations Global Compact 83
3. The OECD Guidelines for Multinational Corporations 84

*B. Responsibility in the Context of Climate Change* 84

1. Application of the UNGP-BHR 84
2. Corporate Financial Disclosure Requirements 85
3. Principles on Climate Change Obligations of Enterprises 86
4. Responsibility of Financial Institutions 87
5. Compliance with State Regulations Regarding Climate Change 88

**VIII. Carbon Majors in the Context of Climate Change** 88

*A. Anthropogenic Contributions to Climate Change is Quantifiable and Substantial* 88

*B. The Carbon Majors Had Early Awareness, Notice, or Knowledge of their Products' Adverse Impacts on the Environment and Climate System* 90

*C. Willful Obfuscation of Climate Science and Obstruction of Global Initiatives Toward Decarbonization* 94

*D. The Carbon Majors Have the Corporate Responsibility to Undertake Human Rights Due Diligence and Provide Remediation* 99

*E. Global Dependence on Fossil Fuels* 102

**IX. Recommendations** 104

*A. General* 104
1. To Governments 105
2. To the Carbon Majors (and Other Carbon-Intensive Industries) 118
3. To Financial Institutions and Investors 121
4. To the United Nations 124
5. To National Human Rights Institutions 125
6. To Courts 128
7. To NGOs, CSOs, and the Legal Profession 131
8. To the Global Citizenry 132

*B. Additional / Particular Recommendations to the Philippine Government* 134
1. Recommendations Particular to the Executive Department 141
2. Recommendations Particular to the Legislative Department 145
3. Recommendations Particular to the Judiciary 147

**Resolution** 149

# NATIONAL INQUIRY ON ***CLIMATE CHANGE*** REPORT

**"The challenge to NHRIs is to
test boundaries and create new paths;
to be bold and creative,
instead of timid and docile;
to be more idealistic or less pragmatic;
to promote soft laws into becoming hard laws;
to see beyond technicalities and
establish guiding principles that can
later become binding treaties;
in sum, *to set the bar of human rights protection
to higher standards*."**

# Preface

The Commission on Human Rights of the Philippines (CHRP) is an independent body established under our Constitution, with the general mandate to investigate allegations of human rights violations against our people. It was created under the banner of "Never Again!" in the aftermath of a "peaceful revolution" waged by our people more than thirty years ago, which resulted in the dramatic ouster of Ferdinand Marcos, under whose rule thousands of Filipinos' civil and political rights were trampled upon. Thus is the context behind the constitutional command for the CHRP to investigate violations involving civil and political rights, which, later on, was to give rise to the notion that the investigation mandate of this Commission is *solely* limited to issues concerning *civil and political* rights.

In 2015, our Commission was petitioned to conduct an inquiry on the impact of climate change on the human rights of the Filipino people and the role therein of the so-called "Carbon Majors."[1] The claim was that climate change was adversely impacting human rights and the top oil producers of the world were contributing, and knowingly continue to contribute, to this phenomenon.

Previous to the filing of this *Petition* before our Commission, different climate-related cases had been brought, as still more are being brought, by various parties before regular courts in many jurisdictions around the world: private citizens are suing governments[2] and carbon producers,[3] governments are suing carbon producers,[4] shareholders are suing their own carbon-producing corporations,[5] and so on.

---

1 Richard Heede, *Tracing Anthropogenic Carbon Dioxide a*nd Methane Emissions *to Fossil Fuel and Cement Producers, 1854-2010*, 122 Clim. Change. 229 (2014) [hereinafter *Heede Carbon Majors Study*].

2 *See* for instance Urgenda Foundation v. The Netherlands [2015] HAZA C/09/00456689 (June 24, 2015); aff'd (Oct. 9, 2018) [District Court of the Hague, and The Hague Court of Appeal (on appeal)]; Leghari v. Federation of Pakistan, W.P. No. 25501/201 (2015); & Future Generations v. Colombia Ministry of Environment, No. 11001 22 03 000 2018 00319 00 (2018).

3 *See* for instance Lliuya v. RWE AG, Case No. 2 O 285/15 Essen Regional Court (filed 2015) & Native Village of Kivalina v. ExxonMobil Corp., Docket No. 4:08-cv-01138 (filed 2008)

4 *See* for instance City of Oakland v. BP P.L.C., No. C 17-06011 WHA (filed 2017); & City of New York v. British Petroleum (BP), No. 18-2188 (filed 2018)

5 *Cf.* Abrahams v. Commonwealth Bank of Australia (2017) (Where "shareholders of the Commonwealth Bank of Australia [CBA] sued the bank, alleging that it violated the Corporations Act of 2001 with the issuance of its 2016 annual report, which failed to disclose climate change-related business risks. […] Before the Federal Court of Australia could issue a decision, the suit was withdrawn after the bank released a 2017 annual report that acknowledged the risk of climate change and pledged to undertake climate change scenario analysis to estimate the risks to CBA's business," citing http://climatecasechart.com/non-us-case/abrahams-v-commonwealth-bank-australia/) (last accessed on Dec. 4, 2010).

Cases before courts have been filed under different legal theories of responsibility or liability, such as those involving tort–a civil wrong consisting of a breach of duty resulting to an injury.

Many of these court cases are still undergoing trial or are on appeal. And all these efforts have so far failed to establish judicial consensus on the responsibility of parties in the context of climate change.

Amidst all the climate-related suits, governments have also been seeking to come to an agreement to avert irreversible global warming, as exemplified by the Conference of Parties (CoP) held every year, which, as many of us know, has not been progressing as effectively as many have been hoping for.

Thus, attempts have been made to explore non-judicial mechanisms for addressing this concern. One such effort is by framing climate change as a human rights issue and filing a case on that basis before a human rights institution.

The Inuit people of North America first attempted to establish the nexus between climate change and human rights in 2005, in an action before the Inter-American Commission on Human Rights,[6] a mechanism under the Organization of American States. The Inter-American Human Rights Commission, however, refused to consider the case, holding that the information provided by the Inuit did not enable the Commission to determine whether the facts alleged characterized a violation of rights protected under the American Declaration.[7]

This *Petition* filed before the CHRP was the second attempt to frame climate change as a human rights issue and the first to be accepted as such by a National Human Rights Institution (NHRI) for investigation.

The choice of the Philippines as a venue for the filing of a climate petition was made significant by the fact that it was the immediate past Chair of the Climate Vulnerable Forum at the time of filing.

---

6 Petition to the Inter-American Commission on Human Rights Seeking Relief from Violations Resulting from Global Warming Caused by Acts and Omissions of the United States, filed in December 2005.

7 Resolution of Petition, No. P-1413-05.

The Philippines is visited by around twenty typhoons every year. In 2013, it had the misfortune of being battered by one of the strongest typhoons in recorded history, Super Typhoon Haiyan (local: *Yolanda*), which caused the death of at least six thousand people within just a few hours from landfall.[8] To date, we have yet to fully recover from its devastating impacts, even as we continue to suffer from the onslaught of other extreme weather events.

Aside from presenting climate change as a human rights case, the *Petition* highlighted a novel assertion, which was that private business enterprises, not just States, have the obligation to respect and uphold human rights, as advocated under the *United Nations Guiding Principles on Business and Human Rights* (UNGP-BHR). The *Petition* prayed that the "Carbon Majors" be held responsible for their contribution to climate change, which, as alleged, was negatively impacting the human rights of the Filipino people.

When this *Petition* was filed before us, there was truly no established legal precedent–as there still is none to date–to help us navigate the case. Our Commission lacked, as well, the financial and human resources necessary to handle an undertaking of such magnitude. Indeed, following the refusal of the Inter-American Commission on Human Rights to hear the case of the Inuit ten years earlier, nobody would have questioned the CHRP had it refused to take cognizance of the case.

Some of those who were impleaded in the *Petition*–the big privately-owned oil companies or the so-called "Carbon Majors"–asked our Commission to dismiss the *Petition*, arguing that we were not a court of law, but just a human rights institution. They contended that we had no jurisdiction to conduct hearings involving allegations of liability. Or that, even if we had the jurisdiction to conduct such hearings, we had no jurisdiction to consider the subject matter of climate change, which they thought to be not within the realm of civil and political rights. They strongly argued that the Philippine Constitution only allowed our Commission to investigate cases involving civil and political rights.

We explained that all human rights are interrelated, interdependent, and indivisible; that one cannot consider civil and political rights separately from economic, social and cultural rights. We pointed out that such was humanity's evolving understanding of, and consciousness about, human rights.

---

8 National Disaster Risk Reduction and Management Council, Final Report re Effects of Typhoon "YOLANDA" (Haiyan) (2013) *available at* http://ndrrmc.gov.ph/attachments/article/1329/FINAL_REPORT_re_Effects_of_Typhoon_YOLANDA_(HAIYAN)_06-09NOV2013.pdf (last accessed Nov. 20, 2019).

Many of the respondent oil companies also raised the issue of *territoriality*–they questioned the power of our Commission to inquire into their activities since they did not operate within the territory of the Philippines.

Stripped of legal niceties, the contention was that our Commission, or, indeed, the Philippine State, in general, may only inquire into the conduct of corporate entities operating within Philippine territory, even if the corporations' operations outside our territory were negatively impacting the rights and lives of our people.

We cannot accept such a proposition.

The CHRP is mandated by the Philippine Constitution with the duty to investigate and inquire into allegations of human rights violations suffered by our people.[9]

Our Commission decides on how it must perform its constitutional duty.[10] And the performance of this duty is neither constrained by nor anchored on the principle of *territoriality* alone.

The challenge to NHRIs is to test boundaries and create new paths; to be bold and creative, instead of timid and docile; to be more idealistic or less pragmatic; to promote soft laws into becoming hard laws; to see beyond technicalities and establish guiding principles that can later become binding treaties; in sum, to set the bar of human rights protection to higher standards.

Even if our Commission were not invested with compulsory processes or powers of enforcement–especially so in regard to parties not doing business in the Philippines–we can proceed with any inquiry we deem appropriate in relation to our mandate, regardless of who the implicated parties might be or where they may be domiciled.

Thus, in 2015, during the 21st Climate Conference (CoP 21) in Paris in December, we announced that we were giving due course to the *Petition*.

9 PHIL. CONST. Art. XIII, § 18, paras. 1 & 3.

10 Under the doctrine of *competence de la competence*

Having agreed to admit the *Petition*, we determined that our process would be dialogical, rather than adversarial. And, recognizing the transboundary character of climate change, we likewise decided that the dialogue we would be pursuing would be global.

Proceeding from the global and dialogical process which we sought to promote, our Commission accepted *amici* briefs, research studies, and position papers from science and legal experts, professional organizations, the academe, advocates, and duty-bearers from around the globe on the various dimensions of the case.

Keenly aware that our Commission, as stated earlier, had neither the power to compel any of the parties to submit before us, nor the power to impose any kind of punitive judgment against them, we conducted our *Inquiry* upon the principle of persuasion, not compulsion. Thus, we proceeded to issue invitations in lieu of summonses and subpoenas. We were also careful to clarify that we were not entertaining notions of imposing financial judgments against any party. We declared, however, that, despite our limitations, we were determined, indeed, to proceed with our *Inquiry*.

We began the initial phases of our process by conducting interviews, roundtable discussions, expert consultations, and community dialogues. And then we proceeded to the conduct of public hearings.

Preparatory to the public hearings, we invited the parties to a pre-hearing conference, during International Human Rights Week, on 11 December 2017. We conducted our first public hearing in March and our last in December, all in 2018.

In all, we held twelve public hearings from March to December of 2018: eight hearings were held in Manila, two hearings were held in New York, at the New York City Bar Association building, and two hearings were held in London, at the London School of Economics.

In the course of the public hearings, we heard 65 witnesses and received and marked 239 documents, both scientific and legal. These numbers do not include the resource persons invited by our Commission and the documentary evidence submitted by them.

In the conduct of our public hearings, we sought to maintain our focus on the substantive aspects of the case, while adhering to internationally-recognized norms of due process of law.

Respondents were duly notified of the *Petition* filed concerning them and were strongly enjoined to participate in our hearings.

All the hearings were transparent and public, even cast live over the internet.

Teleconferencing facilities were set-up to enable parties and witnesses of all sides, even from other parts of the world, to participate in the *Inquiry.*

Testimonial and documentary evidence were received in a very organized manner, all of which were open to challenge by those who had interests in doing so.

Witnesses and resource persons were put under oath and, after giving their direct testimonies, were subjected to examination by the Inquiry Panel members, in the absence of Respondents, who, despite every opportunity to challenge the witnesses, chose not to exercise this right.

Documentary exhibits were properly identified and marked.

The public hearings we conducted in North America (in the United States) and Europe (in the United Kingdom) were not only a matter of underscoring the global nature of climate change and the global character of the dialogue we sought to pursue. It was a matter of "due process" as well–that is, if the Carbon Majors domiciled in other parts of the globe were not willing to come to our country, then we were willing to come to their regions to encourage them to participate in our processes.

We offered to engage with Respondents in special meetings, too, if that was what it would take to hear their position on the issues. For example, in our visit to the Netherlands to participate in a forum held at one of the top business universities in that region, we took the opportunity to especially invite one of them to a dialogue–closed door, if necessary.

Considering all the foregoing, it would be an understatement to say that we have endeavored to reach out to the Respondents. We have, indeed, provided every opportunity within our resources to enable all the parties to dialogue with us.

Beyond the public hearings, we participated in forums and held consultations in other parts of the globe, such as Oslo, Geneva, Bangkok, Sydney, Bonn and Berlin in Germany,

New York and New Jersey in the US, Breukelen in the Netherlands, and London, Glasgow, and Stirling in the UK.

In myriad ways, we engaged international human rights bodies and organizations in our conversations, such as the South East Asia NHRI Forum (SEANF), the Asia Pacific Forum of National Human Rights Institutions (APF), the Global Alliance of National Human Rights Institutions (GANHRI), the United Nations Working Group on Business and Human Rights (UN WGBHR), the United Nations Special Rapporteur on the Environment, the United Nations Office of the High Commissioner for Human Rights (UNOHCHR), and other institutional agencies.

Our findings and recommendations are informed by science and governance experts and may be considered by political and executive branches of government, as well as by courts, wherever they might be deemed relevant.

With our *Inquiry*, we hope to have been able to help identify, or elaborate, on basic rights and duties relative to climate change, as well as amplify standards for corporate behavior.

We hope to have been able to demonstrate, as well, a model, albeit seminal, for the broadening of NHRI mechanisms and processes for providing access to justice, especially in regard to grave human rights challenges with transboundary character and extra-territorial obligations.

**COMMISSIONER ROBERTO EUGENIO T. CADIZ**[11]
National Inquiry on Climate Change Chairperson
Commission on Human Rights of the Philippines
3 May 2022

---

11 The CHRP's *National Inquiry on Climate Change* Chairperson acknowledges the following members of his staff and that of the CHRP Economic, Social and Cultural Rights Center for their contributions in the research, drafting, and editing of this *Report*: Jonas Rex S. Turingan, Martin Angelo L. Esguerra, Caleen Chanyungco Obias, Domnina T. Rances Lao, John Colin Yokingco, Nina Karla Botial, Mediatrix Recella, Frances Eurika M. Yu, Takahiro Kenjie Aman, Angeli Fleur Nuque, and Charles Gerald Madrid.

## I. Mandate of the Commission

The Commission on Human Rights of the Philippines (CHRP) is an independent National Human Rights Institution (NHRI)[12] created by the 1987 Philippine Constitution and organized under Executive Order No. 163, series of 1987. It is constitutionally mandated to:

1. Investigate, on its own or on complaint by any party, all forms of human rights violations involving civil and political rights;[13]
2. Recommend to Congress effective measures that promote human rights and provide for compensation to survivors of human rights violations, or their families;[14]
3. Monitor the Philippine government's compliance with international treaty obligations on human rights;[15]
4. Provide appropriate legal measures for the protection of human rights of all persons within the Philippines, as well as Filipinos residing abroad; and provide for preventive measures and legal aid services to the underprivileged whose human rights have been violated or need protection;[16] and
5. Adopt its operational guidelines and rules of procedure.[17]

## II. Matter Before the Commission

Petitioners posit that, under both domestic and international law, private enterprises, not just States, have an obligation to respect and protect human rights. Underscoring the anthropogenic character of climate change and the latter's adverse impacts on human rights, Petitioners pray this Commission declare Respondents–by extracting, producing, and selling fossil fuels–accountable for either impairing, infringing, abusing, or violating human rights.

12 United Nations General Assembly, *Principles Relating to the Status of National Institutions* (*The Paris Principles*), G.A. Res. 48/134, U.N. Doc. A/RES/48/134 (20 December 1993).

13 Phil. Const. art. XIII, § 18 (1).

14 Phil. Const. art. XIII, § 18 (6).

15 Phil. Const. art. XIII, § 18 (7).

16 Phil. Const. art. XIII, § 18 (3).

17 Phil. Const. art. XIII, § 18 (2).

## III. CHRP Jurisdiction and Admissibility of the Petition

Through the combination and interplay of the five Constitutional powers of this Commission, it exercises jurisdiction over cases. Jurisdiction should not be understood only in the context of the power to render a binding decision but also in the context of having the authority to perform other non-judicial constitutional mandates.

On the issue of subject-matter jurisdiction, this Commission notes the acceptance under customary international law of the interrelatedness, interdependence, and indivisibility of human rights and, therefore, accepts the view that it may investigate the whole gamut of human rights allegedly impacted in the petition.

The United Nations General Assembly recognizes that "'the enjoyment of civic and political freedoms and of economic, social and cultural rights are interconnected and interdependent' and that 'when deprived of economic, social and cultural rights, man does not represent the human person whom the Universal Declaration regards as the ideal of the free man.'"[18] Thus, the violation of one right inevitably impacts other rights which may or may not be in the same category. In order to provide effective remedy to victims and restore their dignity, all of the rights violated must be equally addressed.

A complete consideration of all the dimensions of human rights issues is required for this Commission to effectively exercise its recommendatory, monitoring, advocacy, and other powers.

In any case, if there still be doubt of the Commission's wisdom in accepting the *Petition*, we note the allegation that climate change adversely impacts the right to life, classified as a civil and political right under the International Covenant on Civil and Political Rights (ICCPR),[19] to which the Philippines is a party. The United Nations Human Rights Committee (UNHRC), in General Comment No. 36 on the right to life, declares:

---

18 United Nations General Assembly, *Preparation of Two Draft International Covenant on Human Rights*, G.A. Res. 543 (VI), U.N. Doc. No. A/RES/543 (VI) (Feb. 5, 1952).

19 International Covenant on Civil and Political Rights art. 6, 1996, 999 U.N.T.S. 171 [hereinafter ICCPR].

> 62. Environmental degradation, climate change and unsustainable development constitute some of the most pressing and serious threats to the ability of present and future generation to enjoy the right of life. Obligations of States parties under international environmental law should thus inform the contents of article 6 of the Covenant, and the obligation of States parties to respect and ensure the right to life, and in particular life with dignity, depends, inter alia, on measures taken by States parties to preserve the environment and protect it against harm, pollution and climate change caused by public and private actors. States parties should therefor ensure sustainable use of natural resource, develop and implement substantive environmental standards, conduct environmental impact assessments and consult with relevant States about activities likely to have a significant impact on the environment, provide notification to other States concerned about natural disaster and emergencies and cooperate with them, provide appropriate access to information on environmental hazards and pay due regard to the precautionary approach.[20]

There is also no doubt that this Commission may inquire into allegations involving violations of the human rights of Filipino people, even when occurring outside Philippine territory. No international or domestic law, rule, or principle prohibits this Commission from informing itself of facts and events occurring outside of the Philippines, as long as it does so in a manner respecting domestic laws of foreign territories. This is in line with the United Nations *Principles Relating to the Status of National Institutions* or the *Paris Principles*, which recognize that NHRIs have adequate powers to investigate and gather information in order to perform their mandate to protect human rights.

As it would be challenging for courts to exercise jurisdiction over respondents who are not domiciled within the Philippines, especially for acts also committed outside the Philippines, this Commission is compelled to inquire into the human rights abuses or violations alleged by Petitioners.

In admitting the *Petition*, this Commission does not exercise adjudicative or enforcement jurisdiction, but merely fulfills its broad mandate to promote and protect human rights, which requires inquiring into the issues raised therein.

---

20 United Nations Human Rights Committee, *General Comment No. 36 (2018) on Article 6 of the International Covenant on Civil and Political Rights, on the Right to Life*, U.N. Doc. CCPR/C/GC/36 (Oct. 30, 2018).

# IV. History of the Climate Inquiry and Conduct of the Public Hearings

On 22 September 2015, Petitioners filed their *Petition,* urging this Commission to look into the responsibility of the world's largest investor-owned fossil fuel and cement producers for human rights violations resulting from the impacts of climate change.

On 10 December 2015, the Commission declared that it would conduct a national inquiry to look into the allegations in the *Petition*. For this purpose, the Commission constituted an Inquiry Panel composed of Commissioner Roberto Eugenio T. Cadiz, as Chair, former CHRP Chairperson Jose Luis Martin Gascon, Commissioner Karen S. Gomez-Dumpit, Commissioner Gwendolyn Ll. Pimentel-Gana, and now CHRP Chairperson Leah C. Tanodra-Armamento, as members. Dr. Peter William Walpole, S.J. joined the panel as its independent expert.

The *Inquiry* was conducted in two parts: the first part, consisting of a multi-disciplinary consultative process, and the second, consisting of public hearings. In addition to the *amici* briefs and expert testimonies proffered during the Inquiry, the Commission took administrative notice[21] of the reports of the Intergovernmental Panel on Climate Change (IPCC), the United Nations Framework Convention on Climate Change (UNFCCC), and the United Nations Environment Programme (UNEP).

---

21 Commission on Human Rights, Guidelines and Procedures in the Investigation and Monitoring of Human Rights Violations and Abuses, and the Provision of CHR Assistance, rule 7, § 22 (2012) (This Section provides that, "Applicability of the Rules of Court.—In all matters of procedure not covered by the foregoing rules, the provisions of the Revised Rules of Court shall apply in a suppletory character.") & 2019 Amendments to the 1989 Revised Rules on Evidence, rule 129, §§ 1-2. (Matters of Judicial Notice is provided for under Section 1 or "Judicial notice, when mandatory.—A court shall take judicial notice, without the introduction of evidence, of the existence and territorial extent of states, their political history, forms of government and symbols of nationality, the law of nations, the admiralty and maritime courts of the world and their seals, the political constitution and history of the Philippines, official acts of the legislative, executive and judicial departments of the National Government of the Philippines, the laws of nature, the measure of time, and the geographical divisions. (1a)") and is further provided in Section 2 or "Judicial notice, when discretionary. —A court may take judicial notice of matters which are of public knowledge, or are capable of unquestionable demonstration, or ought to be known to judges because of their judicial functions. (1a)").

## *A. Multi-disciplinary Consultative Process*

In August 2017, the Inquiry Panel began conducting community dialogues, fact-finding missions, key informant interviews (KIIs), focus group discussions (FGDs), and roundtable discussions (RTDs) on climate change and human rights, as follows:

1. Two FGDs and 20 KIIs in Libon and Legazpi City in the Province of Albay from 10 to 16 August 2017;
2. Two FGDs and 6 KIIs in Tanauan and Tacloban City in the Province of Leyte from 11 to 15 September 2017, and a community dialogue and RTD from 6 to 8 December 2018 in Tacloban City;
3. Two FGDs and 7 KIIs from 13 to 14 February 2018 in the Province of Isabela;
4. Two FGDs and 4 KIIs in Alabat Island, Quezon Province, from 10 to 12 April 2018, and a community dialogue on 11 October 2018;
5. A community dialogue with the provinces along the Verde Island Passage,[22] convened in Batangas City on 7 June 2018; and
6. Four FGDs and one community dialogue in the Northern Mindanao Region with the Province of Bukidnon, the City of Iligan, and Cagayan de Oro City from 30 July to 1 August 2018.[23]

On 18 January 2019, the Inquiry Panel participated in a conference entitled "Climate Responsibilities of Business," held at the Nyenrode Business University[24] in Breukelen, Netherlands. The conference, convened under Chatham House Rules, brought together key stakeholders, including leading scholars, lawyers, researchers, industry representatives, and NHRI experts. Further consultations with some of the authors of the *amici curiae* briefs were also conducted.

While in the Netherlands, the Inquiry Panel offered to meet separately with officers of Respondent Royal Dutch Shell and other representatives of oil industry associations. The invitation, however, was politely declined.

---

22 Provinces of Batangas, Occidental Mindoro, Oriental Mindoro, Marinduque, and Romblon.

23 Iligan City, Province of Bukidnon, and Cagayan de Oro City.

24 This was organized in cooperation with Worldconnectors and Stand Up for Your Rights.

On 21 April 2016, Petitioners submitted their *Amended Petition,* after having been granted leave by the Inquiry Panel to amend their original *Petition* dated 22 September 2015.

On 9 June 2016, the Inquiry Panel ordered the Petitioners "to observe the formatting requirements under Supreme Court A.M. No. 11-9-4-0SC, dated 13 November 2012, otherwise known as the 'Efficient Use of Paper Rule,' for pleadings, motions, and similar papers."

On 21 July 2016, Petitioners submitted their correctly-formatted *Petition*, dated 9 May 2016. On the same day, the Inquiry Panel sent copies of the *Petition* by registered mail to the 47 Respondents,[25] enjoining them to submit their *Answers to the Petition* within forty-five days from receipt thereof.

On various dates, the Inquiry Panel received a total of sixteen notices and responses to its communications, consisting of *return to sender* advisories, *notices of non-participation*, *motions to dismiss*, a *letter* acknowledging the issue of climate change with corresponding information on corporate social responsibility programs, and an "*Opposition*."

Meanwhile, the Business and Human Rights Resource Centre[26] (BHRRC), an independent and international non-profit organization which provides an online repository of comprehensive global business and human rights knowledge and tracking human rights policy and performance of over 6,000 companies in over 180 countries, was able to gather eleven responses, from the following parties:

1. Anglo American plc;
2. BHP Billiton;
3. BP plc;
4. ConocoPhillips (Texas mailing address);
5. Eni S.p.A.;
6. Freeport-McMoRan Inc. (for Cyprus Amax Minerals Company);
7. Glencore plc (for Xstrata, Switzerland);
8. PJSC LUKOIL;

25 From the original fifty-two (52) initially identified/included by Greenpeace, et al. in their Petition dated 22 September 2015.

26 Business and Human Rights Resource Centre's Repository, *available at* https://www.business-humanrights.org/en/fossil-fuel-cos-respond-to-petition-with-philippines-human-rights-commission-on-human-rights-climate-change-impacts (last accessed Sep. 12, 2019).

9. Peabody Energy Corporation;
10. Repsol; and
11. Rio Tinto London Ltd.

On 2 December 2016, Petitioners filed a *Manifestation and Motion to Submit a Consolidated Reply on or before 14 February 2017*.

On 13 February 2017, the Inquiry Panel received Petitioners' *Consolidated Reply,* dated 10 February 2017.

On 16 March 2017, the Inquiry Panel issued a *Notice*, enjoining "parties who have not responded to the Petition, as well as those who have earlier filed their responses by way of letters, motions, manifestations, or other pleadings, to file, on or before 5 May 2017, their answers, rejoinders, or other submissions" to either the *Petition* or *Consolidated Reply*. The Inquiry Panel also encouraged interested stakeholders to submit *Amicus Curiae* briefs.

The Inquiry Panel received *Amicus Curiae* briefs from the following individuals and institutions:

1. Asia Pacific Forum of National Human Rights Institutions (APF) and Global Alliance of National Human Rights Institutions (GANHRI);[27]
2. Center for International Environmental Law (CIEL);[28]
3. ClientEarth;[29]
4. Environment Law Alliance (ELAW);[30]
5. Dr. James Hansen, Director of Climate Science, Awareness and Solutions Earth Institute, Columbia University;[31]

---

27 Asia Pacific Forum of National Human Rights Institutions (APF) and Global Alliance of National Human Rights Institutions (GANHRI), Amicus Brief–Human Rights and Climate Change (Submission in Support of Petitioners), *available at* https://www.asiapacificforum.net/media/resource_file/AP Paper_Amicus_Brief_HR_Climate_Change.pdf (last accessed Nov. 7, 2019).

28 Center for International Environmental Law, Opinion of the Center for Environmental International Law In Support of Petitioners, dated 09 February 2019, *available at* https://www.business-humanrights.org/sites/default/files/documents/CHR-NI-2016-0001%20CIEL%20Opinion%2010.2.17.R.pd (last accessed Nov. 7, 2019).

29 ClientEarth, Amicus Curiae Brief, dated 21 November 2016, *available at* https://www.business-humanrights.org/sites/default/files/documents/ClientEarth.pd (last accessed Nov. 7, 2019).

30 Letter *from* Environmental Law Alliance Worldwide *to* Honorable Chairman Jose Luis C. Gascon and Fellow Commissioners, Commission on Human Rights (Nov. 7, 2016) (*available at* https://www.business-humanrights.org/sites/default/files/documents/ELa .pdf [last accessed Nov. 7, 2019]).

31 James Hansen, Amicus Submission in Support of the Petition, dated 28 August 2017, *available at* https://www.business-humanrights.org/sites/default/files/documents/2017.08.28_Jim.Hansen Amicus_Comm_Human%20Rights_0.pdf (last accessed Nov. 7, 2019); *also see* Our Children's Trust, Amicus Curiae Brief.

6. Maastricht Principles Drafting Group-Olivier De Shutter, former UN Special Rapporteur on the *Right to Food* and professor at the University of Louvain, Belgium; Asbjørn Eide, former Director and presently Professor Emeritus at the Norwegian Center for Human Rights at the University of Oslo; Ashfaq Khalfan, Director of Law and Policy Programme Amnesty International - International Secretariat; Marcos A. Orellana, Director of the Center for International Environmental Law's (CIEL) Human Rights and Environment Program; Ian Seiderman, Legal and Policy Director of the International Commission of Jurists; Rolf Künnemann, Human Rights Director, FIAN International Secretariat; Jernej Letnar Černič, Associate Professor of Human Rights Law, Graduate School of Government and European Studies, Slovenia; and Bret Thiele, Co-Executive Director, Global Initiative for Economic, Social and Cultural Rights;[32]
7. Mary Robinson Foundation - Climate Justice;[33]
8. Our Children's Trust (OCT);[34]
9. Timothy Crosland, Director of Plan B Earth;[35]
10. Sabin Center for Climate Change Law - Columbia Law School;[36]
11. Sara Seck, Faculty of Law of Western University, Ontario, Canada;[37]
12. Dr. Kevin E. Trenberth, Senior Scientist, Climate Analysis Section of the National Center for Atmospheric Research;[38] and
13. United Nations Children's Emergency Fund (UNICEF) Philippines.[39]

---

32 Olivier De Schutter, Asbjørn Eide, Ashfaq Khalfan, Rolf Künnemann, Jernej Letnar Černič, Marcos A. Orellana, Ian Seiderman, & Bret Thiele, Amicus Submission, dated 05 December 2016, *available at* https://business-humanrights.org/en/amicus-briefs (last accessed Nov. 7, 2019).

33 Letter *from* Mary Robinson Foundation - Climate Justice *to* Hon. Roberto Eugenio T. Cadiz, Commissioner, Commission on Human Rights, dated 04 November 2016, *available at* https://www.business-humanrights.org/sites/default/files documents/Mary%20Robinson%20Foundation.pdf (last accessed Nov. 7, 2019).

34 Our Children's Trust, Amicus Curiae Brief, dated 06 December 2016, *available at* https://www.business-humanrights.org/sites/default/files/documents/OCT%20Amicus%20Submission.pd (last accessed Nov. 7, 2019).

35 Timothy Crosland, Plan B, Amicus Curiae Brief, dated 18 October 2016, *available at* https://www.business-humanrights.org/sites/default/files/documents/Plan%20B.pd *and* Plan B, Supplement to Amicus Curiae Brief, dated 23 November 2016, *available at* https://www.business-humanrights.org/sites/default/files/Submission_Plan%20B%20supplementary%20note.pd .

36 Sabin Center for Climate Change Law, Columbia Law School, Submission in Support of the Petitioners, dated 16 December 2016, *available at* https://www.business-humanrights.org/sites/default/files/documents/ entz-and-Burger-2016-12-Submission-Case-No.-CHR-NI-2016-0001.pdf (last accessed Nov. 7, 2019).

37 Sara Seck, Amicus Submission, dated 12 November 2016, *available at* https://www.business-humanrights.org/sites/default/files/documents/ estern%20University.pdf (last accessed Nov. 7, 2019).

38 Kevin E Trenberth, Sc.D, Climate Analysis Section, National Center for Atmospheric Research, dated 07 November 2016, *available at* https://www.business-humanrights.org/sites/default/files documents/Kevin%20E%20Trenberth.pdf (last accessed Nov. 7, 2019).

39 United Nations Children's Emergency Fund Philippines, Amicus Curiae Brief submitted by UNICEF,

In May 2017, Chevron Corporation; Chevron Philippines, Inc. and Chevron Holdings, Inc.; Chevron Geothermal Services Company; Chevron Kalinga Ltd. and Chevron Malampaya LLC; ConocoPhillips; Eni S.p.A; Repsol, S.A. and Repsol Oil and Gas Canada Inc; and The Shell Company of the Philippines Limited and Royal Dutch Shell filed their respective *Rejoinders and/or letter response to the Petitioners' Consolidated Reply*.

On 7 December 2017, CEMEX S.A.B. de C.V. filed a *Manifestation* that it was no longer requesting for a formal resolution of its motion to dismiss, dated 14 September 2016.

On 11 December 2017, the Inquiry Panel held a pre-hearing conference with the parties to identify the issues, resource persons, and documents to be presented before the *Inquiry*.[40] Despite notice, only counsels for the Petitioners and the counsel for Respondent Cemex S.A.B. de C.V. appeared, the latter on special appearance to manifest its non-participation in the proceedings.[41]

The Chairman of the Inquiry Panel opened the conference, affirming the Commission's decision to admit the *Petition* and the reasons therefor. The nature of the *Inquiry*, as well as other procedural matters concerning the public hearings, such as the presentation, examination, and marking of documentary evidence, were discussed.[42]

It was also announced during the conference that, as of 18 October 2017, notices had been personally served upon the Petitioners,[43] while notices to the Respondents[44] were sent via registered mail.

dated December 2017, *available at* https://www.business-humanrights.org/sites/default/files documents/UNICEF%20Amicus%20Brief_Child%20%20Rights_Climate_%20Philippines_FINAL.pdf (last accessed Nov. 7, 2019).

40 Transcript of Stenographic Notes [T.S.N.] Case No. CHR-NHI-2016-0001 Conference of Parties 11 December 2017.

41 T.S.N. Case No. CHR-NHI-2016-0001 Preliminary Conference 11 December 2017, at 24.

42 T.S.N. of the Meeting of the Parties dated 11 December 2017.

43 Namely: 1) Greenpeace Southeast Asia (Philippines); 2) Philippine Rural Reconstruction Movement; 3) Sentro ng mga Nagkakaisa at Progresibong Manggagawa; 4) Dakila; 5) Philippine Alliance of Human Rights Advocates; 6) Philippine Human Rights Information Center; 7) Mother Earth Foundation; 8) Ecowaste Coalition; 9) 350.Org East Asia; 10) Nagkakaisang Ugnayan ng mga Magsasaka at Manggagawa sa Niyugan; 11) Asian People's Movement on Debt & Development; 12) Alliance of Youth Organizations and Students-Bicol; 13) Philippine Movement for Climate Justice; 14) Nuclear Free Bataan Movement; 15) Von Hernandez; 16) Fr. Edwin Gariguez; 17) Naderev "Yeb" Saño; 18) Amado Guerrero Saño; 19) Carlos Celdran; 20) Angel Aquino; 21) Juan Manuel "Kokoi" Baldo; 22) Lidy Nacpil; 23) Benjamin Aceron; 24) Elma Reyes; 25) Laidy Remado; 26)Richard Lopez; 27) Constancia Lopez; 28) Lerissa Libao; 29) Gloria Cadiz; 30) Ronie Flores; 31) Marinel Ubaldo; 32) Veronica V. Cabe.

44 Namely: 1) Chevron; 2) Chevron Geo-Local Services Corporation; 3) Chevron Philippines, Incorporated; 4) Chevron Holdings, Incorporate; 5) Chevron Texaco Malampaya LLC; 6) Chevron Kalinga Limited; 7) ExxonMobil; 8) BP PLC; 9) Castrol Philippines, Incorporated, formerly BP Philippines Incorporated; 10) Royal Dutch Shell; 11) ConocoPhillips; 12) Peabody Energy; 13) Total;

The Inquiry Panel noted that it had received various communications and responses from the following Respondents:

1. OMV Aktiengesellschaft;[45]
2. Chevron Geothermal Services Company, Chevron Kalinga Ltd., and Chevron Malampaya LLC;[46]
3. Chevron Philippines, Inc. and Chevron Holdings, Inc.;[47]
4. Eni S.p.A;[48]
5. Murphy Oil Corporation;[49]
6. Encana Corporation;[50]
7. Arch Coal;[51]
8. Consol Energy Inc.;[52]
9. BG Group PLC;[53]
10. Hess Corporation;[54]
11. RWE Konzern;[55] and
12. Devon Energy.[56]

---

14) Consol Energy Incorporated; 14) BHP Billiton; 15) Anglo-American PLC; 16) Anglo-American Exploration Philippines, Incorporated; 17) RWE Konzern; 18) ENI; 19) Rio Tinto; 20) Arch Coal, Incorporated; 21) Anadarko Petroleum Corporation; 22) Occidental Oil and Gas Corporation; 23) Lukoil; 24) Sasol Limited; 25) Repsol; 26) Marathon Petroleum Corporation; 27) Hess Corporation; 28) Glencore PLC; 29) Massey Energy, acquired by Alpha Natural Resources, Incorporated; 30) Alpha Natural Resources, Incorporated; 31) Cyprus Amax, Freeport-McMoRan Incorporated; 32) EnCana Corporation; 33) Devon Energy; 34) BG Group PLC; 35) Westmoreland Company; 36) Suncor Energy, Incorporated; 37) Kiewit Mining Incorporated; 38) National American Coal Corporation; 39) Ruhrkohle AG; 40) Luminant Corporation; 41) LaFarge as merged with Holcim; 42) Canadian National Resources; 43) Apache Corporation; 44) Talisman; 45) Murray Energy Corporation; 46) UK Coal Production Limited; 47) Husky Energy, Incorporated; 48) Heidelberg Cement AG; 49) Cemex; 50) Italcementi as acquired by Heidelberg Cement; 51) Murphy Oil Corporation; 52) Taiheiyo Cement, Incorporated; 53) OMV Group; 54) Rosneft.

45 Received on 28 April 2017.

46 Received on 03 May 2017 with an indication that they are returning the copies of the *Consolidated Reply*.

47 Received on 03 May 2017 with an indication that they are returning the copies of the *Consolidated Reply*.

48 Received on 04 May 2017.

49 Received on 16 November 2017.

50 Received on 17 November 2017 with an indication that they have gone away or moved from the address indicated in the *Petition*.

51 Received on 18 November 2017.

52 Received on 18 November 2017.

53 Received on 18 November 2017 with an indication that they have gone away or moved from the address indicated in the *Petition*.

54 Received on 20 November 2017.

55 Received on 22 November 2017.

56 Mail was sent on 19 October 2017 and Devon Energy refused receipt of the same.

Registry return receipts were received by the Commission from the following:

1. Apache Corporation;[57]
2. Marathon Oil Corporation;[58]
3. Conoco-Phillips Corporation;[59] and
4. Anglo-American Exploration.[60]

During the said conference, the Petitioners were asked to submit, by 11 January 2018, a list of their witnesses and electronic copies of all the documents which they intended to present for pre-marking.

On 11 January 2018, the Petitioners filed a *Motion for Extension of Time to Submit List of Witnesses and Other Documents,* praying for an additional thirty days, or until 10 February 2018, to comply.

On 19 March 2018, a *Joint Summary of the Amicus Curiae Briefs*[61] was submitted by the briefers to the Inquiry Panel.

## B. Public Hearings

The Inquiry Panel conducted the hearings in a dialogic, rather than adversarial manner. It operated on the principle of persuasion. While parties were given notices of the hearings, their participation was entirely voluntary. Indeed, as one of the Respondents subsequently manifested in the *withdrawal of its Motion to Dismiss*, it found no issue with the Commission proceeding with the *Inquiry* as a non-adversarial process.[62]

57 Received on 26 October 2017.

58 Received on 26 October 2017.

59 Received on 26 October 2017.

60 Received on 03 November 2017 with an indication that Anglo-American Exploration have gone away or moved from the address indicated in the *Petition*.

61 Submitted by the following organizations and individuals: Center for International Environmental Law (CIEL) (Erika Lennon, Carroll Muffett, Sébastien Duyck, Steven Feit & Lisa Hamilton); ClientEarth (Sophie Marjanac); Environmental Law Alliance Worldwide (ELAW) (Killian Doherty & Jennifer Gleason); Maastricht Principles Drafting Group (Kristine Perry); Our Children's Trust (Elizabeth Brown & Danny Noonan); Plan B (Tim Crosland); Sabin Center for Climate Change Law, Columbia Law School (Michael Burger & Jessica Wentz); Asia Pacific Forum of National Human Rights Institutions & the Global Alliance of National Human Rights Institutions (Dr. Annalisa Savaresi & Dr. Ioana Cismas); Dr. James E. Hansen (Dan Galpern); and Dr. Kevin E. Trenberth.

62 Received on 8 December 2017.

The Inquiry Panel focused its public hearings on the substantive aspects of the case, while adhering to general principles of due process, as guided under the provisions of its *Omnibus Rules of Procedure*.

The hearings were transparent and streamed live over the internet, allowing all parties and other stakeholders from around the world to participate. Witnesses were treated as resource speakers. They either appeared in person or gave their testimonies live via videoconferencing facilities. Everyone in attendance, including members of the general public, were given the opportunity to pose questions to the resource speakers.

On 27 and 28 March 2018, the Inquiry Panel held the first set of public hearings at the Session Hall of the CHRP in Metro Manila. Five resource persons, representing the indigenous youth;[63] agriculture and fishery sector;[64] and transport workers[65] gave their testimonies. Eight resource persons provided their expert opinions on the impact of greenhouse gases (GHG) on the carbon cycle and the atmosphere;[66] climate change and ocean acidification and the vulnerability of the Philippines to these;[67] Carbon Majors as a source of carbon emissions;[68] findings of the Philippine Atmospheric Geophysical and Astronomical Services Administration (PAGASA) in relation to climate change;[69] health impacts of climate change;[70] and CIEL's Smoke and Fumes report.[71]

On 23 and 24 May 2018, the second set of public hearings was held at the Session Hall of the CHRP in Metro Manila. Seven resource persons spoke about the concerns of fishermen, small business owners (fish consignment),[72] and urban poor victims of Typhoon Ketsana (local: *Ondoy*) in Marikina and Rizal.[73]

---

63 Ms. Rica Cahilig.

64 Mr. Felix "Ka Jhun" Pascua, Jr., Ms. Lerissa Libao, and Ms. Elma Reyes.

65 Mr. Ernesto Cruz.

66 Dr. Gerry Bagtasa.

67 Dr. Laura David, Dr. Perry Aliño, and Dr. Maria Lourdes San Diego-McGlone.

68 Dr. Peter Frumhoff.

69 Ms. Rosalina De Guzman.

70 Dr. Victorino Molina.

71 *See* Exhibit K, Smoke and Fumes: The Legal and Evidentiary Basis for Holding Big Oil Accountable for the Climate Crisis (Center for International Environmental Law), dated November 2017; Ms. Lisa Anne Hamilton.

72 Mr. Pablo Rosales and Mr. Jonathan Delos Reyes.

73 Mr. Pablo Taon III, Ms. Francia Encinas, Mr. Isagani Molina, Mr. RJ De Ramos, and Mr. Manuel "Ka Noli" Abinales.

Six resource persons gave their expert opinions on the liability or accountability of Carbon Majors;[74] the legal framework of human rights responsibility of transnational corporations;[75] analysis of the Inter-American Human Rights Court's opinion on the right to a healthy environment;[76] and climate change impacts on the agriculture sector, fish and seaweed supplies, reef ecology, and food chain supply in relation to the Philippines' food security.[77]

On 29 and 30 August 2018, the third set of public hearings was held at the Session Hall of the CHRP in Metro Manila, where six resource speakers shared their stories and concerns. A transgender woman who survived Super Typhoon Haiyan (local: *Yolanda*) shared how climate change compounded gender-based discrimination;[78] fisherfolks and farmers from Capalonga, Camarines Norte[79] narrated how their lives were impacted; and indigenous people from Ifugao Province articulated how climate change impacted their rice terraces in Banawe, which in turn adversely affected their cultural traditions.[80] Eight expert resource persons tackled topics relating to recent climate scenarios; the vulnerabilities and specific impacts of climate change on children;[81] the GHG contributions of the individual Carbon Majors;[82] the documented corporate actions and communications on climate change of ExxonMobil[83] and Shell;[84] the vulnerability of the Philippines' biodiversity to climate change;[85] the health impacts of climate change and the pathophysiology of heat stress, air pollution, and the Zika virus;[86] valuing climate change impacts, financial policies and climate change as risk multipliers for agricultural livelihoods;[87] and extreme weather attribution science and climate litigation.[88]

---

74 Mr. Carroll Muffett.

75 Dr. Michael Addo.

76 Dr. Marcos Orellana.

77 Undersecretary Sigfredo Serrano of the Department of Agriculture and Dr. Mudjekeewis Santos.

78 Ms. Jean Golong, a transgender woman.

79 Mr. Elicer G. Lauce and Ms. Delia A. Tulagan.

80 Ms. Delia A. Tulagan, Mr. Buucan Hangdaan, Ms. Dalia Nalliw, and Mr. William Mamanglo.

81 Dr. Rosa Perez and Dr. Celine Vicente.

82 Mr. Richard Heede.

83 Dr. Geoffrey Supran.

84 Mr. Carroll Muffett.

85 Dr. Neil Aldrin Mallari.

86 Dr. Jonathan Moses Jadloc.

87 Mr. Glenn Stuart Hodes.

88 Ms. Sophie Marjanac.

On 27 and 28 September 2018, the fourth set of public hearings was conducted in New York City. The Petitioners presented three youth survivors of Super Typhoon Haiyan (local: *Yolanda*) and Hurricane Sandy, who spoke on how these extreme weather events impacted their lives and livelihood.[89] Four resource persons discussed economic, social, and cultural rights in the context of climate change; how climate change acts as a threat multiplier;[90] the fossil fuel industry and trade associations' actions and response to climate change;[91] the 1999 *United States of America v. Philip Morris USA Inc., et al.* case in relation to corporate product liability;[92] and attribution science identifying Carbon Majors as significant contributors to climate change.[93]

The Inquiry Panel also heard six resource persons of its own invitation, namely: Professor David Estrin and Professor Cynthia Williams, who spoke on corporate accountability and disclosure principles; Dr. James Hansen, who briefly discussed the case of *Juliana et al. v. United States of America*;[94] Professor Erin Daly, who spoke on dignity rights; Professor Radley Horton, who discussed the effect of climate change on weather patterns; and Daniel Zarrilli, who discussed how the government of New York City was addressing climate change.

On 6 and 7 November 2018, the fifth set of public hearings was conducted at the London School of Economics. The Petitioners presented two resource persons who shared their stories as typhoon survivors. One, as a survivor of Typhoon Ketsana (local: *Ondoy*)[95] and a young survivor of Super Typhoon Haiyan (local: *Yolanda*).[96] The Petitioners also presented seven expert resource persons: Mark Campanale, Andrew Grant, Prof. Henry Shue, Dr. Roda Verheyen, Dr. Dylan Tanner, Dr. Myles Allen, and Dr. Paul Ekins OBE. These experts spoke about topics on how much carbon dioxide ($CO_2$) was released in the atmosphere and whether supply options of Carbon Majors were aligned with demand levels consistent with various scenarios of carbon constraint; the ethical aspects of the Carbon Majors' responsibility for climate change; climate litigation cases and their relevance to the *Inquiry*; European corporate influence on climate policy and action; attribution science of climate

89 Ms. Marinel S. Ubaldo, Ms. Cristina Cocadiz, and Ms. Candice Sering.
90 Ms. Katherine Lofts.
91 Mr. Kert Davies.
92 Ms. Sharon Eubanks.
93 Dr. Brenda Ekwurzel.
94 Docket No. 18-36082, 9th Circuit Court.
95 Ms. Mariel Trixie Bacason.
96 Ms. Veronica Cabe.

change (modelling) and assessing these changes with future climate simulations; and a model that contains estimates of the quantities, locations, and nature of the world's oil, gas, and coal reserves and resources.

The Inquiry Panel heard seven experts of its own invitation: Joni Pegram, who discussed children's rights in relation to climate change; Adam Matthews,[97] as co-chair of Transition Pathways Initiative,[98] who discussed the Church of England's responsible investment practice; Dr. Jaap Spier, who discussed the Oslo Principles on Global Climate Change Obligations; Lene Wendland,[99] who discussed human rights responsibilities of business in the context of the United Nations Guiding Principles on Business and Human Rights; Ben Schachter,[100] who discussed climate change and its impact on the effective enjoyment of human rights, and human rights obligations of States; Dr. Swenja Surminski,[101] who discussed climate change and its impact on the human rights of the Filipino; and Linda Siegele,[102] who discussed the provisions of the UNFCCC and the Paris Agreement as they relate to adaptation, loss, and damage.

On 11 and 12 December 2018, the final set of public hearings was conducted at the Session Hall of the CHRP in Metro Manila. Three resource persons[103] were presented to share their stories as typhoon survivors who lost loved ones to Typhoon Washi (local: *Sendong*), and a Disaster Risk Reduction officer, who shared how Camotes Island in Cebu survived Super Typhoon Haiyan (local: *Yolanda*) with zero casualties.

Six expert witnesses discussed the following topics: human rights responsibilities in relation to climate change; the Commission's role in this global issue; the concept of a "just transition" and the corporate requirements on Carbon Majors to ensure that they act responsibly in relation to climate change; the health impacts of climate change and the development of a health adaptation strategy by the State in relation to climate change; how the United Nations Guiding Principles on Business and Human Rights provide an analytical

97 Director of Ethics and Engagement of the Church of England's Pensions Board.

98 An initiative that assesses companies' preparedness for the transition to a low carbon economy (*citing* https://lse.ac.uk/granthaminstitute/tpi, last accessed Nov. 13, 2019).

99 Chief of Directorate at the United Nations Office of the High Commissioner on Human Rights, Economic and Social Issues Section.

100 Focal Point on Climate Change of the Office of the UN High Commissioner for Human Rights

101 Head of Adaptation Research, Grantham Research Institute on Climate Change and the Environment, London School of Economics and Political Science.

102 Senior Teaching Fellow, Climate Change Law and Policy, SOAS University of London.

103 Ms. Amalia Bahian, Ms. Monica Piquero-Tan, and Ms. Honeylyn Gonzales.

lens on what may constitute adequate human rights protection from climate harms in the Philippines, including the role of businesses in addressing these harms and the identification of policy gaps that should be addressed by the Philippine government; and the Climate Compensation Act and principles of liability for large-scale GHG emitters. Kumi Naidoo, Laura Gyte, Dr. Glenn Roy Paraso, former Commissioner of the Climate Change Commission Naderev Saño; former Chair of this Commission Loretta Ann Rosales, and Dr. Margaretha Wewerinke-Singh testified as expert resource persons for the Petitioners.

On 26 June 2019, the Inquiry Panel asked Petitioners to submit their *Formal Offer of Evidence* on or before 5 July 2019, and their *Memorandum*, on or before 31 August 2019.

On 4 July 2019, the Petitioners filed an *Ex-Parte Motion for Extension,* dated 3 July 2019, requesting for an extension of fifteen days each within which to file the two pleadings, specifically by 20 July 2019, for the *Formal Offer of Evidence*, and by 15 September 2019, for the *Memorandum*, which motion was granted on 5 July 2019.

On 19 July 2019, the Petitioners filed their *Ex-Parte Formal Offer of Documentary Exhibits and Manifestation.*

On 13 September 2019, Petitioners filed an *Ex-Parte Manifestation and Additional Formal Offer of Documentary Exhibit* requesting the admission of evidence omitted in their formal offer of 19 July 2019.

On 19 September 2019, the Petitioners submitted their *Memorandum.*

## V. Findings

### *A. Climate Change is Real*

The Inter-Governmental Panel on Climate Change (IPCC) defines climate change as the "change in the state of the climate that can be identified (e.g., by using statistical tests) by changes in the mean and/or the variability of its properties, and that persists for an extended period, typically decades or longer." Climate change may be "due to natural internal processes or external forcings such as modulations of the solar cycles, volcanic

eruptions and persistent anthropogenic changes in the composition of the atmosphere or in land use."[104] This definition was derived from the observations of the scientific community through their research.

The United Nations Framework Convention on Climate Change (UNFCCC), which the Philippines signed on 12 June 1992 and ratified on 2 August 1994, has adopted a more nuanced definition, emphasizing the influence of human activities. It defines climate change as "a change of climate which is attributed directly or indirectly to human activity that alters the composition of the global atmosphere and which is in addition to natural climate variability observed over comparable time periods."[105] Philippine statutes have adopted a definition that reflects the one provided by the IPCC. These statutes define climate change as "a change in climate that can be identified by changes in the mean and/or variability of its properties and that persists for an extended period typically decades or longer, whether due to natural variability or as a result of human activity."[106]

The reports of the IPCC provide unequivocal evidence of global warming. The particular indicators are changes in the atmosphere, oceans, cryosphere, and frequency of extreme weather and climate events. Over the past several decades, these changes have been at levels unseen in centuries to millennia, and are changing at rates unprecedented in the last 2000 years.[107]

---

104 Intergovernmental Panel on Climate Change, *2013: Annex III: Glossary [Planton, S. (ed.)]. In: Climate Change 2013: The Physical Science Basis. Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change* [Stocker, T.F., D. Qin, G.-K. Plattner, M. Tignor, S.K. Allen, J. Boschung, A. Nauels, Y. Xia, V. Bex and P.M. Midgley (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA, at 1450.

105 United Nations Framework Convention on Climate Change, Chapter XXVII, art. 1, ¶ 2, *adopted* May 9, 1992, 1771 U.N.T.S. 107, *available at* https://treaties.un.org/doc/Treaties/1994/03/19940321%2004-56%20AM/Ch_XXVII_07p.pdf.

106 An Act Mainstreaming Climate Change into Government Policy Formulations, Establishing the Framework Strategy and Program on Climate Change, Creating for this Purpose the Climate Change Commission, and for other Purposes [Climate Change Act of 2009], Republic Act No. 9729, § 3 (d) (2009); An Act Strengthening the Philippine Disaster Risk Reduction and Management System, Providing for the National Disaster Risk Reduction and Management Framework and Institutionalizing the National Disaster Risk Reduction and Management Plan, Appropriating Funds Therefor and for other Purposes [Philippine Disaster Risk Reduction and Management Act of 2010], Republic Act No. 10121, § 3 (d) (2010); An Act Establishing the People's Survival Fund to Provide Long-term Finance Streams to Enable the Government to Effectively Address the Problem of Climate Change, amending for the Purposes Republic Act No. 9729, otherwise known as the "Climate Change Act of 2009", and for other Purposes, Republic Act No. 10174, § 2 (2011).

107 Intergovernmental Panel on Climate Change, *2021: Summary for Policymakers. In: Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change* [MassonDelmotte, V., P. Zhai, A. Pirani, S.L. Connors, C. Péan, S. Berger, N. Caud, Y. Chen, L. Goldfarb, M.I. Gomis, M. Huang, K. Leitzell, E. Lonnoy, J.B.R. Matthews, T.K. Maycock, T. Waterfield, O. Yelekçi, R. Yu, and B. Zhou (eds.)]. Cambridge University Press. In Press [hereinafter IPCC, *AR 6, WG1, SPM*].

The indicators, meticulously monitored and studied by the scientific community, as evidence of the reality of climate change, are as follows:

## 1. Atmospheric Warming

The temperature of the atmosphere increases due to excess heat being trapped by GHG instead of being released back into space. The IPCC reported that the mean global surface temperatures of each of the last four decades has been successively warmer than any decade that preceded it since 1850.[108] From the years 2001 to 2020, the global surface temperature was 1.09°C higher than the 1850 to 1900 baseline conditions.[109] This increase in temperature is being experienced in all regions of the world. Even accounting for natural climate variabilities, the rate of warming has been unlike anything in the past 800,000 years.[110]

## 2. Oceanic Indicators

### *Ocean Warming*

Oceans, much like the atmosphere, absorb excess heat that fails to escape into space. The IPCC reports state that ocean surface temperature has been increasing over the past decades. The global ocean has warmed unabated, and its heat content has increased since 1970 and is projected to continue to increase over the 21st century. Furthermore, the rate of ocean warming has doubled since 1993. It has, on average, increased by 0.88°C from 1850-1900 to 2011-2020, with 0.60°C of this warming having occurred since 1980.[111] Marine heatwaves[112] have become more frequent over the 20th century, and since the 1980s, have approximately doubled in frequency and have become longer and more intense.[113]

---

108 *Id.*

109 *Id.*

110 *Id.*

111 Intergovernmental Panel on Climate Change, *2019: Summary for Policymakers. In: IPCC Special Report on the Ocean and Cryosphere in a Changing Climate* [H.-O. Pörtner, D.C. Roberts, V. Masson-Delmotte, P. Zhai, M. Tignor, E. Poloczanska, K. Mintenbeck, A. Alegría, M. Nicolai, A. Okem, J. Petzold, B. Rama, N.M. Weyer (eds.)]. Cambridge University Press, Cambridge, UK and New York, NY, USA, pp. 3-35. https://doi.org/10.1017/9781009157964.001 [hereinafter IPCC *SROCC SPM*].

112 Sustained periods of anomalously high near-surface temperatures that can lead to severe and persistent impacts on marine ecosystems.

113 IPCC, *AR 6, WG1, SPM*, supra note 107.

### *Sea Level Rise*

Sea level rise is caused by thermal expansion of water in the seas due to their warming, as well as the increase of the amount of water due to the melting of the cryosphere. From 2006-2015, the sum of ice sheets and glacier melt contributions has been the dominant source of sea level rise, exceeding that of thermal expansion.[114] The findings of the IPCC provide that the rise of global mean sea level (GMSL) in the 20th century is at a rate faster than any preceding century in at least the last three millennia. Between 2006 and 2018, the average rate of sea level rise was 3.7 mm per year.[115] Since 1901, GMSL has risen by 0.20 [0.15-0.25] m, and the rate is accelerating[116] due to the combined increased ice loss from the Greenland and Antarctic ice sheets.

### *Ocean Acidification*

Ocean acidification occurs when oceans absorb $CO_2$. The IPCC reports provide that the ocean has been absorbing more $CO_2$ and has undergone increasing surface acidification. The ocean has taken up between 20 to 30 percent of total anthropogenic $CO_2$ emissions since the 1980s.[117] This has resulted in ocean surface pH declining globally over the past four decades and in all ocean basins in the ocean interior over the past two to three decades.[118]

## 3. Cryosphere Loss

The cryosphere refers to the portions of the Earth System that is frozen such as glaciers, ice sheets, icebergs, sea ice, snow cover, and the like.[119] It is inherently reactive to temperature changes and "provides some of the most visible signatures of climate change."[120] Over the last few decades, the cryosphere has seen widespread

---

114 IPCC *SROCC SPM*, *supra* note 111.

115 IPCC, *AR 6, WG1, SPM*, *supra* note 107.

116 *Id*.

117 *IPCC SROCC SPM*, *supra* note 111.

118 IPCC, *AR 6, WG1, SPM*, *supra* note 107.

119 IPCC *SROCC SPM*, *supra* note 111.

120 Intergovernmental Panel on Climate Change, *Observations: Cryosphere*, in Climate Change 2013 – The Physical Science Basis: Working Group I Contribution to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change 317-382 (Cambridge University Press, 2014). doi:10.1017/CBO9781107415324.012 [hereinafter referred to us IPCC Observations: Cryosphere].

shrinking due to global warming.[121] Ice sheets and glaciers worldwide have lost mass worldwide. The mass loss from the Antarctic ice sheet in 2007-2016 was triple that lost in 1997-2006. While the mass loss in Greenland was doubled over the same period. Snow cover and arctic sea ice extent and thickness have been reduced, and permafrost temperatures have increased.[122]

### 4. Extreme Weather and Climate Events

Climate change has also significantly affected the frequency, intensity, extent, duration, and timing of extreme weather and climate events.[123] Since the 1950s, there have been clear changes in many types of extreme events, including droughts, heavy precipitation, tropical cyclones, and heat waves. The IPCC has found that hot extremes such as heatwaves have become more frequent and intense across land regions while cold extremes have become less frequent and severe.[124] Other events, such as heavy precipitation, tropical cyclones, and droughts, have increased in frequency and intensity. Compound extreme events such as flooding and fire weather have also increased due to the influence of climate change on precipitation, droughts, and cyclones.[125]

The enumerated indicators, when taken together, all point to the conclusion that the climate has indeed changed. The Commission accepts this unequivocal truth, as established by peer-reviewed science, that climate change is real and happening on a global scale.

121 *IPCC SROCC SPM*, *supra* note 111.

122 *Id.*

123 Intergovernmental Panel on Climate Change, *2012: Summary for Policymakers. In: Managing the Risks of Extreme Events and Disasters to Advance Climate Change Adaptation* [Field, C.B., V. Barros, T.F. Stocker, D. Qin, D.J. Dokken, K.L. Ebi, M.D. Mastrandrea, K.J. Mach, G.-K. Plattner, S.K. Allen, M. Tignor, and P.M. Midgley (eds.)]. A Special Report of Working Groups I and II of the Intergovernmental Panel on Climate Change. Cambridge University Press, Cambridge, UK, and New York, NY, USA, pp. 3-21.

124 IPCC, *AR6, WG1, SPM*, *supra* note 107.

125 IPCC, *AR6, WG1, SPM*, *supra* note 107.

## B. Anthropogenic Dimension of Climate Change

The scientific community has long achieved a consensus that climate change is induced by human activity.

In the past, scientific uncertainty, as communicated in scientific research such as the IPCC assessment reports,[126] were used to sow doubt and confusion in public perception on how much of climate change is attributable to anthropogenic or human activities.[127] However,in2021-2022,theIPCCreleaseditslatestreports,theSixthAssessmentReports(AR6), stating that it is unequivocal that the climate change that is currently being experienced is anthropogenic in origin, foregoing the use of their previous method of communicating uncertainty. Human influence has warmed the climate, atmosphere, ocean and land at a rate that is unprecedented in the last 2000 years.[128] The report of Working Group I of AR6 states that global atmospheric concentrations of the GHG responsible for warming, such as $CO_2$, methane ($CH_4$), and nitrous oxide ($N_2O$), have all risen significantly in the last few thousand years.[129] In particular, atmospheric $CO_2$ concentrations are higher than at any time in at least two million years, and concentrations of $CH_4$ and $N_2O$ are higher than at any time in at least 800,000 years.[130] These increases in GHG concentrations have been unequivocally caused by human activities since around 1750.[131]

126 The IPCC Fifth Assessment Report [AR5] relied on two (2) metrics for communicating the degree of certainty in key findings: a) confide ce in the validity of a finding based on the type, amount, quality and consistency of evidence, and the degree of agreement; and b) quantified measures of certainty in a finding expressed probabilistically. The following terms are used to describe the available evidence: limited, medium or robust; and for the degree of agreement: low, medium or high. A level of confidence is expressed using five (5) qualifiers: very low, low, medium, high and very high. If uncertainties can be quantified probabilistically, the following terms are used to indicate the assessed likelihood: virtually certain (99-100% probability), extremely likely (95-100% probability), very likely (90-100% probability), likely (66-100% probability), more likely than not (>50-100% probability), about as likely as not (33-66% probability), unlikely (0-33% probability), very unlikely (0-10% probability), extremely unlikely (0-5% probability), and exceptionally unlikely (0-1% probability) (*citing* IPCC, 2013: Climate Change 2013: The Physical Science Basis. Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Stocker, T.F., D. Qin, G.-K. Plattner, M. Tignor, S.K. Allen, J. Boschung, A. Nauels, Y. Xia, V. Bex and P.M. Midgley (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA, p. 36).

127 Kyun Soo Kim, *Public Understanding of the Politics of Global Warming in the News Media: The Hostile Media Approach*, 20 Public Underst Sci. 690-705, doi:10.1177/0963662510372313 (2011) & Aaron M. McCright & Riley E. Dunlap, *Anti-reflexivity: The American Conservative Movement's Success in Undermining Climate Science and Policy*, 27 Theory Cult. Soc 100-133, doi:10.1177/0263276409356001 (2010).

128 IPCC, *AR 6, WG1, SPM*, *supra* note 107.

129 *Id.*

130 *Id.*

131 *Id.*

The key global indicators, as previously discussed, also point to the conclusion that human activities have caused significant changes. The IPCC found that the warming of the atmosphere and oceans, the acidification of the ocean, sea-level rise, the decrease of the cryosphere, and the changes in climate and weather events can all be traced back to the influence of human activities on the climate.[132]

All these considered, the Commission accepts that climate change is primarily anthropogenic or caused by human activities.

## *C. Climate Change: A Grave and Urgent Human Rights Concern*

### 1. Adverse Impacts of Climate Change on Human Rights

#### *In General*

Anthropogenic climate change is "the greatest human rights challenge of the 21st century."[133] It negatively affects a host of, if not all, human rights.[134] Climate change impacts, including the degradation of the environment; deprivation of resources; prevalence of life-threatening diseases; widespread hunger and malnutrition; and extreme poverty, among others, prevent an individual from living a dignified life.

Some of the individual rights adversely impacted are the rights to life, food, water, sanitation, and health. Collective rights are also affected, including the rights to food security, development and sustained economic growth, self-determination, preservation of culture, equality and non-discrimination.

---

132 *Id.*

133 As remarked by Former High Commissioner for Human Rights, Mary Robinson, now President of the Mary Robinson Foundation – Climate Justice, during the panel discussion on human rights and climate change during the 28th session of the Human Rights Council.

134 *See* United Nations Human Rights Council, *Human Rights and Climate Change*, U.N. Doc. No. A/HRC/RES/41/21 (July 23, 2019) (Some of the previous Council resolution underlining the wide range of implications of climate change on the effective enjoyment of human rights include RES/7/23, RES/10/4, RES/18/22, among others) & Office of the High Commissioner for Human Rights, *Understanding Human Rights and Climate Change* (Submission of the Office of the High Commissioner for Human Rights to the 21st Conference of the Parties to the United Nations Framework Convention on Climate Change).

Vulnerable sectors are also impacted, such as women and children, indigenous peoples, older adults, and persons with disabilities.

Climate change also impacts the rights of future generations, which brings to fore the duty of stewardship upon the present.

Climate change is also now a major cause of migration, and a threat to global security.

Professor Erin Daly, CHRP resource person, explains the relationship of climate change impacts and human dignity, which is at the core of all human rights, as follows:

> Focusing on human dignity helps us see the interdependence, the interrelatedness, the indivisibility of our human rights, which is in fact how deprivation of rights are experienced by people. When a typhoon hits, it is not just independently the loss of a house, the loss of a school, the loss of family, the loss of health care, the lack of water, food insecurity of the end of hope that needs to be vindicated, but all of these churning together in combination and in turmoil that makes the experience of climate impacts so devastating and so threatening to human dignity. [135]

Petitioner Veronica Cabe, a survivor of Typhoon Ketsana (local: *Ondoy*), testified:

> ...The floods have changed our lives. I felt like parts of our dignity was lost because we felt displaced.
>
> We felt displaced, we didn't have our own space. We were forced to live with friends who were willing to share their homes with us. We were separated from each other. My nephews lived in another relative's house. We relied on relief goods and donations for months. I recall every day I had to queue in line and wait for hours, half a day every day waiting for possible relief. We did not know if relief would come and then line up again for another day. And then relief foods were thrown at us, and I saw my neighbors struggling against each other just to get their share. It was chaotic that time. The government was not ready for an *Ondoy* flood that time. And one important thing is that we had to borrow money from everyone because we did not have money.[136]

135 T.S.N. of the Fourth Inquiry Hearing dated 27-28 September 2018, at 157.

136 T.S.N. of the Fifth Inquiry Hearing dated 6-7 November 2018, at 110-111.

Marinel Ubaldo, a survivor of Super Typhoon Haiyan (local: *Yolanda*), narrated:

> I went back to our house even though the winds were still strong, as I wanted to see if we still have a home to go back to. Though it was still dangerous for me to go back, I also wanted to save a box that has a sentimental value to me. That box was very special to me because it was filled with my personal things, my literary works, the medals and certificates I earned in school. For me, that box symbolizes who I am. My achievements, my self-worth. Nothing was left of our home and losing that box also felt like losing my identity, my dreams, my significance as a person.[137]

The aftermath of extreme weather events attributed to climate change dehumanizes the human person. The combination of loss of lives, deprivation of basic needs, material loss, emotional trauma and hopelessness that these survivors experience strip them of their dignities.

## 2. Adverse Impacts of Climate Change in the Philippines

Long-term data over a 20-year period places the Philippines as the fifth most climate change-affected country in the Global Climate Risk Index.[138] Yet, the country only accounts for 0.3 percent of global emissions.[139] It is evident that the burden of climate change falls disproportionately on the Filipino people.

Culled from the testimonies of resource persons presented during the *Inquiry* hearings, fact-finding missions, community dialogues, KIIs, and FGDs, this section illustrates how the brunt of climate change has prevented many Filipinos from living their lives with dignity.

137 T.S.N. of the Fourth Inquiry Hearing dated 27-28 September 2018, at 7.

138 David Eckstein, Marie-Lena Hutfils & Maik Winges, Global Climate Risk Index 2019: Who Suffers Most From Extreme Weather Events? Weather-related Loss Events in 2017 and 1998 to 2017 (Briefing Paper Published by Germanwatch e.V. (2018), *available at* https://germanwatch.org/sites/germanwatch.org/files/Global%20Climate%20Risk%20Index%202019_2.pd .

139 World Bank, Getting a Grip on Climate Change in the Philippines: Executive Report, *available at* https://openknowledge.worldbank.org/handle/10986/16525 [hereinafter World Bank, Getting a Grip].

### *i. Right to Life*

No human right is more fundamental and universal than the inherent right to life. It essentially means the right to exist. Its recognition is enshrined in Article 3 of the United Nations Declarations of Human Rights[140] (UDHR), Article 6 of the ICCPR, and in various international treaties and instruments and State constitutions. In the Philippines, it is protected by Article III, Section 1 of the Constitution.

UNHRC General Comment No. 36 to Article 6 of the ICCPR recognizes climate change as one of the most pressing and serious threats to life.[141] The UNEP further explains that climate change, through sudden onset events, poses a direct threat to human lives and safety, and, through gradual forms of environmental degradation, undermines critical resources that support human life.[142] A study commissioned by the Climate Vulnerable Forum found that climate change is responsible for an estimated 400,000 deaths per year due to the direct effects associated with extreme weather events, flooding, heat waves, disease, and water and food insecurity.[143] The World Health Organization (WHO) reported that between 1998 and 2017, more than 166,000 people died from brutal heat waves,[144] a figure that, given the projected increase of populations[145] especially in urban areas where climate models predict intense warming due to continued emissions,[146] will exponentially increase in the coming decades. Climate change is also expected to cause approximately 250,000 additional deaths per year between 2030 and 2050 due to an increase in malnutrition, malaria, dengue, diarrhea, and heat stress.[147]

---

140 United Nations General Assembly, Universal Declaration of Human Rights, G.A. Res. 217 (III) A, U.N. Doc. A/RES/217 (III) (Dec. 10, 1948) [hereinafter UDHR].

141 United Nations Human Rights Committee, *General Comment No. 36 (2018) on Article 6 of the International Covenant on Civil and Political Rights, on the Right to Life*, UN Doc. CCPR/C/GC/36 (Oct. 30, 2018) ¶ 62.

142 Michael Burger & Jessica Wentz, Climate Change and Human Rights (United Nations Environment Programme in cooperation with Columbia Law School: Sabin Center for Climate Change Law), *available at* http://apps.unep.org/publications/index.php?option=com_pub&task=download&file=0 1917_en (last accessed Nov. 20, 2019).

143 DARA and Climate Vulnerable Forum, Climate Vulnerability Monitor 2012: A Guide to the Cold Calculus of a Hot Planet (Madrid: Fundación DARA Internacional, 2012) (citing Sabin Center for Climate Change Law, *supra* note 36, at 15).

144 World Health Organization, Heatwaves, *available at* https://www.who.int/health-topics/heatwaves#tab=tab_1.

145 Statista Research Department, Urbanization by Continent 2020 (as of 02 December 2020), *available at* https://www.statista.com/statistics/270860/urbanization-by-continent/.

146 Zhao, L., Oleson, K., Bou-Zeid, E. et al. (2021) *Global multi-model projections of local urban climates*. Nat. Clim. Chang. 11, 152–7. https://doi.org/10.1038/s41558-020-00958-8

147 World Health Organization, Quantitative Risk Assessment of the Effects of Climate Change on Selected Causes of Death, 2030s and 2050s (Geneva: World Health Organization, 2014) (citing Sabin Center for Climate Change Law, *supra* note 36, at 15).

Climate change's impact on the right to life of the Filipino people is most pronounced in the death toll and trauma left by extreme weather events. The deadliest in recent history, Super Typhoon Haiyan (local: *Yolanda*) in 2013 resulted in 6,300 individuals dead, 28,688 injured and 1,062 missing in one swoop. [148]

Emilio Oñate, a Haiyan survivor, recounted what he saw–the water had carried away everything in its path, even humans and animals.[149] Emilio saw people drown. He said it was the most traumatic scene–one moment people were reaching above the water, fighting for their lives, and the next moment, they were gone.[150]

Other survivors of extreme weather events that claimed the lives of thousands of Filipinos shared the same experience of profound loss and grief. Amalia Bahian, a survivor of Tropical Storm Washi (local: *Sendong*) narrated:

> I can say that typhoon *Sendong* was one of its kind. There were several typhoons that hit us, but never as strong as such typhoon. We seemed unaware of a looming disaster that would befall our family. I never thought this would kill thousands of lives including my three (3) children, one (1) son-in-law, and four (4) grandchildren. I did not know that day was the last time that I will see them. But the saddest part was that their bodies remain missing up to this day.[151]

Honeylyn Gonzales, who was only eighteen years old when Tropical Storm Washi struck in 2011, testified:

> My older brother and I together with our two (2) younger siblings decided to cross the street even if the flood was already at the chest level to get to the waiting shed. We saw a house with a second floor where we went to, after that, my older brother left us to go back to our parents to help them get to where we were at since our parents needed help too as they are disabled. My two (2) younger siblings and I waited for our parents and older brother but they never came, later on I found out from a neighbor who survived that the three of them were able to move to another house that was quite high. On December 17 at around 2:00 AM, my older brother sent our neighbor where the three of us were [a text message] to ask how

148 National Disaster Risk Reduction and Management Council, *supra* note 8.

149 Emilio Oñate, Leyte Fact Finding Mission.

150 *Id.*

151 Exhibit CCCCCCCCC, *Salaysay* ni Gng. Amalia Bahian (with English Translation) at 2.

> we were doing, my older brother's message was "how are my three (3) siblings?" Then our neighbor tried calling my older brother, but his phone could not be reached, little did we know that the house where he and my parents were staying at had already collapsed. The following morning, together with my two (2) siblings we immediate [sic] left the place we stayed at to go to where my parents and older brother, while on our way there we never thought that they have died. While heading to the said place, we saw a lot of dead people on the road, a lot of houses and properties were wrecked but [we] didn't find our missing family members. Then I decided to temporarily leave my two (2) siblings in the church to continue looking for my parents and older brother. After looking for the entire day, I still was not able to find any of them. We continued to look for them, we went to funeral homes, any place where people said that there were survivors, but no one from my six (6) missing family members could be found.[152]

These are just three of the thousands of similar stories spanning decades of extreme weather events. Filipinos carry the brunt of anthropogenic climate change by paying with their lives.

### *ii. Right to Health*

The right to health is recognized by several international and regional human rights instruments including, the UDHR, International Convention on Economic, Social, and Cultural Rights (ICESCR),[153] International Convention on the Elimination of All Forms of Racial Discrimination, the Convention on the Elimination of All Forms of Discrimination Against Women (CEDAW),[154] and the Convention on the Rights of the Child (CRC),[155] among others. WHO defines "health" as "a state of complete physical, mental and social well-being and not merely the absence

152 T.S.N. of the Sixth Inquiry Hearing dated 11-12 December 2018, at 49-50.

153 United Nations General Assembly, International Covenant on Economic, Social and Cultural Rights, Dec. 16, 1966, 993 U.N.T.S. 3, *available at* https://www.refworld.org/docid/3ae6b36c0.html (last accessed May 3, 2022) [hereinafter ICESCR].

154 United Nations General Assembly, Convention on the Elimination of All Forms of Discrimination Against Women, Dec. 18, 1979, 1249 U.N.T.S. 13, *available at* https://www.refworld.org/docid/3ae6b3970.html (last accessed May 3, 2022) [hereinafter CEDAW].

155 United Nations Commission on Human Rights, Convention on the Rights of the Child, Mar. 7, 1990, E/CN.4/RES/1990/74, *available at* https://www.refworld.org/docid/3b00f03d30.html (last accessed May 3, 2022) [hereinafter as CRC].

of disease or infirmity."[156] The Committee on Economic, Social and Cultural Rights (CESCR) further provides that the right to health is "closely related to and dependent upon the realization of other human rights."[157] It "embraces a wide range of socio-economic factors that promote conditions in which people can lead a healthy life, and extends to the underlying determinants of health."[158]

Climate change negatively affects the right to health because humans are vulnerable to shifts in weather patterns.[159] An increase in heat, for instance, affects humans in multiple ways. Directly, extreme heat can create physiological stress on the body causing dehydration, heat cramps, and heat stroke. More serious implications include hospitalization and increased risk of death from respiratory, cardiovascular, and other chronic diseases.[160] Indirectly, heat can subject populations to increased transmission of food and waterborne diseases and to poor air and water quality.[161] This is also true for extreme weather events that severely degrade water and sanitation infrastructure leading to outbreaks of diseases.[162] Variable rainfall affects freshwater supply which in turn compromises hygiene and leads to increased diarrheal diseases.[163] Changes in climatic conditions can also lengthen the transmission season and widen the geographic range of diseases,[164] and increase instances of "water-borne diseases and diseases transmitted through insects, snails or other cold-blooded animals."[165]

---

156 Constitution of the World Health Organization, 36 Am. J. Public Health 1315, doi:10.2105/AJPH.36.11.1315 (1946) (Preamble).

157 United Nations Committee on Economic, Social and Cultural Rights, *General Comment No. 14: The Right to the Highest Attainable Standard of Health (Article 12 of the Covenant),* E/C.12/2000/4 (Aug. 11, 2000), para. 3.

158 *Id.* at para. 4.

159 Intergovernmental Panel on Climate Change, *2014: Climate Change 2014: Impacts, Adaptation, and Vulnerability. Part A: Global and Sectoral Aspects. Contribution of Working Group II to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change* [Field, C.B., V.R. Barros, D.J. Dokken, K.J. Mach, M.D. Mastrandrea, T.E. Bilir, M. Chatterjee, K.L. Ebi, Y.O. Estrada, R.C. Genova, B. Girma, E.S. Kissel, A.N. Levy, S. MacCracken, P.R. Mastrandrea, and L.L. White (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA, 1132 [hereinafter IPCC, *AR5 WGII*].

160 World Health Organization, Heat and Health (June 1, 2018), *available at* https://www.who.int/news-room/fact-sheets/detail/climate-change-heat-and-health.

161 *Id.*

162 United Nations Office of the High Commissioner for Human Rights, *Analytical Study on the Relationship Between Climate Change and the Human Right of Everyone to the Enjoyment of the Highest Attainable Standard of Physical and Mental Health: Report of the Office of the United Nations High Commissioner for Human Rights*, A/HRC/32/23 (2016) [hereinafter UNOHCHR, *2016 Report on Climate Change and the Right to Health*].

163 World Health Organization, *supra* note 160.

164 UNOHCHR, *2016 Report on Climate Change and the Right to Health*, *supra* note 162.

165 World Health Organization, *supra* note 160.

Climate change also impacts the mental health of individuals and communities. It has been reported that "people who experienced the loss of homes or loved ones or were exposed to life-threatening situations faced higher risks of developing stress and anxiety-related conditions, including post-traumatic stress disorder or depression."[166] Finally, climate change also causes the collapse of all determinants of health "such as food and nutrition, housing, access to safe and potable water and adequate sanitation, safe and healthy working conditions, and a healthy environment."[167]

In the Philippines, Article II, Section 15 of the Constitution protects and promotes the right to health of its people. Yet, climate change has and continues to impinge on the Filipinos' right to health. Filipinos suffer from illnesses resulting from severe temperature increase, extreme weather conditions, air pollution, food and water shortage, and population displacement. Water and food-borne diseases and vector-borne and rodent-borne diseases have also increased.[168] Heavy rainfall during the wet season,[169] combined with the shortened incubation period of viruses due to elevated ambient air temperatures during droughts,[170] has multiplied the incidence of dengue in the Philippines.

In August 2019, the Philippine Department of Health declared a national dengue epidemic owing to the 98 percent increase in cases from January to July 2019.[171] There was also an emergence of *Chikungunya*, a vector-borne disease which may cause debilitating symptoms for up to around three months, in the southern Philippines just months after Typhoon Haiyan (local: *Yolanda*). Dr. Jonathan Moses Jadloc, National Chair of the Climate Change Committee of the Philippine College of

---

166 United Nations Office of the High Commissioner for Human Rights, *Outcome of the Panel Discussion on the Adverse Impact of Climate Change on States' Efforts to Progressively Realize the Right of Everyone to the Enjoyment of the Highest Attainable Standard of Physical and Mental Health and Related Policies, Lessons Learned and Good Practices: Summary Report of the Office of the United Nations High Commissioner for Human Rights*, A/HRC/32/24 (2016).

167 *Id.*

168 Exhibit JJ to JJ-8, Printed PowerPoint Presentation of Dr. Molina. Victorio B. Molina, PhD, an Associate Professor at the Department of Environmental and Occupational Health, College of Public Health at the University of the Philippines-Manila.

169 Precipitation value and incidence of dengue have been trending together positively (citing Asian Development Bank, Accounting for Health Impacts of Climate Change, Figure 3 [Monthly Rainfall and Number of Cases of Dengue Fever in the Philippines, 2009-2008] (2011), at 5).

170 Assaf Anyamba, Jean-Paul Chretien, Jennifer Small, Compton J Tucker & Kenneth J Linthicum, *Developing Global Climate Anomalies Suggest Potential Disease Risks for 2006–2007*, 5:60 Int. J. Health Geogr., doi:10.1186/1476-072X-5-60 (2006).

171 Oscar M. Lopez Center for Climate Change Adaptation and Disaster Risk Management Foundation, Inc. & Climate Change Commission, 2017 Philippine Climate Change Assessment: Impacts, Vulnerabilities and Adaptation (2017), *available at* https://climate.gov.ph/files/PhilCCA-WG2.pd (last accessed Nov. 20, 2019) [hereinafter PhilCCA WG2].

Physicians, testified that "this *Aedes aegypti* vector came from the environment, which was brought about by *Yolanda*."[172] There are also documented cases of *Schistosomiasis,* an acute and possibly chronic disease caused by parasitic flatworms that are released by infected snails during floods.[173]

Rising temperatures have also led to heat-related illnesses such as heat exhaustion and heat stroke. The majority of the fisherfolk who participated in the KIIs and FGDs complained of the intense heat. Among them, Lowell Factor shared that he has to brave the intense heat and sun even if it causes extreme discomfort and severe sunburns.[174]

Extreme weather events have severely affected Filipinos' mental health. Most survivors of extreme weather events suffer from psychological distress. During the *Inquiry*, Joy Tomes shared that her children were in a state of shock after Super Typhoon Haiyan (local: *Yolanda*) and did not want to go home from the evacuation center because of the trauma.[175] Marinel Ubaldo, a survivor of the same typhoon, narrated:

> …We couldn't also bear the thought of eating fish that may have fed on the dead bodies of our dead neighbors and the people we know… As time passed, my father [a fisherman] suffered from depression. He barely ate and slept. He couldn't bear to go fishing anymore and he became suicidal. Knowing that your family is in that painful situation made things worse, but I had to remain strong.
>
> Five (5) years after, my nerves still get the best of me whenever I hear the crash of ocean waves. I get anxious and restless when it rains because I fear that another Haiyan will happen again. It took me three years before I was able to go to the ocean again. It's sad because the ocean was our childhood friend.[176]

Climate change has also overwhelmed the Philippines' public health systems. In Southern Mindanao, mental health services were exhausted after typhoons.[177]

---

172 T.S.N. of the Third Inquiry Hearing dated 29-30 August 2018, at 255-256. Dr. Jonathan Moses Jadloc, the National Chair of the Climate Change Committee of the Philippine College of Physicians (PCP) and the Foundation of PCP.

173 Focus Group Discussion, Northern Mindanao, at 45.

174 Lowell Factor, Case Study: Verde Island Passage, at 30.

175 Joy Tomes, Community Dialogue in Tacloban, at 11.

176 T.S.N. of the Fourth Inquiry Hearing dated 27-28 September 2018, at 8.

177 Focus Group Discussion, Northern Mindanao, at 25.

Provinces had to ask help from external organizations to respond to the demand.[178] It is clear that climate change has deleterious systemic and widespread effects on the realization of the right to health of Filipinos.

### *iii. Right to Food Security*

The UDHR and the ICESCR protect the right to food as part of the right to a dignified standard of living.[179] The CESCR in its General Comment No. 12 states that this right is "realized when every man, woman and child, alone or in community with others, have physical and economic access at all times to adequate food or means for its procurement."[180] While the Philippine Constitution does not explicitly mention the right to food, the recognition of such a right may be inferred from various provisions on human dignity as well as in Article XV, Section 3 which requires the State to, among others, defend children's right to proper nutrition.

The impacts of climate change on food availability, accessibility, adequacy and sustainability are outlined in a report by the Special Rapporteur on the right to food.[181] Citing the IPCC, the report warns that the rising temperatures and increased frequency of extreme weather events will negatively affect crop, livestock, fisheries and aquaculture productivity, and will in turn impact food availability.[182] Food accessibility will be more difficult—especially for the poor and socially-vulnerable groups—due to changes in food production and market prices.[183] Food distribution during emergencies will also become increasingly complicated because of more frequent and intense extreme weather events.[184] The Food and Agriculture Organization (FAO) of the United Nations also warns that the number of people battling hunger and undernourishment will continue to rise if we fail to tackle climate change.[185]

178 *Id.*

179 UDHR, *supra* note 140, art. 25 (1) & ICESCR, *supra* note 153, art. 11 (1).

180 United Nations Committee on Economic, Social and Cultural Rights, *General Comment No. 12: The Right to Adequate Food (Article 11 of the Covenant)*, E/C.12/1999/5 (May 12, 1999), para. 6.

181 Hilal Elver, *Interim Report of the Special Rapporteur on the Right to Food*, A/70/287 (2015).

182 *Id.*

183 *Id.*

184 *Id.*

185 Food and Agriculture Organization of the United Nations, *The State of Food Security and Nutrition in the World: Building Climate Resilience for Food Security and Nutrition* (2018).

Expert resource speakers[186] all confirmed that in the Philippines, there is dwindling fish catch and reduction in agricultural produce due to climate change. Production of rice, the staple food of Filipinos, is reduced by ten percent (10%) for every one degree centigrade (1ºC) increase in night temperatures. For corn, there is a one-point seven percent (1.7%) yield reduction for each day above thirty degrees centigrade (30ºC) under drought conditions. Fruits and vegetables also have substantial yield reductions. As for livestock, aside from the negative impacts on animal fertility, there is a three to five percent (3-5%) reduction in feed intake for every one centigrade (1ºC) above thirty centigrade (30ºC). These result in food supply challenges, higher food prices, higher malnutrition, and food insecurity.[187]

This is confirmed by the consistent experience of community resource persons[188] in their respective localities. Elicer Lauce, both a farmer and fisherfolk, described his situation as follows:

> When we were fishing in the ocean from the seventies to the eighties, we'd catch seven kilos within less than three hours. But lately, in the year 2000, there is a decreasing volume and sizes of the varieties of fishes we are getting. That is why we had an idea to create other strategies. We placed *payao* fish aggregating devices in the sea, wherein we go far from shorelines so that we can create a sanctuary-habitats of fishes so there would be sources of fish.
>
> In our coconut field, on the other hand, we have lots of coconuts and other trees, as well before. But now, when 1990s until 2000s came, lots of coconuts were struck by diseases. There is what we call *kadang-kadang* (coconut scale insect disease), and aside from that, there are *Brontispa*. In other places, there are *cocolisap*. This is the reason why lots of coconut trees were cut down because of the *kadang-kadang* disease where trees and leaves turn yellow and eventually die.
>
> In our rice fields, since we are also farming almost nine thousand square meters (9,000 sq. m.), during 1970s to 1980, we were able to harvest seventy to eighty (80) cavans. The fifty (50) cavans are being used as capital because we don't have investment money.

186 Laura T. David, PhD, Maria Lourdes San Diego-McGlone, PhD, Porfirio Miel Aliño, PhD, Mudjekeewis D. Santos, PhD, Undersecretary Sigfredo Serrano, and Vincent V. Hilomen, PhD.

187 *See* Exhibit UUU to UUU-8, Printed PowerPoint Presentation of Undersecretary Sigfredo Serrano of the Policy and Planning, Project Development, Research and Regulation of the Department of Agriculture.

188 Rica Diamzon Cahilig, Felix "Ka Jhun" Pascua, Jr, Lerissa Libao, Elma Reyes, Pablo Rosales, Jonathan Delos Reyes, Delia Tulagan, Buucan Hangdan, Dalia Naliw and William Mamanglo.

> Lately, because of the intense heat of the sun, we are only harvesting sixty (60) cavans. That is why we just deduct the capital from the remaining ones. But you cannot always harvest because farming is like a gamble. There would be seasons wherein you can't harvest due to flood or extreme heat.[189]

### *iv. Right to Water and Sanitation*

The United Nations General Assembly recognizes "the right to safe and clean drinking water and sanitation as a human right that is essential for the full enjoyment of life and all human rights."[190] In its General Comment No. 15, the CESCR provided that "the human right to water is indispensable for leading a life in human dignity [and] it is a prerequisite for the realization of other rights."[191] It also affirms that both the rights to water and sanitation are essential components of the right to the highest attainable standard of health.[192] However, as the former Special Rapporteur on the human right to safe drinking water stated:

> climate change presents a serious obstacle to the realization of the rights to water and sanitation. … The impacts of climate change need to be seen in light of its direct effects on water resources as well as its indirect influence on other external drivers of change, in particular increasing population pressures and changing consumption patterns.[193]

Extreme weather events, sea level rise and rising temperatures result in water scarcity and increased competition for clean water resources, disruption to sanitation systems, contamination of drinking water and exacerbation of spread of diseases. There is also a resulting increase in the cost of water and sanitation provisions, which threatens

---

189 T.S.N. of the Third Inquiry Hearing dated 29-30 August 2018, at 93-94.

190 The Human Right to Water and Sanitation, G.A. Res. 64/292, U.N. Doc. No. A/RES/64/292 (Aug. 3, 2010).

191 United Nations Committee on Economic, Social and Cultural Rights, *General Comment No. 15: The Right to Water (Arts. 11 and 12 of the Covenant),* U.N. Doc. No. E/C.12/2002/11 (Jan. 20, 2003), para. 1.

192 *Id.* at para. 3 & United Nations Committee on Economic, Social and Cultural Rights, *Statement on the Right to Sanitation,* U.N. Doc. No. E/C.12/2010/1 (Mar. 18, 2011).

193 *Climate Change and the Human Rights to Water and Sanitation* Position Paper (undated), *available at* https://www.ohchr.org/Documents/Issues/Water/Climate_Change_Right_Water_Sanitation.pdf; & The United Nations Special Rapporteurs on the rights of persons with disabilities, Ms. Catalina Devandas Aguilar; the issue of human rights obligations relating to the enjoyment of a safe, clean, healthy, and sustainable environment, Mr. John H. Knox; extreme poverty and human rights, Mr. Philip Alston; the human right to safe drinking water and sanitation, Mr. Léo Heller; and the Independent Expert on human rights and international solidarity, Ms. Virginia Dandan, *The Effects of Climate Change on the Full Enjoyment of Human Rights* (Apr. 30, 2015).

people's access–particularly the poor and vulnerable–to these rights.[194] All these are currently being experienced by Filipinos. Smaller islands and coastal communities with limited freshwater resources are especially susceptible as sea level rise causes saltwater intrusion into the fresh water source. Jesiderio Delos Reyes, a community resource person, shared that in their town in Calatagan, saltwater seeped into deep wells, preventing access to drinking water, and burdening families with the added cost of buying potable water from commercial dealers.[195]

The rise in temperature and extreme heat has caused drinking water sources to dry up. Elicer Lauce testified that it is now difficult to acquire drinking water because the springs are drying-up.[196] In Alabat Island, Quezon Province, residents would install pipes but have no water sources to connect the pipes to.[197] In Marinduque, communities are left without a water source as the river has dried up.[198] The Philippines' National Economic Development Authority (NEDA) projects that climate change will impact domestic water prices.[199] A rise in prices will impede access to potable water, especially in urban areas where the population is dependent on commercial water systems.

Extreme weather events damage water and sanitation infrastructure. Victims of typhoons and flooding commonly lack access to water, sanitation, and hygiene (WASH) facilities. Marielle Trixie J. Bacason, a survivor of Super Typhoon Haiyan (local: *Yolanda*) testified that while they could prepare before the typhoon by stockpiling canned goods, they did not have clean water. She narrated that after the typhoon, she had to walk several miles to a relative's house, passing dead bodies on the way, just to access clean water.[200] While evacuation centers were providing safe drinking water, they did not have sufficient toilets, garbage collection, or vector control management.[201] Without the appropriate WASH infrastructure,

194 *Climate Change and the Human Rights to Water and Sanitation* Position Paper.

195 NICC Community Dialogue/Fact-finding Mission in Verde Island Passage, Batangas, 6-8 June 2018 Documentation Report, at 10.

196 T.S.N. of the Third Inquiry Hearing dated 29-30 August 2018, at 94.

197 Alabat Community Dialogue, at 30.

198 Rolando Jusue, Provincial Gov't Environment and Natural Resources Office - Marinduque. June 2018, Key Informant Interview - Verde Island Passage, at 42.

199 National Economic Development Authority in PhilCCA WG2, *supra* note 171.

200 T.S.N. of the Fifth Inquiry Hearing dated 6-7 November 2018, at 98-99.

201 Ruth Alma Ramos, Vikki Carr de los Reyes, Ma Nemia Sucaldito, & Enrique Tayag, *Rapid Health Assessments of Evacuation Centres in Areas Affected by Typhoon Haiyan*. 6 (Supple 1) Western Pac Surveill Response J., 39-43, doi:10.5365/WPSAR.2015.6.2.HYN_003 (2015).

the survivors of extreme weather events are again victimized by the violation of their rights to water and sanitation.

### *v. Right to Livelihood*

Article 6 of the ICESCR recognizes "the right to work, which includes the right of everyone to the opportunity to gain his living by work which he freely chooses or accepts."[202] Meanwhile, Article II, Section 9 of the Philippine Constitution provides that the State shall "promote full employment, a rising standard of living, and an improved quality of life for all,"[203] and Sections 3 and 9 of Article XIII thereof recognize and promote the importance of equal employment opportunities for all.

However, the IPCC notes that climate change affects both access to and the quality of natural resources that sustain livelihoods.[204] In the agricultural sector, farmers experience a higher incidence of pests and diseases, low crop productivity/ yield, stunted growth, delays in fruiting and harvesting, declining quality of produce, increased labor costs, and low farm income.[205] Increased rainfall has also caused prolonged inundation and destruction of crop fields–particularly rice, which is especially vulnerable to water stress.[206] The weather unpredictability has "made rice-planting less exact and more like guesswork."[207] Yields of other crops were also drastically reduced, making farming less viable as a source of livelihood, and forcing communities to shift to other industries such as construction work.[208]

Buucan Hangdan, an indigenous farmer of the Ifugao tribe residing in the Banaue Rice Terraces, described the disruption in this manner:

---

202 ICESCR, *supra* note 153, art. 6, para. 1.

203 Phil. Const. art. II, § 9.

204 IPCC, *AR5 WGII*, *supra* note 159, at 1068.

205 Lutgarda L. Tolentino & Leila D. Landicho (2013). *Climate Change Adaptation Strategies of Selected Smallholder Upland Farmers in Southeast Asia: Philippines And Indonesia*, 3 APN Sci. Bull. 61 (2013).

206 L. M. Peñalba, D. D. Elazegui, M. G. C. Amit, F. P. Lansigan, & F. J. G. Faderogao, Meeting the Challenges to Food Security and Livelihood in a Changing Climate (Center for Strategic Planning and Policy Studies Working Paper No. 2012-01, 2012).

207 Ma. Lourdes P. Kempis, 15 December 2017, Leyte Community Dialogue, at 9.

208 *Id.*

> Another change is that before, we knew when the rainy season would be. We could plan our planting schedule because we knew the period of good weather when it did not rain that much. So we planted on the month when we predicted good weather to plant, and when we need to transplant. But the problem now is the sudden change in weather. You cannot predict anymore when it will rain. When it rains, it is continuous and torrential; sometimes to the point that the rice fields cannot accommodate the volume of water.
>
> We used to work in our rice fields from about five o'clock in the morning until evening. Our only break was when we chew betel nut or just merely rest. When we went home, we felt fine. But these days, we work at seven but we need to leave the rice fields by 11 because the heat is different. It is painful on our skin.[209]

The fisheries and aquaculture sector are also greatly affected by climate change. Rising sea surface temperatures and changing ocean circulation,[210] ocean acidification and coral bleaching,[211] and the alteration of the physiological processes and the seasonality of biological rhythms that alter food webs and fish production in the coral triangle all contribute to the worsening experience of fisherfolk.[212] Significant impacts on fisherfolk include reduced fish abundance and catch, damage to fishing gear and fishing infrastructure, and increased risks to safety–all threatening the livelihood of fisherfolk. As Pablo Rosales narrated, fisherfolk "were deprived of our livelihood because the water becomes warmer, which resulted in fish kill. Of course, that is our livelihood, and if these occur, that is a problem to us."[213] Elma Reyes, a fish vendor whose husband is a fisherman, recounted that:

> My child once asked me, "Mama, it's already Holy Week, why is the weather still bad? It wasn't like this before." I said, "Yes, child, this is what I have been taught at the seminar. This is what they called climate change." We know that every Holy Week the sea would be very still. Now it's different. It's been a week now that my husband could not go out to the sea. It has a huge effect on me.

209 *Id.* at 181.

210 Coral Triangle Initiative on Coral Reefs, Fisheries and Food Security, Region-Wide Early Action Plan for Climate Change Adaptation for the Nearshore Marine and Coastal Environment and Small Island Ecosystems (REAP-CCA) (Jakarta: CTI Interim Regional Secretariat) (2011).

211 *Id.*

212 *Id.*

213 T.S.N. of the Second Inquiry Hearing dated 23-24 May 2018, at 55-56.

> It ruins our budget. Sometimes we have no choice but to use our child's allowance, and we have no way of replacing it. Where do we get the money?[214]

Workers in urban areas are not spared. Ernesto Cruz, president of the National Confederation of Transport Workers Union, narrated that jeepney drivers in urban areas who used to work for twelve to fourteen hours a day could now only work for a few hours in the morning during the summer months. The intense heat, compounded by heavy traffic and vehicle emissions, makes it too dangerous to work.[215] Meanwhile, they cannot ply their routes during heavy rains because floodwaters would damage their engines, making "heat and rain … both enemies."[216] These workers, who could barely make enough to sustain a family of five even when they were driving twelve-hour shifts, are left with almost nothing to feed their families.

Indubitably, the impacts of climate change rob individuals and communities of their ability to make a living. It places a heavy burden on workers across industries who face job insecurity, lower income, poor working conditions, and increased poverty.

### *vi. Right to Adequate Housing*

The right to housing is enshrined in the ICESCR as a component of the right to an adequate standard of living.[217] The CESCR clarifies that the right to housing "should not be interpreted in a narrow or restrictive sense which equates it with, for example, the shelter provided by merely having a roof over one's head or views shelter exclusively as a commodity. Rather it should be seen as the right to live somewhere in security, peace and dignity."[218] Thus, adequate housing should include: legal security of tenure; availability of services, materials, facilities and infrastructure; affordability; habitability; accessibility; location; and cultural adequacy.[219] Climate change denies people of all of these. Particularly, the IPCC has stated that coastal settlements and

---

214 T.S.N. of the First Inquiry Hearing dated 27-28 March 2018, at 113.

215 *Id.* at 61.

216 *Id.* at 163.

217 ICESCR, *supra* note 153, art. 11 (1).

218 United Nations Committee on Economic, Social and Cultural, *General Comment No. 4: The Right to Adequate Housing (Article 11 (1) of the Covenant),* E/1992/23 (Dec. 13, 1991).

219 *Id.*

low-lying island States will be directly impacted by sea level rise and storm surges.[220] Eroded livelihoods and shelters in the aftermath of disasters will propel migrants to move to informal settlements in hazardous areas.[221] The former Special Rapporteur on adequate housing cautions that the poor, already living in danger zones, are most especially threatened by these impacts.[222]

In the Philippines, while the right to adequate housing is recognized under Article XIII Section 9 of the Constitution, climate change is driving internal displacement and homelessness. This is experienced by around 60 percent of the Philippine population living in the 832 coastal municipalities and 25 coastal cities throughout the country.[223] In Marinduque, sea level rise and soil erosion have displaced coastal communities.[224] With the ocean eating up the coast, residents in these communities felt unsafe, leading many to relocate.[225] In the Verde Island Passage, islets that served as natural barriers have been slowly submerging, increasing the coast's vulnerability to storm surges.[226] Fisherfolk are the most adversely affected. Pablo Rosales, chairperson of *Pagkakaisa ng mga Samahang Mangingisda* or *Pangisda Pilipinas*, related that:

> When unusual calamities occur, we used to say, why is there signal number 4, when before signal number 3 seldom hit the Philippines. But now, if it hits, almost all houses near the shores are washed away, and even the implements of fishermen get damaged, because fishermen generally live near the shores and they have all their implements near them. Thus, when the typhoon gets stronger, waves go bigger, fishing boats get damaged, houses are also damaged, we also lose our livelihood.

220 IPCC, *AR5 WGII, supra* note 159.

221 United Nations High Commissioner for Human Rights, *Report of the Office of the United Nations High Commissioner for Human Rights on the Relationship Between Climate Change and Human Rights*, A/HRC/10/61 (2009) [hereinafter *Relationship Between Climate Change and Human Rights Report]*; *also see* Report of the Special Rapporteur on Adequate Housing as a Component of the Right to an Adequate Standard of Living, and on the Right to Non-Discrimination in this Context.

222 *Id.*

223 Department of Environment and Natural Resources, Department of the Interior and Local Government, Department of Agriculture-Bureau of Fisheries and Aquatic Resources and Coastal Resources Management Project, Legal and Jurisdictional Guidebook for Coastal Resource Management in the Philippines (1997).

224 Rolando Jusue, Provincial Government Environment and Natural Resources Office - Marinduque, June 2018, Key Informant Interview - Verde Island Passage.

225 *Id.*

226 Reynald Pamatian, 7 June 2018, Community Dialogue, Verde Island Passage Fact-finding Mission, at 13.

> One of the major burdens we are facing is we do not have permanent houses because we are fishermen. They said our residential lots are considered danger zones, that's why the tendency is to clean us up, we are moved to far-flung areas for the sake of what they say is keeping us away from danger. Because it is a danger zone and climate changes, typhoons are stronger, waves are stronger, we are told to leave our houses. The problem is we are fishermen. We have many experiences that some of our members were told to evacuate, some were transferred to the foot of mountains in Bulacan, mountain in Cavite. But still, they return to the coastal areas, live in their boats, find shelter and sleep there, then, they go home to their houses in Cavite or Bulacan.
>
> Sometimes they cannot take it any longer, they sell their houses in Bulacan or their house in Cavite for them to fish again. We think the worsening poverty experienced by fisherfolks, one of the biggest factor is climate change. Our homes were taken away from us…[227]

The right to adequate housing is also drastically impacted by extreme weather events. In the aftermath of Typhoon Haiyan, people were forced to stay in evacuation centers for prolonged periods. Most of these centers were overcrowded and poorly resourced. Some stayed in tents and other temporary structures for months.[228] Nicolas Starkey, a survivor of Typhoon Haiyan, had to live with relatives in a tent. The tent had no floor and was frequently inundated by mud and rainwater. Although the tent was only intended to fit two families, five lived in it. They lacked the resources to rebuild quickly, so they lived in dreadful conditions.[229] The worst is when survivors of extreme weather events have to rebuild their homes as consecutive typhoons repeatedly beset them.

### *vii. Right to Preservation of Culture*

The ICESCR expressly recognizes the right of every individual to "take part in cultural life."[230] Meanwhile the ICCPR guarantees that "in those States in which ethnic, religious or linguistic minorities exist, persons belonging to such minorities shall not be denied

227 T.S.N. of the Second Inquiry Hearing dated 23-24 May 2018, at 55-56.

228 Marjanna Bergman, *Typhoon Haiyan Anniversary: Three Generations Under One Roof in Tent City*, United Nations High Commissioner for Refugees, Nov. 7, 2014, *available at* https://www.unhcr.org/afr/news/latest/2014/11/545cce276/typhoon-haiyan-anniversary-three-generations-under-roof-tent-city.html (last accessed Nov. 20, 2019).

229 *Id.*

230 ICESCR, *supra* note 153, art 15.

the right, in community with the other members of their group, to enjoy their own culture, to profess and practice their own religion, or to use their own language."[231] Other international instruments including the Convention Concerning the Protection of the World Cultural Heritage, Convention for the Safeguarding of the Intangible Cultural Heritage, Convention Concerning the Protection of the World Cultural and Natural Heritage, Universal Declaration on Cultural Diversity, among others, recognize the importance of cultural rights.

In the Philippines, the Constitution mandates the State to protect the rights of indigenous cultural communities to their ancestral lands to ensure their economic, social and cultural well-being,[232] while Republic Act No. 7356[233] recognizes that "culture is a manifestation of the freedom of belief and of expression and is a human right to be accorded due respect and allowed to flourish."[234]

The preservation of culture, however, is in danger because of the impacts of climate change. Indeed, the Special Rapporteur in the field of cultural rights[235] warns that "the cultural identities and traces of entire nations may be at risk, facing the threat of cultural extinction, including through the total disappearance of human settlements and related ancestral cultures."[236]

Katherine Lofts testified that climate change particularly impacts cultures closely connected with the natural environment. Traditional livelihoods and ancestral traditions of many indigenous peoples' communities which are dependent on natural resources are threatened or may even be extinguished by climate change. Furthermore, she also maintained that climate change related displacement and migration also infringe upon the right to culture. Cultural practices and social cohesion are disrupted when communities are dispersed and forced to relocate.[237]

231 ICCPR, *supra* note 19, art 27.

232 Phil. Const. art. XII, § 5. *See also* Phil. Const. art. II, § 22.

233 An Act Creating the National Commission for Culture and the Arts, Establishing a National Endowment Fund for Culture and the Arts, and for Other Purposes [Law Creating the National Commission for Culture and the Arts], Republic Act No. 7356 (1992).

234 *Id.* Title I, § 2.

235 Karima Bennoune, *Report of the Special Rapporteur in the Field of Cultural Rights,* A/75/298 (Aug, 10 2020) [hereinafter *Report on Cultural Rights*].

236 *Id.* at 11.

237 T.S.N. of the Fourth Inquiry Hearing dated 27-28 September 2018, at 54.

Bae Inatlawan, the overall chieftain of the Daranghuyan Ancestral Domain in Mt. Kitanglad in southern Philippines, highlighted the value of the environment to her tribe, sharing that they regularly perform rituals and prayers to appease the spirits for sins committed against the environment.[238] However, some of their cultural practices, including planting rituals that depend on cues from nature, have been rendered unreliable and ineffective due to the erratic changes in weather. [239]

Rica Diamzon Cahilig, a member of the Aeta-Ambala indigenous community, shared her fear of losing the cultural traditions of her people because their natural resources could no longer provide the food and medicine they have relied on since time immemorial. The same is true for the tradition of *Baki*– a ritual practiced by Ifugao people before planting and after harvesting to prevent pests from eating rice grains. Dalia Naliw, an Ifugao culture bearer, explains that "the *Baki* tradition is observed by not taking a bath for a month" which has become unbearable because of the scorching heat.[240] With these, it is clear that climate change adversely affects the Filipinos' cultural rights and threatens their cultures' very existence.

### *viii. Right to Self-Determination and Right to Development*

Article 1 of the ICCPR and the ICESCR declare that "All peoples have the right of self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development." Related thereto is the right to development. Article 1 of the Declaration on the Right to Development[241] states that "the right to development is an inalienable human right" and that "the human person is the central subject of development." The Rio Declaration on Environment and Development (Rio Declaration) further puts the human being "at the center of concerns for sustainable development,"[242] encompassing environmental protection.[243]

238 Bae Inatlawan, Northern Mindanao Community Dialogue, at 10.

239 Bae Inatlawan, Focus Group Discussion in Northern Mindanao, at 40.

240 T.S.N. of the Third Inquiry Hearing dated 29-30 August 2018, at 183-184.

241 United Nations General Assembly, *Declaration on the Right to Development*, A/RES/41/128 (Dec. 4, 1986).

242 United Nations Conference on Environment and Development, *Rio Declaration on Environment and Development,* U.N. Doc. A/CONF.151/26 (Vol. I) (Aug. 12, 1992) [hereinafter *Rio Declaration*] (Principle 1).

243 *Id.* (Principle 4).

Climate change prevents the realization of the right to self-determination and development when victims thereof are trapped in an endless cycle of dealing with its adverse impacts. Their lives are spent surviving one climate change impact after another, effectively nullifying any opportunity they may have to participate in, contribute to, enjoy and pursue their political, economic, social and cultural development. Veronica Cabe, a survivor of typhoon Ketsana (local: *Ondoy*), articulated this seemingly endless cycle of being victimized by extreme weather events in the following sentiment:

> Our daily life was disrupted. Unfortunately, our sufferings did not end with *Ondoy*. The story didn't end with *Ondoy*. Unfortunately, the suffering that we have through, continued at the time when we were rebuilding our live. The series of floods brought about by monsoon rains have caused flooding. Again, I clearly remember three (3) incidents of flooding. We lost everything again, everything that mattered to us. After years of struggling, rebuilding and recovering, I knew the typhoon would come in and wreck everything we have put up over the years. When would this situation, when would this devastation stop? How can we survive? When would this process of recovering and rebuilding end?[244]

A fellow Typhoon Ketsana survivor, Manuel "*Ka* Noli" Abinales, echoed the experience of the vicious cycle:

> *Ondoy* did not seem to be a "one-shot-deal" because, I remember, after *Ondoy*, we were still recovering when typhoon Falcon happened and, then, *Pedring* in 2011. Then in 2012, we had *habagat* (southwest monsoon). We did not understand the actions of the nature anymore.
>
> This is the usual scenario: when it rains and will cause flashflood, we will evacuate to the evacuation centers. When the rain stops, people will get bored in the evacuation center and will decide to go out, then attempt to return to their homes near the rivers when the floods subside; then it will rain again, and the people will evacuate again. That happened four (4) times in our community in 2012 because of southwest monsoon. I even received text messages about people getting tired of the repeated experience. We have evacuated, then returned home, then evacuated again. It's like playing *patintero* [similar to a game of tag]. I do not know anymore how we are supposed to move in the community.

244 T.S.N. of the Fifth Inquiry Hearing dated 6-7 November 2018, at 111.

> Modesty aside, we continue to make boats and we have given boats to those areas that are usually flooded. But our efforts are not enough. People living near the rivers are growing in numbers. Typhoons are getting stronger, floods are getting more severe. When will this end? What will happen to the people? Do we just need to undertake rescue operation or must this end? There must be a long-term solution to this problem. That is all. Thank you for your time.[245]

In a macro analysis, these individual experiences taken together exacerbate underdevelopment and hampers development. Susceptibility to repetitive extreme weather events render development efforts to alleviate poverty an exercise in futility. These in turn, have catastrophic effects on many direct and indirect factors of economic growth, potentially undoing current progress and undermining prospects.

### *ix. Right to Equality and Non-Discrimination*

Article 2 (1) of the ICCPR and Article 2 (2) of the ICESR guarantee non-discrimination in the enjoyment of rights of all persons. Climate change infringes on the right to equality and non-discrimination because, as the IPCC reports, people who are already socially, economically, or otherwise marginalized are the most vulnerable to its impacts due to their high dependence on natural resources, heightened exposure to climate change impacts, and lack of resources to adapt.[246] These vulnerable sectors include women, children, indigenous peoples, older adults, people living in poverty, and members of the LGBTQIA+, among others. Indeed, segments of the population already in vulnerable situations owing to geography, poverty, gender, age, indigenous or minority status, and disability, among others, are the ones most acutely affected.[247]

#### a. Women

The IPCC stresses that "existing gender inequalities are increased or heightened by climate-related hazards" and that these "gendered impacts result from customary and

245 T.S.N. of the Second Inquiry Hearing dated 23-24 May 2018, at 244-245.

246 IPCC, *AR5 WGII, supra* note 159; Joint Summary of the Amicus Curiae dated 19 March 2018, *supra* note 61, at 28.

247 United Nations General Assembly, *Human Rights and Climate Change*, U.N. Doc. A/HRC/RES/41/21 (July 12, 2019)*;* United Nations Human Rights Council, *Human Rights and Climate change,* HRC/RES/10/4 (Mar. 25, 2009) (The Human Rights Council also recognizes that environmental damage, not solely due to climate change, is similarly felt most acutely by those segments of the population already in vulnerable situation); *see Human Rights and the Environment*, U.N. Doc. A/HRC/RES/16/11 (Apr. 12, 2011).

new roles in society, often entailing higher workloads, occupational hazards indoors and outdoors, psychological and emotional distress, and mortality in climate-related disasters."[248] Women, particularly pregnant women, older women, and girls, are left more defenseless during different phases of natural disasters. In fact, mortality due to disasters, including droughts, floods and storms, is higher among women than men.[249]

Climate change impacts Filipino women in several significant areas including agriculture production, climate-induced migration, and post-disaster gender-based violence. The Philippine Commission on Women lists gender-based discrimination aggravated by climate change as follows: "insecure land and tenure rights; lack of access to and control of economic and natural resources; limited opportunities to participate in environmental decision-making; lack of access to markets, capital, training and technologies; multiple burden of women being the primary caregivers of affected family members, additional income earners, and community workers; exposure to contracting diseases due to limited reproductive health services and facilities and unhygienic water and lack of private spaces for personal hygiene needs; and gender-based violence risks in the form of physical abuse, rape and sexual harassment in evacuation centers and sexual exploitation in the form of sex trafficking and post-disaster prostitution."[250] Over the last two decades, 15 times as many infants have died in the 24 months after typhoons than in the typhoons themselves. Of those infants, 80 percent were girls.[251]

Climate impacts on women from rural areas are even more severe because (a) women have fewer assets to fall back on in case of crop failure due to extreme weather events; (b) women are tasked with managing household expenses and often fall into chronic indebtedness to bridge resource gaps; and (c) women prioritize the food needs of male household members and children during food shortages.[252]

---

248 IPCC, *AR5 WGII, supra* note 159.

249 *Id.*

250 Philippine Commission on Women, Environment Sector, *available at* https://pcw.gov.ph/environment/.

251 World Meteorological Organization, *Statement of the State of the Global Climate 2017* (2018), at 31.

252 Commission on Human Rights of the Philippines, Inputs to the Questionnaire in Relation to the Human Rights Council Resolution A/HRC/RES/38/4 on Human Rights and Climate Change (2018), *available at* https://www.ohchr.org/Documents/Issues/ClimateChange/GenderResponsive/HRC_Philippines.pdf (citing Athena Peralta, Gender and Climate Change Finance: A Case Study from the Philippines, *available at* https://us.boell.org/2008/11/01/gender-and-climate-change-

This often pushes women to migrate overseas to supplement the family income,[253] making them more vulnerable to trafficking, sexual exploitation, and other abuses.[254]

### b. Children

The Committee on the Rights of the Child, in its General Comment No. 15, states that climate change "is one of the biggest threats to children's health and exacerbates health disparities."[255] The United Nations Children Fund (UNICEF) even declares that "there may be no greater, growing threat facing the world's children–and their children–than climate change."[256] The IPCC confirms that children have an increased risk of climate-related injuries and illnesses as they are more vulnerable to diseases and food insecurity.[257] Beyond immediate mortal dangers posed by extreme weather events, the right to access basic necessities like water, food and shelter disproportionately jeopardizes children.[258]

Joni Pegram testified on the various climate-related impacts on child rights in the Philippines as follows:

> In the case of typhoon Haiyan, we know that almost six (6) million of the fourteen (14) million people affected were children. Although information on the final death toll is not available, the government did confirm that ninety-two percent (92%) of fatalities occurred in Leyte. And according to the 2010 census, children between the ages of ten (10) and fourteen (14) years old comprise the largest group on this province… The next two (2) largest age group are between five (5) and nine (9) and from zero (0) to four

---

finance-case-study-philippine ).

253 *Id.* citing PhilCCA WG2, *supra* note 171.

254 *Id.* citing Rina Chandran, As Wild Weather Worsens, Philippines Migration Takes on a Female Face, (Reuters, Mar. 30, 2018), *available at* https://www.reuters.com/article/us-migration-philippines-women/as-wild-weather-worsens-philippines-migration-takes-on-a-female-face-idUSKBN1H600J (last accessed Oct. 18, 2018).

255 United Nations Committee on the Rights of the Child, *General Comment No. 15 (2013) on the Right of the Child to the Enjoyment of the Highest Attainable Standard of Health (Art. 24),* CRC/C/GC/15 (Apr. 17, 2013).

256 United Nations International Children's Emergency Fund, Unless We Act Now: The Impact of Climate Change on Children (2015).

257 IPCC, *AR5 WGII*, *supra* note 159.

258 John Knox, United Nations Human Rights Council, *Report of the UN Special Rapporteur on the Issue of Human Rights Obligations Relating to the Enjoyment of a Safe, Clean, Healthy and Sustainable Environment,* A/HRC/37/58 (Jan. 24, 2018).

(4). We are looking at a large number of children among the highly affected. And drowning was found to be the principal cause of these deaths.

National outcomes in their future livelihoods…Modelling suggests that an estimated additional seventy thousand (70,000) Filipino children will be malnourished by 2050 due to the impact of climate change, representing an increase of four percent (4%)…

Now if we look at disease and the right to health, children are also highly susceptible to many infectious waterborne diseases that become more prevalent in the context of droughts, floods, and extreme weather, particularly when damage to essential water and sanitation infrastructure occurs. Diarrheal diseases are another major cause of mortality for children, responsible for over half a million deaths of children under five (5) in 2015, the fourth leading cause of death under five (5)-year-olds in the Philippines.

Rising temperatures also increase the incidence of vector-borne diseases, such as malaria and dengue fever. The global burden of these diseases is already heavily concentrated on children. Seventy percent (70%) of all deaths from malaria in 2015 occurred in children under the age of five (5). The World Health Organization projects that climate change will cause an additional 60,000 deaths from malaria among children under the age of fifteen (15) by 2030. In the Philippines, malaria is already endemic in certain province [sic], but WHO projects over one hundred fifty (150) million people will be at risk of malaria by 2017, under both high and low emission scenarios.

Climate change can exacerbate air pollution. It does not cause air pollution, but it can exacerbate the toxicity of certain pollutants, including ozone, and it increases the frequency of wildfires and drought. Air pollution causes approximately six hundred thousand (600,000) deaths of children under five (5) every year. Many more suffer from disease and disability with lifelong consequences and children, again, are more susceptible to air pollution than adults for many reasons. They have smaller airways, they have a developing immune system, and these are easily overwhelmed by infections. They breathe more quickly than adults and they take more air per unit of body weight as well. Acute respiratory infection has been identified as one of the top three (3) causes of mortality in children under five (5) in the Philippines.

The final impact is on the right to education. Climate change has been recognized as an emerging and persistent barrier to the right to education in the Philippines. Impacts include destruction of school infrastructure, loss of nutrition, which means that children

> find it hard to concentrate during the day, and loss of school days due to physical and mental health impact, and higher dropout rates due to pressure on household incomes, for example. The government has identified damages incurred from disasters as one of the key causes of shortages of classrooms and school materials as well. Typhoon Haiyan damaged or destroyed over three thousand (3,000) schools and day care center. Many large schools were also taken over as evacuation centers, and this resulted in a sudden disruption in education for more than a million preschool and school-aged children.[259]

### c. Indigenous Peoples

The UN recognizes that indigenous peoples are at the "front lines of climate change" because they understand what climate change means for societies, ecosystems, and cultures as inheritors and practitioners of unique cultures.[260] Despite their unique role in conservation, indigenous communities are uniquely at risk because of the changing climate. Indigenous people are significantly impacted by climate change owing to their dependence on climate-sensitive resources and deep cultural relationships with the environment.[261]

Between 14-17 million Filipinos belong to more than a hundred ethno-linguistic groups.[262] Environmental degradation due to climate change doubly affects indigenous communities as the environment is a natural extension of their livelihood, survival, and cultural identity. For instance, the Mangyans*,* an indigenous group that relies on fruit farming for their livelihood, have been heavily affected by climate change. Due to extreme heat, the group has been unable to produce and sell their usual agricultural products–bananas and coconuts. Often, banana trees wilt and die or produce fruits that are too thin to sell while coconut trees bear fruits with no coconut meat.[263]

---

259 T.S.N. of the Fifth Inquiry Hearing dated 6-10 November 2018, at 4-6.

260 United Nations Framework Convention on Climate Change, *Indigenous Empowerment is Vital for Climate Action* (Aug. 9, 2017), *available at* https://unfccc.int/news/indigenous-empowerment-is-vital-for-climate-action.

261 United Nations Department of Economic and Social Affairs – Indigenous Peoples, *Climate Change: The Effects of Climate Change on Indigenous Peoples*, *available at* https://www.un.org/development/desa/indigenouspeoples/climate-change.html (last accessed Nov. 11, 2019).

262 United Nations Development Programme Philippines, Fast Facts - Indigenous Peoples in the Philippines (2013), *available* at https://www.undp.org/content/dam/philippines/docs/Governance/fastFacts6%20-%20Indigenous%20Peoples%20in%20the%20Philippines%20rev%201.5.pdf.

263 Norberto Escares, Community Dialogue in Verde Island Passage, June 2018.

Climate change has also caused the disappearance of native species in indigenous lands. A representative from an indigenous community in southern Philippines, Bae Priscilla Cariaga, reported that *Gangis,* a type of beetle which is a staple in their diets, has become scarce due to changes in the onset and duration of the summer season.[264] Droughts and water shortage has also become a problem in indigenous lands. Agricultural yield is reduced, water and sanitation are sacrificed, and health is compromised. Further, community members, particularly the Mangyans, have tussled amongst themselves in the struggle to get water from drying springs.[265]

### d. Older Persons

The UN Principles for Older Persons recognizes the rights of older persons to adequate food, water, shelter, clothing and health care.[266] It states that "older persons should be able to live in environments that are safe and adaptable to personal preferences and changing capacities."[267] Older adults are among the most vulnerable during extreme weather events, particularly when separated from their families and caregivers.[268] Immobility, difficulty crossing terrain, pre-existing conditions, and declining health often lead to inadequate access to food, water, safe housing, and healthcare.

In November 2020, a 78-year-old man was reported to have suffered a stroke and died as he was being evacuated during Typhoon Goni (local: *Ineng*). In the same month, Typhoon Vamco (local: *Ulysses*) claimed the lives of at least three older persons including one who died after slipping and falling to the floor, and another who was killed after a tree fell on his house due to strong winds.[269] A few weeks later, during Tropical Storm Krovanh (local: *Vicky*) a 67-year-old woman and 62-year-old

264 Bae Priscilla Cariaga, Focus Group Discussion in Northern Mindanao, at 44.

265 *Id.*

266 United Nations General Assembly, *United Nations Principles for Older Persons,* A/RES/46/91 (Dec. 16, 1991) [hereinafter *UN Principles for Older Persons*].

267 *Id.*

268 ACAPS, Secondary Data Review: Philippines Typhoon Yolanda, *available at* https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/assessments/140 11%20SDR%20Yolanda%20Philippines%20final.pd (last accessed Jan. 13, 2020) (citing United Nations Children's Emergency Fund Philippines, Typhoon Haiyan Strategic Response Plan, 10 December 2013, *available at* https://reliefweb.int/sites/reliefweb.int/files/resources/Strategic%2 Response%20Plan%20-%20Philippines%2010-Dec-2013.pdf [last accessed Jan. 13, 2020]) [hereinafter ACAPS Data Review].

269 CNN Philippines, *Typhoon Ulysses Kills at Least 13, Leaves 15 Missing*, CNN Philippines, Nov. 12, 2020, *available at* https://www.cnnphilippines.com/news/2020/11/12/ulysses-death-toll.html (last accessed July 21, 2021).

man died due to a landslide caused by the storm. Meanwhile, older persons who are able to relocate often contract illnesses in evacuation centers.[270]

The livelihoods of older adults are likewise affected by climate change. Older persons are forced to rely on a government pension or financial support from family.[271] However, in some southern Philippines provinces, older persons are excluded from cash-for-work schemes despite having had gainful employment prior to typhoons.[272] Loss of documentation also poses a challenge to accessing state-subsidized healthcare benefits, with some older persons being overlooked for support to meet aging and pre-existing conditions.[273]

Social and cultural activities of older persons are also limited by climate change. In the province of Romblon for instance, the local government has limited the participation of older persons in outdoor activities due to the warning of local government social workers on the health effects of extreme heat on them.[274]

### e. People Living in Poverty

The former Special Rapporteur on extreme poverty and human rights reports that:

> people in poverty tend to live in areas more susceptible to climate change and in housing that is less resistant; lose relatively more when affected; have fewer resources to mitigate the effects; and get less support from social safety nets or the financial system to prevent or recover from the impact. Their livelihoods and assets are more exposed and they are more vulnerable to natural disasters that bring disease, crop failure, spikes in food prices, and death or disability.[275]

270 Constancia Lopez, Community Dialogue in Alabat, Quezon, April 2018.

271 Fact-finding mission in erde Island Passage.

272 ACAPS Data Review, *supra* note 268.

273 *Id.*

274 Fe D. Firmalo, Head of the Office of Senior Citizens Affairs - Odiongan, Romblon, Community Dialogue, Verde Island Passage.

275 Philip Alston, United Nations Human Rights Council Special Rapporteur on Extreme Poverty and Human Rights, *Climate Change and Poverty: Report of the UN Special Rapporteur on Extreme Poverty and Human Rights*, A/HRC/41/39 (July 17, 2019), at 4.

In 2018, 16.6 percent of the Philippine population already lived below the national poverty line.[276] This will continue to rise if the impacts of climate change are not mitigated. An analysis released by the Asian Development Bank states that:

> disasters can push non-poor households into poverty and the poor even deeper into poverty. In terms of relative mobility, our findings suggest that households that experienced typhoons are more likely to fall into a lower income quantile than those who didn't experience typhoons. In terms of absolute mobility, the incomes of households that were hit by typhoons are more likely to grow more slowly than the incomes of households that were not hit. These results are intuitive as disasters bring damage to life, property, and livelihood. As these damages affect the households' capacity to cope and recover, a disaster can push families into a downward income spiral.[277]

The country's poorest communities are especially vulnerable because of the shortage of socio-economic resources necessary to cope with climate impacts. The poor are more likely to forego food, health, or education in order to finance their recovery from climate disasters.[278]

The loss of productive assets and livelihood is even more pronounced among farmers and fisherfolk who are highly dependent on natural resources.[279] The fisheries sector, comprising about 70 percent of the Philippine population, "are considered 'poorest of the poor'".[280] Marginalization, insecure housing, limited assets, high costs of fishing equipment, and reliance on uncertain production systems all contribute to the poverty of fisherfolk. This is exacerbated by climate change–the underlying cause of a decline in marine capture and consequently, the decrease in their income.[281]

---

276 Asian Development Bank, Poverty Data: Philippines, *available at* https://www.adb.org/countries/philippines/poverty.

277 Shikha Jha, Arturo Martinez, Pilipinas Quising, Zemma Ardaniel, & Limin Wang, Natural Disasters, Public Spending, and Creative Destruction: A Case Study of the Philippines (Asian Development Bank Institute Working Paper Series No. 817) (2018), *available at* https://www.adb.org/sites/default/files/publication/408351/adbi-wp817.pd .

278 Brian Walsh & Stephane Hallegatte, Measuring Natural Risks in the Philippines: Socioeconomic Resilience and Wellbeing Losses (World Bank Group Policy Research Working Paper 8723) (2019), *available at* http://documents1.worldbank.org/curated/en/482401548966120315/pdf/WPS8723.pdf.

279 World Bank, Getting a Grip*, supra* note 139, at 24.

280 Exhibit 4G, Mudjekeewis D. Santos, Impacts of Climate Change to Philippine Fisheries, May 2018.

281 IPCC, 2022: Summary for Policymakers [H.-O. Pörtner, D.C. Roberts, E.S. Poloczanska, K. Mintenbeck, M. Tignor, A. Alegría, M. Craig, S. Langsdorf, S. Löschke, V. Möller, A. Okem (eds.)]. *In: Climate Change 2022: Impacts, Adaptation, and Vulnerability. Contribution of Working Group II*

The agricultural sector is similarly affected. An estimated 413,456 farmers were directly affected by El Niño-associated dry spells during the last El Niño period.[282] As agriculture is highly dependent on a stable environment, climate change impacts–whether prolonged droughts or intense rain and flooding–disrupt crop productivity and directly affects the farmer and farm workers' income. Increased poverty, dangerous working conditions, lack of access to basic needs, food insecurity, and even loss of tradition all infringe on the Filipino farmers' human rights.

People living in informal urban settlements are also affected. They account for 45 percent of the Philippines' urban population and they are particularly vulnerable to floods due to less secure infrastructure, reduced access to clean water, and lack of health insurance.[283]

### f. LGBTQIA+

The LGBTQIA+ community, because of social stigma and discrimination, is especially vulnerable to exclusion, violence, and exploitation.[284] Their already vulnerable situation is aggravated by the impacts of climate change, as members of the LGBTQIA+ community are frequently denied access to various social opportunities and infrastructure needed to cope with the impacts of climate change.[285]

There is minimal data on LGBTQIA+ rights in the Philippines, particularly in the context of climate change. Much of what has been said remains anecdotal. For instance, Jean, a transgender woman from Tacloban, Leyte, recounted that she was compelled to drop her lived name and revert to her registered birth name in order to be listed as a recipient of government relief goods.[286] Moreover, according to Jean, the livelihood

---

*to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change* [H.-O. Pörtner, D.C. Roberts, M. Tignor, E.S. Poloczanska, K. Mintenbeck, A. Alegría, M. Craig, S. Langsdorf, S. Löschke, V. Möller, A. Okem, B. Rama (eds.)]. Cambridge University Press. In Press [hereinafter referred to as IPCC, *AR6, WGII, SPM*].

282 Climate Change Commission, National Integrated Climate Change Database and Information Exchange System, Climate Change Impacts, *available at* http://mpmc.minda.gov.ph/climate-change-impacts.

283 World Bank, Getting a Grip, *supra* note 139.

284 Cara Thuringer, *Left Out and Behind: Fully Incorporating Gender into the Climate Discourse*, NewsSecurityBeat, Aug. 22, 2016, *available at* https://www.newsecuritybeat.org/2016/08/left-behind-fully-incorporating-gender-climate-discourse/.

285 Anuj Behal, *How Climate Change is Affecting the LGBTQIA+ Community,* DownToEarth, Jan. 11, 2021, *available at* https://www.downtoearth.org.in/blog/environment/how-climate-change-is-affecting-the-lgbtqia-community-74988.

286 *Salaysay ni* Jean Golong, Aug. 14, 2018, at 4, *available at* http://chr.gov.ph (last accessed

programs initiated by the government were not gender-inclusive, recognizing only cisgender orientations.[287]

The lack of data on the impact of disasters caused by climate change on LGBTQIA+ people worldwide exacerbates their plight, making them "largely invisible in relief and development programs."[288]

### *x. Right to Safe, Clean, Healthy and Sustainable Environment*

On 8 October 2021, during its forty-eighth session, the United Nations Human Rights Council adopted the resolution on the Human Right to a Safe, Clean, Healthy and Sustainable Environment. The resolution "recognizes the right to a safe, clean, healthy and sustainable environment as a human right that is important for the enjoyment of human rights."[289] This recognition is borne out, among others, of the acknowledgement of the

> the impact of climate change, the unsustainable management and use of natural resources, the pollution of air, land and water, the unsound management of chemicals and waste, the resulting loss of biodiversity and the decline in services provided by ecosystems interfere with the enjoyment of a safe, clean, healthy and sustainable environment, and that environmental damage has negative implications, both direct and indirect, for the effective enjoyment of all human rights.[290]

The recognition of this human right affirms the Filipinos' constitutionally-guaranteed right to a balanced and healthful ecology in accord with the rhythm and harmony of nature.[291] However, with climate change, this rhythm and harmony has been disrupted. Lowell Factor recounted how corals, once "big and colorful" and

---

July 30, 2021).

287 *Id.* at 5.

288 Zoe Tabary, *Women, LGBT People 'Invisible' Victims of Disasters–Experts*, Thomson Reuters Foundation News, Mar. 8, 2018, *available at* https://news.trust.org/item/20180308114259-otaio/.

289 United Nations Human Rights Council, *Draft Resolution: Promotion and Protection of All Human Rights, Civil, Political, Economic, Social and Cultural Rights, Including the Right to Development*, A/HRC/48/L.23.1, *available at* https://undocs.org/a/hrc/48/l.23/rev.1.

290 *Id.*

291 Phil. Const. art. II, § 16.

visible from his house, have been reduced by 80 percent due to runoff flooding.[292] This example of loss of biodiversity, together with other instances of degradation of ecological processes previously discussed, diminishes the capacity of the environment to provide life-sustaining services, consequently impacting human well-being and the enjoyment of human rights. Dalia Naliw, a culture bearer from Ifugao, thus shared: "Within our surroundings, we could get fruits, herbal medicines, and vegetables that sprouted in our yard before. We used them and cooked them for our viand. This time, these are slowly diminishing."[293]

This disruption in the rhythm and harmony of nature may best be summed by Felix "Ka Jhun" Pacua, Jr., a farmer and national spokesperson for *Pambansang Katipunan ng Makabayang Mambubukid*, when he said that "the weather is getting senile".[294]

### *xi. Rights of Future Generations and Intergenerational Equity*

Numerous international instruments recognize intergenerational equity. Among these are the 1992 Rio Declaration, which stresses that "the right to development must be fulfilled so as to equitably meet developmental and environmental needs of present and future generations;"[295] and the UNESCO declaration which states that "the present generations should strive for sustainable development and preserve living conditions, particularly the quality and integrity of the environment" so that the future generations benefit from the Earth's ecosystems.[296] The UNFCCC also calls on Parties to "protect the climate system for the benefit of present and future generations of humankind, on the basis of equity and in accordance with their common but differentiated responsibilities and respective capabilities."[297] More recently, the Paris Agreement, emphasized the responsibility of States to consider intergenerational equity in taking action to address climate change. In the Philippines, the concept of intergenerational equity is well-entrenched in the right to

292 Lowell Factor, Fact-Finding Mission Verde Island Passage, at 32.

293 T.S.N. of the Third Inquiry Hearing dated 29-30 August 2018, p. 183.

294 *Id.* at 77.

295 *Rio Declaration, supra* note 242, princ. 3.

296 United Nations Educational, Scientific and Cultural Organization, *Declaration on the Responsibilities of the Present Generation Towards Future Generations* (Adopted by the General Conference of the UN Educational, Scientific and Cultural Organization) (Nov. 12, 1997), art. 3, *available at* https://unesdoc.unesco.org/ark:/48223/pf0000110220.page=75.

297 United Nation Framework Convention on Climate Change.

a balanced and healthful ecology that is constitutionally guaranteed for present and future generations.[298]

Climate science has established with certainty that the impacts of climate change are long-term and widespread, and that GHGs persist in the atmosphere for centuries– thus denying future generations of their "right to inherit the same diversity in natural and cultural resources enjoyed by previous generations and to equitable access to the use and benefits of these resources."[299] This has been recognized by the UN General Assembly as early as 1988, when it expressed its concern "that certain human activities could change global climate patterns, threatening present and future generations with potentially severe economic and social consequences."[300]

Climate change goes against the principle of intergenerational equity as it unfairly shifts burdens onto future generations.[301] It "is an inherently intergenerational problem with extremely serious implications for equity between ourselves and future generations and among communities in the present and the future."[302] Former United Nations Secretary-General Ban Ki-Moon noted in his report on intergenerational solidarity that "fairness between generations is embedded in the concept of sustainable development."[303] Even the religious sector has recognized the concept of intergenerational equity. In his encyclical, *Laudato Si',* Pope Francis makes various references to "justice between generations." He instructs that:

> The notion of the common good also extends to future generations. The global economic crises have made painfully obvious the detrimental effects of disregarding our common destiny, which cannot exclude those who come after us. We can no longer speak of sustainable development apart from intergenerational solidarity. Once we start to think about the kind of world we are leaving to future generations, we look at things differently; we realize that the world is a gift which we have freely received

298 Oposa v. Factoran, Jr., G.R. No. 101083, 224 SCRA 792 (1993).

299 J. K. Summers & L. M. Smith, *The Role of Social and Intergenerational Equity in Making Changes in Human Well-Being Sustainable*, 43 Ambio 718 (2014), doi:10.1007/s13280-013-0483-6.

300 United Nations General Assembly, *Protection of Global Climate for Present and Future Generations of Mankind,* A/RES/43/53 (Dec. 6, 1988).

301 IPCC, *AR5 WGII, supra* note 159, at 926.

302 Edith Brown Weiss, *Climate Change, Intergenerational Equity, and International Law*, 9 Vt. J. Envtl. L. 615 (2008).

303 Ban Ki-moon, United Nations General Assembly, *Intergenerational Solidarity and the Needs of Future Generations: Report of the Secretary-General*, A/68/322 (Aug. 15, 2013), para. 10.

> and must share with others. Since the world has been given to us, we can no longer view reality in a purely utilitarian way, in which efficiency and productivity are entirely geared to our individual benefit. Intergenerational solidarity is not optional, but rather a basic question of justice, since the world we have received also belongs to those who will follow us.[304]

The deleterious impacts of climate change go beyond the specific rights of the groups of persons and sectors discussed above.[305] The narratives and stories they weave are more than enough to understand the harrowing situation of the Filipino people who have suffered, will continue to suffer, and have yet to suffer as they are deprived of their human rights by the myriad effects of climate change.

# VI. Duty of States to Protect Human Rights

## *A. General Duty*

States are the primary duty-bearers for upholding human rights obligations under treaties and customary international law, the rules of which are laid out under the International Bill of Human Rights[306] and other core universal human rights treaties. In general, States are obliged to respect, protect, and fulfill human rights.[307] A State's duty to respect prohibits it from interfering or curtailing the enjoyment of human rights.[308] The obligation to protect requires States to adopt and implement legislative, administrative, or judicial measures to prevent human rights violations and abuses[309] and ensure their effective implementation.[310] Finally, the duty of States to uphold and fulfill human rights

304 Pope Francis, Encyclical Letter *Laudato Si'* of the Holy Father Francis on Care for Our Common Home (2015) [hereinafter *Laudato Si'*].

305 See the *Memorandum for the Petitioners* (dated 19 September 2019 and received by the Commission on Human Rights on the same date) for more narratives and discussion on these rights and vulnerable groups. The Petitioners also claim that their discussions "do not represent all of the human rights harms. Continued research and monitoring are necessary to understand the full scope of the climate crisis unfolding in the country" (citing *Memorandum for the Petitioners,* at 87, para. 8.43).

306 Composed of the United Nations Declaration of Human Rights, International Convention on Civil and Political Rights, and International Convention on Economic, Social, and Cultural Rights.

307 Olivia de Schutter, International Human Rights Law 279-90 (2nd ed. 2014).

308 Frédéric Mégret, *Nature of Obligations*, *in* International Human Rights Law (3rd ed.) (Daniel Moeckli, Sangeeta Shah & Sandesh Sivakumaran, eds., 2017) [hereinafter International Human Rights Law: Nature of Obligations].

309 *Id,*

310 Markus Krajewski, The State Duty to Protect Against Human Rights Violations Through Transnational Business Activities, 23 Deakin LR 19 (2018) [hereinafter Krajewski (2018)]; *see* Urgenda Foundation

involves taking positive actions that encourage, enable, or provide essential services and infrastructure to facilitate the enjoyment of fundamental human rights.[311]

The abovementioned duty necessarily includes that of regulating the conduct of non-State actors. Article 2, paragraph 1 of the ICCPR provides that:

> Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

The United Nations Human Rights Committee state that this obligation can only be fully satisfied if individuals were also protected from abuses by non-State actors.[312] The obligation to protect human rights from the abuses of non-State actors is made especially significant by the global expansion of private enterprises, which highlights the impact of businesses on human rights.[313]

On 21 March 2011, the United Nations issued the Guiding Principles on Business and Human Rights (UNGP-BHR),[314] providing a framework on business and human rights built on three pillars: (1) the State duty to protect human rights; (2) the corporate responsibility to respect human rights; and (3) the imperative of providing access to remedies for victims of human rights violations and abuses.

The UNGP-BHR did not create new State obligations, but codified existing standards and practices for States and businesses, elaborated their implications, and integrated them within a "single, logically coherent and comprehensive template."[315]

---

v. The State of the Netherlands, ILDC 2456 (NL 2015), 24 June 2015, par. 5.3.3

311 International Human Rights Law*: Nature of Obligations, supra* note 308.

312 United Nations Human Rights Committee, *General Comment No. 31: The Nature of the General Legal Obligation Imposed on States Parties to the Covenant*, U.N. Doc. No. CCPR/C/21/Rev.1/Add.13 (2004), para. 8.

313 United Nations Human Rights Council, *Report of the Special Representative of the Secretary-General on the Issue of Human Rights and Transnational Corporations and other Business Enterprises, John Ruggie, Guiding Principles on Business and Human Rights: Implementing the United Nations "Protect, Respect and Remedy" Framework*, U.N. Doc. A/HRC/17/31 (2011) [hereinafter UNGP-BHR].

314 *Id.*

315 *Id.* at 5.

The UNGP-BHR provides that States must fulfill their duty to protect human rights by creating laws, policies, and regulations to ensure that businesses respect human rights and refrain from committing abuses. States must provide effective judicial and non-judicial remedies for victims who seek accountability for abuses by businesses, thus:

> The State duty to protect is a standard of conduct. Therefore, States are not per se responsible for human rights abuse by private actors. However, States may breach their international human rights law obligations where such abuse can be attributed to them, or where they fail to take appropriate steps to prevent, investigate, punish and redress private actors' abuse. While States generally have discretion in deciding upon these steps, they should consider the full range of permissible preventive and remedial measures, including policies, legislation, regulations and adjudication. States also have the duty to protect and promote the rule of law, including by taking measures to ensure equality before the law, fairness in its application, and by providing for **adequate accountability, legal certainty, and procedural and legal transparency**.[316]

The UNGP-BHR provides that States should set out a clear expectation that all business enterprises domiciled in their territory must respect human rights.[317] This expectation should cover all aspects of business operations. This may involve requiring corporations to fully disclose their global operations, including the operations of their subsidiaries.[318] Thus, States should provide guidance to business enterprises on how to respect human rights, and to encourage compliance, States should enforce laws that require enterprises to do so.[319] Whenever States contract with or legislate for business enterprises to provide services that may impact the enjoyment of human rights, States should exercise adequate oversight in order to meet their international human rights obligations.[320]

Enterprises have a responsibility to respect human rights under the UNGP-BHR. States must operationalize how enterprises are to meet the requirements for fulfilling the said responsibility. This may be comprised of regulations requiring enterprises to put in place policies and processes that include: (a) a commitment to meet their responsibility to respect human rights; (b) a human rights due diligence process to identify, mitigate and account

316 *Id.* at 6 (Commentary on Principle 1, emphasis supplied).

317 *Id.* (Principle 2).

318 *Id.* (Commentary on Principle 2; Principle 3 (d) Encourage, and where appropriate require, business enterprises to communicate how they address their human rights impacts).

319 *Id.* (Principle 3 (a)).

320 *Id.* (Principle 5).

for how they address their impacts on human rights; and (c) processes to enable the remediation of adverse human rights impacts they cause or to which they contribute.[321]

The jurisdiction of States to enact protective measures are limited within their own territories. Some may equate this to the inability of States to exact accountability for human rights abuses committed abroad by companies domiciled within their territories. However, the duty of States to prevent human rights abuses may extend beyond its territory as applied in the case of *Al-Skeini v. UK*.[322] The UNGP-BHR conveys the view that States are allowed to regulate the behavior of private actors with respect to their impacts on human rights abroad:

> At present States are not generally required under international human rights law to regulate the extraterritorial activities of businesses domiciled in their territory and/or jurisdiction. Nor are they generally prohibited from doing so, provided there is a recognized jurisdictional basis. Within these parameters some human rights treaty bodies recommend that home States take steps to prevent abuse abroad by business enterprises within their jurisdiction.[323]

The customary international law rule of *sic utere tuo ut alienum*[324] is also a rule that imposes upon States a duty to prevent extraterritorial harm. States must not let anything within their territory or control harm other States or their citizens. This principle has been effectively applied to human rights by the Inter-American Court of Human Rights. The Inter-American Court of Human Rights explains in its Advisory Opinion that when a State causes transboundary harm to the citizens of another State, the individuals whose rights are violated are understood to be under the control of the State that caused the damage, if there is a causal connection between the action and the negative impact. This theory is founded on the idea that the State in whose territory or under whose jurisdiction the activities were carried out has effective control over them. States can prevent them from curtailing the enjoyment of human rights by people outside its borders.[325]

321 *Id.* (Principle 15).

322 Al-Skeini and Others v. United Kingdom, Council of Europe: European Court of Human Rights, Application No. 55721/07 (July 7, 2011).

323 UNGP-BHR, *supra* note 313 (Commentary on Guiding Principle 2).

324 T.R. Subramanya & Shuvro Prosun Sarker, *Emergence of Principle of Sic Utere Tuo Ut Alienum Non-Laedes in Environmental Law and Its Endorsement by International and National Courts: An Assessment*, 5 Kathmandu School of Law Review (2017)

325 Inter-American Court of Human Rights, Advisory Opinion Concerning the Interpretation of Article 1(1), 4(1) and 5(1) of the American Convention on Human Rights, OC-23/17 (2017) [hereinafter IACHR Advisory Opinion 23/17].

The Advisory Opinion further says that States have a responsibility to ensure that activities under their jurisdiction or control, whether their own or those of non-State actors,[326] do not harm people in other countries or areas outside their national jurisdiction,[327] and to use all their available resources to do so. It states:

> The obligations to respect and to ensure human rights require that States abstain from preventing or hindering other States Parties from complying with the obligations derived from the Convention. Activities undertaken within the jurisdiction of a State Party should not deprive another State of the ability to ensure that the persons within its jurisdiction may enjoy and exercise their rights under the Convention. The Court considers that States have the obligation to avoid transboundary environmental damage that can affect the human rights of individuals outside their territory.[328]

The Inter-American Court of Human Rights held that the jurisdiction of States concerning the protection of human rights under the American Convention is not limited to their territorial space:

> In international law, the bases of jurisdiction are not exclusively territorial, but may be exercised on several other bases as well. In this sense, [. . .] "under certain circumstances, the exercise of its jurisdiction over acts with an extraterritorial locus will not only be consistent with but required by the norms which pertain." Human rights are inherent in all human beings and are not based on their citizenship or location. "**Under Inter-American Human Rights Law, each American State is obligated therefore to respect the rights of all persons within its territory and of those present in the territory of another State but subject to the control of its agents**."[329]

The *No Harm Rule* is another principle that is now considered as part of customary international law.[330] It supports the view that States have an extraterritorial obligation to protect human rights. It provides that a State is duty-bound to prevent, reduce and control

326 *Id.*

327 David Boyd, *Report of the UN Special Rapporteur on the Issue of Human Rights Obligations Relating to the Enjoyment of a Safe, Clean, Healthy and Sustainable Environment*, A/74/161 (2019) [hereinafter *Safe Climate Report*].

328 IACHR Advisory Opinion 23/17, *supra* note 325.

329 Inter-American Commission on Human Rights, Franklin Guillermo Aisalla Molina (Ecuador v. Colombia), Admissibility Report No. 112/10 of 21 October 2011, para. 91 & Inter-American Commission on Human Rights, Case of Coard et al. v. United States, Merits Report No. 109/99 of 29 September 1999, para. 37 (emphasis supplied).

330 Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, I.C.J. Rep 226 (1996).

the risk of environmental harm to other States.[331] This rule is equally applicable in the context of human rights and has been widely discussed and relied on by the Inter-American Court of Human Rights to explain jurisdiction in matters involving cross-border damages. Indeed, it advances that States have a general obligation to ensure that activities within their territory do not cause damage to the environment of another State and relates this concept to the general duty of States to protect human rights. It logically follows that States are obliged to act if activities in their territory cause serious human rights violations in the territory of another State.[332]

The Maastricht Principles on Extraterritorial Responsibilities of States in the Field of Economic, Social, and Cultural Rights ("Maastricht Principles")[333] address any potential confusion regarding a State's extraterritorial jurisdiction. The Maastricht Principles are based on two main concepts that serve as primary guides in extraterritorial human rights obligations. These are:

1. That international human rights law requires that States must ensure that they respect, protect, and fulfill rights when conducting themselves in a way that has real and foreseeable effects on human rights beyond borders;[334] and
2. That international law, particularly in economic, social, and cultural rights, demands States to realize rights extraterritorially through "international assistance and cooperation.[335]

Finding its basis on varied sources of international human rights law[336] and evolving international human rights jurisprudence recognizing exceptions to the territoriality aspect of jurisdiction under international law,[337] the Maastricht Principles provide that a

331 Ian Brownlie in Principles of Public International Law, 7th ed., 2008, pp.275-285; Patricia Birnie, Alan Boyle and Catherine Redgwell in: International Law and the Environment, 3rd ed., Oxford 2009, pp.143-152 (citing

332 Krajewski (2018), *supra* note 310.

333 ETO Consortium, *Maastricht Principles on Extraterritorial Obligations of States in the Area of Economic, Social and Cultural Rights* (2013), *available* at https://www.etoconsortium.org/nc/en/main-navigation/library/maastricht-principles/?tx_drblob_pi1%5BdownloadUid%5D=23 [hereinafter *Maastricht Principles*].

334 Margot E. Salomon & Ian Seiderman, *Human Rights Norms for a Globalized World: The Maastricht Principles on Extraterritorial Obligations of States in the Area of Economic, Social, and Cultural Rights*, 3 Glob. Policy 458 (2012) [hereinafter Salomon & Seiderman (2012)].

335 *Id.*

336 *Maastricht Principles*, *supra* note 333 (General Principle No. 6).

337 Salomon & Seiderman (2012), *supra* note 332.

State's human rights obligations extend beyond its borders.[338] Thus, "all States have obligations to respect, protect and fulfill human rights, including civil, cultural, economic, political and social rights, both within their territories and extra-territorially."[339]

The extraterritorial application of the human rights obligation of States is further applied in the revised edition of the Organization for Economic Co-operation and Development (OECD)[340] Guidelines for Multinational Companies (OECD Guidelines). An international instrument adopted by 49 countries in 2011, the OECD Guidelines[341] promote responsible business conduct. It requires that States-parties create National Contact Points (NCP) which are offices tasked to promote adherence to the guidelines as a non-judicial grievance mechanism. The revised edition now includes a chapter on human rights consistent with the UNGP-BHR.

The Committee on the Rights of the Child (CRC) and the CESCR have both issued General Comments[342] declaring that States have an obligation to respect, protect, and fulfill human rights in the context of the extraterritorial activities of business. This obligation may be pursued, provided there is a reasonable link[343] between the State and the conduct concerned.[344] Furthermore, the CESCR reiterates that States are required to take steps to

---

338 However, the exercise of extraterritorial jurisdiction, according to the Maastricht Principles, is only proper where the State:

a. has effective control over the territory or persons on that foreign territory;
b. has brought about foreseeable effects on the exercise of its rights outside of its territory through its conduct; and
c. is either under an international obligation or in a position to exercise decisive influence to actively support the realization of people's economic, social, and cultural rights outside of its territory. (Maastricht General Principle 9).

339 *Maastricht Principles*, *supra* note 333 (General Principle No. 3).

340 The OECD is an intergovernmental organization founded in 1961 to stimulate economic progress and world trade.

341 The OECD Guidelines are recommendations on responsible business conduct addressed to multinational enterprises operating in the 49 adhering States. It provides non-binding principles and standards for responsible business conduct in a global context consistent with applicable laws and internationally recognized standards (citing Organisation for Economic Co-operation and Development, OECD Guidelines for Multinational Enterprises (2011) at 31, *available at* https://www.oecd.org/daf/inv/mne/48004323.pdf (last accessed Oct. 23, 2021) [hereinafter OECD Guidelines].

342 Committee on the Rights of the Child, *General Comment No. 16 on State Obligations Regarding the Impact of Business Sector on Children's Rights*, U.N. Doc. CRC/C/GC/16 (Apr. 17, 2013) [hereinafter CRC General Comment 16]; Committee on Economic, Social and Cultural Rights, *General Comment No. 24 on State Obligations Under the International Covenant on Economic, Social and Cultural Rights in the Context of Business Activities*, U.N. Doc. E/C.12/GC/24 (June 23, 2017) [hereinafter CESCR General Comment 24].

343 A reasonable link, according to the Committee on the Rights of the Child, exists "when a business enterprise has its center of activity, is registered or domiciled or has its main place of business or substantial business activities in the State concerned" (citing CRC General Comment 16, at 13).

344 CRC General Comment 16, *supra* note 342.

prevent human rights violations abroad by corporations domiciled within their territory and/or within their jurisdiction.[345]

However, it should be noted that the States' exercise of extraterritorial jurisdiction, following its human rights obligations, does not justify interference with the internal affairs of another State. Exceptional situations[346] necessitating the exercise of extraterritorial jurisdiction must be examined in a restrictive manner, based on the specific circumstances of each case. The obligation to respect and ensure human rights does not allow States to act in violation of principles of international law, particularly that of non-intervention enshrined in the United Nations Charter.[347]

In other words, a balance must be maintained between respecting the sovereignty of States in handling their internal affairs in accordance with the principle of non-intervention and in requiring States to comply with their treaty obligations.[348]
The universality principle of international law acknowledges that actions which are uniformly harmful to States and their subjects, necessitate the recognition of authority of all States to punish such acts wherever they occur, even if there is no relation between the State and the parties or the acts in question. This supports the view that the States' duty to protect is not confined to territorial jurisdiction.[349] There is a rising consensus that this concept extends to abuses against human rights.[350]

## *B. Special Duty of States to Protect Human Rights in the Context of Climate Change*

Climate change directly and indirectly impacts the whole gamut of human rights under international law.[351] The duty of States to protect human rights encompasses the impacts

345 CESCR General Comment 24, *supra* note 342.

346 See, inter alia, ECHR, Case of Al-Skeini and Others v. The United Kingdom [GS], No. 55721/07, Judgment of 7 July 2011, paras. 131 and 133 to 139; ECHR, Case of Ilaşcu and Others v. Republic of Moldova and Russia [GS], No. 48787/99, Judgment of 8 July 2004, paras. 311 to 319; ECHR, Case of Catan and Others v. Republic of Moldova and Russia [GS], Nos. 43370/04, 8252/05 and 18454/06, Judgment of 19 October 2012, para. 105; ECHR, Case of Chiragov and Others v. Armenia, [GS], No. 13216/05, Judgment of 16 June 2015, para. 168, & ECHR, Case of Banković and Others v. Belgium [GS], Decision on admissibility of 12 December 2001, para. 66.

347 United Nations Charter, 1 UNTS XVI.

348 I.C.J., Case Concerning the Gabčikovo-Nagymaros Project (Hungary c. Slovakia), Judgment of 25 September 1997, para. 142.

349 Joaquin Bernas, *Introduction* to Public International Law 157 (2009).

350 *Id.*

351 United Nations Office of the High Commissioner for Human Rights, Understanding Human Rights

of climate change. The OHCHR maintains that "States (duty-bearers) have an affirmative obligation to take effective measures to prevent and redress these climate impacts, and therefore, to mitigate climate change and to ensure that all human beings (rights-holders) have the necessary capacity to adapt to the climate crisis."[352] Although human rights obligations concerning climate change are still evolving, various international laws, treaties, and principles already confirm that States have the responsibility to mitigate climate change impacts in a manner anchored on human rights, "irrespective of whether or not climate change effects can be construed as human rights violations. Human rights obligations provide important protection to individuals whose rights are affected by climate change."[353]

Because it is generally viewed that climate change is a type of environmental harm, the human rights obligations in environmental harm also generally apply to climate change.[354] The framework principles on human rights and the environment clarify three categories of State obligations: procedural, substantive, and special obligations towards those in vulnerable situations.[355]

Procedurally, States are obliged to put safeguards in place, such as prior assessment of environmental impacts, dissemination of environmental information, full and informed participation by those affected, and effective remedies for States' failure to comply with their obligations.[356]

Substantively, States must adopt legal frameworks to protect against environmental harm that interferes with the enjoyment of human rights, including harm caused by State and non-State actors.[357] States must strike a fair balance between environmental security and other legitimate societal interests, while ensuring that such a balance does not result in violations of human rights.

---

and Climate Change (Submission of the Office of the High Commissioner for Human Rights to the 21st Conference of the Parties to the United Nations Framework Convention on Climate Change) (2015) [hereinafter OHCHR, CoP 21 Submission].

352 *Id.* at 2.

353 *Relationship Between Climate Change and Human Rights Report*, *supra* note 221.

354 John Knox, *Report of the UN Special Rapporteur on the Issue of Human Rights Obligations Relating to the Enjoyment of a Safe, Clean, Healthy and Sustainable Environment*, U.N. Doc. A/HRC/37/59 [hereinafter Framework Principles on Human Rights and the Environment].

355 *Safe Climate Report*, *supra* note 327, at 17.

356 Framework Principles on Human Rights and the Environment, *supra* note 354, at 6.

357 *Id.*

These principles must be similarly applied and operationalized when addressing climate change. Thus, States have the procedural obligation to:

1. Provide the public with accessible, affordable, and understandable information regarding the causes and consequences of the global climate crisis, including incorporating climate change into the educational curriculum at all levels;
2. Ensure an inclusive, equitable, and gender-based approach to public participation in all climate-related actions, with a particular emphasis on empowering the most affected populations, namely women, children, young people, indigenous peoples and local communities, persons living in poverty, persons with disabilities, older persons, migrants, displaced people, and other potentially at-risk communities;
3. Enable affordable and timely access to justice and effective remedies for all, to hold States and businesses accountable for fulfilling their climate change obligations;
4. Assess the potential climate change and human rights impacts of all plans, policies, and proposals, including both upstream and downstream effects (i.e., both production- and consumption-related emissions);
5. Integrate gender equality into all climate actions, enabling women to play leadership roles;
6. Respect the rights of indigenous peoples in all climate actions, particularly their right to free, prior, and informed consent; and
7. Provide strong protection for environmental and human rights defenders working on climate-related issues, from land use to fossil fuels. States must vigilantly protect defenders from harassment, intimidation, and violence.[358]

Moreover, States have the substantive obligation to:

1. Abstain from all actions that infringe on a person's basic human rights as a result of their environmental consequences;
2. Establish climate change mitigation programs and implement punitive laws against environmental harm to protect basic human

358 *Safe Climate Report, supra* note 327, at 30.

rights from being violated by third parties, particularly businesses (non-grant or denial of subsidies or incentives to carbon-intensive industries, regulation of carbon footprints left not only by private and state-owned companies but also by consumers, and so on are examples of these programs); and

3. Repeal and modify discriminatory policies that target vulnerable groups.

Finally, concerning vulnerable sectors, States have a general duty to consider additional protections and apply environmental laws without discrimination.

These principles on the three categories of State obligations must govern all of States' climate actions, including obligations related to mitigation, adaptation, finance, and loss and damage.[359]

The principles behind the three categories of State obligations are reflected in the Rio Declaration,[360] which was adopted in 1992. The Rio Declaration consists of 27 principles defining the people's right to development and the States' obligation to protect the shared environment. Though non-binding by itself, the Declaration has been the source of standards to help guide States in fulfilling their obligations towards the environment. The principles in the declaration have been crystallized into a binding treaty, namely the Aarhus Convention.[361] The European Union and 47 of the 50 European countries are parties to the convention, which is open to accession by non-EU States. Hence, the three categories of State obligations on the environment are not only obligatory to a good number of powerful States, but can also be binding on other States through the development of norms under customary international law.[362]

The United Nations High Commissioner for Human Rights[363] also enumerates particular human rights obligations of States in the context of climate change. States have an obligation

---

359 *Id.* at 18.

360 *Rio Declaration*, *supra* note 242.

361 Convention on Access to Information, Public Participation in Decision-Making and Access to Justice in Environmental Matters, Depositary, Chapter XXVII-13, *available at* https://treaties.un.org/doc/Publication/MTDSG/Volume%20II/Chapter%20XXVII/XXVII-13.en.pdf.

362 Sec. 102 of the Restatement of United States Foreign Relations provides that: "International agreements create law for the states parties thereto and may lead to the creation of customary international law when such agreements are intended for adherence by states generally and are in fact widely accepted."

363 *Relationship Between Climate Change and Human Rights Report*, *supra* note 221.

to ensure the widest possible enjoyment of economic, social and cultural rights under any given circumstance irrespective of the additional strain which climate change-related events may place on available resources. States must also seek to satisfy core obligations and protect groups in society who are in a particularly vulnerable situation, as a matter of priority.[364] States also have an obligation to protect individuals against foreseeable threats to human rights posed by climate change, such as extreme weather events.[365] In such cases, States could be held accountable for failure to protect an individual against a harm affecting the enjoyment of human rights.[366]

The CESCR warned in 2018 that a State's failure to prevent foreseeable human rights harm caused by climate change or to mobilize the maximum available resources to do so, could be a breach of its obligation to respect, protect, and fulfill all human rights for all.[367] States must allocate substantial financial and material resources to renewable energy and ecological farming and control deforestation and soil deterioration.[368] States should also prioritize the needs of the vulnerable and marginalized segments of the population through programs that increase their adaptive capacities as they transition to a low-carbon economy.

A State's legal obligation to respond to climate change is neither directly related nor proportional to its contribution to climate change. States may not claim that they have not "caused" climate change to escape the obligation to address global warming. Human rights law requires each State to do more than merely refrain from interfering with human rights itself.[369] It also requires each State to protect against such harms that others may cause actively. Hence, even if it is not possible to connect a particular emission of GHG to a specific infringement of human rights, States are still obliged to protect against the harm caused by climate change.[370]

---

364 Committee on Economic, Social and Cultural Rights, *Statement on An Evaluation of the Obligation to Take Steps to the "Maximum of Available Resources" Under an Optional Protocol to the Covenant*, E/2008/22-E/C.12/2007/1, annex VIII (2007).

365 *Relationship Between Climate Change and Human Rights Report*, *supra* note 221.

366 *Id.*

367 Committee on Economic, Social and Cultural Rights, *Climate Change and the International Covenant on Economic, Social and Cultural Rights: Statement by the Committee on Economic, Social and Cultural Rights*, E/C.12/2018/1 (2018)

368 *Safe Climate Report, supra* note 327, at 19.

369 *Id.*

370 *Id.*

The Advisory Opinion of the Inter-American Court of Human Rights declares that States are obliged to protect human rights impacted by environmental degradation, even if such are beyond their territorial jurisdiction. This principle flows from the *erga omnes*[371] nature of States' duty to protect human rights:

> The States Party to the Convention [American Convention] have erga omnes obligations to respect protective provisions and to ensure the effectiveness of the rights set forth therein under any circumstances and regarding all persons. The effect of these obligations of the State goes beyond the relationship between its agents and the persons under its jurisdiction, as it is also reflected in the positive obligation of the State to take such steps as may be necessary to ensure effective protection of human rights in relations amongst individuals. The State may be found responsible for acts by private individuals in cases in which, through actions or omissions by its agents when they are in the position of guarantors, the State does not fulfill these *erga omnes* obligations embodied in Articles 1(1) and 2 of the Convention.[372]

In conjunction with the *erga omnes* nature of States' duty to protect human rights, the duty to act on climate change is also necessarily implied in each State's duty of international cooperation in addressing human rights issues as provided in the United Nations Charter: "All UN Member States pledge themselves to take joint and separate action in cooperation with the Organization for the achievement of universal respect for, and observance of, human rights and fundamental freedoms for all."[373]

Likewise, the CESCR affirms that States have extraterritorial obligations to ensure that human rights are given due attention in international agreements.[374]

Cooperation among States is critical to mitigating climate change. It is in fulfillment of this duty to cooperate that States came together through UNFCCC to address the global problem of climate change, particularly to "achieve stabilization of greenhouse gas concentrations in

---

371 *Erga Omnes* Obligations are obligations owed by states to the international community as a whole, intended to protect and promote the basic values and common interests of all. The principle was recognized in the Barcelona Traction Case (citing Barcelona Traction, Light and Power Company, Limited, Judgment, I.C.J. Reports 1970, p. 3. Question of Admissibility-Capacity of Applicant Government to Act).

372 *Cf.* Case of the "Mapiripán Massacre" v. Colombia, Judgment of 15 September 2005. Series C No. 134, para. 111.

373 *Relationship Between Climate Change and Human Rights Report*, *supra* note 221; U.N. Charter, 1 UNTS XVI.

374 *See* Committee on Economic, Social and Cultural Rights General Comments Nos. 12, 13, 14, & 15.

the atmosphere at a level that would prevent dangerous anthropogenic interference in the climate system."[375] Thus:

> Recalling also that States have, in accordance with the Charter of the United Nations and the principles of international law … the responsibility to ensure that activities within their jurisdiction or control do not cause damage to the environment of other States or of areas beyond the limits of national jurisdiction.[376]

The 1997 Kyoto Protocol, despite having had limited impact on global emissions,[377] was a milestone in climate action because it was the first legally binding step toward implementing the UNFCCC's principles and goals.[378]

On 1 March 2015, international legal experts adopted the Oslo Principles on Global Climate Obligations (Oslo Principles).[379] The Oslo Principles established specific obligations for States and businesses to combat climate change, the most noteworthy of which being the commitment to ensure that the rise in average world temperature does not exceed 2 degrees Celsius,[380] and that "the measures required … should be adopted without regard to the cost, unless that cost is completely disproportionate to the reduction in emissions that will be brought about by expending it."[381] The obligations elaborated in the Oslo Principles, like the UNGP-BHR, are codifications of well-established principles of international environmental law, international human rights law, and, to some extent, tort law.[382]

---

375 United Nations Framework Convention on Climate, Preamble.

376 *Id.*

377 Stavins R., J. Zou, T. Brewer, M. Conte Grand, M. den Elzen, M. Finus, J. Gupta, N. Höhne, M.-K. Lee, A. Michaelowa, M. Paterson, K. Ramakrishna, G. Wen, J. Wiener, and H. Winkler, 2014: International Cooperation: Agreements and Instruments. In: Climate Change 2014: Mitigation of Climate Change. Contribution of Working Group III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Edenhofer, O., R. Pichs-Madruga, Y. Sokona, E. Farahani, S. Kadner, K. Seyboth, A. Adler, I. Baum, S. Brunner, P. Eickemeier, B. Kriemann, J. Savolainen, S. Schlömer, C. von Stechow, T. Zwickel and J.C. Minx (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA, *available at* https://www.ipcc.ch/site/assets/uploads/2018/02/ipcc_wg3_ar5_chapter13.pdf (last accessed Mar. 18, 2021).

378 Peter Jackson, *From Stockholm to Kyoto: A Brief History of Climate Change*, Green Our World!, No. 2 Vol. XLIV, 2007, *available at* https://www.un.org/en/chronicle/article/stockholm-kyoto-brief-history-climate-change (last accessed Mar. 18, 2021).

379 Expert Group on Global Climate Obligations, Oslo Principles on Global Climate Obligations (2015) [hereinafter Oslo Principles].

380 *Id.* princ. 6.

381 *Id.* princ. 1.

382 *Id.*

On 4 November 2016, the Paris Agreement[383] was adopted through the continued cooperation and efforts of UNFCCC member states. The Agreement acknowledged the link between climate change and the enjoyment of human rights, albeit implicitly:

> Acknowledging that climate change is a common concern of humankind, Parties should, when taking action to address climate change, respect, promote and consider their respective obligations on human rights, the right to health, the rights of indigenous peoples, local communities, migrants, children, persons with disabilities and people in vulnerable situations and the right to development, as well as gender equality, empowerment of women and intergenerational equity.[384]

The entry into force of the Paris Agreement was a momentous occasion in the multilateral process of climate action. For the first time, a binding agreement brought all nations together to make ambitious efforts in the reduction of emissions to combat climate change and to adapt to its effects.

However, it should be noted that in implementing emissions reduction targets and adaptation strategies, States should comply with the tenets of climate justice.[385] The Sustainable Development Goals[386] promote the view that States should pursue justice in addressing climate change. In particular, climate justice is essential in Goal 13: Climate Action.[387] Climate justice demands fairness and equity in the way people are treated, linking development and human rights to achieve a rights-based approach in addressing climate change.[388]

All the above-mentioned instruments and principles clearly point to the imperative obligation of States to mitigate climate change in order to fully protect human rights. States must address the harm caused by climate change, as it is a critical human rights concern

---

383 Paris Agreement to the United Nations Framework Convention on Climate Change, Dec. 12, 2015, T.I.A.S. No. 16-1104 [hereinafter Paris Climate Agreement].

384 *Id.* Preamble.

385 IPCC, *AR6, WGII, SPM*, *supra* note 281.

386 United Nations General Assembly, *Transforming our World: The 2030 Agenda for Sustainable Development*, A/RES/70/1 (2015).

387 Target 13.b seeks to "promote mechanisms for raising capacity for effective climate change-related planning and management in least developed countries and small island developing States, including focusing on women, youth and local and marginalized communities" and "acknowledging that the United Nations Framework Convention on Climate Change is the primary international, intergovernmental forum for negotiating the global response to climate change." The focus on those most vulnerable to climate change promotes the goals of climate justice.

388 IPCC, *AR6, WGII, SPM*, *supra* note 281.

and obligation under international law.[389] States should regulate everything within their territory such that emissions are drastically reduced, the standard being limiting warming to well below 2 degrees Celsius from pre-Industrial levels, as stated in the Paris Agreement. This target has been increased to below 1.5 degrees, as recommended by the IPCC[390] in order to prevent the worst-case scenarios that could impact human rights. States must hence drastically reduce the carbon footprint of not only State activities, but also of non-State actors. This involves drastic reductions in the use of fossil fuels and the transition to renewable energy sources by 2030.[391]

## *C. Refusal of Governments to Engage in Meaningful Action to Mitigate Climate Change may be Categorized as a Human Rights Violation*

Citizens may hold their governments accountable for failure to mitigate–not just adapt to–climate change. The pursuit of the State obligation to mitigate climate change cannot just be framed as aspirational, where the standard of fulfillment is vague and the timeline uncertain. Concrete metrics must be set against which States may be held accountable. Failing in this, States enable the human rights of their citizens to be harmed, which equates to a violation of their duty to protect human rights.

For the purpose of holding States in failure of their human rights obligations in the context of climate change, which failure may, itself, be categorized as a human rights violation, it is sufficient to establish the absence of meaningful State resolve and action to address the major anthropogenic actors and factors driving global warming. That science cannot yet establish to a high degree of accuracy the causal relationship between GHGs and specific climate-related effects on particular parties is a problematic only in establishing legal

---

389 Relationship Between Climate Change and Human Rights Report, *supra* note 221.

390 IPCC, (2018). *Global warming of 1.5°C. An IPCC Special Report on the Impacts of Global Warming of 1.5°C Above Pre-Industrial Levels and Related Global Greenhouse Gas Emission Pathways, in the Context of Strengthening the Global Response to the Threat of Climate Change, Sustainable Development, and Efforts to Eradicate Poverty* [V. Masson-Delmotte, P. Zhai, H. O. Pörtner, D. Roberts, J. Skea, P.R. Shukla, A. Pirani, W. Moufouma-Okia, C. Péan, R. Pidcock, S. Connors, J. B. R. Matthews, Y. Chen, X. Zhou, M. I. Gomis, E. Lonnoy, T. Maycock, M. Tignor, T. Waterfield (eds.)]. In Press.

391 IPCC, 2022: *Summary for Policymakers. In: Climate Change 2022: Mitigation of Climate Change. Contribution of Working Group III to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change* [P.R. Shukla, J. Skea, R. Slade, A. Al Khourdajie, R. van Diemen, D. McCollum, M. Pathak, S. Some, P. Vyas, R. Fradera, M. Belkacemi, A. Hasija, G. Lisboa, S. Luz, J. Malley, (eds.)]. Cambridge University Press, Cambridge, UK and New York, NY, USA. doi: 10.1017/9781009157926.001 [hereinafter referred to as IPCC, *AR6, WGIII*].

liability for the purpose of claiming awards for damages from specific parties, which is a matter for courts to determine.

The obligation of States to address climate change includes the enactment of laws to regulate businesses. These laws should hold enterprises within their jurisdictions legally liable for acts harming the environment and the climate system.

In general, States must establish a general regulatory or policy environment that would incentivize the discovery, development, and use of clean energy. Dependence on carbon fuel should be discouraged. Incentives and subsidies should not be given to carbon producers.

The current debate on whether the effects of climate change may be qualified as human rights violations has no bearing on the clear obligation of States under International Law, including International Human Rights Law, to protect their citizens from the negative impacts of climate change.

## VII. Responsibility of Business Enterprises to Respect Human Rights

Although States have the duty to enact and enforce appropriate laws to ensure that businesses respect human rights,[392] a State's failure to perform this duty does not render business enterprises free from the responsibility of respecting human rights. Private actors, including business entities, must respect human rights, regardless of whether domestic laws exist or are fully enforced domestically.[393] The responsibility of business enterprises to respect human rights is distinct from issues of legal liability and enforcement of national law provisions.[394]

### *A. General Responsibility*

There is a growing number of international standards, guidelines, and principles that restate and codify existing binding obligations from treaties and customary international

392 *See* United Nations Economic and Social Council, *Statement on the Obligations of States Parties regarding the Corporate Sector and Economic, Social and Cultural Rights,* E/C.12/2001/1 (July 12, 2011).

393 *See* CESCR General Comment 24, *supra* note 342.

394 UNGP-BHR, *supra* note 313.

law, emphasizing and specifying the human rights responsibility of business enterprises. The responsibilities of corporations regarding human rights are further expounded in the following: 1) the UNGP-BHR; 2) the United Nations Global Compact; and 3) the Organization for Economic Co-operation and Development Guidelines for Multinational Corporations. Article 29 of the UDHR is instructive regarding the human rights obligations of everyone in general. It provides that:

> **Everyone has duties to the community** in which alone the free and full development of his personality is possible.
>
> In the exercise of his rights and freedoms, **everyone shall be subject only to such limitations as are determined by law solely for the purpose of securing due recognition and respect for the rights and freedoms of others** and of meeting the just requirements of morality, public order and the general welfare in a democratic society.
>
> These rights and freedoms may in no case be exercised contrary to the purposes and principles of the United Nations. (Emphasis supplied)

It is clear from the UDHR that the obligation to respect rights and freedoms is applicable to everyone, not just States. Hence, the UDHR speaks of the general obligation of everyone, including corporations, to respect human rights

## 1. The Corporate Responsibility to Respect Human Rights Under the UNGP-BHR

The UNGP-BHR now embodies the global standard of practice expected of States and businesses with regard to business and human rights.[395] Its key elements have been accepted by the Organization for Economic Cooperation and Development, the European Union, the International Organization of Standardization, the International Finance Corporation, the Human Rights Commission of the Association of Southeast Asian Nations, the General Assembly of the Organization of American States, and the African Union, as well as by scores of individual states

395 United Nations Office of the High Commissioner of Human Rights, *The Corporate Responsibility to Respect Human Rights: An Interpretative Guide*, U.N. Doc. HR/PUB/12/01 (2012), at 1 [hereinafter *UNGP Interpretative Guide*].

and businesses. Additionally, "some of the measures that have already been adopted include binding legal and policy requirements, with penalties for non-compliance."[396]

### *i. Foundational Principles of the Corporate Responsibility to Respect*

The corporate responsibility to respect human rights, as the second pillar of the UNGP-BHR, implements the preambular proclamation in the UDHR that every individual and every organ of society shall strive by progressive measures to secure the universal and effective recognition and observance of human rights.[397] To this end, its foundational principles expound on the parameters of this corporate responsibility, stating first that all business enterprises should respect human rights.[398] These rights, at a minimum, refer to internationally-recognized human rights, as expressed in the International Bill of Rights and the International Labour Organization's Declaration on Fundamental Principles and Rights at Work.[399] To respect these human rights, business enterprises, including every entity within their value chains under a theory of enterprise liability, must: a) avoid contributing to adverse human rights impacts, and address them when they occur; and b) seek to prevent or mitigate adverse human rights impacts that are directly linked to their operations, products or services.[400] Such is required of all business enterprises, regardless of size, sector, operational context, ownership, and structure.[401] To meet this responsibility, business enterprises should have appropriate policies and processes, including: a) a policy commitment to meet their responsibility to respect human rights; b) a human rights due-diligence process to identify, prevent, mitigate and account for how they address their impacts on human rights; and c) processes to enable the remediation of any adverse human rights impacts they cause or to which they contribute.[402]

396 John Ruggie, *Life in the Global Public Domain: Response to Commentaries on the UN Guiding Principles and the Proposed Treaty on Business and Human Rights,* SSRN (2015), *available at* http://dx.doi.org/10.2139/ssrn.2554726.

397 UDHR*, supra* note 140, Preamble.

398 UNGP-BHR, *supra* note 313 (Principle 11).

399 *Id.* (Principle 12).

400 *Id.* (Principle 13).

401 *Id.* (Principle 14).

402 *Id.* (Principle 15).

### *ii. Operational Principles of the Corporate Responsibility to Respect*

To operationalize the corporate responsibility to respect human rights, business enterprises should act with due diligence to avoid infringing on the rights of others and to address adverse impacts of their operations. To do so, business enterprises must first understand their human rights risks. Thus, the operational principles of the corporate responsibility to protect call on business enterprises to conduct due diligence processes[403] and survey their entire business landscapes as a means to effect policy commitments[404] that reduce adverse impacts on human rights, and design remedial measures where needed.[405] In general, the operationalization of corporate human rights responsibilities must include a) the investigation and evaluation of business activities and assessment of corporate policies that may lead to possible human rights abuses;[406] b) integration of "findings about each salient human rights issue into decision-making processes and actions" through company policies and practices;[407] and c) addressing each issue or providing remedy for harms caused "by its actions or decisions in relation to a salient human rights issue."[408] Due diligence processes, when done correctly, will provide business enterprises with the understanding of the harm its activities may cause, and define the ways these harms may be addressed. It does not, however, end at undertaking due diligence procedures. The findings must be made public,[409] reported to investors and stockholders, and submitted to appropriate government agencies.

### *iii. The UNGP Reporting Framework*

The UN Guiding Principles (UNGP) Reporting Framework provides a comprehensive guide for companies to identify and report issues that

403 *Id.* (Principle 17).
404 *Id.* (Principle 16).
405 *Id.* (Principle 22).
406 *Id.* (Principle 18).
407 *Id.* (Principle 19).
408 *Id.* (Principle 20).
409 *Id.* (Principle 21).

detract from their responsibility to respect human rights. It tasks corporations to ask questions and report on "human rights issues associated with [their] activities and business relationships during the reporting period."[410] The questions, as they are framed, focus on saliency and bring into light human rights risks to the individual rather than the material risks to the business. The Framework also guides companies in the disclosure of any "severe human impacts that occurred or were still being addressed."[411] The "know and show" strategy of the UNGP Reporting Framework catalyzes behavior changes. By bringing into light what should be reported to demonstrate respect for human rights, corporations are guided accordingly in the determination and implementation of corporate policies and activities.

## 2. The United Nations Global Compact

The United Nations Global Compact is a forerunner of the UNGP-BHR. It was proposed by then United Nations Secretary General Kofi Annan in an address to the World Economic Forum on 31 January 1999.[412] It espouses corporate social responsibility and seeks to help businesses align their strategies and operations with the Ten Principles on human rights, labor, environment, and anti-corruption.[413] The Ten Principles–all derived from international treaties and principles–encourage corporations to, among others, "support and respect the protection of internationally-proclaimed human rights" (Principle 1); "not [be] complicit in human rights abuses" (Principle 2); "support a precautionary approach to environmental challenges" (Principle 7); "undertake initiatives to promote greater environmental responsibility" (Principle 8); and "encourage the development and diffusion of environmentally friendly technologies" (Principle 9).

410 Human Rights Reporting and Assurance Framework Initiative, UN Guiding Principles Reporting Framework with Implementation Guidance (2017) [hereinafter UNGP Reporting Framework].

411 *Id.*

412 Press Release *by* Kofi Atta Annan, Secretary General of the United Nations, *Secretary-General Proposes Global Compact on Human Rights, Labour, Environment, in address to World Economic Forum in Davos*, U.N. Doc. No. SG/SM/4881 (Feb. 1, 1999), *available at* https://www.un.org/press/en/1999/19990201.sgsm6881.html (last accessed Oct. 23, 2021).

413 This includes the Universal Declaration of Human Rights, the International Labour Organization's Declaration on Fundamental Principles and Rights at Work, the Rio Declaration on Environment and Development, and the United Nations Convention Against Corruption.

### 3. The OECD Guidelines for Multinational Corporations

The OECD Guidelines for Multinational Corporations is a multilaterally agreed and comprehensive code of responsible business conduct that governments have committed to promoting. Its human rights chapter was drawn from the UNGP-BHR and thereby similarly provides that enterprises should:

1. Respect human rights, which means they should avoid infringing on the human rights of others and should address adverse human rights impacts with which they are involved.
2. Within the context of their own activities, avoid causing or contributing to adverse human rights impacts and address such impacts when they occur.
3. Seek ways to prevent or mitigate adverse human rights impacts that are directly linked to their business operations, products or services by a business relationship, even if they do not contribute to those impacts.
4. Have a policy commitment to respect human rights.
5. Carry out human rights due diligence as appropriate to their size, the nature and context of operations and the severity of the risks of adverse human rights impacts.
6. Provide for or co-operate through legitimate processes in the remediation of adverse human rights impacts where they identify that they have caused or contributed to these impacts.[414]

## *B. Responsibility in the Context of Climate Change*

### 1. Application of the UNGP-BHR

The corporate responsibility to respect human rights includes the responsibility to avoid causing or contributing to adverse human rights impacts through harm to the environment and our climate system.[415] Employing the foundational and

414 OECD Guidelines, *supra* note 341.

415 Framework Principles on Human Rights and the Environment, *supra* note 354.

operational principles of the UNGP-BHR in the context of climate change, business enterprises must:

1. Acknowledge, in their statement of policy created under Principle 16, the effect of climate change on the enjoyment of human rights;
2. Include climate change as an element of human rights due diligence undertaken in accordance with Principle 17;
3. Identify and assess the specific human rights impacts of climate change arising from their operations and product;
4. Take appropriate action to mitigate the greenhouse gas emissions from their operations and products, as defined in Principle 19; and
5. Track the effectiveness of their measures and adequately report on their total greenhouse gas emissions (including across the full life-cycle of their products). Actions to mitigate the emissions in the future, including appropriate emissions reduction targets and diversification of energy sources must, also be reported. The process should be transparent and documented to fully comply with UNGP-BHR Principles 20-21.[416]

Further, following Principle 22, when, through the conduct of human rights due diligence, a business enterprise is discovered to have caused or contributed to an adverse climate-related human rights impact, a remediation mechanism or process which is accessible, predictable, transparent, and legitimate must be made available. This may be through internal remediation mechanisms or other legal processes.

## 2. Corporate Financial Disclosure Requirements

The UNGP Reporting Framework of "knowing and showing" human rights due diligence requirements must comply with the highest standards of transparency. Transparency in financial reporting will allow shareholders, investors, and other stakeholders to engage companies to mitigate adverse impacts on human rights and the climate system.

416 Joint Summary of Amicus Curiae, *supra* note 61.

Climate-related financial disclosures "could promote more informed investment, credit, and insurance underwriting decisions" and "help financial market participants understand their climate-related risks."[417] Climate-related financial disclosures can

> help build consideration of the effects of climate change into routine business and financial decisions, and their adoption can help companies demonstrate responsibility and foresight. Better disclosure will lead to a more informed and more efficient capital allocation and help facilitate the transition to a more sustainable, lower-carbon economy.[418]

The Commission supports the recommendation that business enterprises disclose their: a) governance regarding climate-related risks and opportunities (governance); b) actual and potential impacts of climate-related risks and opportunities on the organization's business strategies and financial planning (strategy); c) identification, assessment, and management of climate-related risks (risk management); and d) metrics and targets used to assess and manage relevant climate-related risks and opportunities (metrics and targets).[419] In addition, business enterprises must quantify and disclose the following: a) risks from physical impacts of climate change; b) risks from transitioning to low to zero-carbon economies, including the possibility of stranded assets; and c) associated litigation risks.

## 3. Principles on Climate Change Obligations of Enterprises

More specific than the UNGP-BHR and specifically crafted to guide enterprises on their corporate responsibilities vis-a-vis climate change, experts in international, environmental, tort, human rights, and corporate law have formulated the Principles on Climate Change Obligation of Enterprises (EP). The EP is based on the interpretation of current international law as it stands or will likely develop.[420] Most notably, it directs businesses to take the following measures, among others:

---

417 Financial Stability Board, Proposal for a Disclosure Task Force on Climate-Related Risks (2015) (citing Task Force on Climate-Related Financial Disclosures, Recommendations of the Task Force on Climate-related Financial Disclosure (2017)).

418 Letter *from* Michael R. Bloomberg, Chair, Task Force on Climate-Related Financial Disclosures, *to* Mr. Randal K. Quarles, Chair, Financial Stability Board (Sep. 22, 2020) (citing Task Force on Climate-related Financial Disclosures, 2020 Status Report (2020)).

419 Bernd Kasemir & Manuela Huck-Wettstein, What Is the TCFD and Why Is It Important, Sustainerv.com (2021) *available at* https://sustainserv.com/en/insights/what-is-the-tcfd-and-why-is-it-important/.

420 Climate Principles for Enterprises, *available at* https://climateprinciplesforenterprises.org/about/ (last accessed Oct. 23, 2021).

1. Reduce their GHG emissions to, at the minimum, the percentage required under the Oslo Principles or a country's permissible quantum (Principle 2);
2. Ensure that all entities within its direct or indirect control comply with its obligations to reduce GHG emissions (Principle 6);
3. Undertake GHG reducing measures that incur no relevant additional costs like switching from fossil fuel-based energy sources to renewable energy sources, eliminating excessive energy consumption, using more efficient transport (Principle 7.1) and "take all measures to improve the energy efficiency of its products and services as can be taken without incurring relevant additional costs" (Principle 7.2);
4. Take measures to reduce GHG emissions if the additional costs will, "beyond reasonable doubt, be offset by future financial savings or gains" (Principle 8);
5. Avoid activities that "will or are likely to cause excessive GHG emissions, including, for example, operating coal-fired power plants, without taking countervailing measures." (Principle 9.1)
6. Avoid creating products, including packaging, that cause excessive GHG emissions, or render services that cause excessive GHG emissions, without taking into consideration countervailing measures." (Principle 10.1)

## 4. Responsibility of Financial Institutions

In 2003, private financial institutions adopted the Equator Principles, a framework for determining, assessing, and managing environmental and social risks in project finance, frequently used for major infrastructure and industrial projects.[421] The Equator Principles require financial institutions to refuse loans to borrowers who will not or cannot follow their respective social and environmental policies and processes.[422] Although the principles are not legally binding, they have become an industry standard and are frequently referred to as good practice.[423]

421 The Equator Principles (2020), *available at* https://equator-principles.com/ (last accessed Aug. 21, 2021) [hereinafter The Equator Principles].

422 *Id.*

423 *Id.*

### 5. Compliance with State Regulations Regarding Climate Change

Lastly, enterprises must comply, cooperate, and not hinder State regulations involving climate change and human rights. This is in accordance with the responsibility laid out in the UNGP-BHR, which provides that:

> In all contexts, business enterprises should:
>
> 1. Comply with all applicable laws and respect internationally recognized human rights, wherever they operate;
> 2. Seek ways to honour the principles of internationally recognized human rights when faced with conflicting requirements;
> 3. Treat the risk of causing or contributing to gross human rights abuses as a legal compliance issue wherever they operate.[424]

Hence, enterprises must comply with the Nationally Determined Commitments of States who are parties to the Paris Agreement and, in general, comply with the targets set by science such as those provided by the IPCC as previously discussed.

# VIII. Carbon Majors in the Context of Climate Change

## *A. Anthropogenic Contributions to Climate Change is Quantifiable and Substantial*

The IPCC AR5 attributes climate change predominantly to anthropogenic increases in GHG concentrations.[425] It states that more than half of the increase in global mean surface temperature (GMST) from 1951 to 2010 is very likely due to such an increase in anthropogenic GHG concentrations.[426] It also observed that the atmospheric concentration of carbon dioxide, methane, and nitrous oxide has increased to unprecedented levels in at least the last 800,000 years. Carbon dioxide concentrations, primarily from fossil fuel emissions, have increased by 40 percent since pre-industrial times and about 30 percent

424 UNGP-BHR, *supra* note 313 (Principle 23).

425 IPCC AR5 WG1 at 60 & 869.

426 *Id.* at 869.

of this emitted carbon dioxide was absorbed by the ocean, causing ocean acidification.[427] The IPCC AR5 also singled out the increase in atmospheric carbon dioxide as the largest contributor to total positive radiative forcing (RF).[428] RF quantifies the change in energy fluxes caused by changes in natural and anthropogenic substances and processes that alter the earth's energy budget for 2011 relative to 1750. Positive RF leads to surface warming while negative RF, leads to cooling.[429]

Significantly, the IPCC AR5 reported that from 1750 to 2011, carbon dioxide emissions from fossil fuel combustion and cement production have released 375 [345 to 405] gigatons of carbon (GtC) into the atmosphere.[430] As 1 GtC equals 3.67 $GtCO_2$, this translates to approximately 1.376.25 [1,266.15 to 1,486.35] $GtCO_2$ of global emissions.

Published and peer-reviewed studies[431] and updates[432] thereon (collectively, The Carbon Majors Study) presented to the Commission by its author[433] found that roughly 368 $GtCO_2e$ or 21.4 percent of these global emissions from fossil fuel combustion and cement production were from products sold by the Carbon Majors. It must, however, be stated that the study, updated as of 2016, did not use the global emissions data from the IPCC, but rather used the Carbon Dioxide Information Analysis Center's (CDIAC) data listing 1,545 GtCO2 emissions from 1751 to 2016 in a study covering the period from 1854 to 2016.

The climate model used in their analysis was based on the impulse response function approach presented in IPCC AR5, and covered the periods from 1880 to 2010 and 1980 to 2010. The study reported the following:

---

427 IPCC AR5 WG1, at 11.

428 *Id.* at 13.

429 *Id.*

430 *Id.* at 12.

431 *See* Exhibit VVVV to VVVV-14, Tracing Anthropogenic Carbon Dioxide and Methane Emissions to Fossil Fuel and Cement Producers, 1854-2010; Exhibit UUUU to UUUU-103, Carbon Majors; Accounting for Carbon and Methane Emissions 1854-2010 Methods and Results Report; Exhibit WWWW to WWWW-9, Supplementary Materials.

432 *See* Exhibit D, Updated Details of Carbon Major Publications; Exhibit TTTT to TTTT-1, Climate Accountability Institute, Press Release on Update of Carbon Majors Project.

433 T.S.N. of the Third Inquiry Hearing dated 29-30 August 2018, pp.53-86; *See* Exhibit QQQQ to QQQQ-11, Profile and Statement of Richard Heede dated 7 August 2018; Exhibit RRRR to RRRR-5, Curriculum Vitae of Richard Heede; Exhibit SSSS to SSSS-11, Printed PowerPoint Presentation of Richard Heede, Climate Accountability Institutes' work to quantify the contributions of carbon producers to climate change and climate change damages.

1. "Emissions traced to the 90 largest carbon producers contributed approximately 57 percent of the observed rise in atmospheric carbon dioxide, nearly 50 percent of the rise in global average temperature, and around 30 percent of global sea level rise between 1880-2010;"[434]
2. Emissions linked to the Carbon Majors "were responsible for roughly 16 percent of the global average temperature increase from 1880 to 2010, and around 11 percent of the global sea level rise during the same time frame;"[435] and
3. Emissions tied to the Carbon Majors "from 1980 to 2010, a time when fossil fuel companies were aware their products were causing global warming, contributed approximately 10 percent of the global average temperature increase and about 4 percent sea level rise."[436]

## *B. The Carbon Majors Had Early Awareness, Notice, or Knowledge of their Products' Adverse Impacts on the Environment and Climate System*

Petitioners allege that the fossil fuel industry already had actual knowledge of the harms resulting from the extraction, sale, and use of their products in the 1960s, if not earlier. Petitioners presented: 1) copies of internal documents[437] from the

434 Exhibit R to R-8, Profile and statement of Peter Frumho f, PhD, dated 16 March 2018, at 4.

435 *Id.* at 5.

436 *Id.*

437 Exhibit NN to NN-3, Exxon Research and Engineering Company (Corporate Research Science Laboratories) dated 2 September 1982; Exhibit OO to OO-11, Inter-Office Correspondence dated 31 October 1977 (Re: Environmental Effects of Carbon Dioxide); Exhibit FFF to FFF-30, American Petroleum Institute Medical Advisory Committee 28th Meeting (1959); Exhibit GGG to GGG-74, Energy Resources (A Report to the Committee on Natural Resources) dated December 1962; Exhibit HHH to HHH-13, Final Report (Sources, Abundance and Fate of Gaseous Atmospheric Pollutants) prepared for the American Petroleum Institute (1968); Exhibit III to III-40, Supplemental Report (Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants) prepared for the American Petroleum Institute dated June 1969; Exhibit JJJ to JJJ-215, Environmental Conservation (The Oil and Gas Industries/Volume Two) by National Petroleum Council dated February 1972; Exhibit KKK to KKK-16, Exxon Research and Engineering Company Letter to Mr. Turpin dated 6 June 1978; Exhibit LLL to LLL-20, Review of Environmental Protection Activities for 1978-1979 (Imperial Oild Limited); Exhibit MMM to MMM-1, Exxon Research and Engineering Company Letter to Mr. Natkin dated 2 September 1982; Exhibit NNN to NNN-45, The Greenhouse Effect (Prepared for Shell Environmental Conservation Committee) dated May 1988 (completion of the study on April 1986); Exhibit JJJJJ to JJJJJ-5, Accomplishment in Air Pollution Control by the Petroleum Industry by Dr. Jerry McAfee dated 15 November 1958; Exhibit KKKKK to KKKKK-33, The Greenhouse Effect, J.F. Black, Products Research Division, Exxon Research and Engineering Co.

fossil fuel industry, including the Carbon Majors; 2) publications[438] compiling these and similar internal documents;[439] 3) a peer-reviewed study[440] analyzing the internal communications of one particular carbon major;[441] and 4) early scientific publications on carbon dioxide[442] and a publication on the fossil industry's early knowledge.[443]

Scientists, including those under the employ of the Carbon Majors, already knew about the harms that carbon dioxide from fossil fuels posed on the climate as early as the 1930s, with 1965 being the latest year that the fossil fuel industry can claim ignorance of such knowledge.

In November 1965, the government of the United States of America published "Restoring the Quality of our Environment," a report submitted to President Lyndon Johnson by the President's Science Advisory Committee. The report warned that carbon dioxide from

---

dated 6 June 1978; Exhibit LLLLL to LLLLL-1, CO2 Position Statement dated 15 May 1981 with attached Preliminary Statement of Exxon's Position of the Growth of Atmospheric CO2; Exhibit AAAAAAA to AAAAAAA-1, Climate Files Post Index prepared by Climate Investigations Center with links to copies of the actual documents; & *See* TSN of the Fourth Inquiry Hearing dated 27-28, 2018, at 82-4.

438 Exhibit K, Smoke and Fumes: The Legal and Evidentiary Basis for Holding Big Oil Accountable for the Climate Crisis (Center for International Environmental Law) dated November 2017; Exhibit QQ to QQ-28, The Climate Deception Dossiers (Internal Fossil Fuel Industry Memos Reveal Decades of Corporate Disinformation) by Union of Concerned Scientists; Exhibit IIII to IIII-15, A Crack in the Shell (New Documents Expose a Hidden Climate History) by the Center for International and Environmental Law dated April 2018.

439 T.S.N. of the First Inquiry Hearing dated 27-28 March 2018, Testimony of Lisa Hamilton, at 181-217; T.S.N. of the Second Inquiry Hearing dated 23-24 May 2018, Testimony of Carrol Muffett, at 12-28; T.S.N. of the Fourth Inquiry Hearing dated 27-18 September 2018, Testimony of Kert Davies, at 63-84.

440 Exhibit J, Assessing ExxonMobil's Climate Change Communications (1977-2014) dated 23 August 2017.

441 T.S.N. of the Third Inquiry Hearing dated 29-30 August 2018, Testimony of Geoffrey Supran, at 124-45.

442 Exhibit UU to UU-21, On the influence of Carbonic Acid in the Air upon the Temperature of the Ground by Svante Arrhenius dated April 1896; Exhibit VV to VV-8, The Artificial Production of Carbon Dioxide and its Influence on Temperature by G.S. Callendar dated 16 February 1938; Exhibit WW to WW-9, On the Coefficients of Absorption of Nitrogen and Oxygen in Distilled Water and Seawater, and of the Atmospheric Carbonic Acid in Seawater by Charles J.J. Fox dated 27 April 1909; Exhibit XX to XX-20, An Attempt to Frame a Working Hypothesis of the Cause of Glacial Period on an Atmospheric Basis by T.C. Chamberlin dated September-October 1899; Exhibit YY to YY-7, Radiocarbon Evidence on the Dilution of Atmospheric and Oceanic Carbon by Carbon from Fossil Fuels by H.R. Brannon, et. al., dated October 1957; Exhibit ZZ to ZZ-5, A Review of the Air Pollution Research Program of the Smoke and Fumes Committee of the American Petroleum Institute by Charles A. Jones, dated May 1958; Exhibit AAA to AAA-3, The Petroleum Industry Sponsors Air Pollution Research by Vance N. Jenkins dated February 1954.

443 Exhibit BBBBBBBBB to BBBBBBBBB-1, Early Oil Industry Knowledge of CO2 and Global Warming by Ben Franta dated 19 November 2018.

fossil fuels would cause warming of the earth's surface, melting the Antarctic ice cap, rising sea levels, warming of sea water, increased acidity of fresh water, and increasing photosynthesis. Part of its conclusion states:

> Through his worldwide industrial civilization, Man is unwittingly conducting a vast geophysical experiment. Within a few generations he is burning the fossil fuels that slowly accumulated in the earth over the past 500 million years. The $CO_2$ produced by this combustion is being injected into the atmosphere; about half of it remains there. The estimated recoverable reserves of fossil fuels are sufficient to produce nearly a 200% increase in the carbon dioxide content of the atmosphere.
>
> By the year 2000 the increase in atmospheric $CO_2$ will be close to 25%. This may be sufficient to produce measurable and perhaps marked changes in climate, and will almost certainly cause significant changes in the temperature and other properties of the stratosphere. At present it is impossible to predict these effects qualitatively, but recent advances in mathematical modelling of the atmosphere, using large computers, may allow useful predictions within the next 2 or 3 years.[444]

It is reasonable to charge the fossil fuel industry with actual knowledge or notice of this very important publication from the White House.

In fact, days after the presentation of the report by the United States President's Science Advisory Committee to President Johnson, and even before its publication, then President of the American Petroleum Institute (API), Frank Ikard, in a speech delivered during the 45th Annual Meeting of the API, called on its members to study the report. He said:

> The fact that our industry will continue to be confronted with problems of air and water conservation for many years to come is demonstrated by the massive report of the Environmental Pollution Panel of the President's Science Advisory Committee, which was presented to President Johnson over the weekend.
>
> This report unquestionably will fan emotions, raise fears, and bring demands for action. The substance of the report is that there is still

444 The Environmental Pollution Panel President's Science Advisory Committee, Restoring the Quality of our Environment, 126-127 (1965) from Exhibit AAAAAAA to AAAAAAA-1, Climate Files Post Index prepared by Climate Investigations Center with links to copies of the actual documents, *available at* http://www.climatefiles.com/climate-change-evidence/presidents-report-atmospher carbon-dioxide/ (last accessed Mar. 5, 2020).

> time to save the world's peoples from the catastrophic consequences of pollution but time is running out.
>
> One of the most important predictions of the report is that carbon dioxide is being added to the earth's atmosphere by the burning of coal, oil, and natural gas at such a rate that by the year 2000 the heat balance will be so modified as possibly to cause marked changes in climate beyond local or even national efforts. x x x
>
> x x x
>
> There are more than 100 recommendations in this sweeping report, and I commend it to your study. Implementation of even some of them will keep local, state, and federal legislative bodies, as well as the petroleum and other industries, at work for generations.[445]

The API then commissioned the Stanford Research Institute to make a comprehensive report on gaseous atmospheric pollutants. In 1968, the latter issued a final report, entitled "Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants." This final report referenced and adopted *in toto* the findings of the President's Science Advisory Committee. It concluded that the "past and present studies of $CO_2$ are detailed and seem to explain adequately the present state of $CO_2$ in the atmosphere. What is lacking, however, is an application of these atmospheric $CO_2$ data to air pollution technology and work toward systems in which would be brought under control."[446]

The API again commissioned the same institute to make a supplemental report to the earlier study. In 1969, the Stanford Research Institute released the supplement, this time omitting some of the significant findings in the 1965 report made by the President's Science Advisory Committee, including the melting of the Antarctic ice caps, rise of sea level, warming of sea water, increased acidity of fresh water, and increase in photosynthesis. It still, however, maintained that "on the basis of our present knowledge, significant temperature changes could be expected to occur by the year 2000 as a result of increased $CO_2$ in the atmosphere. These could bring about long term climatic changes."[447]

---

445 Frank Ikard, *Meeting the Challenges of 1966* (45 [I] American Petroleum Institute Proceedings 1965, 12, 13) (1965), *available at* http://www.climatefiles.com/trade-group/american-petroleum institute/1965-api-president-meeting-the-challenges-of-1966/ (last accessed Mar. 5, 2020); *See* Exhibit BBBBBBBBB to BBBBBBBBB-1, Early Oil Industry Knowledge of CO2 and Global Warming by Ben Franta dated 19 November 2018.

446 Exhibit HHH to HHH-13, Final Report (Sources, Abundance and Fate of Gaseous Atmospheric Pollutants) prepared for the American Petroleum Institute (1968), at 112.

447 Exhibit III to III-40, Supplemental Report (Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants) prepared for the American Petroleum Institute dated June 1969, at 24.

While it downplayed some of the effects of atmospheric $CO_2$, it still concluded that "it is rather obvious that we are unsure as to what our long lived pollutants are doing to our environment; however, there seems to be no doubt that the potential damage to our environment could be severe."[448] From then on, as the documents submitted to the Commission show, many of the Carbon Majors' own scientists not only affirmed the findings of the US President's Science Advisory Committee's report throughout the succeeding years, but the Carbon Majors themselves also began to acquire much more detailed knowledge and extent of the climate risks associated with carbon dioxide from fossil fuels, including everything that we already know today.

All these demonstrate that the Carbon Majors have known since 1965 that their products, when used as intended, result in various harms to the climate system.

## C. Willful Obfuscation of Climate Science and Obstruction of Global Initiatives toward Decarbonization

The fossil fuel industry, including the Carbon Majors, engaged in measures to convince the public that the use of their products would not lead to significant harms. This was done through a combination of actions, the most notable of which are mentioned below.

Through the API, the industry perpetrated massive climate denial campaigns. In 1996, the API published a book, entitled *Reinventing Energy: Making the Right Choices*, which attempted to show that "when facts–not commonly held misconceptions–are used, there is no persuasive basis for forcing Americans to dramatically change their lifestyles to use less oil."[449] In arguing for government inaction and discouraging the further development of alternative energy sources, contrary to the findings in all the studies it commissioned over the years, it deceptively stated that:

> Currently, no conclusive–or even strongly suggestive–scientific evidence exists that human activities are significantly affecting sea levels, rainfall, surface temperatures or the intensity and frequency of storms. After all, a conclusion that the global climate is changing as a result of human activity would require much more scientific

448 *Id.* at 25.

449 American Petroleum Institute, Reinventing Energy: Making the Right Choices, 2 (1965) from Exhibit AAAAAAA to AAAAAAA-1, Climate Files Post Index prepared by Climate Investigations Center with links to copies of the actual documents, *available at* http://www.climatefiles.com/trade-group/american-petroleum-institute/1996 reinventing-energy/ (last accessed Mar. 5, 2020).

> knowledge about the entire earth system that exists today. Scientific inquiry has to include natural, geophysical and geochemical cycles responsible for the changing concentrations of atmospheric gases, the systems of winds, the patterns of ocean currents, and the changing weather (including rain, evaporation and clouds), as well as the role of humans and every other plant, animal and biological form of life on earth.[450]

In 1998, the API prepared a "Global Climate Science Communications Action Plan,"[451] which enumerated the strategies and tactics it will employ to undermine the Kyoto Protocol and climate science. Three (3) of its major strategies are as follows:

1. "National Media Relations Program: Develop and implement a national media relations program to inform the media about uncertainties in climate science; to generate national, regional and local media coverage on the scientific uncertainties, and thereby educate and inform the public, stimulating them to raise questions with policy makers;"[452]
2. "Global Climate Science Information Sources: Develop and implement a program to inject credible science and scientific accountability into the global climate debate, thereby raising questions about and undercutting the 'prevailing scientific wisdom.' The strategy will have the added benefit of providing a platform for credible, constructive criticism of the opposition's position on the science;"[453]
3. "National Direct Outreach and Education: Develop and implement a direct outreach program to inform and educate members of Congress, state officials, industry leadership, and school teachers/ students about uncertainties in climate science. This strategy will be able to raise such serious questions about the Kyoto treaty's scientific underpinnings that American policy-makers not only will refuse to endorse it, they will seek to prevent progress toward implementation at the Buenos Aires meeting in November or through other ways. Informing teachers/students about uncertainties in climate action will

450 *Id.* at 79.

451 Global Climate Science Communications Action Plan dated 3 April 1998 from Exhibit AAAAAAA to AAAAAAA-1, Climate Files Post Index prepared by Climate Investigations Center with links to copies of the actual documents, *available at* http://www.climatefiles.com/trade-group/american-petroleum institute/1998-global-climate-science-communications-team-action-plan/ (last accessed Mar. 5, 2020).

452 *Id.* at 4.

453 *Id.* at 5.

> begin to erect barriers against future efforts to impose Kyoto-like measures in the future."[454]

Chillingly, it declared that "victory will be achieved when average citizens 'understand' (recognize) uncertainties in climate science; recognition of uncertainties becomes part of the 'conventional wisdom'"[455] and "those promoting the Kyoto treaty on the basis of extant science appear to be out of touch with reality."[456]

From the testimonies of various resource persons and documents submitted in the course of the inquiry, the Commission is of the opinion that the strategies described in the communications action plan were actually deployed, politicians were funded, and front groups were created to oppose regulations under the guise of grassroots support.
Evidence was also presented, proving the coal industry's history of misleading the public about climate science. In 1991, for example, coal companies formed the Information Council on the Environment (ICE), which launched a national campaign to

> disparage climate science and cherry-pick the data to highlight claims of cooling temperatures to confuse the public. Print and radio ads presented climate science as alarmist and out of touch with reality.[457]

ICE's internal documents show that their campaigns sought to target: 1)"older, less-educated males from larger household, who are not typically active information seekers," and 2) "younger, low-income women."[458] In the same year as it was formed, ICE's devious aims were quickly uncovered by the press and its activities terminated.

The coal industry sent forged letters, appropriating letterheads from respected constituent groups representing minorities, seniors, and women, to members of Congress to influence the votes on the American Clean Energy and Security Act of 2009, which proposed to institute a federal carbon emissions reduction plan. A congressional investigation on the matter "revealed that the fraud was perpetrated by a lobbying firm subcontracted

---

454 *Id.* at 6.

455 *Id.* at 1.

456 *Id.*

457 Exhibit QQ, The Climate Deception Dossiers (Internal Fossil Fuel Industry Memos Reveal Decades of Corporate Disinformation) by Union of Concerned Scientists, at 19.

458 ICE Benchmark Survey from Exhibit AAAAAAA to AAAAAAA-1, Climate Files Post Index prepared by Climate Investigations Center with links to copies of the actual documents, *available at* http://www.climatefiles.com/denial-groups/ice-campaign-plan (last accessed Mar. 5, 2020).

by a front group called the American Coalition for Clean Coal Electricity (ACCCE),"[459] which counts some of the Carbon Majors among its members.

These campaigns were not confined to the United States, but were also conducted at the international plane, particularly through the efforts of the Global Climate Coalition (GCC), an organization of business trade associations, such as the API, including many of the Carbon Majors. It claimed to be "the leading voice for industry on the global climate change issue, and represents its members both internationally and domestically before government agencies, Congress, the media and the general public."[460] Internally, the GCC members acknowledged that "the scientific basis for the Greenhouse Effect and the potential impact of human emissions of greenhouse gases such as $CO_2$ on climate is well-established and cannot be denied."[461] This fact is reflected in a 1995 final draft Climate change Primer created by Lenny Bernstein of Mobil Corporation and circulated to all its members.[462] Yet, in 1996, it actively campaigned to undermine the IPCC Second Assessment Report (IPCC AR2), specifically the IPCC's conclusion about the human contribution to global warming. The GCC wrongly accused IPCC scientists of revising the IPCC AR2 without authorization. The GCC's strategy of attacking scientists was well documented and continued until the third IPCC assessment report.[463]

The Carbon Majors, through individual efforts, also sowed doubt and misinformation about climate change. One of the most documented efforts of obfuscation is that perpetrated by ExxonMobil. A 2017 peer-reviewed study of 187 climate change communications, including peer-reviewed and non-peer-reviewed publications, internal company documents, and paid editorial-style advertisements in The New York Times, produced by ExxonMobil between 1977 to 2014, concluded that ExxonMobil misled the general public. It found that 83 percent of ExxonMobil's peer-reviewed papers and 80 percent of its internal documents acknowledged that climate change is real and human-caused. Yet, only 12 percent of its

459 Exhibit QQ, The Climate Deception Dossiers (Internal Fossil Fuel Industry Memos Reveal Decades of Corporate Disinformation) by Union of Concerned Scientists, at 16-17.

460 Global Climate Coalition: An Overview, at 1 from Exhibit AAAAAAA to AAAAAAA-1, Climate Files Post Index prepared by Climate Investigations Center with links to copies of the actual documents, *available at* http://www.climatefiles.com/denial-groups/global-climate-coalition-collection/1996 global-climate-coalition-overview/ (last accessed Mar. 5, 2020).

461 Approval Draft, Predicting Future Climate Change: A Primer, at 1 from Exhibit AAAAAAA to AAAAAAA-1, Climate Files Post Index prepared by Climate Investigations Center with links to copies of the actual documents, *available at* http://www.climatefiles.com/denial-groups/global-climate coalition-collection/global-climate-coalition-draft-primer/ (last accessed on Mar. 5, 2020).

462 *Id.*

463 Exhibit K, Smoke and Fumes: The Legal and Evidentiary Basis for Holding Big Oil Accountable for the Climate Crisis (Center for International Environmental Law) dated November 2017, at 16-7.

advertisements acknowledge climate change, while 80 percent of advertisements expressed doubt. As documents become more publicly accessible, ExxonMobil increasingly communicated doubt, which reflected the Scientific Certainty Argumentation Method (SCAM), a tactic for undermining public understanding of scientific knowledge.[464]

From the foregoing, the Commission agrees that the Carbon Majors, directly by themselves or indirectly through others, singly and/or through concerted action, engaged in willful obfuscation of climate science, which has prejudiced the right of the public to make informed decisions about their products, concealing that their products posed significant harms to the environment and the climate system. All these have served to obfuscate scientific findings and delay meaningful environmental and climate action.

An argument may be made under Philippine law that the acts of obfuscation, deception, and misinformation as described above contravene the standard of honesty and good faith expected of a person in the exercise of his rights. Articles 19 and 21 of the Civil Code of the Philippines[465] provide:

> ARTICLE 19**.** Every person must, in the exercise of his rights and in the performance of his duties, act with justice, give everyone his due, and observe honesty and good faith.
>
> x x x
>
> ARTICLE 21. Any person who willfully causes loss or injury to another in a manner that is contrary to morals, good customs or public policy shall compensate the latter for the damage.

## Other Possible Bases of Liability

Aside from liability anchored on acts of obfuscation of climate science, fossil-based companies may also be held to account by their shareholders for continued investments on oil explorations for largely speculative purposes. Such reserves may, in the global march towards renewable energy, end up as stranded assets. Failure to comply with specific administrative or regulatory requirements, such as those in the nature of exacting transparency in business operations, may also be basis for establishing liability.

464 Exhibit J, Assessing ExxonMobil's Climate Change Communications (1977-2014) dated 23 August 2017.

465 An Act to Ordain and Institute the Civil Code of the Philippines [Civil Code], Republic Act No. 386 (1949) §§ 19 & 21.

There may be more glaring bases of legal liability for fossil fuel companies. Here we cite the case of *Kiobel v. Royal Dutch Petroleum Co.*,[466] where an oil company was implicated, in complicity with State agents, for extra-judicial killings and other human rights violations committed against community leader who opposed the laying of oil pipelines within their village. The case, however, was settled, also extra-judicially.

### Continuing Climate Denial

The Commission sadly notes that, to this date, climate change denial and efforts to delay the global transition from fossil fuel dependence still persists. Sadder still is that these obstructionist efforts are driven, not by ignorance, but by greed. Fossil fuel enterprises continue to fund the electoral campaigns of politicians, with the intention of slowing down the global movement towards clean, renewable energy.

## *D. The Carbon Majors Have the Corporate Responsibility to Undertake Human Rights Due Diligence and Provide Remediation*

For the Carbon Majors within Philippine jurisdiction, they may be compelled to undertake human rights due diligence and to provide remediation.

### 1. The UNGP-BHR may be Resorted to for Exacting Standards of Responsibility for Corporations within Philippine Jurisdiction

The non-binding nature of the UNGP-BHR under international law notwithstanding, some of the principles enunciated therein may individually be considered under Philippine domestic law as constitutive of generally accepted principles of international law. Article II, Section 2 of the Philippine Constitution states that, "The Philippines… adopts the generally accepted principles of international law as part of the law of the land and adheres to the policy of peace, equality, justice, freedom, cooperation, and amity with all nations." Philippine jurisprudence provides for a wide latitude of what constitutes generally accepted principles of international law that are automatically

466 Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108 (2013).

incorporated into statutory law, including non-binding international instruments, such as the UDHR.

The UDHR, for example, is a resolution and not a treaty. Thus, during its adoption by the United Nations General Assembly in 1948, it was not considered as a binding instrument.[467] Yet, in 1951 or merely three years after its adoption, and long before the UDHR was recognized by the international community to have achieved the status of customary international law, the Supreme Court in the landmark case of *Mejoff v. Director of Prisons*, adopted the UDHR through the incorporation clause of the 1935 Constitution, to wit:

> Moreover, by its Constitution (Art. II, Sec. 3) the Philippines "adopts the generally accepted principles of international law as part of the law of Nation." And in a resolution entitled "Universal Declaration of Human Rights" and approved by the General Assembly of the United Nations of which the Philippines is a member, at its plenary meeting on December 10, 1948, the right to life and liberty and all other fundamental rights as applied to all human beings were proclaimed. It was there resolved that "All human beings are born free and equal in degree and rights" (Art. 1); that "Everyone is entitled to all the rights and freedom set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, nationality or social origin, property, birth, or other status" (Art. 2): that "Everyone has the right to an effective remedy by the competent national tribunals for acts violating the fundamental rights granted him by the Constitution or by law" (Art. 8); that "No one shall be subjected to arbitrary arrest, detention or exile" (Art. 9); etc.[468]

This was followed by similar pronouncements of incorporation of the UDHR as part of Philippine law in *Borovsky v. Commissioner of Immigration*,[469] *Chirskoff v. Commissioner of Immigration*,[470] and *Andreu v. Commissioner of Immigration*.[471] Admittedly, the Supreme Court, six years thereafter, recanted its adoption of the UDHR in

467 James Crawford, Brownlie's principles of public international law (8th ed.) (2012), at 636-7.

468 Boriss Mejoff v. The Director of Prisons, G.R. No. L-4254 (Sep. 26, 1951).

469 Victor Borovsky v. The Commissioner of Immigration and The Director of Prisons, G.R. No. L-4352 (Sep. 28, 951).

470 Vadim Chirskoff v. The Commissioner of Immigration and The Director of Prisons, G.R. No. L-3803 (Oct. 26, 1951).

471 Charles Andreu v. The Commissioner of Immigration and The Director of Prisons, G.R. No. L-4253 (Oct. 31, 1951).

*Ichong v. Hernandez*.[472] But it pivoted back in *Reyes v. Bagatsing*, proudly declaring that at the time when other nations merely considered the UDHR as aspirational, the Philippines had already given it binding force in its jurisdiction, thus:

> "The Philippines renounces war as an instrument of national policy, adopts the generally accepted principles of international law as part of the law of the land, and adheres to the policy of peace, equality, justice, freedom, cooperation, and amity with all nations." The Philippines can rightfully take credit for the acceptance, as early as 1951, of the binding force of the Universal Declaration of Human Rights even if the rights and freedoms therein declared are considered by other jurisdictions as merely a statement of aspirations and not law until translated into the appropriate covenants. In the following cases decided in 1951, Mejoff v. Director of Prisons, 90 Phil. 70; Borovsky v. Commissioner of Immigration, 90 Phil. 107; Chirskoff v. Commissioner of Immigration, 90 Phil. 256; Andreu v. Commissioner of Immigration, 90 Phil. 347, the Supreme Court applied the Universal Declaration of Human Rights.[473]

## 2. All Entities within the Carbon Majors' Value Chain may be Compelled to Undertake Human Rights Due Diligence and Provide Remediation

The corporate responsibility to refrain from contributing to climate change impacts that impair the full enjoyment of human rights extends not only to the whole group of companies of each Carbon Major in recognition of the enterprise theory of corporate personhood,[474] but also to all business enterprises in each of the Carbon Majors' respective value chains.[475] Accordingly, the Carbon Majors and business enterprises that cause, contribute to or are linked to adverse climate-related human rights impacts, "need to know and be able to show" that they respect human rights.[476] This they can do by undertaking a human rights due diligence process as set forth in Principles 16 to 21 of the UNGP-BHR.

472 Lao Ichong, in his own behalf and in behalf of other alien residents, corporations and partnerships adversely affected by Republic Act No. 1180 v. Jaime Hernandes, et. al., G.R. No. L-7995 (May 31, 1957).

473 Jose B.L. Reyes, in behalf of the Anti-Bases Coalition (ABC) v. Ramon Bagatsing, as Mayor of Manila, G.R. No. L-65366 (Nov. 9, 1983), n. 34.

474 *See Amicus Curiae* Brief of ClientEarth, *supra* note 27, at 47-49.

475 UNGP-BHR, *supra* note 313 (Principle 13).

476 *Id.* (Principle 15).

Michael Addo, a member of the United Nations Working Group on Business and Human Rights, explains that:

> it is through human rights due diligence that any enterprise can understand the exact nature of the harm and its contribution to harm. In this case, its contribution to climate change, and so define exactly how each enterprise can prevent, mitigate or remedy any harms. Not knowing your role, contribution, of course, means you are unable to address the harm. Due diligence, therefore, is the key to corporate respect for human rights.[477]

Furthermore, if through the due diligence process or other means, it is found that a business enterprise has caused or contributed to adverse human rights impacts, it would be incumbent upon such business enterprise to provide for or cooperate in the remediation of the adverse human rights impacts as mandated by Principle 22 of the UNGP-BHR:

> Remediation and remedy refer to both the processes of providing remedy for an adverse human rights impact and the substantive outcomes that can counteract, or make good, the adverse impact. These outcomes may take a range of forms, such as apologies, restitution, rehabilitation, financial or non-financial compensation, and punitive sanctions (whether criminal or administrative, such as fines), as well as the prevention of harm through, for example, injunctions or guarantees of non-repetition.[478]

Business enterprises, including their value chains, doing business in, or by some other reason within the jurisdiction of, the Philippines, may be compelled to undertake human rights due diligence and held accountable for failure to remediate human rights abuses arising from their business operations.

## *E. Global Dependence on Fossil Fuels*

Latest data[479] show that fossil fuels hold the largest share in the global energy mix at 83.13 percent of total. Oil, coal, and natural gas amount to 31.21 percent, 27.20 percent, and

477 T.S.N. of the Second Inquiry Hearing dated 23-24 May 2018, at 157.

478 United Nations Human Rights Office of the High Commissioner, *The Corporate Responsibility to Respect Human Rights: An Interpretative Guide*, HR/PUB/12/02 (2012) at 8.

479 Hannah Ritchie, Max Roser & Pablo Rosado, Energy (2020), *available at*

24.72 percent, respectively. There has been a decrease in the use of oil and coal by 7 percent since the Paris Agreement in 2015, and an increase in the use of natural gas by 7 percent.

On the other hand, renewable energy (hydro, wind, solar, geothermal, biomass, waste to energy) amounted to 12.55 percent of the energy mix. This represents an increase of 28 percent since 2015. Nuclear power supplied 4.31 percent of the mix.

The share of renewables in the energy mix in the US amounts to only 9.93 percent, with most of the energy sourced from oil (37.06 percent), natural gas (34.12 percent), and coal (10.38 percent).

China sources a massive 56.56 percent of its primary energy from coal, with 19.59 percent from oil, 13.43 percent from renewables, and 8.18 percent from natural gas. Europe is the leader in renewables, with 19.13 percent of their energy mix coming from green sources, with 33.8 percent from oil, 25.25 percent from gas, and 12.18 percent from coal. The Asia Pacific region sources its primary energy mostly from coal at 47.77 percent of the energy mix, with 26.33 percent from oil, 12.25 percent from gas, and only 11.36 percent from renewables. Africa is highly dependent on fossil fuels, sourcing 38.67 percent from oil, 29.63 percent from natural gas, 22.11 percent from coal, and only 8.85 percent from renewables. The Philippines is also highly dependent on fossil fuels, sourcing 41.01 percent from oil, 39.88 percent from coal, 7.58 percent from natural gas, and only 10.52 percent from renewables.

Globally, renewables represent only 12.55 percent of the total energy mix, which is a 28 percent increase from 2015 to 2020.

While science is clear on the adverse effects of fossil fuels, the present global energy mix shows that our supply of clean, renewable energy is not yet of sufficient scale to effectively replace carbon-based fuel.

The challenge that confronts us, therefore, is to hasten the transition of the global economy towards clean energy. And all acts to obfuscate climate science and delay, derail, or obstruct this transition may be bases for liability. At the very least, they are immoral. States may, as part of their duty to human rights, enact and/or enforce laws to overcome these kinds of undertakings and hold parties accountable for them.

---

https://ourworldindata.org/energy [hereinafter Ritchie, Roser, & Rosado 2020].

The inflection point has already been reached in favor of renewable energy. Globally, although renewables represent only 12.55 percent of the total energy mix, it reflected a significant increase of 28 percent from 2015 to 2020. Soon, renewable energy would be a sufficient alternative to fossil fuel for powering the global economy. The use of fossil fuel which is harmful to the climate and environment and a threat to life and other human rights will then be proscribed, from whence its extraction, processing, and marketing shall be deemed as a human rights abuse and an illegal act as well.

# IX. Recommendations

## *A. General*

Despite science telling us that even an increase in global temperature of 1.5°C above pre-industrial level will significantly harm natural and human systems, we are far from "holding the increase in the global average temperature to well below 2°C above pre-industrial levels and pursuing efforts to limit the temperature increase to 1.5°C above pre-industrial levels."[480] While more and more States have strengthened their commitments and increased their ambitions in addressing climate change, this is still not enough to avert catastrophic climate change in time. The latest IPCC report on Nationally Determined Contributions (NDCs) shows that, even if all current NDCs are implemented, the world will still face a 2.7°C increase in temperature by the end of the century. There is an urgent need for a significant increase in the level of ambition of NDCs between now and 2030, a significant over-achievement of the latest NDCs, or a combination of both.[481] There is a "need [for] maximum ambition from all countries on all fronts."[482]

There is a vital need for a 45 percent reduction in GHG emissions from 2010 levels by 2030 and to reach net zero emissions by 2050.[483] Political will complemented by urgent action is necessary to meet these targets, and everyone, from governments to businesses and

---

480 Glasgow Climate Pact, para. 20 (The full text of the Glasgow Climate Pact is available at https://www.msn.com/en-us/news/world/the-full-text-of-the-glasgow-climate-pact/ar-AAQFBS4) (last accessed on Apr. 25, 2022).

481 United Nations Framework Convention on Climate Change, *Nationally Determined Contributions Under the Paris Agreement: Revised Synthesis Report by the Secretariat,* FCCC/PA/CMA/2021/8/Rev.1 (2021), *available at* https://unfccc.int/sites/default/files/resource/cma2021_08r01_E.pdf (last accessed Apr. 25, 2022), paras. 15, 29, & 150.

482 Mr. António Guterres, Secretary-General, United Nations, Speech at the COP26.

483 *Id.* at 4.

individual citizens, must engage in securing a sustainable future. "[P]olitical commitment and follow-through, institutional frameworks, policies and instruments with clear goals and priorities, enhanced knowledge on impacts and solutions, mobilization of and access to adequate financial resources, monitoring and evaluation, and inclusive governance processes"[484] are all necessary to sustain climate adaptation, mitigation, and resilience actions.

The Commission agrees that, if the international community persists in its "business-as-usual" paradigm despite climate change, the diminution of fundamental rights will become the norm in many nations, or even worse. Cooperation among all duty-bearers and rights-holders is of primal importance, if we are to truly reverse the dangerous path we are on.

It the spirit of cooperation, the Commission endorses the following recommendations:

## 1. To Governments

The very nature of climate change and its worldwide impacts require States to commit to global collective action. The UNFCCC recognizes that effective climate action requires "the broadest possible cooperation by all countries, as well as their involvement in an efficient and acceptable international response in accordance with their shared yet distinct responsibilities."[485]

Ecosystems and people have substantially different vulnerabilities among and within regions due to various "patterns of intersecting socioeconomic development, unsustainable ocean and land use, inequity, marginalization, historical and ongoing patterns of inequity such as colonialism, and governance."[486] In addition, "[a]cross sectors and regions[,] the most vulnerable people and systems are observed to be disproportionately affected."[487] As climate change's consequences and risks are much more severe in low-income countries, developed countries have a special obligation and interest to aid poorer developing countries.[488]

---

484 IPCC, AR6, WGII, SPM, *supra* note 281 (Statement C.5).

485 United Nations General Assembly, *United Nations Framework Convention on Climate Change,* A/RES/48/189 (Jan. 20, 1994) (Article 2, paragraph 2 of the Paris Agreement also explicitly states that "the Agreement will be implemented to reflect equity and the principle of common but differentiated responsibilities and respective capabilities, in the light of different national circumstances").

486 IPCC, AR6, WGII, SPM, *supra* note 281 (B.2, at 13).

487 IPCC, AR6, WGII, SPM, *supra* note 281 (Statement b.1, at 11).

488 *Laudato Si*, *supra* note 304, no. 170.

Countries that have reaped the benefits of high industrialization without regard for massive GHG emissions and their effects on the environment, bear a larger share in providing solutions to the problems they have created. This is climate justice.

In order to usher in the much-needed global green industrial revolution, those in the developed world must recognize their special responsibility to help everybody else.[489] At the same time, "emerging economies, too, must go the extra mile, as their contribution is essential for the effective reduction of emissions."[490] Hence, to truly affect climate justice, global action must involve the "pooling of resources and a sharing of skills across the world."[491]

In accordance with the obligation of States to respect human rights, the Commission endorses the call to States to undertake the following:

### *i. Discourage Dependence on Fossil Fuels*

Apart from not promoting fossil fuels, States should also discourage dependence on them. Steps must be made for the eventual phase-out of all subsidies for coal-fired power plants, not merely "inefficient" subsidies, as suggested in the Glasgow Climate Pact. Additionally, more than just phasing-down, efforts must be made for the complete phase-out of coal power. Previously-granted tax breaks and subsidies in developed countries must immediately be terminated; for developing countries, concrete plans must be made for their eventual termination. As a general rule, no future tax incentives should be granted to carbon-intensive industries or corporations. States must divest from, refrain from investing in, and deny subsidies or incentives to fossil fuel-related projects or activities, as well as cease from issuing new permits therefor.

On the other hand, tax credits and other incentives for investments must be granted to renewable or clean energy technologies, such as solar, wind,

489 Mr. Boris Johnson, Prime Minister, United Kingdom, Speech at the COP 26.

490 Mr. António Guterres, *supra* note 482.

491 Mary Robinson Foundation Climate Justice, Principles of Climate Justice (2015), at 6, *available at* https://www.mrfcj.org/wp-content/uploads/2015/09/Principles-of-Climate-Justice.pdf.

hydro, geothermal, and hydrogen energy. These mus be complemented with aggressive carbon-capture measures. In addition, "[i]nnovative approaches and instruments for mobilizing finance for mitigation and adaptation from private sources"[492] must be explored.

States must require that private actors and businesses receiving grants, funding, loans, or financial assurances have decarbonization and net-zero plans, and other measures to meet the Paris Agreement's objectives and that such plans or actions are fulfilled or are on track to be met.[493]

### *ii. Collaborate on Innovative Climate Action and Guarantee that the Benefits of Science and Technology are Enjoyed by All*

As provided in the Glasgow Climate Pact, "the development, deployment and dissemination of technologies and the adoption of policies to transition towards low-emission energy systems"[494] must be accelerated, including the rapid scaling-up of "the deployment of clean power generation and energy efficiency measures."[495] Towards this end, the Commission endorses the Global Coal to Clean Power Transition Statement, including the need for the rapid scaling-up of the deployment of clean power generation, and technologies and policies "to achieve a transition away from unabated coal power generation in the 2030s (or as soon as possible thereafter) for major economies and in the 2040s (or as soon as possible thereafter) globally."[496]

The Commission echoes the recommendation of the OHCHR, to wit:

> All States should actively support the development and dissemination of new climate mitigation and adaptation technologies, including technologies for sustainable production and consumption. Environmentally clean and sound technologies should be accessibly priced, the cost of their development should be equitably shared, and their benefits should be fairly distributed between and within

492 Glasgow Climate Pact, *supra* note 480, para. 19.

493 *Id.*

494 *Id.* para. 36.

495 *Id.*

496 Global Coal to Clean Power Transition Statement (2021).

> countries. Technology transfers between States should take place as needed and appropriate to ensure a just, comprehensive and effective international response to climate change. States should also take steps to ensure that global intellectual property regimes do not obstruct the dissemination of mitigation and adaptation technologies while at the same time ensuring that these regimes create appropriate incentives to help meet sustainable development objectives. The right of indigenous peoples to participate in decision making related to and benefit[ing] from the use of their knowledge, innovations and practices should be protected.[497]

### *iii. Cooperate towards the Creation of a Legally Binding Instrument to Strengthen the Implementation of the UNGP-BHR, and Provide Redress Mechanisms for Victims of Human Rights Harms Caused by Businesses*

States "must take adequate measures to protect all persons from human rights harms caused by businesses,"[498]–including those arising from the impacts of climate change. Further international legislation that will close global governance gaps and make businesses "accountable for their climate impacts and participate responsibly in climate change mitigation and adaptation efforts with full respect for human rights"[499] is needed. This regulation must necessarily include State "activities conducted in partnership with the private sector" or "[w]here States incorporate private financing or market-based approaches to climate change within the international climate change framework."[500]

For the proposed treaty to be fully meaningful, the Commission further endorses the recommendation to include redress mechanisms and effective remedies for victims of human rights violations committed by enterprises pursuant to or in the conduct of business activities.

497 OHCHR, CoP 21 Submission, *supra* note 349, at 4, para. 7.
498 *Id.* at 4, para. 8 (Emphasis supplied).
499 *Id.* (Emphasis supplied).
500 *Id.* (Emphasis supplied).

### *iv. Concretize the Responsibility of Businesses in the Context of Climate Change*

According to the United Nations Office of the High Commissioner for Human Rights, "States should be accountable to rights-holders for their contributions to climate change including for failure to adequately regulate the emissions of businesses under their jurisdiction regardless of where such emissions or their harms actually occur."[501] National and subnational governments that have authority to regulate the exploration, growth, and operation of natural resources or industrial enterprises, as well as State agencies that have authority to regulate environmental or human rights protection within their jurisdiction, must require companies to prepare decarbonizing analysis, planning and commitments, including corporate actions to carry out said plans and the legal duty of directors and officer relating to such.[502]

To help fulfill their duty to protect human rights, States should "encourage, and where appropriate require, business enterprises to communicate how they address their human rights impacts,"[503] especially when their business operations impact human rights. While corporations are already mandated to submit financial reports to government regulators, States should further require the submission of non-financial reports relating to environmental and climate change impact assessments, disclosure of human rights due diligence and consideration of human rights risks, consistent with the Guiding Principles. Necessarily, States should strictly monitor such submissions and impose appropriate penalties for non-compliance. Importantly, these reports should be accessible to investors and the general public.

501 *Id.* at 3, para. 3.

502 David Estrin & Cynthia A. Williams, Unique Legal Obligations of Officers and Directors of Carbon Major Enterprises and their Investors to Reduce Enterprise Carbon Emissions and Avoid Climate Change Related Human Rights Impacts to Vulnerable Communities, and Measures these Enterprises and their Directors should Implement to Act on/Comply with these Obligations: Summary of Recommended Measures to Reduce and Potentially Avoid Human Rights Impacts in the Planning, Financing and Approval of New or Expanded Carbon Plans and Projects (2018), *available at* https://ccli.ouce.ox.ac.uk/wp-content/uploads/2018/10/Recommendations-for-the-Philippines-CHR.pdf.

503 UNGP-BHR, *supra* note 313 (Principle 3 d).

### *v. Discourage Anthropogenic Contributions to Climate Change and Compensate Victims*

All countries musts put a price on pollution.[504] States must provide penalties for emissions. Monetary penalties may then be earmarked for climate change-related mitigation and adaptation activities.

States should also establish legal frameworks to compensate victims of climate change impacts, through courts or quasi-judicial bodies, with revenues derived directly from polluters. This framework should allow for compensation to be fair, meaningful, and accessible. Polluters may be found to have solidary liability for penalties assessed in favor of a claimant.[505]

### *vi. Ensure that All persons have the Necessary Capacity to Adapt to Climate Change and Guarantee Equality and Non-discrimination in Climate Adaptation and Mitigation Measures*

Sustainable adaptation and mitigation measures must be based on equity and justice and must consider specific inequalities which stem from gender, ethnicity, disability, age, location, and income. Inclusive governance involving "multi-stakeholder co-learning platforms, transboundary collaborations, community-based adaptation and participatory scenario planning, focus on capacity-building, and meaningful participation of the most vulnerable and marginalized groups, and their access to key resources to adapt" is necessary for developing more effective and sustainable adaptation and mitigation laws, policies, processes, and interventions that address context specific inequities.[506]

States must thus implement adaptation and mitigation measures that protect and fulfill the rights of all persons, particularly those most vulnerable and most marginalized, and build climate resilience in communities through recognizing that factors such as "discrimination, and disparities in education

504 Mr. Justin Trudeau, Prime Minister, Canada, Speech at the COP 26.

505 Findings and Recommendations, no. 162.

506 IPCC, AR6, WGII, SPM, *supra* note 281 (C.5.6).

and health affect climate vulnerability,"[507] thus the need to devote "adequate resources to the realization of the economic, social and cultural rights of all persons, particularly those facing the greatest risks."[508]

States must guarantee equity in climate action and give further protection to those who have contributed least to GHG emissions including developing countries, indigenous peoples, people in vulnerable situations, and future generations. Toward this end, States must guarantee that climate actions do not "exacerbate inequalities within or between States. For example, indigenous peoples' rights should be fully reflected in line with the United Nations Declaration on the Rights of Indigenous Peoples and actions likely to impact their rights should not be taken without their free, prior and informed consent. Care should also be taken to ensure that a gender perspective, including efforts to ensure gender equality, is included in all planning for climate change mitigation and adaptation. The rights of children, older persons, minorities, migrants and others in vulnerable situations must be effectively protected."[509] Thus, States must "ensure meaningful youth participation and representation in multilateral, national and local decision-making processes … actively involve indigenous peoples and local communities in designing and implementing climate action… [and] increase the full, meaningful and equal participation of women in climate action and to ensure gender-responsive implementation and means of implementation."[510]

### *vii. Ensure a Just Transition Towards an Environmentally Sustainable Economy*

Global cooperation is necessary for working towards a just and equitable outcome. The collective knowledge of the global community must complement the local and regional experience and realities, including an understanding of differences in goals, values, risks, barriers, and opportunities, in the

507 Mohamed Behnassi, Himangana Gupta, & Olaf Pollmann, Human and Environmental Security in the Era of Global Risks Perspectives from Africa, Asia and the Pacific Islands: Perspectives from Africa, Asia and the Pacific Islands,10.1007/978-3-319-92828-9 (2019) [hereinafter Behnassi, et al., 2019] (Emphasis supplied).

508 *Id.* (Emphasis supplied.)

509 OHCHR, CoP 21 Submission, *supra* note 349, at 4, para 9.

510 Glasgow Climate Pact, *supra* note 480, para 95.

development of just and equitable laws, policies, and process interventions that eliminate entrenched vulnerabilities to climate change.

Thus, States must recognize and address the existing inequalities and varying challenges in the transition to a net-zero carbon economy. Climate neutrality cannot take place at the expense of people.[511] Green policy must put the citizen's well-being at the heart of change because "if domestic and global policies are to achieve common goals, they must create not only a resilient economy but also a resilient society that leaves no one behind."[512]
States must ensure a just transition towards an environmentally-sustainable economy that will guarantee "decent work for all, social inclusion and the eradication of poverty."[513] This is particularly true for oil-based economies and those with workforces relying on carbon-intensive industries and their supply chains. The Commission endorses the recommendation that States, in the transition to net-zero, engage with stakeholders in developing economic strategies that are fair, inclusive, and sustainable; and provide support to workers through the creation of local, inclusive and decent jobs.[514]

### *viii. Fulfill Climate Finance Commitments and Device New Mechanisms For Loss and Damage from Climate Change-Related Events*

Climate-resilient development "is enabled by increased international cooperation including mobilizing and enhancing access to finance, particularly for vulnerable regions, sectors and groups."[515] Accelerated financial support for developing countries, including "increased levels of public finance and publicly mobilized private finance flows from developed to developing countries in the context of the USD100 billion-a-year goal; increas[ing] the use of public guarantees to reduce risks and leverage private flows at

511 Mr. Mateusz Morawiecki, Prime Minister, Poland, Speech at the COP 26.

512 *Id.*

513 International Labour Organization, *Guidelines for a Just Transition Towards Environmentally Sustainable Economies and Societies For All* (2015), paras. 4 &15 (a).

514 The 2021 Declaration on Supporting the Conditions for a Just Transition Internationally for COP 26, *available at* https://ukcop26.org/supporting-the-conditions-for-a-just-transition-internationally. [hereinafter 2021 Declaration on Just Transition].

515 IPCC, AR6, WGII, SPM, *supra* note 281 (D.5.2).

lower cost; local capital markets development; and building greater trust in international cooperation processes" are critical to enhancing adaptation and mitigation actions.[516] The scaling-up of climate financing must be supported by clear policy choices and signals from governments and the international community.[517]

The Commission echoes the call for developed and emerging economies to fulfill their $100 billion annual climate finance commitments. Wealthy nations must take the lead in mobilizing climate finance through various channels, prioritizing country-driven strategies based on data and science. Current climate finance commitments must be balanced between adaptation and mitigation based on the needs and priorities of developing countries. The Commission further endorses the recommendation that developed nations support developing countries and emerging economies through knowledge and technology-transfer, capacity-building, and finance,[518] pursuant to

> … relevant human rights principles, climate assistance should be adequate, effective and transparent, it should be administered through participatory, accountable and non-discriminatory processes, and it should be targeted toward persons, groups, and peoples most in need. States should engage in cooperative efforts to respond to climate-related displacement and migration and to address climate-related conflicts and security risks.[519]

The Commission endorses the recommendation that, apart from climate financing for mitigation and adaptation, a separate finance mechanism for *loss and damage* must be implemented to assist developing countries.

The Commission acknowledges that United Nations agencies, international development organizations, and NGOs have already developed a variety of multilateral and regionally-targeted funding mechanisms for mitigation and

516 IPCC, *AR6, WGIII, supra* note 389 (E.5.3).

517 *Id.* (E.5).

518 2021 Declaration on Just Transition, *supra* note 512.

519 United Nations Office of the High Commissioner for Human Rights, OHCHR's Key Messages on Human Rights, Climate Change and Migration, *available at* https://www.unhcr.org/events/conferences/5a1812a87/ohchrs-key-messages-human-rights-climate-change-migration.html.

adaptation. National, regional, and multilateral policies have also been implemented and proposed. Their influence, however, may be improved.[520]

Coordination across governance scales, including international cooperation, can be improved in achieving mitigation and adaptation goals.[521] It will be more economical and effective if climate actions are embodied in internationally-binding instruments, including trade agreements or regional arrangements, for the joint construction of infrastructure that facilitates the reduction of carbon emissions.[522]

### *ix. Support and Provide Adequate Legal Protection to Environmental Defenders and Climate Activists*

States must support and provide adequate legal protection to climate activists and environmental groups in recognition of their role in promoting and advancing climate justice. In particular, States are encouraged to:

1. Expand the civic space that enables various climate and environmental organizations to build and exchange good practices and call attention to gaps in the security of human rights and environmental defenders;
2. Remove administrative and operational barriers to the formation and accreditation of legitimate environmental groups and NGOs;
3. Avoid interfering with climate activists' and environmental groups' efforts to create networks, including their involvement in public relations, especially at international climate conferences and negotiations, and their access to foreign and domestic funding;

---

520 Intergovernmental Panel on Climate Change, Climate Change 2014*: Synthesis Report, Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change*. (Geneva: IPCC, 2014) [hereinafter IPCC, *SYR*, 2014] at 102-6.

521 *Id.* at 102.

522 *Id.* at 106.

4. Stop labeling climate advocates, environmental groups and defenders as enemies of the State based merely on their advocacy for climate action;
5. Prohibit vilification, surveillance, red-tagging, threats of retaliation, and other activities that limit the freedom of climate activists and environmental groups;
6. Effectively guarantee and preserve climate activists' and environmental organizations' and defenders' freedoms of speech, association, and peaceful assembly, without fear of criminalization;
7. Protect citizens' right to information by allowing environmental groups and defenders, journalists and climate advocates to freely report on environmental activities and give journalists and members of the press full access to information on the promotion of human rights and activities of climate activists and environmental groups;

8. Conduct efficient, timely, comprehensive, and impartial investigations into human rights violations against environmental groups and defenders. Where applicable, take action against those natural or legal persons found liable, in compliance with domestic and international law.

### *x. Promote Climate Change Awareness and Education*

States must take a more proactive approach to promoting climate change awareness and instilling a deep understanding of human rights and climate justice. Formal and non-formal education must raise understanding of these issues by generating new insights not only on a scientific level, but also on a sociological and political level.[523]

In this regard, the Commission endorses the adoption of the Glasgow Action for Empowerment,[524] to wit:

523 Mary Robinson Foundation Climate Justice, *supra* note 489, at 3.

524 Conference of Parties 26 (2021) Decision-/CP.26 Glasgow work programme on Action for Climate

1. Integrate climate change learning into the curricula of schools and other institutions that provide formal education, and support non-formal and informal education on climate change, including respect for and inclusion of indigenous and traditional knowledge;
2. Strengthen education, training and skills development in national institutions to deliver action on climate change learning;
3. Train government officials from different ministries and departments, including those working in local government, on how climate change relates to their respective areas of work to strengthen institutional and technical capacity;
4. Inform the public on the causes of climate change and sources of greenhouse gas emissions, as well as on actions that can be taken at all levels to address climate change and vulnerabilities, including through social media, electronic communication, festivals and cultural events, or by partnering with urban and rural local communities;
5. Improve public access to information on climate change at the national and local level using a range of methods and tools, taking into account the different ways particular communities, groups and individuals, including women and children and youth, may be impacted by climate change;
    a. To include accurate information on climate change science and mitigation on national and subnational government websites;
    b. To make scientific information on climate change mitigation and adaptation freely available and accessible to the general public; and
    c. To make national climate reports available in local languages for vulnerable communities, including people with special needs;
6. Seek public participation and input, including from youth, women, civil society organizations and other groups, in

Empowerment.

formulating and implementing efforts to address climate change and in relation to preparing national communications, and encourage the involvement and participation of representatives of all stakeholders and major groups in the climate change negotiation process; and

7. Promote and facilitate the exchange of information and materials and the sharing of experience and good practices

Importantly, States should invest in training and developing the current student generation in skills and talents which will aid in the transition to a green economy.

### *xi. Include the Military in Carbon Accounting*

Each State must also consider all fuel consumption and carbon emissions resulting from their military operations and supply chains when developing their NDC. For example, a recent study showed that the US military consumes more liquid fuels and emits more CO2e (carbon-dioxide equivalent) than most countries, largely due to its global logistical supply chains.[525] It is likely that other military establishments worldwide also consume and emit similar levels in their operations and supply chains. Because of the size, scale, and spread of global military operations, their impact on climate change must also be considered and included in carbon accounting.

### *xii. Strengthen Shared Efforts to Conserve and Accelerate the Restoration of Forests and Other Terrestrial Ecosystems*

Recognizing the role of forests and other terrestrial ecosystems as carbon sinks, the Commission endorses the recommendation that States urgently commence or continue the transition to sustainable land-use, including "halting and reversing forest loss and land degradation by 2030."[526]

525 Oliver Belcher, Patrick Bigger, Ben Neimark, & Cara Kennelly, *Hidden Carbon Costs of the 'Everywhere War': Logistics, Geopolitical Ecology and the Carbon Boot-print of the US military,* 45 Trans. Inst. Br. Geogr. 65, doi:10.1111/tran.12319 (2020).

526 Conference of Parties 26, Glasgow Leaders Declaration on Forests and Land Use (2021), *available*

The Commission encourages conservation, protection and restoration measures including sustainable forest management, diversifying and adjusting tree species compositions to build resilience, and managing increased risks from pests, diseases, and wildfires.[527]

The Commission endorses the position that programs to arrest forest degradation and accelerate reforestation must be supported by sustainable international and domestic trade and development policies. States must also "reduce vulnerability and empower local communities and indigenous peoples; redesign agricultural policies to promote sustainable agriculture and food security; and facilitate the alignment of financial flows with international goals to reverse loss and degradation, while ensuring policies are in place in the accelerated transition to a greener economy."[528] "Cooperation, and inclusive decision making, with local communities and Indigenous Peoples, as well as recognition of inherent rights of Indigenous Peoples," must be made an integral part of such action plans."[529]

## 2. To the Carbon Majors (and Other Carbon-Intensive Industries)

The Commission echoes the recommendations listed below not only for the Carbon Majors named in the *Petition,* but also for all carbon-intensive corporations and industries, whether private or State-owned.

### *i. Publicly Disclose Due Diligence and Climate and Human Rights Impact Assessment Results, and the Corresponding Measures taken in Relation thereto*

The Carbon Majors must be transparent in their operations, not only to their shareholders and government regulators but also to the general public.

*at* https://ukcop26.org/glasgow-leaders-declaration-on-forests-and-land-use/ [hereinafter Glasgow Leaders Declaration on Forests and Land Use].

527 IPCC, *AR6, WGII, SPM, supra* note 281 (c.2.3).

528 Glasgow Leaders Declaration on Forests and Land Use, *supra* note 524.

529 IPCC, AR6, WGII, *SPM, supra* note 281 (c.2.3).

The public has the right to know the specific climate risks that each carbon major contributes to or may be involved in through the continued production, sales and use of their products. They must disclose the carbon emissions resulting from the totality of their operations, including those of their subsidiaries across multiple jurisdictions. The Carbon Majors must conduct climate change and human rights impact assessments as part of their due diligence in accordance with the UNGP-BHR in all stages of their operations and across all their value chains, even if not required by government regulations in the jurisdictions they operate in.

The Carbon Majors must make public pronouncements on their commitments to combat climate change. Particularly, they should inform the public how they plan to support the Paris Agreement targets by developing and publishing specific business plans about intended emissions reduction, decarbonization and transition to a low-carbon economy, among others. These plans must contain key performance indicators, which may be reviewed and evaluated to determine whether published goals and plans are achieved over a specific period.

### *ii. Desist from Undermining Climate Science*

The Commission urges the Carbon Majors to desist from all activities that undermine climate science. They should acknowledge, in no uncertain terms, the reality of climate change; that it is primarily anthropogenic in nature; and that their products have widely contributed thereto. They should denounce all forms of climate denial propaganda and cease funding lobbies, politicians, pseudo-scientists, trade associations and other organizations that disseminate false information about climate change and climate science. They should harken to the voice of climate science to hasten the global transition towards clean and renewable energy.

### *iii. Cease Exploration for New Oil Fields and Help in the Global Transition Towards Clean Energy*

Explorations for new sources of fossil fuel must stop. There is already a glut in fossil fuel reserves and new discoveries will only end up as stranded assets in the future.[530] Continued, costly, and speculative explorations for new fossil reserves shall subject the officers behind them to suits by their shareholders and investors after these fields end-up as stranded assets. Instead, corporate resources should be applied to research and development of alternative, renewable energy systems and carbon sequestration.

### *iv. Contribute to a Green Climate Fund for the Implementation of Mitigation and Adaptation Measures*

The Carbon Majors must contribute to a Green Climate Fund or other similar funds not only in the jurisdictions they operate in, but also in geographical areas that bear the brunt of the impacts of climate change. They can also choose to finance mitigation and adaptation measures and projects to alleviate the plight of those impacted by climate change-related harms.

### *v. Engage with Experts, CSOs and other Stakeholders for the Assessment and Improvement of Corporate Climate Response*

Carbon Majors must now seriously consider engaging with climate scientists, policymakers, NGOs, affected communities and other stakeholders in climate action towards the development of alternative energy.

530 SEI, IISD, ODI, E3G, & UNEP, The Production Gap Report 2021 (2021), *available at* http://www.productiongap.org/2021report.

### 3. To Financial Institutions and Investors

Financial institutions[531] are progressively taking part in various climate initiatives and publicizing their commitments toward climate action. The financial sector is regarded as "the vital link in enabling the kind of system-wide change"[532] in achieving a net-zero carbon economy. The sector can steer companies and industries towards a sustainable path by aligning lending and investment portfolios with targets set by science. Although their direct emissions are negligible, their role as financiers of the sectors and projects that generate GHG emissions, including and most significantly, the fossil fuel industry, make them similarly accountable for global warming and climate change. To meet the targets of the Paris Agreement, the global carbon budget demands the cessation of new fossil fuel extraction, and the creation of more infrastructure in support of renewable energy. This would be possible if financiers break away from lending and investing in carbon-related industries.

#### *i. Financial Institutions Must Refrain from Financing Fossil Fuel-Related Projects and Instead Direct Capital Towards 'Green' Projects*

The Commission fully supports the latest version of the Equator Principles (EP4),[533] and recommends its adoption by all financial institutions. The Equator Principles serve as a framework for financial institutions to identify, assess and manage environmental and social risks when financing projects. Those who subscribe to them, called the Equator Principles Financial Institutions (EPFIs), commit not to provide Project Finance, Project-Related Corporate Loans to Projects or Project-Related Refinance and Project-Related Acquisition Finance to projects that are not compliant with Equator Principles requirements. Principle 2 of the EP4 requires clients to conduct an environmental and social assessment of their proposed projects. Such assessment specifically includes

531 "The core participants in the finance sector include banks, insurance companies, pension funds, fund managers, mutual funds, sovereign wealth funds, charities and endowment funds." *See* United Nations Environment Programme Finance Initiative, *Financial Institutions Taking Action on Climate Change* (2014).

532 Science Based Targets, Financial Institutions, *available at* https://sciencebasedtargets.org/sectors/financial-institution .

533 The Equator Principles, *supra* note 419.

human rights risks and impacts based on the UNGP-BHR, as well as climate change risk assessments aligned with the Climate Physical Risk and the Climate Transition Risk categories of the Task Force on Climate-related Disclosures. The assessment documentation also requires measures to minimize, mitigate, compensate, and remedy risks and impacts on affected communities and the environment. EPFIs are also encouraged to use the EP4 framework for financial products outside of the scope of the EP4. Praiseworthy in the EP4 is the EPFIs' solid and unequivocal commitment to support the objectives of the Paris Agreement and fulfill the responsibility to respect human rights in line with the UNGP-BHR.

However, as the window to take decisive climate action becomes smaller, the Commission joins in encouraging financial institutions to take bolder actions to fully realize and embrace their unique position to influence and direct the actions and policies of companies and industries to transition to a low-carbon economy. They must refrain from injecting capital into activities related to fossil fuel extraction and conventional fossil fuel-based power generation. Instead, they should redirect capital to activities that promote GHG emissions reduction and build infrastructure necessary to address and respond to the physical impacts of climate change.

Further, financial institutions must endeavor to "enhance finance mobilization in order to deliver the scale of resources needed to achieve climate plans, particularly for adaptation;"[534] scale-up investments in climate action[535] taking into account the vulnerabilities of specific sectors, regions, and countries; simplify and enhance access to finance;[536] and "provide enhanced and additional support for activities addressing loss and damage associated with the adverse effects of climate change."[537]

534 Glasgow Climate Pact, *supra* note 480, para. 19.

535 *See* Glasgow Climate Pact, para. 47.

536 *See* Glasgow Climate Pact, para. 53.

537 Glasgow Climate Pact, *supra* note 480, para. 64.

### *ii. Investors Must Exert Social, Political, and Economic Pressure on the Fossil Fuel Industry to Transition to Clean Energy by Divesting Therefrom*

The Commission calls on investors to invest in protecting the climate for present and future generations. Conventional investing, where profit is the sole driving force, should no longer be the norm. The imperatives of sustainability and protection of the environment and the climate system for present and future generations must now also be investment considerations. As owners of capital, investors have the power to influence and direct company policies and actions. Thus, investors should be more circumspect in their investments and mindful of their obligation under the UNGP-BHR to respect human rights. They must ensure that the companies they invest in do not tolerate, propagate or contribute to human rights abuses in all phases of their operations, including within their value chains.

The consistent use of environmental, social and governance (ESG) criteria in investment decisions is likewise encouraged. ESG criteria are standards used by socially-responsible investors in screening potential investments. Human rights impacts are necessarily included therein. The Commission joins in encouraging networks such as the Investor Alliance for Human Rights, whose members integrate ESG considerations in investment decision-making processes, in using their leverage as investors to influence responsible business conduct. The Commission also notes the work of the Transition Pathways Initiative (TPI) in creating tools and generating resources for investors to assess companies' preparedness to transition to a low-carbon economy. By integrating TPI's data in ESG assessments, investors can better understand how their holdings fare with the pathways set by the Paris Agreement and, consequently, make better and more informed socially responsible investment decisions.

The Commission fully supports the Fossil Fuel Divestment Movement in its action to mitigate climate change. This movement calls on individual and institutional investors to divest from financial instruments connected with the fossil fuel industry to exert social, political and economic pressure upon fossil fuel companies to transition to clean energy. The movement puts to public discourse the ethics and morality of knowingly profiting from activities that

cause significant harm to the climate, in general, and to the victims of climate change impacts, in particular, who are unjustly bearing the brunt of the harm even though they have least benefited from or contributed to it. The Commission hopes that this movement will gain maximum global traction and inspire more investors to use their economic power to support climate action.

## 4. To the United Nations

The United Nations offers a special platform for bringing together world leaders and uniting governments. The Commission recognizes the unique position of the United Nations for shepherding global resources towards the full implementation of the Paris Agreement.

The Commission is encouraged by the United Nations dynamism in promoting a safe climate and healthy ecology, with special reference to human rights. Climate change must be integrated, indeed, in the monitoring of the full implementation of "existing recommendations of the treaty bodies, the Universal Periodic Review, the special procedures mandate holders and the Office of the United Nations High Commissioner for Human Rights."[538]
As countries put forward their NDCs with more ambitious targets, it would be judicious for the United Nations to also report on State compliance with human rights obligations relating to climate change.

The Commission also lauds the addition of "another focal point on climate change and human rights to the UNFCCC to ensure a rights-based approach to negotiating, implementing and monitoring actions pursuant to the Paris Agreement."[539]

The Paris Agreement emphasizes global inclusivity and the need to provide financial, technical, and climate-related capacity-building support to developing countries. The United Nations can act as a catalyst in encouraging developed States to lend technical assistance and financial resources to countries most in need of climate mitigation and adaptation. This includes compensation for loss and damage arising from the impacts of climate change.

538 *Safe Climate Report, supra* note 327, at 24.
539 *Id.*

The United Nations has the unique ability to forge agreements and implement normative frameworks. It is also in a strong position to promote guiding principles into becoming international treaties or domestic laws. It can catalyze the development of mechanisms and processes for hearing human rights cases, especially those involving transboundary harm, universal liability, cross-jurisdictional enforcement, compensation, and proportional liability.

The Commission also recognizes the central role of the United Nations in engaging the business community to deliver climate goals. Developing binding instruments that promote responsible business standards, including compelling the business sector to fulfill their human rights responsibilities for a more inclusive and transformative climate action.

## 5. To National Human Rights Institutions

The climate crisis calls not just for an evaluation of State obligations on human rights, but of the human rights responsibilities of businesses, as well.

NHRIs "play a crucial role in promoting and monitoring the effective implementation of international human rights standards at the national level"[540] and bridging stakeholders to "promote transparent, participatory and inclusive national processes of implementation and monitoring."[541] In the face of one of the greatest human rights challenges of our time, the Commission notes that NHRIs around the world are rising to the challenge and have increased engagements aimed at protecting climate-affected rights.[542]

In October 2015, the Global Alliance of National Human Rights Institutions (GANHRI) adopted the Mérida Declaration, encouraging all NHRIs to "influence the national process of implementation and accountability to ensure human rights are

540 United Nations Human Rights Office of the High Commissioner, *UN Human Rights and NHRIs*, *available at* https://www.ohchr.org/EN/Countries/NHRI/Pages/NHRIMain.aspx.

541 The Mérida Declaration, The Role of National Human Rights Institutions in Implementing the 2030 Agenda for Sustainable Development, para. 15 [hereinafter as Mérida Declaration].

542 Nathaniel Elsen & Nina Eschke, Climate Change and Human Rights, The Contributions of National Human Rights Institutions: A Handbook (2020 ed.).

integrated in the process of tailoring and tracking goals, targets and indicators"[543] of the 2030 Agenda for Sustainable Development. It highlighted the role of NHRIs to "promote remedies for all human rights violations and … use their protection powers to address serious human rights concern linked to the implementation"[544] of development goals, including the realization of Sustainable Development Goal (SDG) No. 13 on climate action. The declaration also encouraged cooperation between NHRIs and private actors, reaffirming the role businesses can play in fulfilling the SDGs, and highlighting the need to align implementation with the UNGP-BHR and other international human rights standards.[545]

A month later, in November 2015, the Commonwealth Forum of National Human Rights Institutions adopted the St. Julian's Declaration on Climate Justice,[546] the first collaborative declaration of commitments signed by NHRIs, acknowledging and affirming their role in climate action.

More recently, during its Annual Meeting in December 2020, GANHRI adopted an outcome statement on the role of NHRIs in combating the climate crisis.[547] Recognizing that a human rights-based approach leads to more sustainable and effective climate action and policies, it called on all States to ratify and implement international and regional human rights instruments. Likewise, it called for the implementation of the provisions of the Paris Agreement, to promote human-rights based and people-centered climate action.[548] Also noteworthy in the statement is the recognition of the need for climate justice, which it defined "as addressing the climate crisis with a human rights-based approach whilst also making progress towards a just transition to a zero-carbon economy."[549]

543 Mérida Declaration, *supra* note 541.

544 *Id.*

545 *Id.* para. 11.

546 Commonwealth Forum of National Human Rights Institutions, St. Julian's Declaration on Climate Justice (2015), at 5.

547 Global Alliance of National Human Rights Institutions, GANHRI Statement Adopted at the GANHRI Annual Conference on Climate Change: The Role of National Human Rights Institutions (adopted on Dec. 4, 2020), *available at* https://ganhri.org/wp-content/uploads/2020/12/EN_Climate-change-and-NHRIs.pdf [hereinafter GANHRI Statement].

548 *Id.* para. 2.

549 *Id.* para. 3.

Guided by these declarations and lessons learned from its climate *Inquiry*, the Commission encourages its fellow NHRIs to:

1. Continuously engage with climate scientists and other experts in the field to keep abreast of the best available science on climate change, event attribution, as well as technological developments related thereto;
2. Collaborate with other NHRIs and engage in regional and international mechanisms to monitor government and business compliance with their duties and responsibilities when dealing with climate-related transboundary harms and cross-border human rights violations;
3. Ensure that climate change actions, including monitoring, investigations, decisions and legislation are participatory, transparent and accountable;
4. Contribute to the development of laws and legal frameworks on the intersection of human rights, climate change and business enterprises through monitoring, research, case studies, investigation, decision on cases and other activities within their mandates;
5. Pursue meaningful collaboration with government actors and encourage them to understand and integrate human rights obligations in national climate action policies by advising them on human rights-based approaches to climate mitigation and adaptation, through the integration of the different international climate agreements, the Sustainable Development Goals, and the adherence to the Geneva Pledge to promote and respect human rights in climate action;
6. Actively dialogue with the business sector and work for the development of normative frameworks that will embed the respect for human rights in the obligations of businesses–such as the conduct of environmental and human rights impact assessments and due diligence across all phases of their operations, as well as providing remedies in case of violations;
7. Increase monitoring and reporting on government's compliance with business, human rights and climate change obligations and

commitments, through international human rights mechanisms like the Universal Periodic Review and other treaty bodies;

8. Strengthen engagements with civil society, particularly in educating communities about the causes and impacts of climate change and how it relates to the realization of human rights in order to mainstream climate awareness in the public consciousness and drive responses ranging from individual changes of lifestyles to concerted climate actions;
9. Recognize that some climate actions are inevitable to negatively impact human rights; that the transition to a carbon-less economy would necessarily put some sectors at risk of losing their livelihoods or that evacuating those living in danger zones would necessarily lose their homes; the challenge is to find a balance towards the most just, humane and equitable climate solution; and finally
10. Commit to achieving climate justice, particularly for those acutely impacted but have least contributed to the climate crises.

## 6. To Courts

Many individuals and organizations have now resorted to initiating actions before State-based judicial mechanisms to compel climate actions[550] and influence the development of laws and policies in both the domestic and international spheres. Litigation has been used to compel governments to provide more ambitious emissions targets,[551] establish the right to a healthful ecology for future generations,[552] or delineate the role of States with regard to transboundary environmental harms.[553]

Similarly, the progressive interpretation of laws by courts enhances regulation and addresses gaps in law where legislation may be vague or when current legislation

550 Michal Nachmany, Sam Fankhauser, Joana Setzer & Alina Averchenkova, Global Trends in Climate Change Legislation and Litigation (2017) [hereinafter Global Trends 2017].

551 Netherlands Hague District Court [2015] HAZA C/09/00456689. Affirmed by Hague Court of Appeals and Supreme Court of the Netherlands in 2018 and 2020, respectively [hereinafter Urgenda v. Netherlands].

552 Philippine Supreme Court [1993] G.R. No. 101083 and Juliana v. United States, 217 F. Supp.3d 1224 (D. Or. 2016) (U.S.).

553 Inter-American Court of Human Rights [2017] OC-23/17.

is not up to date with developments in science.[554] In the case of *Massachusetts v. EPA*[555] for instance, the court held that the US Environmental Protection Agency under their statute had the power to regulate GHGs, even though the statute did not specifically contemplate emissions regulation.

Courts must also interpret the law in conformity with international obligations and act as enforcement tools of States' international obligations–including those relating to climate change.[556] The coupling of international obligations with domestic regulation is not new. The courts in *Urgenda v. Netherlands* and *Leghari v. Pakistan* established their States' commitments under international conventions as part of their domestic obligations to their citizens. In *Pro Public v. Godavari Marble Industries Pvt. Ltd.*,[557] the court established that mining in a protected area is inconsistent with the principles found in international environmental protection and the Nepal Constitution.

The judiciary may also grant remedies not expressly provided by laws. The "*imprimatur* of the courts confers considerable legitimacy on the operation of the administrative state[;] [...] courts have considerable latitude to develop law on their own."[558] A review of government acts has been accepted by courts to compel public agencies and offices to act and revise policies.[559] Civic organizations and individuals have used the threat of judicial review to compel governments into climate action.[560]

Judiciaries worldwide have also provided remedies that protect the environment and the people affected by environmental degradation. Examples of these are the

554 Joana Setzer & Mook Bangalore, *Regulating Climate Change in the Courts*, *in* Trends in Climate Change Legislation (Alina Averchenkova, et al. eds., 2017).

555 United States Supreme Court [2007] 549 U.S. 497 (2007).

556 Esmeralda Colombo, *Enforcing International Climate Change Law in Domestic Courts: A New Trend of Cases for Boosting Principle 10 of the Rio Declaration?* 35 UCLA Journal of Environmental Law and Policy 98 (2017).

557 Supreme Court of Nepal [2015] 068–WO–0082.

558 David Markell & J.B. Ruhl, *An Empirical Assessment of Climate Change in The Courts: A New Jurisprudence or Business As Usual*? 64 FLA. L. REV. 15, 20 (2012) [hereinafter referred to as Markell & Ruhl 2012].

559 Urgenda v. Netherlands; John Hermse, *Dutch Government Plans CO2 Emissions Levy for Industrial Firms*, Bloomberg Businessweek, Jun. 28, 2019 (last accessed Jan. 6, 2021); Reuters, Dutch to Close Amsterdam Coal-fired Power Plant Four Years Early – RTL, Reuters, Mar. 7, 2019 (last accessed Jan. 6, 2021).

560 Alina Averchenkova, Sam Fankhauser, & Jared J. Finnegan, *The Impact of Strategic Climate Legislation: Evidence from Expert Interviews on the UK Climate Change Act,* 21 Clim. Policy 251 (2020).

*Tutela*[561] writs, found in Latin American countries and the *Writ of Kalikasan*[562] in the Philippines. These special writs have been consistently used by their respective courts to protect the environment.[563] Regional courts have also promoted remedies by issuing Advisory Opinions to help clarify the duties and rights relative to the environment and transboundary harm.[564]

In the climate change context, "courts have moved beyond their primary function of resolving disputes between private individuals and are now being used by public interest litigants as vehicles for achieving social change."[565] The Commission encourages all courts to embrace their power to influence and inspire government action. However, caution must be exercised to avoid "overly aggressive judicial review [that] has the potential to engender administrative ossification—agency paralysis—among other phenomena."[566] Thus, without favoring any particular party or going beyond their authority, courts should strive to inform, determine, explain and uphold, through their decisions, the rights and obligations of parties concerning particular climate laws, policies and issues. In dismissing claims, courts should clarify the factual and legal bases that were found wanting or insufficient to provide guidance not only to the parties but also to future actions. It should be emphasized that even when courts do not rule in favor of the claimants, they still contribute to meaningful climate response through their elucidation of the law and the rights and obligations of the parties. Judicial contribution to the development of the law and jurisprudence on various climate issues is indispensable to the success of the global climate action.

In the determination of claims and liabilities, courts may take judicial notice of the findings of NHRIs or other similar bodies.

561 1991 Colom. Const. (Revised 2015).

562 Rules of Procedure for Environmental Cases.

563 Corte Constitutional de Colombia [2016] T-622 of 2016; Supreme Court of the Philippines [2019] Abogado et. al v. Department of Environment and Natural Resources.

564 Inter-American Court of Human Rights [2017] Advisory Opinion Concerning the Interpretation of Article 1(1), 4(1) and 5(1) of the American Convention on Human Rights.

565 Brian J. Preston, *Characteristics of Successful Environmental Courts and Tribunals*, 26 J. Environ. Law 365, 387-8 (2014).

566 Markell & Ruhl 2012, *supra* note 558 (citing Thomas O. McGarity, *Some Thoughts on "Deossifying" the Rulemaking Process*, 41 DUKE L. J. 1385, 1386-87 (1992); Mark Seidenfeld, *Why Agencies Act: A Reassessment of the Ossification Critique of Judicial Review*, 70 Ohio St. L. J. 251, 254 (2009); & Jason Webb Yackee & Susan Webb Yackee, *Testing the Ossification Thesis: An Empirical Examination of Federal Regulatory Volume and Speed, 1950–1990*, 80 Geo. Wash. L. Rev. 1414, 1414 (2012)).

## 7. To NGOs, CSOs, and the Legal Profession

### *i. NGOs and CSOs*

No less than the Human Rights Council has emphasized that "civil society actors have an important and legitimate role in promoting corporate social responsibility, and in preventing, mitigating and seeking remedy for the adverse human rights impacts of transnational corporations and other business enterprises."[567] With the growing power of multinational companies and the shrinking influence of governments, NGOs and CSOs have become the third force alongside the public and private sectors in promoting and ensuring human rights with respect to companies.[568]

The Commission recommends that NGOs and CSOs continuously engage in strategic litigation to strengthen business and human rights norms, change public policy, increase government ambition, and create binding precedents catalyzing the movement towards zero-carbon energy.

### *ii. Legal Profession*

Justice Brian Preston[569] explains the role that lawyers play in supporting climate action:

> Recognizing that addressing climate change depends on responses on a small scale, and that any legal action which involves climate change issues will impact on climate change policy, gives rise to a responsibility on lawyers to be aware of climate change issues in daily legal practice. It calls for a climate conscious approach rather than a climate blind approach. A climate blind approach is where the outcome of the legal problem or dispute will have some impact on climate change issues, but legal advice is given or the dispute is litigated or resolved without any attention to climate change issues. A climate conscious approach requires an active awareness of the reality of climate change and how it interacts

567 United Nations Human Rights Council, *Elaboration of an International Legally Binding Instrument on Transnational Corporations and Other Business Enterprises with Respect to Human Rights,* U.N. Doc. No. A/HRC/RES/26/9 (July 14, 2014), *available at* https://undocs.org/A/HRC/RES/26/9.

568 Chris Jochnick and Louis Bickford, *The Role of Civil Society in Business and Human Rights*, *in* Business and Human Rights from Principles to Practice 258 (Dorothée Baumann-Pauly & Justine Nolan eds., 2016).

569 Chief Judge of the Land and Environment Court of New South Wales.

> with daily legal problems. A climate conscious approach demands, first, actively identifying the intersections between the issues of the legal problem or dispute and climate change issues and, secondly, giving advice and litigating or resolving the legal problem or dispute in ways that meaningfully address the climate change issues.[570]

The Commission shares Preston's view and that of the International Bar Association (IBA) that the global response to climate change entails, if not inevitably requires, a host of legal proceedings if any success is to be gained. Lawyers around the world will be called upon to represent the conflicting rights and interests of States, corporations, communities and individuals impacted by the climate crisis. Thus, "the legal profession must be prepared to play a leading role in maintaining and strengthening the rule of law and supporting responsible, enlightened governance in an era marked by a climate crisis."[571]

In whatever side or capacity lawyers may find themselves in these proceedings, the Commission appeals to them to work towards the development of laws and legal systems that will justly protect and uphold the common interest of humankind. To this end, the Commission calls on lawyers to generously lend their expertise towards improving or creating a legal framework for climate accountability in their localities, which may inform and ultimately become one of the bases for the development of a global legal framework for addressing the challenges posed by climate change.

## 8. To the Global Citizenry

### As Consumers

The Commission calls on all citizens of the world, as stewards of nature, to do their just share in caring for our common home. Much has been said about the legal and moral obligation of governments and private enterprises, including carbon-intensive

570 Brian J. Preston, Implementing a Climate Conscious Approach in Daily Legal Practice (Dec. 4, 2015), at 2.

571 International Bar Association, Climate Crisis Statement (May 5, 2020), *available at* https://www.ibanet.org/Article/NewDetail.aspx?ArticleUid=cac6e15d-ec80-4669-9025-2773e9019519.

industries. Yet, as individual consumers, each one of us must also take responsibility for the role of our consumption habits in climate-related human rights impacts.

Indeed, "an important contributor to global emissions is over-consumption."[572] Consequently, a just transition toward a carbonless economy cannot be achieved through mere technological innovations and global changes in national policies, but also necessarily includes reduction in demand by altering consumer habits and mindsets. Thus, the Commission invites self-reflection to examine whether our behavior contributes to excessive and irresponsible consumerism, and recommends that we consciously take steps to reduce our carbon footprint and make positive choices to adopt a climate-friendly lifestyle consistent with global efforts for climate change mitigation and adaptation.

### As Shareholders and Investors

The Commission encourages global citizens to be informed shareholders and investors. Knowledge of production chains, corporate values, and business practices and the individual investment choices made based on this information will ultimately shape and fuel the global response to climate change. Support must be given to clean and green products and business enterprises instead of those that seek to profit at the cost of the destruction of our common home.

### As Electorate

Pope Francis in his encyclical letter, *Laudato Si'*, reminds us that we need "leadership capable of striking out new paths and meeting the needs of the present with concern for all and without prejudice towards coming generations.[573] Thus, the Commission calls on all global citizens to elect responsible leaders. Individual efforts will be for naught if those in power or those who make and influence policies are blind to the plight of the planet. Everyone must exercise their right to vote in favor of those who will champion the fundamental human right of present and future generations to live with dignity in a home safe from the grave and fatal impacts of climate change.

---

572 Expert Group on Climate Obligations of Enterprises, *Principles on Climate Obligations of Enterprises* (2018), at 30.

573 *Laudato Si'*, *supra* note 304, para. 53.

## *B. Additional / Particular Recommendations to the Philippine Government*

### The General Climate Policy in the Philippines

At the core of Philippine environmental policy is the 1987 Constitution which establishes Filipinos' right "to a balanced and healthful ecology in accord with the rhythm and harmony of nature."[574]

In 1991, the Inter-Agency Committee on Climate change[575] was created in preparation for the first Conference of Parties. Soon after, the Philippines signed and adopted the UNFCCC and the Kyoto Protocol. In 1999, Congress passed the Clean Air Act[576] outlining the country's response to industrial emissions and air pollution, and mandating the incorporation of environmental protection in development plans.

The next decade saw the strengthening of the Philippines' climate response through the enactment of the Climate change Act of 2009[577]–a law that mainstreamed climate change in government policy formulation, established the framework strategy and program on climate change, and created the Climate Change Commission (CCC).

It also mandated the creation of two policy documents that would guide the country's integrated action on climate change–the National Framework Strategy on Climate change 2010-2022 (NFSCC) and the National Climate change Action Plan 2011-2028 (NCCAP).

The NFSCC envisioned "a climate risk-resilient Philippines with healthy, safe, prosperous and self-reliant communities, and thriving and productive ecosystems."[578] Its goal was "to build the adaptive capacity and increase the resilience of natural ecosystems to climate change, and optimize mitigation opportunities towards sustainable development."[579]

---

574 Phil. Const. art. II, § 16.

575 Office of the President, Creation of an Inter-Agency Committee on Climate Change, Administrative Order No. 220, s. 1991 (May 18, 1991).

576 An Act Providing for a Comprehensive Air Pollution Control Policy and for Other Purposes [Clean Air Act of 1999], Republic Act No. 8749 (1999).

577 An Act Mainstreaming Climate Change Into Government Policy Formulations, Establishing the Framework Strategy and Program on Climate Change, Creating for this Purpose the Climate Change Commission, and for Other Purposes [Climate Change Act of 2009], Republic Act No. 9729 (2009).

578 National Framework Strategy on Climate Change 2010-2022 [hereinafter NFSCC] (Guiding Principles 2.1).

579 *Id.* at (Guiding Principles 2.2.).

Formulated within the context of the Philippines' sustainable development goals, it considered governance and institutional factors that may limit the country's capacity to respond to climate change.[580] It identified climate change impacts and vulnerabilities and set key result areas to be pursued in climate-sensitive sectors through adaptation and mitigation strategies. The NFSCC mitigation pillar relies on "pursuing cost-effective measures to reduce GHG emissions, including increased energy efficiency and conservation, development and increased utilization of appropriate low carbon and renewable energy technologies, and reducing emissions from deforestation and degradation."[581] However, mitigation is treated as a function of adaptation[582] and more emphasis is given on adaptation due to the "country's geophysical and socio-economic characteristics," and the "risks associated with current climate variability and extremes."[583]

A year after the NFSCC was signed, its framework and guiding principles were translated into the NCCAP. The NCCAP outlined the country's strategic direction for adaptation and mitigation from 2011 to 2028. It laid down the government's short-, medium- and long-term plans and expected outputs in the seven thematic areas of food security, water security, ecological and environmental stability, human security, climate smart industries and services, sustainable energy, and knowledge and capacity development.[584] Six of the seven NCCAP priority areas are focused on adaptation. The NCCAP also highlighted the convergence between adaptation and disaster risk reduction and management.

In 2010, the Disaster Risk Reduction and Management Act[585] was passed. The law provides for an "approach that is holistic, comprehensive, integrated, and proactive in lessening the socioeconomic and environmental impacts of disasters including climate change, and promote the involvement and participation of all sectors and all stakeholders concerned, at all levels, especially the local community."[586] Notable in the law is the mainstreaming of

580 *Id.* at 17 (Philippine Climate Change Framework).

581 *Id.* at 20 (The Mitigation Pillar, para. 2).

582 *Id.* at 17 (Philippine Climate Change Framework).

583 *Id.* at 27 (The Adaptation Pillar, para. 1).

584 Republic of the Philippines Intended Nationally Determined Contribution Communicated to the UNFCCC on October 2015, at 3, *available at* https://www4.unfccc.int/sites/submissions/INDC/Published%20Documents/Philippines/1/Philippines%20-%20Final%20INDC%20submission.pdf.

585 An Act Strengthening the Philippine Disaster Risk Reduction and Management System, Providing For the National Disaster Risk Reduction and Management Framework and Institutionalizing the National Disaster Risk Reduction and Management Plan, Appropriating Funds Therefor and for Other Purposes [Philippine Disaster Risk Reduction and Management Act of 2010], Republic Act No. 10121 (2010).

586 *Id.* § 2 (d).

disaster risk reduction in several sectors including land-use planning, budget, infrastructure, education, health, environment, and housing; and the creation of disaster risk reduction offices in every province, city, and municipality.

In 2012, the People's Survival Fund was established to finance the adaptation programs and projects based on the NFSCC and the NCCAP. It has an annual allocation of at least one billion Pesos, which may be augmented by donations, endowments, grants and ontributions.[587] However, to date, only six (6) approved climate change projects utilizing the said fund have been approved. These are: 1) Disaster Risk Reduction & Management Response as Coping Mechanism to Resiliency in Lanuza, Surigao del Sur; 2) Siargao Climate Field School for Farmers and Fisherfolk in the Municipality of Del Carmen, Siargao Islands, Surigao del Norte; 3) Building Resilience through Community-based Ecological Farming in San Francisco, Camotes Island, Cebu; 4) Promoting Resiliency and Climate-Informed Gerona in Gerona, Tarlac; 5) Saub Watershed Ecosystem Rehabilitation and Flood Risk Reduction for Increased Resilience to Climate change and Natural Hazards in Sarangani; and 6) Establishment and Sustainable Management of River Ecosystem in Kitcharao, Agusan del Norte.[588]

Several sectoral laws and policies, including the National Environmentally Sustainable Transport Strategy for the Philippines (2011), the Energy Efficiency Roadmap 2014-2030 (2013), Institutionalizing the Philippine Greenhouse Gas Inventory Management and Registry System (2014), the Philippine Green Building Code (2015), the Philippine Masterplan for Climate Resilient Forestry Development (2016), the Philippine Energy Plan 2016-2030 (2016) and the Philippine Green Jobs Act (2016) were then instituted. These were in addition to sectoral legislation already in place to regulate the utilization of resources, such as the National Integrated Protected Areas System Act of 1992, the Ecological Solid Waste Management Act of 2000, the Electric Power Industry Reform Act of 2001, the Philippine Clean Water Act of 2004, the Biofuels Act of 2006, the Oil Compensation Act of 2007 and the Renewable Energy Act of 2008, among others.

During the last quarter of 2020, after Super Typhoon Vamco (local: Ulysses) battered the Philippines and caused massive floods and deaths, the House of Representatives

---

587 An Act Establishing the People's Survival Fund to Provide Long-Term Finance Streams to Enable the Government to Effectively Address the Problem of Climate Change, Republic Act No. 10174, § 13.

588 Climate Change Commission, Approved Projects, *available at* https://climate.gov.ph/our-programs/climate-finance/peoples-survival-fun .

passed House Resolutions No. 1377 and 535, seeking to declare a climate emergency and enjoining a "whole-of-government, whole-of-society, and whole-of-nation policy response to anticipate, halt, reduce, reverse, address, and adapt to its impacts, consequences, and causes."[589] Although non-binding, the resolution expressed the general sentiment of local representatives–or half of the bicameral Congress. A similar bill[590] is pending before the Senate. Several local government units have also declared climate emergencies in their localities.

In 2015, the Philippines communicated its intended Nationally Determined Contribution (INDC) to the UNFCCC, pledging "GHG (CO2e) emissions reduction of about 70% by 2030, relative to its BAU scenario of 2000-2030."[591] This was anchored on reducing carbon emissions by the energy, transport, waste, forestry, and industry sectors. However, "the mitigation contribution is conditioned on the extent of financial resources, including technology development and transfer, and capacity building, that will be made available to the Philippines."[592] In 2017, the Philippines submitted its Instrument of Accession to the Paris Agreement, with an express provision that the country's first NDC will be submitted before 2020. However, it was only on 15 April 2021, that the said NDC was communicated to the UNFCCC.

Through its NDC submission in 2021, the Philippines projected a

> … GHG emissions reduction and avoidance of 75%, of which 2.71% is unconditional and 72.29% is conditional, representing the country's ambition for GHG mitigation for the period 2020 to 2030 for the sectors of agriculture, wastes, industry, transport, and energy. This commitment is referenced against a projected business-as-usual cumulative economy-wide emission of 3,340.3 MtCO2e 12 for the same period.[593]

589 A Resolution Declaring a Disaster and Climate Emergency, H. Res. No. 535, 18th Cong., 1st Reg. Sess. (2019).

590 An Act Declaring Climate Change Emergency and Enhancing Resiliency and Adaptability to The Effects of Climate Change, S.B. No. 1964, 18th Cong., 2d Reg. Sess. (2020).

591 *Id.*

592 *Id.*

593 United Nations Framework Convention on Climate Change, NDC Registry (Republic of the Philippines Nationally Determined Contribution Communicated to the UNFCC on 15 April 2021), *available at* https://unfccc.int/sites/default/files/NDC/2022-06/Philippines%20-%20NDC.pd [hereinafter Philippine NDCs].

It was also stated that "[t]he implementation of the mitigation commitments shall be undertaken through bilateral, regional and multilateral cooperation," and "market and non-market mechanisms under Article 6 of the Paris Agreement."[594]

The NDC is anchored on enhanced access to climate finance, technology transfer and development, and capacity building.

Noticeably, the NDC mitigation commitment is 5 percent higher than that indicated in the INDC. The NDC likewise promotes education, public awareness, and meaningful inclusive collaboration with vulnerable sectors, and "upholds the importance of ensuring ecosystems integrity and promoting the country's obligations on human rights and the rights of indigenous peoples."[595]

The Judiciary also plays and continues to play a significant role in environmental protection. In the oft-cited case of *Oposa v. Factoran*,[596] the Supreme Court recognized the right of current and future generations to a balanced and healthful ecology. The Court, in *MMDA v. Concerned Residents of Manila* mandated the clean-up of *Manila Bay through a Writ of Continuing Mandamus*[597]–an order not usually used in environmental cases.

In 2009, the Supreme Court issued the Rules of Procedure for Environmental Cases, [598] which introduced the *Writ of Kalikasan*, a special civil action

> on behalf of persons whose constitutional right to a balanced and healthful ecology is violated, or threatened with violation, by an unlawful act or omission of a public official or employee, or private individual or entity, involving environmental damage of such magnitude as to prejudice the life, health or property of inhabitants in two or more cities or provinces.[599]

This procedural remedy allows for a "citizen suit,"[600] and permits any Filipino citizen–representing "minors and generations yet unborn"–to file an action

594 *Id.*

595 *Id.*

596 Oposa v. Factoran, Jr., G.R. No. 101083, 224 SCRA 792 (1993).

597 Metropolitan Manila Development Authority v. Concerned Residents of Manila Bay, G.R. Nos. 171947-48, 574 SCRA 661 (Dec. 18, 2008).

598 Rules of Procedure for Environmental Cases, A.M. No. 09-6-8-SC (Apr. 29, 2010).

599 *Id.* (Rule 7).

600 *Id.* (Part II, Civil Procedure, Rule 2, Section 5. Citizen suit. — Any Filipino citizen in representation of

for violations of environmental laws. The Court, in *Metropolitan v. Concerned Residents of Manila Bay* affirmed that the need to give animals (in this case resident marine mammals of the Tañon Strait) "legal standing has been eliminated by our Rules [for Environmental Cases], which allow any Filipino citizen, as a steward of nature, to bring a suit to enforce our environmental laws."[601]

The Rules of Procedure for Environmental Cases further provide that when there is a lack of full scientific certainty in establishing a causal link between human activity and environmental effect, the court shall apply the *precautionary principle* in resolving the case before it and the constitutional right of the people to a balanced and healthful ecology shall be given the benefit of the doubt.[602] Section 2 of said rules provide for the standards to be used by courts in applying the precautionary principle to environmental cases, *viz.*:

> SEC. 2. *Standards for application*.—In applying the precautionary principle, the following factors, among others, may be considered: (1) threats to human life or health; (2) inequity to present or future generations; or (3) prejudice to the environment without legal consideration of the environmental rights of those affected.

In *Osmeña v. Garganera*,[603] the Supreme Court declared that while it has "jurisdiction and power to decide cases, [it] is not precluded from utilizing the findings and recommendations of the administrative agency on questions that demand the exercise of sound administrative discretion requiring the special knowledge, experience, and services of the administrative tribunal to determine technical and intricate matters of fact."[604] The court emphasized that the *Writ of Kalikasan* was designed to give stronger protection for environmental rights; provide speedy and effective resolution to cases involving violations of the right to a healthful and balanced ecology that transcends political and territorial boundaries; and to address the potentially exponential nature of large-scale ecological threats.[605]

---

others, including minors or generations yet unborn, may file an action to enforce rights or obligations under environmental laws. Upon the filing of a citizen suit, the court shall issue an order which shall contain a brief description of the cause of action and the reliefs prayed for, requiring all interested parties to manifest their interest to intervene in the case within fifteen (15) days from notice thereof. The plaintiff may publish the order once in a newspaper of a general circulation in the Philippines or furnish all affected barangays copies of said order.)

601 Resident Marine Mammals v. Reyes, G.R. No. 180771 (2015).

602 Rules of Procedure for Environmental Cases (Section 1, Rule 20, Evidence, Part V).

603 Osmena v. Garganera, G. R. No. 231164 (Mar. 20, 2018) [hereinafter Osmena v. Gargarena].

604 Osmeña v. Garganera, citing West Tower Condominium Corporation v. First Philippine Industrial Corporation, 760 Phil. 304, 339 (2015).

605 *See* Segovia, et al., v. The Climate Change Commission, G.R. No. 211010 (Mar. 7, 2017), citing Osmeña v. Garganera.

However, to date, there are no Philippine laws, policies, or jurisprudence on the intersectionality between business and Human rights, on the one hand, and climate change, on the other.

The Philippines has a wide-ranging set of laws, policies, and institutions seeking to address the impacts of climate change. Both national laws and sectoral policies integrate climate mitigation and adaptation plans into their development plans. In fact, Margareta Wahlström, special Disaster Risk Reduction representative of the United Nations Secretary General, in a press conference said the country has "an excellent legal framework for disaster risk reduction and an excellent framework for climate adaptation."[606]

Despite this, GHG emissions continue to rise, and thousands of Filipinos continue to perish, become sick, or suffer the loss of heritage and properties. The problem is found in the weak enforcement of laws. Even with lofty international pledges on emission cuts and dedicated climate legislation, implementation depends on the political will of the ruling administration–leaving much to the caprice of politicians.
The Philippine government exhibits mediocre actions to meet the Paris Agreement climate commitments. Actions from the Executive are inconsistent with Legislative resolutions–with moves to reopen closed mines,[607] continuous coal-based electricity generation, coal expansion,[608] and public declarations by the President suggesting that international climate conferences are useless.[609]

The Commission thus recommends the following to the Philippine government:

606 Michael Lim Ubac, *UN lauds Philippines' Climate Change Laws 'World's Best'*, Philippine Daily Inquirer, May 4, 2012, *available at* https://globalnation.inquirer.net/35695/un-lauds-philippines%E2%80%99-climate-change-laws-%E2%80%98world%E2%80%99s-best%E2%80%99.

607 Department of Environment and Natural Resources, In the News: Strategic Communication and Initiatives Service (2020), *available at* https://www.denr.gov.ph/images/Online_News_Monitoring/DENR_Online_News_Monitoring_07_27_2020.pdf.

608 Department of Energy, Coal Overview, *available at* https://www.doe.gov.ph/coal-overview.

609 Pia Ranada, *Duterte Slams Climate Change Conferences for Accomplishing 'Nothing'*, Rappler, May 31, 2019, *available at* https://www.rappler.com/nation/duterte-slams-climate-change-conferences-accomplishing-nothing.

## 1. Recommendations Particular to the Executive Department

### *a. Commit to the Implementation of the UNGP-BHR and Formulate a National Action Plan on Business and Human Rights*

The government should make a clear commitment to the UNGP-BHR and bring to life its three pillars: the State duty to protect human rights; the corporate responsibility to respect human rights; and access to remedies for human rights abuses. In line with this, the government should provide a clear policy on business and human rights, codify the expected conduct of businesses, promote an understanding of how bringing human rights to the forefront of business practices stimulates success, and design remediation measures for victims of corporate human rights abuses.

The Commission recommends the adoption of a National Action Plan on Business and Human Rights (NAP) to support the implementation of the UNGP-BHR, and ensure that business enterprises, in the conduct of their activities, do not infringe on the fundamental freedoms of individuals and communities.

The NAP must:1) summarize and review all government initiatives in relation to business and human rights; 2) ensure policy coherence by identifying gaps and including new measures in furtherance of the implementation of the UNGP-BHR; 3) provide information on how private actors might violate human rights, including directives on due diligence processes and prevention actions; 4) require accountability for human rights abuses by corporations and private business enterprises; 5) stipulate victim-centric legal and non-legal mechanisms for redress of business-related human rights violations; and 6) contain monitoring provisions to guarantee continuous compliance by business enterprises.

The Commission also recommends forming an interdepartmental and multi-stakeholder working group to design the initial NAP and thereafter conduct regular reviews and follow-ups.

### *b. Declare a Climate and Environmental Alert*

The government must recognize the need for urgent measures to address the impacts of climate change. There must be an acknowledgement that anthropogenic climate change, if left unmitigated, can and will lead to global extinction; that existing measures to combat its consequences must be improved; and that long-term measures for adaptation, mitigation, and resiliency must be translated to concrete actions.

The declaration must specify in no uncertain terms the need to address climate action as a national priority and require the (a) mainstreaming of climate science and climate response into national and local policies and legislation; (b) alignment of sectoral development priorities and socioeconomic development plans with climate targets; (c) mobilization and proper allocation of international and domestic financial resources; (d) involvement of the private sector in climate actions; and (e) the immediate and just transition to a low-carbon economy.

### *c. Revisit the NDC*

The NDC mentions GHG mitigation targets for the agriculture, wastes, industry, transport, and energy sectors but fails to mention the forestry sector–seemingly disregarding the importance of forest covers as effective carbon sinks, and the contribution of deforestation and change in land cover to the net release of $CO_2$ and rise in global temperatures.[610] The Commission recommends the revision of the NDC to include the forestry sector in GHG mitigation–not just adaptation targets.

The Commission also recommends including sectoral baseline data to serve as a basis for the evaluation of the effectiveness of climate policies and projects for each sector.

610 IPCC, 2019: *Climate Change and Land: An IPCC Special Report on Climate Change, Desertification, Land Degradation, Sustainable Land Management, Food Security, and Greenhouse Gas Fluxes in Terrestrial Ecosystems* [P.R. Shukla, J. Skea, E. Calvo Buendia, V. Masson-Delmotte, H.-O. Pörtner, D. C. Roberts, P. Zhai, R. Slade, S. Connors, R. van Diemen, M. Ferrat, E. Haughey, S. Luz, S. Neogi, M. Pathak, J. Petzold, J. Portugal Pereira, P. Vyas, E. Huntley, K. Kissick, M. Belkacemi, J. Malley, (eds.)]. In press.

Further, the Commission recommends the inclusion of concrete methodologies and investment plans to ensure implementation across all sectors, enhance access to climate finance, and to get policy support from other States.

Last, and perhaps most important, is the need to increase the 2.71 percent unconditional targets. The government must avoid reliance on external support offered by undetermined cooperation agreements as these are often dependent on the will of higher-income states. The Commission recommends that the Climate Change Commission revisit the targets set in the NDC to genuinely achieve the goals set in the Paris Agreement.

### *d. Implement Coal Moratoriums and Spearhead Transition to Renewable Energy and Cleaner Energy Sources*

In October 2020, the Department of Energy declared a moratorium on endorsements of greenfield coal power plants and emphasized the need to transition to a more flexible power supply mix that allows "the entry of new, cleaner, and indigenous technological innovations."[611] However, the coal moratorium does not cover projects previously approved by the Department, nor does the most recent draft Philippine Energy Plan (PEP) reflect this moratorium.

The Commission therefore recommends the formulation of a coal-exit policy to spur the transition of the country to cleaner energy sources.

Measures to create an electricity market favoring renewable energy must urgently be established. This can include: (a) tax breaks for 'green' investments and jobs; (b) actualization of the National Renewable Energy Program which provides the blueprint towards a triple renewable energy capacity by 2030; and (c) crafting of renewable market rules mandating renewable auctions for a more competitive electricity market. Policy measures, including subsidies for wind, solar, hydropower, and other renewable energy sources, must be

611 Press Release *by* Alfonso G. Cusi, Secretary, Department of Energy, *DOE Sec. Cusi Declares Moratorium on Endorsements for Greenfield Coal Power Plants* (Oct. 27, 2020), *available at* https://www.doe.gov.ph/press-releases/doe-sec-cusi-declares-moratorium-endorsements-greenfield-coal power-plants.

designed, together with measures to improve energy efficiency standards and regulations.

### *e. Transition to Low-Carbon Transportation Systems*

The Commission recommends adopting the Asian Development Bank (ADB) - Sustainable Transport Initiative "Avoid-Shift-Improve" approach to reduce GHG emissions from the transport sector.[612] This includes policies that will discourage unnecessary travel, create more energy efficient routes, modernize railways and the public transport system, and improve vehicle energy efficiency through better inspection and enforcement.

The Commission also recommends enacting laws establishing a policy and regulatory framework for electric vehicles (EV), including infrastructure development and fiscal and non-fiscal incentives for EV manufacturers and users. This must be accompanied by the phase-out of internal combustion engines (ICE) within a reasonable time, taking into consideration the human rights of workers that may be affected by the transition.

### *f. Implement 'Reducing Emissions from Deforestation and Forest Degradation Plus' (REDD+) Measures*

The UNFCC, understanding the critical role of forests in carbon sequestration and climate change mitigation, initiated the REDD+ framework to promote the role of conservation, sustainable forest management, and forest carbon stock enhancement. Likewise, the Philippines has a National REDD+ Strategy in place. However, as with many countries, its implementation is hampered by weak governance, lack of financial and technical support, and conflicting interests with local government development plans.

The Commission recommends the strict implementation of the Philippine National REDD+ Strategy, at both the national and local levels. Local sources

612 Asian Development Bank, Addressing Climate Change in Transport, *available at* https://www.adb.org/new/sectors/transport/issues#climate-change.

must supplement funding from external sources to ensure the continuity of projects. Further, it is necessary to create and strengthen mandatory reforestation programs. A logging ban in all-natural forests must also be imposed and strictly implemented. Lastly, land-use planning and management must be made more climate and human rights-sensitive.

#### *g. Implement Data Building and Reporting Mechanisms*

The Commission recommends the passage of a framework policy mandating sharing, reporting, and verification of climate data–bringing together the country's robust network of scientists, meteorologists, and researchers both in the government and private sector. A central database that will facilitate analysis, sharing, verification, and communication among the various stakeholders and duty-bearers will lead to effective adaptation and mitigation strategies including infrastructure development, coastal planning, climate risk reduction, and forest management. Reviews and evaluation of effectivity of climate actions must also be quantified by proper data.

### 2. Recommendations Particular to the Legislative Department

#### *a. Enact Laws Imposing Legal Liabilities for Corporate or Business-related Human Rights Abuses*

The Commission recommends enacting laws that mandate business compliance with the UNGP-BHR and other human rights treaties and instruments. Domestic laws must clearly set out jurisdiction over cases involving human rights abuses committed by non-state actors, provide sanctions for such abuses, and provide legally demandable reparations to the victims. This must necessarily include redress for transboundary harms felt by victims domiciled in the Philippines, regardless of juridical personality or local presence of erring corporation.

*b. Amend Climate Change Act, Disaster Risk Reduction and Management Act, and Other Related Regulations to Create a Singular Climate Code*

In order for the Government to have a unified, holistic, and complete approach to tackling climate change, the Commission recommends that the Philippine Climate Change Act, the Disaster Risk Reduction and Management Act, and all other related regulations the be merged into one complete instrument with the following additions:

1. A legally binding GHG emissions reduction target with reference to the NDCs;
2. A five-year carbon budget or statutory cap on GHG emissions to meet reductions target;
3. Incentive mechanisms to achieve reductions target including tax breaks and subsidies for transitioning to a zero-carbon economy;
4. Fossil fuel exploration and coal plant moratorium;
5. Carbon footprint due diligence and reporting requirements for all public and private enterprises;
6. Annual government review of emission reductions and energy supply decarbonization commitment compliance;
7. Strengthening of disaster risk and climate change mitigation efforts (as opposed to the current emphasis on post-disaster relief and short-term preparedness);
8. Provisions on post-disaster support for economic recovery;
9. Redress mechanisms for victims of climate impacts including compensation for all forms of harm including human rights harm;
10. Mandate corporate contribution to a climate fund which shall be apportioned equally to mitigation, adaptation, post-disaster recovery, and victim compensation;
11. Provide a percentage tax on carbon fuel profits after company taxes to fund climate education;
12. Penal provision for non-compliance with any provisions of the Code.

## 3. Recommendations Particular to the Judiciary

### *a. Design and Implement Rules of Evidence for Attributing Climate Change Impacts and Assessing Damages*

There is a distinction between the science of event attribution and the establishment of legal causation. Event attribution is not a direct reconstruction of how each carbon contribution of an individual caused damage through climate change. Instead, it seeks to establish: (a) whether the likelihood or strength of a natural event has changed in the observational record, and (b) whether this change is consistent with the anthropogenic influence as found in one or more climate models.

Assessment of the "Fraction of Attributable Risk"[613] is often misunderstood and misapplied in the context of legal causation where a clear unbroken chain of events leading up to the injury or damage is necessary to establish liability.

In many jurisdictions, courts evaluate evidence linking actors to climate-related losses using the stringent standards of legal causation. This disregards the work of climate and attribution science, and causes more climate injustice.

The Commission therefore recommends that the judiciary take notice of developments in the science of attribution when considering legal causality in assessing climate change impacts and damages.

### *b. Take Judicial Notice of the Anthropogenic Nature of Climate Change*

The scientific community has long reached a consensus that climate change is induced by human activity. In the Sixth Assessment Report (AR6), the IPCC stated that it is unequivocal that the climate change currently being experienced is anthropogenic in origin. As discussed in earlier chapters, it has been concluded that human activities have caused significant changes in the key global climate change indicators. In light of this uncontroverted evidence, courts should take judicial notice that climate change is unequivocally anthropogenic, as supported by incontrovertible data.

---

613 Kevin E. Trenberth, John T. Fasullo, & Theodore G. Shepherd, *Attribution of Climate Extreme Events*, 5 Nat. Clim. Chang. 725 (2015), *available at* https://doi.org/10.1038/nclimate2657.

REPUBLIC OF THE PHILIPPINES
COMMISSION ON HUMAN RIGHTS

# RESOLUTION
## CHR (V) No. POL2022-017

The Commission **RESOLVES** to **ADOPT** the attached National Inquiry on Climate Change Report, submitted by Commissioner Roberto Eugenio T. Cadiz.

**SO RESOLVED.**

Done this 4th day of May 2022 in Quezon City, Philippines.

**LEAH C. TANODRA-ARMAMENTO**
Chairperson

**KAREN S. GOMEZ-DUMPIT**
Commissioner

**GWENDOLYN LL. PIMENTEL-GANA**
Commissioner

**ROBERTO EUGENIO T. CADIZ**
Commissioner

ATTESTED BY:

**MARIA ASUNCION I. MARIANO-MARAVILLA**
Commission Secretary

Naglilingkod maging sino ka man

**Contact us:**

**SAAC Bldg., Commonwealth Ave.,**
**UP Complex, Diliman Quezon City**

**Public Assistance and Complaints Desk**
**(0936) 068 0982 (TM) | (0920) 506 1194 (Smart)**
**(02) 8294-8704**

**www.chr.gov.ph**
**chrgovph**

2022 | COVER DESIGN BY
STRATCOMM
DIVISION