IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IRISH MAE B. DE LOS SANTOS, REYNALDO C. INFIESTO, RICKEL S. INTING, JELSON C. SUMABAL, AND ADELISA C. SURIGAO,<br><br>*Applicants*,<br><br>For an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in a Foreign Proceeding | Misc. Case No. ____________________ |

**DECLARATION OF ROBERTO EUGENIO TEMPLO CADIZ**

## DECLARATION OF ROBERTO EUGENIO TEMPLO CADIZ

## IN SUPPORT OF AN APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

I, Roberto Eugenio Templo Cadiz, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge, information, and belief:

# I. INTRODUCTION AND SCOPE OF ENGAGEMENT

1. I am a member of the Philippine Bar with more than thirty-five years of legal practice. Throughout my professional career, I have specialized in litigation and in the development and application of legal and policy frameworks concerning constitutional law, human rights, environmental protection, climate governance, business and human rights, and corporate accountability.
2. I have been requested to provide my independent professional opinion regarding the relevance and materiality of documentary evidence concerning the climate-related activities, knowledge, communications, and conduct of Shell, by itself or in coordination or collaboration with the American Petroleum Institute ("API"), to civil proceedings pending before the courts of England and Wales.
3. Specifically, I have been asked to explain:

   a. the legal significance under Philippine law of the findings of the Commission on Human Rights of the Philippines' National Inquiry on Climate Change ("NICC");

   b. the principal causes of action arising under Philippine law that form the basis of the claims asserted by the claimants in the foreign proceedings;

   c. whether the categories of documentary evidence sought from API are relevant to those causes of action;

   d. whether such documentary evidence could be of use in assessing the causes of action, and, if so, the manner in which such documentary evidence could assist the foreign court in resolving factual and legal issues concerning corporate knowledge, conduct, foreseeability, causation, and responsibility.

4. The opinions expressed in this Declaration are based upon my education, professional experience, study and practice of Philippine law, my service as Commissioner of the Commission on Human Rights of the Philippines ("CHRP"), my leadership of the National Inquiry on Climate Change, my continuing work in the fields of climate governance and business and human rights, my review of the official records of the NICC, and my consideration of publicly-available materials relevant to the issues discussed herein.
5. Unless otherwise indicated, the opinions contained in this Declaration represent my independent professional judgment. They have not been dictated or influenced by any

party, counsel, or other person. My opinions are offered solely to assist the Court in understanding relevant aspects of Philippine law, the significance of the National Inquiry on Climate Change, and the potential relevance of the requested documentary evidence to the proceeding pending before the courts of England and Wales.

6. If called to testify, I could and would competently testify to the matters set forth in this Declaration. I reserve the right to supplement or amend my opinions, should additional information or documentary evidence become available.

## II. Qualifications and Professional Experience

7. I am a member of the Philippine Bar with more than thirty-five years of legal practice. Over the course of my career, I have practiced in the fields of constitutional law, civil law, criminal law, labor law, corporate law, human rights law, environmental law, and climate governance. My professional work has combined litigation, public service, legal scholarship, and policy development concerning the intersection of climate change, human rights, and corporate accountability.
8. From July 2015 until May 2022, I served as Commissioner of the Commission on Human Rights of the Philippines ("CHRP"), an independent constitutional institution established under Article XIII of the 1987 Philippine Constitution. The CHRP is mandated to investigate alleged human rights violations, monitor the Philippine State's compliance with its domestic and international human rights obligations, promote respect for human rights, and recommend legal, policy, and administrative measures for the protection of those rights.
9. During my tenure as Commissioner, I served as the Commission's focal Commissioner on environmental rights, climate change, business and human rights, sustainable development, international humanitarian law, crisis and conflict, and related policy matters. These responsibilities required me to examine the relationship between environmental degradation, corporate conduct, and the protection of internationally-recognized human rights.
10. My principal responsibility relevant to this Declaration was serving as Chairperson of the Commission's National Inquiry on Climate Change ("NICC"), the first inquiry conducted by any National Human Rights Institution to examine the human rights implications of climate change and the responsibility of major fossil fuel companies under domestic and international legal principles.
11. As Chairperson of the NICC, I planned and directed the Inquiry, supervised its evidentiary proceedings, presided over public hearings, participated in evaluating the legal and factual issues presented, and substantially drafted its Final Report. My responsibilities required me to assess complex questions involving Philippine civil law, constitutional law, international human rights law, climate science, environmental governance, business and human rights, corporate accountability, and transboundary environmental harm.
12. In the course of the Inquiry, I examined extensive documentary evidence, expert testimony, scientific literature, legal authorities, and corporate records relating to the historical development of climate science, the knowledge of major fossil fuel companies, including Shell, concerning climate-related risks, corporate communications, climate-risk disclosure, public messaging, lobbying activities, and the role of industry associations,

including the American Petroleum Institute ("API"), as an information-sharing and coordinating entity by the Carbon Majors. This experience afforded me an extensive understanding of the evidentiary significance of corporate documents bearing upon knowledge, intent, foreseeability, causation, and responsibility.

13. Prior to my appointment to the CHRP, my legal practice focused principally on litigation, constitutional law, civil law, criminal law, labor law, and corporate law. My work at the Commission substantially expanded my expertise to include international human rights law, environmental law, climate governance, and the application of the United Nations Guiding Principles on Business and Human Rights to climate-related corporate conduct.
14. Following the completion of my constitutional term in 2022, I founded the Climate Action and Human Rights Institute ("CAHRI"), an independent non-profit organization devoted to research, policy development, capacity building, and advocacy concerning climate change, environmental justice, and human rights. I continue to serve as its President.
15. I also serve as a member of the Board of Advisors of the Climate Research Forum, a London-based organization dedicated to interdisciplinary research concerning climate change, governance, and public policy.
16. Since leaving public office, I have continued to advise governmental institutions, the Philippine legislature, national human rights institutions, international organizations, and civil society organizations on matters relating to climate accountability, business and human rights, environmental governance, access to environmental justice, and corporate responsibility. Among other engagements, I have advised a committee of the Philippine Congress on proposed climate legislation and have drafted, as an expert consultant of a global human rights institute, a *Strategy Paper* for the implementation of the Access to Justice dimension of the ASEAN Declaration on the Right to a Safe, Clean, Healthy, and Sustainable Environment.
17. I have participated as an invited expert, resource person, or panelist at conferences and professional forums organized by, among others, the Office of the United Nations High Commissioner for Human Rights (OHCHR), the United Nations Development Programme (UNDP), the United Nations Environment Programme (UNEP), and other international institutions. I have also delivered talks and participated in academic programs hosted by institutions, including the London School of Economics, Yale University, Columbia University, and Nyenrode Business University, and have spoken at a conference of the International Bar Association on climate change, human rights, and environmental governance.

## III. The National Inquiry on Climate Change

18. The National Inquiry on Climate Change ("NICC") was an independent, evidence-based inquiry undertaken by the Commission on Human Rights of the Philippines ("CHRP") between 2015 and 2022. It was the first inquiry conducted by a National Human Rights Institution ("NHRI") to examine the relationship between climate change and the enjoyment of internationally recognized human rights, as well as the responsibilities of business enterprises under international human rights standards in relation to climate-related harms.

19. The NICC was initiated in response to a petition filed by Filipino survivors of Super Typhoon Yolanda (international name: Haiyan), together with civil society organizations. The petition alleged that anthropogenic climate change was causing or contributing to serious human rights harms suffered by communities in the Philippines and requested that the CHRP investigate whether major fossil fuel companies ("Carbon Majors") could bear responsibility, under Philippine law and applicable legal principles, for conduct contributing to those harms.
20. The petition raised issues of exceptional public importance at the intersection of climate science, human rights, environmental law, corporate accountability, and transboundary harm. It required the Commission to consider complex questions concerning the respective obligations of States, the independent responsibility of business enterprises to respect human rights, and the legal significance of scientific and historical evidence concerning climate change.
21. Acting within its constitutional mandate, the CHRP commenced a comprehensive inquiry to examine these issues. The objective of the Inquiry was not to adjudicate civil liability or award damages, but rather to determine, on the basis of an extensive evidentiary record, whether climate change implicated the protection of human rights and whether the conduct of major fossil fuel companies could give rise to legal, policy, or other forms of accountability under Philippine law and applicable international human rights standards.
22. I served as Chairperson of the Inquiry throughout its proceedings. In that capacity, I directed the planning and conduct of the Inquiry, supervised its evidentiary process, presided over public hearings, evaluated documentary and testimonial evidence, and prepared the Commission's Final Report.
23. The Inquiry was multidisciplinary in both its scope and methodology. Over the course of nearly seven years, it received documentary evidence, expert reports, written submissions, sworn testimonies, and amicus curiae briefs from climate scientists, economists, public health experts, environmental specialists, governance experts, legal scholars, representatives of governmental and intergovernmental organizations, civil society organizations, Indigenous Peoples, affected communities, and other stakeholders from multiple jurisdictions.
24. The Commission conducted twelve public hearings, including hearings held in Manila, New York, and London. These proceedings enabled the Commission to receive evidence from internationally-recognized experts and to examine issues extending beyond the territorial boundaries of the Philippines, reflecting the inherently transboundary nature of climate change and its consequences.
25. The Inquiry also received testimony from Filipino communities affected by extreme weather events, including survivors of Super Typhoon Yolanda. Witnesses described the human consequences of climate change, including loss of life, displacement, destruction of homes, loss of livelihoods, damage to cultural heritage, and enduring social and economic impacts. Their testimony provided important factual context concerning the human rights dimensions of climate-related harm.
26. The respondents involved forty-seven Carbon Majors, including Shell, representing a substantial proportion of historical industrial greenhouse gas emissions. These respondents included multinational energy companies that were members of, or closely associated with, the American Petroleum Institute ("API"), whose role as a leading trade

association for the petroleum industry formed an important aspect of the evidentiary record considered during the Inquiry.

27. Among the principal categories of evidence examined by the Inquiry were scientific studies concerning climate change; historical materials relating to the development of climate science; corporate publications; climate-risk disclosures; public communications; lobbying activities; industry reports; and documentary materials concerning the knowledge, communications, and conduct of major fossil fuel companies and industry associations. Particular attention was given to evidence bearing upon what corporate actors knew concerning climate-related risks, when they acquired that knowledge, how such knowledge was communicated internally and externally, and whether their conduct may have influenced public understanding or governmental responses to climate change.
28. Because the Inquiry examined many of the same categories of documentary evidence that are the subject of the present application, my experience directing the NICC has provided me with a detailed understanding of the evidentiary significance of internal corporate records relating to climate science, climate-risk assessments, public communications, industry coordination, and corporate decision-making. It is this experience, together with my knowledge of Philippine law and climate governance, that forms the principal basis for the opinions expressed in this Declaration.

## IV. Principal Findings of the National Inquiry on Climate Change

29. Upon completion of its evidentiary proceedings, the Commission on Human Rights of the Philippines issued the Final Report of the National Inquiry on Climate Change ("NICC") in May 2022. The Report synthesized the extensive factual record developed during the Inquiry and set forth the Commission's findings concerning the relationship between climate change, human rights, and corporate conduct.
30. The NICC concluded that climate change is not solely an environmental concern but constitutes a profound human rights issue. The Commission found that climate change adversely affects the enjoyment of numerous internationally-recognized human rights, including the rights to life, health, food, water, housing, self-determination, development, and a safe, clean, healthy, and sustainable environment. It further found that these impacts fall disproportionately upon vulnerable and marginalized populations, including coastal communities, Indigenous Peoples, women, children, older persons, and those living in poverty.
31. The Commission further found that the scientific evidence overwhelmingly establishes that anthropogenic greenhouse gas emissions are the principal drivers of contemporary climate change. It concluded that the increasing frequency, intensity, and severity of extreme weather events have resulted in substantial human rights impacts, including those experienced by communities throughout the Philippines.
32. Based upon the scientific, historical, and documentary evidence presented during the Inquiry, the Commission found that major fossil fuel producers ("Carbon Majors"), including Shell, have made significant historical contributions to cumulative greenhouse gas emissions and that modern attribution science permits the identification of substantial contributions by particular corporate actors.
33. The Commission also found that extensive evidence indicated that certain Carbon Majors, including Shell, possessed early knowledge of the relationship between fossil

fuel combustion and climate change. The Inquiry considered evidence suggesting that some companies, acting individually and, in certain instances, collectively through trade associations and other organizations, participated in public communications, lobbying activities, and other efforts that obscured or undermined public understanding of climate science or delayed effective regulatory and policy responses to climate change.

34. The NICC concluded that business enterprises have an independent responsibility to respect human rights under the United Nations Guiding Principles on Business and Human Rights ("UNGPs"), irrespective of the separate legal obligations of States. In the context of climate change, this responsibility includes conducting appropriate human rights due diligence, identifying and addressing climate-related risks, providing accurate and transparent disclosures, avoiding conduct that contributes to human rights harms, and cooperating in appropriate remedial processes where adverse impacts occur.
35. The Commission further concluded that scientific knowledge concerning climate-related risks carries corresponding responsibilities of honesty, transparency, and good faith in corporate communications affecting public understanding of those risks. The Report observed that, where evidence establishes the deliberate suppression, distortion, or misrepresentation of material scientific information concerning foreseeable climate-related harms, such conduct may have legal significance under applicable domestic law and under evolving international standards governing business and human rights.
36. In addressing Philippine law, the NICC analyzed the Civil Code provisions governing abuse of rights, fault, bad faith, negligence, and quasi-delict, together with relevant constitutional principles and Supreme Court jurisprudence. The Commission concluded that Philippine law provides legal doctrines capable of addressing conduct involving the knowing concealment, or misrepresentation of information where such conduct contributes to foreseeable injury. The Report emphasized, however, that the existence and extent of liability in any individual case must ultimately be determined by courts of competent jurisdiction upon the evidence presented before them.
37. The Commission also recognized that climate change presents inherently transboundary legal questions requiring cooperation among States, judicial institutions, and other actors. It observed that meaningful accountability frequently depends upon access to documentary evidence located outside the jurisdiction in which climate-related harms are suffered.
38. In my opinion, the NICC Final Report represents the most comprehensive examination undertaken in the Philippines concerning the intersection of climate science, human rights, corporate conduct, and civil liability. Its principal significance lies not only in its legal analysis but also in its careful evaluation of an extensive evidentiary record compiled over nearly seven years. That experience informs my assessment of the categories of documentary evidence sought in the present application and their potential relevance to the proceeding before the courts of England and Wales.

## V. Philippine Law Applicable to the Foreign Proceedings

39. I understand that the claims asserted in the proceedings pending before the courts of England and Wales are governed principally by Philippine substantive law. Although climate change provides the factual context of the proceedings, the legal causes of action

arise primarily under established principles of Philippine civil law governing fault, abuse of rights, bad faith, negligence, and extra-contractual liability.

40. The principal legal framework relevant to the claims consists of Articles 19, 20, 21, and 2176 of the Civil Code of the Philippines, read together with applicable constitutional principles, relevant environmental legislation, and jurisprudence of the Supreme Court of the Philippines.
41. Article 19 embodies what Philippine jurisprudence commonly refers to as the **doctrine of abuse of rights**. It requires every person, in the exercise of rights and the performance of duties, to act with justice, give everyone his due, and observe honesty and good faith. Although Article 19 does not itself create an independent cause of action, it establishes a governing standard of lawful conduct. When that standard is violated, Articles 20 and 21 provide corresponding remedies where the elements prescribed by law are satisfied.
42. Article 20 provides that any person who, contrary to law, willfully or negligently causes damage to another shall indemnify the injured party. Liability under Article 20 generally requires proof of a violation of a legal duty imposed by statute or other positive law, together with resulting injury and the requisite causal connection.
43. Article 21 serves a complementary function. It provides a remedy where a person willfully causes injury in a manner contrary to morals, good customs, or public policy, even where no specific statutory prohibition has been violated. Philippine courts have consistently recognized Article 21 as an equitable provision intended to address serious forms of misconduct involving fraud, deception, abuse of rights, bad faith, or other socially injurious conduct not otherwise remedied by more specific provisions of law.
44. In my opinion, allegations that a corporation knowingly concealed, distorted, or misrepresented material information concerning foreseeable climate-related risks, thereby delaying informed decision-making, regulatory action, or public understanding and contributing to increased harm suffered by vulnerable populations, are capable—depending upon the evidence ultimately presented—of falling within the legal principles embodied in Articles 19, 20, and 21 of the Civil Code.
45. The claims may also implicate Article 2176 of the Civil Code, which establishes the Philippine law governing quasi-delicts. Article 2176 imposes liability upon any person who, through fault or negligence, causes damage to another independently of contractual obligations. The essential elements include the existence of a duty recognized by law, a negligent or otherwise wrongful breach of that duty, resulting damage, and a legally-sufficient causal relationship between the conduct complained of and the injury sustained.
46. Whether the evidence ultimately establishes these elements is, of course, a matter for determination by the trial court. My opinion is limited to explaining that Philippine law recognizes causes of action capable of addressing wrongful conduct involving corporate negligence, misleading representations, concealment of material information, or other conduct alleged to have contributed to foreseeable injury.
47. These provisions of the Civil Code do not operate in isolation. Their interpretation is informed by the 1987 Philippine Constitution, including constitutional protections afforded to life, human dignity, health, and the right of the people to a balanced and healthful ecology, as recognized by the Supreme Court of the Philippines. They are likewise informed by environmental legislation, consumer protection laws, corporate governance principles, and the broader body of Philippine jurisprudence addressing fault, negligence, abuse of rights, and public policy.

48. Philippine courts have long recognized that the Civil Code is intended to evolve with changing social conditions and to provide remedies for new forms of wrongful conduct that may not have been specifically contemplated when the Code was enacted. The broad language employed in Articles 19, 20, 21, and 2176 reflects the legislative intention that those provisions remain capable of addressing novel factual circumstances through the application of established legal principles.
49. In my opinion, the legal theories advanced in the proceedings before the courts of England and Wales are consistent with this framework. The claimants do not seek recognition of a novel cause of action unique to climate change. Rather, they invoke long-established principles of Philippine civil liability and contend that those principles apply to corporate conduct allegedly involving knowledge of foreseeable climate-related risks, misleading communications, failure to act in good faith, negligence, and resulting harm.
50. Consequently, documentary evidence bearing upon what corporate actors knew, when they acquired that knowledge, how they communicated internally and externally concerning climate-related risks, whether they acted transparently and in good faith, and whether they coordinated their conduct through industry organizations may be directly relevant to material issues arising under Philippine law, including foreseeability, breach of duty, causation, fault, and the availability of civil remedies.

## VI. The Legal Significance of the National Inquiry on Climate Change Under Philippine Law

51. Having described the legal framework governing the claims asserted in the proceedings before the courts of England and Wales, I next explain the legal significance of the National Inquiry on Climate Change ("NICC") within the Philippine constitutional system and the reasons why its analysis is relevant to the issues addressed in this Declaration.
52. The Commission on Human Rights of the Philippines ("CHRP") is an independent constitutional commission established under Article XIII of the 1987 Philippine Constitution. Unlike administrative agencies created by statute, the CHRP derives its authority directly from the Constitution. It is entrusted with the promotion and protection of human rights, the investigation of alleged human rights violations, the monitoring of the Philippines' compliance with its domestic and international human rights obligations, and the formulation of recommendations concerning legal, administrative, and policy measures designed to strengthen human rights protection.
53. In carrying out its constitutional mandate, the CHRP necessarily examines and interprets constitutional provisions, statutes, jurisprudence, international human rights law, and other relevant legal authorities. Although those interpretations do not bind courts in the manner of judicial precedent, they constitute the considered views of the constitutional institution specifically entrusted with addressing human rights questions within the Philippine legal system.
54. The NICC was conducted pursuant to that constitutional mandate. It was neither a political initiative nor an advocacy exercise. Rather, it was an extensive quasi-investigative proceeding undertaken over nearly seven years through public hearings, documentary submissions, sworn testimonies, expert reports, amicus curiae briefs, and

written observations from a broad range of participants, including governmental bodies, intergovernmental organizations, scientific experts, legal scholars, representatives of civil society, and affected communities.

55. The purpose of the Inquiry was not to adjudicate civil liability, impose sanctions, or award damages. Those functions belong exclusively to courts and other bodies possessing adjudicatory jurisdiction. Instead, the Commission sought to determine, on the basis of an extensive evidentiary record, whether climate change implicated the protection of human rights and whether existing provisions and principles of Philippine law and international human rights law were capable of addressing the conduct alleged in the petition.
56. Accordingly, the NICC Final Report should not be understood as a judicial judgment or as binding precedent under Philippine law. Under the Philippine constitutional system, only the Supreme Court of the Philippines may render authoritative interpretations of law that bind all lower courts. Neither does the CHRP possess the authority to determine the civil liability of private parties, nor the power to award damages.
57. The absence of binding judicial effect does not diminish the significance of the NICC. Within the Philippine constitutional framework, constitutional commissions frequently perform functions that inform the development of law and public policy without exercising judicial power. The CHRP's findings and recommendations therefore occupy an important place within Philippine legal discourse, particularly where they synthesize constitutional principles, statutory provisions, jurisprudence, international law, scientific evidence, and complex factual records concerning matters falling squarely within the Commission's constitutional competence.
58. In my opinion, the NICC represents the most comprehensive examination yet undertaken in the Philippines concerning the intersection of climate change, corporate conduct, human rights, and civil liability. Its significance derives not merely from the conclusions ultimately reached, but from the breadth of the evidentiary record assembled, the multidisciplinary nature of the Inquiry, and the rigorous legal and factual analysis reflected in the Final Report.
59. For those reasons, I would expect Philippine courts to regard the NICC as a persuasive, though not binding, authority when considering legal issues concerning climate change, human rights, and corporate accountability. Courts remain entirely free to accept, distinguish, or reject particular aspects of the Report's analysis. Nevertheless, the Report provides a carefully reasoned synthesis of relevant constitutional principles, Philippine legislation, Supreme Court jurisprudence, international human rights law, comparative legal authorities, and climate science that may assist courts confronted with these novel and complex questions.
60. The significance of the NICC is particularly apparent in proceedings, such as those presently pending before the courts of England and Wales, in which Philippine substantive law governs claims arising from alleged climate-related harms. In such proceedings, the NICC provides an authoritative description of the legal framework within which Philippine courts would analyze issues concerning abuse of rights, negligence, bad faith, quasi-delict, business and human rights, and the evidentiary relevance of corporate knowledge and conduct.
61. It is in this context that I express the opinions contained in this Declaration. My reliance upon the NICC is not based solely upon my role as its Chairperson, but upon my familiarity with the evidentiary record developed during the Inquiry, the legal authorities

considered by the Commission, and my continuing work in the fields of Philippine law, climate governance, environmental justice, and business and human rights. My opinions therefore reflect both my personal expertise and my understanding of one of the most extensive examinations of climate-related corporate accountability yet undertaken within the Philippine legal system.

## VII. Relevance of the Requested API Documents to the Foreign Proceedings

62. I understand that the proceedings pending before the courts of England and Wales are brought against Shell and not against the American Petroleum Institute ("API"). I further understand that claimants allege that Shell, in its capacity as a member of API and in conjunction with API, engaged in activities intended to influence public and governmental responses to climate change and to delay the global energy transition away from reliance on fossil fuels. I have reviewed the categories of documents sought from API in connection with the said proceedings. Based upon my understanding of the issues raised therein, my knowledge and experience in the application of Philippine law, and my experience as Chairperson of the National Inquiry on Climate Change ("NICC"), it is my opinion that the requested API materials are capable of providing highly relevant and probative evidence concerning issues material to the claims asserted against Shell.
63. In particular, such materials may bear upon Shell's knowledge of climate-related risks, the timing and dissemination of that knowledge, its communications and activities undertaken through or in coordination with API, the nature and purpose of any such coordinated activities, and the extent to which those matters may be relevant under Philippine law to questions of foreseeability, good faith, negligence, fault, causation, and corporate responsibility. My opinion does not assume that the allegations concerning Shell are established; rather, it is directed to the evidentiary capacity of the requested materials to assist the foreign court in determining those disputed issues.
64. The requested documents include categories of materials relating to Shell's and API's historical knowledge of climate science, internal scientific assessments, communications among member companies, public statements, climate-risk assessments, funding of research or advocacy organizations, and other records concerning the petroleum industry's collective understanding of, and response to, climate change.
65. Materials reflecting communications among API and its member-companies, including Shell, may further assist the court in determining whether decisions were made independently or through coordinated industry action. Depending upon their contents, such documents may assist in evaluating allegations concerning collective conduct, shared knowledge, common strategies, or coordinated responses to emerging scientific information. Whether those facts are ultimately established remains a matter for the trial court.
66. Documents concerning climate-risk assessments, internal governance processes, board-level deliberations, or corporate decision-making may also assist the court in evaluating whether reasonable measures were taken to identify, assess, and address known climate-related risks. Such evidence may bear upon questions of negligence, reasonable care, and compliance with evolving standards of corporate governance and business responsibility.
67. The requested materials may likewise assist the foreign court in evaluating issues of causation. Under Philippine law, causation ordinarily involves determining whether the

conduct alleged substantially contributed to the injury claimed. Documentary evidence demonstrating the timing and nature of corporate knowledge, decisions, communications, or coordinated activities may assist the court in determining whether such conduct materially contributed to delayed public understanding, regulatory responses, or other circumstances alleged to have increased the risk or severity of climate-related harms.

68. In addition, the requested documents may assist in evaluating the credibility of other evidence presented during the proceedings. Internal records may corroborate, qualify, or contradict public statements, expert testimony, historical accounts, or other documentary materials already available to the parties. From an evidentiary perspective, contemporaneous internal documents often provide particularly significant insight into what was known, believed, discussed, and decided at relevant points in time.
69. My experience during the NICC demonstrated both the importance of such documentary evidence and the limitations imposed by the absence of compulsory access to certain categories of internal corporate records maintained outside the jurisdiction of the Philippines. Although the Commission considered a substantial body of publicly-available evidence, internal documents held by organizations such as API were beyond the Commission's compulsory investigative powers. The production of such materials therefore has the potential to supplement and materially expand the evidentiary record concerning matters considered during the Inquiry.
70. I express no opinion as to whether any particular document will ultimately establish liability or otherwise determine the outcome of the proceedings before the courts of England and Wales. Those determinations remain exclusively within the province of the trial court after considering all of the evidence presented by the parties.
71. It is, however, my professional opinion that the categories of documents sought from API are reasonably capable of providing relevant and material evidence concerning corporate knowledge, foreseeability, transparency, good faith, negligence, coordinated conduct, causation, and other issues arising under the Philippine legal principles governing the claims asserted in the foreign proceedings. Access to such evidence would therefore materially assist the court in resolving disputed factual issues central to the litigation.

## VIII. Summary of Opinions

72. Based upon my education, professional experience, review of the relevant materials, leadership of the National Inquiry on Climate Change ("NICC"), continuing work in climate governance and business and human rights, and familiarity with Philippine law, I offer the following opinions to a reasonable degree of professional certainty:
73. First, the National Inquiry on Climate Change represents the most comprehensive examination undertaken in the Philippines concerning the relationship between climate change, human rights, corporate conduct, and civil accountability. Although the NICC Final Report is not a judicial decision and does not bind Philippine courts, it constitutes a significant and persuasive analysis of the legal and factual issues arising at the intersection of climate science, human rights, and Philippine law.
74. Second, the claims asserted by the claimants in the proceedings pending before the courts of England and Wales are capable of being analyzed under established principles of Philippine civil law, including Articles 19, 20, 21, and 2176 of the Civil Code of the Philippines, together with relevant constitutional principles, environmental legislation,

and jurisprudence of the Supreme Court of the Philippines. Those legal principles are sufficiently broad to address allegations involving abuse of rights, bad faith, negligence, misleading conduct, concealment of material information, and other conduct alleged to have contributed to foreseeable injury.

75. Third, documentary evidence concerning the historical knowledge, scientific assessments, internal communications, public statements, governance processes, and coordinated conduct of the American Petroleum Institute ("API") and, where relevant, its member companies, is capable of providing material evidence concerning issues that arise under Philippine law, including foreseeability, knowledge, intent, honesty and good faith, negligence, causation, and the assessment of corporate conduct.
76. Fourth, internal documentary evidence maintained by API may substantially supplement the evidentiary record considered during the NICC by providing contemporaneous records concerning matters that could not be fully explored through publicly-available materials alone. Such documents therefore have the potential to assist the foreign court in evaluating disputed factual issues central to the proceedings before it.
77. Fifth, in my professional opinion, the categories of documents sought from API are reasonably capable of assisting the courts of England and Wales in applying Philippine law to the facts established by the evidence. Whether any individual document ultimately supports or undermines the parties' respective positions remains a matter for determination by the trial court upon consideration of the complete evidentiary record.
78. I express no opinion concerning the ultimate merits of the claims asserted in the foreign proceedings, the credibility of any particular witness, or the weight that should ultimately be accorded to any specific item of evidence. Those determinations fall exclusively within the province of the court before which the proceedings are pending.

## IX. Declaration Under Penalty of Perjury

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this day of 23 September 2026, in Quezon City, Metro Manila, Philippines.

**ROBERTO EUGENIO TEMPLO CADIZ**